**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR
CASH MANAGEMENT SYSTEM AND MAINTAIN EXISTING BANK
ACCOUNTS, (B) MAINTAIN EXISTING BUSINESS FORMS AND (C) PERFORM
<u>INTERCOMPANY TRANSACTIONS; AND (II) GRANTING RELATED RELIEF</u>**

---

**Emergency relief has been requested. Relief is requested not later than 1:30 p.m. (prevailing Central Time) on March 25, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on March 25, 2024 at 1:30 p.m. (prevailing Central Time) in Courtroom 404, 4th Floor, 515 Rusk Street, Houston, TX 77002. Participation at the hearing will only be permitted by audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state

the following in support of this emergency motion (the "<u>Motion</u>"):

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

## Relief Requested

1.      By this Motion, the Debtors seek entry of interim and final orders, substantially in the forms attached hereto (respectively, the "Interim Order" and the "Final Order"):  (i) authorizing the Debtors to continue to (a) operate their Cash Management System (as defined below) and maintain their existing Bank Accounts (as defined below), including honoring certain prepetition obligations related thereto, (b) maintain existing Business Forms (as defined below) and (c) perform Intercompany Transactions (as defined below); and (ii) granting related relief. Additionally, the Debtors request that the Court schedule a final hearing 21 days after the commencement of these Chapter 11 Cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are Bankruptcy Code sections 345, 363, 503 and 507, Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas.

## Background

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their

businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

6.      The Debtors and their non-Debtor affiliates (collectively, the "Company") provide consumer credit lending services across the U.S. and Canada. In the U.S., the Company operates under several principal brands, including "Heights Finance," "Southern Finance," "Covington Credit," "Quick Credit," and "First Heritage Credit." In Canada, the Company operates under the "Cash Money" and "LendDirect" brands. As of the Petition Date, the Company operated approximately 400 store locations across 13 U.S. states and approximately 150 stores in eight Canadian provinces and had an online presence in eight Canadian provinces and one territory. The Company generated approximately $672 million in total revenue for the fiscal year 2023, and, as of the Petition Date, the Company had approximately $2.1 billion in aggregate principal amount of prepetition funded debt obligations.

7.      A description of the Debtors and their businesses, and the facts and circumstances supporting this Motion, are set forth in the *Declaration of Douglas Clark in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

## The Cash Management System

8.      To facilitate the efficient operation of their businesses, the Debtors and their non-debtor affiliates maintain an integrated, centralized cash management system (the "Cash Management System") to collect, transfer, and disburse funds generated by their operations, as

illustrated and summarized on **Exhibit 1** attached to the Interim Order and Final Order.  The Cash Management System facilitates cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of approximately 249 bank accounts (each a "Bank Account" and, collectively, the "Bank Accounts") maintained with multiple banks (collectively, the "Cash Management Banks"), as listed on **Exhibit 2** attached to the Interim Order and Final Order and as described below.  In addition, nine bank accounts are maintained by or on behalf of the Non-Debtor SPVs[2] in connection with the Securitization Program (as defined below), each of which is also listed on **Exhibit 2**.

9.      The Cash Management System is similar to systems commonly employed by businesses comparable in size and scale to the Company.  The Debtors' treasury department maintains daily oversight over the Cash Management System and utilizes cash management controls for entering, processing and releasing funds, including in connection with Intercompany Transactions (as defined below).  The Debtors' treasury and accounting departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly and for cash forecasting purposes.  The Cash Management System is vital to the Company's ability to conduct its operations.  Any disruption of the Cash Management System would be extremely detrimental to the Debtors' operations, as their businesses require prompt access to cash and accurate cash tracking.

---

[2]     The following special purpose vehicle entities are non-debtor affiliates of the Debtors that are parties to the Securitization Program (as defined below): (i) First Heritage Financing I LLC, (ii) Heights Financing I LLC, (iii) Heights Financing II LLC, (iv) CURO Canada Receivables Limited Partnership, (v) CURO Canada Receivables GP, Inc., (vi) CURO Canada Receivables II Limited Partnership, and (vii) CURO Canada Receivables II GP Inc. (the special purpose vehicle entities, collectively, the "Non-Debtor SPVs").

## I.      The Bank Accounts and Flow of Funds.

10.     The Cash Management System is tailored specifically to meet the Company's operating needs—enabling the Debtors to effectively and centrally control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and facilitate the tracing of accurate account balances.  These controls are critical given the significant volume of cash transactions managed through the Cash Management System each day.

11.     The Debtors' Cash Management System is generally organized around the following categories, each representing a major segment of the Company's operations in the U.S. and Canada, as illustrated on **Exhibit 1**: (i) operating accounts out of which the Company issues and funds loans to its customer-borrowers (the "Branch Operations Accounts"); (ii) collection accounts in which the Debtors collect loan repayments from customer-borrowers for themselves and on behalf of the Non-Debtor SPVs (the "Customer Payment Collection Accounts"); (iii) accounts that are used to facilitate the Securitization Program[3] (the "SPV Funding Accounts" and together with the Customer Payment Collection Accounts, the "Securitization Program Accounts") and in which accounts the applicable collateral agent, on behalf of the Non-Debtor SPVs, holds funds for the benefit of the lenders and other secured parties under the Securitization Program; (iv) accounts through which the Debtors facilitate their corporate operational expenses, such as their payroll, accounts payable to vendors, and healthcare and other benefits (the

---

[3]     As further discussed in the First Day Declaration, as of the Petition Date, the Debtors are party to certain loan receivables securitization programs (collectively, the "Securitization Program"), whereby receivables from loans made by the Debtors to customer-borrowers are sold for cash consideration to the Non-Debtor SPVs. Concurrently with this Motion, the Debtors are seeking entry of an order pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling, Contributing and Servicing Receivables and Related Rights Pursuant to the Securitization Program, (II) Modifying The Automatic Stay, (III) Scheduling A Final Hearing, and (IV) Granting Related Relief* (the "Securitization Program Motion") to continue their Securitization Program on a postpetition basis.

"Corporate Operations Accounts"); (v) standalone accounts that have been funded on a one-off basis to satisfy various contractual obligations of the Debtors (the "Standalone Accounts") and (vi) certain dormant and/or legacy accounts that are currently non-operational—many of which are currently pending closure (the "Non-Operational Accounts").[4]

12.    As of the Petition Date, the Debtors have approximately $35 million in cash on hand.  The Bank Accounts (other than the Non-Operational Accounts) are described further in the following table:[5]

| Bank Account(s) | Account Description |
|---|---|
| *Curo Management LLC (US) – Corporate Operations Accounts* | |
| **Main Operating Account**<br><br>*Wells Fargo Account ending in 6540* | The Debtors maintain their primary operating account with Wells Fargo (the "Main Operating Account"), which serves as the Debtors' centralized operating account for the Cash Management System.  Funds are swept periodically into the Main Operating Account from various Debtor and non-debtor Bank Accounts through Intercompany Transactions, as described further below. The Main Operating Account also receives other miscellaneous deposits.<br><br>The Main Operating Account funds the Payroll Account (as defined below), Accounts Payable Account (as defined below), Curo Customer Refunds Account (as defined below), Ad Astra Expense Account (as defined below), Customer Referrals Account (as defined below), Curo HCA Account (as defined below), Heights Branch Checks Account (as defined below), First Heritage Account (as defined below), Heights Automated Clearing House (ACH) Funding Account (as defined below), First Heritage ACH Funding Account (as defined below), and Title Fees Account (as defined below) through a zero balance account hierarchy. On an as-needed basis, Curo Management LLC transfers funds to Curo Canada Corp.'s Canada Main Operating Account (as defined below) from the Main Operating Account. Historically, prepetition borrowings under the Securitization Program were funded into the Main Operating Account, and certain interest and principal repayments of the Company's funded debt were made out of this account. |
| **Payroll Account**<br><br>*Wells Fargo Account ending in 6494* | The Debtors maintain a Bank Account with Wells Fargo to administer certain payroll-related obligations (the "Payroll Account"). The Debtors fund the Payroll Account with cash from the Main Operating Account.  The Payroll Account is a zero-balance account. The payroll wire is completed biweekly via reverse wire debit from ADP, the payroll processor. |

---

[4]    A schedule of Non-Operational Accounts is also attached as **Exhibit 3** to each of the Interim Order and Final Order.

[5]    The Company also maintains an account at Wells Fargo (ending in 9522) in the name of its political action committee Curo Financial Technologies Corp. PAC, which for the avoidance of doubt is not a business entity and not a Debtor in these Chapter 11 Cases.

