### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING
CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) MODIFYING
<u>THE AUTOMATIC STAY AND (V) SCHEDULING A FINAL HEARING</u>**

> **Emergency relief has been requested. Relief is requested not later than 1:30 p.m. (prevailing Central Time) on March 25, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on March 25, 2024, at 1:30 p.m. (prevailing Central Time) in Courtroom 404, 4th Floor, 515 Rusk Street, Houston, TX 77002. Participation at the hearing will only be permitted by audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state

the following in support of this motion (the "<u>Motion</u>"):

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC  29601.

**Relief Requested**

1.      By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim DIP Order") and a final order[2] (the "Final DIP Order") and, together with the Interim DIP Order, the "DIP Orders"):

> (i)      authorizing CURO Group Holdings Corp., a Delaware corporation, as borrower (the "DIP Borrower"), to obtain, and the other Debtors[3], as guarantors (each, a "Guarantor", and collectively, the "Guarantors" and the Guarantors together with the DIP Borrower the "DIP Loan Parties"), to guarantee, on a joint and several basis, the DIP Borrower's obligations under, a priming, senior secured, superpriority debtor-in-possession term loan facility (the "DIP Facility", and the commitments thereunder, the "DIP Commitments", and the term loans advanced (or deemed advanced) thereunder, the "DIP Loans") under that certain $70,000,000 Superpriority Senior Secured Debtor-In-Possession Credit Facility Term Sheet (the "DIP Term Sheet") which shall be superseded prior to closing the Initial Draw (as defined below) by that certain Superpriority Senior Secured Debtor-In-Possession Credit Agreement, by and among the DIP Borrower, the Guarantors, and the DIP Secured Parties (as defined below) (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement"), consisting of a "new money" multi-draw term loan facility in an aggregate principal amount of $70,000,000, of which (i) an initial draw amount of no more than $25,000,000 (the "Initial DIP Loans") will be made available to be drawn in a single drawing upon entry of the Interim DIP Order (together with all annexes and exhibits hereto, the "Interim DIP Order") and satisfaction of the other applicable conditions to any Initial DIP Loans set forth in the DIP Term Sheet (such initial draw, the "Initial Draw"), (ii) an amount of, together with the amount of the Initial Draw, no more than $50,000,000 (the "Second Draw DIP Loans") will be made available to be drawn in a single drawing upon entry of the Final DIP Order (as defined below) and satisfaction of the other applicable conditions to any Second Draw DIP Loans set forth in the DIP Credit Agreement (the "Second Draw") and (iii) subject to the consent of the Required DIP Lenders (as defined in the DIP Term Sheet), an additional amount of no more than $20,000,000 (the "Delayed Draw DIP Loans" and, together with the Initial DIP Loans and the Second Draw DIP Loans, the "DIP Loans") may be drawn in up to two drawings, each of no more than $10,000,000, upon entry of the Final DIP Order and the satisfaction or waiver of the other

---

[2]      The Debtors will file the form of the Final DIP Order prior to the Final Hearing (as defined herein).

[3]      The DIP Loan Parties shall not include LendDirect Corp. or CURO Canada Corp. (collectively, the "Canadian Debtors") and none of the provisions of the DIP Term Sheet, the DIP Documents and the DIP Orders (as each is defined herein) shall apply to the Canadian Debtors.

applicable conditions to the Delayed Draw DIP Loans set forth in the DIP Credit Agreement (the "<u>Delayed Draws</u>"), which shall be funded by OCO ($7 million) and certain Prepetition 1L Lenders or their affiliates or related funds ($63 million), in their capacities as postpetition financing lenders (collectively, the "<u>DIP Lenders</u>"), pursuant to the terms and conditions set forth in (x) the DIP Credit Agreement, (y) the DIP Term Sheet attached as an exhibit to the RSA (as defined below) and attached hereto and (z) all agreements, documents, and instruments delivered or executed in connection with the DIP Credit Agreement, in each case reasonably satisfactory in form and substance to the Debtors, Alter Domus (US) LLC, as administrative agent and collateral agent for the DIP Lenders (in such capacities, the "<u>DIP Administrative Agent</u>" and the "<u>DIP Collateral Agent</u>", as applicable, and, together, the "<u>DIP Agent</u>", and the DIP Agent, together with the DIP Lenders, the "<u>DIP Secured Parties</u>"), and Required Backstop Parties (as defined in the DIP Term Sheet) (such agreements, documents, and instruments, including, without limitation, the DIP Credit Agreement and the DIP Term Sheet, collectively, the "<u>DIP Documents</u>");

(ii)   authorizing the Debtors to (i) execute and enter into the DIP Credit Agreement and the other DIP Documents, consistent in all respects with the DIP Term Sheet and (ii) to perform their respective obligations thereunder and to take all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Credit Agreement and the other DIP Documents or the DIP Facility;

(iii)   granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, allowed superpriority administrative expense claims in each of the Cases and any successor cases, including any chapter 7 cases, with respect to the DIP Facility and all obligations and indebtedness owing thereunder and under the DIP Credit Agreement, the other DIP Documents and the Interim DIP Order (collectively, the "<u>DIP Obligations</u>"), subject to (i) the Superpriority Securitization Facilities Claims (as defined in the Inteim DIP Order), which claims shall be *pari passu* with the applicable superpriority claims granted to the DIP Agent hereunder, and (ii) the other priorities set forth herein;

(iv)   granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, automatically perfected priming security interests in, and liens on, with respect to the DIP Loans, all of the DIP Collateral (as defined below), including, but not limited to, Cash Collateral (as defined below) and the Prepetition Collateral (as defined below), in each case, to secure the DIP Loans and the other DIP Obligations, subject to (i) the Carve-Out (as defined below), (ii) the Securitization Liens (as defined in the Interim DIP Order) and (iii) the other terms and priorities set forth herein;

(v)   authorizing the Debtors to incur and pay, on the terms set forth herein and in the DIP Documents, on a final and irrevocable basis, the principal,

interest, premiums, fees, expenses, indemnities, and other amounts payable under the Interim DIP Order and the DIP Documents as such amounts become earned, due, and payable;

(vi)    authorizing the Debtors, pursuant to Bankruptcy Code sections 105, 361, 362, 363, 503 and 507 to (i) use cash collateral, as such term is defined in Bankruptcy Code section 363(a), and all other Prepetition Collateral (as defined below), solely in accordance with the terms of the Interim DIP Order, and (ii) grant adequate protection to the Prepetition Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (including Cash Collateral);

(vii)    modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order;

(viii)    except to the extent of the Carve Out (as defined below), and subject to entry of the Final DIP Order (as defined below) solely in respect of the Prepetition Collateral, waiving of all rights to surcharge any Prepetition Collateral or Collateral (as defined below) under Bankruptcy Code section 506(c) or any other applicable principle of equity or law;

(ix)    to the extent set forth herein, requiring the "equities of the case" exception under Bankruptcy Code section 552(b) to not apply to any of the Prepetition Secured Parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral under Bankruptcy Code section 552(b) or any other applicable principle of equity or law, provided that with respect to the Prepetition Secured Parties, the foregoing waiver shall be without prejudice to any provisions of the Final DIP Order;

(x)    scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of a Final DIP Order granting the relief requested in the Motion on a final basis;

(xi)    waiving any applicable stay with respect to the effectiveness and enforceability of the Interim DIP Order (including a waiver pursuant to Bankruptcy Rule 6004(h)); and

(xii)    granting related relief.

2.    In support of this Motion, the Debtors submit the following (filed contemporaneously herewith):

(i)     the *Declaration of Douglas Clark in Support of the Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>");[4] and

(ii)    the *Declaration of Joe Stone (Oppenheimer & Co., Inc.) in Support of (A) the Debtors' DIP Financing Motion and (B) the Debtors' Securitization Facilities Motion* (the "<u>Oppenheimer Declaration</u>").

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a), 363(b), 364, 506(a), 553, 1107 and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>"), and the Procedures for Complex Cases in the Southern District of Texas (the "<u>Complex Case Procedures</u>").

## Background

6.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to

---

[4]     All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration or the proposed Interim DIP Order, as applicable.

Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

7.     The Debtors and their non-Debtor affiliates (collectively, the "Company") provide consumer credit lending services across the U.S. and Canada. In the U.S., the Company operates under several principal brands, including "Heights Finance," "Southern Finance," "Covington Credit," "Quick Credit," and "First Heritage Credit." In Canada, the Company operates under the "Cash Money" and "LendDirect" brands through the Canadian Debtors. As of the Petition Date, the Company operated approximately 400 store locations across 13 U.S. states and approximately 150 stores in eight Canadian provinces and had an online presence in eight Canadian provinces and one territory. The Company generated approximately $672 million in total revenue for the fiscal year 2023, and, as of the Petition Date, the Debtors had approximately $2.1 billion in aggregate principal amount of prepetition funded debt obligations.

8.     A description of the Debtors and their businesses, and the facts and circumstances supporting this Motion, are set forth in the First Day Declaration filed contemporaneously with this Motion and incorporated by reference herein.

### **Preliminary Statement**

9.     The terms of the DIP Facility, including the budget restrictions, interest rate, and fees, were negotiated at arm's length and are, taken as a whole, fair and reasonable under the circumstances of the Chapter 11 Cases. Further, the Debtors do not believe there are alternative sources of financing currently available, much less any other sources available on both better and executable terms than those being provided by the DIP Facility and the Securitization Facilities (as defined below) on a combined basis. Moreover, the Debtors believe that the DIP Facility permits the Debtors to avoid a costly and value-destructive priming fight.

10.     The DIP Facility and the Securitization Facilities are not just the best financing currently available to the Debtors, but together with the proposed restructuring transactions contemplated by the RSA (as defined below), provide the Debtors with a global settlement with their key stakeholders that allows them to file prepackaged cases, with milestones designed to shorten their stint in chapter 11 (as best as feasibly possible), and with a clear path to emerge from the Chapter 11 Cases with a de-levered balance sheet, better positioned for long-term success.

## **CONCISE STATEMENT PURSUANT TO COMPLEX CASE PROCEDURES AND BANKRUPTCY RULE 4001[5]**

11.     Pursuant to paragraph 8 of the Complex Case Procedures, the proposed DIP Facility and/or Interim DIP Order contains the following provisions:

| Material Provision | Summary |
|---|---|
| **Sale or Plan Confirmation Milestones**<br><br>Complex Case Procedures, ¶ 8(a) | The DIP Credit Agreement will include the following milestones related to the Chapter 11 Cases (the "Milestones"):<br>•      no later than 1 business day after the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement;<br>•      no later than 3 business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;<br>•      no later than 3 business days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving the Securitization Facilities Motion;<br>•      no later than 45 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;<br>•      no later than 45 calendar days after the Petition Date the Court shall have entered a final order approving the Securitization Facilities Motion;<br>•      no later than 50 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Plan and approving the Disclosure Statement; and<br>•      no later than 120 calendar days after the Petition Date, the effective date of the Plan shall have occurred.<br><br>*DIP Term Sheet, § pp. 11-12 "Milestones".* |
| **Cross-Collateralization**<br><br>Complex Case Procedures, ¶ 8(b) | N/A |

