IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
OF AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING,
DEBTORS TO (A) PAY PREPETITION EMPLOYEE WAGES,
SALARIES, OTHER COMPENSATION, AND REIMBURSABLE
EMPLOYEE EXPENSES AND (B) CONTINUE COMPENSATION
<u>AND BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF</u>

> **Emergency relief has been requested. Relief is requested not later than 1:30 p.m. (prevailing Central Time) on March 25, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on March 25, 2024, at 1:30 p.m. (prevailing Central Time) in Courtroom 404, 4th Floor, 515 Rusk Street, Houston, TX 77002. Participation at the hearing will only be permitted by audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state the following in support of this emergency motion (the "<u>Motion</u>"):

## Relief Requested

1.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto (the "<u>Order</u>"): (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses; and (b) continue compensation and benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (ii) granting related relief.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a), 363(b) and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rules 4002-1 and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>"), and the Procedures for Complex Cases in the Southern District of Texas.

## Background

5.     On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code

sections 1107(a) and 1108.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

6.      The Debtors and their non-Debtor affiliates (collectively, the "Company") provide consumer credit lending services across the U.S. and Canada.  In the U.S., the Company operates under several principal brands, including "Heights Finance," "Southern Finance," "Covington Credit," "Quick Credit," and "First Heritage Credit."  In Canada, the Company operates under the "Cash Money" and "LendDirect" brands.  As of the Petition Date, the Company operated approximately 400 store locations across 13 U.S. states and approximately 150 stores in eight Canadian provinces and had an online presence in eight Canadian provinces and one territory.  The Company generated approximately $672 million in total revenue for the fiscal year 2023, and, as of the Petition Date, the Company had approximately $2.1 billion in aggregate principal amount of prepetition funded debt obligations.

7.      A description of the Debtors and their businesses, and the facts and circumstances supporting this Motion, are set forth in the *Declaration of Douglas Clark in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

## The Debtors' Workforce

8.      As of the Petition Date, the Debtors employ approximately 2,856 employees (the "Employees") in the U.S. and Canada, with approximately 1,781 Employees located in the U.S. and 1,075 Employees located in Canada.  Approximately 2,833 Employees are full-time

Employees and 23 are part-time Employees.  Of these Employees, approximately 858 Employees are salaried employees and approximately 1,998 are paid on an hourly basis.  The Debtors also use the services of approximately nine independent contractors (the "Independent Contractors and, together, with the Employees, the "Debtors' Workforce").

9.      The Debtors' Workforce performs a wide variety of functions at the corporate and branch level that are crucial to the Debtors' operation of their consumer credit lending business, including sales, marketing, client services, project management, product management, finance, accounting, billing, collections, business system analysis, human resources roles, recruiting, and executive roles, such as legal counsel and corporate development managers.

10.     The Debtors' Workforce includes personnel who are intimately familiar with the Debtors' businesses, processes, and systems, who possess unique skills and experience in the Debtors' core business segments and/or who have developed relationships with vendors providing services essential to the Debtors' businesses.  Without the Debtors' Workforce, the Debtors' ability to operate their businesses would be materially impaired, if not impossible.

11.     Moreover, the vast majority of the Debtors' Workforce relies exclusively on their compensation and benefits to pay their daily living expenses and to support their families.  Thus, the Debtors' Workforce would be exposed to significant financial hardships if the Debtors were not permitted to continue paying wages and salaries, providing employee benefits, and maintaining certain programs benefiting the Debtors' Workforce in the ordinary course of their businesses on a postpetition basis.  The Debtors intend to continue their prepetition employee practices, programs, and policies in the ordinary course of business on a postpetition basis and, subject to the Court's approval of the relief sought herein, to pay prepetition amounts related thereto.

**Compensation and Benefits**

12.     The Debtors seek to minimize the negative impact the Debtors' Workforce would suffer if prepetition employee-related obligations are not paid or remitted when due or as expected. Therefore, the Debtors seek authority to pay and honor certain prepetition claims and obligations, as well as continue to pay and honor certain claims and obligations in the ordinary course of their businesses on a postpetition basis, as applicable (each as defined below and, collectively, the "Compensation and Benefits").

13.     The approximate prepetition amounts owing in relation to the Compensation and Benefits that the Debtors are seeking authority to pay pursuant to this Motion are summarized in the following table:

| Compensation and Benefits | Estimated Amounts Owed on a Prepetition Basis |
|---|---|
| Wage Obligations | $3,563,403 |
| Independent Contractor Obligations | $0 |
| Withholding Obligations | $1,673,078 |
| Payroll Processing Obligations | $0 |
| Reimbursable Expenses | $340,000 |
| Health and Welfare Coverage and Benefits | $2,807,899 |
| Paid Leave Benefits | $1,138,513 |
| Workers' Compensation Program | $0 |
| Retirement Plans | $80,632 |
| Employee Relief Fund | $0 |
| Bonus and Incentive Programs | $6,017,970 |
| Severance Obligations | $5,056,661 |
| Non-Employee Director Compensation | $0 |
| **Total** | **$20,678,156** |

14.     Further, out of an abundance of caution, the Debtors request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of their businesses on a postpetition basis during these Chapter 11 Cases, without the need for further Court approval, subject to applicable law.

