**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |
| | ) | |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING CERTAIN DEBTORS TO
CONTINUE SELLING RECEIVABLES AND RELATED RIGHTS PURSUANT TO
THE SECURITIZATION FACILITIES, (II) MODIFYING THE AUTOMATIC STAY,
<u>(III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF</u>**

---

**Emergency relief has been requested. Relief is requested not later than 4:30 p.m. (prevailing Central Time) on March 25, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on March 25, 2024, at 4:30 p.m. (prevailing Central Time) in Courtroom 404, 4th Floor, 515 Rusk Street, Houston, TX 77002. Participation at the hearing will only be permitted by audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (the "Motion"):

## Relief Requested

1. By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim Order") and a final order (the "Final Order") and together with the Interim Order (the "Orders"):

i. in connection with the Debtors' existing loan receivables securitization programs (collectively, the "Securitization Facilities," each program individually, a "Securitization Facility") relating to non-Debtors, First Heritage Financing I, LLC ("First Heritage Financing"), Heights Financing I, LLC ("Heights Financing I"), Heights Financing II LLC ("Heights Financing II," collectively with First Heritage Financing and Heights Financing I, the "US Purchasers"), CURO Canada Receivables Limited Partnership ("Canada SPV I"), CURO Canada Receivables II Limited Partnership ("Canada SPV II," collectively with Canada SPV I, the "Canada Purchasers," and, Canada Purchasers collectively with US Purchasers, the "Non-Debtor Purchasers") authorizing the applicable Debtors to enter into and/or otherwise perform (and continue to perform) under all amendments, restatements, supplements, instruments and agreements entered into in connection with the Securitization Facilities (collectively, the "Securitization Transaction Documents"), which include, but are not limited to, the following agreements:

   (a) that certain *Purchase Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "First Heritage Purchase Agreement") by and among First Heritage Credit, LLC ("First Heritage") as the direct or indirect owner of the First Heritage Originators (as defined herein), the originator parties thereto (such originators, the "First Heritage Originators"),[2] as transferors, First Heritage Financing, as transferee, and Wilmington Trust, National Association ("Wilmington Trust") solely in its capacity as loan trustee for the benefit of First Heritage Financing (the "First Heritage Loan Trustee"), a copy of which is attached as Exhibit A;

   (b) that certain *Assignment Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "First Heritage Assignment Agreement") by and among First Heritage Originators, as transferors, First Heritage Financing, as transferee, and First Heritage Loan Trustee, as

---

[2] "First Heritage Originators" means the following Debtors:  First Heritage Credit of Alabama, LLC, First Heritage Credit of Louisiana, LLC, First Heritage Credit of Mississippi, LLC, First Heritage Credit of South Carolina, LLC and First Heritage Credit of Tennessee, LLC.

transferee solely with respect to legal title, a copy of which is attached as <u>Exhibit B</u>;

(c)     that certain *Credit Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>First Heritage Credit Agreement</u>") by and between First Heritage Financing, as borrower (the "<u>First Heritage Borrower</u>"), First Heritage, as servicer (in such role, the "<u>First Heritage Servicer</u>"), the subservicer parties thereto, the lenders from time to time parties party thereto (the "<u>First Heritage Lenders</u>"), Computershare Trust Company, National Association ("<u>Computershare</u>") as paying agent, image file custodian and collateral agent, Atlas Securitized Products Holdings, L.P. ("<u>Atlas</u>") as successor to Credit Suisse AG, New York Branch ("<u>Credit Suisse</u>"), as structuring and syndication agent (in such role, the "<u>First Heritage Structuring and Syndication Agent</u>") and as administrative agent (in such role, the "<u>First Heritage Administrative Agent</u>"), Systems & Services Technologies, Inc. ("<u>S&S</u>"), as backup servicer, and the First Heritage Loan Trustee, a copy of which is attached as <u>Exhibit C</u>;

(d)     that certain *Borrower Loan Trust Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>First Heritage Trust Agreement</u>") by and between First Heritage Financing, as borrower, and First Heritage Loan Trustee, a copy of which is attached as <u>Exhibit D</u>;

(e)     that certain *Limited Guaranty* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>First Heritage Limited Guaranty</u>") by and between CURO Group Holdings Corp. ("<u>CURO</u>"), as guarantor (in such role, the "<u>First Heritage Guarantor</u>") and First Heritage Administrative Agent, a copy of which is attached as <u>Exhibit E</u>;

(f)     that certain *Fee Letter* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>First Heritage Fee Letter</u>") among Atlas as successor to Credit Suisse, ACM AIF Evergreen P2 DAC Subco LP, Atalaya A4 Pool 1 LP and Atalaya A4 Pool 1 (Cayman) LP;[3]

(g)     that certain *Purchase Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Heights I Purchase Agreement</u>") by and among the originator parties thereto (such originators, the "<u>Heights Originators</u>"),[4] as transferors, SouthernCo, Inc. ("<u>SouthernCo</u>") as the direct

---

[3]     The Fee Letters and Credit Agreements (each as defined below), as amended, contain certain terms that are commercially sensitive and proprietary in nature.  Accordingly, the Debtors have filed  the *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Redact Certain Confidential Information and File The Credit Agreements and Fee Letters Under Seal*.  The Credit Agreements attached hereto are redacted Credit Agreements.

[4]     "<u>Heights Originators</u>" means the following Debtors:  Southern Finance of South Carolina, Inc., Southern Finance of Tennessee, Inc., Covington Credit of Alabama, Inc., Quick Credit Corporation, Covington Credit, Inc., Covington Credit of Georgia, Inc., Covington Credit of Texas, Inc., Heights Finance Corporation (an Illinois

or indirect owner of the Heights Originators, Heights Financing I, as transferee, and Wilmington Trust, solely in its capacity as loan trustee for the benefit of Heights Financing I (the "Heights I Loan Trustee"), a copy of which is attached as Exhibit G;

(h)     that certain *Assignment Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights I Assignment Agreement") by and among Heights Originators, as transferors, Heights Financing I, as transferee, and Heights I Loan Trustee, as transferee solely with respect to legal title, a copy of which is attached as Exhibit H;

(i)     that certain *Credit Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights I Credit Agreement") by and between Heights Financing I, as borrower, SouthernCo, as servicer (in such role as servicer, the "Heights I Servicer"), the subservicers party thereto, the lenders from time to time parties thereto (the "Heights I Lenders"), and agents for the Lender Groups (as defined therein) from time to time parties thereto, Computershare, as paying agent, image file custodian and collateral agent,  Heights I Loan Trustee, Atlas as successor to Credit Suisse, as the Structuring and Syndication Agent (in such role, the "Heights I Structuring and Syndication Agent"), Atlas as successor to Credit Suisse, as administrative agent (in such role as administrative agent, the "Heights I Administrative Agent"), and S&S, as backup servicer, a copy of which is attached as Exhibit I;

(j)     that certain *Borrower Loan Trust Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights I Trust Agreement")  by and between Heights Financing I, as borrower, and the Heights I Loan Trustee, a copy of which is attached as Exhibit J;

(k)     that certain *Limited Guaranty* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights I Limited Guaranty") by and between CURO, as guarantor (in such role, the "Heights I Guarantor") and the Heights I Administrative Agent, a copy of which is attached as Exhibit K;

(l)     that certain *Fee Letter* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights I Fee Letter") among Atlas as successor to Credit Suisse, ACM AIF Evergreen P2 DAC Subco LP, Atalaya A4 Pool 1 LP and Atalaya A4 Pool 1 (Cayman) LP;

(m)     that certain *Purchase Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights II Purchase Agreement," collectively with First Heritage Purchase Agreement and Heights I Purchase Agreement, the "US Purchase Agreements") by and

_____

corporation) and Heights Finance Corporation (a Tennessee corporation) (collectively, with First Heritage Originators, the "US Originators").

among Heights Originators, as transferors, SouthernCo, as the direct or indirect owner of Heights Originators, Heights Financing II, as transferee, and Wilmington Trust, solely in its capacity as loan trustee for the benefit of Heights Financing II (the "Heights II Loan Trustee"), a copy of which is attached as Exhibit M;

(n) that certain *Assignment Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights II Assignment Agreement") by and among Heights Originators, as transferors, and Heights Financing II, as transferee, and Heights II Loan Trustee, as transferee solely with respect to legal title, a copy of which is attached as Exhibit N;

(o) that certain *Credit Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights II Credit Agreement," collectively with First Heritage Credit Agreement and Heights I Credit Agreement, the "US Credit Agreements") by and between Heights Financing II, as borrower, SouthernCo, as servicer (in such role as servicer, the "Heights II Servicer," collectively with First Heritage Servicer and Heights I Servicer, the "US Servicers"), the subservicers party thereto identified in Schedule H thereto, the lenders from time to time party thereto (the "Heights II Lenders," collectively with First Heritage Lenders and Heights I Lenders, the "US Lenders"), S&S, as backup servicer and image file custodian, Heights II Loan Trustee, Midtown Madison Management, LLC ("Midtown"), as structuring and syndication agent (in such role, the "Heights II Structuring and Syndication Agent," collectively with First Heritage Structuring and Syndication Agent and Heights I Structuring and Syndication Agent, the "US Structuring and Syndication Agents"), Midtown as paying agent and collateral agent and Midtown as administrative agent (in such role as administrative agent, the "Heights II Administrative Agent," collectively with First Heritage Administrative Agent and Heights I Administrative Agent, the "US Administrative Agents"), a copy of which is attached as Exhibit O;

