**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY**
**OF AN ORDER (I) AUTHORIZING THE DEBTORS TO**
**ASSUME AND CONTINUE PERFORMING UNDER CERTAIN**
**<u>SEPARATION AGREEMENTS AND (II) GRANTING RELATED RELIEF</u>**

---

**Emergency relief has been requested. Relief is requested not later than 10:00 a.m. (prevailing Central Time) on April 19, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on April 19, 2024, at 10:00 a.m. (prevailing Central Time). Participation at the hearing will only be permitted by audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this emergency motion (the "Motion"):

**Preliminary Statement**

1.        In the ordinary course of business, the Company has historically offered a Severance Program to its Employees (each as defined below), with varying benefits available to terminated Employees based on seniority level and tenure with the Company.  The Severance Program provides certain guidelines on how termination of Employees is handled but is ultimately discretionary.  For certain upper management Employees, Severance Obligations (as defined below) are set forth in the applicable employment agreement or a separately negotiated separation agreement.  The Severance Program is an important part of the Company's compensation package and allows the Company to remain competitive in the market and attract talent, especially at the higher skill and compensation level.

2.        The Court has previously approved the continuation of the Severance Program pursuant to the *Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Compensation and Benefits Programs and (II) Granting Related Relief* [Docket No. 61], entered on March 25, 2024, but has not approved payments to "insiders" on account of Severance Programs.

3.        Pursuant to this Motion, the Debtors seek authorization to pay Severance Obligations to three Former Employees (as defined below) who qualify as "insiders" under the Bankruptcy Code.  The Former Employees are entitled to payment pursuant to certain Separation Agreements that were negotiated and entered into pre-petition.  The Debtors believe that complying with their contractually agreed obligations will build confidence among the existing

Employees and send a strong message to the market that will aid the Company in attracting talent post-emergence from chapter 11.  While the Severance Obligations at issue total approximately $1.6 million, because the payments are made in periodic installments as part of the Debtors' regular payroll, the Debtors expect that only a fraction of that amount will be paid while the Debtors are in bankruptcy.

4.      Moreover, as is further explained below, the Debtors are pursuing confirmation of a consensual prepackaged chapter 11 plan, which intends to leave the general unsecured creditors, including creditors holding claims on account of employee claims, unimpaired.  Thus, granting the relief sought in this Motion does not ultimately change whether or not payments on the account of the Former Employees' Claims are made, but simply changes the timing of the payments.[2]

5.      To the extent the Court determines that payment of the Severance Obligations in full as set forth in each applicable Separation Agreement is not appropriate, the Debtors request that the Court nevertheless allows partial payment up to the cap as permitted by Bankruptcy Code section 503(c)(2).

## Relief Requested

6.      By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto (the "Order"): (i) authorizing the Debtors to (a) assume certain separation agreements for Former Employees and (b) pay postpetition obligations owing thereunder; and (ii) granting related relief.

---

[2]   Importantly, the Debtors are especially sensitive to continued provision of healthcare benefits pursuant to the Separation Agreements.  The Debtors are unable to temporarily halt and subsequently resume providing healthcare benefits.  If the healthcare benefits are interrupted during the pendency of the Chapter 11 Cases, the Debtors will not be able to resume providing these benefits post-emergence.

**Jurisdiction and Venue**

7.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

8.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     The bases for the relief requested herein are sections 105(a), 363(b) and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 4002-1 and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas.

**Background**

10.     On March 25, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  On the Petition Date, the Court entered an order [Docket No. 15] authorizing the joint administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

11.     The Debtors and their non-Debtor affiliates (collectively, the "Company") provide consumer credit lending services across the U.S. and Canada.  In the U.S., the Company operates under several principal brands, including "Heights Finance," "Southern Finance," "Covington Credit," "Quick Credit," and "First Heritage Credit."  In Canada, the Company operates under the

4

"Cash Money" and "LendDirect" brands.  As of the Petition Date, the Company operated approximately 400 store locations across 13 U.S. states and approximately 150 stores in eight Canadian provinces and had an online presence in eight Canadian provinces and one territory.  The Company generated approximately $672 million in total revenue for the fiscal year 2023, and, as of the Petition Date, the Company had approximately $2.1 billion in aggregate principal amount of prepetition funded debt obligations.