| Bank Account(s) | Account Description |
|---|---|
| **Curo Customer Refunds Account**<br><br>*Wells Fargo Account ending in 8459* | The Debtors maintain a Bank Account with Wells Fargo to administer legacy Speedy Cash customer check refunds (the "Curo Customer Refunds Account"). This account is no longer in use; however, it remains open to process legacy customer check refunds that are currently held in escheatment with their respective states. |
| **Ad Astra Expense Account**<br><br>*Wells Fargo Account ending in 8097* | The Debtors maintain a Bank Account with Wells Fargo to administer legacy Ad Astra expense checks (the "Ad Astra Expense Account"). The account is no longer in use; however, it remains open to process legacy Ad Astra check expenses. |
| **Accounts Payable Account**<br><br>*Wells Fargo Account ending in 0363* | The Debtors maintain a Bank Account with Wells Fargo to administer certain vendor obligations (the "Accounts Payable Account"). The Debtors fund the Accounts Payable Account with cash from the Main Operating Account. The Accounts Payable Account is a zero-balance Account. The account is debited daily for all Accounts Payable items processed by the third-party payment InvoicePay via ACH or check. |
| **Curo HCA Account**<br><br>*Wells Fargo Account ending in 6275* | The Debtors maintain a Bank Account with Wells Fargo to administer certain healthcare benefits (the "Curo HCA Account"). The Debtors fund the Curo HCA Account with cash from the Main Operating Account.  The Curo HCA Account is a zero-balance Account. The account debits for health care and benefits are completed via ACH debit by United Healthcare (UMR), Optum, WEX Health Inc, AEGON USA, Navia Benefit and other healthcare and benefits vendors. |
| **Heights Legacy Operating Account**<br><br>*Wells Fargo Account ending in 5680* | The Debtors maintain a legacy operating account for Heights Finance. This account is pending closure after the Heights credit card program monthly fees are moved to the Heights Accounts Payable Account, and the Customer Referrals Account has its zero-balance account hierachy changed to roll up to the Main Operating Account. |
| **Proffesional Fees Escrow Account**<br><br>*Wells Fargo Account ending in 1317* | The Debtors maintain a Bank Account with Wells Fargo to administer their professional fees payment obligations under the Plan (the "Professional Fees Escrow Account"). The Debtors will fund the Professional Fees Escrow Account with cash from the Main Operating Account. |
| **Utilities Adequate Assurance Deposit Account**<br><br>*Wells Fargo Account ending in 1309* | The Debtors maintain a Bank Account with Wells Fargo to administer their Adequate Assurance Deposit (as defined in the Utilities Motion) obligations under the Utilities Motion (the "Utilities Adequate Assurance Deposit Account"). The Debtors will fund the Utilities Adequate Assurance Deposit Account with cash from the Main Operating Account. |
| *U.S. Branch Operations Accounts* | |
| **Customer Referrals Account**<br><br>*Wells Fargo Account ending in 4040* | The Debtors maintain a Bank Account with Wells Fargo to administer certain customer referral obligations (the "Customer Referrals Account"). The Debtors fund the Customer Referral Account with cash from the Main Operating Account.  The Customer Referrals Account is a zero-balance Account. The customer referral program is for field branches that have customers who refer another individual to obtain a loan with the Company and are awarded a check upon completion of the new customer's loan. |
| **Heights Branch Checks Account**<br><br>*Wells Fargo Account ending in 2889* | The Debtors maintain a Bank Account with Wells Fargo to administer certain customer check loan origination obligations (the "Heights Branch Checks Account"). The Debtors fund the Heights Branch Checks Account with cash from the Main Operating Account. The is a zero-balance account. Checks are issued in field locations daily. |

| Bank Account(s) | Account Description |
|---|---|
| **First Heritage Branch Checks Account**<br><br>*Wells Fargo Account ending in 2340* | The Debtors maintain a Bank Account with Wells Fargo to administer certain customer check loan origination obligations (the "First Heritage Branch Checks Account"). The Debtors fund the First Heritage Branch Checks Account with cash from the Main Operating Account. The First Heritage Branch Checks Account is a zero-balance account. Checks are issued in field locations daily. |
| **Heights ACH Funding Account**<br><br>*Wells Fargo Account ending in 0790* | The Debtors maintain a Bank Account with Wells Fargo to administer certain Heights ACH funding obligations (the "Heights ACH Funding Account"). The Debtors fund the Heights ACH Funding Account with cash from the Main Operating Account. The Heights ACH Funding Account is a zero-balance Account. |
| **First Heritage ACH Funding Account**<br><br>*Wells Fargo Account ending in 7106* | The Debtors maintain a Bank Account with Wells Fargo to administer certain First Heritage ACH funding obligations (the "Heights Heritage ACH Funding Account"). The Debtors fund the First Heritage ACH Funding Account with cash from the Main Operating Account. The First Heritage ACH Funding Account is a zero-balance Account. |
| **Title Fees Account**<br><br>*Wells Fargo Account ending in 8744* | The Debtors maintain a Bank Account with Wells Fargo to administer certain branch title fee obligations (the "Title Fees Account"). The Debtors fund the Title Fees Account with cash from the Main Operating Account. The Title Fee Account is a zero-balance account. Branches operating in states that allow secured loans via personal vehicle title debit the Debtors' Title Fee Account daily after processing title lookups on customers obtaining secured loans. |
| **Live Check Main Account**<br>Texas Capital Bank (TCB) Account ending in 6274 | The Debtors maintain a Bank Account with Texas Capital Bank to administer certain Heights and First Heritage live check obligations (the "Live Check Main Account"). The Debtors fund the Live Check Main Account with cash from Curo Management LLC's Main Operating Account via wire. The Live Check Main Account is controlled as the debit account for the two additional live zero balance accounts within Texas Capital Bank for Heights and First Heritage mailed live checks for customer loan originations. |
| **Heights Live Check Account**<br><br>Texas Capital Bank (TCB) Account ending in 1277 | The Debtors maintain a Bank Account with Texas Capital Bank to administer certain Heights live check obligations (the "Heights Live Check Account"). The Heights Live Check Account is funded by the Live Check Main Account via zero balance account hierarchy. This Account is utilized for all Heights live checks mailed by the Debtors. |
| **First Heritage Live Check Account**<br><br>Texas Capital Bank (TCB) Account ending in 2480 | The Debtors maintain a Bank Account with Texas Capital Bank to administer certain First Heritage live check obligations (the "First Heritage Live Check Account"). This account is funded by the Live Check Main Account via zero balance account hierarchy. This Account is utilized for all First Heritage live checks mailed by the Debtors. |

| Bank Account(s) | Account Description |
|---|---|
| *U.S. Collection Accounts* | |
| **Heights Collection Account** <br><br> *Wells Fargo Account ending in 8378* | The Debtors maintain a Bank Account with Wells Fargo to administer certain branch Heights collections obligations (the "Heights Collection Account"). The Debtors' branch locations deposit checks from customers for their loan repayments into the Heights Collection Account online. The Debtor receives additional ACH and wire credits for customer payments initiated via debit card in this Bank Account. The loan insurance program Fortegra processes daily ACH deposits into the Heights Collection Account for loan insurance claims owed to the Debtor. Wells Fargo processes ACH customer debit payments daily for web and telephone payments initiated by customers after receiving confirmation from the Debtor's loan management system. The Heights Collection Account processes three daily disbursements for the prior day branch collections determined by an internal daily payment bifurcation report. The Debtors send one wire transfer to the Main Operating Account for collections due to the Debtor, and one additional wire transfer to the Heights SPV I Collection Account maintained by ComputerShare. The third disbursement is completed via wire for prior day collections due to the Heights SPV II Collection Account. |
| **First Heritage-Heights II Collection Account** <br><br> *Wells Fargo Account ending in 5058* | The Debtors maintain a Bank Account with Wells Fargo to administer certain Heights II and First Heritage branch collection obligations (the "First Heritage-Heights II Collection Account"). The branch locations deposit into the First Heritage-Heights II Collection Account only money orders and checks, and do not carry cash. The Debtors receive additional ACH and wire credits for customer payments initiated via debit card. The loan insurance program Fortegra processes daily ACH deposits into the First Heritage-Heights II Collection Account for loan insurance claims owed to the Debtors. Wells Fargo processes ACH customer debit payments daily for web and telephone payments initiated by customers after receiving confirmation from the Debtors' loan management system. The First Heritage-Heights II Collection Account processes three daily disbursements for the prior day branch collections determined by an internal daily payment bifurcation report: (i) one book transfer to the Main Operating Account for collections due to the Debtor, (ii) one book transfer to the First Heritage SPV I Collection Account and (iii) one book transfer to the Heights SPV II Trust Account maintained. |
| *SPV Funding Accounts (Non-Debtor SPVs)* | |
| **Heights SPV I Account** <br><br> *ComputerShare Trust Account ending in 7500* | ComputerShare maintains a bank account for the Heights SPV I facility (the "Heights SPV I Account"). This account is funded daily via book transfer from the Heights Collections Account for previous day Height's customer payment collections. The book transfer amount is determined daily by the payment bifurcation report that determines the amount of collections due to the non-debtor special purpose vehicle Heights Financing I, LLC. On the third business day prior to the fifteenth day of each month a waterfall packet is submitted by SouthernCo, Inc. (as servicer), reconciling all collections for the prior month sent to the Heights SPV I Collection Account. Once reviewed and approved by the SPV administrative agent, on the fifteenth day of each calendar month (or, if not a business day, the next business day) the prior month ending balance amount is disbursed by Computershare to the parties determined within the waterfall packet (the SPV lender, Southern Co, Inc. (as servicer), and any agency providing services).  In addition to the monthly report, there is also a weekly servicer report which shows the releases of funds swept to Curo's Wells Fargo collection account. |

| Bank Account(s) | Account Description |
|---|---|
| **Heights SPV I Reserve Account**<br><br>*ComputerShare Trust Account ending in 7501* | ComputerShare maintains a reserve account for the Heights SPV I facility (the "Heights SPV I Reserve Account"). The account is funded on an as need basis determined by a monthly waterfall packet submitted on the third business day prior to the fifteenth day of the month (as described in the Heights SPV I Collection Account description). Funds are released from the account in the event disbursements from the Heights SPV I Account are insufficient to make the waterfall payments. |
| **First Heritage SPV I Account**<br><br>*ComputerShare Trust Account ending in 0800* | ComputerShare maintains a bank account for the First Heritage SPV I facility (the "First Heritage SPV I Account"). This account is funded daily via book transfer from the First Heritage-Heights II Collections Account for previous day First Heritage customer payment collections. The book transfer amount is determined daily by the payment bifurcation report that determines the amount of collections due to the non-debtor special purpose vehicle First Heritage Financing I, LLC. All previous day collections are swept to the ComputerShare account automatically, the only funds not swept are held over to keep a minimum balance for turn of customer payments. On the third business day prior to the fifteenth day of each month a waterfall packet is submitted by First Heritage Credit, LLC (as servicer), reconciling all collections for the prior month sent to the First Heritage SPV I Collection Account. Once reviewed and approved by the SPV administrative agent, on the fifteenth day of each calendar month (or, if not a business day, the next business day) the prior month ending balance amount is disbursed by Computershare to the parties determined within the waterfall packet (the SPV lender, First Heritage Credit, LLC (as servicer), and any agency providing services). |
| **First Heritage SPV I Reserve Trust Account**<br><br>*ComputerShare Trust Account ending in 0801* | ComputerShare maintains a reserve account for the First Heritage SPV I facility (the "First Heritage SPV I Reserve Account"). The account is funded on an as need basis determined by a monthly waterfall packet submitted on the third business day prior to the fifteenth day of the month (as described in the First Heritage SPV I Trust Collection Account description). Funds are released from the account in the event disbursements from the First Heritage SPV I Account are insufficient to make the waterfall payments. |
| **Heights SPV II Account**<br><br>*Axos Bank (Axos) Account ending in 6101* | Midtown Madison Management LLC ("Midtown"), in its capacity as paying agent, maintains a collections account for non-debtor Heights Financing II, LLC's ("Heights SPV II") Securitization Program at Axos in the name of Heights SPV II (the "Heights SPV II Account"). The Heights SPV II Account is funded daily via wire from the Heights Collection Account and First Heritage-Heights II Collection Account for previous day Heights customer payment collections. The wire amount is determined daily by a payment bifurcation report that determines the amount of collections due to Heights SPV II. On the third business day prior to the fifteenth day of each month, SouthernCo, Inc. (as servicer) submits a waterfall packet reconciling all collections for the prior month sent to the Heights SPV II Account. Once reviewed and approved by Midtown, in its capacity as administrative agent, on the fifteenth calendar day of the month (or, if not a business day, the next business day), the prior month ending balance amount is disbursed by Midtown, as paying agent, to the parties determined within the waterfall packet (SouthernCo, Inc. (as servicer), the Securitization Program Lenders, and any agency providing services). |