---

[5]     Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

| Material Provision | Summary |
|---|---|
| **Roll-Ups / Refinance**<br><br>Complex Case Procedures, ¶ 8(c) | N/A |
| **Liens on Avoidance Actions or Proceeds Thereof**<br><br>Complex Case Procedures, ¶ 8(d) | Subject to the entry of the Interim DIP Order, the DIP Secured Parties will receive a lien on the proceeds of Avoidance Actions (as defined in the Interim DIP Order), under Bankruptcy Code Chapter 5.<br><br>*Interim DIP Order, ¶ 5.* |
| **Default Provisions and Remedies**<br><br>Complex Case Procedures, ¶ 8(e) | Usual and customary for debtor-in-possession financings and other events of default agreed to by CURO and the Required Backstop Parties.<br><br>The DIP Credit Agreement shall provide for customary remedies for an Event of Default that remains uncured including, but not limited to, the accrual of interest at the Default Rate and relief from the automatic stay on customary terms for the Bankruptcy Court.<br><br>The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "<u>Events of Default</u>"):  (a) the failure of the Debtors to comply with any of the Required Milestones (as defined below); or (b) the occurrence of an "Event of Default" under the DIP Credit Agreement.<br><br>Immediately upon the occurrence and during the continuation of an Event of Default and the delivery of the Carve Out Trigger Notice, notwithstanding the provisions of Bankruptcy Code section 362, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the Interim DIP Order, including, without limitation, the Remedies Notice Period (defined below), (x) the DIP Agent (at the direction of the Required DIP Lenders) may declare (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) the application of the Carve Out through the delivery of the Carve Out Trigger Notice to the DIP Borrower and (y) the DIP Agent (at the direction of the Required DIP Lenders) may declare a termination (or reduction or restriction) on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "<u>DIP Termination Date</u>") in which case such rights and remedies described in clauses (x) and (y) as are set forth in the applicable Termination Declaration shall immediately go into effect, provided, however, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve-Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved Budget, subject to Permitted Variances.  The Termination Declaration shall not be effective until notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), counsel to the Securitization Agents, and the U.S. Trustee.<br><br>Upon the occurrence of an Event of Default, the DIP Agent, (acting at the direction of the Required DIP Lenders) and/or applicable Prepetition 1L Secured Parties, may file a motion with the Court seeking emergency relief (a "<u>Remedies Determination Hearing</u>") on at least five (5) business days' notice to the Debtors, the Securitization Agents, and the U.S. Trustee, and the Debtors agree not to object to the shortening of notice of such |

| Material Provision | Summary |
|---|---|
| | Remedies Determination Hearing.  The "<u>Remedies Notice Period</u>" shall be defined as the date commencing with the Termination Declaration through a Court termination at the Remedies Determination Hearing.  At such Remedies Determination Hearing, (x) the DIP Agent (acting at the direction of the Required DIP Lenders) may seek Court approval to exercise its rights and remedies (in addition to those rights and remedies set forth in Paragraph 17(a) above) in accordance with the DIP Documents and the Interim DIP Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out and the Superpriority Securitization Facilities Claims, including the complete termination of the use of Cash Collateral and (y) the applicable Prepetition Secured Parties may seek to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition Secured Indebtedness Documents and the Interim DIP Order with respect to the Debtors' use of Cash Collateral. Upon a Termination Declaration, the Debtors, the Committee (if appointed), and/or any party in interest shall also be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing. <br><br> Nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing on any request by the Debtors or other party in interest to re-impose or continue the automatic stay under Bankruptcy Code section 362(a), use Cash Collateral, or to obtain any other injunctive relief.  Any delay or failure of the DIP Agent or the Prepetition 1L Agent to exercise rights under the DIP Documents, the Credit Documents, the Intercreditor Agreements, or the Interim DIP Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.  The occurrence of the DIP Termination Date shall not affect the validity, priority, or enforceability of any and all rights, remedies, benefits, and protections provided to any of the DIP Secured Parties or the Prepetition Secured Parties under the Interim DIP Order, which rights, remedies, benefits, and protections shall survive the DIP Termination Date or the delivery of a Termination Declaration. <br><br> Upon the termination of the DIP Facility in accordance with the terms of the Interim DIP Order, all DIP Obligations shall be indefeasibly paid in cash. <br><br> *DIP Term Sheet p. 12; Interim DIP Order, ¶¶ 15, 17.* |
| **Releases of Claims** <br><br> Complex Case Procedures, ¶ 8(f) | Subject to the rights and limitations set forth in Paragraph 30 of the Interim DIP Order, and effective upon entry of the Interim DIP Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Secured Parties and the Prepetition Secured Parties (each in their respective roles as such), and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and assigns, and predecessors and successors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Loans, the Prepetition 1L Loans, the Prepetition 1.5L Notes, the Prepetition 2L Notes, the DIP Liens, the Prepetition Liens, the DIP Obligations, the Prepetition Secured Indebtedness, the DIP Documents, the Prepetition 1L Credit |

| Material Provision | Summary |
|---|---|
| | Documents, the Prepetition 1.5L Notes Documents, the Prepetition 2L Notes Documents, or the Intercreditor Agreements, or the Interim DIP Order, as applicable, and/or the transactions contemplated hereunder or thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties or the Prepetition Secured Parties; provided that nothing herein shall relieve the Released Parties from fulfilling their obligations under the DIP Documents, the Prepetition 1L Credit Documents, the Prepetition 1.5L Notes Documents, the Prepetition 2L Notes Documents, the Intercreditor Agreements or the Interim DIP Order. *Interim DIP Order, ¶ 27-29.* |
| **Limitations on Use of Cash Collateral or DIP Proceeds** Complex Case Procedures, ¶ 8(g) | Subject to the terms and conditions of the Interim DIP Order, the Court hereby authorizes the Debtors' use of the proceeds of the DIP Facility and Cash Collateral during the period beginning with the Petition Date and ending on the DIP Termination Date (as defined below), in each case, solely and exclusively in a manner consistent with the Interim DIP Order and the Approved Budget (subject to Permitted Variances), and for no other purposes. As used in the Interim DIP Order: (i) "Approved Budget" means the last budget delivered to and agreed with the DIP Agent acting at the direction of the Required DIP Lenders prior to the Petition Date, including for the thirteen-week period reflected on the budget attached as Exhibit 1 hereto, as such Approved Budget may be modified from time to time by the Debtors subject to not receiving notice of an objection from the DIP Agent acting at the direction of the Required DIP Lenders in their reasonable discretion as set forth in Paragraph 7(e) of the Interim DIP Order; and (ii) "Budget Period" means the rolling four-week (4-week) period set forth in the Approved Budget in effect at such time. Notwithstanding anything to the contrary set forth in the Interim DIP Order, but subject to the proviso in Paragraph 31, none of the DIP proceeds (the "DIP Proceeds"), the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds of the foregoing may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person: (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties under the DIP Documents or the Interim DIP Order or the Prepetition Secured Parties under the Prepetition 1L Credit Documents, the Prepetition 1.5L Notes Documents, or the Prepetition 2L Notes Documents (as applicable) or the Interim DIP Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed (if any) in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties to recover on the DIP Collateral or the |

| Material Provision | Summary |
|---|---|
| | Prepetition Secured Parties to recover on the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties related to the DIP Obligations or the Prepetition Secured Parties related to the Prepetition Secured Indebtedness (excluding, for the avoidance of doubt, filing and seeking approval of the Securitization Facilities Motion); (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition Secured Indebtedness, or the DIP Secured Parties' and the Prepetition Secured Parties' respective DIP Liens, Prepetition Liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable (excluding, for the avoidance of doubt, filing and seeking approval of the Securitization Facilities Motion); or (iii) for monetary, injunctive, or other affirmative relief against any of the DIP Secured Parties, the Prepetition Secured Parties, or the DIP Secured Parties' and the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Indebtedness, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the DIP Liens and the Prepetition Liens) held by or on behalf of each of the DIP Secured Parties and the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Secured Indebtedness, to the extent applicable; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever (including, without limitation, any Avoidance Actions) related to the DIP Obligations, the DIP Liens, the Prepetition Secured Indebtedness or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of DIP Liens or the Prepetition Liens or any other rights or interests of any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations, the DIP Liens, the Prepetition Secured Indebtedness or the Prepetition Liens, to the extent applicable; *provided*, that notwithstanding the foregoing, an aggregate of $50,000 of the DIP Proceeds, the DIP Collateral, or the Prepetition Collateral, including Cash Collateral, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any Committee to investigate potential Challenges.<br><br>*Interim DIP Order ¶ 7, 31.* |
| **Non-Consensual Priming Liens**<br><br>Complex Case Procedures, ¶ 8(h) | N/A  All priming liens are consensual. |
| **Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties**<br><br>Complex Case Procedures, ¶ 8(i) | N/A |

12.    Each of the foregoing provisions is customary for DIP financings in cases of this complexity and appropriate under the circumstances; in addition, the provisions were negotiated

in good faith and at arm's length and are part of the overall deal with respect to the DIP Facility and RSA.  Where possible, the Debtors have sought to defer the effectiveness of such provisions to entry of a Final DIP Order to ensure that parties in interest have a full and fair opportunity to be heard.  Accordingly, the foregoing provisions should be approved.

13.     Additionally, the following chart contains a summary of the material terms of the proposed DIP Facility, with references to the applicable sections of the relevant documents.

| Material Provision | Summary |
|---|---|
| **Parties to the DIP Term Sheet**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Borrower</u>:  CURO Group Holdings Corp.<br><br><u>Guarantors</u>:  The other Debtors in the Chapter 11 Cases that guarantee the Prepetition 1L Term Loans, except in no event shall the Canadian Debtors be Guarantors.<br><br><u>Agent</u>:  Alter Domus (US) LLC<br><br><u>Lenders</u>:  (a) OCO ($7 million) and (b) holders of Prepetition 1L Term Loans who, on or prior to the DIP Joinder Deadline (as defined in the DIP Term Sheet), have (i) executed the RSA and (ii) elected to provide DIP Commitments and DIP Loans ($63 million) (the "DIP Lenders").<br><br>*DIP Term Sheet, p. 1.* |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | Unless converted to First-Out Takeback Term Loans (or, with respect to undrawn Delayed Draw commitments, commitments to fund delayed-draw First-Out Takeback Term Loans) pursuant to the Plan, all obligations under the DIP Loan Documents will be due and payable (and all commitments thereunder will terminate) in full in cash on the earliest of:  (a) the date that is six (6) months after the Petition Date; (b) 45 calendar days after the Petition Date if the Final DIP Order has not been entered by such date; (c) the date of acceleration of such obligations in accordance with the DIP Credit Agreement and the other DIP Loan Documents; (d) the effective date of any plan of reorganization or liquidation in the Chapter 11 Cases; (e) the date on which the sale of all or substantially all of the Debtors' assets is consummated; (f) the date on which termination of the RSA occurs; (g) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (h) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases; and (i) the date an order is entered in any Chapter 11 Case appointing a Chapter 11 trustee or examiner with enlarged powers.<br><br>*DIP Term Sheet, p. 3.* |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The aggregate amount of the Term Loan Commitments as of the Closing Date is $70 million (which total, for the avoidance of doubt, does not include any reduction on account of the Commitment Fee or the Backstop Fee payable pursuant to the terms of the DIP Term Sheet).<br><br>*DIP Term Sheet, p. 1, 3, DIP Facility, DIP Conversion.* |
| **Conditions of Borrowing** | The occurrence of the Closing Date and the Initial Draw shall be subject to the following conditions precedent: |

| Material Provision | Summary |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | 1. (i) An interim order approving the DIP Facility in substantially the form attached as Exhibit A to the DIP Term Sheet and otherwise subject to the consent rights in Section 3.02 of the RSA (the "<u>Interim DIP Order</u>") shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Required Backstop Parties and (ii) no motion for reconsideration of the Interim DIP Order shall have been timely filed by any Debtor or any subsidiary thereof.

2. The DIP Agent shall have received from the Borrower and each of the Guarantors (i) a counterpart of the DIP Loan Documents to be executed on the Closing Date to which the Borrower or such Guarantor is a party signed on behalf of such party or (ii) written evidence reasonably satisfactory to the DIP Agent (which may include delivery of signed signature page(s) by facsimile or other means of electronic transmission (e.g., "pdf" or DocuSign)) that such party has signed a counterpart thereof, which DIP Loan Documents shall be in form and substance consistent with the DIP Term Sheet and otherwise reasonably satisfactory to the Borrower and the Required Backstop Parties.