**A.     Wage Obligations**

15.     In the ordinary course of business, the Debtors incur payroll obligations on account of base and overtime wages that are owed to Employees (the "Wage Obligations").  The Wage Obligations accrue on either a salaried or hourly basis, and Employees are generally paid on a bi-weekly basis in the United States and Canada.  The majority of the Debtors' payroll is made by direct deposit or other electronic means.

16.     In the 12 months prior to the Petition Date, the Debtors have incurred a monthly average of approximately $12,345,449 on account of the Wage Obligations due to U.S. Employees and approximately $3,842,030 on account of the Wage Obligations due to Canadian Employees. As of the Petition Date, the Debtors estimate that they owe approximately $3,563,403 on account of accrued but unpaid Wage Obligations.  By this Motion, the Debtors request authorization to pay all outstanding prepetition obligations on account of the Wage Obligations and to continue paying the Wage Obligations on a postpetition basis in the ordinary course of business and consistent with the Debtors' prepetition practices.

### B.     Independent Contractor Obligations

17.     Historically, the Debtors have utilized the services of Independent Contractors to provide specialized skills.  As explained above, the Debtors currently utilize the services of approximately nine Independent Contractors.  The Debtors generally hire Independent Contractors through staffing agencies (the "Staffing Agencies") and pay fees for services provided by the Independent Contractors either through the Staffing Agencies (the "Staffing Agency Obligations") or directly to the Independent Contractors (such amounts owed to Independent Contractors, together, with the Staffing Agency Obligations, the "Independent Contractor Obligations").  On average, the Debtors pay approximately $32,000 in Staffing Agency Obligations per month. Independent Contractors are not eligible to receive Health and Welfare Coverage and Benefits (as defined herein) or any other benefits provided by the Debtors and further described in this Motion. As of the Petition Date, the Debtors estimate that they do not have accrued but unpaid Independent Contractor Obligations.  The Debtors request authorization to continue paying the Independent Contractor Obligations on a postpetition basis in the ordinary course of their businesses and consistent with their prepetition practices.

### C.     Withholding Obligations

18.     During each applicable payroll period, and subject to the laws of the applicable state, province, or jurisdiction in which the Debtors operate, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions in the United States and registered retirement savings plan

contributions in Canada, and legally ordered deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

19.     Certain U.S. federal, state, and local laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, Medicare taxes, Social Security, and other withholdings (collectively, the "U.S. Employee Payroll Taxes") for remittance to the appropriate taxing authorities.   The Debtors also have similar obligations under Canadian law (the "Canadian Employee Payroll Taxes" and, together, with the U.S. Payroll Taxes, the "Employee Payroll Taxes").   The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for United States federal and state unemployment insurance, Social Security and Medicare taxes, and other applicable social insurance programs, including Canadian federal and provincial equivalents (together, with the Employee Payroll Taxes, the "Payroll Taxes").   The Payroll Taxes are generally processed and forwarded to the appropriate taxing authorities in accordance with remittance intervals and deadlines established by those taxing authorities.

20.     In the 12 months prior to the Petition Date, the Debtors paid a monthly average of approximately $3,525,424 on account of the Deductions and Payroll Taxes (collectively, the "Withholding Obligations").   As of the Petition Date, the Debtors estimate that they owe approximately $1,673,078 on account of the Withholding Obligations.   Accordingly, the Debtors request authorization to pay all outstanding prepetition obligations on account of the Withholding Obligations and to continue paying the Withholding Obligations on a postpetition basis in the ordinary course of their businesses and consistent with their prepetition practices.

### D.     Payroll Processing Obligations

21.     The Deductions and Payroll Taxes in the U.S. are processed by Automatic Data Processing, Inc. ("ADP US"); in Canada, the Deductions and Payroll Taxes are processed by ADP

Canada Co. ("ADP Canada," together, with ADP US, "ADP").  ADP ensures that the Deductions and Payroll Taxes are submitted to the appropriate parties and distributes the checks and direct deposits received by the Employees.  The Debtors pay (i) ADP US approximately $45,000 and (ii) ADP Canada approximately $20,250 each month for these administrative services (collectively, the "Payroll Processing Obligations").  As of the Petition Date, the Debtors estimate that they do not have accrued but unpaid Payroll Processing Obligations. The Debtors request authorization to continue paying the Payroll Processing Obligations on a postpetition basis in the ordinary course of their businesses and consistent with their prepetition practices.