(p) that certain *Borrower Loan Trust Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights II Trust Agreement") by and between Heights Financing II, as borrower, and Heights II Loan Trustee, a copy of which is attached as Exhibit P;

(q) that certain *Limited Guaranty* (as amended, restated, supplemented or otherwise modified from time to time, the "Heights II Limited Guaranty," collectively with First Heritage Limited Guaranty and Heights I Limited Guaranty, the "US Guaranties") by and between CURO, as guarantor (in such role, the "Heights II Guarantor" collectively with First Heritage Guarantor and Heights I Guarantor, the "US Guarantors") and Heights II Administrative Agent, a copy of which is attached as Exhibit Q;

(r)    that certain *Fee Letter* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Heights II Fee Letter</u>," collectively with First Heritage Fee Letter and Heights I Fee Letter, the "<u>US Fee Letters</u>");

(s)    that certain *Second Amended and Restated Sale and Servicing Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada I Purchase Agreement</u>") by and among CURO Canada Corp. ("<u>CURO Canada</u>") and LendDirect Corp. ("<u>LendDirect</u>") as sellers (in the role as sellers, the "<u>Canada I Originators</u>") and as servicers (in the role as servicers, the "<u>Canada I Servicers</u>"), and Canada SPV I, as transferee,  a copy of which is attached as <u>Exhibit S</u>;

(t)    that certain *Second Amended and Restated Asset-Backed Revolving Credit Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada I Credit Agreement</u>") by and between Canada SPV I, by its general partner, CURO Canada Receivables GP Inc. ("<u>Canada I General Partner</u>"), as borrower, WF Marlie 2018-1, Ltd. ("<u>WF Marlie</u>") as lender and the other lenders from time to time party thereto (with WF Marlie, the "<u>Canada I Lenders</u>") Waterfall Asset Management, LLC ("<u>Waterfall</u>") as administrative agent (in such role as administrative agent, the "<u>Canada I Administrative Agent</u>"), a copy of which is attached as <u>Exhibit T</u>;

(u)    that certain *General Security Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada I GSA</u>") by and among Canada SPV I, and non-Debtor Canada I General Partner as debtors (collectively the "<u>Canada I GSA Debtors</u>"), and Canada I Administrative Agent, a copy of which is attached as <u>Exhibit U</u>;

(v)    that certain *Seller Security Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada I SSA</u>") by and between Canada SPV I, as purchaser, and Canada I Originators, a copy of which is attached as <u>Exhibit V</u>;

(w)    that certain *Back-up Servicing and Verification Agency Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada I BU Agreement</u>") by and between Canada SPV I, Canada I Administrative Agent, Curo Canada, f/k/a Cash Money Cheque Cashing Inc. and LendDirect as servicers, and S&S as back-up servicer and verification agent, a copy of which is attached as <u>Exhibit W</u>;

(x)    that certain *Second Amended and Restated Guaranty* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada I Limited Guaranty</u>") by and between CURO, as guarantor (the "<u>Canada I Guarantor</u>"), Canada I Originators, Canada I Servicers, Canada SPV I, Canada I Lenders and Canada I Administrative Agent, a copy of which is attached as <u>Exhibit X</u>;

(y)    that certain *Fee Letter* (as amended, restated, supplemented or otherwise modified from time to time, the "Canada I Fee Letter") among Canada SPV I, CURO, WF Marlie and Canada I Administrative Agent;

(z)    that certain *Sale and Servicing Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Canada II Purchase Agreement," collectively with Canada I Purchase Agreement, the "Canadian Purchase Agreements," Canadian Purchase Agreements collectively with US Purchase Agreements, the "Purchase Agreements") by and among CURO Canada and LendDirect as sellers (in the role as sellers, the "Canada II Originators," collectively with Canada I Originators, the "Canada Originators," Canada Originators collectively with US Originators, the "Originators") and as servicers (in the role as servicers, the "Canada II Servicers," collectively with Canada I Servicers, the "Canada Servicers," Canada Servicers collectively with US Servicers, the "Servicers"), and Canada SPV II, as transferee,  a copy of which is attached as Exhibit Z;

(aa)    that certain *Asset-Backed Revolving Credit Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Canada II Credit Agreement," collectively with Canada I Credit Agreement, the "Canada Credit Agreements," Canada Credit Agreements collectively with US Credit Agreements, the "Credit Agreements") by and between Canada SPV II, by its general partner, CURO Canada Receivables II GP Inc. (the "Canada II General Partner"), as borrower, the lenders from time to time party thereto (the "Canada II Lenders," collectively with Canada I Lenders, the "Canada Lenders," Canada Lenders with US Lenders, the "Lenders"),  Midtown as administrative agent (in such role as administrative agent, the "Canada II Administrative Agent," collectively with Canada I Administrative Agent, the "Canada Administrative Agents," Canada Administrative Agents collectively with US Administrative Agents, the "Agents"), a copy of which is attached as Exhibit AA;

(bb)    that certain *General Security Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Canada II GSA") by and among Canada SPV II, and non-Debtor Canada II General Partner as debtors (collectively the "Canada II GSA Debtors"), and Canada II Administrative Agent, a copy of which is attached as Exhibit BB;

(cc)    that certain *Pledge Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Canada II Pledge") by and among CURO Canada and LendDirect as pledgors (in such role, the "Canada II Pledgors"), and Canada II Administrative Agent, a copy of which is attached as Exhibit CC;

(dd)    that certain *Seller Security Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Canada II SSA") by and

between Canada SPV II, as purchaser, and Canada II Originators, a copy of which is attached as <u>Exhibit DD</u>;

(ee)    that certain *Back-up Servicing and Verification Agency Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada II BU Agreement</u>") by and between Canada SPV II, Canada II Administrative Agent, Canada II Servicers, and S&S as back-up servicer and verification agent, a copy of which is attached as <u>Exhibit EE</u>;

(ff)    that certain *Limited Guaranty* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada II Limited Guaranty</u>") by and between CURO, as guarantor (in such role, the "<u>Canada II Guarantor,</u>" collectively with Canada I Guarantor, the "<u>Canada Guarantors</u>") and Canada II Administrative Agent, a copy of which is attached as <u>Exhibit FF</u>;

(gg)    that certain *Limited Guarantee* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada II Partners Limited Guarantee</u>" collectively with the Canada I Limited Guaranty, Canada II Limited Guaranty, and US Guaranties, the "<u>Guaranties</u>") by and between CURO Canada, LendDirect and Canada II GP as guarantors (in such role, the "<u>Canada II Partner Guarantors</u>," collectively with US Guarantors and Canada Guarantors, the "<u>Guarantors</u>") and Canada II Administrative Agent, a copy of which is attached as <u>Exhibit GG</u>;

(hh)    that certain <u>Fee Letter</u> (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada II Fee Letter</u>" with the U.S. Fee Letters and the Canada I Fee Letter, collectively, the "<u>Fee Letters</u>") among Canada SPV II, CURO, and Canada II Administrative Agent;

(ii)    that certain *Intercreditor Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Canada II IC</u>") by and among the Atalaya Lenders (as defined therein), Canada II Administrative Agent, Canada SPV II, Canada II General Partner, WF Marlie, Canada I Administrative Agent, Canada SPV I,  CURO Canada and LendDirect, a copy of which is attached as <u>Exhibit II</u>;

(jj)    each of the other Basic Documents or Transaction Documents (as defined in the Securitization Transaction Documents), as applicable, to which the applicable Debtors are parties;

ii.    authorization for the Securitization Facilities Debtors (as defined below) to continue the Securitization Facilities, subject to the terms of the Interim Order and the Final Order, in the ordinary course of business, including, without limitation, authorizing:

(a)    the Originators to continue selling, pursuant to the respective Purchase Agreements free and clear of any and all liens, claims, charges, interests or

encumbrances, certain loan receivables and related rights and interests (the "<u>Receivables</u>") to the respective Non-Debtor Purchasers, in accordance with and pursuant to the respective Purchase Agreements;

(b)     the Servicers to continue servicing and collecting the Receivables pursuant to the respective Purchase Agreements and the respective Credit Agreements; and