12.     A description of the Debtors and their businesses is set forth in the *Declaration of Douglas Clark in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed on the Petition Date [Docket No. 8] and incorporated by reference herein.  In further support of the relief sought herein, the Debtors also submit (a) the *Declaration of Alvarez & Marsal in Support of the Debtors' Severance Motion* (the "A&M Declaration") and (b) the *Declaration of Douglas Clark, Chief Executive Officer of the Debtors, in Support of the Debtors' Severance Motion* (the "Clark Declaration"), each filed contemporaneously herewith and incorporated herein by reference.

13.     As further described in the First Day Declaration, the Debtors commenced these Chapter 11 Cases seeking confirmation of a *Joint Prepackaged Plan of Reorganization of Curo Group Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 51, as modified by Docket No. 119] (the "Plan").  The Plan reflects a fully consensual deal with the Debtors' key stakeholders and, importantly, leaves all general unsecured creditors, encompassing all trade, customer, employee and landlord claims, unimpaired.  In other words, holders of general unsecured claims, including claims arising on account of employment obligations, will receive full recovery upon the occurrence of the Effective Date of the Plan.

**The Debtors' Severance Programs**

14.     As of the Petition Date, the Debtors employ approximately 2,856 employees (the "Employees") in the U.S. and Canada, with approximately 1,781 Employees located in the U.S. and 1,075 Employees located in Canada.  Approximately 2,833 Employees are full-time Employees and 23 are part-time Employees.  Of these Employees, approximately 858 Employees are salaried employees and approximately 1,998 are paid on an hourly basis.  While generally the Debtors' rank-and-file Employees are at will, some employment arrangement, especially with Employees that may be deemed "insiders" under the Bankruptcy Code, are governed by employment agreements.

15.     In the ordinary course of business, the Debtors historically have offered a severance program pursuant to which an Employee received a severance payment upon termination of such Employee's employment (the "Severance Program" and the obligations thereunder the "Severance Obligations").  The Severance Program provides general guidelines on how the Company manages termination of employees, but whether or not severance payments are actually awarded is left to the Debtors' discretion.  Severance awards vary based on the Employee's title or managerial level and years of employment with the Company.

16.     For example, Employees that are deemed Vice President and above are generally eligible to receive 2 weeks of standard pay per year of service for a minimum of 26 weeks and a maximum of 52 weeks.  Directors or District Managers are eligible to receive 2 weeks  of standard pay per year of service for a minimum of 12 weeks and a maximum of 52 weeks.  All other employees may receive 2 weeks of standard pay per year of service for a minimum of 4 weeks and a maximum of 52 weeks.  If an Employee's employment with the Company is governed by an employment agreement, the terms of severance are typically set forth therein.  In certain

circumstances the Company negotiates a separation agreement with a particular Employee which would set forth the Debtors' Severance Obligations.   Payments on account of Severance Obligations are typically made in installments as part of the Debtors' regular payroll or in certain cases paid out in lump sum upon termination.

17.     The Debtors contemplate payment of prepetition severance and continuation of benefits for three Insiders while the Chapter 11 Cases are pending:

(a)     The Company's former Chief Executive Officer (the "Former CEO") is owed approximately $650,000 on account of Severance Obligations, payable over the course of the next 37 weeks, and is entitled to continuation of certain benefits, pursuant to a Separation and Release Agreement, dated November 30, 2022, among certain of the Debtors and the Former CEO (the "CEO Separation Agreement");

(b)     The Company's former Chief Marketing Officer (the "Former CMO") is owed approximately $500,000 on account of Severance Obligations, payable over the course of the next 52 weeks, beginning on April 19, 2024, and is entitled to continuation of certain benefits, pursuant to the terms of the Separation and Release Agreement dated March 18, 2024, among certain of the Debtors and the Former CMO (the "CMO Separation Agreement"); and

(c)     The Company's former Chief Technology Officer (the "Former CTO", and together with the Former CEO and the Former CMO, the "Former Employees") is owed approximately $450,000 on account of Severance Obligations, payable over the course of the next 52 weeks, beginning on April 19, 2024, and is entitled to continuation of certain benefits, pursuant to the terms of the Separation and Release Agreement dated March 5, 2024, among certain of the Debtors and the Former CTO (the "CTO Separation Agreement," together with the CEO Separation Agreement and the CMO Separation Agreement, the "Separation Agreements").

18.     Importantly, pursuant to the Separation Agreements, the Former Employees are subject to certain confidentiality obligations and non-compete covenants.  Given the nature of the Debtors' business, continued enforcement of the confidentiality and non-compete obligations is important to preserve trade-sensitive information and prevent material hard to the business.