| Bank Account(s) | Account Description |
|---|---|
| **Heights SPV II Reserve Account**<br><br>*Axos Bank (Axos) Account ending in 6119* | Midtown maintains a reserve account for Heights SPV II's Securitization Program (the "Heights SPV II Reserve Account") at Axos. This account is funded on an as-need basis determined by the monthly waterfall packet submitted on the third business day prior to the fifteenth day of the month (as described in Heights SPV II Account description). Funds are released from the account in the event disbursements from the Heights SPV II Collection Account are insufficient to make the waterfall payments. |
| **WAM SPV I**<br><br>*Royal Bank of Canada (RBC) Account ending in 8523* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer a special purpose vehicle ("WAM SPV I") backed by Waterfall Asset Management, LLC ("WAM") (the "WAM SPV I Account"). The WAM SPV I Account is funded daily for previous day customer payments pledged to WAM SPV I as determined by an internal WAM daily rollfoward report. Every Thursday funds are transferred from the WAM SPV I Account to the WAM SPV I Transfer Account (as defined below), which funds are then transferred to the Canada Main Operating Account. The Thursday funds transfer amount is provided through a completed weekly servicer report, and once agreed upon by WAM and Curo Canada Corp., the funds are transferred by Curo Canada Corp. on the designated date. The second Thursday of each month a monthly service report is completed and once agreed by WAM and Curo Canada Corp., the designated funds are moved from the WAM SPV I Account to the WAM SPV I Transfer Account as described below in the WAM SPV I Transfer Account description. |
| **WAM SPV I Transfer Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 9638* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer WAM SPV I backed by WAM (the "WAM SPV I Transfer Account"). Funds are transferred out of the WAM SPV I Transfer Account each Thursday based on the weekly service report submitted and agreed to by WAM, and Curo Canada Corp. to the Canada Main Operating Account. Every second Thursday of the month a monthly service report is agreed upon by Curo Canada Corp. and WAM. Funds are transferred from the WAM SPV I Account to the WAM SPV I Transfer Account for the full amount of the monthly servicer report. Funds due back to WAM or any servicing agent are then wired from the WAM SPV I Transfer Account to the designated party. The remaining amount due back to Curo Canada Corp from the monthly service report is transferred to the Canada Main Operating Account. |
| **ACM SPV II Account**<br><br>*National Bank of Canada (NBC) Account ending in 0524* | Debtor Curo Canada Corp. maintains a Bank Account with National Bank of Canada to administer a special purpose vehicle ("ACM SPV II") backed by Atalaya Capital Management ("ACM") (the "ACM SPV II Account"). The ACM SPV II Account is funded daily for previous day customer payments pledged to ACM SPV II as determined by an internal ACM daily rollfoward report. Each Thursday a weekly service report is submitted and agreed upon by ACM and Curo Canada Corp. for funds to be transferred back to the Canada Main Operating Account via wire.  The second Thursday of every month a monthly servicer report is submitted, and once agreed upon by ACM and Curo Canada Corp., funds are wired from the ACM SPV II Account to any servicing agents, ACM, and the remaining amount as determined by the monthly servicer report is wired back to the Canada Main Operating Account. |

| Bank Account(s) | Account Description |
|---|---|
| **Curo Canada Corp. – Corporate Operations Accounts** | |
| **Canada Main Operating Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 3138* | Debtor Curo Canada Corp. maintains its primary operating account with Royal Bank of Canada (the "Canada Main Operating Account"). Funds are swept periodically into the Canada Main Operating Account from various Bank Accounts through Intercompany Transactions, as described further below. On an as-needed basis, funds are transferred between the Canada Main Operating Account and the Main Operating Account depending on the cash needs of the Curo Management LLC and Curo Canada Corp. The Canada Main Operating Account also earns interest income and receives other miscellaneous deposits.<br><br>The Canada Main Operating Account funds the Canada Payroll Account (as defined below), each of the Canda EFT Transfer Account (as defined below), Canada Visa Funding Account (as defined below), Canada Accounts Payable Account (as defined below), Canada Western Union Money Orders Account (as defined below), Canada Telpay (as defined below), Canada Branch Money Orders (as defined below), Canada Lendirect Account (as defined below), and Main Operating Account, as needed.  Historically, prepetition borrowings under the Debtors' Special Purpose Vehicle credit facility were funded into the Canada Main Operating Account, and certain interest and principal repayments of the Company's debt were made out of this account. |
| **Canada Payroll Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 4275* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain payroll-related obligations (the "Payroll Account"). The Canada Payroll Account is funded with cash from the Canada Main Operating Account.  Payroll is completed on Wednesdays on a biweekly basis via wire. |
| **Canada Accounts Payable Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 3528* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain vendor obligations (the "Canada Accounts Payable Account"). The Canada Accounts Payable Account is funded with cash from the Canada Main Operating Account. |
| **Canada Telpay Funding Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 2718* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain Telpay obligations (the "Canada Telpay Funding Account"). The Canada Telpay Account is funded with cash from the Canada Main Operating Account. |
| **Canada Branch Operations Accounts** | |
| **Canada EFT Funding Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 8735* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain Electronic Funds Transfer ("EFT") customer loan obligations (the "Canada EFT Funding Account"). The Canada EFT Funding Account is funded with cash from the Canada Main Operating Account. Funding is disbursed from the Canada EFT Funding Account through the Canadian EFT network. |
| **Canada EFT Funding Account II**<br><br>*Royal Bank of Canada (RBC) Account ending in 2026* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain EFT customer loan obligations (the "Canada EFT Funding Account II"). The Canada EFT Funding Account II is funded with cash from the Canada Main Operating Account. Funding is disbursed from the Canada EFT Funding Account II through the Canadian EFT network. |

| Bank Account(s) | Account Description |
|---|---|
| **Canada Visa Funding Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 0905* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain Visa card funding obligations (the "Canada Visa Funding Account"). The Canada Visa Funding Account is funded with cash from the Canada Main Operating Account. The Visa funding product is offered by Curo Canada Corp. as an instant funding option for customers with Visa cards held with the Debtor. |
| **Canada Western Union Money Orders Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 2668* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain Western Union money order obligations (the "Canada Wetern Union Money Orders Account"). The Canada Western Union Money Orders Account is funded with cash from the Canada Main Operating Account. Western Union will directly debit the account for all previous and current day money orders cashed on behalf of the Curo Canada Corp. |
| **Canada Branch Money Orders Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 2767* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain branch money order obligations (the "Canada Branch Money Orders Account"). Debtor Curo Canada Corp. funds the Canada Branch Money Orders Account with cash from the Canada Main Operating Account. Customers issued money orders from branch locations that are deposited or cashed are debited directly by the bank on behalf of Curo Canada Corp. from this account. |
| **Canada LendDirect Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 9903* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain LendDirect obligations (the "Canada LendDirect Account"). The Canada LendDirect Account is funded with cash from the Canada Main Operating Account. Loans originated for customers for the LendDirect entity are debited from the Canada LendDirect Account. |
| *Canadian Collections Accounts* | |
| **Canada Collections Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 0349* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain third-party collection obligations (the "Canada Collections Account"). Curo Canada Corp. transfers funds from the Canada Collections Account on an as needed basis to manage a peg balance within the Canada Collections Account. Payments are transferred via EFT, wire, or bill payment daily by third party payment processers collecting customer payments on behalf of the Debtor. |
| **Canada Western Union Collections Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 7960* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain Western Union collection obligations (the "Canada Western Union Collections Account"). Curo Canada Corp. transfers funds from the Canada Western Union Collections Account on an as needed basis to manage a peg balance within the Canada Western Union Collections Account. Payments are transferred via EFT, wire, or bill payment daily by Western Union for customer payments made via money order to Curo Canada Corp. |
| **Canada Online Customer Payments Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 2585* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain online customer payments collection obligations (the "Canada Online Customer Payments Account"). Curo Canada Corp. transfers funds from the Canada Online Customer Payments Account on an as needed basis to manage a peg balance within the Canada Online Customers Payments Account. Repay the third-party payment processer transfers funds daily to the Canada Online Customer Payments Account daily for prior day customer collections. |