3. The DIP Agent shall have received a certificate of the Secretary or Assistant Secretary or Director or similar officer or authorized signatory of the Borrower and each of the Guarantors, dated as of the Closing Date and certifying a copy of resolutions duly passed or adopted by the Board of Directors (or equivalent governing body or committee thereof) of the Borrower or such Guarantor (or its members, managing general partner or managing member), authorizing the execution, delivery and performance of the DIP Loan Documents dated as of the Closing Date to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date.

4. The absence of any event, circumstance or condition occurring since the date hereof that has had, or would reasonably be expected to have, a material and adverse effect on (a) the business or condition (financial or otherwise), performance, properties, contingent liabilities or material agreements of the Borrower and each Subsidiary, taken as a whole, (b) the ability of the Borrower and the Guarantors, taken as a whole, to perform their payment obligations under the DIP Loan Documents or (c) the rights and remedies of the DIP Agent and the DIP Lenders under the DIP Loan Documents, in each case under clauses (a) and (b), excluding (i) any matters publicly disclosed in writing or disclosed to the DIP Agent and the DIP Lenders in writing prior to the Agreement Effective Date (as defined in the RSA), (ii) any matters disclosed in any first day pleadings or declarations filed in the Chapter 11 Cases, (iii) the filing of the Chapter 11 Cases, (iv) the events and conditions related and/or leading up to the filing of the Chapter 11 Cases and the effects resulting from, or related to, the filing of the Chapter 11 Cases or such events and conditions related and/or leading up thereto, and (v) the continuation and prosecution of the Chapter 11 Cases, including, without limitation, any action required to be taken under the DIP Loan Documents, the DIP Orders or the RSA (any of the foregoing in clauses (a) through (c), subject to the exclusions specified in clauses (i) through (v), being a "<u>Material Adverse Change</u>").

5. All necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Required Backstop Parties) and shall remain in effect; and the making of the loans under the DIP Facility shall not violate any |

| Material Provision | Summary |
|---|---|
| | material applicable requirement of law and shall not be enjoined temporarily, preliminarily or permanently. |
| | 6. The DIP Agent, the DIP Lenders and the fronting lender, if any, shall have received all fees payable hereunder or under any DIP Loan Documents on or prior to the Closing Date and, to the extent invoiced at least one (1) business day prior to the Closing Date and required to be paid under the DIP Loan Documentation and the Interim DIP Order on or prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including, without limitation, the reasonable and documented fees and out-of-pocket expenses of (a) Wachtell, Lipton, Rosen & Katz, counsel to the Ad Hoc Group and to the DIP Agent and (b) such other advisors as are necessary or appropriate, shall be paid (or will be paid from the proceeds of the DIP Loans). |
| | 7. The RSA shall be in full force and effect and shall not have been amended or modified in a fashion that is materially adverse to the DIP Lenders and no event permitting termination of the RSA with respect to the Consenting Stakeholders pursuant to Section 11.01 of the RSA shall have occurred and be continuing, in each case, unless consented to by the Required Backstop Parties. |
| | 8. To the extent requested at least ten (10) business days before the Closing Date, the Borrower shall have provided to the DIP Agent and the fronting lender, if any, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including the USA PATRIOT Act, in each case at least three (3) business days prior to the Closing Date. |
| | 9. At least three days in advance of the Closing Date, the DIP Agent and the fronting lender, if any, shall have received a beneficial ownership certificate in relation to any Borrower or Guarantor to the extent the Borrower or such Guarantor qualifies as a "legal entity customer". |
| | 10. The Backstop Commitment Parties shall have received the Budget and, except as reasonably acceptable to the Required Backstop Parties, such Budget shall be substantially consistent with the budget attached as Exhibit 1 to the form of Interim DIP Order attached as Exhibit A to the DIP Term Sheet. |
| | 11. The DIP Agent shall have received a customary certificate of a financial officer of the Borrower satisfactory to the Required Backstop Parties (it being understood, that a certificate substantially consistent with the equivalent certificate delivered in connection with the First Lien Credit Agreement shall be considered satisfactory), dated as of the Closing Date and confirming compliance with the conditions precedent set forth in Schedule A (other than any matters which are to be delivered by, provided by, or subject to the satisfaction of, any party other than the Borrower and the Guarantors) and the Draw Conditions. |
| | 12. The Chapter 11 Cases shall have been commenced by the Debtors and the same shall each be a debtor and a debtor-in-possession. |
| | 13. The Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under Chapter 7. |
| | 14. No trustee under chapter 7 or chapter 11 shall have been appointed in the Chapter 11 Cases. |

14

| Material Provision | Summary |
|---|---|
| | 15. After giving effect to the Interim DIP Order, the DIP Agent shall have a valid and perfected lien on and security interest in the DIP Collateral in the manner and with the priority set forth in the DIP Term Sheet. |
| | 16. (a) Amendments and waivers with respect to each of the Securitization Facilities, providing for continued performance under such Securitization facilities both during the Chapter 11 Cases and following the effective date of the Plan, in form and substance satisfactory to the Required Backstop Parties (the "Securitization Facility Amendments"), (i) shall have been entered into by all parties thereto, (ii) shall remain in full force and effect and (iii) shall not have been amended or modified and (b) no default, event of default or other similar event shall have occurred and be continuing under any of the Securitization Facilities, as amended by the Securitization Facility Amendments, in each case without the consent of the Required Backstop Parties. |
| | 17. Any orders approving the Securitization Facilities (including, without limitation, any amendments, supplements or other modifications thereto and any forbearance arrangements with respect thereof) shall be in form and substance satisfactory to the Required Backstop Parties. |
| | The Second Draw and the Delayed Draws shall be subject to the following conditions precedent: |
| | 1. (i) A final order approving the DIP Facility, which shall contain customary modifications to the Interim DIP Order to reflect the final nature of the approval set forth therein and shall otherwise be reasonably acceptable to the Required DIP Lenders (the "Final DIP Order"), shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Required DIP Lenders and (ii) no motion for reconsideration of the Final DIP Order shall have been timely filed by any Debtor or any subsidiary thereof. |
| | 2. The RSA shall be in full force and effect and shall not have been amended or modified in a fashion that is materially adverse to the DIP Lenders and no event permitting termination of the RSA with respect to the Consenting Stakeholders pursuant to Section 11.01 of the RSA shall have occurred and be continuing, in each case, unless consented to by the Required DIP Lenders. |
| | 3. (a) The Securitization Facility Amendments, (i) shall have been entered into by all parties thereto, (ii) shall remain in full force and effect and (iii) shall not have been amended or modified and (b) no default, event of default or other similar event shall have occurred and be continuing under any of the Securitization Facilities, as amended, supplemented or otherwise modified by such amendments and waivers, in each case without the consent of the Required DIP Lenders. |
| | 4. Any orders approving the Securitization Facilities (including, without limitation, any amendments, supplements or other modifications thereto and any forbearance arrangements with respect thereof) shall be in form and substance satisfactory to the Required DIP Lenders. |
| | On each date of the Initial Draw, the Second Draw or a Delayed Draw, as applicable, (i) immediately after giving effect to the Initial Draw, the Second Draw or the applicable Delayed Draw, as applicable, no default or event of default under the DIP Documents shall have occurred and be continuing, (ii) each of the representations and warranties set forth in the DIP Documents shall be true and correct in all material respects on and as of |

| Material Provision | Summary |
|---|---|
| | the date of the Initial Draw, the Second Draw or the applicable Delayed Draw, as applicable, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); provided that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects and (iii) the DIP Agent shall have received a borrowing notice in accordance with the DIP Documents (collectively, the "<u>Draw Conditions</u>").<br><br>The Delayed Draws shall also be subject to the consent of the Required DIP Lenders.<br><br>*DIP Term Sheet, p. 9, Exhibits A and B.* |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall pay interest at a rate of S + 10.00% (payable in kind), and subject to a 2.50% SOFR floor.<br><br>*DIP Term Sheet, p. 4.* |
| **Use of Proceeds**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii) | Subject to the terms and conditions of the Interim DIP Order, the Interim DIP Order authorizes the Debtors' use of the proceeds of the DIP Facility and Cash Collateral during the period beginning with the Petition Date and ending on the Termination Date (as defined below), in each case, solely and exclusively in a manner consistent with the Interim DIP Order and the Approved Budget (subject to Permitted Variances), and for no other purposes.<br><br>As used in the Interim DIP Order: (i) "Approved Budget" means the last budget delivered to and agreed with the DIP Agent acting at the direction of the Required DIP Lenders prior to the Petition Date, including for the thirteen-week period reflected on the budget attached as Exhibit 1 to the Interim DIP Order, as such Approved Budget may be modified from time to time by the Debtors subject to not receiving notice of an objection from the DIP Agent acting at the direction of the Required DIP Lenders in their reasonable discretion as set forth in Paragraph 7(e) of the Interim DIP Order; and (ii) "Budget Period" means the rolling four-week (4-week) period set forth in the Approved Budget in effect at such time.<br><br>Notwithstanding anything to the contrary set forth in the Interim DIP Order, but subject to the proviso below,  none of the DIP Proceeds, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds of the foregoing may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties under the DIP Documents or the Interim DIP Order or the Prepetition Secured Parties under the Prepetition 1L Credit Documents, the Prepetition 1.5L Notes Documents, or the Prepetition 2L Notes Documents (as applicable) or the Interim DIP Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed (if any) in these Cases in connection with the |

| Material Provision | Summary |
|---|---|
| | assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties to recover on the DIP Collateral or the Prepetition Secured Parties to recover on the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties related to the DIP Obligations or the Prepetition Secured Parties related to the Prepetition Secured Indebtedness; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition Secured Indebtedness, or the DIP Secured Parties' and the Prepetition Secured Parties' respective DIP Liens, Prepetition Liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against any of the DIP Secured Parties, the Prepetition Secured Parties, or the DIP Secured Parties' and the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Indebtedness, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the DIP Liens and the Prepetition Liens) held by or on behalf of each of the DIP Secured Parties and the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Secured Indebtedness, to the extent applicable; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever (including, without limitation, any Avoidance Actions) related to the DIP Obligations, the DIP Liens, the Prepetition Secured Indebtedness or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of DIP Liens or the Prepetition Liens or any other rights or interests of any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations, the DIP Liens, the Prepetition Secured Indebtedness or the Prepetition Liens, to the extent applicable; provided, that notwithstanding the foregoing, an aggregate of $50,000 of the DIP Proceeds, the DIP Collateral, or the Prepetition Collateral, including Cash Collateral, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any Committee to investigate potential Challenges.<br><br>*DIP Term Sheet, p. 4.* |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition 1L Secured Parties, the Prepetition 1.5L Secured Parties, and the Prepetition 2L Secured Parties (each as defined in the Interim DIP Order).<br><br>*Interim DIP Order, ¶ 4.* |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | In exchange for the Backstop Commitments, the Backstop Commitment Parties shall receive a premium equal to 5.00% of the initial Backstop Commitments (the "Backstop Premium"), which shall be fully earned upon entry of the Interim DIP Order and paid (i) to the extent the Plan is consummated, in equity at a 25% discount to the implied equity value provided by the Plan upon effectiveness of the Plan, and (ii) otherwise in cash upon payment in full of the DIP Claims, in each case ratably based on each of the Backstop Commitment Parties' respective Backstop Commitments. For the avoidance of doubt, only the Backstop Commitment Parties shall be entitled to receive the Backstop Premium. Any fronting/seasoning fees incurred by the DIP Lenders will be paid out of the proceeds of the DIP Loans. |