### E.      Reimbursable Expenses

22.     Certain of the Debtors' employees who use personal credit cards or cash for business-related expenses including business and entertainment meals, overtime meals, internal events (upon receipt of internal approval), as well as travel-related expenses, such as air travel, ground transportation, hotels and lodging, meal allowances, car mileage allowances, car rentals, and parking (collectively, the "Out-of-Pocket Expenses") are entitled to reimbursement after certain approvals are received in accordance with internal policies and procedures.  In the 12 months prior to the Petition Date, the Debtors paid a monthly average of approximately $43,000 on account of the Out-of-Pocket Expenses.  As of the Petition Date, the Debtors estimate that they owe Employees approximately $15,000 on account of Out-of-Pocket Expenses.

23.     The Debtors also maintain corporate credit card programs (the "Card Programs") to reimburse travel & entertainment expenses incurred by Employees.  The Debtors operate three Card Programs: (i) two for the U.S. Employees (a) via American Express in the U.S. (the "AMEX Card Program"), which has a $985,000 credit limit, and (b) via Truist Bank in the U.S. (the "Truist Card Program"), which has a $249,000 credit limit, and (ii) one for the Canadian Employees via Royal Bank of Canada in Canada (the "RBC Card Program"), which has a $200,000 credit limit.

Pursuant to the AMEX Card Program and RBC Card Program, corporate manager Employees whose work responsibilities include travel are eligible for a corporate credit card, while non-management Employees whose work responsibilities include travel require manager approval to obtain a card.  Pursuant to the Truist Card Program, branch manager Employees are authorized to obtain a credit card.  As of the Petition Date, the Debtors estimate the total accrued but unpaid obligations on account of the Card Programs are approximately $265,000.

24.     Certain of the Debtors' Employees also participate in the driver reimbursement program that makes payments to drivers in two ways: fixed and variable rates (the "Motus Program" and, collectively with the Out-of-Pocket Expenses and the Card Programs, the "Reimbursable Expenses").  The variable rate amount is paid for the previous month's mileage on the 15th of the month.  The fixed rate amount is paid on the 15th for the next month. The fixed payment is for the maintenance and depreciation of the vehicle and considers location and estimated annual mileage.  The administrative costs of the Motus Program are $40,000 annually. As of the Petition, the Debtors estimate that the total accrued but unpaid obligations on account of the Motus Program are approximately $60,000.

25.     Accordingly, the Debtors request authorization to pay all outstanding prepetition obligations on account of the Reimbursable Expenses, and to continue paying the Reimbursable Expenses on a postpetition basis in the ordinary course of their businesses and consistent with their prepetition practices.  For the avoidance of doubt, the Debtors will not seek to pay any outstanding Reimbursable Expenses or fees related thereto in advance of the date they come due.

**F.      Health and Welfare Coverage and Benefits**

26.     The Debtors offer their Employees the ability to participate in a number of health insurance and benefits programs, including, among other programs: medical, prescription, vision and dental coverage plans; life and accident insurance; short-term and long-term disability

insurance; health savings account and flexible spending account programs; and other employee benefit plans (collectively, the "Health and Welfare Coverage and Benefits").

27.     In the 12 months prior to the Petition Date, the Debtors paid a monthly average of approximately $1,708,485 on account of the Health and Welfare Coverage Benefits.  As of the Petition Date, the Debtors estimate they owe approximately $2,807,899[2] on account of unpaid Health and Welfare Coverage and Benefits.  As described above, failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship.  Accordingly, the Debtors request authorization to pay all outstanding prepetition obligations on account of the Health and Welfare Coverage and Benefits, and to continue paying the Health and Welfare Coverage and Benefits on a postpetition basis in the ordinary course of their businesses and consistent with their prepetition practices.

**G.     Paid Leave Benefits**

28.     The Debtors provide paid time off to certain eligible Employees (the "Paid Leave Benefits").  The Debtors' Paid Leave Benefits program covers vacation, floating holidays, volunteering, new parental leave, bereavement, and sick leave.  In the U.S., Employees receive (i) paid time off days (sick or vacation) based on their years of service, between 17 and 25 days per year; (ii) one floating holiday per year; (iii) two volunteering days per year; (iv) 10 new parental leave days per year; and (v) five bereavement days per year.  In Canada, Employees receive (i) vacation days based on their years of service, between 10 and 25 days per year; (ii) five sick leave days per year; (iii) two floating holidays per year; and (iv) three bereavement days per year.  Except in states or provinces where Paid Leave Benefits carryover is required by law, Paid Leave Benefits may not be carried from one calendar year to the next calendar year, unless an

---

[2]     This amount is larger than the typical monthly average due to delays with billing.