(c)     the Guarantors to continue guaranteeing, pursuant to the respective Guaranties, the obligations of the Originators and the Servicers under the Securitization Transaction Documents to which they are a party (Servicers, Originators and Guarantors, are referred to herein collectively as the "<u>Securitization Facilities Debtors</u>");

iii.     authorization for the Securitization Facilities Debtors to cause and direct each of the respective Non-Debtor Purchasers to perform or continue to perform under each of the Securitization Transaction Documents to which such Non-Debtor Purchaser is a party;

iv.     authorization for the Securitization Facilities Debtors to further amend the Securitization Transaction Documents, on a postpetition basis, as necessary and appropriate, and as agreed to by the respective Agent for each Securitization Facility on behalf of such Agent's respective Lenders, and to perform their obligations thereunder, subject to the terms of the Interim Order and the Final Order;

v.     pursuant to Bankruptcy Code section 365 authorization for the Securitization Facilities Debtors, as applicable, to assume, and approval of the assumption of, the Securitization Transaction Documents to which they are a party;

vi.     pursuant to Bankruptcy Code section 364(c)(1), a grant to the respective Non-Debtor Purchasers, and the respective Agents, priority in payment, with respect to the obligations of the respective Securitization Facilities Debtors under the applicable Securitization Transaction Documents, over any and all administrative expenses of the kinds specified in Bankruptcy Code sections 503(b) and 507(b), other than with respect to (a) the DIP Superpriority Claims (as defined in the DIP Orders) (which shall be *pari passu* with the Superpriority Claims (as defined below) granted in the Orders) and (b)(i) the Carve Out[5] (which, notwithstanding any provision of the Orders  or in the Securitization Transaction Documents to the contrary, shall be senior in priority in all respects to the Superpriority Claims and the Liens (as defined below) granted under the Orders) and (ii) the charge granted

---

[5]     "<u>Carve Out</u>" has the meaning set forth in the interim and final orders approving the *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* (as may be amended, restated, or otherwise modified from time to time, collectively, the "<u>DIP Orders</u>", and the motion, the "<u>DIP Motion</u>").

by the Canadian Court[6] in the Canadian Recognition Proceedings on the assets, undertakings and properties of the Canadian Debtors (the "Canadian Property") in favor of Canadian counsel to CURO and the Canadian Debtors, the Court-appointed Information Officer and its counsel (the "Administration Charge"), each with respect to the applicable Debtors and without duplication;

vii.   pursuant to Bankruptcy Code section 364(c)(1), a grant of the Liens (as defined below) in favor of the respective collateral or administrative agents under the respective Securitization Transaction Documents (each a "Collateral Agent" and collectively, the "Collateral Agents"), to the extent any transfer of the Receivables is subsequently avoided or recharacterized as an extension of credit or a pledge rather than a true sale;

viii.   pursuant to Bankruptcy Code section 362, modification of the automatic stay to permit the enforcement of remedies under the Securitization Transaction Documents; and

ix.   that a final hearing to consider the relief requested in the Motion on a final basis (the "Final Hearing") be scheduled and held within twenty-eight (28) days of entry of this Interim Order and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of the Final Order authorization for, on a final basis, among other things, the relief requested herein.

## Jurisdiction and Venue

2.   The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

3.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.   The bases for the relief requested herein  are section[s] 105(a), 362, 363, 364, 365, 503, 506, 507, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

---

[6]   As noted in the First Day Declaration (as defined below), CURO  intends to bring an application for recognition of the Chapter 11 Cases of Curo Canada and LendDirect under the *Companies' Creditors Arrangement Act* (Canada) before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").

Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no official committees have been appointed or designated.

6.      The Debtors and their non-Debtor affiliates (collectively, the "Company") provide consumer credit lending services across the U.S. and Canada.  In the U.S., the Company operates under several principal brands, including "Heights Finance," "Southern Finance," "Covington Credit," "Quick Credit," and "First Heritage Credit."  In Canada, the Company operates under the "Cash Money" and "LendDirect" brands through the Debtors Curo Canada Corp. and LendDirect Corp. (the "Canadian Debtors").  As of Petition Date, the Company operated approximately 400 store locations across 13 U.S. states and approximately 150 stores in eight Canadian provinces and had an online presence in eight Canadian provinces and one territory.  The Company generated approximately $672 million in total revenue for the fiscal year 2023, and, as of the Petition Date, the Company's capital structure includes approximately $2.1 billion of funded debt obligations.

7.      A description of the Debtors and their businesses, and the facts and circumstances supporting this Motion, are set forth in the *Declaration of Douglas Clark in Support of Chapter*

*11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein. A description of the proposed DIP financing and the necessity for the continuation of the Securitization Facilities supporting this Motion is set forth in the *Declaration of Joe Stone (Oppenheimer & Co., Inc.) in Support of (A) the Debtors' DIP Financing Motion and (B) the Debtors' Securitization Motion* (the "Oppenheimer Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

### Preliminary Statement

8.     The Securitization Facilities are a crucial source of day-to-day operating liquidity for the Debtors. Since August of 2018, in exchange for immediate liquidity, the Originators have continuously sold certain ordinary-course loan receivables to the Non-Debtor Purchasers -- each a non-Debtor special purpose entity. Without sales that take place under the Securitization Facilities, the Debtors would be unable to fund their operations. The continuation of the Securitization Facilities is critical for the Debtors to maintain sufficient liquidity during the Chapter 11 Cases. The Debtors' ability to operate without disruption during the Chapter 11 Cases is dependent upon continued access to the liquidity provided by the Securitization Facilities.

9.     If the Debtors were denied authority to extend the Securitization Facilities on a postpetition basis, they would suffer significant liquidity challenges and a disruption to the ordinary course of their business operations, as the Debtors would not be able to access the daily cash collections on the Receivables, which are a critical component of their liquidity, until all obligations under the Prepetition Securitization Transaction Documents (as defined below) are paid in full. Continuation of the Securitization Facilities will avoid such an immediate adverse impact on the Debtors' liquidity and significant value destruction.

10.     Contemporaneous herewith, the Debtors filed the DIP Motion, seeking approval to enter into a debtor in possession financing facility (the "<u>DIP Facility</u>"), secured by substantially all assets of the Debtors, which is also critical to ensuring sufficient liquidity for the Debtors during these cases[7].   The DIP Facility and the Securitization Facilities, together with the proposed restructuring transactions contemplated by the RSA (as defined in the First Day Declaration), provide the Debtors with a clear path to emerge from the Chapter 11 Cases better positioned for long-term success with a de-levered balance sheet.   Accordingly, the Debtors are seeking the relief requested herein.

<strong><u>Concise Statement of Certain Material Terms</u>[8]</strong>

11.     The below summary of material terms has been included to assist the parties in interest and the Court.   While the Debtors seek (i) to grant Liens to the extent any transfer of Receivables to the Non-Debtor Purchasers on or after the Petition Date is subsequently recharacterized as an extension of credit or a pledge rather than an absolute sale, and (ii) to grant the Non-Debtor Purchasers a superpriority administrative expense claim, the Debtors do not seek to obtain credit by this Motion.

12.     The proposed Interim Order contains the following provisions:

| Material Provision | Summary |
|---|---|
| **Sale or Plan Confirmation Milestones** | The Credit Agreements will include the following milestones related to the Chapter 11 Cases (the "<u>Milestones</u>"):<br>•       No later than one (1) business day after the Petition Date, the Debtors shall have filed the Bankruptcy Plan and Disclosure Statement;<br>•       No later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order; |

---

[7]     The assets of the Canadian Debtors are not collateral for the DIP Facility.  For more detail regarding the DIP Facility, see the DIP Motion.

[8]     Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the Securitization Facilities Documents, the Restructuring Support Agreement or the Interim Order, as applicable.

| Material Provision | Summary |
|---|---|
| | • No later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order; <br><br>• No later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order <br><br>• No later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order; <br><br>• No later than fifty (50) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Plan and approving the Disclosure Statement; and <br><br>• No later than one hundred twenty (120) calendar days after the Petition Date, the Effective Date of the Bankruptcy Plan shall have occurred. <br><br>The Credit Agreements regarding Canada SPV I and Canada SPV II will include the following additional Milestones: <br><br>• No later than one (1) business day after the Petition Date, the Canadian Court shall have issued the Canadian Initial Stay Order; <br><br>• No later than five (5) business days after the Petition Date, the Canadian Court shall have issued the Canadian Initial Recognition Order, the Canadian Supplemental Recognition Order and the Canadian Interim Securitization Recognition Order; <br><br>• No later than fifty (50) business days after the Petition Date, the Canadian Court shall have issued the Canadian Final Securitization Recognition Order; <br><br>• No later than fifty-seven (57) calendar days after the Petition Date, the Canadian Court shall have issued an order recognizing and giving full force and effect in Canada to the order of the Court confirming the Plan, which order shall be in form and substance acceptable to the respective Canadian Administrative Agents. <br><br>*Amended Credit Agreements, Heights I Credit Agreement ¶ 6.02(z). Canada II Credit Agreement, ¶ 5.45(e)* |
| Cross-Collateralization | N/A |
| Roll-Ups / Refinance | N/A |
| Liens on Avoidance Actions or Proceeds Thereof | N/A |
| Default Provisions and Remedies | The Purchase Agreements and Credit Agreements contain events of default that are usual and customary for receivables financing arrangements, including, without limitation, failing to make when due any payment or deposit to be made.  Moreover, prior to exercising certain remedies the respective Agent must give five (5) business days notice and consents to an emergency hearing regarding an event of default. <br><br>*Interim Order, ¶ 21.* |
| Releases of Claims | Subject to Paragraph 24 of the Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their respective past, present, and future |

| Material Provision | Summary |
|---|---|
| | predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges from and acquits of any and all claims (as such term is defined in the Bankruptcy Code), counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action of any kind, nature, or description (whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort, or under any state or federal law or otherwise, in each case arising from or related to any acts or transactions occurring prior to the Petition Date) against any Non-Debtor Purchaser or with respect to any property heretofore conveyed to that Non-Debtor Purchaser, the Agents, the Structuring and Syndication Agents, the Lenders, and, with respect to each of the foregoing, their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, and the respective successors and assigns thereof (collectively, in each case solely in their capacity as such, the "Released Parties"), arising from or related to the Securitization Facilities, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to Bankruptcy Code section 105 or chapter 5 of the Bankruptcy Code or any similar provisions of applicable state or federal law; provided, however, that nothing in this Interim Order releases any party thereto from its contractual obligations under the Securitization Transaction Documents or in any way affects its property interests in the Receivables or the proceeds thereof.<br><br>*Interim Order, ¶ 4.* |
| **Limitations on Use of Cash Collateral or DIP Proceeds** | N/A |
| **Non-Consensual Priming Liens** | All priming liens are consensual. |
| Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties | N/A |