19.     In connection with this Motion, the Debtors engaged Alvarez & Marsal Tax, LLC ("<u>A&M</u>") to analyze the Severance Program and determine if the Severance Obligations owing pursuant to the Separation Agreements are in compliance with Bankruptcy Code section 503(c)(2). As further described in the A&M Declaration, while the Severance Programs is generally applicable to all full-time employees, satisfying the first prong of Bankruptcy Code section 503(c)(2), the total Severance Obligations payable pursuant to the Separation Agreements are greater than 10 times the amount of mean severance pay given to non-management employees during the 2024 calendar year.

## Basis for Relief

### A.     The Separation Agreements May Be Assumed Pursuant to Bankruptcy Code Section 365(a)

20.     Bankruptcy Code Section 365(a) provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a); *see In re Mirant Corp.*, 378 F.3d 511, 517-18 (5th Cir. 2004).  When determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease, courts apply the "business judgment" rule.  *See, e.g., In re Pisces Energy, LLC*, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) (to determine whether a debtors' decision to assume an executory contract is supported by valid business justification, "[c]ourts apply the business judgment test, which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment"); *see also Richmond Leasing Co. v. Capital Bank, N.A. (In re Richmond Leasing Co.)*, 762 F.2d 1303, 1309 (Bankr. N.D. Tex. 2009).

21.     Under the business judgment rule, debtors are usually given significant discretion when requesting to assume or reject an executory contract or unexpired lease.  *See, e.g., In re*

*Pisces Energy*, 2009 WL 7227880, at *6 ("In the absence of a showing of bad faith or an abuse of business discretion, the debtor's business judgment will not be altered."); *In re Cont'l Airlines Corp.*, 57 B.R. 845, 851 (Bankr. S.D. Tex. 1985) (stating that, in the absence of a showing of bad faith or an abuse of business discretion, the debtors' business judgment will not be altered). Accordingly, so long as a debtor exercises "reasonable" business judgment, a court should approve the proposed assumption or rejection. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Grp. of Inst. Investors v. Chi-cago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 421 (Bankr. N.D. Tex. 2009); *In re Idearc Inc.*, 423 B.R. 138, 157 (Bankr. N.D. Tex. 2009).

22.     As the term "executory contract" is not defined in the Bankruptcy Code, courts, including those in the Fifth Circuit, have adopted the "Countryman Definition," which was formulated by Professor Vern Countryman in his 1973 law review article entitled, "Executory Contracts in Bankruptcy: Part I." *In re Goodrich Petroleum Corp.*, 554 B.R. 817, 821 (Bankr. S.D. Tex. 2016); *In re LG Philips Displays USA, Inc.*, No. 06-10245, 2006 WL 1748671, at *3 (Bankr. D. Del. June 21, 2006).  Under the Countryman Definition, "an executory contract is a contract under which the obligations of *both* the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Goodrich Petroleum*, 554 B.R. at 821 (emphasis in original). The Former Employees are subject to ongoing confidentiality and non-compete obligations set forth in the Separation Agreements.  The Company operates in a highly competitive industry, and disclosure of trade-sensitive information could materially harm the business.  Therefore, each Former Employee's entitlement to the Severance Obligations is conditioned upon compliance with the confidentiality and non-compete clauses contained in the Employment Agreement.  In similar

circumstances courts in other jurisdictions have deemed employment contracts providing for severance to be executory. *See, e.g., In re Constant Care Cmty. Health Ctr., Inc.*, 99 B.R. 697, 702 (Bankr. D. Md. 1989) (where executive director of debtor resigned prepetition, holding that the employment contract between the executive director and the debtor remained executory because the Debtors were obligated to provide certain severance benefits and the (former) executive director was obligated to comply with a non-compete provision contained in the employment contract); *Cent. Control Alarm Corp. v. Black (In re Cent. Watch, Inc.)*, 22 B.R. 561, 564 (Bankr. E.D. Wis. 1982) (finding the employment agreement executory because under the terms of the agreement post-termination "[the employee] was to refrain from competition with [the debtor] and [the debtor] was to hold [the employee] harmless for liabilities he incurred in the good faith performance of his duties as an officer of the corporation").

23.     As further set forth in the Clark Declaration, the Debtors submit that assumption of the Separation Agreements is an appropriate exercise of the Debtors' business judgment. If the Separation Agreements are not assumed, the Debtors risk releasing three former top-level executives from their obligations to safeguard confidential information, and obligations to not take their skill and knowledge obtained while employed at the Company to a direct competitor. Moreover, the Debtors believe that assumption of the Separation Agreements and payment of the Severance Obligations due thereunder provides an important signal to the potential future employees that the Company values its workforce and takes its commitment to fulfill employment-related obligations seriously.