| Bank Account(s) | Account Description |
|---|---|
| **BC/AB/MB/NS Online Customer Payments**<br><br>*Royal Bank of Canada (RBC) Account ending in 6167* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain British Columbia, Alberta, Manitoba, Nova Scotia online customer payments collection obligations (the "<u>BC/AB/MB/NS Online Customer Payments Account</u>"). Curo Canada Corp. transfers funds from the BC/AB/MB/NS Online Customer Payments Account to the Canada Main Operating Account on an as needed basis to manage a peg balance within the BC/AB/MB/NS Online Customer Payments Account.  Canadian regulations require customers making payments for the products offered under the Curo Canda Corp. umbrella within provinces of British Columbia, Alberta, Manitoba, Nova Scotia to be separated from other products offered by Curo Canada Corp. |
| **Canada Customer Debit Card Collections Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 8917* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain customer debit card collections obligations (the "<u>Canada Customer Debit Card Collections Account</u>"). Curo Canada Corp. transfers funds from the Canada Customer Debit Card Collections Account on an as needed basis to manage a peg balance within the Canada Customer Debit Card Collections Account. Customer payments are processed by the third-party vendor Interact are transferred daily via EFT, wire, or bill payment to this Bank Account. |
| **Canada Collections Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 8806* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain collections obligations (the "<u>Canada Collections Account</u>"). Curo Canada Corp. transfers funds from the Canada Collections Account to the Canada Main Operating Account on an as needed basis to manage a peg balance within the Cana Collections Account. Customer payments are processed by the third-party vendor Interact for customers receiving products offered by Curo Canada Corp. Entities located within the provinces of British Columbia, Alberta, and Manitoba are transferred daily via EFT, wire, or bill payment. |
| **Canada Store Deposits Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 5147* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to administer certain Store deposit obligations (the "<u>Canada Store Deposits Account</u>"). Curo Canada Corp. transfers funds from the Canada Store Deposits Account to the Canada Main Operating Account on an as needed basis to manage a peg balance within the Store Deposits Account. |
| *Standalone Accounts (U.S. & Canada)* | |
| **RBC Letters of Credit Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 1548* | Debtor Curo Canda Corp. maintains a Bank Account with Royal Bank of Canada to hold collateral for certain letters of credit issued by RBC (the "<u>RBC Letters of Credit Account</u>"). The RBC Letters of Credit Account is funded as needed from the Canada Main Operating Account. |
| **LendDirect Insurance Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 8537* | Debtor LendDirect Corp. maintains a Bank Account with Royal Bank of Canada to satisfy a licensing requirement to segregate into a separate account insurance premiums paid to LendDirect Corp. in New Brunswick, Canada (the "<u>LendDirect Insurance Account</u>"). The LendDirect Insurance Account is funded as needed via funds transfer from the Canada Main Operating Account. |

| Bank Account(s) | Account Description |
|---|---|
| **Curo Canada Corp. Insurance Account**<br><br>*Royal Bank of Canada (RBC) Account ending in 8511* | Debtor Curo Canada Corp. maintains a Bank Account with Royal Bank of Canada to satisfy a licensing requirement to segregate into a separate account insurance premiums paid to Curo Canada Corp. in New Brunswick, Canada (the "Curo Canda Corp. Insurance Account"). The Curo Canda Corp. Insurance Account is funded as needed via funds transfer from Canada Main Operating Account. |
| **Money Market Account**<br><br>*The Bank of Missouri (TBOM) Account ending in 1177* | The Debtors maintain a money market account (the "Money Market Account") with The Bank of Missouri for Debtor Curo Management LLC. The Money Market Account was initially funded via wire from the Main Operating Account. |
| **ACH Collateral Account**<br><br>*Wells Fargo Account ending in 6920* | Debtor First Heritage Credit LLC maintains a Bank Account with Wells Fargo (the "ACH Collateral Account") to allow First Heritage branches to execute customer card payments processed by Wells Fargo via ACH. Wells Fargo requires the ACH Collateral Account to hold collateral for any customer payment returns. This Bank Account was initially funded from the Main Operating Account. |
| **Hanover LOC Account**<br><br>*Wells Fargo Account ending in 5579* | The Debtors maintain a Bank Account with Wells Fargo (the "Hanover LOC Account") to allow an evergreen letter of credit to be held with Wells Fargo for the benefit of Hanover Insurance Company. The Hannover LOC Account was initially funded via wire from the Main Operating Account. The Bank Account is only funded if the letter of credit is reissued and an updated balance is required. |
| **Heights Reinsurance Account**<br><br>*BMO Harris Account ending in 7173* | The Debtors maintain a Bank Account with BMO Harris to allow reinsurance releases for Heights Reinsurance LTD (the "Heights Reinsurance Account"). Funds are transferred via wire to the account as necessary from the Main Operating Account. Funds are released from this account after the Debtors' finance department has issued a dividend request with Fortegra, the loan insurance provider. |
| **Heights Reinsurance Trust Account**<br><br>*Midwest Institutional Trust Account ending in 9058* | The Debtors maintain a Bank Account with Midwest Institutional Trust to allow reinsurance releases for Heights Reinsurance LTD (the "Heights Reinsurance Trust Account"). The Heights Reinsurance Trust Account releases funds once the Debtors' finance department issues a dividend request with Fortegra, the Debtors' loan insurance provider. Once the dividend is reviewed and approved by Fortegra, the funds are wired to the above Heights Reinsurance Account (7173) held at BMO Harris. |

13.     With respect to Non-Operational Accounts, the Debtors are either in the process of or contemplate closing such Non-Operational Accounts as soon as practicable.  Certain of the Debtors' Cash Management Banks have not been responsive to the Debtors' requests to close such Non-Operational Accounts.  Therefore, by this Motion, the Debtors also seek authority to compel

the banks identified on **Exhibit 3** hereto to honor the Debtors' requests to close the applicable Non-Operational Accounts.

## II.    Intercompany Transactions.

14.    The Debtors maintain business relationships with each other and with their non-debtor affiliates[6] in the ordinary course of their businesses (collectively, the "Intercompany Transactions"), resulting in intercompany receivables and payables (collectively, the "Intercompany Claims").[7] For the purposes of this Motion and the relief requested hereby, the Intercompany Transactions and the Cash Management System do not include dividends or similar distributions.

15.    At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor or between a Debtor and a non-Debtor affiliate in connection with the receipt and disbursement of funds, and there may be recognitions of offsets between the Debtors or between Debtors and non-debtor affiliates.  For example, by operation of the Cash Management System, Debtor Curo Management LLC transfers funds out of the Main Operation Account (Wells Fargo 6540) to Debtor Curo Canada Corp.'s Canada Main Operating Account (RBC 3138), and vice-versa, on an as-needed basis depending on whether either entity is operating in excess or a deficiency vis-à-vis its monthly cash forecasting.  These Bank Accounts are reconciled monthly on a general ledger that records intercompany receivables and payables

---

[6]    The Debtors' non-debtor affiliates include the Non-Debtor SPVs, CURO SPV, LLC, Southco Reinsurance, Ltd. (Turks & Caicos), Heights Reinsurance, Ltd. (Turks & Caicos) and Flexiti Financial Technologies (Slovakia) s.r.o. (which is in the process of being wound down).

[7]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of Bankruptcy Code section 363(c)(1) and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions are integral to ensuring the Debtors' ability to operate their businesses.

based on such Intercompany Transactions.  As a further example, the Debtors collect funds in connection with loan receivables from their customer-borrowers and then transfer all or a portion of such funds to the Non-Debtor SPVs pursuant to the terms of the Securitization Program. With respect to all Intercompany Transactions, the Debtors closely track all funds and transfers in their accounting system and can ascertain, trace and account for all Intercompany Transactions. Intercompany Transactions are an essential component of the Cash Management System.

16.     To the extent the Debtors engage in any postpetition Intercompany Transactions, such Intercompany Transactions are trackable and will be accounted for in accordance with pre-bankruptcy procedures.  Accordingly, the Debtors seek authority—and, to the extent applicable, relief from the automatic stay—to continue the Intercompany Transactions in the ordinary course of business on a postpetition basis, in a manner consistent with the Debtors' past practice.

17.     To ensure each individual Debtor will not permanently fund the operations of any affiliate, the Debtors respectfully request that, pursuant to Bankruptcy Code sections 503(b) and 364(c)(1), all Intercompany Claims against any Debtor by another Debtor arising after the Petition Date resulting from postpetition payments on account of ordinary course Intercompany Transactions be accorded administrative expense status.  If Intercompany Claims are given administrative expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for its ordinary course Intercompany Transactions, reducing the risk that these transactions would jeopardize the recoveries available to the Debtors' creditors.  Moreover, the Debtors request the authority to continue the Intercompany Transactions in a manner consistent with historical practices to enable the Debtors to smoothly transition into chapter 11 and ensure certain of the Debtors' revenue streams are not impacted.  For the avoidance of doubt, (i) the Intercompany Claims shall be

unsecured and rank junior in priority to the DIP Obligations, the 507(c) Claims, and any superpriority administrative expense claims granted under any order approving the Securitization Program Motion (the "Securitization Program Orders"), and (ii) the Canadian Debtors are not guarantors of the DIP Facility, and no security or administrative expense priority has been requested concerning the DIP Obligations against the estates of the Canadian Debtors.

### III.   Bank Fees.

18.     In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees").  The Debtors incur approximately $293,000 per month on account of the Bank Fees in the aggregate.  Historically, the Bank Fees have been debited directly out of the Debtors' Bank Accounts.  The Debtors estimate that approximately $257,000 in prepetition Bank Fees have accrued and are unpaid as of the Petition Date.  Accordingly, the Debtors seek authority to pay all prepetition Bank Fees and continue paying the Bank Fees in the ordinary course on a postpetition basis, consistent with historical practices.

### IV.   Business Forms.

19.     As part of their Cash Management System, the Debtors use various preprinted business forms (including checks, letterhead, correspondence forms, invoices, and other business forms) in the ordinary course (collectively, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records").  To minimize expenses to their estates and avoid confusion during the pendency of these Chapter 11 Cases, the Debtors request that the Bankruptcy Court authorize the Debtors' continued use of all Business Forms and Books and Records in a manner consistent with prepetition practice, without reference to the Debtors' status as debtors in possession.  Once the Debtors have exhausted their existing stock of Business Forms, they will

ensure that any new Business Forms are clearly labeled "Debtor in Possession" and, with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor in Possession."