| Material Provision | Summary |
|---|---|
| | In addition to the Backstop Fee, the Debtors shall pay to all DIP Lenders, ratably, |
| | (i) an upfront fee of 3.00% of all amounts drawn under the DIP Facility, payable in kind, and |
| | (ii) an exit fee of 10.00% of the aggregate principal amount of the DIP Facility (including any amounts paid in kind), (a) in the case of the consummation of the Plan and the conversion of the DIP Loans, with 5.00% payable in kind as additional Takeback Term Loans and 5.00% payable in equity of Reorganized CURO at a 25% discount to implied Plan equity value, and (b) otherwise, payable in cash upon satisfaction in full of the DIP Claims. *DIP Term Sheet, pp. 4, 12.* |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The use of DIP Facility and Cash Collateral proceeds is subject to a 13-week budget, which is attached to the Interim DIP Order as <u>Schedule 1</u>. *Interim DIP Order, Schedule 1.* |
| **Reporting Information** Bankruptcy Rule 4001(c)(l)(B) | Usual and customary for debtor-in-possession financings of this type and in form and substance acceptable to the Debtors and the Required Backstop Parties, including, but not limited to, (i) updates of the Budget every 4 weeks (updated Budget to be acceptable to Required DIP Lenders) with the first such update due on April 19, 2024, (ii) a bi-weekly report (with the first such report due on April 11, 2024 with respect to the period ending April 5, 2024 and thereafter 4 business days after the end of each succeeding two-week period ending on Friday of the applicable calendar week) comparing the Budget for the most recently ended Test Period to actual results for such Test Period for each line item in a form to be attached to the DIP Credit Agreement and otherwise reasonably acceptable to the Required DIP Lenders and the Debtors, with management commentary on any individual line item with a positive or negative variance of 10.0% or more as compared to the Budget (unless the dollar amount corresponding to such percentage variance is less than $1,000,000, in which case no management commentary shall be required); (iii) monthly delivery (within 5 calendar days after the end of the applicable calendar month) of operating reports for the Debtors in a form consistent with the reports that have been provided to holders of the Prepetition First Lien Indebtedness prior to the date hereof (subject to such modifications agreed with the Required Backstop Parties), (iv) quarterly and annual financial reporting consistent with the Credit Agreement and (v) commercially reasonable efforts to report (which reports may be delivered by email) unrestricted cash of the Borrower and its Subsidiaries as of end of each calendar day within 24 hours of the end of such day; provided that such cash balance is solely based on the online viewing of the Borrower and its Subsidiaries' bank accounts and may not include cash in transit. *DIP Term Sheet p. 7.* |
| **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) | The Debtors' actual cumulative cash flow, based on actual "Operating Disbursements" (which shall not include professional fees) and actual "Operating Receipts", during each Test Period shall not be less than 85% of the projected cumulative cash flow, based on projected "Operating Disbursements" (which shall not include professional fees) and projected "Operating Receipts", for such Test Period as set forth in the Budget. "<u>Test Period</u>" shall mean, with respect to actual cash receipts and operating cash disbursements, (x) initially, the four-week period following the Petition Date and (y) thereafter, each rolling four-week period ending two weeks after the last day of the previous Test Period. *DIP Term Sheet, p. 10.* |

| Material Provision | Summary |
|---|---|
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement will include the following milestones related to the Chapter 11 Cases (the "Milestones"):<br><br>•     no later than 1 business day after the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement;<br><br>•     no later than 3 business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;<br><br>•     no later than 3 business days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving the Securitization Facilities Motion;<br><br>•     no later than 45 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;<br><br>•     no later than 45 calendar days after the Petition Date the Court shall have entered a final order approving the Securitization Facilities Motion;<br><br>•     no later than 50 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Plan and approving the Disclosure Statement; and<br><br>•     no later than 120 calendar days after the Petition Date, the effective date of the Plan shall have occurred.<br><br>*DIP Term Sheet, p. 7 .* |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i) | Subject and subordinate to the Carve Out and to the provisions set forth in Paragraph 5 of the Interim DIP Order, effective immediately upon entry of the Interim DIP Order and perfected automatically hereunder as of the Petition Date and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control, the DIP Obligations shall be secured by valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected liens on, and security interests in (such liens and security interests, the "DIP Liens") all (i) the Prepetition Collateral and (ii) all of the DIP Borrower's and the Guarantors' other now-owned and hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, whether encumbered or unencumbered, including, without limitation, all prepetition property and postpetition property of the DIP Borrower and Guarantors' estates, and the proceeds, products, rents and profits thereof, whether arising from Bankruptcy Code section 552(b) or otherwise, including, without limitation, all equipment, goods, accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the DIP Borrower and the Guarantors (including any accounts opened prior to, on, or after the Petition Date), insurance, equity interests, intercompany claims, accounts receivable, other rights to payment, general intangibles, contracts, securities, chattel paper, interest rate hedging agreements, owned real estate, real property leaseholds, fixtures, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, causes of action (other than those arising under Bankruptcy Code sections 544, 547, 548 and 549 and any related action under Bankruptcy Code section 550 (the "Avoidance Actions")), and any and all proceeds, products, rents, and profits of the foregoing, and proceeds of Avoidance Actions (all property identified in Paragraph 5 of the Interim DIP Order, subject to the following provisos, being collectively referred to as the "DIP Collateral"); provided that, for the avoidance of doubt and notwithstanding anything to the contrary herein, the DIP Collateral shall exclude (i) all Excluded Assets (as defined in the DIP Credit Agreement), (ii) any of the foregoing to the extent a lien cannot attach to such property, assets or rights pursuant to applicable law, provided the liens granted pursuant to the Interim DIP Order shall, attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing, and (iii) (x) any and all |

| Material Provision | Summary |
|---|---|
| | Receivables originated and sold pursuant to the Securitization Facilities to the Non-Debtor Purchasers (including any such Receivables purported to be sold pursuant to the Securitization Facilities but subsequently avoided or recharacterized as an extension of credit or a pledge) prepetition or postpetition and any proceeds thereof and (y) any claims or causes of action held by the Non-Debtor Purchasers arising on account of transfers of Receivables to the Non-Debtor Purchasers (the assets described in this clause (iii), "Transferred Receivables Assets").  The DIP Agent shall have a security interest in any residual cash balance remaining in the Carve Out Reserves (as defined below) after all obligations benefitting from the Carve Out have been indefeasibly paid in full in cash pursuant to a final non-appealable order of this Court (or such other Court of competent jurisdiction), which residual balance shall be paid to the DIP Agent for application in accordance with the DIP Credit Agreement (such security interest on residual cash balances remaining in the Carve Out Reserves, the "Carve Out Security Interest").  The Carve Out shall be senior to the DIP Liens, the Prepetition Liens, the Adequate Protection Liens and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Indebtedness whatsoever.  The DIP Liens will otherwise have the following priorities:<br><br>Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, non-avoidable, automatically fully-perfected, first-priority senior security interest in and lien upon all of the DIP Collateral, whether existing on the Petition Date or thereafter created, acquired or arising, and wherever located, that, on or as of the Petition Date, is not subject to Prepetition Liens or any other valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), subject and subordinate only to (x) the Carve Out, and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest, and (y) the Receivables Liens (as defined in the Interim Securitization Order) (which shall apply solely to all rights of the Originators (as defined in the Interim Securitization Order) in the Receivables originated and purported to be sold through the Securitization Facilities on or after the Petition Date, whether existing on the Petition Date or thereafter arising or acquired) and the Pledge Liens (as defined in the Interim Securitization Order) (which apply solely to all limited liability company interests and all other equity interests in each case in the respective Non-Debtor Purchasers, and all proceeds and products thereof) (collectively, the "Securitization Liens"); and<br><br>Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, non-avoidable, automatically fully perfected, first-priority senior priming security interest and lien (the "Priming Liens") on all DIP Collateral, whether in existence on the Petition Date or thereafter created, acquired, or arising, and wherever located, to the extent that such DIP Collateral is subject to any of the Prepetition Liens or any other valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), subject and subordinate only to the Carve Out and to the Permitted Prior Liens and as to the Carve Out Reserves, and funds therein, to the extent of any Carve Out Security Interest.  The Priming Liens shall prime in all respects the liens and security interests of the Prepetition Secured Parties (including, without limitation, the Prepetition Liens and the Adequate Protection Liens) (the "Primed Liens").  Notwithstanding anything herein to the contrary, the Priming Liens (x) shall be subject and immediately junior to the Permitted Prior Liens and will have no recourse to the Carve Out Reserves, or the funds therein (other than to the extent of the Carve Out Security Interest on the terms therein and in all cases, for the avoidance of doubt, subject and subordinate to the Carve Out), in all respects, (y) shall be subject and subordinate to the Securitization Liens, and (z) shall be senior in all respects to the Primed Liens. |

| Material Provision | Summary |
|---|---|
| | The DIP Liens shall be entitled to the full protection of Bankruptcy Code section 364(e) if the Interim DIP Order or any provision hereof is vacated, reversed, or modified on appeal.<br><br>*Interim DIP Order, ¶. 5.* |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B) | As used in the Interim DIP Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee (the "<u>U.S. Trustee</u>") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by Interim DIP Order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code section 327, 328, or 363 (the "<u>Debtor Professionals</u>") and the Committee pursuant to Bankruptcy Code section 328 or 1103 (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (the amounts set forth in clauses (i) through (iii), the "<u>Pre Carve Out Trigger Notice Cap</u>"); and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $2,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the "<u>Post-Carve Out Trigger Notice Cap</u>"); provided that no fees or expenses of any Professional Persons may be included in the calculation of both the Post-Carve Out Trigger Notice Cap and the Pre-Carve Out Trigger Notice Cap. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (as directed by Required DIP Lenders in their sole discretion) to the Debtors, their lead restructuring counsel (Akin Gump Strauss Hauer & Feld LLP), the U.S. Trustee, and counsel to any Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>*Interim DIP Order, ¶ 13.* |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B) | Subject to the Challenge Period (as defined below), the stipulations, admissions, waivers, and releases contained in the Interim DIP Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors, including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative, in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date. The stipulations, admissions, waivers and releases contained in the Interim DIP Order, including the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and solely to the extent that (i) a party in interest is granted standing to file an adversary proceeding or contested matter under the Bankruptcy Rules and files a complaint seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding (A) the validity, enforceability, extent, priority, or perfection of any of the Prepetition Liens or the mortgages, security interests, and liens of any of the Prepetition Secured Parties securing any Prepetition Secured Indebtedness, and the characterization of any of the |