Employee receives written approval.  In Canada and three U.S. states where the Debtors operate, an employee is entitled to a cash payment for any accrued but unused vacation and sick leave days in the event such Employee is terminated from the Debtors' employment.  As of the Petition Date, the Debtors estimate that their Employees have accrued Paid Leave Benefits with an aggregate value of approximately $76,293 in the U.S. and $1,062,220 in Canada.  This amount, however, is not a current cash payment obligation.  Accordingly, the Debtors seek authorization to pay all outstanding prepetition obligations on account of the Paid Leave Benefits as they come due and to continue paying the Paid Leave Benefits on a postpetition basis in the ordinary course of their businesses and consistent with their prepetition practice.

### H.     Workers' Compensation Program

29.     The Debtors maintain workers' compensation insurance only for their Employees based in the U.S. (the "Workers' Compensation Program").  The annual cost of the insurance policy associated with the Workers' Compensation Program is approximately $143,500.00 which the Debtors pay monthly for the first ten months and the remaining amount due (or refund due) is reconciled in a plan-year-end audit.  Three claims remain outstanding under the Debtors' Workers' Compensation Program.

30.     The Debtors must continue the claims assessment, determination, adjudication, and payments pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  As of the Petition Date, the Debtors estimate that there are no amounts due and owing on account of the claims under the Workers' Compensation Program.  The Debtors seek authorization to continue the Workers' Compensation Programs in the ordinary course of their businesses on a postpetition basis.

### I.     Retirement Benefits

31.     The Debtors maintain a defined contribution retirement savings plan for the benefit of their Employees based in the U.S. that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  New hires are eligible to participate in the 401(k) Plan after being employed for at least 30 days.  The 401(k) Plan is administered by TAG Resources and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  In 2023, the Company's matching contributions totaled $2,955,630.  As of the Petition Date, approximately 1,567 current Employees participate in the 401(k) Plan.  The Company also maintains the existing contributions for 1,019 former Employees.[3] As of the Petition Date, the Company expects to owe approximately $65,155 on account of 401(k) Plan matching contributions.

32.     The Company also maintains a registered retirement savings plan for Canadian Employees ("Canada Retirement Plan" and, together with the 401(k) Plan, the "Retirement Plans").  New hires are eligible to participate in the Canada Retirement Plan after being employed for 90 days.  There is no annual cost to maintain the Canada Retirement Plan other than matching contributions by the Company.  In 2023, the Company's match totaled $547,500.  As of the Petition Date, approximately 418 current Employees participate in the Canada Retirement Plan.   As of the

---

[3]     The Company plans on making certain administrative changes to the 401(k) Plan during these Chapter 11 Cases in the ordinary course of business.  Such changes are anticipated to decrease the cost of administering the 401(k) Plan for the benefit of participants.

Petition Date, the Company expects to owe approximately $15,477 on account of Canada Retirement Plan matching contributions.

33.     Accordingly, the Debtors seek authorization to pay all outstanding prepetition obligations on account of the Retirement Plans.

**J.     The CURO Cares Employee Relief Fund**

34.     The Company has established the CURO Cares Employee Relief Fund to help employees who are facing financial hardship immediately after a natural disaster or an unforeseen personal hardship (the "Employee Relief Fund").  The Employee Relief Fund relies primarily on individual donations from employees and support from the Company.  Emergency Assistance Foundation, a third party, administers the Employee Relief Fund.  The Debtors contributed $110,000 to the Employee Relief Fund in 2023.  As of the Petition Date, the Company does not have currently outstanding obligations in connection with the Employee Relief Fund.

**K.     Bonus and Incentive Programs**

35.     Historically, the Debtors have offered the following performance-based incentive programs to provide Employees with an opportunity to receive monetary compensation for achieving certain performance goals (the "Bonus and Incentive Programs").  The Debtors believe that continuation of the Bonus and Incentive Programs is essential to maintaining Employee morale, performance, and recruitment. Therefore, the Debtors are seeking authority to continue to

make payments under the Bonus and Incentive Programs as described below in the ordinary course of business.[4]

### a.      Sales Commissions

36.     Certain of the Debtors' sales-dedicated Employees based in the U.S. receive commissions (the "Sales Commissions") for sale of certain ancillary products, such as club memberships and identity theft protection plan in the U.S. (the "Sales Commission Program"). Approximately 350 Employees participate in the Sales Commission Program.  In the 12 months prior to the Petition Date, the Debtors paid out a monthly average of approximately $50,000 on account of Sales Commissions.  As of the Petition Date, the Debtors estimate that they owe approximately $37,500 in accrued but unpaid Sales Commissions.