13.     Each of the foregoing provisions are customary for securitization facilities in cases of this complexity and appropriate under the circumstances.[9]   In addition, the provisions were

---

[9]     *See*, *e.g.*, *Audacy, Inc.*, No. 24-90004 (CML) (Bankr. S.D. Tex. Feb. 20, 2024); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. Oct. 24, 2023) (authorizing debtors to enter into amendments to and continuation of accounts receivable securitization facility postpetition, and granting superpriority claims in favor of securitization lenders pursuant to Bankruptcy Code section 364(c)(1)).

negotiated in good faith and at arm's length and are part of the overall deal with respect to the Securitization Facilities and RSA. Where possible, the Debtors have sought to defer the effectiveness of such provisions to entry of a Final Order to ensure that parties in interest have a full and fair opportunity to be heard. Accordingly, the foregoing provisions should be approved.

**The Securitization Facilities**[10]

14.     Beginning in August of 2018, the Company began entering the Prepetition Securitization Transaction Documents (as defined below) which established the Securitization Facilities. Under the Securitization Facilities, the Non-Debtor Purchasers purchase Receivables from certain Originators identified in the respective Securitization Transaction Documents pursuant to the Purchase Agreements. The Guarantors guarantee the Originators' and Servicers' performance under the Prepetition Securitization Transaction Documents to which they are a party.

15.     To ensure continued liquidity through the Securitization Facilities on a postpetition basis, the Company negotiated with the respective Agents and Lenders to amend, modify and waive certain terms of the Securitization Transaction Documents (as such documents were in effect prior to the Petition Date, the "Prepetition Securitization Transaction Documents") to allow the Securitization Facilities to continue postpetition notwithstanding the commencement of the Chapter 11 Cases (which would have otherwise been a default under the Prepetition Securitization Transaction Documents). These negotiations proved successful, and subject to Court approval, the Securitization Transaction Documents will provide the Debtors with continued access to liquidity by keeping the Securitization Facilities in effect postpetition. Additional amendments to

---

[10]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

the Securitization Transaction Documents are being finalized and will be executed on a postpetition basis.

16.     In connection with entry into the above-referenced amendments to the Securitization Transaction Documents, each of the Non-Debtor Purchasers and Originators agreed to, among other things:

- grant certain Collateral Agents the Pledge Liens (as defined below);

- in some instances, extend the term of the Securitization Facility and modify the pricing, advance rates and financial covenants upon the Effective Date of the proposed Plan;

- amend the maturity date, pricing, advance rates, "Events of Default", financial covenants, and other representations and warranties and covenants under the Securitization Transaction Documents to account for the circumstances of the Chapter 11 Cases and provide that the Debtors' voluntary chapter 11 filing does not trigger an "Event of Default"; and

- alter the fee structure of the Securitization Facilities.

## I.     Purchase and Sale of Receivables

17.     The Originators originate or acquire the Receivables that are subject to the Securitization Facilities.   Under the respective Purchase Agreements, the Originators sell the Receivables to the respective Non-Debtor Purchasers.   After the creation or acquisition of Receivables by the applicable Originator, such Originator selects Receivables based on the eligibility terms in each of the applicable Purchase Agreements to be transferred to a particular Non-Debtor Purchaser.[11]   Once the other conditions to purchase are satisfied under the applicable Purchase Agreements, the transfers are effected through an assignment, with respect to transfers pursuant to the US Purchase Agreements (a form of which is attached to each US Purchase Agreement) or a purchase notice, with respect to transfers pursuant to the Canadian Purchase

---

[11]   If a Receivable qualifies for sale under both of the Canadian Purchase Agreements, the Debtors allocate the Receivable to one of the Canada Purchasers.

Agreements (a form of which is attached to each Canadian Purchase Agreement). The assignments and purchase notices identify which Receivables are being transferred by the applicable Originator to the applicable Non-Debtor Purchaser along with certain other material terms of the purchase. Under the terms of the respective Purchase Agreements, the transfers from the Originators to the Non-Debtor Purchasers are "true sales" and absolute assignments of the Receivables. Each Originator has also granted a precautionary, back-up security interest in the transferred Receivables, which security interest has been perfected by the filing of UCC-1 financing statements and the Canadian equivalents in the proper filing office in the appropriate jurisdictions under applicable law. These security interests are granted solely to guard against the possibility that, contrary to the express terms of the Purchase Agreements and intent of the parties, the transfers of the Receivables are recharacterized as loans, extensions of credit, or the grant of a security interest to secure a debt or other obligation rather than true sales.

18.     Pursuant to the respective Purchase Agreements and the Credit Agreements, the Servicers on behalf of the respective Non-Debtor Purchasers, are responsible for, among other things, servicing, administering and collecting on the Receivables. Each Servicer receives a fee which is comparable to the fees that would be paid to an independent third-party servicer on an arm's length basis.

19.     Under the terms of the respective Purchase Agreements, the purchase price of the Receivables is intended to represent the fair market value of the Receivables being sold as agreed by the Originator and the Non-Debtor Purchaser, as applicable, at the time of transfer. Pursuant to the respective Purchase Agreements, the Non-Debtor Purchasers pay the purchase price for Receivables sold thereunder.

## II.        Use of the Securitization Facilities

20.        Continuation of the Securitization Facilities prevents an immediate and significant drain on liquidity and associated degradation of value that would result from its termination.  In the event that certain events of default occur under the respective Securitization Transaction Documents or the Securitization Facilities are terminated, the collections and proceeds of outstanding Receivables sold from time to time to the Non-Debtor Purchasers would continue to be remitted to the Non-Debtor Purchasers, but such collections and proceeds would be used to reduce the obligations that the Non-Debtor Purchasers owe to the Agents under the Securitization Transaction Documents until all such amounts have been reduced to zero.

## III.       Collection of Receivables, Application of Proceeds.[12]

21.        Customer payments are initially received in accounts in the name of Debtor Heights Finance Holding Co. ("Heights Holdco") (for Heights Financing I and Heights Financing II), Debtor First Heritage (for Heights Financing II and First Heritage Financing) and Curo Canada (for the Canada Purchasers).  Thereafter, daily disbursements are made from these collection accounts.  Based on a daily payment bifurcation report, the Heights Holdco account makes disbursements to the Debtors' main operating account, and controlled accounts held by Heights Financing I and Heights Financing II (as described below).  The First Heritage account makes daily sweeps to a ComputerShare account (as described below) for First Heritage Financing. Historically, Curo Canada sweeps the funds into the Curo Canada's main operating account and Curo Canada segregates the funds for each of the Canada Purchasers and transfer the corresponding proceeds to collection accounts maintained by each of the Canada Purchasers.  The

---

[12]    For additional discussion of the Debtors' cash management program, see the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to (A) Operate Their Cash Management System, (B) Use Existing Checks, and Business Forms, and (C) Honor Certain Intercompany Arrangements, and (II) Granting Related Relief*, filed contemporaneously herewith.

master collection accounts maintained on behalf of Heights Holdco and First Heritage are governed by account control agreements including: (a) that certain *Deposit Account Control Agreement*, dated as of January 27, 2023, by and among Heights Holdco, Computershare, and BMO Harris Bank, National Association; (b) that certain *Deposit Account Control Agreement*, dated as of January 27, 2023, by and among Heights Holdco, Computershare, and Wells Fargo Bank, National Association; and (c) that certain *Amended and Restated Deposit Account Control Agreement*, dated as of February 28, 2024, by and among First Heritage Servicer, Computershare, and Wells Fargo Bank, National Association.  The collection accounts maintained on behalf of the Non-Debtor Purchasers are governed by account control agreements including:  (a) that certain *Account Control Agreement*, dated as of July 13, 2022, by and among First Heritage Financing, First Heritage Servicer, and Computershare; (b) that certain *Account Control Agreement*, dated as of July 15, 2022, by and among Heights Financing I, Heights I Servicer, and Computershare; (c) that certain *Deposit Account Control Agreement*, dated as of November 3, 2023, by and among Heights Financing II, SouthernCo, Midtown as collateral agent and CIBC Bank USA; (d) that certain *Deposit Account Control Agreement*, dated as of February 29, 2024, by and among the Heights Financing II, Axos Bank and Midtown as agent; (e) that certain *Blocked Accounts Agreement*, dated as of August 2, 2018, by and among Canada SPV I, Canada I General Partner, Canada I Administrative Agent and Royal Bank of Canada; (g) that certain *Blocked Account Agreement*, dated as of August 1, 2023, by and among Canada SPV II, Canada II Administrative Agent and National Bank of Canada; and (h) that certain Letter Agreement, by and between Curo Canada, LendDirect, the Canada II Administrative Agent and Brink's Canada Limited (collectively, the "Collection Accounts").