**B.      Payment of the Severance Obligations Pursuant to the Separation Agreements is a Valid Exercise of the Debtors' Business Judgment**

24.     Bankruptcy Code section 363(b)(1) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate . . . ."  11 U.S.C. § 363(b)(1); *see, e.g., In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Eagle Broadband, Inc.*, 2009 WL 1067128, at *1 (Bankr. S.D. Tex. Apr. 9, 2009); *In re Quality Beverage Co., Inc.*, 181 B.R. 887, 895 (Bankr. S.D. Tex. 1995). Although section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of estate property outside the ordinary course of business, applicable case law provides that a bankruptcy court should approve a transaction that is outside the ordinary course of a debtor's business if the debtor can demonstrate that it exercised sound business judgment in deciding to enter into the transaction.  *In re Cont'l Air Lines,* 780 F.2d at 1226.  *See also In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Bombay Co., Inc.*, 2007 WL 2826071, at *4 (Bankr. N.D. Tex. Sept. 26, 2007) (stating that the court should "rely heavily on the business judgment of a debtor's management in determining whether to grant relief respecting the use, sale or lease of estate property"); *In re Oaktree Imaging, L.P.*, 2007 WL 2667979, at *2 (Bankr. S.D. Tex. Sept. 6, 2007) (noting that the "[debtor's] decision should be approved, where a sound business purpose justifies such action").

25.     As described above, if the debtor articulates a valid business justification, there "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Once a valid business judgment is made, the business judgment rule shields a debtor's management from judicial second-guessing.  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (stating that court approval of a debtor's business judgment "should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code").

26.     As discussed above, the Debtors have exercised their sound business judgment in electing to continue making payments on account of Severance Obligations and continuing to provide certain benefits under the Separation Agreements consistent with the historical practices. The Former Employees are bound by certain confidentiality and non-compete provisions as a result of the Separation Agreements that are necessary to preserve to maintain the integrity of the Debtors' trade secrets.  Additionally, the Debtors' election to comply with their employee-related contractual obligations sends a strong signal to the marketplace that the Debtors value their employees.   The proposed Severance Obligations payments are modest, amounting only to approximately $1.6 million in the aggregate payable in installments over the course of the next 52 weeks.[3]  Moreover, paying the Severance Obligations pursuant to the terms of the Separation Agreements does not prejudice the Debtors' creditors because such payments constitute general unsecured claims and would be payable in full upon the Debtors' emergence from chapter 11 in accordance with the Plan, which leaves the Debtors' general unsecured creditors unimpaired. Therefore, the relief sought by this Motion simply changes the timing of the payments but does not result in any additional depletion of estate assets.

**C.     The Severance Obligations Should Be Approved Under Bankruptcy Code Section 105(a)**

27.     Finally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.   Bankruptcy Code section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Provided

---

[3]     In fact, if the Debtors emerge from bankruptcy by the end of June 2024, as anticipated, the total amount of severance payable during the pendency of the Chapter 11 Cases will be as follows: (a) Former CEO—$226,154; (b) Former CMO—$113,462; and (c) Former CTO—$102,115.

that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).

28.     Bankruptcy Code section 105(a) gives this Court broad authority under its equitable powers to fashion any order or decree that would preserve or protect the value of a debtor's assets. *In re Davis*, 730 F.2d 176, 183-84 (5th Cir. 1984) (stating that "bankruptcy courts [are armed] with broad powers . . . to protect the estate"); *see also Perkins Coie v. Sadkin* (*In re Sadkin*), 36 F.3d 473, 478 (5th Cir. 1994) (stating that section 105(a) authorizes bankruptcy courts to "fashion such orders as are necessary to further the . . . substantive provisions of the Bankruptcy Code"); *U.S. v. Sutton*, 786 F.2d 1305, 1307 (5th Cir. 1986) (same). For the reasons explained above, the Debtors submit that paying the Severance Obligations owed pursuant to the Separation Agreements provides significant benefits to the estate and therefore should be authorized under the Court's broad discretionary powers.