## V.     The Customer Loans

20.     As more fully described in the First Day Declaration, the Company is a full-spectrum consumer credit lender serving U.S. and Canadian customers.  In the ordinary course of their businesses, the Debtors' operations include a broad range of direct-to-consumer finance products focusing on installment loans and revolving line of credit loans (collectively, the "Customer Loans").  As part of the Cash Management System, the Customer Loans are issued with funds from the Debtors' various Branch Operations Accounts via check, live check, Automated Clearing House transfer ("ACH") or electronic funds transfer ("EFT"), as more-fully described in the table in paragraph 12.  For the avoidance of doubt, any prepetition loans issued by the Debtors to their customer-borrowers via check, live check, ACH or EFT that have not yet settled as of the Petition Date should be processed by the Cash Management Banks in the ordinary course of business following the Petition Date.

## Basis for Relief

## I.     Maintaining the Existing Cash Management System Is Necessary to the Debtors' Operations During the Chapter 11 Cases and Efforts to Complete Transactions for the Company.

21.     The Cash Management System constitutes an ordinary course and essential business practice of the Debtors. The Cash Management System provides significant benefits to the Debtors including, among other things, the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information. Thus, to ensure the seamless operation of the Debtors' businesses and realize the benefits of the Cash

Management System, the Debtors should be allowed to continue using the Cash Management System and should not be required to open new bank accounts.

22.     The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for payment of taxes including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor in possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.   These requirements are intended to provide a clear distinction between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.

23.     Continuation of the Cash Management System nonetheless should be permitted pursuant to Bankruptcy Code section 363(c)(1), which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter."  *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *See In re HLC Props., Inc.*, 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business). In granting such relief, courts recognize that an integrated cash management system allows a

debtor "to administer more efficiently and effectively its financial operations and assets." *In re*

*Southmark Corp*., 49 F.3d 1111, 1114 (5th Cir. 1995).

24.     Requiring the Debtors to adopt a new cash management system during these

Chapter 11 Cases would be costly, burdensome and disruptive to the Debtors' operations and their

goal to reorganize in an efficient manner. Importantly, the Cash Management System provides the

Debtors with the ability to quickly create status reports on the location and amount of funds, which,

in turn, allows management to track and control such funds, ensure cash availability, and reduce

administrative costs through a centralized method of coordinating the collection and movement of

funds. As a result, any disruption of the Cash Management System would have a severe and

adverse effect on the Debtors' restructuring efforts. Indeed, absent the relief requested herein,

requiring the Debtors to adopt a new, segmented cash management system would cause the

Debtors' operations to grind to a halt, needlessly destroying the value of the Debtors' business

enterprise.

25.      By contrast, maintaining the current Cash Management System will facilitate the

Debtors' smooth transition into chapter 11 by minimizing delays in paying postpetition debts and

eliminating administrative inefficiencies.  Moreover, maintaining the current Cash Management

System will allow the Debtors' employees to attend to their daily responsibilities rather than

organize and administer a new system.

26.     Parties in interest will not be harmed by the Debtors' maintenance of their existing

Cash Management System because the Debtors have implemented appropriate mechanisms to

ensure that unauthorized payments will not be made on account of prepetition obligations except

as authorized by the Court. The Debtors will continue to work closely with the Cash Management

Banks to ensure that appropriate procedures are in place to prevent accounts payable related checks

that were issued prepetition from being honored without the Court's approval. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

27.     Accordingly, the Debtors respectfully request that the Court authorize the continued use of the existing Cash Management System to facilitate the Debtors' transition into chapter 11.  Specifically, the Debtors request that the Court (a) authorize the Cash Management Banks to continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business; (b)  authorize each of the Cash Management Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date (including the completion of any such transaction commenced on or before the Petition Date but not yet settled on or after the Petition Date in connection with the Customer Loans); and (c) authorize the Debtors to continue to pay the Bank Fees, including any prepetition Bank Fees, in the ordinary course of business.

28.     Additionally, the Debtors respectfully request that to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account that is the subject of this Motion, either at the direction of the Debtors or on a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Cash Management Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored on  or after the Petition Date.  Such relief is reasonable and appropriate because the Cash Management Banks are not able to independently verify or audit whether the Debtors may pay a particular item in accordance with a Court order or otherwise.

**II.    Continued Use of Existing Business Forms and Books and Records Will Avoid Unnecessary Administrative and Financial Burdens on the Debtors and their Estates.**

29.    To avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they be authorized to continue to use their Business Forms and Books and Records, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.  Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing forms such as letterhead would be an unnecessary additional expense.

30.    The Debtors should be permitted to maintain their existing Books and Records rather than open a new set as required under the U.S. Trustee Guidelines. The Debtors use a sophisticated recordkeeping system that enables them to consolidate their Books and Records for financial reporting purposes while maintaining separate records on an entity-by-entity basis to track the operations and results of individual entities across their corporate structure. Continued use of the Debtors' current Books and Records, therefore, will maximize efficiency and decrease administrative burden while maintaining the precise entity-by-entity reporting contemplated by the U.S. Trustee.

**III.    Payment of Prepetition Obligations Related to the Bank Accounts Will Facilitate a Smooth Transition into Chapter 11 and Will Benefit the Estates.**

31.    As part of the Cash Management System, the Debtors request authority to pay any prepetition Bank Fees owed on account of their Bank Accounts to their Cash Management Banks and to continue paying postpetition Bank Fees in the ordinary course of business and consistent with the Debtors' prepetition practices.

32.    Bankruptcy Code Section 363(b) permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See In re Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that Bankruptcy Code section 363(b)

provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  In addition, under Bankruptcy Code section 1107(a), a debtor in possession has, among other things, the "implied duty . . . to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that courts authorize debtors to pay, outside of a plan, prepetition claims from "business transactions which are at once individually minute but collectively immense and critical to the survival of the business of the debtor.").

33.    Additionally, under Bankruptcy Code section 105(a), "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a); *CoServ*, 273 B.R. at 497 (finding that Bankruptcy Code sections 105 and 1107 provide the authority for a debtor in possession to pay prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business).

34.    Indeed, the Debtors' continued use of the Cash Management System will facilitate their transition into chapter 11 for the benefit of their estates and their stakeholders by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of debts that are necessary for the continued operation of the Debtors' businesses.  Certain payments to their Cash Management Banks as the payment of prepetition and postpetition Bank Fees, will help ensure the continuity of the Debtors' Cash Management System on a go-forward basis at this critical juncture in these Chapter 11 Cases.

IV.     **The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Expense Status to Postpetition Intercompany Claims.**

35.     Intercompany Transactions are made among the Debtors and their non-debtor subsidiaries in the ordinary course of business as part of the Cash Management System.  The Debtors currently maintain detailed records of Intercompany Transactions and intend to continue to maintain records of such Intercompany Transactions.  The continued transfer of funds between and among the Debtors and their non-debtor subsidiaries in the ordinary course is in the best interest of the Debtors' (and ultimately the Company's) creditors, because all of the Debtors and non-debtor subsidiaries must act in concert to operate and maintain the business of the Company's going-concern enterprise.  Any termination of the Intercompany Transactions would significantly disrupt the Cash Management System and would result in adverse consequences to the Debtors and their estates.  Accordingly, the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors, and, as such, the Debtors should be authorized to continue performance in the ordinary course.

36.     As the Intercompany Transactions have historically been essential components of the Cash Management System, the Debtors request the authority to continue conducting the Intercompany Transactions in the ordinary course on a postpetition basis and request that, pursuant to Bankruptcy Code sections 503(b)(1) and 364(b), all Intercompany Claims on account of valid postpetition transfers from a Debtor or a non-debtor affiliate to a Debtor be accorded administrative expense status.  This relief will ensure that no Debtor or non-debtor affiliate will fund the operations of a Debtor at the expense of such entity's creditors.

**V.     Cause Exists for Waiving the Investment and Deposit Guidelines of Bankruptcy Code Section 345 and the Authorized Depository Requirement of the U.S. Trustee Guidelines.**

37.     To the extent the Cash Management System does not strictly comply with Bankruptcy Code section 345 and/or the U.S. Trustee's Operating Guidelines and Financial Reporting Requirements for Debtors-in-Possession and Trustees (the "U.S. Trustee Guidelines"), the Debtors submit that cause exists to temporarily suspend the requirements of section 345(b) and the U.S. Trustee Guidelines for an interim period of thirty days from the Petition Date, without prejudice to the Debtors' ability to seek further extensions to the extent necessary.

38.     Bankruptcy Code section 345(a) authorizes the deposit or investment of money of a debtor's estate, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). While Bankruptcy Code section 345(b) generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee-approved corporate surety, it allows the Court to dispense with this limitation "for cause." *Id.* § 345(b).

39.     Accordingly, it is within the Court's discretion to waive or modify the investment guidelines of Bankruptcy Code section 345(b) for "cause."  *See Id.* § 345(b)(2); *In re Serv. Merch. Co.*, 240 B.R. 894, 896-97 (Bankr. M.D. Tenn. 1999) (concluding that "cause" existed to waive requirements of section 345 because the benefit of waiving the requirements of section 345(b) "far outweighed any potential harm to the estate"); *see also* H.R. Rep. 103-835, 103rd Cong., 2d Sess. 47 (Oct. 4, 1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3354 (noting that section 345(b) investment guidelines may be "wise in the case of a smaller debtor with limited funds that cannot

26

afford a risky investment to be lost, [but] can work to needlessly handcuff larger, more sophisticated debtors").

40.     In determining whether the "for cause" standard has been satisfied, the Court should consider the "totality of the circumstances," utilizing the following factors:

   a.     the sophistication of the debtor's business;

   b.     the size of the debtor's business operations;

   c.     the amount of the investments involved;

   d.     the bank ratings (Moody's and S&P) of the financial institutions where the debtor in possession funds are held;

   e.     the complexity of the case;

   f.     the safeguards in place within the debtor's own business of insuring the safety of the funds;

   g.     the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

   h.     the benefit to the debtor;

   i.     the harm, if any, to the estate; and

   j.     the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*In re Serv. Merch. Co.*, 240 B.R. at 896.