| Material Provision | Summary |
|---|---|
| | Prepetition Collateral or (B) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Secured Indebtedness (any such claim set forth in such a complaint, a "<u>Challenge</u>") before the earlier of (a) (1) solely in the case of the Committee, if any, sixty (60) days after the appointment of the Committee if such appointment occurs no more than sixty (60) days from the entry of the Interim DIP Order and (2) with respect to all other parties in interest, sixty (60) days from the entry of the Interim DIP Order and (b) the date of entry of an order confirming a plan of reorganization or liquidation, subject to further extension by written agreement of (1) the Debtors and (2) as applicable, the Prepetition 1L Agent (at the direction of the requisite Prepetition 1L Secured Parties), the Prepetition 1.5L Agent (at the direction of the requisite Prepetition 1.5L Secured Parties) or Prepetition 2L Agent (at the direction of the requisite Prepetition 2L Secured Parties) (the "<u>Challenge Period</u>" and, the date of expiration of the Challenge Period, the "<u>Challenge Period Termination Date</u>"); *provided*, *however*, that if, prior to the end of the Challenge Period, (x) the Cases are converted to Cases under chapter 7 of the Bankruptcy Code, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (I) the time remaining under the Challenge Period plus ten (10) days or (II) such other time as ordered by the Court solely with respect to any such trustee appointed; and (ii) the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter, which is no longer subject to appeal.<br><br>*Interim DIP Order, ¶ 30.* |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Pursuant to sections 361, 363(c), 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of their interests in the Prepetition Collateral in light of the incurrence of the DIP Facility, the imposition of the automatic stay, and the Debtors' use of the Prepetition Collateral, the Debtors and the DIP Lenders agree to the following forms of adequate protection to be granted to the holders of the Prepetition Secured Indebtedness (the "<u>Adequate Protection</u>"): (a) valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral (the "<u>Adequate Protection Liens</u>"), which Adequate Protection Liens shall be junior and subordinate only to (i) the Carve-Out, (ii) the Securitization Liens, (iii) the DIP Liens, (iv) the Prepetition Priming Liens, (v) in the case of the Prepetition 1.5L Indebtedness and the Prepetition 2L Indebtedness, the Adequate Protection Liens in favor of holders of the Prepetition 1L Indebtedness, and (vi) in the case of the Prepetition 2L Indebtedness, the Adequate Protection Liens in favor of the holders of the Prepetition 1.5L Indebtedness; (b) superpriority administrative expense claims as provided by section 507(b) of the Bankruptcy Code (the "<u>Adequate Protection Superpriority Claims</u>"), which Adequate Protection Superpriority Claims shall be junior only to (i) the Carve-Out, and the Administrative Charges (solely for the Canadian Debtors), (ii) the Superpriority Securitization Facilities Claims, (iii) the DIP Claims, (iv) in the case of the Prepetition 1.5L Indebtedness and the Prepetition 2L Indebtedness, the Adequate Protection Superpriority Claims in favor of the holders of the Prepetition 1L Indebtedness, and (v) in the case of the Prepetition 2L Indebtedness, the Adequate Protection Superpriority Claims in favor of the holders of the Prepetition 1.5L Indebtedness; (c) for the benefit of the holders of Prepetition 1L Indebtedness, payment in cash of all reasonable and documented out-of-pocket fees and expenses (to the extent consistent with the terms of the applicable engagement or reimbursement letters, if any) of Alter Domus (US) LLC, as administrative agent and collateral agent under the Prepetition 1L Credit Agreement, and the Ad Hoc Group (including all reasonable and documented fees and expenses of Wachtell, Lipton, Rosen & Katz, Houlihan Lokey, Ernst & Young, Texas counsel to the Ad Hoc Group, Canadian counsel to the Ad Hoc Group and such other advisors as are necessary and appropriate and reasonably acceptable to the Debtors), in each case that have accrued as of the Petition Date upon entry of the Interim DIP Order and, thereafter, within ten (10) calendar days of presentment of invoices; and |

| Material Provision | Summary |
|---|---|
| | (d) financial and other periodic reporting substantially in compliance with the Prepetition 1L Credit Agreement and as required under the DIP Credit Agreement.<br><br>*DIP Term Sheet, pp. 5-6.* |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"):  (a) the failure of the Debtors to comply with any of the Required Milestones (as defined below); or (b) the occurrence of an "Event of Default" under the DIP Credit Agreement.<br><br>*DIP Term Sheet, p. 12.* |

| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Immediately upon the occurrence and during the continuation of an Event of Default and the delivery of the Carve Out Trigger Notice, notwithstanding the provisions of Bankruptcy Code section 362, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the Interim DIP Order, including, without limitation, the Remedies Notice Period (defined below), (x) the DIP Agent (at the direction of the Required DIP Lenders) may declare (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) the application of the Carve Out through the delivery of the Carve Out Trigger Notice to the DIP Borrower and (y) the DIP Agent (at the direction of the Required DIP Lenders) may declare a termination (or reduction or restriction) on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "<u>DIP Termination Date</u>") in which case such rights and remedies described in clauses (x) and (y) as are set forth in the applicable Termination Declaration shall immediately go into effect, provided, however, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve-Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved Budget, subject to Permitted Variances. The Termination Declaration shall not be effective until notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), counsel to the Securitization Agents, and the U.S. Trustee.<br><br>Upon the occurrence of an Event of Default, the DIP Agent, (acting at the direction of the Required DIP Lenders) and/or applicable Prepetition 1L Secured Parties, may file a motion with the Court seeking emergency relief (a "<u>Remedies Determination Hearing</u>") on at least five (5) business days' notice to the Debtors, the Securitization Agents, and the U.S. Trustee, and the Debtors agree not to object to the shortening of notice of such Remedies Determination Hearing. The "<u>Remedies Notice Period</u>" shall be defined as the date commencing with the Termination Declaration through a Court determination at the Remedies Determination Hearing. At such Remedies Determination Hearing, (x) the DIP Agent (acting at the direction of the Required DIP Lenders) may seek Court approval to exercise its rights and remedies (in addition to those rights and remedies set forth in Paragraph 17(a) above) in accordance with the DIP Documents and the Interim DIP Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out and the Superpriority Securitization Facilities Claims, including the complete termination of the use of Cash Collateral and (y) the applicable Prepetition Secured Parties may seek to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition Secured Indebtedness Documents and the Interim DIP Order with respect to the Debtors' use of Cash Collateral. Upon a Termination Declaration, the Debtors, the Committee (if appointed), and/or any party in interest shall also be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing.<br><br>Nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing on any request by the Debtors or other party in interest to re-impose or continue the automatic stay under Bankruptcy Code section 362(a), use Cash Collateral, or to obtain any other injunctive relief. Any delay or failure of the DIP Agent or the Prepetition 1L Agent to exercise rights under the DIP Documents, the Credit Documents, the Intercreditor Agreements, or the Interim DIP Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise. The occurrence of the DIP Termination Date shall not affect the validity, priority, or enforceability of any and all rights, remedies, benefits, and protections provided to any of the DIP Secured Parties or the Prepetition Secured Parties under the Interim DIP Order, which rights, |

| Material Provision | Summary |
|---|---|
| | remedies, benefits, and protections shall survive the DIP Termination Date or the delivery of a Termination Declaration.<br><br>Upon the termination of the DIP Facility in accordance with the terms of the Interim DIP Order, all DIP Obligations shall be indefeasibly paid in cash.<br><br>The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of the Interim DIP Order and the transactions contemplated hereby.  The stay of Bankruptcy Code section 362 is hereby modified to permit the parties to accomplish the transactions contemplated by the Interim DIP Order.<br><br>*Interim DIP Order, ¶ 17, 24.* |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | All DIP Liens authorized and granted pursuant to the DIP Orders shall be deemed valid, binding, enforceable, effective and automatically perfected and non-avoidable as of the Petition Date, and no further filing, notice, or act under applicable law or otherwise will be required to effect such perfection.  The DIP Lenders, or the DIP Agent, acting upon the instruction of the Required DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be necessary under state law or other applicable law in order to enforce the security, perfection or priority of the DIP Liens and the DIP Loans.<br><br>*DIP Term Sheet, p. 5.* |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors will indemnify the DIP Lenders, the DIP Agent, and their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility and any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by any of the Debtors or any of their subsidiaries or affiliates; provided that no such person will be indemnified for costs, expenses, or liabilities (x) to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the gross negligence, fraud or willful misconduct of such Indemnified Person (or their related persons), (y) that arose from a material breach in bad faith of such Indemnified Person's (or their related persons') obligations under any DIP Document (as determined by a court of competent jurisdiction in a final, non-appealable judgment) or (z) arose from any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve an act or omission of the Debtors and is brought by any Indemnified Person against another Indemnified Person (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against the DIP Agent, in its capacity as such). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction (x) to have resulted primarily from such Indemnified Person's (or their related persons') gross negligence, fraud, or willful misconduct or breach of their obligations under the DIP Facility or (y) that arose from a material breach in bad faith of such Indemnified Person's (or their related persons') obligations under any DIP Document, and in no event shall any Indemnified Person be |

| Material Provision | Summary |
|---|---|
| | liable on any theory of liability for any special, indirect, consequential, or punitive damages.<br><br>*Interim DIP Order, ¶ 38.* |
| **Section 506(c) and 552(b) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x) | In consideration of (i) the DIP Secured Parties' willingness to provide the DIP Facility to the extent set forth herein, (ii) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to subordinate their respective liens and claims to the Carve-Out, (iii) the Prepetition Secured Parties' agreement to subordinate their respective liens and superpriority claims to the DIP Obligations and the Carve Out, (iv) the application and use of Cash Collateral as set forth in the Interim DIP Order, subject to and upon entry of the Final DIP Order, each DIP Secured Party and Prepetition Secured Party is entitled to (x) the rights and benefits of Bankruptcy Code section 552(b), and a waiver of any "equities of the case" claims under Bankruptcy Code section 552(b), (y) a waiver of the provisions of Bankruptcy Code section 506(c) and (z) a waiver of unjust enrichment, the equitable doctrine of marshaling and other similar doctrines.<br><br>*Interim DIP Order, ¶ I.* |

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE

### A. The Debtors' Prepetition Capital Structure

14.     As of the Petition Date, the Company's capital structure includes approximately

$2.1 billion of funded debt Obligations, as summarized below.

| *($ in millions)* | Capacity | Interest Rate | Maturity | Balance (in USD) |
|---|---|---|---|---|
| **Debtors' Corporate Debt:** | | | | |
| 1L Secured Term Loan | N/A | 18.0% Fixed | Aug 2027 | $ 178 |
| 1.5L Secured Notes | N/A | 7.5% Fixed | Aug 2028 | $ 682 |
| 2L Secured Notes | N/A | 7.5% Fixed | Aug 2028 | $ 318 |
| | | | **Subtotal:** | **$ 1,178** |
| **Non-Debtor Funding Debt:** | | | | |
| Heights SPV | $375 | 1-Mo SOFR + 5.70% | July 2025 | $301 |
| Heights SPV II | $140 | 1-Mo SOFR + 8.50% | Nov 2026 | $136 |
| First Heritage SPV | $200 | 1-Mo SOFR + 4.40% | July 2025 | $155 |
| Canada SPV | C$400 | 3-Mo CDOR + 6% | Aug 2026 | $252 |
| Canada SPV II | C$150 | 3-Mo CDOR + 8% | Nov 2025 | $80 |
| | | | **Subtotal:** | **$924** |
| | | | **Total:** | **$2,102** |

### B. Prepetition 1L Credit Agreement

15.     On May 15, 2023, in connection with the May 2023 Exchange (as defined below),

CURO, as borrower, and the other Debtors (other than the Canadian Debtors), as guarantors,

entered into the First Lien Credit Agreement (the "Prepetition 1L Credit Agreement") with Alter

Domus (US) LLC, as administrative agent and collateral agent (the "Prepetition 1L Agent"), and the lenders party thereto (the "Prepetition 1L Lenders"), pursuant to which the Prepetition 1L Lenders extended $150 million in term loans to CURO (the "Prepetition 1L Term Loans"). The Prepetition 1L Term Loans are secured by first priority liens on substantially all of the domestic Debtors' assets. The obligations under the Prepetition 1L Credit Agreement are guaranteed by all Debtors, other than the Canadian Debtors. The Prepetition 1L Term Loans mature on August 2, 2027. Interest on the Prepetition 1L Term Loans accrues at a rate of 18.00% per annum, payable quarterly. As of the Petition Date, approximately $178 million in principal amount remains outstanding under the Prepetition 1L Credit Agreement.