37.     The Sales Commission Program is essential to incentivize and stimulate sales of the Debtors' services, which ultimately benefits the Debtors' enterprise and stakeholders. Accordingly, the Debtors request authorization to pay all outstanding prepetition obligations on account of the Sales Commission Program and to continue paying Sales Commissions on a postpetition basis in the ordinary course and consistent with prepetition practice.

### b.      Long-Term Incentive Plans

38.     The Company maintains two Long-Term Incentive Plans for employees in leadership roles: (a) the 2017 Incentive Stock Plan (the "2017 Incentive Plan") and (b) the 2010 Equity Incentive Plan (the "2010 Incentive Plan").  The 2010 Incentive Plan allowed for grants of various types of equity awards, but no new awards have been granted under the 2010 Incentive Plan since the approval of the 2017 Incentive Plan.  There remain outstanding vested but

---

[4]     As of the Petition Date, the Debtors believe that all annual incentive and bonus payments for the 2023 year have been made.  The Debtors do not seek authority to make any bonus or incentive payments to any Insiders (as such term is defined in Bankruptcy Code section 101(31)) without further notice and order of this Court.

unexercised options under the 2010 Incentive Plan. Awards made in 2023 under the 2017 Incentive Plan were approved on February 20, 2023 (the "2023 LTIP"). Under the 2023 LTIP, senior executives were granted restricted stock units under the Company's stockholder-approved 2017 Incentive Plan in an amount based upon a targeted percentage of the participant's base salary. For participating senior executives, one-half of the restricted stock units is subject to time-based vesting in three equal installments in February 2024, 2025 and 2026, and one-half of the restricted stock units is subject to performance-based vesting, based on the Company's relative total shareholder return which vests, if at all, on the last day of the performance period. No payments on account of 2023 LTIP are contemplated during the course of the Chapter 11 Cases. Other key employees were designated to participate in the 2023 Long-Term Cash Incentive Program ("2023 LTCP"), which provided a cash payment based upon a targeted percentage of the participant's base salary. The cash payments vest in equal installments over the course of three years. The first installment of the cash awards under the 2023 LTCP was paid on February 27, 2024, with the remaining installments vesting in February of 2025 and 2026.

### c.      Short-Term Incentive Plan

39.      The Company provides certain executive and non-executive Employees with the opportunity each year to earn a cash bonus in an amount based upon a targeted percentage of the participant's base salary based upon the achievement of performance objectives (the "STIP"). The purpose of the STIP was to incent and reward eligible employees for their material contributions to the operating and financial performance of the Company. Under the STIP, participants were eligible to earn a cash bonus in an amount based upon a targeted percentage of the participant's base salary. For 2023, a participant's cash bonus under the STIP was earned based upon the achievement of certain performance metrics. The 2023 STIP was paid out on February 27, 2024.

As of the Petition Date, the Debtors do not have any outstanding obligations on account of the STIP.

### d.      Non-Qualified Deferred Compensation Plan

40.      Prior to the IPO, the Company implemented a non-qualified deferred compensation plan (the "Deferred Compensation Plan").  Formerly, the Company made contributions on each participant's behalf into the Deferred Compensation Plan.  That practice was discontinued in 2018, following the IPO.  Beginning in 2021, the Company did not permit new participants to join the Deferred Compensation Plan.  Beginning in 2023, enrollment was limited to active employees who had elected to contribute in 2022.  Beginning in 2024, the plan was frozen to new participants and contributions.  Currently, there are nine participants in the Deferred Compensation Plan, consisting of five current and four former Employees.  As of the Petition Date, the Debtors estimate that they owe approximately $5 million in connection with the Deferred Compensation Plan.

### e.      Other Bonus Programs

41.      The Company maintains several other bonus programs for eligible Employees, including, among others, (a) the Branch Monthly Bonus Plan for 1,298 eligible U.S. Employees and 907 eligible Canadian Employees, with the average monthly payout equal to $767 for U.S. and CAD $370 for Canadian Employees; (b) the Recovery/Collection Bonus Plan for eligible collections recovery specialists; (c) the Employee Referral Bonus; and (d) the Signing Bonus (collectively, the "Other Bonus Programs").  As of the Petition Date, the Debtors estimate that they owe approximately $980,470 in connection with the Other Bonus Programs.