22.     Pursuant to the Purchase Agreements, the Credit Agreements, the Canada I GSA, the Canada II GSA and the corresponding accounting control agreements for the Collection Accounts, the respective Agents have dominion and control over each of the Collection Accounts. Funds collected in the Collection Accounts are then released pursuant to the Securitization Transaction Documents.

## IV.     Security Interests

23.     Under the Securitization Transaction Documents, to continue to secure the Non-Debtor Purchasers' obligations, the respective Agents on behalf of the respective Lenders continue to hold a perfected security interest in all of the respective Non-Debtor Purchasers' property, including all Receivables, the Collection Accounts, the rights of the respective Non-Debtor Purchasers under the respective Purchase Agreements, and all proceeds of the foregoing.

24.     The Securitization Transaction Documents expressly state that the transfers of Receivables from the Originators to the respective Non-Debtor Purchasers are, in each case, whether occurring prior or subsequent to the Petition Date, true sales and absolute assignments of the Receivables.  If, however, contrary to the intent of the parties (and notwithstanding entry of the Interim Order and the Final Order, in which the Debtors stipulate that the transfers of the Receivables constitute true sales), any transfer of Receivables by an Originator to one of the Non-Debtor Purchasers, on or after the Petition Date is subsequently avoided or recharacterized as an extension of credit or a pledge rather than a true sale, to secure an Originator's postpetition obligations to the applicable Non-Debtor Purchasers, one of the Agents, and/or the other Secured Parties (as defined in the Purchase Agreements) under the Securitization Transaction Documents, the Originators agreed to grant the respective Collateral Agent, valid, binding, continuing, enforceable, unavoidable and fully perfected first-priority continuing security interests in and liens upon all of such Originator's rights in the Receivables originated and purported to be sold in

21

connection with the applicable Securitization Facility on or after the Petition Date, whether existing on the Petition Date or thereafter arising or acquired pursuant to Bankruptcy Code section 364 (the "Receivables Liens").

25.     To the extent of the Receivables sold by the Securitization Facilities Debtors to the Non-Debtor Purchasers on or after the Petition Date, the respective Collateral Agents (for the benefit of the respective Secured Parties under the respective Securitization Transaction Documents) will also be granted (effective and perfected upon the date of entry of the Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements), valid, binding, continuing, enforceable, unavoidable and fully perfected continuing first-priority security interests in all of Originators' now existing and hereafter acquired or arising, right, title and interest in, to and under all limited liability company interests or partnership interests, as applicable, and all other equity interests in each case in the respective Non-Debtor Purchasers[13] and all proceeds and products thereof pursuant to Bankruptcy Code section 364 (the "Pledge Liens," and collectively with the Receivables Liens, the "Liens").

## V.     Certain Obligations of the Originators

26.     Under the Purchase Agreements, in the event that certain representations and warranties made by the Originators as to the nature of the Receivables (including whether such Receivable was an "Eligible Receivable" (as defined in the Purchase Agreements)) were inaccurate when made, then the Originators are required to repurchase such Ineligible Receivable or Disqualified Receivable (as defined in the respective Purchase Agreements) along with certain

---

[13]     Pursuant to the Pledge Agreement, the limited partnership and general partnership interests in Canada SPV II are already pledged to the Canada II Administrative Agent.

other obligations to repurchase Receivables (as described in the Securitization Transaction Documents, the "Repurchase Obligations")).

27.     Further, pursuant to the Guaranties, the Guarantors have guaranteed each of the respective Originators and Servicers performance under the Securitization Transaction Documents.  In connection with the continuation of the Securitization Facilities pursuant to the Securitization Transaction Documents, the Debtors seek approval of superpriority claims against the respective Securitization Facilities Debtors (without the need to file any proof of claim) and in favor of each of the applicable Non-Debtor Purchasers and the applicable Agents.  These superpriority claims are in respect of all obligations of the respective Securitization Facilities Debtors under the Securitization Transaction Documents for the specific Securitization Facility, including the Repurchase Obligations and certain other limited indemnification obligations of the Securitization Facilities Debtors under the Securitization Transaction Documents (such claims, the "Superpriority Claims").  The Debtors also seek approval for the Agents to enforce on a derivative basis any Superpriority Claims in favor of the respective Non-Debtor Purchasers.

28.     The Superpriority Claims will, for purposes of section 1129(a)(9)(A), be considered administrative expenses allowed under Bankruptcy Code sections 364 and 503(b), and will be payable from, and have recourse to, all prepetition and postpetition property of the applicable Securitization Facilities Debtors and all proceeds thereof in accordance with the terms of the Interim Order and the Final Order.  The Superpriority Claims will have priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the respective Securitization Facilities Debtors, now existing or hereafter arising, of any kind whatsoever; *provided*, that the Superpriority Claims will be subject and subordinate solely to the Carve Out and the Administration Charge (solely with respect to the Canadian Property) and

rank *pari passu* solely with the DIP Superpriority Claims (as defined in the DIP Orders) against the applicable Securitization Facilities Debtors and senior to the Adequate Protection Superpriority Claims (as defined in the DIP Orders), with respect to the applicable Debtors.  For avoidance of doubt, nothing contained herein shall be construed (i) to grant, or otherwise permit an Agent a right to enforce, any Superpriority Claim against an Originator or a Servicer that is not specifically identified in the Agent's component Securitization Transaction Documents, or (ii) modify, alter, amend or replace any parties' rights or obligations under any applicable intercreditor agreement.

## VI.    Events of Default and Maturity Date[14]

29.    In addition to the terms described above, the Securitization Transaction Documents also permit the termination of the Securitization Facilities and the acceleration of Non-Debtor Purchasers payment obligations under the Securitization Facilities, and the termination of the Purchase Agreements, upon the occurrence of certain events (each an "Event of Default"), including but not limited to[15]:

- dismissal or conversion to a chapter 7 proceeding;

- maturity of the Debtors' DIP Facility;

- appointment of a trustee or an examiner with expanded powers;

- entry of an order modifying the Interim Order or Final Order or the Debtor seeks such relief;

- filing by the Debtors of a motion to approve a DIP Facility that is not an Eligible DIP Facility or an order is entered approving such a DIP Facility;

- entry of an order modifying the automatic stay to allow a third party to proceed against the Collateral of the Lenders;

---

[14]   Capitalized terms used in this Section VI and not otherwise defined in this Motion shall have the meanings ascribed to them in the Securitization Transaction Documents.

[15]   Each Securitization Facility has different Events of Default.  The below list of Events of Default is illustrative of the Events of Default across each Securitization Facility, and subject to the exact terms of each Event of Default are set forth in the respective Credit Agreements.

- filing of a motion to approve a DIP financing appointment secured by any receivables, collateral, security, collections, lock-box or collection accounts subject to the Securitization Facility;

- filing by the Debtors or any affiliate of any motion or proceeding that would reasonably be expected to have a material and adverse effect on the Lenders' rights under the Securitization Facility;

- existence of an Adverse Claim against the Collateral of the Lenders;

- entry of an order authorizing recovery against the Collateral of the Lenders under Bankruptcy Code section 506(c);

- with respect to super-priority claims of the Borrowers, Originators or Lenders that are *pari passu* with, or senior to the super-priority claims of the Lenders, granting of any super-priority claims (other than the DIP Facility claims or the Administration Charge, as applicable) or claims for surcharge against the Lenders;

- other orders are entered in the Chapter 11 Cases which impair the rights of the Lenders or the Administrative Agent with respect to the facility documents under the Securitization Facility;

- the occurrence of any "event of default" under the DIP Facility after giving effect to all applicable cure rights, grace periods, waivers, amendments or modifications;

- commencement of a Challenge by a party to the Restructuring Support Agreement;

- Non-Debtor Purchasers or their affiliates are enjoined by a final order from conducting a material part of their business;

- substantive consolidation of the Non-Debtor Purchaser with any of the Debtors;

- failure to provide timely drafts of pleadings;

- subject to notice and cure periods, failure to comply with the Orders;

- failure to comply with any Milestone;

- termination of the Restructuring Support Agreement;

- the proposal or filing of (a) a plan of reorganization or (b) motion to approve a sale of (I) all or substantially all of the Debtors' assets or (II) any materials asset(s) that are essential to the continued operation of the Securitization Program, in each case that does not render the Lenders unimpaired and/or provide for the payment in full in cash of the claims arising under the Securitization Program, or as otherwise agreed by the Lenders and

- cross defaults to the other securitization facilities of the Debtors or sponsored by the Debtors.

In addition, an Event of Default (as defined in the Purchase Agreements) under the Purchase Agreement will occur within three (3) calendar days of the Petition Date if the Interim Order has not been entered.  This would result in all of the Non-Debtor Purchasers' obligations becoming immediately due and payable, and the Non-Debtor Purchasers would be required to use all of their available funds to make payments on its obligations to the Agents rather than to purchase Receivables from the Originators.