**D.     The Debtors Submit That at Least Partial Payment of the Severance Obligations Pursuant to the Separation Agreements is Permissible Pursuant to Bankruptcy Code Section 503(c)(2)**

29.     Bankruptcy Code section 503(c) provides criteria for courts to use in approving certain types of payments to insiders and other transfers or obligations that are outside the ordinary course of business. *See* 11 U.S.C. § 503(c). Bankruptcy Code section 503(c)(1) generally prohibits retention plans for insiders, while Bankruptcy Code section 503(c)(2) generally prohibits severance payments to insiders. Bankruptcy Code section 503(c)(3), in turn, establishes standards governing other transfers to certain employees and consultants, among others, that are outside the ordinary course of business. *See id.*

30.     Pursuant to Bankruptcy Code section 503(c)(2), a severance payment to an insider may not be made unless (a) the payment is part of a program generally applicable to all full-time employees and (b) the amount is not more than ten times the amount of mean severance given to non-management employees in that calendar year.  *See* 11 U.S.C. § 503(c)(2).  Bankruptcy Code Section 101(31) sets forth a non-exhaustive, but broad, list of employees who may be considered "insiders."  11 U.S.C. § 101(31).  The Debtors do not dispute that the Former Employees are insiders, and thus any Severance Obligations payable to them should comply with Bankruptcy Code section 503(c)(2).

31.     The Debtors contend that the proposed severance payments satisfy subsection (A) of Bankruptcy Code section 503(c)(2).  As set forth above, the Debtors historically have maintained a broad Severance Program and severance payable to executives and upper management is only one component thereof.  As set forth in the A&M Declaration, however, the Severance Obligations payable to the Former Employees do not fall within the parameters allowable under Bankruptcy Code section 503(c)(2)(B).  A&M determined that the mean severance pay given to non-management employees during the 2024 calendar year so far (*i.e.*, between January 1, 2024 through April 30, 2024) is approximately $23,081.  Therefore, to the extent the Court determines that payment of the Severance Obligations to the Former Employees is not otherwise appropriate, the Debtors propose that the Former Employees receive the maximum amount of severance that they are entitled to under the Separation Agreements, as capped by Bankruptcy Code section 503(c)(2) (*i.e.*, up to $230,810), with the remainder of the Severance Obligations payable upon the Debtors' emergence from chapter 11 in accordance with the confirmed Plan.

**\*\*\*\***

32.     For the reasons set forth above, the Debtors respectfully submit that this Court should authorize the Debtors to assume the Separation Agreements and continue paying the Severance Obligations and providing continued benefits pursuant to the Separation Agreements in the ordinary course of business.  However, if the Court determines that payment of the Severance Obligations in full as set forth in each applicable Separation Agreement is not appropriate, the Debtors request that the Court nevertheless allows partial payment up to the cap as permitted by Bankruptcy Code section 503(c)(2).

## Emergency Consideration

33.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003 and Bankruptcy Local Rule 9013-1, which empower a court to grant relief within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate.   The Debtors submit that given that the next payments payable pursuant to the Separation Agreements are due on April 19, 2024, emergency consideration of this Motion is appropriate and necessary to prevent harm to the Debtors' business. Accordingly, the Debtors request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

34.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

35.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors', or any other party in interest's, right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt or reject any agreement, contract or lease pursuant to Bankruptcy Code section 365; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity or perfection or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

36.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the entities listed on the Debtors' petitions as holding the largest 30 unsecured claims (on a consolidated basis); (c) counsel to the Prepetition 1L Agent; (d) counsel to the Prepetition 1.5L Notes Trustee; (e) counsel to the Prepetition 2L Notes

Trustee; (f) counsel to the Ad Hoc Group; (g) counsel to Atlas Securitized Products Holdings, L.P. in its capacity as Administrative Agent; (h) counsel to Midtown Madison Management LLC as Heights II Administrative Agent and Canada II Administrative Agent; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the state attorneys general in the states where the Debtors conduct their business operations; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no further notice is necessary.

*[Remainder of the page intentionally left blank.]*

WHEREFORE, the Debtors request entry of an order, substantially in the form of the Order filed with this Motion, granting the relief requested herein and granting such other relief as the Court deems just, proper, and equitable.

Dated: April 15, 2024
      Houston, Texas

/s/  Sarah Link Schultz

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Sarah Link Schultz (State Bar No. 24033047;
S.D. Tex. 30555)
Patrick Wu (State Bar No. 24117924;
S.D. Tex. 3872088)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: sschultz@akingump.com
      pwu@akingump.com

-and-

Michael S. Stamer (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Omid Rahnama (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
      akordas@akingump.com
      orahnama@akingump.com

*Proposed Counsel to the Debtors*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Sarah Link Schultz*
Sarah Link Schultz


## **Certificate of Service**

I certify that on April 15, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Sarah Link Schultz*
Sarah Link Schultz