41.     The vast majority of the Bank Accounts comply with Bankruptcy Code section 345(b) because they are maintained at institutions insured by the Federal Deposit Insurance Corporation (the "FDIC").  As of the Petition Date, the Debtors maintained Bank Accounts at 27 FDIC-insured Cash Management Banks: Axiom Bank, Axos Bank, Bank of Missouri, BMO, BNA Bank, Cadence Bank, CIBC Bank USA, Citizens Community Federal, Community Bank, First Horizon, First National of Huntsville, First Premier Bank, First State Bank, Hancock Whitney Bank, Iberia Bank, JD Bank, Metropolitan Commercial Bank, One Bank of Tennessee, Republic

Bank, Sabine State Bank, Simmons Bank, Stride, Texas Capital Bank, The Cottonport Bank, The First Bank, Truist, United Community Bank, Wells Fargo and West Tennessee Bank. The majority of the Debtors' Bank Accounts at these Cash Management Banks typically do not have balances in excess of the FDIC-insured limit.

42. The Debtors' Bank Accounts held at two Cash Management Banks in Canada are not FDIC insured: Royal Bank of Canada and National Bank of Canada. However, all three of these institutions are well-capitalized and highly-rated, and maintaining the Bank Accounts at these Cash Management Banks is necessary to facilitate the Debtors' operations in Canada.

43. Further, Cadence Bank, First Horizon, Iberia Bank, Metropolitan Commercial Bank, Texas Capital Bank, Truist and Wells Fargo are also designated as authorized depositories pursuant to the U.S. Trustee Guidelines.

44. The Cash Management Banks that are not authorized depositories pursuant to the U.S. Trustee Guidelines are:

    (i)    legacy Bank Accounts that are restricted or pending closure: Bank of Missouri, BMO, BNA Bank, CIBC Bank USA, Citizens Community Federal, Community Bank, First National of Huntsville, First State Bank, Hancock Whitney Bank, JD Bank, One Bank of Tennessee, Republic Bank, Sabine State Bank, Simmons Bank, Stride, The First Bank, The Cottonport Bank, United Community Bank and West Tennessee Bank;

    (ii)    no-balance Bank Accounts that are pending closure: Axiom Bank and First Premier Bank; and/or

    (iii)    Canadian banks: National Bank of Canada and Royal Bank of Canada.

45. Attached hereto as **Schedule 1** is a schedule summarizing whether each Cash Management Bank is FDIC-insured and/or is an authorized depository pursuant to the U.S. Trustee Guidelines and identifies Cash Management Banks that are not in compliance with either of the above.

46.     The Debtors submit that cause exists to suspend the requirements of Bankruptcy Code section 345 and the U.S. Trustee Guidelines for a period of thirty days, without prejudice to the Debtors' ability to seek further extensions to the extent necessary, to avoid the additional and unnecessary disruption to the Debtors' operations that would ensue if the Debtors were required to close the Debtors' Bank Accounts and re-open them at authorized depositories at this juncture in these Chapter 11 Cases.  Requiring the Debtors to change their Bank Accounts at this time, when they are focusing on making a smooth transition into chapter 11, would impose significant administrative burdens on the Debtors and their employees with no corresponding benefit to the estates, which would, in turn, impede the Debtors' ability to facilitate their ordinary course operations and reorganization efforts.

## Emergency Consideration

47.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003 and Bankruptcy Local Rule 9013-1, which empower a court to grant relief within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder the Company's global operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these Chapter 11 Cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' reorganization. Accordingly, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

48.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

<u>**Notice**</u>

49.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the entities listed on the Debtors' petitions as holding the largest 30 unsecured claims (on a consolidated basis); (c) counsel to the Prepetition 1L Agent; (d) counsel to the Prepetition 1.5L Notes Trustee; (e) counsel to the Prepetition 2L Notes Trustee; (f) counsel to the Ad Hoc Group; (g) counsel to Atlas Securitized Products Holdings, L.P. in its capacity as Administrative Agent; (h) counsel to Midtown Madison Management LLC as Heights II Administrative Agent and Canada II Administrative Agent; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the state attorneys general in the states where the Debtors conduct their business operations; (m) the Cash Management Banks; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no further notice is necessary.

WHEREFORE, the Debtors request entry of interim and final orders, substantially in the forms of the Interim Order and Final Order filed with this Motion, granting the relief requested herein and granting such other relief as the Court deems just, proper and equitable.

Dated: March 25, 2024
       Houston, Texas

/s/  Sarah Link Schultz
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Sarah Link Schultz (State Bar No. 24033047;
S.D. Tex. 30555)
Patrick Wu (State Bar No. 24117924;
S.D. Tex. 3872088)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: sschultz@akingump.com
       pwu@akingump.com

-and-

Michael S. Stamer (*pro hac vice* pending)
Anna Kordas (*pro hac vice* pending)
Omid Rahnama (*pro hac vice* pending)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
       akordas@akingump.com
       orahnama@akingump.com

*Proposed Counsel to the Debtors*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Sarah Link Schultz*
Sarah Link Schultz


## **Certificate of Service**

I certify that on March 25, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Sarah Link Schultz*
Sarah Link Schultz

## Schedule 1

## Cash Management Banks[1]

| Bank | FDIC-Insured | Authorized Depository pursuant to the U.S. Trustee Guidelines | Reason for Maintaining Despite Non-Compliance |
|---|---|---|---|
| Wells Fargo (148 accounts) | ✓ | ✓ | N/A |
| Axos Bank (2 accounts) | ✓ | ✓ | N/A |
| Truist (1 account) | ✓ | ✓ | N/A |
| CIBC Bank USA (2 accounts) | ✓ | ✗ | Legacy Bank Account pending closure |
| National Bank of Canada (1 account) | ✗ | ✗ | Maintaining existing Bank Accounts is necessary to facilitate operations |
| Royal Bank of Canada (21 accounts) | ✗ | ✗ | Maintaining existing Bank Accounts is necessary to facilitate operations |
| Bank of Missouri (3 accounts) | ✓ Each account holds under $250,000 | ✗ | Legacy Bank Account pending closure |
| BMO (3 accounts) | ✓ Each account holds under $250,000 | ✗ | Legacy Bank Account pending closure |
| Axiom Bank (9 accounts) | ✓ | ✗ | No-balance Bank Account pending Closure |
| Metropolitan Commercial Bank (8 accounts) | ✓ | ✓ | N/A |
| First Premier Bank (2 accounts) | ✓ | ✗ | No-balance Bank Account pending Closure |
| Republic Bank (5 accounts) | ✓ | ✗ | No-balance Bank Account pending Closure |

---

[1]    Four additional Bank Accounts that are to remain operational are with Computershare (formerly Wells Fargo Corporate Trust Services).  These accounts are maintained on behalf of non-debtors.

| Bank | FDIC-Insured | Authorized Depository pursuant to the U.S. Trustee Guidelines | Reason for Maintaining Despite Non-Compliance |
|---|---|---|---|
| Stride (4 accounts) | ✔ Each account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| Texas Capital Bank (3 accounts) | ✔ | ✔ | N/A |
| Citizens Community Federal (1 account) | ✔ Account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| First National of Huntsville (1 account) | ✔ Account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| West Tennessee Bank (1 account) | ✔ Account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| Hancock Whiteney Bank (9 accounts) | ✔ Each account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| Sabine State Bank (2 accounts) | ✔ Each account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| First Horizon (10 accounts) | ✔ | ✔ | N/A |
| United Community Bank (2 accounts) | ✔ Account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| The Cottonport Bank (1 account) | ✔ Account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| One Bank of Tennessee (1 account) | ✔ Account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| Simmons Bank (1 account) | ✔ Account holds under $250,000 | ✘ | Legacy Bank Account pending closure |
| Cadence Bank (along with BancorpSouth)[2] (8 accounts) | ✔ Each Account holds under $250,000 | ✔ | N/A |
| JD Bank (1 account) | ✔ Account holds under $250,000 | ✘ | Legacy Bank Account pending closure |

[2]    Cadence Bank owns Bancorp South, so for purposes of this chart they are included together.

| Bank | FDIC-Insured | Authorized Depository pursuant to the U.S. Trustee Guidelines | Reason for Maintaining Despite Non-Compliance |
|---|---|---|---|
| Iberia Bank (1 account) | ✓ | ✓ | N/A |
| The First Bank (1 account) | ✓<br>Account holds under $250,000 | ✗ | Legacy Bank Account pending closure |
| First State Bank (1 account) | ✓<br>Account holds under $250,000 | ✗ | Legacy Bank Account pending closure |
| BNA Bank (1 account) | ✓<br>Account holds under $250,000 | ✗ | Legacy Bank Account pending closure |
| Community Bank (1 account) | ✓<br>Account holds under $250,000 | ✗ | Legacy Bank Account pending closure |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CURO Group Holdings Corp., *et al.*, | Case No. 24-90165 (MI) |
| Debtors.[1] | |
| | **Re: Docket No.___** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO
OPERATE THEIR CASH MANAGEMENT SYSTEM AND MAINTAIN EXISTING
BANK ACCOUNTS, (B) MAINTAIN EXISTING BUSINESS FORMS AND
(C) PERFORM INTERCOMPANY TRANSACTIONS;
AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the Debtors for entry of an interim order (this "<u>Interim Order</u>"):  (i) authorizing the Debtors to continue to (a) operate their Cash Management System and maintain their existing Bank Accounts, including honoring certain prepetition obligations related thereto, (b) maintain existing Business Forms and (c) perform the Intercompany Transactions, including in connection with the Securitization Program; and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

of the Debtors' estates, their creditors and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      A hearing to consider the relief requested in the Motion on a final basis shall be held on **[_____], 2024, at [ : ] a/p.m. (prevailing Central Time)**, and any objections or responses to the Motion shall be filed and served on the notice parties on or prior to **[_____], 2024, at 4:00 p.m. (prevailing Central Time)**.