16.    Of the aggregate principal amount of Prepetition 1L Term Loans provided under the Prepetition 1L Credit Agreement, approximately $17 million was funded by a non-Debtor Curo SPV, LLC (the "CURO SPV"), a wholly-owned special purpose vehicle of the Company (the "SPV Loans"), using proceeds from a concurrent private placement issuance of 18.00% Senior Secured Notes issued by the CURO SPV (the "Backstop Notes") to certain noteholders. The Backstop Notes are secured by the SPV Loans and guaranteed by CURO.

17.    The proceeds of the Prepetition 1L Term Loans were used (a) to repay the obligations under the existing senior revolver facility that provided $40 million of borrowing capacity, (b) for payment of fees and expenses associated with the May 2023 Exchange, and (c) for general corporate purposes. The Prepetition 1L Credit Agreement includes certain financial and operating covenants, including a covenant requiring the Company to maintain liquidity as of the last day of each calendar month, beginning May 31, 2023, (a) prior to September 30, 2024, equal to or greater than $75 million and (b) on and after September 30, 2024, equal to or greater than $60 million (the "Liquidity Covenant").

### C.     Prepetition Senior Secured Notes and the May 2023 Exchange

18.     On July 30, 2021, CURO, as the issuer, issued $750 million in aggregate principal amount of 7.5% senior secured notes maturing on August 1, 2028 (the "Prepetition 2L Notes"), pursuant to an Indenture (the "Prepetition 2L Notes Indenture") between CURO, the guarantors party thereto, and TMI Trust Company, as trustee and collateral agent (the "Prepetition 2L Notes Trustee").  On December 3, 2021, CURO issued an additional $250 million in principal amount of Prepetition 2L Notes to fund the acquisition of certain assets.  The obligations under the Prepetition 2L Notes Indenture are guaranteed by all Debtors, other than Curo Ventures, LLC and the Canadian Debtors.  At the time of issuance, the Prepetition 2L Notes were secured by a first priority lien on substantially all of the Debtors' assets (other than the assets of the Canadian Debtors).

19.     On May 15, 2023, the Company closed an exchange transaction (the "May 2023 Exchange"), pursuant to which certain holders of the Prepetition 2L Notes agreed to exchange approximately $682.3 million aggregate principal amount of the Prepetition 2L Notes for approximately $682.3 million of new 7.5% senior secured notes maturing on August 1, 2028 (the "Prepetition 1.5L Notes").  The Prepetition 1.5 Lien Notes are governed by an Indenture (the "Prepetition 1.5L Notes Indenture") between CURO, as issuer, the other Debtors, as guarantors (other than the Canadian Debtors), and U.S. Bank Trust Company, N.A., as trustee and collateral agent (the "Prepetition 1.5L Notes Trustee").   The Prepetition 1.5L Notes retained all the same terms and conditions of the Prepetition 2L Notes except that they rank senior in lien priority to the remaining Prepetition 2L Notes.  Consequently, the liens evidencing the Prepetition 2L Notes now rank third in priority, behind the Prepetition 1L Term Loans and Prepetition 1.5L Notes.  The interest on each of the Prepetition 1.5L Notes and Prepetition 2L Notes accrues at a rate of 7.5% per annum, payable on February 1 and August 1 of each year.  As of the Petition Date,

approximately $682 million and $318 million remains outstanding under the Prepetition 1.5L Notes and Prepetition 2L Notes, respectively.

### D.    Non-Debtor Funding Debt

20.    As of the Petition Date, the Company had five credit facilities pursuant to which loans receivable originated by the Debtors are sold to variable interest entities to collateralize debt incurred under each such facility (the "Securitization Facilities").  The borrowers under each of the Securitization Facilities are non-debtor bankruptcy remote special purpose vehicles (the "SPVs").  The Securitization Facilities generally provide that recycling will cease approximately one year prior to maturity.  The Securitization Facilities are repaid when the Debtors collect and turn over to the applicable agent funds on account of the loan receivables and during the amortization period beginning when the revolving period matures.

21.    The allocation of loan receivables among the Securitization Facilities is determined by (a) location of loan receivable origination, (b) requirements regarding size, type or other loan receivable characteristics set forth in each Securitization Facility, and (c) the Debtors' discretion, when a loan receivable qualifies for sale to more than one of the Securitization Facility.  The Securitization Facilities provide a critical source of liquidity for day-to-day operations for the Company.  During the revolving period, the borrowing capacity under each Securitization Facility is determined by applying an applicable advance rate against the outstanding principal balance of eligible receivables, subject to certain adjustments.  Each Securitization Facility is secured primarily by a pool of secured and unsecured fixed-rate personal loans and related assets.

22.    CURO is a limited guarantor under each of the Securitization Facilities. Additionally, each of First Heritage Credit of Alabama, LLC, First Heritage Credit of South Carolina, LLC, and First Heritage Credit of Tennessee, LLC are originators of loans receivable subject to the First Heritage SPV Facility and the Heights II SPV Facility.  First Heritage Credit

of Louisiana, LLC and First Heritage Credit of Mississippi, LLC are also originators of loans receivable subject to the First Heritage SPV Facility. Covington Credit, Inc., Covington Credit of Alabama, Inc., Covington Credit of Georgia, Inc., Covington Credit of Texas, Inc., Heights Finance Corporation (IL), Heights Finance Corporation (TN), Quick Credit Corporation, Southern Finance of South Carolina, Inc. and Southern Finance of Tennessee, Inc. are also originators of loans receivable subject to the Heights SPV Facility and the Heights II SPV Facility. Further, each of LendDirect Corp. and CURO Canada Corp. are Debtor obligors under the Canada SPV Facility by virtue of being originators of loans receivable subject to such facility and under the Canada SPV II Facility by virtue of being originators of loans receivable subject to and limited guarantors under such facility. The borrowers under each of the Securitization Facilities are non-debtor bankruptcy remote special purpose vehicles (the "Non-Debtor Purchasers").[6]

The Securitization Facilities include the following:

(i) ***Heights SPV***. On July 15, 2022, Heights Financing I, LLC, a wholly owned bankruptcy-remote non-Debtor subsidiary of the Company, entered into a non-recourse revolving warehouse facility with, among others, certain lender party thereto, and Wilmington Trust National Association, as borrower loan trustee and Atlas Securitized Products Holdings, L.P. as successor structuring and syndication agent and as administrative agent (as amended, modified and supplemented from time to time, the "Heights SPV Facility"). The current borrowing capacity under the Heights SPV Facility is $375 million. The effective interest rate under the Heights SPV Facility is 1-month SOFR plus 5.7%. The warehouse revolving period matures on July 15, 2024. The facility matures on July 15, 2025. As of the Petition Date, the outstanding balance under the Heights SPV Facility was approximately $301 million.

(ii) ***Heights SPV II***. On November 3, 2023, Heights Financing II, LLC, a wholly owned bankruptcy-remote non-Debtor subsidiary of the Company, entered into a non-recourse revolving warehouse facility with certain lenders and Wilmington Trust N.A., as borrower loan trustee and Midtown

---

[6] The following entities are non-debtor affiliates of the Debtors: (i) First Heritage Financing I, LLC, (ii) Heights Financing I, LLC, (iii) Heights Financing II, LLC, (iv) CURO Canada Receivables Limited Partnership, (v) CURO Canada Receivables GP, Inc., (vi) CURO Canada Receivables II Limited Partnership, and (vii) CURO Canada Receivables II GP Inc.

Madison Management LLC, as structuring and syndication agent and as administrative agent (as amended, modified and supplemented from time to time, the "Heights SPV II Facility"). The current borrowing capacity under the Heights SPV Facility is $140 million. The effective interest rate under the Heights SPV II Facility is 1-month SOFR plus 8.5%. The warehouse revolving period and the facility mature on November 3, 2026. As of the Petition Date, the outstanding balance under the Heights SPV II Facility was approximately $136 million.

(iii) *First Heritage SPV*. On July 13, 2022, concurrently with the closing of the First Heritage Acquisition (as defined below), First Heritage Financing I, LLC, a wholly owned bankruptcy-remote non-Debtor subsidiary of the Company, entered into a non-recourse revolving warehouse facility with, among others, certain lenders thereto, Wilmington Trust National Association, as borrower loan trustee, and Atlas Securitized Products Holdings, L.P., as successor structuring and syndication agent and as administrative agent (as amended, modified and supplemented from time to time, the "First Heritage SPV Facility"), to replace the incumbent lender's facility and finance future loans originated by First Heritage (as defined below). The current borrowing capacity under the First Heritage SPV Facility is $200 million. The effective interest rate under the First Heritage SPV is 1-month SOFR plus 4.40%. The warehouse revolving period matures on July 13, 2024. The facility matures on July 13, 2025. As of the Petition Date, the outstanding balance under the First Heritage SPV Facility was $155 million.

(iv) *Canada SPV*. On August 2, 2018, CURO Canada Receivables Limited Partnership, a wholly owned bankruptcy-remote non-Debtor subsidiary of the Company, entered into a non-recourse revolving warehouse facility with lenders party thereto and Waterfall Asset Management, LLC, as administrative agent (as amended, modified and supplemented from time to time, the "Canada SPV Facility"). The borrowing capacity under the Canada SPV Facility is currently approximately $340 million (or CAD $400 million). The effective interest rate is 3-month CDOR plus 6.00%. The warehouse revolving period ends in July 2024. The facility matures on August 2, 2026. As of the Petition Date, the outstanding balance under the Canada SPV Facility was $252 million. The general partner of the limited partnership is non-Debtor CURO Canada Receivables GP, Inc.

(v) *Canada SPV II*. On May 12, 2023, CURO Canada Receivables II Limited Partnership, a wholly owned bankruptcy-remote non-Debtor subsidiary of the Company, entered into a non-recourse revolving warehouse facility with lenders party thereto and Midtown Madison Management LLC, as administrative agent (as amended, modified and supplemented from time to time, the "Canada SPV II Facility"), to finance loans in Canada. The effective interest rate is three-month CDOR plus 8.00%. The warehouse revolving period ends and the facility matures on November 12, 2025. The

borrowing capacity under the Canada SPV II Facility is currently approximately $112 million (or CAD $150 million). As of the Petition Date, the outstanding balance under the Canada SPV II Facility was $80 million. The general partner of the limited partnership is non-Debtor CURO Canada Receivables II GP Inc.

**E.      Intercreditor Agreements**

23.      The Debtors (other than Canadian Debtors) are party to a senior Intercreditor Agreement, by and among the Debtors, Prepetition 1L Agent, the Prepetition 1.5L Notes Trustee and the Prepetition 2L Notes Trustee, dated as of May 15, 2023 (the "<u>Senior Intercreditor Agreement</u>"). The Debtors (other than Canadian Debtors) are also party to a junior Intercreditor Agreement, by and among the Debtors, the Prepetition 1.5L Notes Trustee and the Prepetition 2L Notes trustee, dated as of May 15, 2023 (the "<u>Junior Intercreditor Agreement</u>", and, together with the Senior Intercreditor Agreement, the "<u>Intercreditor Agreements</u>"). The Intercreditor Agreements govern, among other things, distributions of payments and treatment of collateral between the lenders under the Prepetition 1L Credit Agreement, the Prepetition 1.5L Notes Indenture and the Prepetition 2L Notes Indenture.

**The Debtors Have A Need For**
<u>**Debtor-In-Possession Financing And Use Of Cash Collateral**</u>

24.      The Debtors require immediate access to the Prepetition Secured Parties' Cash Collateral and the DIP Facility. The Debtors' businesses are cash intensive, with significant daily costs required to satisfy obligations to vendors, landlords and employees and cash available for extension of credit to the Debtors' customer base. While the Debtors have been operating on a cash flow positive basis prior to the Petition Date, access to additional liquidity is necessary to ensure that the Debtors are able to meet certain financial covenants under the Securitization Facilities and thus have sufficient liquidity to operate their business and continue generating income. As described in the Oppenheimer Declaration, without the financing provided through

the DIP Facility, the Debtors would not be able to continue to operate in the ordinary course. Moreover, the Debtors need additional liquidity to cover the expenses of these Chapter 11 Cases in order to effectuate the restructuring contemplated by the RSA and the Plan.  Finally, the Debtors require access to the DIP Facility to maintain certain liquidity thresholds required under the Securitization Facilities, continued access to which is essential to allow the Debtors to continue their consumer lending operations.