### L.      Severance Obligations

42.      In the ordinary course of business, the Debtors historically have offered a severance program pursuant to which an Employee receives a severance payment upon termination of the Employee's employment in the United States and Canada (the "Severance Program" and the

obligations thereunder the "Severance Obligations").  Eligible Employees may receive a severance benefit based upon their years of service, compensation, and other factors the Debtors determine to be relevant.  Those Employees with an employment agreement have a contractually established severance.  Severance is typically paid out in installments as part of the Debtors' regular payroll. As of the Petition Date, the Debtors estimate that they owe approximately $4,036,516 on account of U.S. Severance Obligations and approximately $1,020,145 on account of Canadian Severance Obligations.  The Debtors request authorization to continue the Severance Program in the ordinary course and to pay prepetition obligations on account of the Severance Obligations.[5]

### M.    Non-Employee Director Compensation

43.    The Debtors' board of directors consists of eight directors (collectively, the "Directors").  While traditionally the non-Employee Directors have been compensated for their services in a combination of restricted stock units and cash, effective April 1, 2023, the Directors agreed to be compensated in restricted stock units only to signal greater alignment of their interests with those of the Company's equity holders (the "Director Compensation").  Effective January 1, 2024, the Board approved the conversion of the Director Compensation to a cash-based program, payable quarterly in advance.  There are no outstanding amounts due on account of Director Compensation as of the Petition Date.

---

[5]    The Debtors contemplate payment of prepetition severance to three Insiders while the Chapter 11 Cases are pending—the former Chief Executive Officer in the total amount of approximately $700,000 (over remaining 46 weeks) and two other executives in the amount of approximately $500,000 and $450,000, respectively, over the course of 52 weeks (plus continuation of certain health benefits).  Because the Debtors' proposed plan contemplates payments to all unsecured creditors in full, the Debtors submit that payment of these contractual obligations is appropriate.

## Basis for Relief

**I.      Sufficient Cause Exists to Authorize the Debtors to Honor Compensation and Benefits Obligations.**

**(i)      Certain of the Compensation and Benefits are Entitled to Priority Treatment.**

44.      Bankruptcy Code sections 507(a)(4) and 507(a)(5) entitle the majority of the Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under Bankruptcy Code sections 507(a)(4) and 507(a)(5), for (a) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  To the extent that an Employee receives no more than $15,150 on account of prepetition claims entitled to priority or to the extent a proposed plan pays unsecured claimants in full, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for other stakeholders.[6]  Indeed, the Debtors submit that payment of the Compensation and Benefits at this time enhances value for the benefit of all interested parties.  Finding, attracting, and training new qualified talent would be extremely difficult and could require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**(ii)      Payment of Certain Compensation and Benefits Is Required by Law.**

45.      By the Motion, the Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees.  These amounts principally represent Employee earnings that

---

[6]      The Debtors' filed plan proposes to pay unsecured claims in full. As such, to the extent an Employee's claim for Compensation and Benefits exceeds the statutory cap, payment of such claims in the ordinary course similarly only impacts timing.

governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, United States federal and state laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that a state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between the debtor and the city for payment of withheld income taxes); *In re Chabrand*, 301 B.R. 468, 475-81 (Bankr. S.D. Tex. 2003) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of their businesses.

46. Similarly, laws in many of the jurisdictions in which the Debtors operate require the Debtors to maintain the Workers' Compensation Program and to provide the Health and Welfare Coverage and Benefits. If the Debtors fail to maintain Compensation and Benefits required by the laws of a given jurisdiction, the laws of that jurisdiction may prohibit the Debtors from operating in that location or give rise to causes of action against the Debtors. Payment of all Compensation and Benefits required by relevant laws is therefore crucial to the Debtors' continued operations and the success of these Chapter 11 Cases.

II. **Payment of Compensation and Benefits Is Warranted Under Bankruptcy Code Section 363(b)(1) and the Doctrine of Necessity.**

47. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's

going-concern value. *See, e.g.*, *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (recognizing that business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *see also GLM DFW, Inc. v. Windstream Holdings Inc. (In re Windstream Holdings Inc.)*, 614 B.R. 441, 460 (S.D.N.Y. 2020) (holding that bankruptcy court properly utilized its broad "equitable power" to allow payment of certain prepetition claims which would "ensure the rehabilitation of Debtors and viability of the estate for all creditors"), *appeal dismissed*, 838 F. App'x 634 (2d Cir. 2021); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (affirming bankruptcy court's order granting authority to pay prepetition claims of suppliers); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (outlining the standards and case law governing payment of prepetition claims and stating that courts can "authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor"). In doing so, courts acknowledge that several legal theories rooted in Bankruptcy Code sections 363(b) and 105(a) support the payment of prepetition claims as provided herein.

48.     Bankruptcy Code section 363(b) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under Bankruptcy Code section 363(b), a court may authorize a debtor to pay certain prepetition claims where a sound business purpose exists for doing so.[7] *See Ionosphere Clubs*, 98 B.R. at 175; *In re James A. Phillips, Inc.*, 29 B.R. at 397

---

[7]     The Debtors also seek authority to continue paying postpetition Compensation and Benefits obligations as they come due in the ordinary course of business. Although the Debtors believe that the payment of postpetition

(relying on Bankruptcy Code section 363 to allow contractor to pay prepetition claims of suppliers).