**VII.    Pricing, Fees, and Expenses**

30.    In connection with the Securitization Transaction Documents, the Debtors have agreed to revised yield rates and fees, payable by the Non-Debtor Purchasers to the respective Agents and Lenders pursuant to the terms set forth in the Securitization Transaction Documents. The yield rates and fees set forth in the Securitization Transaction Documents effectively represent the new pricing of the Securitization Facilities.

31.    The Non-Debtor Purchasers and certain Securitization Facilities Debtors have also agreed to pay the reasonable and documented fees, costs and disbursements of the Agents (including any advisors' fees and expenses) in connection with the Securitization Transaction Documents.  The Debtors submit that the fees, expense reimbursements, and other payment terms under the Securitization Transaction Documents are fair, reasonable, and customary for financings of this type.

**Applicable Authority**

**VIII. The Debtors Should Be Authorized to Enter into the Securitization Transaction Documents, Continue Selling Receivables and Related Rights Pursuant to the Securitization Facilities, and Pay Fees In Connection Therewith**

32.    The Debtors' decision to continue the Securitization Facilities pursuant to the Securitization Transaction Documents, and to cause and direct the Non-Debtor Purchasers to pay the associated expenses, is an appropriate exercise of the Debtors' business judgment and should be approved by this Court under Bankruptcy Code sections 105(a) and 363(b).  Bankruptcy Code section 363(b)(1) allows debtors, after notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Debtors' decisions to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See, e.g.*, *Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res.  Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.").

33.    Courts emphasize that the business judgment rule is a standard that "is flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).  "Great judicial deference is given to the [debtor's] exercise of business judgment."  *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg.  Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005).  As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's

judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation and internal quotation marks omitted).

34.     Moreover, Bankruptcy Code section 363(c) authorizes a debtor in possession operating its business pursuant to Bankruptcy Code section 1108 to "enter into transactions... in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1).  One purpose of Bankruptcy Code section 363(c) is to provide a debtor with the flexibility to engage in the ordinary course transactions required to operate its business without undue supervision by its creditors or the court.  *See, e.g.*, *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (citations omitted) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.").  Included within the purview of Bankruptcy Code section 363(c) is a debtor's ability to continue "routine transactions" necessitated by a debtor's business practices.  *See, e.g.*, *Amdura Nat. Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996) (citations omitted) ("A debtor in possession under Chapter 11 is generally authorized to continue operating its business."); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr.  D. Del. 2007) (citations omitted) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions).

35.     The Bankruptcy Code does not define "ordinary course of business."  In determining whether a transaction qualifies as "ordinary course," the courts use the "horizontal" dimension test (*i.e.*, "the way businesses operate within a given industry") and the "vertical" dimension test (*i.e.*, whether the transaction is consistent with the reasonable "expectations of

creditors"). *See Denton Co. Elec.  Coop., Inc. v. Eldorado Ranch, Ltd. (In re Denton Cty.  Elec. Cocp., Inc.)*, 281 B.R. 876, 882 & n.12 (Bankr.  N.D. Tex. 2002) (collecting cases).  "In general, under the vertical test, courts look at whether the transaction subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit.  Under the horizontal test, in general courts look at whether the transaction was of the sort commonly undertaken by companies in the industry.  The primary focus is on the debtor's prepetition business practices and conduct." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr.  W.D. Tex. 2013).

36.     The Debtors further submit that postpetition amendment of and continuation of the Securitization Facilities is authorized under Bankruptcy Code section 105(a) pursuant to what is referred to interchangeably as the "doctrine of necessity" or "necessity of payment rule."  The doctrine of necessity functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr.  N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr.  N.D. Tex. 2003) (same and citing *In re CoServ*); *see also In re Lehigh & New Eng.  Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D.  Del. 1999) (holding that Bankruptcy Code section 105(a) "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity).

37.     The Court's power to utilize the "doctrine of necessity" in the Chapter 11 Cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C.  § 105(a).  "[T]he debtor-in-possession's role as the equivalent of a trustee under

§ 1107(a) and its duty to protect the going-concern value of an operating business in a Chapter 11 provide[s] the 'bridge that makes application to the Doctrine of Necessity 'necessary or appropriate to carry out the provisions of the Bankruptcy Code.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004) (citing *In re CoServ*, 273 B.R. at 497). Accordingly, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets. *See In re Young*, 416 F. App'x 392, 398 (5th Cir. 2011) (recognizing that "[s]ection 105(a) of Title 11 permits the bankruptcy court to exercise broad authority"); *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) (citation omitted) ("It is well settled that the court's power under § 105(a) is broad."); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (citation omitted) (noting that Bankruptcy Code section 105 "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings"); *In re Trevino*, 599 B.R. 526, 542-43 (Bankr. S.D. Tex. 2019) (noting that the bankruptcy court has "broad authority" under Bankruptcy Code section 105(a)); *In re Padilla*, 379 B.R. 643, 667 (Bankr. S.D. Tex. 2007) (citations omitted) ("Section 105(a) gives bankruptcy courts broad authority to take actions necessary and appropriate for administering and enforcing the Bankruptcy Code and... authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code."); *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) (citation omitted) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

38.     The United States Supreme Court first articulated the doctrine of necessity more than a century ago, in *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts

owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309. This doctrine has become an accepted component of modern bankruptcy jurisprudence, and courts' application of it largely adheres to the Supreme Court's reasoning in *Miltenberger*. *See, e.g.*, *In re Lehigh & New Eng. Ry.*, 657 F.2d at 581-82 ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the continued operation of the [debtor] in serious jeopardy."); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that "courts in this district" have applied this doctrine "primarily out of common sense and the presence of a legal or factual inevitability of payment"); *In re Mirant*, 296 B.R. at 429 (applying the rule where the "Debtors' businesses [would be] seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (holding that the "ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept"); *In re Just for Feet, Inc.*, 242 B.R. at 826 (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment).

39.     The Debtors have determined, in their business judgment, that in light of the resulting liquidity, entering into, amending and continuing to perform under the Securitization Transaction Documents is the best available option under the circumstances. Such liquidity is crucial to the continuation of the Debtors' business operations. If the Securitization Facilities were terminated, it would likely be difficult, if not impossible, for the Debtors to timely find replacement liquidity on comparable economic terms as those offered by the Agents. Further, termination of

the Securitization Facilities would result in the Debtors' immediate loss of access to collections of outstanding Receivables. Instead, all collections and proceeds of the Receivables will be used to reduce all other obligations that the Non-Debtor Purchasers owe to the Agents under the Securitization Transaction Documents until all such amounts have been reduced to zero.

40.    The Debtors who are party to the Securitization Transaction Documents extensively negotiated the Securitization Transaction Documents, resulting in the facility remaining at a sufficient size to allow such Debtors to access sufficient liquidity throughout the Chapter 11 Cases. Although the Securitization Transaction Documents contain certain restrictive provisions and an increase in certain pricing, such terms are generally consistent with loan receivables facilities approved by bankruptcy courts in this and other districts and were required as a condition to continuation of the Securitization Facilities.

41.    Accordingly, the Debtors submit that the relief requested in this Motion constitutes the sound exercise of the Debtors' business judgment and thus should be granted by this Court under Bankruptcy Code section 363(b), or in the alternative, under Bankruptcy Code section 105(a).

## IX.    The Debtors Should Be Authorized to Assume the Securitization Transaction Documents Upon Entry of the Interim Order

42.    As outlined above and as expressly stated in the Securitization Transaction Documents, sales of Receivables under the Securitization Transaction Documents are true sales. The Securitization Transaction Documents constitute executory contracts, with material obligations of all parties remaining such that the Debtors may assume the Securitization Transaction Documents under Bankruptcy Code section 365(a).

43.    Bankruptcy Code section 365(a) provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a). "It is well established that the question [of] whether a lease should be rejected... is one of business judgment." *Richmond Leasing Co.*, 762 F.2d at 1309 (citation and internal quotation marks omitted). "As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Id.* (citation and internal quotation marks omitted).

44.     The Debtors' decision to continue the Securitization Facilities pursuant to the Securitization Transaction Documents is a sound exercise of the Debtors' business judgment. As with the Debtors' other business decisions related to continuation of the Securitization Facilities, the Debtors' decision to assume the Securitization Transaction Documents satisfies the business judgment test because it is in the Debtors' best interests to continue performing under the Securitization Transaction Documents postpetition. Accordingly, the Court should authorize the Debtors to assume the Securitization Transaction Documents under Bankruptcy Code section 365.

## X.     The Receivables Purchased Under the Securitization Facilities Are Good Faith Purchases and Satisfy Bankruptcy Code Section 363(m)

45.     Bankruptcy Code section 363(m) protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, Bankruptcy Code section 363(m) states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code]... does not affect the validity of a sale... to an entity that purchased... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale... were stayed pending appeal.

11 U.S.C. § 363(m). "The purpose of § 363(m)'s stay requirement is in furtherance of the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give

finality to those orders and judgments upon which third parties rely." *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014) (citation and internal quotation marks omitted). "Section 363(m) patently protects, from later modifications on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal." *Matter of Gilchrist*, 891 F.2d 559, 560 (5th Cir. 1990).