2.      The Debtors are authorized, but not directed, on an interim basis and in their sole discretion, to:  (a) continue operating the Cash Management System as described in the Motion and substantially as identified in **Exhibit 1** attached hereto, (b) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those accounts identified on **Exhibit 2** attached hereto, (c) honor their prepetition and postpetition obligations related thereto, including the Bank Fees, (d) maintain their Books and Records and their existing Business Forms (including letterhead) without reference to the Debtors' status as debtors in possession; *provided* that once the Debtors have exhausted their existing stock of checks, the Debtors shall ensure that any new Business Forms are clearly labeled "Debtor In Possession" as soon as it is reasonably practicable to do so and (e) continue performance of the Intercompany Transactions, including in connection with the Securitization Program, in the ordinary course of

business and consistent with historical practice; *provided* that the Debtors shall maintain current records with respect to all such transfers so that all Intercompany Transactions among the Debtors and between the Debtors and their non-Debtor affiliates may be readily ascertained, traced and properly recorded on intercompany accounts; *provided further* that such records shall be made available upon request by the U.S. Trustee and any official statutory committee.  To the extent that any transfers within the Cash Management System are disbursements, they will be noted and reflected on the monthly operating reports and post confirmation reports filed by Debtors.

3.      The Cash Management Banks are authorized to (a) continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course and (b) accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date (including the completion of any such transaction commenced on or before the Petition Date but not yet settled on or after the Petition Date in connection with the Customer Loans).  Notwithstanding anything to the contrary herein, the Cash Management Banks shall not be obligated to (a) extend credit to any Debtor in connection with the Cash Management System by permitting overdrafts or otherwise, (b) honor any check or other payment item drawn on a Bank Account at a Cash Management Bank unless there are sufficient and collected funds in such Bank Account or (c) allow any Debtor to initiate any outgoing EFT or ACH credits with respect to any Bank Account unless the same have been pre-funded by such Debtor.

4.      The Debtors and the Cash Management Banks are authorized to continue to perform pursuant to the terms of any prepetition agreement that exists between them relating to

any Bank Accounts or other cash management services except to the extent otherwise expressly provided in this Interim Order, and the parties to such agreements shall continue to enjoy the rights, benefits, liens, offset rights, privileges and remedies afforded to them, including, without limitation, the termination and fee provisions, under such agreements except to the extent expressly modified by the terms of this Interim Order.

5.     The Debtors are hereby authorized to close existing Bank Accounts in the ordinary course of business and open new bank accounts in the ordinary course of business, and any applicable bank or Cash Management Bank, including but not limited to the banks identified on **Exhibit 3** hereto, is directed to honor such request; *provided* that (a) any new bank account is opened at a bank that (i) is insured by the FDIC, (ii) is designated as an authorized depository by the U.S. Trustee, and (iii) agrees to be bound by the terms of this Interim Order, and (b) the Debtors provide reasonable prior written notice to the U.S. Trustee, the Ad Hoc Group and any statutory committee appointed in these Chapter 11 Cases of the opening of such account.  Such opening shall be timely indicated on the Debtors' monthly operating reports.

6.     All banks, including the Cash Management Banks, provided with notice of this Interim Order shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue stop payment orders in accordance with the documents governing such Bank Accounts.

7.     In the course of providing cash management services to the Debtors, each of the Cash Management Banks is authorized, without further order of this Court, to deduct the applicable Bank Fees and other applicable charges from the appropriate Bank Accounts.

8.     Subject to the terms set forth herein, any bank, including a Cash Management Bank, may rely upon the representations of the Debtors with respect to whether any check, draft, wire,

EFT or ACH payment or other transfer drawn or issued by the Debtors prior to, on or after the Petition Date should be honored pursuant to any order of this Court, without any duty to inquire further, and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Interim Order, at the direction of the Debtors or in a good-faith belief upon a representation by the Debtors that this Court has authorized such prepetition check or item to be honored shall be (a) deemed to be, nor shall be, liable to the Debtors or their estates on account of (i) following the Debtors' representations, instructions, directions or presentations as to any order of the Court (without any duty of further inquiry), (ii) honoring of certain prepetition checks, drafts, wires, EFT or ACH payments in a good faith belief or upon a representation by the Debtors that the Court has authorized such prepetition check, draft, wire, EFT or ACH payment, or (iii) an innocent mistake made despite implementation of reasonable handling procedures; or (b) otherwise deemed to be in violation of this Interim Order.

9.     Subject to paragraph 18 hereof, each Cash Management Bank shall be authorized to exercise rights of offset pursuant to the terms and agreements relating to any Bank Accounts or other cash management services with respect to any indebtedness at any time owed by the Debtors to such Cash Management Bank solely to the extent such indebtedness arises directly out of or directly relates to the Cash Management System at such Cash Management Bank, regardless of whether such indebtedness was incurred or arose prior to or after the Petition Date, including, without limitation, indebtedness on account of (a) Bank Fees and expenses (including, without limitation, analysis and overdraft fees or charges) related to the maintenance or administration of any Bank Account or lockbox or the processing of any, EFT, ACH or wire transfers, (b) checks drawn on the Bank Accounts which were cashed at the Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (c) overdrafts in

any Bank Account and any indebtedness arising from returned checks initially deposited in a Bank Account, and (d) amounts payable or reimbursable to such Cash Management Bank at any time in respect of EFT, ACH  or wire transfers.

10.     Any banks, including the Cash Management Banks, are further authorized to (a) honor the Debtors' directions with respect to the opening and closing of any Bank Account; *provided that* the Debtors shall have complied with the notice requirements set forth in this Interim Order, and (b) accept and hold the Debtors' funds in accordance with the Debtors' instructions.

11.     To the extent any of the Debtors' Bank Accounts are not in compliance with Bankruptcy Code section 345(b), the Debtors shall have 30 days from the date of entry of the Interim Order, without prejudice to seeking an additional extension or extensions, to come into compliance with Bankruptcy Code section 345(b); *provided* that nothing herein shall prevent the Debtors or the U.S. Trustee from seeking further relief from the Court to the extent that an agreement cannot be reached.  The Debtors may obtain a further extension of the time period set forth in this paragraph by entering into a written stipulation with the U.S. Trustee and filing such stipulation on the Court's docket without the need for further Court order.

12.     Except as otherwise set forth herein, the Debtors and the Cash Management Banks may, without further order of the Court, agree and implement changes to the policies and procedures related to the Cash Management System in the ordinary course of business; *provided* that the Debtors or the Cash Management Banks shall provide reasonable prior written notice to (i) the U.S. Trustee, (ii) any statutory committee appointed in these Chapter 11 Cases, (iii) the Ad Hoc Group, (iv) the Administrative Agents under the Securitization Facilities (as defined in the Securitization Program Orders), and (v) the individual Lenders (as defined in the Securitization Program Orders) under the facilities that correspond with the bank accounts affected by such

changes (if any); *provided further* that the Debtors shall make no changes to the Securitization Program Accounts without the prior written consent of the individual Lenders (as defined in the Securitization Program Orders) under the facilities that correspond with the bank accounts affected by such changes, which consent shall not be unreasonably withheld.

13.     All Intercompany Claims against a Debtor arising after the Petition Date shall be accorded administrative expense priority in accordance with Bankruptcy Code sections 503(b) and 507(a)(2), subject and subordinate to any superpriority administrative expense claims granted under (a) the Cash Collateral and DIP Orders (as defined below) and (b) the Securitization Program Orders; *provided, however*, the foregoing grant of administrative expense priority shall not apply with respect to any postpetition debtor in possession financing that is provided by any of the Debtors' non-Debtor subsidiaries.  For the avoidance of doubt, the relief granted in this Interim Order with respect to the postpetition Intercompany Transactions and the Intercompany Claims resulting therefrom shall not constitute a finding as to the validity, priority or status or any prepetition Intercompany Claim or any Intercompany Transaction from which such Intercompany Claim may have arisen, and the Debtors and any other party in interest expressly reserve any and all rights with regard to the validity, priority or status of any prepetition Intercompany Claim or any Intercompany Transaction from which such Intercompany Claim may have arisen.

14.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

15.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, with respect to prepetition amounts owed where such payments are authorized by an order of this Court.

16.     Nothing contained in the Motion or this Interim Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

17.     Nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program and policy under Bankruptcy Code section 365.

18.     Notwithstanding anything in this Interim Order to the contrary, any payment to be made, or any authorization contained hereunder, shall be subject to and in compliance with the terms of (i) any orders authorizing debtor in possession financing or the use of cash collateral approved by this Court in these Chapter 11 Cases (the "<u>Cash Collateral and DIP Orders</u>") and the DIP Documents (as defined in the Cash Collateral and DIP Orders), including compliance with

any budget or cash flow forecast in connection therewith and any other terms and conditions thereof, and (ii) the Securitization Program Orders, as applicable.  To the extent there is any inconsistency between the terms of the Cash Collateral and DIP Orders or the Securitization Program Orders, as applicable, and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral and DIP Orders or the Securitization Program Orders, as applicable, shall control.  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the Cash Collateral and DIP Orders and the Securitization Program Orders.

19.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

20.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

21.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon entry.

22.     Notwithstanding the Debtors' use of the Cash Management System, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

23.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

24.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Interim Order.