25.     As such, and given their current limited liquidity, the Debtors require immediate access to postpetition financing and the use of the Prepetition Secured Parties' Cash Collateral to operate their businesses.  Further, the failure to obtain access to the DIP Facility and the Prepetition Secured Parties' Cash Collateral will result in immediate and irreparable harm to the Debtors and their stakeholders and materially diminish the value of the Debtors' estates.

26.     Accordingly, the proposed DIP Facility is necessary to provide the Debtors with the liquidity they need to fund the Chapter 11 Cases.

**Alternative Financing Is Not Available On Better Terms**

27.     Given the Debtors' prepetition capital structure and the challenges facing their business, the DIP Facility represents the best and only actionable postpetition financing to supplement the Securitization Facilities.  As discussed in greater detail below, prior to the Petition Date, the Debtors, with the aid of their advisors, reviewed and considered several potential alternatives with the goal of maximizing enterprise value.  None of these alternatives proved actionable in light of the Debtors' capital structure and market environment.  As a result, the Debtors determined that the restructuring agreed to under the RSA, including the DIP Facility, was the best and only path forward under the circumstances.

## Events Leading to These Chapter 11 Cases

28.     As is further described in the First Day Declaration, in the two years leading up to the Petition Date, the Company took significant steps aimed at (a) shifting its business model to focus on longer term, higher balance and lower interest rate credit products, (b) optimizing its business operations and (c) strengthening the Company's liquidity.   These efforts included strategic acquisitions, sale of legacy businesses, and operational restructuring, which included replacement of the C-suite in the second half of 2022 and into early 2023.   Additionally, in May and November of 2023, the Company attempted to strengthen its liquidity through two debt transactions and to extend operating liquidity by refinancing of the Securitization Facilities.

29.     Despite the Company's efforts to boost liquidity, reduce expenses and streamline operations, the Company's 2023 cash flow was lower than forecasted.   First, the Company's sale of Flexiti, its Canadian point-of-sale consumer financing business, did not generate as much in proceeds as the Company forecasted.   Second, in 2023, the Company became embroiled in litigation with Community Choice Financial ("CCFI") – the purchaser of the U.S. Legacy Direct Lending Business.   The Company sold the U.S. Legacy Direct Lending Business to CCFI in July 2022.   Per the terms of the sale agreement, CCFI owed the Company a portion of the deferred purchase price, the final net working capital adjustment and a portion of amounts owed under the Transition Services Agreement, totaling approximately $22.5 million plus interest.   The Company initiated litigation against CCFI to recover the amounts owed.   In turn, CCFI is counter-suing the Company for $27 million (which claims the Company believes are without merit).

30.     Other factors contributing to strained liquidity included the rising interest rates which increased the cost of servicing the Company's existing debt, the Company's inability to successfully pledge certain single-pay Canada-based loans with a value of approximately $25 million and increase in variable advance rates under the Securitization Facilities.

31.     Importantly, in late 2023 the Company undertook an effort to ensure continued operational financing by seeking to refinance the Securitization Facilities, some of which were fast approaching maturity.  The Company engaged Oppenheimer & Co. Inc. ("Oppenheimer") to explore potential refinancing of certain Securitization Facilities.  Although many of the parties Oppenheimer spoke to indicated that they were interested in supporting the Company's business and its management team, they were only willing to do so if the Company was able to deleverage its corporate balance sheet.  Other parties that Oppenheimer spoke to indicated that should the corporate leverage remain elevated, any refinancing would be at a materially higher costs than the existing levels.  Additionally, it became apparent to the Company that, given its constrained balance sheet, any decision to make material payments to third parties would result in further liquidity tightening by the lenders under the Securitization Facilities.

32.     In January 2024, the Company's management determined that it may miss the January 31, 2024, liquidity covenant under certain of the Prepetition Credit Documents, which would have resulted in a default under the Company's debt instruments and the Securitization Facilities.  In the face of this potential default, and guided by market feedback that the Securitization Facility lenders would cease recycling at the first opportunity if significant cash were to leave the Debtors' balance sheet outside of a deleveraging event, on February 1, 2024, the Company elected not to make the $25.6 million interest payments due on the Prepetition 1.5L Notes and the $11.9 million interest payment due on the Prepetition 2L Notes.

33.     While the Prepetition 2L Notes Indenture allowed for a 30-day grace period before the Payment Default ripened into an "Event of Default," the grace period under the Prepetition 1.5L Notes was only five business days.  As such, on February 5, 2024, the Company commenced a solicitation of consents from the holders of the Prepetition 1.5L Notes to supplement the

indenture to obtain an extension of the grace period as a result of the Payment Default until March 1, 2024 and a waiver of the Potential Liquidity Default (the "Consent Solicitation").  The Company received an overwhelming support from the holders, receiving consents from holders of 97% of the Prepetition 1.5L Notes.  Because the Payment Defaults constituted a cross default under the Prepetition 1L Credit Agreement, the Company also obtained a waiver of the aforementioned defaults from the holders of the Prepetition 1L Term Loans.  The Payment Defaults and the Potential Liquidity Default also triggered certain cross-defaults under the Company's Securitization Facilities.

34.     Following the launch of the Consent Solicitation, the Company determined that as of January 31, 2024, the Company was in compliance with the Liquidity Covenant set forth in the Prepetition 1L Credit Agreement, the Prepetition 1.5L Notes Indenture and the Company's Securitization Facilities; and therefore, no liquidity default under such debt facilities occurred as of such date.  Nevertheless, the Company determined that, given the go-forward liquidity projections and the need to deleverage the balance sheet to facilitate the extension of the Securitization Facilities, making the interest payments on the Prepetition 1.5L Notes and the Prepetition 2L Notes was not advisable.  Therefore, the Company focused its efforts on continuous engagement with the lenders and third parties for a comprehensive financial restructuring to strengthen the Company's balance sheet and financial position.  As part of the restructuring discussion, the Debtors began exploring financing options to fund the Chapter 11 Cases.

35.     To facilitate the Debtors' efforts to obtain the best financing terms currently available to them, the Debtors (through their financial advisor, Oppenheimer) solicited interest for alternative postpetition financing from parties outside of their existing capital structure (the "DIP Marketing Process").  As part of that process, Oppenheimer solicited interest from 23 financial

institutions to determine whether such parties would be willing to provide postpetition financing

to the Debtors.  The Debtors considered all potential financing options—unsecured, junior secured,

and senior secured financing, and reached out to a variety of third parties and the existing

stakeholders, including significant shareholders of the Company.  No party that Oppenheimer

communicated with as part of the marketing process and no other party that Oppenheimer is aware

of is currently interested in providing and willing to provide postpetition financing to the Debtors,

whether on an unsecured, junior, or senior basis.  Notably, no party was interested in providing

financing on a priming basis given the risk and uncertainty attendant to a priming fight with the

Debtors' prepetition secured lenders.

36.     As further explained in the Oppenheimer Declaration, the principal economic terms

proposed under the DIP Facility, including the contemplated fees and interest rates, are customary

and usual for financings of these types.  Moreover, the interest rates and fees were the subject of

arm's-length and good-faith negotiations, are integral components of the overall terms of the

Securitization Facilities and the proposed DIP Facility and were required by the DIP Lenders as

consideration for the extension of postpetition financing.

37.     The DIP Facility ensures the Debtors' continued access to Cash Collateral on a

consensual basis and, together with the Securitization Facilities, provides the financing and

liquidity necessary to consummate the de-leveraging transactions set forth in the RSA.

Accordingly, for the reasons set forth herein, the Debtors believe the DIP Facility is in the best

interests of the Debtors' estates and should be approved.

## **BASIS FOR RELIEF**

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

**A.     Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

38.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.   Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.   *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Courts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). This Court has approved postpetition financing as a sound exercise of debtors' business judgment. *See, e.g., In re Air Methods Corp., et al.*, Case No. 23-90886 (MI) (Bankr. S.D. Tex. Nov. 14, 2023), Docket No. 225; *In re SmileDirectClub, Inc., et al.*, Case No. 23-90786 (CML) (Bankr. S.D. Tex. Nov. 7, 2023), Docket No. 296; *Noble Home Furnishings LLC, et al.*, Case No. 23-90773 (CML) (Bankr. S.D. Tex. Oct. 4, 2023), Docket No. 130.

39.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.   *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

40.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a careful evaluation of alternatives, including the prepetition DIP Marketing Process.  Specifically, the Debtors and their advisors determined that it would not be possible to rely solely on Cash Collateral and the Securitization Facilities to fund these cases and that the Debtors would need additional postpetition financing to support their minimum liquidity requirements under the Securitization Facilities, operations and chapter 11 activities.  The proceeds of the proposed DIP Facility and the Securitization Facilities will allow the Debtors to pay employees, landlords, vendors, and other critical operating expenses in the ordinary course, each of which is necessary to avoid disruptions to the Debtors' business operations.  Beyond satisfying the Debtors' immediate liquidity needs, the DIP Facility and the Securitization Facilities further provide the Debtors with a clear path to emergence to implement the de-leveraging transactions contemplated under the RSA.

41.     The terms and conditions of the DIP Facility are favorable to the Debtors and in the best interests of their estates.  Specifically, the DIP Facility:

a)     is being funded by a group of the Debtors' prepetition secured lenders who have a vested interest in the success of the Chapter 11 Cases;

b)     is anticipated to provide sufficient liquidity for the Debtors to fund their operations and avoid business disruptions during the pendency of the Chapter 11 Cases;

c)     avoids the prospect of a costly and value-destructive priming fight with the Debtors' senior lenders and/or a substantially more costly adequate protection package;

> d)     provides for a mechanism for the DIP Lenders to convert their claims under the DIP Facility into First-Out Exit Term Loans, and thus avoids the additional risks and costs of a marketing process to obtain exit financing and potential delays associated therewith; and

> e)     provides the Debtors with a clear path to emergence by providing the liquidity needed (together with the Securitization Facilities) to implement the de-leveraging transactions contemplated under the RSA.

42.     Overall, the Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of their respective advisors.  The Debtors believe that they have obtained the best financing available, given the circumstances and the broader restructuring contemplated by the RSA.  Absent the proceeds of the DIP Facility and the Securitization Facilities, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

43.     The Debtors propose to obtain financing under the DIP Facility, in part, by granting superpriority claims and liens pursuant to Bankruptcy Code sections 364(c) and 364(d).  Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including liens on previously unencumbered property and "priming" liens on other property (subject to the terms of the DIP Orders)[7].

---

[7]     For avoidance of doubt, all DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims and Prepetition Liens (as each term is defined in the Interim DIP Order), shall be subject to the Superpriority Securitization Facilities Claims and Securitization Liens as provided in the interim order approving the Securitization Facilities Motion and the Interim DIP Order.

44.     Bankruptcy Code Section 364(c) provides that, if a debtor is unable to obtain

unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1),

a court:

> May authorize the obtaining of credit or the incurring of debt (1)
> with priority over any or all administrative expenses of the kind
> specified in [Bankruptcy Code] section 503(b) or 507(b); (2)
> secured by a lien on property of the estate that is not otherwise
> subject to a lien; or (3) secured by a junior lien on property of the
> estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under Bankruptcy Code section 364(c) is authorized, after notice and hearing, upon

showing that unsecured credit cannot be obtained); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088

(4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections of sections 364(c)).