49.      In addition, the Court has the authority, pursuant to its equitable powers under Bankruptcy Code section 105(a), to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their fiduciary duties under Bankruptcy Code section 1107(a).   Bankruptcy Code section 105(a) empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).   Bankruptcy Code section 1107(a) contains an implied duty of the debtor in possession to protect and preserve the estate, including an operating business's going-concern value, on behalf of a debtor's creditors and other parties in interest.  *See In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. at 497); *In re Sillerman*, 605 B.R. 631, 648 (Bankr. S.D.N.Y. 2019) ("While the Bankruptcy Code permits a debtor to operate its business and exercise control over its estate, the debtor-in-possession acts as a fiduciary of the estate and its creditors.") (citations omitted); *Taub v. Taub (In re Taub)*, 427 B.R. 208, 224 (Bankr. E.D.N.Y. 2010), *aff'd*, No. 10-cv-5717, 2011 WL 1322390 (E.D.N.Y. Mar. 31, 2011); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 233 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

---

Compensation and Benefits obligations constitutes an ordinary course use of property of the estates that, pursuant to Bankruptcy Code section 363(c), does not require notice and a hearing, the Debtors seek authorization to pay such Compensation and Benefits obligations out of an abundance of caution.

50.     Here, the Debtors must continue to honor the Compensation and Benefits in order to maximize the value of their businesses and their revenues.  The Debtors believe that, should they fail to honor their Compensation and Benefits obligations, certain members of the Debtors' Workforce may leave.  A depletion in the Debtors' Workforce could severely disrupt the Debtors' efforts to maximize value in these Chapter 11 Cases.  Even if the Debtors could avoid payment of Compensation and Benefits obligations, the collateral consequences of losing skilled and experienced Employees and needing to hire additional employees while undergoing the chapter 11 process would vastly exceed whatever modest short-run cost savings the Debtors might achieve.  Accordingly, the Debtors seek authorization to continue honoring certain Compensation and Benefits as described herein in the ordinary course of business, including by making payments with respect thereto.

51.     Further, in a long line of well-established cases, courts consistently have permitted payment of a prepetition obligation where such payment is necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g.*, *Miltenberger v. Logansport, C & S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); *In re Windstream Holdings Inc.*, 614 B.R. at 456–57 (noting existence of "judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is

essential to the continued operation of the debtor") (quoting *Ionosphere Clubs*, 98 B.R. at 175); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving bankruptcy court's order authorizing payment of prepetition wages, salaries, expenses and benefits); *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able . . . to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.").

52.    Here, many Employees rely exclusively on the Compensation and Benefits to satisfy their daily living expenses.  Many of the Debtors' Employees expect and require their wages to arrive on a timely basis.  Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations to them expeditiously. Moreover, failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.  Furthermore, if this Court does not authorize the Debtors to honor their various obligations under the insurance programs described herein, Employees may not receive health coverage and thus may be obligated to pay certain health care claims that the Debtors have not satisfied.  The loss of health care coverage may result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

53.    Authority to continue performing under certain Compensation and Benefits programs and to pay obligations related thereto, including obligations arising prior to the commencement of these Chapter 11 Cases, is critical to the Debtors' ability to preserve the going concern value of their businesses, which value will inure to the benefit of all parties in interest.

Further, the relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under Bankruptcy Code sections 363(b) and 105(a). Accordingly, the Court should authorize the Debtors to pay any accrued and unpaid prepetition amounts on account of the Compensation and Benefits and to continue certain Compensation and Benefits on a postpetition basis in the ordinary course of their businesses and consistent with past practices.

**III.    The Debtors seek a Waiver of the Automatic Stay to the Extent it Applies to Workers' Compensation Program.**

54.    Bankruptcy Code section 362(a)(1) operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Bankruptcy Code section 362, however, permits a debtor or other party-in-interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. §362(d)(1).

55.    The Debtors seek authorization, under Bankruptcy Code section 362(d), to permit Employees to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum. Cause exists to modify the automatic stay because staying the Workers' Compensation Program could have a detrimental effect on Employee financial well-being and morale and could lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' businesses, which would be to the detriment of all parties in interest.

<u>Emergency Consideration</u>

56.    The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003 and Bankruptcy Local Rule 9013-1, which empower a court to grant relief

within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder their operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these Chapter 11 Cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

57.      To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

58.      Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors', or any other party in interest's, right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt or reject any agreement, contract or lease pursuant to Bankruptcy Code section 365; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in or other encumbrance on

26

property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity or perfection or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### **Notice**

59.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the entities listed on the Debtors' petitions as holding the largest 30 unsecured claims (on a consolidated basis); (c) counsel to the Prepetition 1L Agent; (d) counsel to the Prepetition 1.5L Notes Trustee; (e) counsel to the Prepetition 2L Notes Trustee; (f) counsel to the Ad Hoc Group; (g) counsel to Atlas Securitized Products Holdings, L.P. in its capacity as Administrative Agent; (h) counsel to Midtown Madison Management LLC as Heights II Administrative Agent and Canada II Administrative Agent; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the state attorneys general in the states where the Debtors conduct their business operations; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no further notice is necessary.