46.     Although the Bankruptcy Code does not define "good faith," the Fifth Circuit has defined the term in two ways in the context of Bankruptcy Code section 363(m).  First, it has "defined a 'good faith purchaser' as 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'" *TMT Procurement Corp.*, 764 F.3d at 521 (citations omitted). Second, the Fifth Circuit has "noted that 'the misconduct that would destroy a purchaser's good faith status... involves fraud, collusion between the purchaser and other bidders of the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Id.* (citations omitted).

47.     Here, the requirements of section 363(m) have been satisfied.  Each sale of the Receivables that will take place pursuant to the terms of the Securitization Facilities will be entirely governed by the terms of the Securitization Transaction Documents and the terms of the proposed Interim Order and Final Order.  Consequently, a good faith finding regarding entry into and continued performance under the Securitization Transaction Documents would necessarily constitute a good faith finding of each sale of the Receivables pursuant to the Securitization Transaction Documents.  The Servicers, the Originators, the Non-Debtor Purchasers and the Agents all acted in good faith in negotiating the Securitization Transaction Documents and the terms of the proposed Interim Order and Final Order.  The negotiations surrounding the terms of these documents were conducted in good-faith, and constituted arm's-length negotiations.  The Debtors believe that the Servicers, the Originators, the Non-Debtor Purchasers and the Agents will

34

continue to act in good faith as Receivables are sold under the Securitization Facilities in the ordinary course of business. Accordingly, the Court should issue a finding that these parties are entitled to the protections of Bankruptcy Code section 363(m).

## XI. Bankruptcy Code Section 363(f), if Applicable, Allows For the Sale of the Receivables Free and Clear

48. Pursuant to Bankruptcy Code section 363(f), a debtor in possession may sell property free and clear of any lien, claim or interest in such property if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 814 (Bankr. W.D. Tex. 2013) ("Section 363(f) of the Bankruptcy Code sets forth five alternative conditions that must be satisfied by the Court to authorize a debtor... to sell its property... free and clear of interests of a third party.").

49. Bankruptcy Code section 363(f) is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

50. As an initial matter, the Debtors submit that section 363(f) is inapplicable to the sale of the Receivables by the Originators. The liens granted under the Debtors' prepetition

indebtedness and the DIP Facility expressly do not include liens on the Receivables and proceeds and products thereof.  As a result, the only liens securing the Receivables are those held by the Non-Debtor Purchasers and assigned to the respective Agents, which liens were put in place for the purpose of complying with UCC requirements for sales of accounts, as well as protecting such parties in the event that such sales and absolute assignments occurring under the Securitization Facilities are recharacterized as loans.  Accordingly, the Debtors are not aware of any lien from which the Receivables could be released and thus the Debtors need not satisfy the requirements of Bankruptcy Code section 363(f).  *See, e.g., Mich. Empl. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.23 (6th Cir. 1991) ("General unsecured claimants... have no specific interest in a debtor's property.  Therefore, section 363 is inapplicable for sales free and clear of such claims.") (quoting *In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987)); *Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.)*, 19 B.R. 323, 326 (Bankr. W.D. Wash. 1982) (finding that general unsecured creditors do not have an interest in the property of the estate contemplated by Bankruptcy Code section 363(f)).

51.     In any event, even assuming a lien existed, the Debtors satisfy the provisions of Bankruptcy Code section 363(f).  Satisfaction of any of the five requirements enumerated in section 363(f) suffices to authorize a debtor's sale of assets free and clear of all interests (*i.e.,* all liens, claims, rights, interests, charges, or encumbrances).  *See In re Kellstrom Indus., Inc.,* 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *In re C-Power Prods., Inc.*, 230 B.R. 800, 803 (Bankr. N.D. Tex. 1998) (same).  The Debtors satisfy section 363(f) because the Debtors' prepetition financing agreements and the DIP Facility documents permit the sale of the Receivables, and other parties holding security interests in the Receivables, if any, could be

compelled to accept a money satisfaction of such interests. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003) (section 363(f)(5) is satisfied where the interest in property being sold is subject to monetary valuation); *GBL Holdings Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg.  Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr.  N.D. Tex. 2005) (same).  Because the Receivables can be reduced to a monetary amount, sale of the Receivables is authorized under section 363(f)(5).  Accordingly, the Debtors request that the Court approve the ongoing transfers of Receivables from the Originators to the Non-Debtor Purchasers, in each case, free and clear of all liens, claims, encumbrances, or interests within the meaning of Bankruptcy Code section 363(f).

## XII.   Modification of the Automatic Stay Is Warranted with Respect to the Securitization Facilities

52.     In connection with the continuation of the Securitization Facilities, the Debtors request that this Court modify the automatic stay to permit certain transactions contemplated by the Securitization Transaction Documents.  Specifically, pursuant to the Securitization Transaction Documents, the Originators may be required to pay Repurchase Obligations with respect to Receivables with respect to which certain events have occurred, including that a representation or warranty made by the applicable Originator with respect to such Receivable was not accurate when made.  The Debtors also request that this Court modify the automatic stay to permit the Agents to exercise rights and remedies to the extent provided for in the Interim Order and the Securitization Transaction Documents.

53.     Pursuant to Bankruptcy Code section 362(d)(l), a court shall grant relief from the automatic stay imposed thereby "for cause." 11 U.S.C. § 362(d)(1). "'Cause' is not defined in title 11, which behooves courts to determine courts to determine whether cause exists in a case-by-case

approach." *In re JCP Props. Ltd.*, 540 B.R. 596, 613 (Bankr. S.D. Tex. 2015) (citing *In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998)).

54.     The Debtors submit that "cause" exists here to modify the automatic stay to the extent necessary to permit the payment of Repurchase Obligations if required and to permit the Agent to exercise its rights and remedies to the extent provided for in the Interim Order and the Securitization Transaction Documents. Such modification is limited in scope and is necessary to allow the Securitization Facilities to function as it was designed. Accordingly, the Court should modify the automatic stay, pursuant to Bankruptcy Code section 362(d)(1), to the extent necessary to permit the payment of Repurchase Obligations if required.

## XIII.    The Agents and Non-Debtor Purchasers Should Be Granted Superpriority Claims Pursuant to Bankruptcy Code Section 364(c)(1)

55.     Pursuant to Bankruptcy Code section 364(c), a court may authorize the grant of a superpriority claim, after notice and a hearing, upon a finding that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(l)" of the Bankruptcy Code. 11 U.S.C. § 364(c). To satisfy the requirements of Bankruptcy Code section 364(c), courts consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under Bankruptcy Code sections 364(a) and 364(b), (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. *See In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at \*11;  *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312–13 (Bankr. D. Del. 2011);  *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991). However, section 364 imposes no duty to seek credit from every possible lender. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (citation omitted). A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential

lenders by Bankruptcy Code sections 364(c). *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

56.     As a condition to the continuation of the Securitization Facilities pursuant to the Securitization Transaction Documents, the Agents have required that they and the Non-Debtor Purchasers be granted the Superpriority Claims, pursuant to Bankruptcy Code section 364(c), for obligations of the Securitization Facilities Debtors arising under the Securitization Transaction Documents. As negotiated and agreed among the parties, the Superpriority Claims will have priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the applicable Securitization Facilities Debtors, now existing or hereafter arising, of any kind whatsoever; *provided*, that the Superpriority Claims will be subject and subordinate solely to the Carve Out and the Administration Charge (solely with respect to the Canadian Property), with respect to the applicable Debtors, rank *pari passu s*olely with the DIP Superpriority Claims (as defined in the DIP Orders) against the Servicers and the Originators, and rank senior to the Adequate Protection Superpriority Claims (as defined in the DIP Orders).

57.     The sufficiency of a debtor's efforts to obtain credit on an unsecured basis is determined on a case-by-case basis, and debtors are granted particular flexibility when time is of the essence. *In re Reading Tube Indus.*, 72 B.R. at 332. When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (approving section 364(d) financing and finding that other financing

was unavailable when debtor approached three other lenders), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of Bankruptcy Code section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received). Finally, in analyzing whether section 364(c) relief is appropriate, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties." *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 37.

58.     The requested Superpriority Claims meet the standard imposed under Bankruptcy Code section 364(c) and should be approved thereunder.  As previously noted, continuation of the Securitization Facilities is necessary to preserve the value of the Debtors' estates, and the Superpriority Claims are among the negotiated terms that were required to continue the Securitization Facilities.

59.     Additionally, the terms of the Securitization Facilities are favorable to the Debtors and thus meet the "fair, reasonable, and adequate" requirement under section 364(c).  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 885-86 (Bankr.  W.D. Mo. 2003) (finding that amendments to DIP facility were "fair, reasonable, and adequate" even though they represented a "hard bargain" because "[c]hapter 11 post-petition financing is fraught with dangers for creditors," and so "debtors may have to enter into hard bargains to acquire (or continue to receive) the funds needed for reorganization") (internal quotation marks omitted).  Further, the obligations of the Originators that give rise to the Superpriority Claims are limited in nature and, therefore, unlikely to accumulate in a significant amount.  Based on the foregoing, the Superpriority Claims meet the requirements of section 364(c) and should be granted by the Court.