Houston, Texas
Dated: _____, 2024

_____
THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Cash Management System Schematic**

**Exhibit 2**

**Bank Accounts**

**<u>Exhibit 3</u>**

**Legacy Bank Accounts Pending Closure**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
|  | ) |  |
| Debtors.[1] | ) |  |
|  | ) | **Re: Docket No.___** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO
OPERATE THEIR CASH MANAGEMENT SYSTEM AND MAINTAIN EXISTING
BANK ACCOUNTS, (B) MAINTAIN EXISTING BUSINESS FORMS
AND (C) PERFORM INTERCOMPANY TRANSACTIONS;
AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of a final order (this "Final Order"): (i) authorizing the Debtors to continue to (a) operate their Cash Management System and maintain their existing Bank Accounts, including honoring certain prepetition obligations related thereto, (b) maintain existing Business Forms and (c) perform the Intercompany Transactions, including in connection with the Securitization Program; and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

of the Debtors' estates, their creditors and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Debtors are authorized, but not directed, on a final basis and in their sole discretion, to:  (a) continue operating the Cash Management System as described in the Motion and substantially as identified in **Exhibit 1** attached hereto, (b) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those accounts identified on **Exhibit 2** attached hereto, (c) honor their prepetition and postpetition obligations related thereto, including the Bank Fees, (d) maintain their Books and Records and their existing Business Forms (including letterhead) without reference to the Debtors' status as debtors in possession; *provided* that once the Debtors have exhausted their existing stock of checks, the Debtors shall ensure that any new Business Forms are clearly labeled "Debtor In Possession" as soon as it is reasonably practicable to do so and (e) continue performance of the Intercompany Transactions, including in connection with the Securitization Program, in the ordinary course of business and consistent with historical practice, *provided* that the Debtors shall maintain current records with respect to all such transfers so that all Intercompany Transactions among the Debtors and between them and their non-Debtor affiliates may be readily ascertained, traced and properly recorded on intercompany accounts; *provided further* that such records shall be made available

2

upon request by the U.S. Trustee and any official statutory committee.  To the extent that any transfers within the Cash Management System are disbursements, they will be noted and reflected on the monthly operating reports and post confirmation reports filed by Debtors.

2.      The Cash Management Banks are authorized to (a) continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course and (b) accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date (including the completion of any such transaction commenced on or before the Petition Date but not yet settled on or after the Petition Date in connection with the Customer Loans).  Notwithstanding anything to the contrary herein, the Cash Management Banks shall not be obligated to (a) extend credit to any Debtor in connection with the Cash Management System by permitting overdrafts or otherwise, (b) honor any check or other payment item drawn on a Bank Account at a Cash Management Bank unless there are sufficient and collected funds in such Bank Account or (c) allow any Debtor to initiate any outgoing EFT or ACH credits with respect to any Bank Account unless the same have been pre-funded by such Debtor.

3.      The Debtors and the Cash Management Banks are authorized to continue to perform pursuant to the terms of any prepetition agreement that exists between them relating to any Bank Accounts or other cash management services except to the extent otherwise expressly provided in this Final Order, and the parties to such agreements shall continue to enjoy the rights, benefits, liens, offset rights, privileges and remedies afforded to them, including, without

limitation, the termination and fee provisions, under such agreements except to the extent expressly modified by the terms of this Final Order.

4.      The Debtors are hereby authorized to close existing Bank Accounts in the ordinary course of business and open new bank accounts in the ordinary course of business, and any applicable bank or Cash Management Bank, including but not limited to the banks identified on **Exhibit 3** hereto, is directed to honor such request; *provided* that (a) any new bank account is opened at a bank that (i) is insured by the FDIC, (ii) is designated as an authorized depository by the U.S. Trustee and (iii) agrees to be bound by the terms of this Final Order, and (b) the Debtors provide reasonable prior written notice to the U.S. Trustee, the Ad Hoc Group and any statutory committee appointed in these Chapter 11 Cases of the opening of such account.  Such opening shall be timely indicated on the Debtors' monthly operating reports.

5.      All banks, including the Cash Management Banks, provided with notice of this Final Order shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue stop payment orders in accordance with the documents governing such Bank Accounts.

6.      In the course of providing cash management services to the Debtors, each of the Cash Management Banks is authorized, without further order of this Court, to deduct the applicable Bank Fees and other applicable charges from the appropriate Bank Accounts.

7.      Subject to the terms set forth herein, any bank, including a Cash Management Bank, may rely upon the representations of the Debtors with respect to whether any check, draft, wire, EFT or ACH payment or other transfer drawn or issued by the Debtors prior to, on or after the Petition Date should be honored pursuant to any order of this Court, without any duty to inquire further, and no bank that honors a prepetition check or other item drawn on any account that is the

4

subject of this Final Order, at the direction of the Debtors or in a good-faith belief upon a representation by the Debtors that this Court has authorized such prepetition check or item to be honored shall be (a) deemed to be, nor shall be, liable to the Debtors or their estates on account of (i) following the Debtors' representations, instructions, directions or presentations as to any order of the Court (without any duty of further inquiry), (ii) honoring of certain prepetition checks, drafts, wires, EFT or ACH payments in a good faith belief or upon a representation by the Debtors that the Court has authorized such prepetition check, draft, wire, EFT or ACH payment, or (iii) an innocent mistake made despite implementation of reasonable handling procedures; or (b) otherwise deemed to be in violation of this Final Order.

8.      Subject to paragraph 17 hereof, each Cash Management Bank shall be authorized to exercise rights of offset pursuant to the terms and agreements relating to any Bank Accounts or other cash management services with respect to any indebtedness at any time owed by the Debtors to such Cash Management Bank solely to the extent such indebtedness arises directly out of or directly relates to the Cash Management System at such Cash Management Bank, regardless of whether such indebtedness was incurred or arose prior to or after the Petition Date, including, without limitation, indebtedness on account of (a) Bank Fees and expenses (including, without limitation, analysis and overdraft fees or charges) related to the maintenance or administration of any Bank Account or lockbox or the processing of any EFT, ACH or wire transfers, (b) checks drawn on the Bank Accounts which were cashed at the Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (c) overdrafts in any Bank Account and any indebtedness arising from returned checks initially deposited in a Bank Account, and (d) amounts payable or reimbursable to such Cash Management Bank at any time in respect of EFT, ACH or wire transfers.

9.     Any banks, including the Cash Management Banks, are further authorized to (a) honor the Debtors' directions with respect to the opening and closing of any Bank Account; *provided that* the Debtors shall have complied with the notice requirements set forth in this Final Order, and (b) accept and hold the Debtors' funds in accordance with the Debtors' instructions.

10.     To the extent any of the Debtors' Bank Accounts are not in compliance with Bankruptcy Code section 345(b), the Debtors shall have 30 days from the date of entry of the Interim Order, without prejudice to seeking an additional extension or extensions, to come into compliance with Bankruptcy Code section 345(b); *provided* that nothing herein shall prevent the Debtors or the U.S. Trustee from seeking further relief from the Court to the extent that an agreement cannot be reached.  The Debtors may obtain a further extension of the time period set forth in this paragraph by entering into a written stipulation with the U.S. Trustee and filing such stipulation on the Court's docket without the need for further Court order.

11.     Except as otherwise set forth herein, the Debtors and the Cash Management Banks may, without further order of the Court, agree and implement changes to the policies and procedures related to the Cash Management System in the ordinary course of business; *provided* that the Debtors or the Cash Management Banks shall provide reasonable prior written notice to (i) the U.S. Trustee, (ii) any statutory committee appointed in these Chapter 11 Cases, (iii) the Ad Hoc Group, (iv) the Administrative Agents under the Securitization Facilities (as defined in the Securitization Program Orders), and (v) the individual Lenders (as defined in the Securitization Program Orders) under the facilities that correspond with the bank accounts affected by such changes (if any); *provided further* that the Debtors shall make no changes to the Securitization Program Accounts without the prior written consent of the individual Lenders (as defined in the

Securitization Program Orders) under the facilities that correspond with the bank accounts affected by such changes, which consent shall not be unreasonably withheld.

12.     All Intercompany Claims against a Debtor arising after the Petition Date shall be accorded administrative expense priority in accordance with Bankruptcy Code sections 503(b) and 507(a)(2), subject and subordinate to any superpriority administrative expense claims granted under (a) the Cash Collateral and DIP Orders (as defined below) and (b) the Securitization Program Orders; *provided, however*, the foregoing grant of administrative expense priority shall not apply with respect to any postpetition debtor in possession financing that is provided by any of the Debtors' non-Debtor subsidiaries.  For the avoidance of doubt, the relief granted in this Final Order with respect to the postpetition Intercompany Transactions and the Intercompany Claims resulting therefrom shall not constitute a finding as to the validity, priority or status or any prepetition Intercompany Claim or any Intercompany Transaction from which such Intercompany Claim may have arisen, and the Debtors and any other party in interest expressly reserve any and all rights with regard to the validity, priority or status of any prepetition Intercompany Claim or any Intercompany Transaction from which such Intercompany Claim may have arisen.

13.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

14.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, with respect to prepetition amounts owed where such payments are authorized by an order of this Court.

15.     Nothing contained in the Motion or this Final Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

16.     Nothing contained in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program and policy under Bankruptcy Code section 365.

17.     Notwithstanding anything in this Final Order to the contrary, any payment to be made, or any authorization contained hereunder, shall be subject to and in compliance with the terms of (i) any orders authorizing debtor in possession financing or the use of cash collateral approved by this Court in these Chapter 11 Cases (the "Cash Collateral and DIP Orders") and the DIP Documents (as defined in the Cash Collateral and DIP Orders), including compliance with any budget or cash flow forecast in connection therewith and any other terms and conditions thereof, and (ii) the Securitization Program Orders, as applicable.  To the extent there is any inconsistency between the terms of the Cash Collateral and DIP Orders or the Securitization

Program Orders, as applicable, and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral and DIP Orders or the Securitization Program Orders, as applicable, shall control.  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the Cash Collateral and DIP Orders and the Securitization Program Orders.

18.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

19.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

20.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon entry.

21.     Notwithstanding the Debtors' use of the Cash Management System, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

22.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

23.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Final Order.

Houston, Texas
Dated: _____, 2024

_____
THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

## <u>Exhibit 1</u>

**Cash Management System Schematic**

*[Intentionally Omitted]*

## **Exhibit 2**

**Bank Accounts**

*[Intentionally Omitted]*

## **Exhibit 3**

**Legacy Bank Accounts Pending Closure**

*[Intentionally Omitted]*