45.     Further, Bankruptcy Code section 364(d) provides that a debtor may obtain credit

secured by a senior or equal lien on property of the estate already subject to a lien where the debtor

is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the

holder of the lien on the property of the estate on which such senior or equal lien is proposed to be

granted."   11 U.S.C. § 364(d)(1).   Accordingly, the Debtors may "prime" the liens of the

Prepetition Secured Parties if the Debtors are unable to obtain unsecured or junior secured credit

and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties'

interests in collateral are adequately protected.

46.     First, the Debtors are not able to obtain unsecured or junior secured credit.  Despite

the DIP Marketing Process, the Debtors do not have any actionable financing alternative, other

than the proposed Securitization Facilities, which, by themselves are insufficient to satisfy the

Debtors' postpetition financing needs.  The DIP Facility is necessary to provide the Debtors with

the liquidity they need to consummate the restructuring transactions contemplated under the RSA. The Debtors' prepetition lenders were not willing to provide postpetition financing on an unsecured or junior basis, nor has any third party presented such a proposal. Absent such consent, the Debtors risk a potentially costly and difficult nonconsensual priming dispute with any potential postpetition priming lenders and the Prepetition Secured Parties at a time when the Debtors' liquidity is severely limited. Following extended negotiations with the Prepetition Secured Parties, the Debtors were able to negotiate the proposed DIP Facility and obtain concessions that materially improved the terms of the proposed financing. Thus, as a result of these negotiations and the DIP Marketing Process, the Debtors determined that the DIP Facility is the best actionable alternative available to fund these cases under the circumstances.

47.     Second, the Prepetition Secured Parties have consented (or are deemed to consent) to their prepetition liens and claims being primed on the terms set forth in the DIP Orders, which includes a negotiated consensual adequate protection package. As further described in the Interim DIP Order, the proposed adequate protection package for the Prepetition Secured Parties includes, subject to the Carve Out, (a) valid and perfected security interests in and liens on DIP Collateral in accordance with the priorities set forth in the DIP Orders, (b) superpriority administrative expense claims under Bankruptcy Code sections 503(b) and 507(b), in accordance with the priorities set forth in the DIP Orders, (c) the reasonable and documented fees and expenses of the counsel and other professionals as set forth in the DIP Orders, and (d) certain information rights as set forth in the DIP Orders.

48.     Overall, the DIP Facility is the only actionable financing under the circumstances and will avoid the risk of a costly and value-destructive priming fight with the Debtors' prepetition lenders and will provide the Debtors (together with the Securitization Facilities) with the liquidity

needed to administer the Chapter 11 Cases and implement the de-leveraging transactions contemplated under the RSA. Accordingly, the Debtors submit that the DIP Facility (including the superpriority claims and priming liens provided thereunder) is both warranted and appropriate under the circumstances.

## II.     The Debtors Should Be Authorized to Continue to Use the Cash Collateral.

49.     The Debtors' use of property of their estates, including the Cash Collateral[8], is governed by Bankruptcy Code section 363,[9] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). Pursuant to Bankruptcy Code section 363(c)(2), a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

50.     In general, what constitutes adequate protection is decided on a case-by-case basis. While Bankruptcy Code section 361 provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection in each case. *See In re Timbers of Inwood Forest Assocs.*, Ltd., 793 F.2d 1380,

---

[8]     For avoidance of doubt, any accounts receivables or cash proceeds thereof which are property of the Non-Debtor Purchasers (as defined herein), but in the possession of one of the Debtors shall not be Cash Collateral.

[9]     Bankruptcy Code Section 363(a) defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

1393 (5th Cir. 1986) (citing legislative history for proposition that the form of adequate protection is determined on a case-by-case basis); *see also In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696-97 (Bankr. S.D. Tex. 2009) (noting that the Bankruptcy Code "contains no specific, definitive definition of adequate protection").  Adequate protection is designed to shield a secured creditor from diminution in value of its interest in collateral during the period of a debtor's use of the collateral.  *See Timbers*, 793 F.2d at 1412 (citing to Adequate Protection Under the Bankruptcy Reform Act, in W. Norton, 1978 Annual Survey of Bankruptcy Law 171, 173 ("Section 361 is designed to prevent loss or diminution of assets.")).

51.     For the same reasons set forth above (regarding the Prepetition Secured Parties' consensually negotiated adequate protection package), the Prepetition Secured Parties will be adequately protected by the Debtors' use of Cash Collateral and other Prepetition Collateral (as defined in the Interim DIP Order).  In light of the foregoing, the Debtors submit that the proposed adequate protection provided for the benefit of the Prepetition Secured Parties is appropriate under the circumstances of the Chapter 11 Cases.  The Debtors' provision of the adequate protection obligations ensures that the Debtors are able to avail themselves of the DIP Facility and to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order and the DIP Documents, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.**

52.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders:

> (i)    ***Interest Rate***.  The interest rate is SOFR (as defined in the DIP Credit Agreement) plus 10.00% per annum (payable in kind and subject to a 2.50% SOFR floor).
>
> (ii)   ***DIP Lender Fee***.  In addition to the Backstop Fee, the Debtors shall pay to all DIP Lenders, ratably,

(a) an upfront fee of 3.00% of all amounts drawn under the DIP Facility, payable in kind, and

(b) an exit fee of 10.00% of the aggregate principal amount of the DIP Facility (including any amounts paid in kind), (a) in the case of the consummation of the Plan and the conversion of the DIP Loans, with 5.00% payable in kind as additional Takeback Term Loans and 5.00% payable in equity of Reorganized Curo at a 25% discount to implied Plan equity value, and (b) otherwise, payable in cash upon satisfaction in full of the DIP Claims.

(iii)  ***Backstop Fee***.  In exchange for the Backstop Commitments, the Backstop Commitment Parties shall receive a premium equal to 5.00% of the initial Backstop Commitments (the "Backstop Premium"), which shall be fully earned upon entry of the Interim DIP Order and paid (i) to the extent the Plan is consummated, in equity of Reorganized Curo at a 25% discount to the implied equity value provided by the Plan upon effectiveness of the Plan, and (ii) otherwise in cash upon payment in full of the DIP Claims, in each case ratably based on each of the Backstop Commitment Parties' respective Backstop Commitments.

53.    The Debtors have also agreed to pay a fronting fee to the fronting bank for the DIP Facility.  As set forth in the Oppenheimer Declaration, the interest rates and fees were the subject of arm's-length and good-faith negotiations, are integral components of the overall terms of the DIP Facility and were required by the proposed DIP Lenders as consideration for the extension of postpetition financing.  The benefits to the Debtors and their estates provided by the DIP Facility significantly outweigh the fees incurred by the Debtors thereunder and are, taken as a whole, reasonable and appropriate under the circumstances of the Chapter 11 Cases.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## IV.    The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection Under Section 364(e).

54.    Bankruptcy Code Section 364(e) protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of

45

the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Bankruptcy Code Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this [Bankruptcy Code section 364] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

55.    The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the proposed DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing and (ii) extensive arm's-length, good-faith negotiations between the Debtors and the proposed DIP Lenders (through the Ad Hoc Group) in connection with the restructuring set forth in the RSA.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the proposed DIP Lenders in "good faith" within the meaning of Bankruptcy Code section 364(e) and therefore the DIP Lenders are entitled to all of the protections afforded thereby.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

56.    The Interim DIP Order provides that the automatic stay provisions of Bankruptcy Code section 362 will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders.  The Interim DIP Order further provides that the automatic stay is modified to the extent necessary to

implement and effectuate the terms of the Interim DIP Order.  Finally, the Interim DIP Order provides that the automatic stay shall be modified, subject to certain limitations, to the extent necessary to permit the DIP Agent to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Documents, subject to the procedures set forth in the Interim DIP Order (including the requirement to seek relief from the stay).  These modifications are customary, reasonable, and integral to the DIP Facility.

**VI.**     **Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

57.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code section 363 may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  See Bankruptcy Rule 4001(b)(2).  Bankruptcy Code Section 363(c)(3) authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [Bankruptcy Code section 363(e)]."  11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that on motion by a debtor, a hearing will "routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing."  Complex Case Procedures, ¶ 5.

58.     The Debtors require immediate access to the DIP Facility.  As of the Petition Date, the Debtors' total cash balance is approximately $ 35 million of cash on hand. The Debtors' business is cash intensive, with significant daily costs required to satisfy obligations to, among other things, employees, customers and vendors.  Further, the Securitization Facilities, which provide the necessary liquidity for the Debtors' loan origination business, require the Debtors to

maintain a minimum capital amount.  Without the financing under the Interim DIP Order, it is likely that the Debtors could not meet this minimum capital requirement and thus lose access to the financing under the Securitization Facilities.  Thus, without financing at this critical early stage, the Debtors would be unable to pay their operating expenses, which could result in a value destructive interruption to their business and, simultaneously, eliminate their best chance for consummating the proposed restructuring transactions contemplated under the RSA.

59.     For these reasons, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral (in addition to the Securitization Facilities) to operate their business, preserve value, and avoid irreparable harm pending the Final Hearing.  The Debtors, with the assistance of their advisors and through negotiations with the DIP Secured Parties, developed the DIP Budget (attached to the Interim DIP Order as Schedule 1).  The DIP Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the DIP Budget is prepared.  The DIP Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the DIP Budget.  The DIP Budget establishes that the Debtors will have adequate liquidity during the expected duration of the Chapter 11 Cases (including the interim period before the Final Hearing) if the Debtors are allowed to use the Cash Collateral and access the proceeds of the DIP Facility and the Securitization Facilities.

60.     Accordingly, pursuant to Bankruptcy Code section 363(c)(3) and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this Motion and enter the Interim DIP Order authorizing the Debtors to enter into the DIP Facility and use Cash Collateral.

## REQUEST FOR FINAL HEARING

61.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court (i) set a date for the Final Hearing that is as soon as practicable but not later than 45 days after the Petition Date and (ii) fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

62.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## Emergency Consideration

63.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder their operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these chapter 11 cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

64.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

65.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors', or any other party in interest's, right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt or reject any agreement, contract or lease pursuant to Bankruptcy Code section 365; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity or perfection or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the DIP Orders is not intended and should not be construed as an admission as to the validity of any particular

claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

66.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the entities listed on the Debtors' petitions as holding the largest 30 unsecured claims (on a consolidated basis); (c) counsel to Prepetition 1L Agent; (d) counsel to Prepetition 1.5L Notes Trustee; (e) counsel to Prepetition 2L Notes Trustee; (f) counsel for the Ad Hoc Group; (g) counsel to the lenders under the Securitization Facilities; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general in the states where the Debtors conduct their business operations; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no further notice is necessary.

WHEREFORE, the Debtors request entry of interim and final orders, substantially in the forms of the Interim DIP Order filed with this Motion and the Final DIP Order, granting the relief requested herein and granting such other relief as the Court deems just, proper and equitable.

Dated: March 25, 2024
      Houston, Texas

*/s/ Sarah Link Schultz*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Sarah Link Schultz (State Bar No. 24033047;
S.D. Tex. 30555)
Patrick Wu (State Bar No. 24117924;
S.D. Tex. 3872088)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email:  sschultz@akingump.com
       pwu@akingump.com

-and-

Michael S. Stamer (*pro hac vice* pending)
Anna Kordas (*pro hac vice* pending)
Omid Rahnama (*pro hac vice* pending)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email:  mstamer@akingump.com
       akordas@akingump.com
       orahnama@akingump.com

*Proposed Counsel to the Debtors*

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ Sarah Link Schultz
Sarah Link Schultz

**<u>Certificate of Service</u>**

I certify that on March 25, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Sarah Link Schultz
Sarah Link Schultz