WHEREFORE, the Debtors request entry of an order, substantially in the form of the Order filed with this Motion, granting the relief requested herein and granting such other relief as the Court deems just, proper, and equitable.

Dated: March 25, 2024
      Houston, Texas

*/s/ Sarah Link Schultz*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Sarah Link Schultz (State Bar No. 24033047;
S.D. Tex. 30555)
Patrick Wu (State Bar No. 24117924;
S.D. Tex. 3872088)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: sschultz@akingump.com
      pwu@akingump.com

-and-

Michael S. Stamer (*pro hac vice* pending)
Anna Kordas (*pro hac vice* pending)
Omid Rahnama (*pro hac vice* pending)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
      akordas@akingump.com
      orahnama@akingump.com

*Proposed Counsel to the Debtors*

## **Certificate of Accuracy**

      I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Sarah Link Schultz*
Sarah Link Schultz

## **Certificate of Service**

      I certify that on March 25, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Sarah Link Schultz*
Sarah Link Schultz

**<u>Proposed Order</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
|  | ) |  |
| Debtors.[1] | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **Re: Docket No. __** |

**ORDER (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY
PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, AND
REIMBURSABLE EMPLOYEE EXPENSES AND (B) CONTINUE COMPENSATION
AND BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order"): (i) authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (b) continue compensation and benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto and (ii) granting related relief; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing (if any) establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The Debtors are authorized to continue and/or modify, change, or discontinue the Compensation and Benefits, subject to the Bankruptcy Code and applicable law, and to honor and pay any claims or obligations on account of the Compensation and Benefits in the amounts and categories as set forth in the Motion in the ordinary course and in accordance with the Debtors' prepetition policies and practices and the terms of this Order, *provided* that the Debtors shall not make any payments to any Employee or Independent Contractor that exceed the statutory cap on priority status set forth in Bankruptcy Code sections 507(a)(4) and 507(a)(5).

2.     The Debtors shall provide five days' advance notice to the U.S. Trustee, counsel to the Ad Hoc Group, and any statutory committee appointed in these Chapter 11 Cases of any material changes or modifications to the Compensation and Benefits and any new Compensation and Benefits plans or programs.

3.     The Debtors shall not make any bonus, incentive or retention payment to any Insiders (as such term is defined in Bankruptcy Code section 101(31)) without further order of this Court or pursuant to the terms of a confirmed chapter 11 plan.

4.     The Debtors shall maintain a schedule of amounts paid related to the Bonus and Incentive Programs and Severance Program made pursuant to this Order, including the following

information: (a) the names of the payee; (b) the date and amount of the payment; (c) the category or type of payment, as further described and classified in the Motion; and (d) the Debtor or Debtors that made the payment. The Debtors shall provide a copy of such schedule to the U.S. Trustee, counsel to the Ad Hoc Group, and any statutory committee appointed in these Chapter 11 Cases every thirty days beginning upon entry of this Order.

5.      The Debtors are authorized to forward any unpaid amounts on account of Deductions or Payroll Taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' prepetition policies and practices, whether such amounts related to the period before or after the Petition Date.

6.      The Debtors are authorized to continue the Severance Program on a postpetition basis in the ordinary course of business, and in each case to pay any accrued amounts thereunder as they become due.

7.      The Debtors are authorized to pay costs and expenses incidental to payment of the Compensation and Benefits obligations, including all administrative and processing costs and payments to outside professionals.

8.      Nothing contained herein is intended or should be construed to create an administrative priority claim on account of the Compensation and Benefits obligations.

9.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized, but not directed, to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, provided that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.

10.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed (a) an admission as to the amount of, basis for or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors', or any other party in interest's, right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by the Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to Bankruptcy Code section 365; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or to seek avoidance of all such liens.

11.     Notwithstanding anything to the contrary in this Order, any payment authorized to be made by the Debtors pursuant to this Order shall be made only to the extent authorized under, and in compliance with, any order entered by the Court then in effect authorizing the Debtors' use of cash collateral and postpetition debtor-in-possession financing (such orders, the "DIP Order") and the DIP Documents (as defined in the DIP Order), including compliance with any budget or cash flow forecast in connection therewith and any other terms and conditions thereof.  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or

4

restrictions set forth in the DIP Order. To the extent there is any inconsistency between the terms of the DIP Order and the terms of this Order or any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.

12. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13. Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a), and the Bankruptcy Local Rules are satisfied by such notice.

14. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon entry.

15. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

16. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: _____, 2024

_____
THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

5