**XIV. The Court Should Authorize the Postpetition Liens Pursuant to Bankruptcy Code Section 364(c)(2)**

60.     As documented in the Securitization Transaction Documents, the intent of the parties to the Securitization Facilities is that the transfer of the Receivables under those agreements be characterized as true sales and absolute assignments. Nevertheless, in the event that those transfers are not respected as true sales and instead are recharacterized as loans secured by the Receivables, the Originators have given the Receivables Liens to secure repayment of the recharacterized loans. The Receivables Liens cover Receivables and effectively serve to extend the prepetition liens on the Receivables into the postpetition period.

61.     Further, as set forth above, the Pledge Liens are a requirement of the Agents for entry into the amendments to the Prepetition Securitization Documents, without which the amendments Agents could cease performing under the Securitization Facilities on a postpetition basis. Accordingly, to allow the Securitization Facilities to continue to operate as designed, the Originators and Servicers have agreed, pursuant to the Securitization Transaction Documents, to grant the Liens.

62.     The decision of the Servicers and the Originators to grant the Liens is a crucial component of the parties' larger agreement to continue the Securitization Facilities pursuant to the Securitization Transaction Documents. The Debtors thus submit that the granting of the Liens, pursuant to Bankruptcy Code section 364(c)(2), is in the best interests of their estates.

63.     The Liens are limited in nature and serve only to provide, *inter alia*, the Agents, Collateral Agents and Non-Debtor Purchasers with the benefit of the agreed bargain. The Receivables Liens become relevant only if the postpetition[16] transfers of Receivables under the

---

[16]   As noted above, the Receivables Liens would apply only to those Receivables originated and purported to be sold or contributed in connection with the Securitization Program on or after the Petition Date, whether existing on the Petition Date or thereafter arising or acquired.

Securitization Transaction Documents are, against the intent of the parties and the provisions of the Interim Order and Final Order, recharacterized as secured loans. In such circumstances, the Receivables would be property of the relevant Originator's estate, and the Receivables Liens on those Receivables would simply provide the Agents with the benefit of their respective bargains under the Securitization Transaction Documents.

64.     A court may authorize a debtor to incur postpetition secured debt, pursuant to section 364(c)(2), upon finding that (a) the debtor is unable to obtain unsecured credit with priority under section 503(b)(1); (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate given the circumstances of the debtor and proposed lender. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011); *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40; *In re Aqua Assoc.*, 123 B.R. 192, 195-99 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988) (authorizing the debtor to obtain credit pursuant to Bankruptcy Code section 364(c)(2), after notice and a hearing, upon showing that unsecured credit could not be obtained). Courts "permit debtors-in-possession to exercise their basic business judgment" in analyzing whether section 364(c) relief should be granted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 37-38.

65.     The Agents will not continue the Securitization Facilities unless the Servicers and the Originators are authorized to grant the Liens. As discussed above, the Securitization Facilities provides crucial liquidity the Debtors need to continue to operate their businesses. As a result, without the Securitization Facilities, the Debtors' reorganization prospects could be jeopardized and the Debtors would likely only be able to obtain the additional needed liquidity on less favorable

terms.  Moreover, termination of the Securitization Facilities would disrupt the Debtors' operations and could immediately impact the Debtors' liquidity.  As explained in the Oppenheimer Declaration, the Debtors do not believe that they could obtain replacement financing for the Securitization Facilities on either (a) better terms than those offered under the Securitization Facilities pursuant to the Securitization Transaction Documents or (b) on an unsecured basis.

66.     In the context of their efforts to reorganize or consummate asset sales, the Debtors have determined that continuation of the Securitization Facilities, along with entering into the DIP Facility, is essential to preserving their liquidity and continuing their operations during the chapter 11 process.  The Debtors further believe that the terms of the Securitization Facilities are fair, reasonable, and adequate.  For these reasons, the Debtors respectfully request that the Court authorize the Servicers and the Originators to grant under section 364(c)(2) the Receivables Liens and the Pledge Liens.

## XV.     The Court Should Grant Good Faith Protections Pursuant to Bankruptcy Code Section 364(e)

67.     Bankruptcy Code section 364(e) protects the validity of a good faith lender's rights under a section 364 postpetition financing agreement even if the order authorizing the debtor to enter into such financing agreement is reversed or modified on appeal.  Bankruptcy Code Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

68.     The Servicers, the Guarantors, the Originators, the Non-Debtor Purchasers and the Agents have acted in good faith in their prepetition conduct under the Securitization Facilities and in negotiating the Securitization Transaction Documents.  The Servicers, the Guarantors, the Non-Debtor Purchasers the Originators and the Agents fully expect that such good faith conduct will continue in the parties' postpetition conduct under the Securitization Facilities.  Accordingly, to the extent that the Securitization Facilities contemplates an extension of credit or the grant of security interests, the Debtors request a finding of fact that the Servicers, the Guarantors, the Originators, the Non-Debtor Purchasers and the Agents have acted, and continue to act, as good faith lenders, and as such are entitled to the protections of Bankruptcy Code section 364(e).

## XVI.    Bankruptcy Courts Have Granted the Relief Requested in This Motion

69.     Given the widespread usage of receivables purchase programs and the essential role of such programs in preserving liquidity, courts in this and other districts have previously permitted debtors in possession to cause the continued operation of comparable receivables purchase facilities and have granted relief similar to that requested in this Motion.  *See*, *e.g.*, *Audacy, Inc.,* No. 24-90004 (CML) (Bankr. S.D. Tex. Feb. 20, 2024); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. Oct. 24, 2023) (authorizing debtors to enter into amendments to and continuation of accounts receivable securitization facility postpetition, and granting superpriority claims in favor of securitization lenders pursuant to Bankruptcy Code section 364(c)(1)); *In re Southern Foods Group, LLC*, No. 19-36313 (DRJ) (Bankr. S.D. Tex.  Dec. 20, 2019) (same); *In re Mallinckrodt plc*, No. 23-11258 (Bankr. D. Del. Sep. 19, 2023) (same); *In re Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 5, 2023) (same); *In re Centric Brands, Inc.*, No. 20-22637 (Bankr. S.D.N.Y. May 20, 2020) (same); *In re Cloud Peak Energy Inc.*, No. 19-11047 (KG) (Bankr. D. Del.  May 10, 2019) (same); *In re Peabody Energy Corp.*, No. 16-42529 (Bankr. E.D. Mo.  May 18, 2016) (same); *accord In re Arch Coal, Inc.*, No. 16-40120

(Bankr. E.D. Mo.  Feb. 25, 2016); *In re AbitibiBowater, Inc.*, No. 09-11296 (Bankr. D. Del.  July 1, 2009); *In re Tribune Media Co.*, No. 08-13141 (Bankr. D. Del.  Jan. 15, 2009); *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. Feb. 5, 2008).[17]

## Emergency Consideration

70.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder their operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these Chapter 11 Cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and (h)

71.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

72.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for or validity of any

---

[17]   The unreported orders cited herein are not attached to this Motion.  Copies of these orders will be made available to the Court or other parties upon request made to the Debtors' counsel.

claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors', or any other party in interest's, right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in or other encumbrance on property of the Debtors' estates; (f) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity or perfection or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Interim Order or Final Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## <u>Notice</u>

73.    The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the entities listed on the Debtors' petitions as holding the largest 30 unsecured claims (on a consolidated basis); (c) counsel to Prepetition 1L Agent; (d) counsel to Prepetition 1.5L Notes Trustee; (e) counsel to Prepetition 2L Notes Trustee; (f) counsel to the Ad Hoc Group; (g) counsel to Atlas Securitized Products Holdings, L.P. in its capacity as Administrative Agent; (h) counsel to Midtown Madison Management LLC in its capacity as administrative agent; (i) the Collection Account financial institutions; (j)  the United

States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general in the states where the Debtors conduct their business operations; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no further notice is necessary.

WHEREFORE, the Debtors request entry of interim and final orders, substantially in the forms of the Interim Order filed with this Motion and the Final Order to be filed in this case, granting the relief requested herein and granting such other relief as the Court deems just, proper and equitable.

Dated: March 25, 2024
   Houston, Texas

        */s/  Sarah Link Schultz*
        **AKIN GUMP STRAUSS HAUER & FELD LLP**
        Sarah Link Schultz (State Bar No. 24033047;
        S.D. Tex. 30555)
        Patrick Wu (State Bar No. 24117924;
        S.D. Tex. 3872088)
        2300 N. Field Street, Suite 1800
        Dallas, TX 75201-2481
        Telephone: (214) 969-2800
        Facsimile: (214) 969-4343
        Email:  sschultz@akingump.com
          pwu@akingump.com

        -and-

        Michael S. Stamer (*pro hac vice* pending)
        Anna Kordas (*pro hac vice* pending)
        Omid Rahnama (*pro hac vice* pending)
        One Bryant Park
        New York, NY 10036-6745
        Telephone: (212) 872-1000
        Facsimile: (212) 872-1002
        Email:  mstamer@akingump.com
          akordas@akingump.com
          orahnama@akingump.com

        *Proposed Counsel to the Debtors*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Sarah Link Schultz*
Sarah Link Schultz


## **Certificate of Service**

I certify that on March 25, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Sarah Link Schultz*
Sarah Link Schultz

**EXHIBITS A - II**

**[TO COME]**