**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF PLAN SUPPLEMENT FOR THE JOINT
PREPACKAGED PLAN OF REORGANIZATION OF CURO GROUP
HOLDINGS CORP. AND ITS DEBTOR AFFILIATES PURSUANT
TO CHAPTER 11 OF THE BANKRUPTCY CODE (MODIFIED)**

**PLEASE TAKE NOTICE THAT** as contemplated in the *Joint Prepackaged Plan of Reorganization of CURO Group Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Modified)* (as modified, amended or supplemented from time to time, the "Plan") [Docket No. 119],[2] the above-captioned debtors and debtors in possession (the "Debtors") hereby file the supplement to the Plan (as may be modified, amended, or supplemented from time to time, the "Plan Supplement").  The Plan Supplement contains the following documents (each as defined in the Plan and certain of which continue to be negotiated and may be Filed in substantially final form prior to the Effective Date):

| | |
|---|---|
| **Exhibit A** | New Stockholders' Agreement |
| **Exhibit B** | To the extent known, identity of the members of the New Board |
| **Exhibit C** | Exit Facility Credit Agreement |
| **Exhibit D** | Description of Transaction Steps |
| **Exhibit E** | Rejected Executory Contract and Unexpired Lease List |
| **Exhibit F** | List of Retained Causes of Action |
| **Exhibit G** | CVR Agreement |
| **Exhibit H** | Warrant Agreement |

**PLEASE TAKE FURTHER NOTICE THAT** the documents contained in the Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto and are not in agreed form for execution among the Debtors, the Ad Hoc Group and/or the Consenting Stakeholders.  The Debtors and interested

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

[2] Capitalized terms used but not defined herein have the same meaning as set forth in the Plan.

parties with respect thereto reserve the right to alter, amend, modify, or supplement any document in this Plan Supplement in accordance with the Plan and the Restructuring Support Agreement at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Combined Hearing, the Debtors will file a redline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Epiq Corporate Restructuring, LLC, the claims and noticing agent retained by the Debtors in these chapter 11 cases ("Epiq"), by:  (a) writing to CURO Group Holdings Corp, c/o Epiq Ballot Processing Center, P.O. Box 4422, Beaverton, OR 97076-4422;  (b) emailing CURO@epiqglobal.com with a reference to "CURO" in the subject line; or (c) calling the Debtors' restructuring hotline at (877) 354-3909 (Domestic) or +1 (971) 290-1442 (International).  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at:  http://www.txs.uscourts.gov.  Copies of certain orders, notices, and pleadings, as well as other information regarding these chapter 11 cases, are also available for inspection free of charge online at https://dm.epiq11.com/Curo.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Dated: April 30, 2024
      Houston, Texas

/s/ *Sarah Link Schultz*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Sarah Link Schultz (State Bar No. 24033047;
S.D. Tex. 30555)
Patrick Wu (State Bar No. 24117924;
S.D. Tex. 3872088)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: sschultz@akingump.com
      pwu@akingump.com

-and-

Michael S. Stamer (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Omid Rahnama (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mstamer@akingump.com
      akordas@akingump.com
      orahnama@akingump.com

*Proposed Counsel to the Debtors*

## Exhibit A

**New Stockholders' Agreement**

*[DRAFT]*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## [REORGANIZED CURO]

### (A Delaware Limited Liability Company)

### Effective as of [●], 2024

THE SECURITIES REPRESENTED BY AND ISSUED IN ACCORDANCE WITH THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THESE MEMBERSHIP INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT AS PERMITTED UNDER THIS LIMITED LIABILITY COMPANY AGREEMENT, THE SECURITIES ACT OF 1933 AND APPLICABLE STATE OR FOREIGN SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## [REORGANIZED CURO]

## TABLE OF CONTENTS

**Page**

ARTICLE I GENERAL PROVISIONS; DEFINITIONS ................................................2

1.1     Formation of Company ................................................ 2
1.2     Name ................................................ 2
1.3     Registered Agent; Offices; Principal Place of Business ................................................ 2
1.4     Purpose and Powers ................................................ 2

ARTICLE II DEFINITIONS ................................................2

2.1     Definitions ................................................ 2

ARTICLE III BOARD OF DIRECTORS ................................................10

3.1     Management and Control ................................................ 10
3.2     Board of Directors ................................................ 10
3.3     Meetings of the Board of Directors ................................................ 14
3.4     Committees ................................................ 15
3.5     Officers ................................................ 16

ARTICLE IV MEMBERSHIP INTERESTS ................................................16

4.1     Existing Members; New Members ................................................ 16
4.2     Membership Interests; Certification ................................................ 18
4.3     Voting Rights ................................................ 21
4.4     Related Party Transactions ................................................ 21
4.5     Tender Offers ................................................ 22
4.6     Record Dates; Meetings ................................................ 22
4.7     Representations of Members ................................................ 23
4.8     Registration Rights ................................................ 24

ARTICLE V MEMBERS' CAPITAL COMMITMENTS, CAPITAL CONTRIBUTIONS AND UNITS ................................................24

5.1     Capital Contributions ................................................ 24
5.2     Preemptive Rights ................................................ 24
5.3     No Interest in Company Property ................................................ 26

ARTICLE VI DISTRIBUTIONS ................................................26

6.1     Distributions Generally ................................................ 26
6.2     Priority of Distributions ................................................ 27
6.3     In-Kind Distributions ................................................ 27
6.4     Limitation Upon Distributions ................................................ 27
6.5     Withholding ................................................ 27

i

# TABLE OF CONTENTS (CONT'D)

Page

ARTICLE VII TRANSFER OF INTERESTS AND ADMISSION OF MEMBERS ..................27

7.1    Transfers of Membership Interests ........................................................ 27
7.2    Resignation or Withdrawal of Members ................................................ 28
7.3    Drag-Along Right .................................................................................. 28
7.4    Tag-Along Rights .................................................................................. 30

ARTICLE VIII DISSOLUTION AND LIQUIDATION OF THE COMPANY ..........................31

8.1    Dissolution Events ................................................................................ 31
8.2    Winding Up .......................................................................................... 31
8.3    Certificate of Cancellation .................................................................. 32

ARTICLE IX WAIVERS; INDEMNIFICATION; LIMITATION OF LIABILITY ..................32

9.1    Duties and Obligations ......................................................................... 32
9.2    Indemnification .................................................................................... 33
9.3    Waiver of Opportunities ....................................................................... 35
9.4    Limitation on Liability ......................................................................... 35

ARTICLE X AMENDMENTS; TERMINATION ......................................................................36

10.1    Amendments .......................................................................................... 36
10.2    Termination ........................................................................................... 36

ARTICLE XI MISCELLANEOUS ...........................................................................................37

11.1    Records ................................................................................................. 37
11.2    Notices .................................................................................................. 37
11.3    Further Action ...................................................................................... 38
11.4    Information Rights ................................................................................ 38
11.5    Survival of Rights ................................................................................ 39
11.6    Specific Performance ........................................................................... 39
11.7    References to this Agreement; Headings; Scope ................................. 39
11.8    Construction ......................................................................................... 40
11.9    Validity of Agreement; Severability .................................................... 40
11.10    No Third Party Beneficiaries ............................................................... 40
11.11    Tax Classification ................................................................................ 41
11.12    Governing Law ..................................................................................... 41
11.13    Jurisdiction ........................................................................................... 41
11.14    Cumulative Remedies .......................................................................... 41
11.15    Counterpart Execution ......................................................................... 42
11.16    No Implied Waiver ............................................................................... 42
11.17    Confidentiality ..................................................................................... 42
11.18    IPO Matters .......................................................................................... 43

## TABLE OF CONTENTS (CONT'D)

Page

**SCHEDULES AND ANNEXES:**

Schedule 1 ............................................................................................ Members Information
Schedule 2 ............................................................................................Competitors
Schedule 3 ............................................................................................Initial Members


Annex A ...........................................................................................Registration Rights
Annex B............................................................................................Form of Joinder Agreement

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**[REORGANIZED CURO]**

THIS LIMITED LIABILITY COMPANY AGREEMENT OF [REORGANIZED CURO] (the "Company"), a limited liability company organized pursuant to the Act, is adopted and entered into, and shall be effective, as of [●], 2024, by and among the Company, the Persons listed on Schedule 1 hereto and all other Persons who shall in the future become Members in accordance with and pursuant to the provisions hereof, all in accordance with and pursuant to the provisions of the Act.

WHEREAS, the Company was formed on [●], 2024 by the filing of a Certificate of Formation, dated as of [●], 2024 (the "Certificate of Formation"), with the Secretary of State of the State of Delaware;

WHEREAS, CURO Group Holdings Corp. ("CURO") and certain other parties agreed to implement the transactions contemplated by that certain Restructuring Support Agreement, dated as of March 22, 2024 (amended, supplemented, modified or waived from time to time, the "Restructuring Support Agreement");

WHEREAS, on March 25, 2024, CURO and certain of its affiliates (collectively, the "Debtors"), commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court");

WHEREAS, the Persons listed on Schedule 1 hereto shall be admitted to the Company as of the date hereof (the "Effective Time") and shall receive Common Units pursuant to the Debtors' *Joint Prepackaged Plan of Reorganization of CURO Group Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as filed with the Bankruptcy Court on March 25, 2024 (together with all schedules, documents and exhibits contained therein, as amended, supplemented, modified or waived from time to time, the "Plan of Reorganization");

WHEREAS, the Plan of Reorganization was confirmed by an order of the Bankruptcy Court entered on [●], 2024; and

WHEREAS, in accordance with the Plan of Reorganization, as of the Emergence Date, each Member shall be deemed, as a result of having accepted distributions of the Membership Interests pursuant to the Plan of Reorganization, to have accepted the terms of this Agreement (solely in their capacity as Members) and to be parties hereto without further action or execution of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## GENERAL PROVISIONS; DEFINITIONS

**1.1** **Formation of Company**. The Company was previously duly formed as a limited liability company pursuant to the provisions of the Act. The Company and the Members hereby agree to continue, in accordance with the terms and conditions of this Agreement, the limited liability company heretofore formed pursuant to the provisions of the Act.

**1.2** **Name**. The name of the Company is "[Reorganized Curo]." The Board of Directors may change the name of the Company at any time and from time to time.

**1.3** **Registered Agent; Offices; Principal Place of Business**. The registered agent and office of the Company shall be c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 or such other agent or office (which need not be a place of business of the Company) as the Board of Directors may designate from time to time in the manner provided by applicable Law. The principal place of business of the Company shall be located at 101 N. Main Street, Suite 600, Greenville, SC 29601 or such other location within or without the State of Delaware as the Company may designate. The Company at any time may establish or close other offices and places of business and may change the principal place of business of the Company to any other place within or without the State of Delaware.

**1.4** **Purpose and Powers**.

(a) <u>Purpose</u>. The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act.

(b) <u>Powers</u>. The Company shall have all powers which are necessary or desirable to carry out the purposes and business of the Company to the extent the same may be legally exercised by a limited liability company under the Act.

## ARTICLE II
## DEFINITIONS

**2.1** **Definitions**. The following terms used in this Agreement shall have the following meanings:

"<u>Act</u>" means the Delaware Limited Liability Company Act, as the same may be amended from time to time.

"<u>Additional Interests</u>" is defined in <u>Section 4.1(d)</u>.

"<u>Affiliate</u>" of a specified Person means any other Person who directly or indirectly controls, is controlled by, or is under common control with such specified Person. For purposes of the preceding sentence, "control" of a Person means possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of the management and policies of such Person through ownership of voting securities (or other ownership interests), contract, voting trust or otherwise.

"Agreement" means this Limited Liability Company Agreement, including all schedules and exhibits hereto, as the same may be amended, supplemented, modified or restated from time to time.

"Bankruptcy Code" is defined in the recitals.

"Bankruptcy Court" is defined in the recitals.

"Board of Directors" is defined in Section 3.1(a).

"Business Day" means any day other than Saturday, Sunday or any other day on which national banking associations in the State of New York generally are closed for commercial banking business.

"Caspian" means, collectively, Caspian Capital LP, its Affiliates and the funds, accounts and investment vehicles managed or advised by it that hold Membership Interests.

"Caspian/Empyrean Director" is defined in Section 3.2(b)(i)(C).

"Certificate of Formation" means the Certificate of Formation of the Company, as the same may be amended from time to time in accordance with the terms of this Agreement and filed in the office of the Secretary of State of Delaware in the manner required by the Act.

"Chapter 11 Cases" is defined in the recitals.

"Chief Executive Officer" means the Chief Executive Officer of the Company (or member of Company management holding an equivalent position).

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Units" means the common units of the Company having the rights and obligations set forth herein.

"Company" is defined in the preamble.

"Company Assets" means all assets owned from time to time by the Company (or such lesser amount of the assets of the Company as indicated by the particular context used herein), whether such property is real, personal, tangible or intangible or was acquired by the Company as a result of capital contributions, operations or other means.

"Company Sale" means (a) the acquisition of the Company by one or more entities, in a single transaction or series of related transactions, through a merger, consolidation, share exchange, recapitalization, business combination or otherwise, the result of which is that the Members of the Company of record immediately prior to such transaction or transactions or their Affiliates will, immediately after such transaction or transactions, hold, directly or indirectly, less than a majority of the voting power of the resulting or surviving entity (or such entity's ultimate parent entity), or (b) the sale, transfer or lease of all or substantially all of the assets of the Company and its Subsidiaries, in a single transaction or series of related transactions, in each

3

case that has been approved by the Board of Directors with the consent of more than 50% of the outstanding Common Units.

"Competitor" means (a) any Person that is a direct or indirect competitor of the Company and its Subsidiaries, as set forth on Schedule 2 (which may be populated or amended from time to time by the Board of Directors in its good faith, reasonable judgment) and (b) any Affiliate of any such Person; provided that no Person that is a financial investment firm, collective-investment vehicle or private investment fund and that does not control any Competitor shall constitute a Competitor (or an Affiliate of a Competitor).

"Confidential Information" is defined in Section 11.17(a).

"Covered Person" is defined in Section 9.1(b).

"CVR Agreement" shall mean that certain CVR Agreement of even date herewith between the Company and Equiniti Trust Company, LLC, as CVR Agent.

"CVRs" shall mean the contingent value rights issued pursuant to the Plan of Reorganization and governed by the CVR Agreement.

"Debtors" is defined in the recitals.

"Director" means a member of the Board of Directors.

"Dissolution Event" is defined in Section 8.1.

"Drag-Along Disposition Transaction" is defined in Section 7.3(a).

"Drag-Along Exempt Transaction" is defined in Section 7.3(a).

"Drag-Along Members" is defined in Section 7.3(a).

"Drag-Along Notice" is defined in Section 7.3(a).

"Drag-Along Purchasers" is defined in Section 7.3(a).

"Drag-Along Triggering Holder" means any Member or group of Members with an aggregate Governance Percentage Interest of 50% or greater (as measured on the date of delivery of the applicable Drag-Along Notice).

"Drag-Along Units" is defined in Section 7.3(b).

"DTC" is defined in Section 7.3(b).

"Effective Time" is defined in the recitals.

"Emergence Date" means the effective date of the Company's emergence from the Chapter 11 Cases, which is [●], 2024.

4

"Empyrean" means, collectively, Empyrean Capital Partners, LP, its Affiliates and the funds, accounts and investment vehicles managed or advised by it that hold Membership Interests.

"Equity Securities" means Common Units or any other equity securities, including any equity-linked securities, convertible debt, or other securities convertible into, exercisable for, or exchangeable for or otherwise representing any right to subscribe for or otherwise acquire any equity securities, equity-linked securities or convertible debt securities.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Transactions" means (a) issuances or sales of securities to employees, officers, directors, managers or consultants of the Company or any of its Subsidiaries pursuant to employee benefits or similar employee or management equity incentive plans or arrangements or hiring or retention plans or arrangements of the Company or any of its Subsidiaries, in each case approved by the Board of Directors, including the Management Incentive Plan, (b) issuances or sales of securities to a Person in connection with an acquisition, business combination or merger approved by the Board of Directors, (c) issuances of securities by a Subsidiary of the Company to the Company or any other Subsidiary of the Company, (d) issuances of securities pursuant to the exercise, exchange or conversion of convertible securities, warrants or options previously issued by the Company in compliance with the terms of this Agreement, (e) issuances of securities that are ancillary to any *bona fide* third party financing of the Company or any of its Subsidiaries, (f) issuances of Common Units pursuant to the exercise of any Warrants or (g) issuances of Common Units or other Equity Securities of the Company or any Subsidiary of the Company issued in connection with any equity split, dividend, distribution, division or recapitalization by the Company or any Subsidiary of the Company, pursuant to which all holders of Common Units are treated equivalently, in each case of this clause (g), approved by the Board of Directors.

"Fiscal Year" means the annual accounting period of the Company, as determined by the Board of Directors from time to time.

"Fund Indemnitee" is defined in Section 9.2(e).

"Fund Indemnitors" is defined in Section 9.2(e).

"GAAP" means generally accepted accounting principles in effect from time to time in the United States.

"Governance Percentage Interest" means the Percentage Interest of any Member (a) calculated without giving effect to Management Excluded Units and (b) calculated on an aggregate basis together with any other Members that are Affiliates of the relevant Member, and any of its or their related funds, investment vehicles and managed accounts.

"Governmental Authority" means any federal, state, local, foreign or other governmental or quasi-governmental authority and any governmental, quasi-governmental or other department, commission, body, board, bureau, agency, association, subdivision, court, tribunal or other

instrumentality exercising any executive, judicial, legislative, regulatory or administrative function, including any self-regulatory authority (including the Securities and Exchange Commission and any stock exchange).

"Impacted Members" is defined in Section 10.1(a).

"Independent Director" means a Director that is independent of the Company and of each Member that has a Percentage Interest of 5% or more as of the time of the applicable determination (calculated on an aggregate basis together with any other Members that are Affiliates of the relevant Member, and any of its or their related funds, investment vehicles and managed accounts).

"Initial Members" means the Members set forth on Schedule 3, in each case to the extent such Initial Member remains a Member at the time of the applicable determination.  "Initial Member" means any one of the Initial Members.

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Investor Group Directors" means the Caspian/Empyrean Director, the Oaktree Directors and the OCO Director.

"IPO" means (a) a public offering of common equity securities of the Company (or a successor entity) that (i) results in no less than $50 million of proceeds (ii) is completed at an implied equity valuation for the Company of no less than $300 million and (ii) results in such common equity securities of the Company or such successor being listed on the New York Stock Exchange or NASDAQ or (b) a direct listing of common equity securities of the Company (or a successor entity) that results in (i) such common equity securities of the Company or such successor being listed on the New York Stock Exchange or NASDAQ and (ii) an average daily trading volume of such common equity securities of no less than $10 million in the 10-Business Day period following the completion of such direct listing.

"Joinder" means the joinder agreement in form and substance attached hereto as Annex B or such other form as is approved by the Board of Directors.

"Joint Appointers" is defined in Section 3.2(b)(i)(C).

"Law" means any federal, state, local, municipal, foreign or international, multinational or other law, constitution, statute, treaty, ordinance, rule, regulation, regulatory or administrative guidance, principle of common law, code, edict, decree or equity, order, award, decision, injunction, judgment, ruling, decree or other law, requirement or standard issued, enacted, adopted, implemented, promulgated or otherwise put into effect by any Governmental Authority.

"Loss" means, with respect to a Person, any liability, loss, damage, penalty, action, claim, judgment, settlement, cost, expense of any kind or nature whatsoever, including attorneys' fees, costs and expenses of defense, appeal and settlement of any proceedings instituted or threatened to be instituted against that Person and all other costs incurred in connection therewith.

"Management Excluded Units" means Units issued or issuable pursuant to any management or employee equity incentive plan (whether or not such Units are issued or outstanding, or may be issued in the future pursuant to any contingent instrument).

"Management Incentive Plan" has the meaning given to it in the Plan of Reorganization.

"Members" means the parties hereto designated as Members on Schedule 1, together with all those Persons who subsequently are admitted as Members in accordance with this Agreement. "Member" means any one of the Members.

"Membership Interest" of a Member at any time means the entire ownership interest of such Member in the Company at such time, including all benefits to which the owner of such Membership Interest is entitled under this Agreement and applicable Law, together with all obligations of such Member under this Agreement and applicable Law.

"New Securities" means (a) Units, or any securities convertible into, exercisable for or exchangeable for any Units, including all forms of Equity Securities, and (b) any debt or debt securities, solely in the case of this clause (b) to the extent to be issued to a then-existing Member.

"Notice of Preemptive Rights Acceptance" is defined in Section 5.2(d).

"Oaktree" means, collectively, Oaktree Capital Management, L.P., its Affiliates and the funds, accounts and investment vehicles managed or advised by it that hold Membership Interests.

"Oaktree Directors" is defined in Section 3.2(b)(i)(B).

"Oaktree Portfolio Transformation Team" is defined in Section 11.4(g).

"OCO" means, collectively, OCO Capital Partners, L.P, its Affiliates and the funds, accounts and investment vehicles managed or advised by it that hold Membership Interests.

"OCO Director" is defined in Section 3.2(b)(i)(D).

"Other 1.5L Noteholders" means Members that were (or whose Affiliates were) Consenting 1.5L Noteholders (as defined in the Restructuring Support Agreement), in each case other than Oaktree, Caspian, Empyrean and OCO.

"Other Member Director" is defined in Section 3.2(b)(i)(E).

"Other Member Representative" is defined in Section 3.2(b)(i)(E).

"Percentage Interest" means, with respect to each Member as of the applicable time of determination, a fraction, expressed as a percentage, having as its numerator the number of Common Units owned by such Member and having as its denominator the total outstanding number of Common Units owned by all of the Members (provided that to the extent the Member is a depositary through which beneficial holders may hold securities, each such beneficial holder

shall be considered separately for purposes of the calculation of Percentage Interest and related calculations).

"Person" means any natural person, corporation, partnership, firm, joint venture, limited liability company, unincorporated organization, trust, estate, Governmental Authority or other entity or organization.

"Plan of Reorganization" is defined in the recitals.

"Preemptive Offer Notice" is defined in Section 5.2(b).

"Preemptive Right" is defined in Section 5.2(a).

"Preemptive Rights Election Period" is defined in Section 5.2(b).

"Preemptive Rights Members" is defined in Section 5.2(a).

"Principal Investor" means each of (i) Oaktree, (ii) Caspian, (iii) Empyrean and (iv) OCO.

"Proportionate Percentage" is defined in Section 5.2(a).

"Public Side Teams" is defined in Section 11.17(b).

"Regulations" means the temporary and final regulations of the U.S. Department of the Treasury promulgated under the Code.

"Related Party" means (a) any director, officer or Affiliate of the Company or any of its Subsidiaries, and (b) each Member with a Governance Percentage Interest in excess of 5% at the time of the relevant determination (calculated on an aggregate basis together with any other Members that are Affiliates of the relevant Member, and any of its or their related funds, investment vehicles and managed accounts), and each of their Affiliates and portfolio companies.

"Related Party Transaction" is defined in Section 4.4.

"Reserves" means funds or amounts set aside or otherwise allocated to pay taxes, insurance, debt service, and future, anticipated, unforeseen and contingent obligations and all of the other costs and expenses incident to the Company's business or the ownership of the Company Assets.  The amount of Reserves shall be established by the Board of Directors from time to time in its sole and absolute discretion.

"Restructuring Support Agreement" is defined in the recitals.

"Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Selling Investor" is defined in Section 7.4.

"Specified Termination Event" is defined in Section 10.2(a).

"<u>Subject Purchaser</u>" is defined in <u>Section 5.2(a)</u>.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, partnership, firm, joint venture, limited liability company, unincorporated organization, or other entity or organization, whether incorporated or unincorporated, (a) of which such first Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions, (b) of which such first Person is a general partner or managing member or (c) that is otherwise controlled by such first Person.

"<u>Tag-Along Exempt Transaction</u>" is defined in <u>Section 7.4</u>.

"<u>Tag-Along Holder Notice</u>" is defined in <u>Section 7.4</u>.

"<u>Tag-Along Notice</u>" is defined in <u>Section 7.4</u>.

"<u>Tag-Along Sale</u>" is defined in <u>Section 7.4</u>.

"<u>Transfer</u>" means any transfer, sale, assignment, pledge, hypothecation or other disposition of any Units, whether direct or indirect and whether voluntary or involuntary, or any agreement to transfer, sell, assign, pledge, hypothecate or otherwise dispose of any Units, including any such transfer, sale, assignment, pledge, hypothecation, disposition by operation of law or otherwise to an heir, successor or assign; <u>provided</u>, <u>however</u>, that (a) with respect to any Member that is a widely held "investment company" as defined in the Investment Company Act, or any publicly traded company whose Securities are registered under the Exchange Act, a transfer, sale, assignment, pledge, hypothecation, or other disposition of ownership interests in such investment company or publicly traded company shall not be deemed a Transfer and (b) with respect to any Member that is, or is owned directly or indirectly by, a private equity fund, hedge fund or similar vehicle, any Transfer of limited partnership or other similar non-controlling interests in any entity which is a pooled investment vehicle holding other material investments and which is, or is an equityholder (directly or indirectly) of, a Member, or the change in control of any general partner, manager or similar Person of such entity, will not be deemed to be a Transfer for purposes hereof.  The term "Transferred" shall have a correlative meaning.  Transfers of beneficial ownership of any Units shall be subject to equivalent restrictions and requirements as are applicable to Transfers of Units.

"<u>Unaffiliated Debtholders</u>" is defined in <u>Section 4.4</u>.

"<u>Units</u>" means the units of ownership into which the Company's Membership Interests are divided.

"Warrant Agreement" shall mean that certain Warrant Agreement of even date herewith between the Company and Equiniti Trust Company, LLC, as Warrant Agent.

"<u>Warrants</u>" shall mean the warrants issued pursuant to the Plan of Reorganization and governed by the Warrant Agreement.

## ARTICLE III
## BOARD OF DIRECTORS

**3.1** **Management and Control**.

(a)    <u>Board of Directors</u>.  Except to the extent otherwise expressly provided in this Agreement or required by any non-waivable provision of the Act or other applicable Law, the management, operation and control of the business and affairs of the Company shall be vested exclusively in a Board of Directors comprised of the Persons appointed as Directors in accordance with <u>Section 3.2</u> (the "<u>Board of Directors</u>").  All powers of the Company, for which approval by the Members to the exercise thereof is not expressly required (or expressly reserved for the Members) by this Agreement, the Act or other applicable Law, shall be exercised under the authority of, and the business and affairs of the Company shall be managed by, or under the direction and control of, the Board of Directors in a manner consistent with the terms, provisions and conditions of this Agreement and the Act.  The acts of the Board of Directors in carrying on the affairs and activities of the Company (and the management, operation and control thereof and of the Company Assets) as authorized herein shall bind the Company.  Unless authorized to do so by the Board of Directors, no Member shall have any power or authority to act for, or to assume any obligation or responsibility on behalf of, the Company or to otherwise bind the Company in any way.  No Director acting individually, in his or her capacity as such, will have the power or authority to bind the Company in any way.

(b)    <u>Scope of Authority</u>.  Except to the extent otherwise expressly provided in this Agreement, or required by any non-waivable provision of the Act or other applicable Law, The Board of Directors shall have full and complete power, authority and discretion for, on behalf of and in the name of the Company, to enter into and perform all contracts and undertakings that it may deem necessary or advisable to carry out any and all of the objects and purposes of the Company.  Each Director shall be considered a "Manager" of the Company (as that term is defined in the Act).

**3.2** **Board of Directors**.

(a)    <u>Size and Composition.</u>  The Board of Directors shall initially be composed of seven (7) Directors.  The number of Directors constituting the entire Board of Directors may be increased or decreased by the Board of Directors; <u>provided</u> that the number of Directors may not be reduced below the number of Directors that the Principal Investors and Other 1.5L Noteholders are entitled to appoint pursuant to this Agreement at the time of the applicable action.  Each Director shall hold office until his or her respective successor is elected, or until his or her earlier death, resignation or removal in accordance with this <u>Section 3.2</u>.  Directors need not be Members of the Company.  Any Director may resign at any time by so notifying the Chairperson (or, if none in office, any other Director) in writing, with such resignation to take effect upon receipt of such notice by the Chairperson (or, if none in office, any other Director) or at such later time as specified therein and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(b)     Appointment of Directors.

(i)     Board Composition.  The Board of Directors shall be comprised as follows:

(A)     the then-current Chief Executive Officer, who shall be automatically appointed as a Director while holding the position of Chief Executive Officer and shall automatically cease to be a Director upon ceasing to be the Chief Executive Officer;

(B)     As long as Oaktree has a Governance Percentage Interest of 10% or more, Oaktree shall have the right to appoint two (2) Directors.  If Oaktree has a Governance Percentage Interest that is greater than or equal to 5% but less than 10%, then Oaktree shall have the right to appoint one Director.  Oaktree shall no longer have the right to appoint any Directors if its Governance Percentage Interest is less than 5% (notwithstanding any subsequent acquisition of Common Units by Oaktree that causes Oaktree to have a Governance Percentage Interest of 5% or greater).  Any Directors appointed by Oaktree pursuant to this paragraph shall constitute the "Oaktree Directors."  As of the date of this Agreement, the Oaktree Directors are Thomas Casarella and David Smolens.

(C)     As long as each of Caspian and Empyrean (the "Joint Appointers") has a Governance Percentage Interest of 5% or more, the Joint Appointers shall jointly have the right to appoint one (1) Director mutually agreed between the Joint Appointers.  If each of the Joint Appointers has a Governance Percentage Interest that is less than 5%, then the Joint Appointers shall no longer have any rights to appoint a Director (notwithstanding any subsequent acquisition of Common Units by the Joint Appointers that causes the Joint Appointers to have a Governance Percentage Interest of 5% or greater).  If one of the Joint Appointers has a Governance Percentage Interest that is less than 5%, and the other Joint Appointer has a Governance Percentage Interest that is 5% or more, then the Joint Appointer that has a Governance Percentage Interest that is 5% or more shall have the sole right to appoint one (1) Director and the other Joint Appointer shall no longer have any rights to appoint a Director pursuant to this paragraph (notwithstanding any subsequent acquisition of Common Units by such Joint Appointer that causes such Joint Appointer to have a Governance Percentage Interest of 5% or greater).  Any Director appointed by the Joint Appointer(s) pursuant to this paragraph shall constitute the "Caspian/Empyrean Director."  As of the date of this Agreement, the Caspian/Empyrean Director is Nathaniel J. Lipman.

(D)     As long as OCO has a Governance Percentage Interest of 5% or more, OCO shall have the right to appoint one (1) Director.  OCO shall no longer have the right to appoint a Director if its Governance Percentage Interest is less than 5% (notwithstanding any subsequent acquisition of Common Units by OCO that causes OCO to have a Governance Percentage Interest of 5% or greater).  Any Director appointed by OCO pursuant to this paragraph shall constitute the

11

"OCO Director."  As of the date of this Agreement, the OCO Director is Samuel Martini.

(E)     As long as the Other 1.5L Noteholders have an aggregate Governance Percentage Interest of 15% or more, the Other 1.5L Noteholders shall have the right to, through a representative duly authorized by Other 1.5L Noteholders with an aggregate Governance Percentage Interest representing at least 50% of the aggregate Governance Percentage Interest of all Other 1.5L Noteholders (an "Other Member Representative"), appoint one (1) Director who must qualify as an Independent Director.  The Other 1.5L Noteholders shall no longer have the right to appoint a Director if their aggregate Governance Percentage Interest is less than 15% (notwithstanding any subsequent acquisition of Common Units by any Other 1.5L Noteholder that causes the Other 1.5L Noteholders to have an aggregate Governance Percentage Interest of 15% or greater), unless any individual Other 1.5L Noteholder and its Affiliates together have a Governance Percentage of at least 5% (in which case, such individual Other 1.5L Noteholders shall have the right to appoint a Director for so long as it and its affiliates together have a Governance Percentage of at least 5%).  Any Director appointed by the Other 1.5L Noteholders pursuant to this paragraph shall constitute the "Other Member Director."  Notwithstanding the foregoing, if an Other Member Representative does not notify the Company of the appointment by the Other 1.5L Noteholders of the Other Member Director within sixty (60) days of the Emergence Date, the seat reserved for the Other Member Director pursuant to this paragraph shall instead be deemed a vacancy of a seat on the Board of Directors reserved for an Independent Director in accordance with the last sentence of Section 3.2(c)(ii), and shall be filled as set forth in Section 3.2(b)(i)(F).

(F)     The remainder of the Directors (constituting a number of Directors equal to the then-current size of the Board of Directors, reduced by the number of Directors entitled to be appointed pursuant to paragraphs (A) through (E) above), at least one of whom (excluding any Independent Director(s) appointed to replace the Caspian/Empyrean Director and/or the Other Member Director in accordance with Section 3.2(c)(iii)) shall be an Independent Director, shall be appointed by the valid act of Members holding Common Units representing a majority of the outstanding Common Units.  As of the date of this Agreement, there is one such remaining Director, who is an Independent Director, [●].

(G)     Each Director shall disclose to the Company all boards of directors, or similar governing bodies, of other entities on which such Director serves during the term of their service as a Director.

(c)     Removals; Filling Vacancies.  Directors may be removed and vacancies on the Board of Directors may be filled only as provided in this Section 3.2(c).

(i)     At any time, and for any reason or no reason with or without cause, by delivery of written notice to the Company, (A) Oaktree may remove any Oaktree Director

12

as a Director, (B) the Joint Appointers (or, if only one of the Joint Appointers has a right to appoint the Caspian/Empyrean Director, such Joint Appointer) may remove the Caspian/Empyrean Director as a Director, (C) OCO may remove the OCO Director as a Director, (D) the Other 1.5L Noteholders, through an Other Member Representative, may remove the Other Member Director as a Director and (E) Members holding sufficient Units to appoint an Independent Director pursuant to <u>Section 3.2(b)(i)(F)</u> may remove any Independent Director as a Director (for the avoidance of doubt, excluding the Other Member Director).

(ii)    Oaktree may, at any time while Oaktree has the right to appoint one or more Directors pursuant to this Agreement, fill a vacancy of a seat on the Board of Directors reserved for a Oaktree Director with a person of its choosing.  The Joint Appointers (or, if only one of the Joint Appointers has a right to appoint the Caspian/Empyrean Director, such Joint Appointer) may, at any time while a Joint Appointer has the right to appoint a Director pursuant to this Agreement, fill a vacancy of the seat on the Board of Directors reserved for a Caspian/Empyrean Director with a person mutually agreed upon by the Joint Appointers (or, if only one of the Joint Appointers has a right to appoint the Caspian/Empyrean Director, at such Joint Appointer's choosing).  OCO may, at any time while OCO has the right to appoint a Director pursuant to this Agreement, fill a vacancy of the seat on the Board of Directors reserved for an OCO Director with a person of its choosing.  Any vacancy of a seat on the Board of Directors reserved for an Independent Director may be filled as set forth in <u>Section 3.2(b)(i)(F)</u>.  The Other 1.5L Noteholders may, through the Other Member Representative, fill a vacancy of the seat on the Board of Directors reserved for an Other Member Director with a person of its choosing.

(iii)   If at any time either OCO or the Other 1.5L Noteholders shall cease to have the right to appoint a Director, then the applicable OCO Director or Other Member Director shall immediately resign or, if such OCO Director or Other Member Director, as applicable, fails to immediately resign, such Director shall be removed by a vote of the majority of the remaining Directors (excluding the OCO Director or Other Member Director required to resign pursuant to this paragraph), and, unless the size of the Board of Directors shall be validly reduced pursuant to <u>Section 3.2(a)</u>, the resulting vacancy shall be filled with an Independent Director appointed pursuant to <u>Section 3.2(b)(i)(F)</u>.  If at any time Oaktree shall cease to have the right to appoint a number of Directors that is equal to or greater than the number of Oaktree Directors then in office or the Joint Appointers shall cease to have the right to appoint a Director, then the applicable Oaktree Director(s) or the Caspian/Empyrean Director shall immediately resign or, if any such Oaktree Director(s) or Caspian/Empyrean Director, as applicable, fails to immediately resign, such Director(s) shall be removed by a vote of the majority of the remaining Directors (excluding any Oaktree Director(s) or Caspian/Empyrean Director required to resign pursuant to this paragraph), and, unless the size of the Board of Directors shall be validly reduced pursuant to <u>Section 3.2(a)</u>, the resulting vacancy shall be filled with a Director (who shall not be required to be an Independent Director) appointed pursuant to <u>Section 3.2(b)(i)(F)</u>.

13

(iv)    If at any time the Chief Executive Officer of the Company ceases to serve in such position, the departing Chief Executive Officer shall immediately resign from the Board of Directors or, if such individual fails to immediately resign, shall be removed by a vote of the majority of the remaining Directors (excluding the departing Chief Executive Officer).

(d)    Nontransferability of Rights.  The rights of each Principal Investor pursuant to this Section 3.2 (including to appoint a Director) shall not be transferable.

(e)    Chairperson.  The Board of Directors shall have a Chairperson as determined under this Agreement.  At any time when Oaktree is entitled to appoint a Director pursuant to this Agreement, the Chairperson shall be selected by the Oaktree Directors in their sole and absolute discretion.  At any other time, the Chairperson will be selected by a majority of the Board of Directors.  The Chairperson shall preside when present at all meetings of the Board of Directors and Members; provided that the Chairperson may delegate presiding over meetings to another Director.  The Chairperson shall have such powers and duties as designated in accordance with this Agreement and as from time to time may be assigned by the Board of Directors.  The Chairperson of the Board of Directors will be designated by the Oaktree Directors following the date of this Agreement.

### 3.3    Meetings of the Board of Directors.

(a)    Meetings.  The Board of Directors shall meet at least quarterly at such time and place as the Chairperson or a majority of the Directors may designate.  A schedule of regular meetings of the Board of Directors shall be determined at the start of each calendar year, and notice of such schedule shall be given in writing to each Director.  Written notice of any change to a scheduled regular meeting of the Board of Directors must be given to all Directors at least seven days prior to the meeting.  Special meetings of the Board of Directors may be scheduled by the Chairperson or by any Investor Group Director on at least three Business Days' written notice to all Directors.  The notice requirements for any regular meeting or special meeting of the Board of Directors may be waived in writing by any Director, whether before or after the meeting, and shall be deemed waived with respect to each Director who attends the applicable meeting (other than attendance solely for the purpose of registering a dissent at the beginning of the meeting regarding the failure to give adequate notice of the meeting).

(b)    Quorum.  At any meeting of the Board of Directors or any committee of the Board of Directors, the quorum requirement shall be determined as set forth in this Section 3.3(b).  The presence of a majority of the total number of Directors then in office (with respect to any meeting of the Board of Directors) or the total number of Directors that are members of any committee of the Board of Directors (with respect to any meeting of such committee) shall be needed to constitute a quorum, which majority must include (i) at least one Oaktree Director, if there are any Oaktree Directors then in office; (ii) the Caspian/Empyrean Director, if there is a Caspian/Empyrean Director then in office; (iii) the OCO Director, if there is an OCO Director then in office; and (iv) at least one Independent Director.  No action may be taken at a meeting of the Board of Directors or any committee of the Board of Directors unless a quorum is present.  If a meeting is adjourned due to lack of quorum because the Directors set forth in the foregoing clauses (i) through (iv), as applicable, fail to attend a meeting of the Board of

Directors for which notice was duly provided in accordance with this Agreement, then with respect to the second consecutive meeting of the Board (which second meeting may be held upon twenty-four (24) hours' notice to all Directors), the requirements in the foregoing clauses (i) through (iv) shall be eliminated and quorum shall require a simple majority of the Directors then in office (with respect to any meeting of the Board of Directors) or a simple majority of the Directors that are members of any committee of the Board of Directors (with respect to any meeting of a committee of the Board of Directors).

(c)     Voting; Proxies.  Each Director shall be entitled to one vote on any matter to be considered by the Board of Directors.  A Director may cast their vote by granting a written proxy to any other Director, who may exercise such proxy to vote on any matter to be considered by the Board of Directors.  Except as otherwise provided in this Agreement, the act or approval of a majority of the Directors present and voting on any action will be the act or approval, as the case may be, of the Board of Directors.

(d)     Participation by Conference Telephone.  Any one or more of the Directors may participate in a meeting of the Board of Directors by means of a conference telephone or similar communication device that allows all Persons participating in the meeting to simultaneously hear each other during the meeting, and such participation in the meeting shall be the equivalent of being present in person at such meeting.

(e)     Action by Board of Directors Without a Meeting.  Any action required or permitted to be taken at a meeting of the Board of Directors (or any committee thereof) may be taken without a meeting if all of the members of the Board of Directors or of such committee of the Board of Directors consent in writing (including giving consent by e-mail) to such action.  Any such consent shall have the same effect as a vote of the Board of Directors (or any committee thereof) taken at a meeting of the Board of Directors (or any committee thereof).

(f)     Director Compensation; Reimbursement of Expenses.  The Company shall reimburse the Directors for reasonable out-of-pocket expenses so incurred by them on behalf of the Company, including travel expenses for any in-person meetings of the Board of Directors (or any committee thereof), in accordance with the written expense policy as adopted from time to time by the Board of Directors.  Directors that are not (i) employees of the Company or of a Member or an Affiliate of a Member or (ii) an Investor Group Director that is an Affiliate of the appointing Principal Investor shall receive customary compensation for their services as Directors, as determined from time to time by the Board of Directors.

**3.4     Committees**.  The Board of Directors may, from time to time, establish one or more committees.  Any such committee, to the extent provided in the enabling resolution or the Certificate of Formation or this Agreement, shall have and may exercise all of the authority of the Board of Directors.  At every meeting of any such committee, the affirmative vote of a majority of the members present shall be necessary for the adoption of any resolution.  The Board of Directors may dissolve any committee at any time.  Each committee of the Board of Directors shall include the same proportionate number of Oaktree Directors, Caspian/Empyrean Directors, OCO Directors and Other Member Directors as are serving on the Board of Directors, in each case unless the applicable Director(s) and/or Principal Investor(s) (or, with respect to the

Other Member Director, Other Member Representative) that appointed such Directors waive such right to proportionate representation.

**3.5     Officers**.

(a)     <u>Appointment and Term of Office</u>.  The Board of Directors may, from time to time, employ and retain persons, subject to its supervision and control, as may be necessary or appropriate (as determined by the Board of Directors) for the conduct of the Company's business, including employees, agents and other persons (any of whom may be a Member or Director) who may be designated as officers of the Company with such titles, duties, responsibility and authority as may be determined by the Board of Directors (or by the Chief Executive Officer, to the extent the Board of Directors delegates this power to the Chief Executive Officer with respect to certain officers of the Company).  None of the Company's officers will be subject to periodic elections by the Board of Directors, but will hold office until the earlier of (i) that officer's death, resignation, retirement, disqualification or removal from office and (ii) the date that his or her successor shall have been duly elected and qualified.  Two or more offices may be held by the same individual, and two or more individuals may hold the same office.

(b)     <u>Removal</u>.  Any officer elected or appointed hereunder or by the Board of Directors may be removed at any time by the Board of Directors (or the Chief Executive Officer, to the extent the Chief Executive Officer was authorized to appoint such officer), for or without cause.  Such removal will be without prejudice to the contract rights, if any, of the individual so removed.  The election or appointment of an officer will not of itself create contract rights.

(c)     <u>Vacancies</u>.  Whenever any vacancy shall occur in any office of any officer by death, resignation, removal, increase in the number of officers of the Company, or otherwise, such vacancy may be filled by the Board of Directors.

(d)     <u>Compensation and Reimbursement of Expenses</u>.  Subject to the terms of this Agreement, the compensation of all officers of the Company shall be determined by the Board of Directors (or a duly authorized committee thereof) and may be altered by the Board of Directors (or such committee) from time to time, except as otherwise provided by contract, and no officer shall be prevented from receiving such compensation by reason of the fact such officer is also a Director.  All officers shall be entitled to be paid or reimbursed for all reasonable costs and expenditures properly incurred in the Company's business.

**ARTICLE IV**
**MEMBERSHIP INTERESTS**

**4.1     Existing Members; New Members**.

(a)     As of the Effective Time, each of the Persons listed on Schedule 1 to this Agreement is hereby admitted to the Company as a Member and has, pursuant to and in accordance with the Plan of Reorganization, accepted (or, on the date of this Agreement, will accept) duly authorized and issued Common Units as set forth on Schedule 1 attached hereto opposite such Member's name.  All other limited liability company interests, interests as a

16

member and ownership interests issued by the Company prior to the Emergence Date have been cancelled and extinguished pursuant to the Plan of Reorganization and are of no further force or effect.

(b)     The Company will update Schedule 1 following any Transfer made in compliance with this Agreement (and shall use commercially reasonable efforts to make such update within five Business Days from the receipt of any Joinder or the receipt of a notification of a Transfer where a Joinder is not required), any issuance of additional Units or other Equity Securities of the Company in accordance with this Agreement to reflect the admission of any new Member, or to reflect other changes to the information set forth on Schedule 1 following notice of such changes from the applicable Member in accordance with this Agreement.

(c)     Each Member's Membership Interest shall be represented by Units of Membership Interest.  As of the date of this Agreement, the ownership interests in the Company shall be evidenced by a single class of ownership interests, the Common Units. As of the date of this Agreement, the Common Units are the only voting ownership interests in the Company. All Common Units are identical to each other and accord the holders thereof the same obligations, rights and privileges as are accorded to each other holder thereof, except for any specific obligations, rights and privileges expressly set forth in this Agreement.  As of the date of this Agreement, [●] Common Units may be issued by the Company.  As of the date of this Agreement, [●] Common Units are reserved in respect of issuances pursuant to the Management Incentive Plan and [●] Common Units are initially reserved in respect of issuances pursuant to the exercise of the Warrants (subject to adjustment in accordance with the terms of the Warrants).

(d)     Subject to the preemptive rights contained in Section 5.2 and the approval of the Board of Directors, the Company shall have the right to issue or sell to any Person (including Members and Affiliates of Members) any of the following (which for purposes of this Agreement shall be referred to as "Additional Interests"):  (i) additional Common Units (including, for the avoidance of doubt, Common Units issuable upon exercise of the Warrants) and (ii) any securities authorized pursuant to any equity incentive plan of the Company or its Subsidiaries adopted in accordance with this Agreement.  Subject to the provisions of this Agreement and approval by the Board of Directors, the Company shall determine the number of each class or series of Units to be issued or sold and the contribution required in connection with the issuance of such Additional Interests.

(e)     In order for a Person that is not already a Member to be admitted as a Member of the Company with respect to an Additional Interest, with respect to a Membership Interest that has been Transferred pursuant to this Agreement or otherwise, such Person must have delivered to the Company a written undertaking in the form of the Joinder and shall deliver such documents and instruments as the Company reasonably determines to be necessary or appropriate in connection with the issuance of such Additional Interests to such Person or the Transfer of a Membership Interest to such Person or to effect such Person's admission as a Member (including, if requested by the Company, a customary consent of the spouse of any such Person that is a natural person).  Upon the delivery of such validly completed documents and instruments, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued such Person's Membership

17

Interest, including any Units that correspond to and are part of such Membership Interest. Prior to the receipt of a Joinder in accordance with the immediately preceding sentence and the admission of a Person as a Member in connection with a Transfer, the Company and the Board of Directors shall be entitled to treat the transferor as the Member with respect to the applicable Units in all respects. Each Person designated for admission to the Company as an additional Member in accordance with this Agreement (other than in connection with a Transfer made in accordance with this Agreement) shall contribute cash, other property (which may include securities) or services rendered in the amount and of the type designated by the Board of Directors.

      **4.2**    **Membership Interests; Certification**. The Membership Interests as of the date of this Agreement shall consist solely of Common Units. The Common Units shall be uncertificated, unless the Company, in its sole discretion, determines to issue certificates to the Members representing the Common Units. Any certificates that may be issued (and the book-entry notation for any uncertificated Common Units) will bear a restrictive legend in the form reasonably determined by the Company, including the following:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE FEDERAL, STATE AND FOREIGN SECURITIES LAWS.

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO, AND ISSUED IN ACCORDANCE WITH, THE TERMS AND PROVISIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT OF [REORGANIZED CURO], DATED AS OF [●], 2024, AS THE SAME MAY BE AMENDED AND/OR RESTATED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS (THE "AGREEMENT"). THE SALE, PLEDGE, HYPOTHECATION, ASSIGNMENT OR TRANSFER IN ANY MANNER, WHETHER DIRECT OR INDIRECT, VOLUNTARY OR INVOLUNTARY, BY OPERATION OF LAW OR OTHERWISE, OF THIS CERTIFICATE

AND THE SECURITIES REPRESENTED HEREBY ARE RESTRICTED AS DESCRIBED IN THE AGREEMENT. NO REGISTRATION OR TRANSFER OF THESE SECURITIES WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, AS DETERMINED BY THE COMPANY IN ITS SOLE DISCRETION. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY THE PROVISIONS OF THE AGREEMENT.

ONLY MEMBERS ARE ENTITLED TO EXERCISE THE RIGHTS OF MEMBERS UNDER THE AGREEMENT, INCLUDING INFORMATION RIGHTS, VOTING RIGHTS AND REGISTRATION RIGHTS UNDER THE AGREEMENT. NO PERSON MAY BECOME A MEMBER PURSUANT TO ANY TRANSFER OF UNITS OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE COMPANY. A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY CONTACTING: GENERAL COUNSEL, [REORGANIZED CURO], 101 N. MAIN STREET, SUITE 600, GREENVILLE, SC 29601.

Certain Common Units issued on the emergence date pursuant to the exemption from registration under Section 1145 of Title 11 of the Bankruptcy Code ("Section 1145 Securities") will instead bear the following legend on any certificates that may be issued (or the applicable book-entry notation):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "BANKRUPTCY CODE"). THIS SECURITY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE

ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE COMPANY, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO, AND ISSUED IN ACCORDANCE WITH, THE TERMS AND PROVISIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT OF [REORGANIZED CURO], DATED AS OF [●], 2024, AS THE SAME MAY BE AMENDED AND/OR RESTATED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS (THE "AGREEMENT"). THE SALE, PLEDGE, HYPOTHECATION, ASSIGNMENT OR TRANSFER IN ANY MANNER, WHETHER DIRECT OR INDIRECT, VOLUNTARY OR INVOLUNTARY, BY OPERATION OF LAW OR OTHERWISE, OF THIS CERTIFICATE AND THE SECURITIES REPRESENTED HEREBY ARE RESTRICTED AS DESCRIBED IN THE AGREEMENT. NO REGISTRATION OR TRANSFER OF THESE SECURITIES WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, AS DETERMINED BY THE COMPANY IN ITS SOLE DISCRETION. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY THE PROVISIONS OF THE AGREEMENT.

ONLY MEMBERS ARE ENTITLED TO EXERCISE THE RIGHTS OF MEMBERS UNDER THE AGREEMENT, INCLUDING INFORMATION RIGHTS, VOTING RIGHTS AND REGISTRATION RIGHTS UNDER THE

AGREEMENT. NO PERSON MAY BECOME A MEMBER PURSUANT TO ANY TRANSFER OF UNITS OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE COMPANY. A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY CONTACTING: GENERAL COUNSEL, [REORGANIZED CURO], 101 N. MAIN STREET, SUITE 600, GREENVILLE, SC 29601.

Notwithstanding anything to the contrary in this Agreement, to the extent that any Common Units are held through the facilities of the Depositary Trust Company ("DTC"), nothing in this Agreement shall impose any obligation on DTC to monitor or examine any Transfers of Common Units for compliance with the restrictions on Transfers set forth in this Agreement.

    4.3    **Voting Rights**.  Except as required by applicable Law, the holders of Common Units shall have the general right to vote together as a single class and shall be entitled to one vote for each Common Unit held.  There shall be no cumulative voting.  Members (including any Member who also is a Director) shall be entitled to vote on any matter submitted to a vote of the Members in accordance with this Agreement or the Act (unless such voting is expressly restricted or prohibited herein) but shall have no right to vote on Company matters other than as expressly provided by this Agreement or required by the Act.  To the fullest extent permitted under the Act and other applicable Law, the Members hereby cede and otherwise relinquish all voting rights that they might otherwise have to the Board of Directors except as otherwise expressly provided herein.  Except as otherwise provided in this Agreement, all decisions and actions to be made as taken by the Members are to be made or taken as approved by Members with an aggregate Percentage Interest in excess of 50%.  Except as otherwise provided in this Agreement, any action requiring the consent of the Members entitled to vote thereon or required to be taken at a meeting of such Members may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by such Members who hold the requisite Percentage Interest or Governance Percentage Interest, as applicable, required for such consent.

    4.4    **Related Party Transactions**.  Neither the Company nor any of its Subsidiaries shall enter into, modify (including by waiver) or terminate any transaction, agreement, arrangement or series of related transactions, agreements or arrangements with, or for the benefit of (other than proportionally as a holder of Common Units), any Related Party (a "Related Party Transaction"), other than (i) any Related Party Transaction that is not material to the Company or the applicable Subsidiary, is in the ordinary course of business for both the Company or such Subsidiary and the applicable counterparty and is conducted on arm's-length terms and (ii) customary employment, indemnification or expense reimbursement arrangements with Directors, officers, or employees of the Company, unless such Related Party Transaction is duly approved by a majority of the disinterested Directors.  For purposes of this Section 4.4, references to "disinterested Directors" shall be references to those Directors who are not Affiliates of the applicable Related Party and were not appointed to the Board of Directors by the applicable

Related Party.  Notwithstanding the foregoing, the Company and its Subsidiaries may enter into, and the approval of a majority of the disinterested Directors shall not be required for, any Related Party Transaction (i) comprising the incurrence of indebtedness or the issuance of debt securities by the Company or its applicable Subsidiary if such Related Party Transaction is subject to the preemptive rights contained in Section 5.2 or (ii) that concerns then-outstanding indebtedness or debt securities of the Company or its applicable Subsidiary if (a) at least 25% of the aggregate principal amount of such additional series or principal amounts of indebtedness or debt securities is, as of immediately prior to the consummation of such debt incurrence or issuance, held by Persons who are not Affiliates of the Company ("Unaffiliated Debtholders") and (b) Unaffiliated Debtholders are eligible to participate *pro rata* in such Related Party Transaction.

      **4.5**    **Tender Offers**.  Subject to the receipt of the required approvals under this Agreement, and subject to compliance with the terms of any applicable indebtedness, the Company shall have the right to periodically conduct one or more tender offers for a portion of the outstanding Common Units from time to time, as determined by the Board of Directors in its sole discretion.

      **4.6**    **Record Dates; Meetings**.

      (a)    Record Date. The record date for determining the Members entitled to notice of any meeting or for purposes of any action by written consent, or for any other purpose under this Agreement, shall be the date set by the Board of Directors.  If no record date is set, (i) the record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the Business Day preceding the day on which notice is given or, if notice is waived, at the close of business on the Business Day preceding the date on which the meeting is held; (ii) the record date for determining Members entitled to act by written consent shall be the day on which the first written consent is given and (iii) the record date for determining Members for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto, or the tenth (10th) day prior to the date of such other action, whichever is later.

      (b)    Meetings; Notice. The Company shall not be required to hold an annual meeting of Members.  A special meeting of the Members may be called at any time by the Board of Directors, and will be promptly called by the Board of Directors upon the request of any Principal Investor (provided that any Principal Investor shall no longer have the right to call a special meeting of the Members if it has a Governance Percentage Interest below 5%), for the purpose of addressing any matters on which the Members may vote.  Any meeting of the Members shall be held at such location as may be determined by the Board of Directors, or may be held by means of remote communication.  Following the calling of a meeting, the Board of Directors shall give notice of such meeting in accordance with this Agreement to all Members of record entitled to vote at such meeting, no less than ten (10) and no more than sixty (60) days prior to the date of the meeting.  The notice of meeting shall state the place (or method of remote communication by which the meeting shall be held), date and time of the meeting and the general nature of the business to be transacted.  No business may be transacted at any meeting other than as set forth in the notice of meeting.  A quorum of any meeting of the Members shall consist of a Percentage Interest of no less than 50%, present in person or

represented by proxy.  The Members present in person or represented by proxy at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum (underline provided that the taking of any action, other than adjournment, is approved by the requisite standard specified in this Agreement or in the Act).  Members may participate in a meeting by means of a conference telephone or similar communication device that allows all Persons participating in the meeting to simultaneously hear each other during the meeting, and such participation in the meeting shall be the equivalent of being present in person at such meeting.

(c)     Adjournment.  A meeting of Members at which a quorum is present may be adjourned to another time or place and any business that might have been transacted at the original meeting may be transacted at the adjourned meeting.  If a quorum is not present at an original meeting, that meeting may be adjourned by the vote of Members holding a majority Percentage Interest present at the meeting, either present in person or represented by proxy. Notice of an adjourned meeting need not be given to Members if the time and place of the reconvened meeting are announced at the meeting at which the adjournment is taken, unless the adjournment is for more than forty-five (45) days or if, after the adjournment, a new record date is fixed for the adjourned meeting, in which case notice of the adjourned meeting shall be given to each Member of record entitled to vote at the adjourned meeting in the manner provided in Section 4.6(b).

(d)     Waiver of Notice.  The transactions of any meeting of Members, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice, if a quorum is present at that meeting, either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote that was not present in person or by proxy signs either a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting.  Attendance of a Member at a meeting shall constitute waiver of notice, other than attendance solely for the purpose of registering a dissent at the beginning of the meeting regarding the failure to give adequate notice of the meeting.

(e)     Proxies.  At all meetings of Members, or with respect to any written consent of any Member at any time, a Member may vote in person or by proxy executed in writing by such Member or by such Member's duly authorized attorney-in-fact.  Such proxy shall be filed with the chairperson of the applicable meeting before or after the time of the meeting, or with the applicable consent (which filing may be by paper filing, electronic or facsimile transmission to the Company in accordance with this Agreement).

**4.7     Representations of Members**.

(a)     Each Initial Member, severally and not jointly, represents and warrants to the Company and every other Initial Member that, as of the date hereof, such Member has not made or entered into, and is not a party to, any agreement, understanding or arrangement, oral or written, with respect to the governance of the Company or the relationship between or among the Company, the Directors, such Initial Member or any other Initial Member, in each case (i) other than as set forth in this Agreement or (ii) for any agreements, understandings or arrangements solely involving such Initial Member and its Affiliates.

(b)     Until such time as the Company becomes subject to reporting obligations under the Exchange Act, the Company may request any Member to provide the Company with a certificate, within thirty (30) days of such request, certifying whether such Member is an "accredited investor" (within the meaning of Rule 501(a) under Regulation D of the Securities Act ).

**4.8     Registration Rights**.  The Members shall have the registration rights set forth on Annex A to this Agreement, which is hereby made part of this Agreement as if it was set forth in full in this Section 4.8.

**ARTICLE V**
**MEMBERS' CAPITAL COMMITMENTS, CAPITAL**
**CONTRIBUTIONS AND UNITS**

**5.1     Capital Contributions**.  Each Initial Member shall be automatically deemed to have made a contribution to the capital of the Company in the amount set forth in the books and records of the Company.  Except as required by applicable Law, no Member will be required to make any additional contribution to the capital of the Company.  However, subject to the approval of the Board of Directors, a Member may, at any time and in its sole discretion, make additional contributions to the capital of the Company.  No Member shall be entitled to the return of any part of its capital contribution except as specified in this Agreement.  No Member shall be required to loan the Company any funds.

**5.2     Preemptive Rights**.

(a)     Preemptive Rights.  After the Emergence Date and prior to an IPO, subject to Section 5.2(i), if the Company or any of its Subsidiaries proposes to issue any New Securities to any Person (the "Subject Purchaser"), each Member that has (in the aggregate with all Affiliates of such Member) a Percentage Interest of 2% or greater (measured as of the date of the applicable Preemptive Offer Notice) (collectively, "Preemptive Rights Members") shall have the right (a "Preemptive Right") to purchase such Preemptive Rights Member's *pro rata* share of the New Securities (determined based on such Preemptive Rights Member's Percentage Interest relative to the Percentage Interest of all other Preemptive Rights Members, measured as of the date of the applicable Preemptive Offer Notice) (the "Proportionate Percentage"), at the same price and on the same other terms as such New Securities are proposed to be issued and sold.

(b)     Preemptive Offer Notice.  Not later than ten (10) Business Days prior to any issuance of New Securities giving rise to Preemptive Rights under this Section 5.2, the Company shall deliver to each Preemptive Rights Member a notice (the "Preemptive Offer Notice") that (i) includes the principal terms and conditions of the proposed issuance, including (A) the number of New Securities proposed to be issued, (B) the price per unit of the New Securities and (C) the proposed issuance date; (ii) sets forth such Preemptive Rights Member's Proportionate Percentage; and (iii) offers to sell to such Preemptive Rights Member its Proportionate Percentage of such New Securities, in each case at the price and on the terms and conditions set forth in the Preemptive Offer Notice.  The Preemptive Offer Notice shall by its terms remain open for a period of ten (10) Business Days from the date of delivery thereof (the

24

"Preemptive Rights Election Period") and shall specify the date on which the New Securities will be sold to accepting Preemptive Rights Members (which shall be at least ten (10) Business Days but not more than 180 days after the date of delivery of the Preemptive Offer Notice). The failure of any Preemptive Rights Member to respond to the Preemptive Offer Notice during the Preemptive Rights Election Period shall be deemed a waiver of such Preemptive Rights Member's Preemptive Rights with respect to the applicable Preemptive Offer Notice.

(c)     Post-Issuance Notice.  Notwithstanding the requirements of Section 5.2(b), the Board of Directors may determine in connection with any issuance of New Securities to defer the issuance of the Preemptive Offer Notices until after the issuance of the New Securities, in which case the Preemptive Offer Notices shall be given promptly after the issuance of the New Securities and the Company shall ensure that each Preemptive Rights Member that elects to exercise its Preemptive Rights within the Preemptive Rights Election Period is offered the right to acquire from the applicable Subject Purchaser (directly or indirectly), no later than ten (10) Business Days following the end of the Preemptive Rights Election Period, such Preemptive Rights Member's Proportionate Percentage of the New Securities that were issued in such issuance and otherwise on the terms set forth in the other provisions of this Section 5.2.

(d)     Acceptance.  Each Preemptive Rights Member shall have the right, during the Preemptive Rights Election Period, to elect to purchase any or all of its Proportionate Percentage of the New Securities at the purchase price and on the terms set stated in the Preemptive Offer Notice.  Notice by any Preemptive Rights Member of its acceptance, in whole or in part, of the offer set forth in a Preemptive Offer Notice (a "Notice of Preemptive Rights Acceptance") shall be irrevocable upon delivery to the Company prior to the end of the Preemptive Rights Election Period, and shall set forth the number of New Securities such Preemptive Rights Member elects to purchase.

(e)     Underallotment.  Each Preemptive Rights Member shall have the additional right to offer in its Notice of Preemptive Rights Acceptance to purchase any of the New Securities not accepted for purchase by any other Preemptive Rights Members, in which event such New Securities not accepted by such other Preemptive Rights Members shall be deemed to have been offered to and accepted by the Preemptive Rights Members exercising such additional right under this Section 5.2(e) *pro rata* in accordance with their respective Proportionate Percentages (determined based on such Preemptive Rights Member's Percentage Interest relative to the Percentage Interest of all other Preemptive Rights Members exercising this right pursuant to this Section 5.2(e)) on the same terms and conditions as those specified in the Preemptive Offer Notice, but in no event shall any such electing Preemptive Rights Member be allocated a number of New Securities in excess of the maximum number of New Securities such Preemptive Rights Member has elected to purchase in its Notice of Acceptance.

(f)     Closing.  The closing of an issuance of New Securities pursuant to this Section 5.2 shall take place on the proposed issuance date set forth in the Preemptive Offer Notice; provided that consummation of an issuance may be extended beyond such date to the extent necessary to obtain any applicable governmental approval or other required approval or to satisfy other conditions set forth in the Preemptive Offer Notice (and notice of any such extension will be given to the applicable Preemptive Rights Members).  At the closing of such issuance, each Member participating in the issuance shall be delivered the notes, certificates or

other instruments (if any) evidencing the New Securities to be issued to such Member, registered in the name of such Member or its designated nominee, free and clear of any liens (other than any liens arising pursuant to this Agreement or applicable securities laws), with any transfer tax stamps affixed, against delivery by such Member of the applicable consideration. Each Member participating in such issuance shall take or cause to be taken all such reasonable actions as may be reasonably necessary or desirable in order to expeditiously consummate such issuance pursuant to this <u>Section 5.2</u> and any related transactions, including executing, acknowledging and delivering consents, assignments, waivers and other customary documents or instruments and filing applications, reports, returns, filings and other documents or instruments with Governmental Authorities.

(g)     <u>Post-Closing Sales</u>.  If Notices of Preemptive Rights Acceptance given by the Preemptive Rights Members do not cover in the aggregate all of the New Securities, the Company may, during the 180 days following the end of the Preemptive Rights Election Period sell to any other Person or Persons all or any part of the New Securities not covered by such notices, only on terms and conditions that are no more favorable, with respect to price or with respect to other material terms in the aggregate, to such Person or Persons or less favorable, with respect to price or with respect to other material terms in the aggregate, to the Company than those set forth in the Preemptive Rights Offer Notice.  If the Company does not sell the New Securities pursuant to this <u>Section 5.2(g)</u> during such 180-day period, then the Company shall be required to again comply with this <u>Section 5.2</u> prior to any sales of the New Securities.

(h)     <u>Securities Law Matters</u>.  Notwithstanding anything to the contrary herein, it shall be a condition of the exercise of any Preemptive Rights under this Agreement that the applicable Preemptive Rights Member meets all requirements under all applicable securities Laws for participation in the applicable issuance, in the reasonable determination of the Company, and has executed and delivered to the Company appropriate evidence of such status.

(i)     <u>Excluded Transactions</u>.  Preemptive Rights under this <u>Section 5.2</u> shall not apply to issuances or sales of securities in any Excluded Transaction.

**5.3     No Interest in Company Property**.  No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may otherwise have to bring or maintain any action for partition with respect to the property of the Company.

# ARTICLE VI
# DISTRIBUTIONS

**6.1     Distributions Generally**.  The Board of Directors may distribute the Company's available cash and other assets to the Members at such times and in such amounts as it determines to be appropriate, in the order and priority provided in this <u>Article VI</u> (subject to the terms of this Agreement and to applicable Law).

26

**6.2    Priority of Distributions**.  Any distribution (whether of cash or property) shall be made to the holders of Common Units on a *pro rata* basis.

**6.3    In-Kind Distributions**.  The Board of Directors may from time to time make distributions of Company Assets other than money in the manner described in Section 6.2 on the basis of the net fair market value (as determined by the Board of Directors) of the property to be distributed.  Except as provided in the previous sentence of this Section 6.3, no Member shall have any right or power to demand or receive Company Assets other than money from the Company.

**6.4    Limitation Upon Distributions**.  No distribution shall be declared and paid if payment of such distribution would cause the Company to violate any limitation on distributions provided in the Act.

**6.5    Withholding**.  The Company is authorized to deduct and withhold from payments and distributions any amounts required to be deducted or withheld under applicable Law.  All amounts deducted or withheld with respect to any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was deducted or withheld pursuant to Section 6.2 or Section 8.2, as applicable, for all purposes under this Agreement.  Neither the Company nor any of its officers, directors or agents shall be liable for any over-withholding in respect of any Member's Membership Interest, and, in the event of such over-withholding, a Member's sole recourse shall be to apply for a refund from the appropriate Governmental Authority.

**ARTICLE VII**
**TRANSFER OF INTERESTS AND ADMISSION OF MEMBERS**

**7.1    Transfers of Membership Interests**.

(a)    Restriction on Transfer.  The Members may Transfer any Units, except as prohibited by any provision of this Agreement, including Section 7.1(b).  The Members and beneficial owners (as such term is used in Rule 13d-3 under the Exchange Act) of any Units shall not Transfer any Units (or beneficial ownership therein) in violation of this provisions of this Agreement.  Any attempt to Transfer any Units or beneficial ownership in any Units in violation of the provisions of this Agreement, including this Article VII, shall be null and void *ab initio* and the Company shall not register or effect any such Transfer.

(b)    No Transfer shall be permitted if (i) such Transfer would violate the Securities Act or any state securities or "blue sky" laws applicable to the Company or to the Units to be Transferred, (ii) such Transfer would impose liability or reporting obligations on the Company or any Member under the Exchange Act or would otherwise require the Company or any Member to make any filing with the Securities and Exchange Commission, (iii) such Transfer would, individually or together with other concurrently proposed Transfers, cause the Company to be regarded as an "investment company" under the Investment Company Act, (iv) following such proposed Transfer, the Company would have either (x) in the aggregate, more than nineteen hundred (1,900) holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (y) in the aggregate, more than four hundred and fifty

27

(450) holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act or (v) the transferor and transferee have failed to comply with Section 4.1(e) or the Company has not received an executed Joinder in a form reasonably acceptable to the Company (determined, in the case of each of the foregoing, in the Company's sole discretion) and, if requested by the Company, an opinion of counsel or other evidence reasonably requested by the Company in connection with the foregoing.  In addition, no Transfer shall be permitted if such Transfer is to a Competitor, other than any Transfer pursuant to a Drag-Along Disposition Transaction or a Company Sale, without the prior consent of the Board of Directors.  Each Member further acknowledges that, to the extent such Member is an "underwriter" (as defined in Section 1145(b)(1) of the Bankruptcy Code), such Member may not be able to Transfer any Units in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder.

**7.2**     **Resignation or Withdrawal of Members**.  A Member does not have any right to resign, dissociate, or withdraw such Member's capital from the Company, except that a Member shall cease to be a Member upon the Transfer of all of such Member's Membership Interests.  In furtherance of the foregoing, no Member shall be entitled to any distribution under section 18-604 of the Act or any other provision of the Act whether upon the withdrawal of such Member from the Company or otherwise.  A Member shall cease to be a member of the Company upon the bankruptcy or involuntary dissolution of such Member as provided in Section 18-304 of the Act; provided that thereafter any such former Member shall only be entitled to the economic rights of an assignee of membership interests under the Act.

**7.3**     **Drag-Along Right**.

(a)     If any Drag-Along Triggering Holder proposes to Transfer Units representing a Percentage Interest of 50% or more, other than in a Drag-Along Exempt Transaction, or to otherwise effect a Company Sale, to any *bona fide* third party or parties that are not Affiliates of any such Drag-Along Triggering Holder (collectively, "Drag-Along Purchasers" and such transaction a "Drag-Along Disposition Transaction"), the Drag-Along Triggering Holders shall have the right to require each other Member (collectively, the "Drag-Along Members") to Transfer to the Drag-Along Purchasers such number of outstanding Units owned by each such Drag-Along Member determined in accordance with this Section 7.3, or vote its Common Units and take any other actions in furtherance thereof on the same terms and conditions applicable to the Drag-Along Triggering Holders.  The Drag-Along Triggering Holders shall send a written notice (a "Drag-Along Notice") to each other Member not less than ten (10) Business Days prior to the date upon which such sale or disposition is scheduled to close.  Each Drag-Along Notice shall (i) specify in reasonable detail all the terms and conditions (including purchase price) upon which such Drag-Along Disposition Transaction is to occur, and (ii) make reference to this Section 7.3 and state that each Drag-Along Member is obligated to Transfer its Drag-Along Units pursuant to such Drag-Along Disposition Transaction subject to the terms of this Section 7.3.  A "Drag-Along Exempt Transaction" shall mean any Transfer or proposed Transfer (x) to an Affiliate of the transferring Member, (y) to another Member (who is a Member prior to such Transfer) or (z) in connection with an IPO.

(b)     In connection with any Drag-Along Disposition Transaction, each Drag-Along

Member shall be required to sell or dispose of the number of Units (the "Drag-Along Units") requested by the Drag-Along Triggering Holders, which (i) may be equal to 100% of the Units held by any Drag-Along Members with a Percentage Interest (in the aggregate with all Affiliates of such Drag-Along Member) less than or equal to 1% (provided that any request pursuant to this clause (i) shall apply to all Drag-Along Members with a Percentage Interest (in the aggregate with all Affiliates of such Drag-Along Member) less than or equal to such percentage), and (ii) shall otherwise be based on a percentage of such Drag-Along Member's total Units that is no greater than the percentage of the Units held by the Drag-Along Triggering Holders that are being sold or disposed of by the Drag-Along Triggering Holders (calculated in the aggregate for all Drag-Along Triggering Holders). Each Drag-Along Member shall receive as consideration upon such Drag-Along Disposition Transaction for its Units or Equity Securities the same amount and type of consideration per Unit, on the same terms and conditions as are applicable to the Units to be sold by the Drag-Along Triggering Holders. Each Drag-Along Member shall execute the applicable transaction agreement and shall agree severally and not jointly to the same covenants, representations and warranties, escrow arrangements and holdback arrangements as the Drag-Along Triggering Holders agree to in connection with the Drag-Along Disposition Transaction. Each Drag-Along Triggering Holder and Drag-Along Member shall bear a *pro rata* share of the fees and expenses incurred by the Company in connection with any Drag-Along Disposition Transaction, in each case based on the proceeds to be received by such Drag-Along Member or Drag-Along Triggering Holder. To the extent any Drag-Along Member is required to provide indemnification in connection with the Drag-Along Disposition Transaction, the indemnification obligations of such Drag-Along Member shall be (x) several and not joint, (y) no less favorable to such Drag-Along Member than that resulting from *pro rata* indemnification among all the Drag-Along Members (other than with respect to indemnification arising from breaches of customary representations relating to such Drag-Along Member's ownership of Units and authority) and the Drag-Along Triggering Holders based on the proceeds to be received by such Drag-Along Member or Drag-Along Triggering Holder in the Drag-Along Disposition Transaction and (z) limited to the aggregate proceeds received by such Drag-Along Member in such Drag-Along Disposition Transaction. Each Member agrees to waive or cause to be waived any dissenters' rights, appraisal rights or similar rights and all claims of fiduciary duty breach in connection with such Drag-Along Disposition Transaction. No Member shall be subject to (or be required to agree to) any non-competition, non-solicitation or similar restrictive covenants in connection with any Drag-Along Disposition Transaction. Each Member shall, in connection with any Drag-Along Disposition Transaction, use their commercially reasonable efforts to obtain any required consents, and shall take any and all other actions that are reasonably necessary in furtherance of the Drag-Along Disposition Transaction, including granting to the Company (A) an irrevocable proxy coupled with an interest to vote, including in any action taken by written consent, such Member's Units to approve any Drag-Along Disposition Transaction and (B) an irrevocable power of attorney coupled with an interest to execute and deliver in the name and on behalf of such Member all such agreements, instruments and other documentation as is required to transfer such Member's Units; provided that the Company may exercise the proxy and power of attorney granted by each Member pursuant to clauses (A) and (B) at any time as may be necessary to consummate a Drag-Along Disposition Transaction only if such Member fails to comply with the provisions of this Section 7.3(b) within five (5) days of receiving notice of any such request. Notwithstanding anything in this Section 7.3, the Members agree that the

29

foregoing agreements by the Members shall not prohibit any Member from raising or pursuing any claim that a purported Drag-Along Disposition Transaction does not comply with this Section 7.3 or this Agreement.

  **7.4**  **Tag-Along Rights**.  If any Member or group of Members (for purposes of this Section 7.4, in each case, collectively the "Selling Investor") propose to Transfer Common Units representing a Percentage Interest of 50% or more, in a single transaction or a series of related transactions (other than in a Tag-Along Exempt Transaction), to any Person (a "Tag-Along Sale"), the Selling Investor must provide the Company and each other Member with written notice (a "Tag-Along Notice") of such Tag-Along Sale, which notice must state (a) the identity of the Selling Investor(s), (b) the identity of the proposed purchaser of the Common Units, (c) the number of Common Units proposed to be Transferred by each Selling Investor and (d) the proposed purchase price and form of consideration and payment in such Tag-Along Sale, including a calculation of the consideration to be received per Common Unit, and all other material terms and conditions of the proposed Tag-Along Sale.  Subject to the terms of this Section 7.4, each Member that is not a Selling Investor shall have the right to participate in the proposed Tag-Along Sale by Transferring, at the same price and on the other terms and conditions specified in the Tag-Along Notice, up to the same percentage of such Member's Common Units as the percentage of the Selling Investor's Common Units (calculated on an aggregate basis for all Selling Investors) proposed to be Transferred in the Tag-Along Sale.  In order to participate in the Tag-Along Sale, a Member must deliver a written notice to the Selling Investor (the "Tag-Along Holder Notice") during the ten (10) Business Day period after the date of delivery of the Tag-Along Notice, which Tag-Along Holder Notice shall state the number of Units such Member proposes to include in the Tag-Along Sale (which shall not exceed the maximum amount computed in accordance with the terms set forth herein).  If the proposed purchaser elects to purchase less than all of the Common Units offered for sale specified in the Tag-Along Holder Notices and by the Selling Investor(s), then each Member that has delivered a valid Tag-Along Holder Notice shall have the right to include its *pro rata* portion of the Common Units to be Transferred to such purchaser on the same terms and conditions as the Selling Investor(s) in exchange for a *pro rata* portion of consideration to be received by the Selling Investor(s).  Each Member delivering a Tag-Along Holder Notice shall agree, severally and not jointly, to the same covenants, representations and warranties as the Selling Investor(s) agree to in connection with the Tag-Along Sale (provided that no Member shall be subject to (or be required to agree to) any non-competition, non-solicitation or similar restrictive covenants in connection with any Tag-Along Sale).  To the extent any Transferring Member is required to provide indemnification in connection with the Tag-Along Sale, the indemnification obligations of such Member shall be (i) several and not joint, (ii) no less favorable to such Member than that resulting from *pro rata* indemnification among all the Transferring Members (including the Selling Investor(s)) based on the proceeds to be received by such other Members (including the Selling Investor(s)) in the Tag-Along Sale and (iii) limited to the fair market value of the cash, property or other assets received by such Member in such Tag-Along Sale.  A "Tag-Along Exempt Transaction" shall mean any Transfer or proposed Transfer (v) to an Affiliate of the Transferring Member, (w) to another Member (who is a Member prior to such Transfer), (x) if the Member is an individual, to the spouse, domestic partner, sibling, child or other lineal descendant of such Member (including adoptive relationships and stepchildren) and the spouses of each such natural person, (y) in a transaction subject to the provisions of Section 7.3 or (z) in connection with an IPO.  The provisions of this Section 7.4 shall apply, *mutatis mutandis*, in the

event the Company issues Units other than Common Units.

## ARTICLE VIII
## DISSOLUTION AND LIQUIDATION OF THE COMPANY

**8.1    Dissolution Events**.  This Section 8.1 sets forth the exclusive events which will cause the dissolution of the Company.  The provisions of Section 18-801 of the Act that apply unless the Agreement otherwise provides shall not be operative.  The Company shall be dissolved upon any of the following events (each a "Dissolution Event"):

(a)    The approval of the Board of Directors to dissolve the Company; or

(b)    The entry of a decree of judicial dissolution under Section 18-802 of the Act.

The dissolution of the Company pursuant to this Section 8.1 shall be effective on the date such Dissolution Event occurs, but the Company shall not terminate until the Company Assets have been distributed as provided herein.  Except as provided in this Section 8.1, the Company shall not dissolve due to the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or under any other circumstances described, or to which reference is made, in section 18-801 of the Act.  Notwithstanding anything to the contrary in this Agreement, no Member shall (i) resign from the Company prior to the dissolution and winding up of the Company except in connection with a Transfer of Units pursuant to the terms of this Agreement, or (ii) take any action to dissolve, terminate or liquidate the Company or to require apportionment, appraisal or partition of the Company or any of its assets, or to file a bill for an accounting, except as specifically provided in this Agreement, and each Member, to the fullest extent permitted by applicable law, hereby waives any rights to take any such actions under applicable law, including any right to petition a court for judicial dissolution under Section 18-802 of the Act.

**8.2    Winding Up**.  Upon the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors, and the Members.  Under such circumstances the Board of Directors shall not take any action that is inconsistent with, or not necessary or appropriate for, the winding up of the Company's business and affairs.  To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall remain in full force and effect until such time as all of the Company Assets have been distributed or otherwise applied in the manner provided in this Section 8.2 and the Company is terminated in accordance with the Act.  The Board of Directors (or liquidator, as the case may be) shall be responsible for overseeing the winding up and dissolution of the Company and, in connection therewith, shall take full account of the Company's liabilities and Company Assets, shall cause the Company Assets to be liquidated as promptly as is consistent with obtaining the fair value thereof and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order and priority:

(a)    Creditors.  First, to the payment (or reasonable provision therefor) of all of the Company's debts and liabilities to the creditors of the Company (including any Members who are creditors) in the order of priority provided by Law, with the Board of Directors making

31

provision for their payment or satisfaction (which may include establishing such Reserves as the Board of Directors (or liquidator, as the case may be) may deem necessary for the payment of any obligations or contingent liabilities of the Company), and the Board of Directors (or liquidator) may hold such Reserves for such period that it deems advisable for the payment of such obligations and liabilities as they become due and, at the expiration of such period, the balance of such Reserves, if any, shall be distributed as provided in <u>Section 8.2(b)</u>; and

(b)        <u>Members</u>.  Second, a reasonable period of time shall be allowed for the orderly termination of the Company's business, discharge of its liabilities, and distribution or liquidation of the remaining assets so as to enable the Company to minimize the normal losses attendant to the liquidation process.  Upon satisfaction (whether by payment or the making of reasonable provision for payment) of the Company's liabilities, the Company's property and assets or the proceeds from the liquidation thereof shall be applied and distributed in accordance with  <u>Section 6.2</u>.

(c)        A full accounting of the assets and liabilities of the Company shall be taken and a statement thereof shall be furnished to each Member within thirty (30) days after the distribution of all of the Company Assets.  Such accounting and statements shall be prepared under the direction of the Board of Directors.

**8.3      Certificate of Cancellation**.  Upon the dissolution and commencement of the winding up of the Company, the Board of Directors shall cause a Certificate of Cancellation to be executed on behalf of the Company and filed with the Secretary of State of Delaware, and the Board of Directors shall cause the execution, acknowledgement and filing of any and all other instruments necessary or appropriate to reflect the dissolution of the Company.

**ARTICLE IX**
**WAIVERS; INDEMNIFICATION; LIMITATION OF LIABILITY**

**9.1      Duties and Obligations**.

(a)        <u>Waiver of Duties</u>.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person, who instead shall be subject only to the express contractual standards set forth herein.  Each of the Members and the Company hereby waives, to the fullest extent permitted by applicable Law, any and all duties, including fiduciary duties, that, absent such waiver, may be implied by applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Company and the Members to replace such other duties and liabilities of a Covered Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's discretion or under a grant of similar authority or latitude), such Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests (or, in the case of an Investor Group Director, the Principal Investor that appointed such Director), and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  A

Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon opinions, reports, statements and other information presented to them or the Company by any Director, officer or employee of the Company or any of the Company's Subsidiaries or by any other Person, as to matters such Covered Person reasonably believes are within that Person's competence, including opinions, reports, statements or other information pertaining to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions might properly be paid.

(b)      Exculpation.  To the fullest extent permitted under the Act and applicable law, none of the organizer of the Company, any Person appointed to liquidate the Company in accordance with this Agreement, any Director or former Director, officer or former officer, or Member, or any of their respective Affiliates, officers, directors, employees, partners, members, representatives or equity holders, or any director, former director, officer or former officer of any Subsidiary of the Company (each of the foregoing a "Covered Person" and collectively, the "Covered Persons") will be liable to the Company or any other Covered Person for any Loss incurred by reason of any action taken or omitted to be taken by such Covered Person, so long as such actions or omissions do not constitute a violation of the implied contractual covenant of good faith and fair dealing.

(c)      Officers. Notwithstanding anything else to the contrary in this Section 9.1, all officers of the Company shall owe the Company and its Members the same fiduciary duties as are owed by an officer of a corporation incorporated under the Laws of the State of Delaware to such corporation and its shareholders under applicable Delaware Law; provided that, for the avoidance of doubt, if a Person is an officer and a Director, the foregoing shall not in any event limit the application of Section 9.1(a) and Section 9.1(b) to such Person, when acting in their capacity as a Director.

(d)      Severability.  If this Section 9.1 or any portion of it shall be invalidated on any ground by any court of competent jurisdiction, then the duties and personal liability of each Member and each Director to the Company, any of the Members or any other Covered Person (other than an officer or former officer of the Company, in such capacity) shall be eliminated to the greatest extent permitted under the Act.

**9.2      Indemnification**.

(a)      General.  Subject to Section 9.2(b) and the limitations set forth therein, the Company, to the fullest extent permitted under applicable Law, shall release, hold harmless, defend and indemnify (collectively, for purposes of this Section 9.2, "indemnify") each Covered Person from any Loss incurred or suffered by such Covered Person, as a party or otherwise, that in any way relates to, or arises out of, or is alleged to relate to or arise out of, any action, inaction or omission on the part of the Company or that Covered Person acting on behalf of the Company or the Members.

(b)      Limitations.  Notwithstanding anything in Section 9.2(a) to the contrary, the Company is not required to indemnify a Covered Person under this Section 9.2 to the extent that the Loss results from such Covered Person's actual fraud or willful misconduct, as determined

33

by a final, non-appealable order of a court of competent jurisdiction. The termination of any action, suit or proceeding by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person engaged in any action or inaction that constituted actual fraud or willful misconduct. The indemnification obligations of the Company pursuant to this <u>Section 9.2</u> shall be satisfied from and limited to Company Assets and no Covered Person shall have any personal liability on account thereof.

(c)     <u>Advancement of Expenses</u>. To the fullest extent permitted by law, expenses incurred by a Covered Person in defending any claim, demand, action, suit or proceeding subject to this <u>Section 9.2</u> will, promptly upon request by the Covered Person, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to promptly reimburse the Company for those advances to the extent that the Covered Person ultimately is found to not be entitled to indemnification under this <u>Section 9.2</u>.

(d)     <u>Nonexclusivity of Rights</u>. The right to indemnification and the advancement and payment of expenses conferred under this <u>Section 9.2</u> shall not be exclusive of any other right that a Covered Person may have or hereafter acquire under Law, this Agreement or otherwise. Notwithstanding anything herein to the contrary, the indemnification obligations set forth in Article V.B of the Plan of Reorganization are incorporated herein by reference and shall remain in full force and effect and be continuing obligations of the Company and its Subsidiaries and shall survive unimpaired and unaffected, irrespective of when such obligations arose, and not be limited, reduced or adversely affected or terminated, including pursuant to any amendment, modification or restatement of this Agreement after the Emergence Date.

(e)     <u>Indemnitor of First Resort</u>. Certain Covered Persons that are directors, officers, employees, stockholders, partners, limited partners, members, equityholders, managers or advisors of any Member or any of such Member's Affiliates or that are otherwise Directors (each such Person, a "<u>Fund Indemnitee</u>") may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of such Member and/or its Affiliates or such Fund Indemnitees personally (collectively, the "<u>Fund Indemnitors</u>"). Notwithstanding anything to the contrary in this Agreement or otherwise: (i) the Company is the indemnitor of first resort (*i.e.*, the Company's obligations to each Fund Indemnitee are primary and any obligation of the Fund Indemnitors to advance in respect of a Loss or to provide indemnification for such Losses incurred by each Fund Indemnitee are secondary), (ii) the Company shall be required to advance the full amount of Losses incurred by each Fund Indemnitee and will be liable for the full amount of all such Losses paid in settlement to the extent legally permitted and as required by this Agreement, without regard to any rights each Fund Indemnitee may have against the Fund Indemnitors, and (iii) the Company irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by the Fund Indemnitors on behalf of a Fund Indemnitee with respect to any claim for which such Fund Indemnitee has sought indemnification or advancement of Losses from the Company shall affect the foregoing and the Fund Indemnitors will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the

34

rights of recovery of such Fund Indemnitee against the Company.  The Fund Indemnitors are express third party beneficiaries of the terms of this Section 9.2(e).

(f)  Insurance.  The Company shall maintain directors' and officers' insurance on customary terms at all times from and after the Emergence Date.

(g)  Amendment or Repeal.  The rights to exculpation, indemnification and advancement of expenses conferred upon any Covered Person shall be contract rights, vested or shall vest when such person became or becomes a Covered Person, and shall continue as vested contract rights even if such person ceases to be a Covered Person.  Any amendment, repeal or modification of, or adoption of any provision inconsistent with, Section 9.1 or this Section 9.2 hereof shall not adversely affect any right to exculpation, indemnification or advancement of expenses granted to any Covered Person pursuant hereto with respect to any act or omission of such Covered Person, or impose any additional or more stringent fiduciary or other duties with respect to any act or omission of such Covered Person, in each case occurring prior to the time of such amendment, repeal, modification or adoption (regardless of whether the proceeding relating to such acts or omissions, or any proceeding relating to such Covered Person's rights to exculpation, indemnification or to advancement of expenses, is commenced before or after the time of such amendment, repeal, modification or adoption), and any such amendment, repeal, modification or adoption that would adversely affect such Covered Person's rights to exculpation, indemnification or advancement of expenses hereunder shall be ineffective as to such Covered Person with respect to any such acts, omissions or time period prior to such amendment, repeal, modification or adoption.  The rights provided hereunder shall inure to the benefit of any Covered Person and such person's heirs, executors and administrators, all of whom (notwithstanding anything to the contrary contained herein), shall be express third party beneficiaries of Section 9.1 and this Section 9.2 of this Agreement with the right to enforce the same as if they were parties hereto.

9.3    **Waiver of Opportunities**.  Each Member acknowledges and affirms that the other Members, the Directors and their respective Affiliates and representatives may have, and may continue to participate in, directly or indirectly, investments in assets or businesses that are, or will be, suitable for the Company or competitive with the Company's businesses.  Each Member expressly acknowledges and agrees that (a) no Member, Director or any of their respective Affiliates or representatives, including in such capacities, shall have any duty to disclose to the Company or any other Member any such business opportunities and each Member and the Company renounces any expectancy or interest in such business opportunities, whether or not competitive with the Company's businesses and whether or not the Company might be interested in such business opportunity for itself, and (b) no Member, Director or any of their respective Affiliates or representatives shall be obligated to account to the Company or to any other Member for any profits or income earned or derived from other such activities or businesses.

9.4    **Limitation on Liability**.  Except as required by applicable Law, no Covered Person shall be liable for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.  No Member shall be obligated to make any additional capital contribution to the Company.

35

## ARTICLE X
## AMENDMENTS; TERMINATION

**10.1    Amendments**. This Agreement and the Certificate of Formation may be amended, modified or supplemented, and any provision of this Agreement may be waived, from time to time only with the written approval of the Board of Directors, except that:

(a)    any amendments, modifications, supplements or waivers of this Agreement or the Certificate of Formation that by their terms are disproportionately and materially adverse to any group of Members (the "Impacted Members") as compared to all other Members shall also require the prior written consent of Impacted Members holding in excess of 50% of the Common Units held by all Impacted Members, other than amendments, modifications, supplements or waivers to cure or clarify any ambiguity or typographical or clerical mistake, implement any clerical, ministerial or administrative or typographical changes or to provide for rights granted to any new or existing Member in connection with the issuance of Equity Securities of the Company to such new or existing Member; provided that (i) such Equity Securities are otherwise issued in compliance with this Agreement and the Certificate of Formation and (ii) such rights do not discriminate among the existing Members;

(b)    any amendments, modifications, supplements or waivers of this Agreement or the Certificate of Formation that would (i) require any Member to make any additional capital contributions to the Company or (ii) adversely affect the rights or obligations of any Member set forth in Section 5.2, Section 7.3, Section 7.4, Section 9.1, Section 9.2, this Section 10.1(b) or Section 11.4 of this Agreement or Annex A to this Agreement, shall require the prior written consent of such affected Member(s), other than amendments, modifications, supplements or waivers (x) to cure or clarify any ambiguity or typographical or clerical mistake, implement any clerical, ministerial or administrative or typographical changes applicable to all Members and (y) that have no economic impact on such Member and are not material to the interests of such Member;

(c)    any amendments, modifications, supplements or waivers of this Agreement that would adversely affect the rights or obligations of any Principal Investors or of the Other 1.5L Noteholders set forth in Section 3.2 shall require the prior written consent of such affected Principal Investor(s) or the Other 1.5L Noteholders; and

(d)    any amendments, modifications, supplements or waivers to Section 3.2(b)(i)(F) shall, as long as the aggregate Governance Percentage Interest of the Principal Investors is not greater than or equal to 85%, require the prior written consent of Members holding in excess of 50% of the Common Units held by all Members other than the Principal Investors.

**10.2    Termination**.

(a)    The rights and obligations set forth in Section 4.4, Section 7.1(b) (with respect to a Transfer to a Competitor), Section 7.3 and Section 7.4 shall terminate upon the earliest to occur of:  (i) the consent of Members with a Percentage Interest in excess of 80%, (ii) the occurrence of an IPO, (iii) the dissolution, liquidation or winding up of the Company in accordance with the terms of this Agreement and (iv) the consummation of a Drag-Along

Disposition Transaction in accordance with the terms of this Agreement in which all of the Members participate, either as Drag-Along Triggering Holders or Drag-Along Members (the earliest to occur of the foregoing, a "Specified Termination Event").

(b)     From and after the occurrence of a Specified Termination Event (and until further amended in accordance with this Agreement), Section 3.2 shall read as follows: "The Board of Directors shall be composed of such persons as may be elected by Members with a Percentage Interest greater than 50% from time to time.  The number of Directors constituting the entire Board of Directors may be increased or decreased from time to time by Members with a Percentage Interest greater than 50% from time to time (provided that the number of Directors may not be reduced below the number of Directors then in office at the time of the applicable action).  Each Director shall hold office until his or her respective successor is elected, or until his or her earlier death or resignation or removal in accordance with this Section 3.2.  Directors need not be Members of the Company.  Each Director shall disclose to the Company all board of directors, or similar governing body, of other entities on which such Director serves during the term of their service as a Director.  A Director may be removed, with or without cause, and any vacancy on the Board of Directors may be filled, at any time by Members with a Percentage Interest greater than 50% from time to time.  The Board of Directors shall have a Chairperson as selected by a majority of the Board of Directors.  The Chairperson shall preside when present at all meetings of the Board of Directors and members; provided that the Chairperson may delegate presiding over meetings to another Director.  The Chairperson shall have such powers and duties as designated in accordance with this Agreement and as from time to time may be assigned by the Board of Directors."

(c)     From and after the occurrence of a Specified Termination Event (and until further amended in accordance with this Agreement), Section 3.3 shall read as follows: "The presence of a majority of the total number of Directors then in office (with respect to any meeting of the Board of Directors) or the total number of Directors that are members of any committee of the Board of Directors (with respect to any meeting of such committee) shall be needed to constitute a quorum.  No action may be taken at a meeting of the Board of Directors or any committee of the Board of Directors unless a quorum is present."

## ARTICLE XI
## MISCELLANEOUS

**11.1    Records**.  The records of the Company will be maintained at the Company's principal place of business or at such other place as the Company shall select; provided that the Company keep at its principal place of business the records required by the Act to be maintained there.  Each Member, at its expense, may inspect and make copies of the records maintained by the Company.

**11.2    Notices**.  All notices and other communications to be given to any party pursuant to this Agreement shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service, or five days after being mailed by certified or registered mail, with appropriate postage prepaid, or when received in the form of email transmission (receipt confirmation requested), and shall be directed to the address set forth on Schedule 1 for such party, or to the Company at the address set forth below.  The Company

will update the notice information set forth on Schedule 1 for any party upon receipt of notice given to the Company pursuant to this <u>Section 11.2</u> by such party, and may update the notice address for the Company set forth below by giving notice to the other parties to this agreement pursuant to this <u>Section 11.2</u>.

> [Reorganized Curo]
> 101 N. Main Street, Suite 600
> Greenville, SC 29601
> Attention: General Counsel

**11.3    Further Action**.  Each Member, upon the request of the Company, agrees to perform all further acts and execute, acknowledge, or deliver any instruments or documents and to perform such additional acts as the Company may reasonably deem to be necessary, appropriate or desirable to carry out the provisions of this Agreement.

**11.4    Information Rights**.

(a)    Subject to <u>Section 11.4(f)</u>, each Member shall be entitled to receive, and the Company shall make available, the following reports in a timely manner as described below:

(i)    within 150 days after the end of each Fiscal Year (commencing with the Fiscal Year ending December 31, 2024), audited annual consolidated financial statements of the Company and its Subsidiaries, certified by a national accounting firm and prepared in accordance with GAAP;

(ii)    within seventy-five (75) days after the end of each of the first three fiscal quarters of each Fiscal Year (commencing with the fiscal quarter ending [●], 2024), unaudited quarterly condensed consolidated financial statements of the Company and its Subsidiaries, prepared in accordance with GAAP and with respect to which a national accounting firm has conducted customary procedures; and

(iii)    within five (5) Business Days of approval thereof by the Board of Directors, a copy of the annual budget of the Company as prepared by management of the Company.

(b)    The information and reports to be provided pursuant to <u>Section 11.4(a)</u> shall, to the extent permitted, be made available to each Member and each of a Member's qualifying prospective Transferees, as applicable, through an online data room maintained by the Company.

(c)    The Company shall invite Members to join any conference calls that the Company holds for its lenders to discuss the Company's annual and fiscal results.

(d)    Each Member acknowledges that the information made available pursuant to this <u>Section 11.4</u>, including on any conference call pursuant to <u>Section 11.4(c)</u>, may include material non-public information concerning the Company and its Subsidiaries, and agrees that it will handle such information in accordance with applicable Law, including applicable securities Laws, and in accordance with <u>Section 11.17</u> of this Agreement.

(e)     Each Initial Member shall be permitted to transfer the information rights set forth in this <u>Section 11.4</u> to any transferee in any Transfer of Units that is otherwise permitted under this Agreement (provided that the transferring Initial Member may also maintain its rights set forth in this <u>Section 11.4</u> to the extent that it continues to hold Common Units).

(f)     The Company shall not have any obligations pursuant to this <u>Section 11.4</u> to provide, furnish or give access to any information to any Competitor.

(g)     As long as the Governance Percentage Interest of Oaktree is 10% or more, at Oaktree's request, the management team of the Company shall be made reasonably available to, and meet during normal business hours with, members or representatives of the portfolio transformation team of Oaktree (the "<u>Oaktree Portfolio Transformation Team</u>") to discuss matters related to the Company's business.  The Company shall reimburse such members or representatives of the Oaktree Portfolio Transformation Team for reasonable out-of-pocket expenses incurred by them in connection with such meetings, including travel expenses, it being understood that neither Oaktree nor such members or representatives of the Oaktree Portfolio Transformation Team shall otherwise be entitled to any management or other fees in connection with such meetings or any services rendered by Oaktree or the Oaktree Portfolio Transformation Team in connection therewith.

**11.5**    **Survival of Rights**.  Except as provided herein to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**11.6**    **Specific Performance**.  The Company and each Member agree that the Company and the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached and that monetary damages (even if available) would not provide an adequate remedy in such event. Accordingly, the Company and each Member acknowledge and agree that, in addition to any other remedy to which the Company may be entitled by Law or at equity, the Company and each Member shall be entitled to seek injunctive relief to prevent or remedy breaches or threatened breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof.  The Company and each Member agree that they shall not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the Company or any other Member has an adequate remedy at Law or that any such award is not an appropriate remedy for any reason at Law or in equity.  Any Party seeking an injunction or injunctions to prevent breaches or threatened breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such remedy.

**11.7**    **References to this Agreement; Headings; Scope**.  Unless otherwise indicated, "Articles," "Sections," "Subsections," "clauses" and "paragraphs" mean and refer to designated Articles, Sections, Subsections, clauses and paragraphs of this Agreement.  Words such as "herein," "hereby," "hereinafter," "hereof," "hereto," and "hereunder" refer to this Agreement as a whole, unless the context indicates otherwise.  All headings in this Agreement are for convenience of reference only and are not intended to define or limit the scope or intent of this Agreement.  This Agreement, including the schedules and annexes hereto, together with the Plan of Reorganization and any subscription agreements entered into between the Members and the

Company, constitutes the entire understanding of the Members with respect to the subject matter hereof and supersedes all prior understandings and agreements in regard hereto. All exhibits, schedules, instruments and other documents referred to herein, and as the same may be amended from time to time, are by this reference made a part hereof as though fully set forth herein.

**11.8    Construction**. Common nouns and pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person, Persons or other reference in the context requires. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member. Any reference to the Act, Code or other statutes, Laws, or regulations (including the Regulations), forms or schedules shall include the amendments, modifications, or replacements thereof. Whenever used herein, "or" shall include both the conjunctive and disjunctive, "any" shall mean "one or more," and "including" shall mean "including without limitation."

**11.9    Validity of Agreement; Severability**. Every provision of this Agreement is intended to be severable. If any provision hereof is illegal, invalid or unenforceable for any reason whatsoever, such provision will be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision were not a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the invalid or unenforceable provision or by its severance from this Agreement. Further, in lieu of such illegal, invalid or unenforceable provision, there will be automatically, as part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable. In the event the Act or other controlling Law is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the date provided in such interpretation or amendment or in the event the interpretation or amendment does not otherwise provide, from the effective date of such interpretation or amendment.

**11.10    No Third Party Beneficiaries**. This Agreement is made solely and specifically among and for the benefit of the Company and the Members and their respective successors and assigns, and no other Person, (a) unless express provision is made herein to the contrary (including (1) those provisions made applicable to Covered Persons and Fund Indemnitors under Article IX and (2) as set forth in <u>Section</u> 11.11) and (b) except as specifically provided in the Warrant Agreement or the CVR Agreement, shall have any rights, interests or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise. No creditor of the Company or of any Member will be entitled to require the Company to solicit or accept any loan or additional capital contribution or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**11.11   Tax Classification**.[1]  The Company shall be treated as an association taxable as a corporation for all U.S. federal (and applicable state and local) income tax purposes, unless each Principal Investor with a Governance Percentage Interest of at least 5% (or which previously held a Governance Percentage Interest of at least 5% at any time during which the Company would be treated as other than an association taxable as a corporation) determines otherwise (it being agreed and understood that any former Principal Investor which previously held a Governance Percentage Interest of at least 5% at any time during which the Company would be treated as other than an association taxable as a corporation shall be a third party beneficiary of this Section 11.11).  Each officer of the Company is authorized to make an election pursuant to Regulations Section 301.7701-3(c) to effect the intended classification.

**11.12   Governing Law**.  The Laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members without regard to the principles of conflict of laws; provided, however, that the foregoing shall not be construed so as to restrict in any manner the ability of the Company to enforce any judgment obtained in any court of competent jurisdiction.

**11.13   Jurisdiction**.  To the maximum extent permitted by Law, each party to this Agreement hereby irrevocably agrees that any legal action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby (whether brought by any party or any of its Affiliates or against any party or any of its Affiliates) shall be brought in the Court of Chancery of the State of Delaware or, if such court shall not have jurisdiction, any federal court located in the State of Delaware, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, to the maximum extent permitted by Law, each party hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the address set forth under, or in accordance with, Section 11.2, such service to become effective ten (10) days after such mailing.

**11.14   Cumulative Remedies**.  Each right, power and remedy of the Company and each Member provided herein or which exists by Law shall be cumulative and in addition to every other right, power or remedy the Company or such Member, as the case may be, may have.

---

[1] Note to Draft:  In the event that the Company is intended to be classified as a partnership for U.S. federal income tax purposes, provisions relevant to a partnership for U.S. federal income tax purposes will be added to this LLC Agreement, and this Section 11.11 will be adapted to reflect such intended classification.

**11.15  Counterpart Execution**.  This Agreement may be executed in any number of counterparts, including by facsimile signature or other electronic transmission, with the same effect as if the Members and the Company had signed the same document.

**11.16  No Implied Waiver**.  The Members and the Company shall have the right at all times to enforce the provisions of this Agreement in strict accordance with the terms hereof, and no waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver constitute a continuing waiver unless otherwise provided in writing.

**11.17  Confidentiality**.

(a)        Except as and to the extent as may be required by applicable law, Governmental Authorities or regulatory examinations, without the prior written consent of the Board of Directors, the Members shall not make, and shall direct their officers, directors, agents, employees and other representatives not to make, directly or indirectly, any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of Confidential Information or any of the terms, conditions or other aspects of this Agreement; provided, however, that the Members and their respective equity owners may disclose Confidential Information (i) to their respective investors, limited partners or other similar Persons of the Members and their respective Affiliates, as applicable, who are subject to obligations of confidentiality, and in confidential materials delivered to prospective investors, limited partners or other similar Persons of the Members and their Affiliates, as applicable, who are subject to obligations of confidentiality; provided that the Members will use commercially reasonable efforts to, or cause their Affiliates to, enforce their respective rights in connection with a breach of such confidentiality obligations by any Person receiving Confidential Information pursuant to this clause (i); (ii) to a *bona fide* potential purchaser of Units held by such Member if such *bona fide* potential purchaser executes a confidentiality agreement with such Member containing terms at least as protective as the terms set forth in this Section 11.17 and which, among other things, provides for third-party beneficiary rights in favor of the Company to enforce the terms of such agreement; and (iii) to such Members' and its Affiliates' respective directors, officers, employees, agents and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors), in each case who have been advised as to the obligations of confidentiality set forth in this Agreement and who is not a Competitor. As used in this Agreement, "Confidential Information" means all information, knowledge or data relating to the business, operations, finances, policies, strategies, intentions or inventions of the Company (including any of the terms of this Agreement and any information provided pursuant to Section 11.4) from whatever source obtained, except for any such information, knowledge, systems or data which at the time of disclosure was in the public domain or otherwise in the possession of the disclosing Person unless such information, knowledge or data was placed into the public domain or became known to such disclosing Person in violation of any non-disclosure obligation, including this Section 11.17.  Each Member agrees that money damages would not be a sufficient remedy for any breach of this Section 11.17 by a Member, and that in addition to all other remedies, the Company shall be entitled to injunctive or other equitable relief as a remedy for any breach or threatened breach of this provision.  Each Member agrees not to oppose the granting of such relief and agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.  If any Member is required by applicable Law to disclose any Confidential Information, it must, to the extent permitted by applicable Law, first provide

notice reasonably in advance to the Company with respect to the content of the proposed disclosure, the reasons that such disclosure is required by Law and the time and place that the disclosure will be made (provided that this requirement shall not apply to routine examinations by the applicable supervisory or regulatory body of a Member).  Such Member shall cooperate, at the Company's sole cost and expense, with the Company to obtain confidentiality agreements or arrangements with respect to any legally mandated disclosure and in any event shall disclose only such information as is required by applicable Law when required to do so.  Notwithstanding anything to the contrary in this Agreement, a Person who ceases to be a Member for purposes of this Agreement (as a result of a Transfer of all of its Units or otherwise) shall continue to be subject to the obligations set forth in this Section 11.17 for twelve months following the date on which such Person is no longer a Member.

(b)     The Company acknowledges that each of the Principal Investors is a multi-strategy investment firm and, in the ordinary course of business through separate platforms, engages in a variety of investing activities (including the provision of debt financing, the investment in and formation and operation of various operating companies and joint ventures, and the purchase and sale of securities and syndicated bank debt) and that nothing in this Agreement shall restrict such activities of such other platforms; provided that none of the Confidential Information is used or disclosed in connection therewith.  Each of the Principal Investors has in place compliance procedures, which monitor the receipt of Confidential Information and restrict the dissemination of Confidential Information to personnel of such Principal Investor and its affiliates who trade or may trade in the securities of the Company and/or its affiliates and certain other employees of the firm (collectively, the "Public Side Teams").  Accordingly, notwithstanding anything to the contrary in this Agreement, the Company acknowledges and agrees that, to the extent that the foregoing procedures are applied or an affirmative defense pursuant to paragraph (c) of the Rule 10b5-1 under the Exchange Act is applicable, this Agreement shall not in any way restrict or limit the activities of the Principal Investors, or any funds, accounts or other investment vehicles managed by them so long as they are not then in possession of Confidential Information and are not otherwise acting at the direction of any personnel who have received Confidential Information.

**11.18   IPO Matters**.  If any initial public offering of the Company's Equity Securities is approved by the Board of Directors, then the Company may effect a conversion, recapitalization, reorganization or exchange of securities of the Company or any portion of the Company or any Subsidiary of the Company into one or more corporations, limited liability companies, limited partnerships or other business entities in order to effect such initial public offering without the need for the approval of any Members or the holders of any Units; provided that each Member receives capital stock or other securities with substantially similar economic and other rights, privileges and preferences as those possessed by the Units held by the applicable Member immediately prior to the consummation of such transaction (other than to the extent otherwise provided in this Agreement).  The Company shall pay the reasonable, documented out-of-pocket expenses incurred by the Members in connection with such a conversion, recapitalization, reorganization or exchange, and the Members agree to enter into such agreement or agreements as may be necessary in order to preserve the rights and obligations of the Members hereunder as

in effect immediately prior to the consummation of such initial public offering (other than to the extent otherwise provided in this Agreement).

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the day and year first above written.

**COMPANY**:

[REORGANIZED CURO]

By:

_____

Name:
Title:

**SCHEDULE 1**

**MEMBERS INFORMATION**

**[To be attached]**

**SCHEDULE 2**

## **COMPETITORS**

[To be populated]

## SCHEDULE 3

## <u>INITIAL MEMBERS</u>

[To be attached]

Each Person not set forth above that (a) received Common Units on the Emergence Date pursuant to the Plan (for the avoidance of doubt, not including any issuances pursuant to the Management Incentive Plan), (b) is bound by this Agreement as a Member pursuant to the operation of the Plan and (c) that furnishes evidence, reasonably satisfactory to the Company, of such Person's beneficial ownership (including the power to vote and to control the disposition of such Common Units) as of the Emergence Date, including evidence of such beneficial ownership of shares held through the facilities of DTC.

## ANNEX A

## <u>REGISTRATION RIGHTS</u>

Section 1.1.    <u>Demand Registration Rights</u>.

(a)    Any Principal Investor or group of Principal Investors may request that the Company effect a registration of some or all of the Registrable Securities held by such Principal Investor(s) (<u>provided</u> that such Registrable Securities have an estimated fair market value of at least $50,000,000) on Form S-1 (or any successor form thereto) under the Securities Act in connection with a public offering of such Registrable Securities, as follows:  (i) following the completion of an IPO, on up to five (5) separate occasions, upon the written request of Members with an aggregate Governance Percentage Interest of not less than 9% or (ii) on or after the fifth anniversary of the Emergence Date, upon the written request of Principal Investors with an aggregate Governance Percentage Interest of not less than 40%.  Each request pursuant to this <u>Section 1.1(a)</u> shall be made in writing, and shall include the identity of the Requesting Investor(s) and the approximate number of Registrable Securities proposed to be included in the relevant registration.  The right of each Requesting Investor to have Registrable Securities included in an offering pursuant to this <u>Section 1.1(a)</u> shall be conditioned (if an underwritten offering) upon each Requesting Investor entering into (together with the Company) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the majority vote of the selling Principal Investors, with the consent of the Company (such consent not to be unreasonably withheld, delayed or conditioned) (the "<u>Company Underwriter</u>").  Subject to <u>Section 1.3</u>, the Company shall, at its own expense and as soon as reasonably practicable after such written request, but in any event within (x) ninety (90) days for a registration requested pursuant to clause (i) above and (y) 120 days for a registration requested pursuant to clause (ii) above, as applicable, after the date such request is given by the Requesting Investors, (A) file (or confidentially submit) a Registration Statement on Form S-1 (or any successor form thereto) for all Registrable Securities that the Company has been requested to register and (B) include in such offering the Registrable Securities of the other Members (other than the Requesting Investors) who have requested in writing to participate in such underwritten offering pursuant to <u>Section 1.2</u>.  The Company shall not be required to effect more than two (2) registrations requested pursuant to clause (i) of the first sentence of this <u>Section 1.1(a)</u> in any twelve-month period.  A registration shall not count against any of the limitations on the number of registrations pursuant to this paragraph until the applicable registration statement has become effective.  The Requesting Investors making a request for a registration pursuant to this <u>Section 1.1(a)</u> at any time prior to the effective date of the applicable registration statement may request that the registration statement be withdrawn, and the Company will withdraw the applicable registration statement; <u>provided</u> that the Requesting Investors shall pay all fees, expenses and other costs of the Company incurred in connection with such request.

(b)        Following the Company becoming eligible for use of Form S-3 (or any successor form thereto) under the Securities Act in connection with a public offering of its Securities, any Principal Investor or group of Principal Investors that collectively hold Registrable Securities representing a Governance Percentage Interest of at least 5% at the time of the applicable request may request that the Company register, under the Securities Act on Form S-3 (or any successor form then in effect) (an "S-3 Registration"), all or a portion of the Registrable Securities held by such Requesting Investors (provided that such Registrable Securities represent a Governance Percentage Interest of at least 2%).  If requested by such Requesting Investors, such S-3 Registration shall be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act.  Each request pursuant to this Section 1.1(b) shall be made in writing, and shall include the identity of the Requesting Investor(s), the approximate number of Registrable Securities proposed to be included in the relevant registration and whether such Registration is requested to be on a continuous basis.  The Company shall use its reasonable best efforts to (i) cause such registration pursuant to this Section 1.1(b) to become and remain effective as soon as practicable, but in any event not later than sixty (60) days after it receives a request therefor and (ii) subject to Section 1.3, include in such offering the Registrable Securities of the other Members (other than the Requesting Investors) who have requested in writing to participate in such S-3 Registration pursuant to Section 1.2.  The Company shall not be required to conduct or facilitate an underwritten offering pursuant to such S-3 Registration unless the estimated fair market value of Registrable Securities to be sold in such offering is at least $50,000,000.  For the avoidance of doubt, a request by a Requesting Investor for an S-3 Registration pursuant to this Section 1.1(b) will not be deemed to be a request by a Requesting Investor for purposes of the maximum allowance set forth by Section 1.1(a)(i).

(c)        If the Board of Directors determines in good faith that any registration of Registrable Securities should not be made or continued because it would materially interfere with any bona fide material financing, acquisition, corporate reorganization or merger or other material transaction or occurrence involving the Company that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner (a "Valid Business Reason"), the Company may (i) postpone filing a Registration Statement relating to an S-3 Registration until such Valid Business Reason no longer exists, and (ii) in case a Registration Statement has been filed relating to an S-3 Registration, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Directors acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated or may postpone amending or supplementing such Registration Statement until such Valid Business Reason no longer exists.  Any postponement or withdrawal pursuant to clause (i) or (ii) of the preceding sentence shall not be for a period of more than ninety (90) days on any one occasion or for a period of more than 150 days during any 12-month period.  The Company shall give written notice to the Members of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof.  Notwithstanding anything to the contrary

contained in this <u>Annex A</u>, the Company may not postpone or withdraw a filing due to a Valid Business Reason more than three (3) times in any 12-month period.

(d)     The Company shall not be required to effect any registration pursuant to <u>Section 1.1(a)</u> within one hundred twenty (120) days after the effective date of any other Registration Statement of the Company.

Section 1.2.     <u>Piggyback Registration Rights</u>.  At any time the Company proposes for any reason to register any Equity Securities under the Securities Act (other than a Registration Statement on Form S-4 or S-8 or any successor thereto), including in an offering pursuant to <u>Section 1.1(a)</u> or <u>Section 1.1(b)</u>, the Company shall give written notice to each Member (each, a "<u>Participating Member</u>") at least twenty (20) Business Days prior to the proposed filing of the Registration statement in connection with such offering. Following the receipt of such notice, each Participating Member shall be entitled, by the delivery of a written request to the Company no later than ten (10) days following receipt of notice from the Company, to include all or any portion of its Registrable Securities in such filing (subject to <u>Section 1.3</u>.  The right of each Participating Member to have its Registrable Securities included in an offering pursuant to this <u>Section 1.2</u> shall be conditioned (if an underwritten offering) upon each Participating Member entering into (together with the Company) an underwriting agreement in customary form with the Company Underwriter.  Subject to <u>Section 1.3</u>, the Company shall (within fifteen (15) Business Days of sending the written notice provided for above to each Member) cause the Company Underwriter to permit the Participating Member to participate in a registration pursuant to this <u>Section 1.2</u> to include their Registrable Securities in such offering on the same terms and conditions as the Equity Securities being sold for the account of the Company or the Registrable Securities being sold for the account of any other Member.

Section 1.3.     <u>Cutback</u>.  If the relevant managing underwriter(s) in an underwritten offering contemplated by <u>Section 1.1</u> or <u>Section 1.2</u> advise the Company that, or if such managing underwriter(s) are unwilling to so advise the Company, the Company reasonably determines (after consultation with such managing underwriter(s) and the Members proposing to include Registrable Securities in such offering) that the number of Equity Securities requested to be included in such offering exceeds the amount that can be sold in such offering without adversely affecting the distribution of the Equity Securities being offered, then the Company shall reduce the number of Equity Securities to be included in such offering as follows:

(a)     in the case of an underwritten offering contemplated by <u>Section 1.1</u>, by (i) first only including Registrable Securities being sold for the account of the Requesting Investor(s), with each Requesting Investor entitled to include its *pro rata* share based on the number of Registrable Securities proposed to be included by such Requesting Investor; (ii) second, to the extent that all Registrable Securities being sold for the account of the Requesting Investors can be included, then only including the total number of Registrable Securities of the Participating Members in such offering as the Company so determines can be included (in addition to all Registrable Securities being sold for the account of the Requesting Investors), with each Participating Member entitled to include its *pro rata* share based on the number of Registrable Securities

proposed to be included by such Participating Member; and (iii) third, to the extent that all Registrable Securities being sold for the account of the Requesting Investors and the Participating Members can be included, then only including the total number of Registrable Securities being sold for the account of the Company that the Company so determines can be included; and

(b)     in the case of an underwritten offering contemplated by <u>Section 1.2</u>, by (i) first only including the Registrable Securities being sold for the account of the Company that the Company (after consultation with the relevant underwriter) so determines can be included and (ii) second, to the extent that all Registrable Securities being sold for the account of the Company can be included, then only including the total number of Registrable Securities of the Participating Members in such offering as the Company so determines can be included (in addition to all Registrable Securities being sold for the account of the Company), with each Participating Member entitled to include its *pro rata* share based on the number of Registrable Securities proposed to be included by such Participating Member.

Section 1.4.    <u>Holdback Agreements</u>.

(a)     To the extent not inconsistent with applicable Law and requested by the relevant underwriter, in the case of an underwritten public offering by the Company or by the Members pursuant to this Annex, each Member that has a Governance Percentage Interest of at least 1% at the time of the applicable underwritten offering (considered on an aggregate basis taking into account all Affiliates of such Member) agrees not to effect any public sale or distribution of any Registrable Securities, including a sale pursuant to Rule 144 under the Securities Act, or offer to sell, contract to sell (including any short sale), grant any option to purchase or enter into any hedging or similar transaction with the same economic effect as a sale of Registrable Securities in each case, during the 90-day period (or such lesser period as the underwriter may agree) beginning on the effective date of the Registration Statement (except as part of such registration) for such public offering; without prior written consent from the underwriters managing the underwritten public offering; <u>provided</u> that nothing in this provision shall prevent any Member from (A) pledging, hypothecating or otherwise granting a security interest in the Registrable Securities or securities convertible into or exchangeable for Registrable Securities to one or more lending institutions as collateral or security for any loan, advance or extension of credit and any transfer upon foreclosure upon such Registrable Securities or such securities, (B) transferring Registrable Securities to an Affiliate, or (C) transferring Registrable Securities pursuant to a final non-appealable order of a court or regulatory agency.  The foregoing lockup period restrictions shall be applicable on substantially similar terms to the Company and all of its executive officers and directors as reasonably requested by the underwriter.

(b)     The Company agrees not to effect any public sale or distribution of any of its Equity Securities (except pursuant to registrations on Form S-4 or S-8 or any successor thereto) during the period beginning on the effective date of any Registration Statement filed pursuant to <u>Section 1.1</u> in which the Members are participating and ending on the earlier of (i) the date on which all Registrable Securities registered on such

Registration Statement are sold and (ii) 180 days (or such lesser period as the applicable underwriter (or, if there is no underwriter, the Requesting Investors representing a majority of the Registrable Securities to be sold in the applicable offering) may agree) after the effective date of such Registration Statement.

Section 1.5.    <u>Registration Procedures</u>.    Whenever registration of Registrable Securities has been requested pursuant to <u>Section 1.1</u> or <u>Section 1.2</u>, the Company shall use its reasonable best efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method of distribution thereof as promptly as practicable, and in connection with any such request, the Company shall, as promptly as practicable:

(a)    prepare and file (or confidentially submit) with the SEC a Registration Statement on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate and which form shall be available for the sale of such Registrable Securities in accordance with the intended method of distribution thereof, and cause such Registration Statement to become effective and, upon the request of the Members owning a majority of the Registrable Securities registered thereunder, keep such registration statement effective for a period of up to 120 days or, if earlier, until the distribution contemplated by the registration statement has been completed; <u>provided</u> that (i) before filing a Registration Statement or prospectus or any amendments or supplements thereto, the Company shall provide one legal counsel selected by holders of a majority of the Registrable Securities to be included in such Registration Statement ("<u>Members' Counsel</u>") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the SEC, subject to such documents being under the Company's control, and (ii) the Company shall promptly notify Members' Counsel and each seller of Registrable Securities of any stop order issued or threatened by the SEC and promptly take all action required to prevent the entry of such stop order or to remove it if entered;

(b)    prepare and file with the SEC such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the lesser of (i) 180 days and (ii) such shorter period terminating when all Registrable Securities covered by such Registration Statement have been sold; <u>provided</u> that if a Requesting Investor has requested that an S-3 Registration be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act, then the Company shall keep such Registration Statement effective until all Registrable Securities covered by such Registration Statement have been sold or no longer constitute Registrable Securities;

(c)    furnish to each seller of Registrable Securities, prior to filing a Registration Statement, a reasonable number of copies of such Registration Statement as is proposed to be filed, and thereafter such number of copies of such Registration Statement, each amendment and supplement thereto (in each case, including all exhibits thereto), and the prospectus included in such Registration Statement (including each preliminary prospectus) and any prospectus filed under Rule 424 under the Securities Act

as each such seller may reasonably request in order to facilitate the disposition of the Registrable Securities held by such seller;

(d)    register or qualify such Registrable Securities under any "blue sky" Laws of such jurisdictions as any seller of Registrable Securities may request, and continue such qualification in effect in such jurisdiction for as long as permissible pursuant to the Laws of such jurisdiction, or for as long as any such seller requests or until all of such Registrable Securities are sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable any such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller; provided that the Company shall not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 1.5(d), (ii) subject itself to taxation in any such jurisdiction or (iii) consent to general service of process in any such jurisdiction;

(e)    notify each seller of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and the Company shall promptly prepare a supplement or amendment to such prospectus and furnish to each seller of Registrable Securities a reasonable number of copies of such supplement to or an amendment of such prospectus as may be necessary so that, after delivery to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(f)    enter into and perform customary agreements (including an underwriting agreement in customary form with the relevant underwriter) and take such other actions as are prudent and reasonably required in order to expedite or facilitate the disposition of such Registrable Securities, including causing its officers to participate in "road shows" and other information meetings organized by the relevant underwriter;

(g)    upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, which shall be consistent with the due diligence and disclosure obligations under securities Laws applicable to the Company and the Members, make available at reasonable times for inspection by any managing underwriter participating in any disposition of such Registrable Securities pursuant to a Registration Statement, Members' Counsel and any attorney, accountant or other agent retained by any managing underwriter, all financial and other records, pertinent corporate documents and properties of the Company and its Subsidiaries as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Company's and its Subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Person in connection with such Registration Statement;

(h)      if such sale is pursuant to an underwritten offering, obtain comfort letters dated the effective date of the Registration Statement and the date of the closing under the underwriting agreement from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by comfort letters as Members' Counsel or the managing underwriter reasonably requests;

(i)      furnish, at the request of any seller of Registrable Securities on the date such Registrable Securities are delivered to the underwriters for sale pursuant to such registration or, if such Registrable Securities are not being sold through underwriters, on the date the Registration Statement with respect to such Registrable Securities becomes effective, an opinion (including, in the case of an underwritten offering, a "negative assurance" statement or letter), dated such date, of counsel representing the Company for the purposes of such registration, addressed to the underwriters, if any, and to the seller making such request, covering such legal matters with respect to the registration in respect of which such opinion is being given as the underwriters, if any, and such seller may reasonably request and are customarily included in such opinions;

(j)      comply with all applicable rules and regulations of the SEC, and make generally available to its Members, as soon as reasonably practicable but no later than fifteen (15) months after the effective date of the Registration Statement, an earnings statement covering a period of twelve (12) months beginning after the effective date of the Registration Statement, in a manner which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(k)      cause all such Registrable Securities to be listed on each national securities exchange on which Registrable Securities of such type are then listed, provided that the applicable listing requirements are satisfied;

(l)      keep Members' Counsel advised as to the initiation and progress of any registration under Section 1.1 or Section 1.2 hereunder;

(m)      cooperate with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA; and

(n)      take all other steps reasonably necessary to effect the registration of the Registrable Shares contemplated hereby.

Section 1.6.      Seller Information.  The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such Registrable Securities as the Company may from time to time reasonably request in writing, as a condition to including such Registrable Securities in such Registration Statement.

Section 1.7.   <u>Notice to Discontinue</u>.  Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in <u>Section 1.5(e)</u> (which notice shall not be required to include any specific information regarding such event), such Member shall forthwith discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until such Member's receipt of the copies of the supplemented or amended prospectus contemplated by <u>Section 1.5(e)</u> and, if so directed by the Company, such Member shall deliver to the Company (at the Company's expense), or destroy, all copies, other than permanent file copies then in such Member's possession, of the prospectus covering such Registrable Securities that is current at the time of receipt of such notice.  If the Company gives any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Annex (including the period referred to in <u>Section 1.5(b)</u>) by the number of days during the period from and including the date of the giving of such notice pursuant to <u>Section 1.5(e)</u> to and including the date when sellers of such Registrable Securities under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by and meeting the requirements of <u>Section 1.5(e)</u>.

Section 1.8.   <u>Registration Expenses</u>.  The Company shall pay all expenses arising from or incident to its performance of, or compliance with, this Annex, including (i) SEC, stock exchange and FINRA registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" Laws (including reasonable fees, charges and disbursements of counsel to any underwriter incurred in connection with "blue sky" qualifications of the Registrable Securities as may be set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and expenses of counsel to the Company and of its independent public accountants and any other accounting fees, charges and expenses incurred by the Company (including any expenses arising from any comfort letters or any special audits incident to or required by any registration or qualification), (v) the reasonable legal fees, charges and expenses of Members' Counsel incurred by such Members participating in any registration (up to an aggregate amount of $150,000 for a single offering), and (vi) any liability insurance or other premiums for insurance obtained in connection with any S-3 Registration pursuant to the terms of this Annex, regardless of whether such Registration Statement is declared effective.  Each Member holding Registrable Securities sold pursuant to a Registration Statement shall bear the expense of any broker's commission or underwriter's discount or commission relating to registration and sale of such Member's Registrable Securities and, subject to clause (v) above, shall bear the fees and expenses of its own counsel.

Section 1.9.   <u>Indemnification; Contribution</u>.

(a)   <u>Indemnification by the Company</u>.  The Company shall indemnify and hold harmless each Member, its partners, directors, officers, Affiliates, legal counsel, accountants, investment advisors and each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) such Member from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending

against any claim or alleged claim) (collectively, "Liabilities"), arising out of or based upon (i) any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto), (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made) or (iii) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under any of the foregoing, except insofar as any such Liability arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning any Member furnished in writing to the Company by such Member expressly for use therein, including the information furnished to the Company pursuant to Section 1.9(b). The Company shall also provide customary indemnities to any underwriters of the Registrable Securities, their officers, directors and employees and each Person who controls such underwriters (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the same extent as provided above with respect to the indemnification of the Members.

(b)     Indemnification by the Members.  In connection with any Registration Statement in which any Member is participating pursuant to Section 1.1 or Section 1.2, each Member shall promptly furnish to the Company in writing such information with respect to such Member as the Company may reasonably request or as may be required by Law for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Member not materially misleading or necessary to cause such Registration Statement not to omit a material fact with respect to such Member necessary in order to make the statements therein not misleading.  Each Member agrees to indemnify and hold harmless the Company, its partners, directors, officers, Affiliates, any Company Underwriter and each Person who controls the Company or such Company Underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) from and against any and all Liabilities arising out of or based upon (i) any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto), (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made) or (iii) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under any of the foregoing, but if and only to the extent that such Liability arises out of or is based upon any untrue statement or alleged omission or alleged untrue statement or omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning such Member furnished in writing by such Member expressly for

use therein and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the person asserting such loss, claim, damage, liability or expense; provided, however, that the total amount to be indemnified by each Member pursuant to this Section 1.9(b) shall be limited to such Member's *pro rata* portion of the net proceeds (after deducting the underwriters' discounts and commissions) received by such Member in the offering to which the Registration Statement or prospectus relates.

(c)    Conduct of Indemnification Proceedings.  Any Person entitled to indemnification under this Section 1.9 (the "Indemnified Party") agrees to give prompt written notice to the indemnifying party (the "Indemnifying Party") after the receipt by the Indemnified Party of any written notice of the commencement of any proceeding or investigation or threat thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Annex; provided that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party under in this Section 1.9 (except to the extent that the Indemnifying Party is prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure).  If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party. The Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees to pay such fees and expenses, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Indemnified Party or (iii) the named parties to any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and the Indemnified Party has been advised by such counsel that either (A) representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (B) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party.  In any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all Indemnified Parties. No Indemnifying Party shall be liable for any settlement entered into without its written consent (such consent not to be unreasonably withheld or delayed).  No Indemnifying Party shall, without the consent of such Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

(d)    Contribution.  If the indemnification provided for in this Section 1.9 from the Indemnifying Party is held by a court of competent jurisdiction to be

unavailable to an Indemnified Party under this Section 1.9 in respect of any Liabilities referred to in this Section 1.9, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and Indemnified Party on the other in connection with the statements or omissions which resulted in such Liabilities, as well as other relevant equitable considerations.  The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by such Indemnifying Party or Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in Section 1.9(a), Section 1.9(b) and Section 1.9(c), any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; provided that the total amount to be contributed by any Member shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by the Member in the offering.

(e)     Fraud.  The Parties agree that it would not be just and equitable if contribution pursuant to Section 1.9(d) were determined by *pro rata* allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Section 1.10.   Prohibition of On-Exchange Transfers.  Prior to the earlier of (x) the completion of an IPO and (y) the fifth anniversary of the Emergence Date, each Member agrees not to effect any Transfer of any Registrable Securities on any securities exchange or national market system (including the "pink sheets" by OTC Markets Group Inc. (formerly Pink OTC Markets Inc.) or any successor thereto).  This restriction shall not restrict any Transfer that occurs off of a securities exchange or national market system, including any privately negotiated transaction.

Section 1.11.   No Inconsistent Agreements.  The Company shall not enter into any agreements which are inconsistent with the terms of this Annex, or would prohibit the Company from complying with the terms of this Annex.

Section 1.12.   Successors and Assigns.  If the Company is a party to a Conversion Event pursuant to which Registrable Securities are converted into or exchanged for Conversion Securities, the applicable issuer of such Conversion Securities shall assume, with respect to such Conversion Securities, all rights and obligations of the Company under this Annex (which assumption shall not relieve the Company of its obligations of the Company under this Annex to the extent that any Registrable Securities issued by the Company continue to be outstanding and held by a Member following a Conversion

Event), and this Annex shall apply with respect to such Conversion Securities, *mutatis mutandis*.

Section 1.13.  <u>Definitions</u>.  For the purposes of this Annex, the following terms shall have the following definitions (with all terms capitalized and not otherwise defined in this Annex having the meaning given to them in the Agreement):

(a)  "<u>Conversion Event</u>" means a merger, amalgamation, consolidation, exchange or other similar transaction pursuant to which Registrable Securities are converted into or exchanged for Conversion Securities or the right to receive Conversion Securities.

(b)  "<u>Conversion Securities</u>" means securities of any other Person.

(c)  "<u>FINRA</u>" means the Financial Industry Regulatory Authority.

(d)  "<u>IPO</u>" (solely for purposes of this Annex) means (i) a public offering of common equity securities of the Company (or a successor entity) that results in such common equity securities of the Company or such successor being listed on the New York Stock Exchange or NASDAQ, (ii) a transaction with a special purpose acquisition company pursuant to which the Company becomes, or merges into, a public registrant under the Securities Act, or (iii) a direct listing of common equity securities of the Company (or a successor entity) that results in such common equity securities of the Company or such successor being listed on the New York Stock Exchange or NASDAQ.

(e)  "<u>Registrable Securities</u>" means all Common Units and all other common Equity Securities of the Company held by the Members, whether acquired on or after the Emergence Date; <u>provided</u> that securities shall cease to be Registrable Securities when, in the opinion of counsel to the Company, which counsel shall be reasonably acceptable to the relevant Member, they may be sold without restriction as to volume and manner of sale or current public information requirement under Rule 144.

(f)  "<u>Registration Statement</u>" means any registration statement of the Company filed with the SEC under the Securities Act which covers any of the Registrable Securities pursuant to the provisions of this Annex, including the prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

(g)  "<u>Requesting Investor</u>" means any Principal Investor requesting registration of Registrable Securities pursuant to <u>Section 1.1</u> or <u>Section 1.2</u>.

(h)  "<u>Rule 144</u>" means Rule 144 as promulgated by the SEC under the Securities Act, as may be amended from time to time, or any successor rule that may be promulgated by the SEC.

(i)  "<u>SEC</u>" means the Securities and Exchange Commission.

**ANNEX B**

**FORM OF JOINDER AGREEMENT**

Reference is hereby made to the Limited Liability Company Agreement, dated as of [●], 2024 (as amended, modified, supplemented or restated from time to time, the "LLC Agreement"), of [Reorganized Curo], a limited liability company formed under the laws of Delaware (the "Company").  Pursuant to and in accordance with Section 4.1(e) of the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement, and agrees that upon execution of this Joinder Agreement (this "Agreement") and upon the satisfaction of the conditions to the admission of such Person as a Member set forth in the LLC Agreement, such Person shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto, with effect from and after the date hereof.

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the LLC Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Agreement effective as of _____.

**[NEW MEMBER]**

By: _____
      Name:
      Title:

B-1

## Exhibit B

### Identity of the members of the New Board

1.  **Thomas Casarella** – to serve for no compensation, subject to receipt of standard indemnifications and placement of D&O insurance.

    Mr. Casarella is a Managing Director and Assistant Portfolio Manager at Oaktree Capital Management, L.P.  He helps lead investing efforts in Oaktree's consumer, business and financial services industries.  Prior to joining Oaktree in 2012, he served as Deputy Chief Restructuring Officer at the United States Department of the Treasury.  Before that, Mr. Casarella was an investor in the Private Equity Group at Brookfield Asset Management.  He is a board member of Healthcare Finance Direct, Crossroads Building Supply, Gitsit Solutions, Techstyle Fashion Group, and WHP Global.  Mr. Casarella is also the Chairman of the Board of Trustees for the Children's Bureau.  He began his career as an analyst at Goldman Sachs and an associate at Lazard.  Mr. Casarella holds an A.B. degree summa cum laude from Bowdoin College, an M.A. degree in economics from Oxford University, and an M.B.A. from the Harvard Business School.  He is also a CFA charterholder.

2.  **Douglas Clark** – to serve for no additional compensation, subject to receipt of standard indemnifications and placement of D&O insurance.

    Mr. Clark is the Chief Executive Officer and a member of the board of directors of CURO Group Holdings Corp.  Mr. Clark has served as the Chief Executive Officer of CURO and as a director since November 2022.  He first joined the Company as Chief Executive Officer-Heights in December 2021, following the Company's acquisition of SouthernCo Inc.  He was appointed President, N.A. Direct Lending, in May 2022. Prior to joining Heights Finance Corporation, Mr. Clark has served as President at Axcess Financial for five years. Prior to that role, for 11 years, Mr. Clark served as Chief Operating Officer with responsibility for the retail and central operations in the U.S. & U.K. markets, information technology, marketing and credit risk analytics. Prior to his time at Axcess Financial, Mr. Clark worked with Chiquita Brands International, a multinational producer and distributor of fresh fruits, in a variety of financial and operational roles.  Mr. Clark earned his bachelor's degree in finance from Xavier University.

3.  **Nathaniel Lipman** – compensation to be determined.

    Mr. Lipman served as Executive Chairman of CX Loyalty Holdings, Inc. ("CX Loyalty," a global provider of customer loyalty platforms and solutions), formerly known as Affinion Group Holdings, Inc. from 2012 until November 2015, and as President and Chief Executive Officer from October 2005 (when CX Loyalty was formed through the purchase of assets from Cendant Corporation ("Cendant") by a coalition of investors) to 2012.  Mr. Lipman joined Cendant in June 1999 as Senior Vice President, Corporate Development and Strategic Planning.   After a series of increasing responsibilities in business development and marketing, Mr. Lipman served as President and Chief Executive Officer of Cendant's domestic membership business, Trilegiant, from 2002 to April 2004, and served as President and Chief Executive Officer of the Cendant Marketing Services

Division from April 2004 to 2005.  Prior to Cendant, Mr. Lipman held various legal and finance roles since 1989, including roles with Planet Hollywood, Inc., House of Blues Entertainment, Inc. and The Walt Disney Company.  Mr. Lipman also has significant experience serving as a director of both public and private companies, including prior service on the boards of directors of FTD.com, Redbox Automated Holdings, LLC, and Diamond Resorts International, Inc.  Mr. Lipman received his B.A. from UC Berkeley and his J.D. from UCLA.

4.   **Samuel F. Martini** – to serve for no compensation, subject to receipt of standard indemnifications and placement of D&O insurance.

Mr. Martini is Managing Partner of OCO Capital Partners LP ("OCO").  Prior to co-founding OCO in 2018, he was a Partner at Omega Advisors, Inc. ("Omega") in numerous capacities beginning in 2009.  While at Omega, Mr. Martini served as the Co-Director of Research from 2011 to 2016 and served as the Chairman of the Stock Selection Committee from 2016 until the end of 2018.  Mr. Martini maintained a wide focus while at Omega, concentrating on general opportunities throughout the capital structure in a diverse group of industries as well as different sectors of structured credit including collateralized loan obligations and asset backed securities. Additionally, Mr. Martini co-founded Omega Credit Opportunities in June 2013 as a stand-alone entity within Omega, focused on the structured credit, corporate credit and specialty finance market.  Prior to joining Omega, Mr. Martini was an Analyst at Cobalt Capital with a generalist focus across the capital structure from 2002 to 2008.  Prior to his time at Cobalt, Mr. Martini was an Associate in the investment bank of Bankers Trust / Deutsche Banc Alex Brown.  Mr. Martini graduated from Middlebury College with a degree in Political Science and Classics.

5.   **David Smolens** – to serve for no compensation, subject to receipt of standard indemnifications and placement of D&O insurance.

Mr. Smolens is a Managing Director in Oaktree's Special Situations group and helps lead investing efforts in financial services, among other industries.  He joined the firm in 2019 from Apollo Global Management, where he was an associate in the Hybrid Value group. Prior thereto, Mr. Smolens was with Citigroup as an analyst in the Financial Institutions group.  He began his career with First Reserve Corporation.  Mr. Smolens currently serves on the boards of Neovia Logistics and TriMark USA.  He received his B.A. in economics from the University of Notre Dame.

6.   One independent director mutually agreed upon by the Consenting 1.5L Noteholders (excluding Oaktree Capital Management, L.P., Caspian Capital LP, Empyrean Capital Partners, LP and OCO Capital Partners, L.P.) – compensation to be determined.

7.   One independent director, whose seat will be filled pursuant to a customary majority vote of the equityholders – compensation to be determined.

## Exhibit C

**Exit Facility Credit Agreement**

*[DRAFT]*

TERM LOAN CREDIT AGREEMENT


dated as of [_], 2024


among


[REORGANIZED CURO GROUP HOLDINGS CORP.],[1]
as the Borrower,


THE SUBSIDIARIES OF CURO GROUP HOLDINGS CORP. LISTED IN THE SIGNATURE
PAGES HERETO,
each as Guarantors,


THE LENDERS PARTY HERETO,


and


ALTER DOMUS (US) LLC,
as Administrative Agent and Collateral Agent

---

**Senior Secured Term Loan Facility**

---

---

[1] NTD: TBD.

# Table of Contents[2]

**Page**

ARTICLE I DEFINITIONS, ACCOUNTING TERMS AND RULES OF
CONSTRUCTION..................................................................................2

    Section 1.01    Certain Defined Terms ...................................................2

    Section 1.02    Computation of Time Periods .....................................41

    Section 1.03    Accounting Terms.......................................................41

    Section 1.04    Principles of Construction...........................................42

    Section 1.05    Rate .............................................................................42

    Section 1.06    Divisions .....................................................................43

    Section 1.07    Timing of Payment or Performance............................43

ARTICLE II AMOUNTS AND TERMS OF THE LOANS ...............................43

    Section 2.01    Commitments and Loans .............................................43

    Section 2.02    Borrowing Mechanics for Loans ................................44

    Section 2.03    Payment of Loans .......................................................44

    Section 2.04    [Reserved] ...................................................................45

    Section 2.05    [Reserved] ...................................................................45

    Section 2.06    Pro Rata Shares; Availability of Funds.......................45

    Section 2.07    Use of Proceeds..........................................................45

    Section 2.08    Evidence of Indebtedness; Register; Notes.................45

    Section 2.09    Interest on Loans.........................................................46

    Section 2.10    [Reserved] ...................................................................47

    Section 2.11    Default Interest; Late Fees .........................................47

    Section 2.12    Fees .............................................................................48

---

[2] NTD:  to be updated.

Section 2.13    Voluntary Prepayments ................................................................48

Section 2.14    Mandatory Prepayments .............................................................48

Section 2.15    General Provisions Regarding Payments ...................................49

Section 2.16    Ratable Sharing ...........................................................................53

Section 2.17    [Reserved] ...................................................................................54

Section 2.18    Increased Costs; Capital Adequacy ...........................................54

Section 2.19    Taxes; Withholding, Etc. ............................................................55

Section 2.20    Obligation to Mitigate.................................................................59

Section 2.21    Benchmark Replacement Setting.................................................59

Section 2.22    Illegality ......................................................................................60

Section 2.23    Inability to Determine Rates .......................................................61

Section 2.24    Funding Losses ............................................................................61

Section 2.25    Matters Applicable to All Requests for Compensation ...........62

ARTICLE III CONDITIONS PRECEDENT ...................................................................62

Section 3.01    Conditions to Closing Date and Initial Draw.............................62

Section 3.02    Conditions to Making of Loans ..................................................64

ARTICLE IV REPRESENTATIONS AND WARRANTIES ..........................................65

Section 4.01    Loan Parties' Representations and Warranties .........................65

ARTICLE V COVENANTS.................................................................................................69

Section 5.01    Financial Statements and Other Reports..................................69

Section 5.02    [Reserved] ...................................................................................71

Section 5.03    Information Regarding Collateral ..............................................71

Section 5.04    Certification of Public Information.............................................71

Section 5.05    Existence .....................................................................................72

Section 5.06    Payment of Taxes and Claims....................................................72

Section 5.07      Maintenance of Properties ................................................................72

Section 5.08      Insurance ...........................................................................................72

Section 5.09      Books and Records; Inspections .........................................................73

Section 5.10      Compliance with Contractual Obligations and Laws ...........................73

Section 5.11      Environmental Compliance .................................................................73

Section 5.12      Subsidiaries ........................................................................................73

Section 5.13      Further Assurances..............................................................................73

Section 5.14      Mortgages ...........................................................................................74

Section 5.15      Post-Closing Obligations ....................................................................75

Section 5.16      Restricted Payments ...........................................................................75

Section 5.17      Dividend and Other Payment Restrictions Affecting Subsidiaries.........77

Section 5.18      Incurrence of Indebtedness and Issuance of Disqualified Stock
                  and Preferred Stock............................................................................79

Section 5.19      Mergers, Consolidations, Sales of Assets and Acquisitions..................83

Section 5.20      Transactions with Affiliates ................................................................85

Section 5.21      Liens...................................................................................................86

Section 5.22      [Reserved.] ........................................................................................86

Section 5.23      Business Activities..............................................................................86

Section 5.24      Stay, Extension and Usury Laws .........................................................87

Section 5.25      Loan SPV ...........................................................................................87

Section 5.26      [Reserved] ..........................................................................................88

Section 5.27      Operating Covenants...............................**Error! Bookmark not defined.**

ARTICLE VI EVENTS OF DEFAULT ................................................................88

Section 6.01      Events of Default ................................................................................88

ARTICLE VII GUARANTY .................................................................................90

Section 7.01      The Guaranty ......................................................................................90

Section 7.02     Obligations Unconditional ............................................................91

Section 7.03     Reinstatement....................................................................................91

Section 7.04     Subordination and Subrogation......................................................92

Section 7.05     Remedies ...........................................................................................92

Section 7.06     Continuing Guarantee ......................................................................92

Section 7.07     General Limitation on Guaranteed Obligations.....................................92

Section 7.08     Contribution by Guarantors ............................................................93

Section 7.09     Additional Guarantors......................................................................93

Section 7.10     Keepwell ...........................................................................................94

ARTICLE VIII AGENTS .........................................................................................95

Section 8.01     Authorization and Authority ...........................................................95

Section 8.02     Agent Individually ...........................................................................95

Section 8.03     Duties of Agents; Exculpatory Provisions......................................95

Section 8.04     Reliance by Agent ............................................................................96

Section 8.05     Delegation of Duties ........................................................................97

Section 8.06     Resignation of Agent .......................................................................97

Section 8.07     Non-Reliance on Agent....................................................................98

Section 8.08     Collateral and Guarantee Matters ...................................................99

Section 8.09     Right to Indemnity .........................................................................100

Section 8.10     Administrative Agent May File Proofs of Claim................................101

ARTICLE IX MISCELLANEOUS ..........................................................................101

Section 9.01     Amendments, Etc.............................................................................101

Section 9.02     Notices, Etc. ....................................................................................102

Section 9.03     No Waiver; Remedies .....................................................................104

Section 9.04     Costs, Expenses and Indemnification .................................................104

iv

Section 9.05   Successors and Assigns; Participations ................................................105

Section 9.06   Governing Law; Submission to Jurisdiction........................................109

Section 9.07   Severability ................................................................................110

Section 9.08   Counterparts; Integration; Effectiveness.............................................110

Section 9.09   Survival ....................................................................................110

Section 9.10   Confidentiality ...........................................................................110

Section 9.11   No Fiduciary Relationship .............................................................111

Section 9.12   Right of Set-off ..........................................................................111

Section 9.13   Payments Set Aside......................................................................112

Section 9.14   Obligations Several .....................................................................112

Section 9.15   PATRIOT Act .............................................................................112

Section 9.16   Headings Descriptive ...................................................................112

Section 9.17   Entire Agreement ........................................................................112

Section 9.18   [Reserved] .................................................................................112

Section 9.19   Borrower Acknowledgements .........................................................112

Section 9.20   Lender Acknowledgements ............................................................113

Section 9.21   Acknowledgement and Consent to Bail-In of Affected Financing Institutions...............................................................................................114

<u>SCHEDULES</u>

Schedule 1.01(A)          Investments
Schedule 1.01(B)          Liens
Schedule 1.01(C)          Ad Hoc Group
Schedule 2.01             Commitments
Schedule 4.01(a)          Jurisdiction of Organization
Schedule 4.01(b)          Equity Interests and Ownership
Schedule 5.01(o)          Post-Closing Obligations
Schedule 5.18             Existing Indebtedness
Schedule 5.20(b)(iii)     Existing Transactions with Affiliates

<u>EXHIBITS</u>

Exhibit A-1    Borrowing Request
Exhibit B      Note
Exhibit C      Compliance Certificate
Exhibit D      Security Agreement
Exhibit E      Counterpart Agreement
Exhibit F      Junior Intercreditor Agreement
Exhibit G      Assignment Agreement
Exhibit H      Administrative Questionnaire
Exhibit I      [Reserved]
Exhibit J-1    Certificate re Non-Bank Status (Foreign Non-Partnership Lenders)
Exhibit J-2    Certificate re Non-Bank Status (Foreign Partnership Lenders)
Exhibit J-3    Certificate re Non-Bank Status (Foreign Non-Partnership Participants)
Exhibit J-4    Certificate re Non-Bank Status (Foreign Partnership Participants)

# TERM LOAN CREDIT AGREEMENT

This TERM LOAN CREDIT AGREEMENT is entered into as of [_], 2024 among [REORGANIZED CURO GROUP HOLDINGS CORP.], a Delaware corporation (the "Borrower"), each Guarantor from time to time party hereto, each Lender from time to time party hereto, and ALTER DOMUS (US) LLC, as administrative agent and collateral agent.

WHEREAS, on March 25, 2024 (the "Petition Date"), the Borrower and certain other Loan Parties (together with any of their Subsidiaries and Affiliates that are or became debtors under the Chapter 11 Cases, collectively, the "Debtors," and each individually, a "Debtor") voluntarily commenced Chapter 11 Cases, jointly administered under Chapter 11 Case No. 24-90165 (MI) (collectively, the "Chapter 11 Cases" and each individually, a "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court");

WHEREAS, in connection with the Chapter 11 Cases, the Borrower, as a debtor and a debtor-in-possession, entered into that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement, dated as of April 4, 2024, by and among the Borrower, each guarantor from time to time party thereto, each lender from time to time party thereto (collectively, the "DIP Lenders") and Alter Domus (US) LLC, as administrative agent and collateral agent, pursuant to which the DIP Lenders provided to the Borrower a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $70,000,000.00 (the "DIP Facility");

WHEREAS, the Borrower is party to that certain First Lien Credit Agreement, dated as of May 15, 2023, by and among the Borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto (the "Prepetition 1L Lenders") and Alter Domus (US) LLC, as agent (the "Prepetition First Lien Facility").

WHEREAS, this Agreement, together with the other Facility Documents, are the "Exit Facility Documents" referred to in the Debtors' Joint Prepackaged Plan of Reorganization (as amended, supplemented, or otherwise modified from time to time, the "Chapter 11 Plan") filed in the Chapter 11 Cases of the Debtors; and

WHEREAS, pursuant to the Chapter 11 Plan, (i) the Prepetition 1L Lenders are entitled to receive their ratable share of the Second Out Loans (as defined below) in satisfaction of their claims under the Prepetition First Lien Facility, (ii) the DIP Lenders are entitled to receive their ratable share of the First Out Loans (as defined below) in satisfaction of their claims under the DIP Facility and (iii) the Borrower is authorized to borrow additional amounts that were committed but undrawn under the DIP Facility on the terms and conditions set forth in this Agreement and the other Facility Documents;

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

# ARTICLE I

## DEFINITIONS, ACCOUNTING TERMS AND RULES OF CONSTRUCTION

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accepting Lender" has the meaning set forth in Section 2.14(c).

"Acquired Debt" means with respect to any specified Person:

(1)      Indebtedness of any other Person existing at the time such other Person was merged with or into or became a Subsidiary of such specified Person, including Indebtedness Incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Subsidiary of such specified Person; and

(2)      Indebtedness secured by a Lien encumbering any asset acquired by such specified Person at the time such asset is acquired by such specified Person.

"Activities" has the meaning set forth in Section 8.02.

"Ad Hoc Group" has the meaning set forth in the Chapter 11 Plan.

"Additional Secured Obligations" means (a) all Cash Management Obligations, (b) all Secured Hedging Obligations and (c) all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the reasonable fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under the Bankruptcy Code or other applicable Law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding; *provided* that Additional Secured Obligations of a Loan Party shall exclude any Excluded Swap Obligations with respect to such Loan Party.

"Administrative Agent" means Alter Domus (US) LLC, in its capacity as administrative agent hereunder, or any successor in such capacity.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to Term SOFR; provided that if Term SOFR shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Adverse Proceeding" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Borrower or any of its Subsidiaries) at Law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of the Borrower or any of its Subsidiaries, threatened

against or affecting the Borrower or any of its Subsidiaries or any property of the Borrower or any of its Subsidiaries.

"Affected Financial Institution" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Affiliate Transactions" has the meaning set forth in Section 5.20(a).

"Agent" means, collectively, the Administrative Agent and the Collateral Agent.

"Agent Fee Letter" shall mean that certain Administrative Agent and Collateral Agent Fee Letter, dated as of the Closing Date, by and among the Borrower and the Agents.

"Aggregate Payments" has the meaning set forth in Section 7.08.

"Agreement" means this Term Loan Credit Agreement, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Amounts Due" has the meaning set forth in Section 2.16.

"Asset Sale" means:

> (1)     the Disposition of any assets;

> (2)     the issuance or sale by the Borrower or any of its Subsidiaries of Equity Interests of any of the Borrower's Subsidiaries; and

> (3)     an Event of Loss.

"Assignment Agreement" means an Assignment and Assumption Agreement substantially in the form of Exhibit G, with such amendments or modifications as may be approved by the Administrative Agent.

"Assignment Effective Date" has the meaning specified in Section 9.05(b).

"Authorized Officer" means, with respect to any Person, any of the chairman of the board, the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, the secretary, any assistant secretary or any vice president (or authorized signatory holding equivalent function) of such Person (or of such Person's general partner, member or other similar Person); provided that, when such term is used in reference to any document executed by, or a certification of, an Authorized Officer, upon request of the

3

Administrative Agent, the secretary, an assistant secretary or any other officer or manager (or authorized signatory holding equivalent function) of such Person (or of such Person's general partner, member or other similar Person) shall have delivered (which delivery may be made on the Closing Date) an incumbency certificate to the Administrative Agent as to the authority of such individual.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for a term rate Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.21(d).

"Backstop Notes" means the Senior Secured Notes issued by Loan SPV, as in effect on the Closing Date and with such modifications as the holders thereof and Loan SPV may agree, which modifications are immaterial or which reflect corresponding modifications to the Loans in accordance with the terms hereof.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" shall mean (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and certified as 11 U.S.C. Section 101 *et seq*.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals of this Agreement.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.21(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)      Daily Simple SOFR; or

(b)       the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent (at the direction of the Required Lenders) and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, then the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Facility Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent (at the direction of the Required Lenders) and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time; provided however that, such Benchmark Replacement Adjustment is administratively feasible for the Administrative Agent.

"Benchmark Replacement Date" means, a date and time determined by the Required Lenders, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)       in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)       in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current

Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Facility Document in accordance with Section 2.21 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Facility Document in accordance with Section 2.21.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in, and subject to, Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"Board" means the Board of Governors of the Federal Reserve System (or any successor).

"Board of Directors" means:

(a)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(b)     with respect to a partnership, the board of directors or other governing body of the general partner of the partnership;

(c)     with respect to a limited liability company, the board of directors, managers or other governing body, and in the absence of the same, the managing member or members or any controlling committee of managing members thereof; and

(d)     with respect to any other Person, the board or committee of such Person or other individual or entity serving a similar function.

"Borrower" has the meaning specified in the preamble hereto.

"Borrowing Request" means a written notice substantially in the form of Exhibit A-1.

"Business Day" means (a) a day which is not a Saturday or Sunday or a legal holiday and on which banks are not required or permitted by Law or other governmental action to close in New York City, New York and (b) if such day relates to a borrowing of, a payment or prepayment of principal of or interest on a Loan or a notice by the Borrower with respect to any such borrowing, payment or prepayment, which is also a U.S. Government Securities Business Day.

"CAD", "CAD$" or "Canadian Dollars" means the lawful currency of Canada.

"Canadian Subsidiary" means any Subsidiary incorporated or organized in Canada or any province or territory thereof.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under a lease of (or other Indebtedness arrangements conveying the right to use) real or personal property which are required to be classified and accounted for as a capital lease or capitalized on a balance sheet of such Person determined in accordance with GAAP and the amount of such obligations shall be the capitalized amount thereof in accordance with GAAP and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease or other arrangement prior to the first date upon which such lease or other arrangement may be terminated by the lessee without payment of a penalty.

7

"Capital Stock" of any Person means any and all shares, interests, participations or other equivalents (however designated) of such Person's capital stock, including preferred stock, whether now outstanding or issued after the Closing Date.

"Cash Equivalents" means:

(1)　marketable direct obligations issued by, or unconditionally Guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition;

(2)　certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits or banker's acceptances having maturities of one year or less from the date of acquisition issued by any lender to the Borrower or any of its Subsidiaries or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $1,000,000,000;

(3)　commercial paper of an issuer rated at least A-1 by Standard & Poor's Ratings Group ("S&P") or P-1 by Moody's Investors Service, Inc. ("Moody's"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within one year from the date of acquisition;

(4)　repurchase obligations of any financial institution satisfying the requirements of clause (2) of this definition, having a term of not more than 30 days, with respect to securities issued or fully Guaranteed or insured by the United States government;

(5)　securities with maturities of one year or less from the date of acquisition issued or fully Guaranteed by any state of the United States, by any political subdivision or taxing authority of any such state or by any foreign government, the securities of which state, political subdivision, taxing authority or foreign government (as the case may be) have one of the two highest ratings obtainable from either S&P or Moody's;

(6)　securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any financial institution satisfying the requirements of clause (2) of this definition;

(7)　money market, mutual or similar funds that invest at least 95% of their assets in assets satisfying the requirements of clauses (1) through (6) of this definition;

(8)　money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $1,000,000,000; and

(9)　with respect to Foreign Subsidiaries only, any Investments outside of the United States that are functional foreign equivalents in all material respects to the Cash Equivalents described in clauses (1) through (5) above.

"<u>Cash Management Obligations</u>" means all obligations of any Loan Party in respect of overdrafts and liabilities that arise from treasury, depositary or cash management services, including in connection with any automated clearing house transfers of funds, or any similar transactions, in each case pursuant to an agreement with any person that, at the time it enters into such agreement (or on the Closing Date), is an Agent, a Lender or an Affiliate of an Agent or a Lender; provided that obligations under such agreement are not designated by notice delivered by the Borrower to the Administrative Agent to be excluded from being Cash Management Obligations.

"<u>Certificate re Non-Bank Status</u>" means a certificate substantially in the form of Exhibit J-1, J-2, J-3 or J-4, as applicable.

"<u>CFC</u>" means a Subsidiary of the Borrower that is a controlled foreign corporation within the meaning of Section 957(a) of the Code.

"<u>Change in Law</u>" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"<u>Change of Control</u>" means the occurrence of any of the following:[3]

(1) the direct or indirect Disposition, in one or a series of related transactions, of all or substantially all of the assets of the Borrower and its Subsidiaries, taken as a whole, to any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) other than the Borrower or any of its Subsidiaries;

(2) the adoption of a plan relating to the liquidation or dissolution of the Borrower; or

(3) the consummation of any transaction (including any merger or consolidation) the result of which is that any "person" or "group" (as defined above) other than the Permitted Holders, becomes the "beneficial owner" (as such term is defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this clause <u>(3)</u> such "person" or "group" shall be deemed to have "beneficial ownership" of all shares that such "person" or "group" has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 50% of the Voting Stock of the Borrower.

---

[3] To be updated to account for holding company structure

"Chapter 11 Cases" shall have the meaning assigned to such term in the recitals of this Agreement.

"Closing Date" means the date on which the conditions specified in Section 3.01 are satisfied (or waived in accordance with the terms hereof), which date is acknowledged to be [_], 2024.

"Closing Date First Out Commitment" means a First Out Commitment to be funded or deemed funded on the Closing Date in accordance with Section 2.01(a)(i) and as set forth on Schedule 2.01(a).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" means, collectively, all of the property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"Collateral Agent" means Alter Domus (US) LLC, in its capacity as collateral agent hereunder, or any successor in such capacity.

"Collateral Documents" means the Security Agreement, the Pledge Agreement and all other instruments, documents and agreements delivered by any Loan Party pursuant to this Agreement or any of the other Facility Documents in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a Lien on any assets or property of that Loan Party as security for the Obligations, including UCC financing statements and amendments thereto and filings with the U.S. Patent and Trademark Office and the U.S. Copyright Office.

"Commitment" means a First Out Commitment and/or Second Out Commitment, as the case may be.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.) and any successor thereto.

"Compliance Certificate" means a Compliance Certificate substantially in the form of Exhibit C.

"Confidential Information" means all information received from the Borrower or any Affiliate of the Borrower on any of their respective businesses, other than any such information that is available to an Agent or a Lender on a non-confidential basis prior to disclosure by the Borrower or any of its Affiliates, *provided* that, in the case of information received from the Borrower or any of its Affiliates after the Closing Date, such information is clearly identified as confidential at the time of delivery. A Person required to maintain the confidentiality of Confidential Information as provided in this Agreement is a "Confidential Person." Any Confidential Person shall be considered to have complied with its obligation to do so if such Confidential Person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such Confidential Person would accord to its own confidential information.

"Conforming Changes" means, with respect to either the use or administration of Adjusted Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of an "interest period"), timing and frequency of determining rates and making payments of interest, timing of Borrowing Requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.24 and other technical, administrative or operational matters) that the Administrative Agent (at the direction of the Required Lenders) decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent or the Required Lenders determine that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders decide is reasonably necessary in connection with the administration of this Agreement and the other Facility Documents); provided however that such market practice or other manner of administration is administratively feasible for the Administrative Agent; and provided further that no Conforming Change may affect the rights or duties of the Administrative Agent without its consent.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contractual Obligation" means, as applied to any Person, any provision of any security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Contributing Guarantors" has the meaning set forth in Section 7.08.

"Counterpart Agreement" means a Counterpart Agreement substantially in the form of Exhibit E delivered by a Loan Party pursuant to Section 7.09.

"CSO Obligations" means obligations to purchase, or other Guarantees of, consumer loans the making of which were facilitated by the Borrower or a Subsidiary of the Borrower acting as a credit services organization or other similar service provider.

"Currency Hedging Obligations" means the obligations of any Person pursuant to an arrangement designed to protect such Person against fluctuations in currency exchange rates.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent (at the direction of the Required Lenders) in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that any such

convention is not administratively feasible for the Administrative Agent, then the Administrative Agent (at the direction of the Required Lenders) may establish another convention that is administratively feasible for the Administrative Agent.

"Declined Prepayment Amount" has the meaning set forth in Section 2.14(c).

"Declining Lender" has the meaning set forth in Section 2.14(c).

"Default" means any event which is, or after notice or the passage of time or both would become, an Event of Default.

"Default Rate" has the meaning set forth in Section 2.11.

"Defaulting Lender" means any Lender that has (a) failed to fund any portion of its Commitment within one Business Day of the date required to be funded by it hereunder, unless the subject of a good faith dispute, (b) notified the Borrower, the Administrative Agent or any Lender in writing, or has otherwise indicated through a public statement, that it does not intend to comply with its funding obligations generally under agreements in which it commits to extend credit, (c) failed, within three (3) Business Days after receipt of a written request from the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Commitments, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, unless the subject of a good faith dispute, (e) become subject to a Bail-In Action or (f) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, custodian, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, custodian, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that (i) the Administrative Agent and the Borrower may declare (A) by joint notice to the Lenders that a Defaulting Lender is no longer a "Defaulting Lender" or (B) that a Lender is not a Defaulting Lender if in the case of both clauses (A) and (B) the Administrative Agent and the Borrower each determines, in its sole respective discretion, that (x) the circumstances that resulted in such Lender becoming a "Defaulting Lender" no longer apply or (y) it is satisfied that such Lender will continue to perform its funding obligations hereunder and (ii) a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of Voting Stock or any other equity interest in such Lender or a parent company thereof by a Governmental Authority or an instrumentality thereof.

"DIP Facility" shall have the meaning assigned to such term in the recitals of this Agreement.

"Dispose" or "Disposed of" means to convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset.  The term "Disposition" shall have a correlative meaning to the foregoing.

"Disqualified Stock" means, with respect to any Person, any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(1)    matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

(2)    is convertible or exchangeable for Indebtedness or Disqualified Stock (excluding Capital Stock convertible or exchangeable solely at the option of the Borrower or a Subsidiary of the Borrower; provided that any such conversion or exchange will be deemed an Incurrence of Indebtedness or Disqualified Stock, as applicable);

(3)    is redeemable at the option of the holder thereof, in whole or in part; or

(4)    provides for scheduled mandatory payments of dividends in cash,

in the case of each of clauses (1), (2), (3) and (4), on or prior to the ninety-first day after the Scheduled Maturity Date; *provided* that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring on or prior to the ninety-first day after the Scheduled Maturity Date will not constitute Disqualified Stock if the terms of such Capital Stock provide that such Person may not repurchase or redeem any such Capital Stock pursuant to such provisions prior to repayment in full of the Loans and all other Obligations that are accrued and payable in connection therewith.

"Dollars", "USD" and "$" mean the lawful currency of the United States of America.

"Domestic Subsidiary" means any Subsidiary other than a Foreign Subsidiary.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, Norway and the United Kingdom.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means any Person other than a natural Person that is (i) a Lender or an Affiliate or Related Fund of any Lender, or (ii) a commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans in the ordinary course of business; *provided* that in no event shall (A) any Defaulting Lender, (B) any Loan Party or any Affiliate thereof or (C) any direct competitor of any Loan Party or any subsidiary of a Loan Party which, in the case of this clause (C), has been previously identified by the Borrower in writing to the Administrative Agent be an Eligible Assignee; *provided further* that nothing in this definition shall prevent Loan SPV from owning the Loans issued to it on the Closing Date.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, any Loan Party or any of its ERISA Affiliates, or with respect to which any Loan Party or any of its ERISA Affiliates has or could reasonably be expected to have liability, contingent or otherwise under ERISA.

"Environmental Claim" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order, decree or directive (conditional or otherwise) by any Governmental Authority or any other Person, arising (i) pursuant to any Environmental Law, (ii) in connection with any actual or alleged violation of, or liability pursuant to, any Environmental Law, including any Governmental Authorizations issued pursuant to Environmental Law, (iii) in connection with any Hazardous Material, including the presence or Release of, or exposure to, any Hazardous Materials and any abatement, removal, remedial, corrective or other response action related to Hazardous Materials or (iv) in connection with any actual or alleged damage, injury, threat or harm to natural resources, the environment or, as such relate to exposure to Hazardous Materials, health or safety.

"Environmental Laws" means any and all current or future foreign or domestic, federal, state or local Laws (including any common law), statutes, ordinances, orders, rules, regulations, judgments or any other requirements of Governmental Authorities relating to or imposing liability or standards of conduct with respect to (i) the protection of the environment, (ii) the generation, use, storage, transportation or disposal of, or exposure to, Hazardous Materials; or (iii) occupational safety and health as such relate to exposure to Hazardous Materials, industrial hygiene, the protection of human health or welfare as such relate to exposure to Hazardous Materials, in any manner applicable to the Borrower or any of its Subsidiaries or any of their facilities.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, the regulations promulgated thereunder and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which

14

is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which that Person is a member; and (iii) with respect to any provisions relating to Section 412 of the Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member.

"ERISA Event" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation); (ii) a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) a determination that any Multiemployer Plan is, or is expected to be in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (v) the withdrawal by any Loan Party or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors in which such Loan Party or its ERISA Affiliates was a substantial employer as defined in Section 4001(a)(2) of ERISA or the termination of any such Pension Plan resulting in liability to any Loan Party, or any of its ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (vi) the institution by the PBGC of proceedings to terminate any Pension Plan or the occurrence of any event or condition which would reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer any Pension Plan; (vii) the imposition of liability on any Loan Party (including on account of any of its ERISA Affiliates) pursuant to Section 4062(e) ERISA; (viii) the withdrawal of a Loan Party or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, (ix) the receipt by a Loan Party or any of its ERISA Affiliates of notice from a Multiemployer Plan that it is in insolvency pursuant to Section 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, (x) failure by any Loan Party or any of its ERISA Affiliates thereof to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA) or the failure to make by its due date a required installment under Section 430 of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan after any applicable cure periods; or (xi) the imposition of any lien on any of the rights, properties or assets of any Loan Party, in either case pursuant to Section 303(k) or Section 4068 of ERISA, or Section 430(k) of the Code.  For purposes of clause (viii) of the preceding sentence, no complete or partial withdrawal from a Multiemployer Plan shall be deemed to have occurred unless and until the Borrower or any of its ERISA Affiliates receives written notice thereof from such Multiemployer Plan.

"Erroneous Payment" has the meaning set forth in Section 2.15(i)(A).

"Erroneous Payment Deficiency Assignment" has the meaning set forth in Section 2.15(i)(D).

"Erroneous Payment Impacted Class" has the meaning set forth in Section 2.15(i)(D).

"Erroneous Payment Return Deficiency" has the meaning set forth in Section 2.15(i)(D).

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Loss" means, with respect to any property or asset, any (i) loss or destruction of, or damage to, such property or asset or (ii) any condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such property or asset, or confiscation or requisition of the use of such property or asset.

"Events of Default" has the meaning specified in Section 6.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, any successor statute thereto, and any regulations promulgated thereunder.

"Excluded Assets" means:

(1)    the voting Capital Stock of any CFC (other than a Canadian Subsidiary) in excess of 65% of all of the outstanding voting Capital Stock of such CFC;

(2)    motor vehicles covered by certificates of title or ownership to the extent that a security interest cannot be perfected solely by filing a UCC-1 financing statement (or similar instrument);

(3)    (x) real property owned by the Borrower or any of the Guarantors in fee simple that has a Fair Market Value of less than $[2.5] million and (y) leasehold interests in real property with respect to which the Borrower or any Guarantor is a tenant or subtenant;

(4)    rights under any contracts that contain a valid and enforceable prohibition on collateral assignment of such rights (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction or any other applicable law or principles of equity, or pursuant to the Confirmation Order), but only for so long as such prohibition exists and is effective and valid;

(5)    Equity Interests in a Receivables Entity only to the extent that terms of the related Qualified Receivables Facility prohibit the pledge thereof to secure the Obligations;

(6)    (i) deposit accounts of the Borrower or any Guarantor and securities accounts held by First Heritage Credit, LLC, in each case, to the extent (a) exclusively used for payroll, payroll taxes, other trust fund taxes and other employee wage and benefit payments or (b) the terms of a Qualified Receivables Facility (which terms are permitted pursuant to Section 5.17(b)(xiii)) prohibit the pledge thereof to secure the Obligations, and (ii) each deposit or security account expressly excluded as Collateral pursuant to the Security Agreement;

(7)    property or assets owned by any Subsidiary of the Borrower that is not a Guarantor;

(8)     any application for registration of a trademark filed with the United States Patent and Trademark Office on an intent-to-use basis until such time (if any) as a statement of use or amendment to allege use is accepted by such office, at which time such trademark shall automatically become part of the Collateral and subject to the security interest of the Indenture Documents;

(9)     [reserved;]

(10)     Equity Interests in any joint venture only to the extent and for so long as a pledge thereof to secure the Obligations is not permitted by the terms of the joint venture or other agreement under which such joint venture is organized; and

(11)     any segregated deposits that constitute Permitted Liens under clauses (5), (6), (9), (11), (12) and (19) of the definition of Permitted Liens, in each case, that are prohibited from being subject to other Liens;

*provided*, proceeds and products from any and all of the foregoing Excluded Assets shall not themselves constitute Excluded Assets unless such proceeds or products would otherwise constitute Excluded Assets if not proceeds or products of the foregoing.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a Lien to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 7.10 and any other "keepwell", support or other agreement for the benefit of such Guarantor and any and all Guarantees of such Guarantor's Swap Obligations by other Loan Parties) at the time the Guaranty of such Guarantor, or grant by such Guarantor of a Lien, becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a Swap Master Agreement governing more than one Swap Agreement, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Agreements for which such Guaranty or Lien is or becomes excluded in accordance with the first sentence of this definition.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by overall net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (1) that are imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), or (2) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.19(b), amounts with respect to such Taxes were payable either to such Lender's

17

assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.19(c) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Indebtedness" means any Indebtedness of the Borrower or any of its Subsidiaries outstanding on the Closing Date, other than the Obligations and the Securitization Facilities.

"Exposure" means, with respect to any Lender as of any date of determination, as the context may require, (a) that Lender's Commitment; (b) the sum of that Lender's Commitment and the sum of the aggregate outstanding principal amount of the Loans of that Lender; and (c) after the termination of the Commitments, the sum of the aggregate outstanding principal amount of the Loans of that Lender.

"Facility Documents" means, collectively, this Agreement, the Notes, if any, the Collateral Documents, any Intercreditor Agreement, any related fee letter, including the Agent Fee Letter, and each other agreement or instrument executed or delivered in connection herewith or therewith (including each other agreement, instrument or document that creates a Lien in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Obligations) that is designated by the parties thereto as a "Facility Document."

"Fair Market Value" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Borrower, as applicable; provided, however, that with respect to any such value less than $2.5 million, only the good faith determination of the Borrower's senior management shall be required.

"Fair Share" has the meaning set forth in Section 7.08.

"Fair Share Contribution Amount" has the meaning set forth in Section 7.08.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code as of the date of this Agreement (or any amended or successor version described above) and any fiscal or regulatory legislation, rules, or practices adopted pursuant to any intergovernmental agreement among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1.00%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the

Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by the Administrative Agent.

"Financial Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of the Borrower that such financial statements fairly present, in all material respects, the financial condition of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"First Out Commitment" means a commitment of a Lender to make, be deemed to make, or otherwise fund a First Out Loan hereunder on the Closing Date or thereafter, and "First Out Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's First Out Commitment, if any, is set forth opposite such Lender's name on Schedule 2.01,[4] subject to any adjustment or reduction pursuant to the terms and conditions hereof.

"First Out Lender" means each financial institution listed on Schedule 2.01 hereto as a First Out Lender for so long as they hold a First Out Loan and any other Person that becomes a party hereto as a First Out Lender pursuant to an Assignment Agreement.

"First Out Loan" means a loan made or deemed made by a First Out Lender to the Borrower pursuant to Section 2.01(a).

"Fiscal Quarter" means each fiscal quarter of the Borrower and its Subsidiaries.

"Fiscal Year" means each fiscal year of the Borrower and its Subsidiaries.

"Floor" means a rate of interest equal to 2.50%.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Subsidiary incorporated or organized in a jurisdiction other than the United States or any state thereof or the District of Columbia.

"Fronting Lender" shall mean Barclays Bank PLC.[5]

"Fronting Fee Letter" shall mean that certain Fronting Fee Letter, dated as of the Closing Date, by and among, inter alia, the Borrower and the Fronting Lender (as such Fronting Fee Letter may be amended, supplemented or otherwise modified).

"Funding Guarantors" has the meaning set forth in Section 7.08.

"GAAP" means generally accepted accounting principles in the United States as in effect on the Closing Date, consistently applied.

---

[4] Includes any unfunded delayed draw DIP Commitments.
[5] Fronting Lender provisions to be discussed.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Governmental Authorization" means any permit, license, authorization, certification, registration, approval, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Guarantee" means, with respect to any Person, any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person:

      (1)    to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise); or

      (2)    entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

The term "Guarantee" used as a verb has a corresponding meaning.

"Guaranteed Indebtedness" of any Person means, without duplication, all Indebtedness of any other Person referred to in the definition of Indebtedness and all dividends of other Persons, in either case, the payment of which such Person has Guaranteed or for which such Person is directly or indirectly responsible or liable as obligor, guarantor or otherwise.

"Guaranteed Obligations" has the meaning specified in Section 7.01.

"Guarantor" means each of the Guarantors listed in the signature pages hereto and each other Subsidiary of the Borrower that hereafter becomes a Guarantor in accordance with Section 7.09; *provided* that the Borrower shall also be a Guarantor with respect to Obligations owing by any other Loan Party (determined before giving effect to Sections 7.01 and 7.10) under the Guaranty.

"Guaranty" means, collectively, the Guarantee made by the Guarantors pursuant to Article VII in favor of the Secured Parties, together with each other guaranty delivered pursuant to Section 7.09.

"Hazardous Materials" means any pollutant, contaminant, chemical, waste, material or substance, exposure to which or Release of which is prohibited, limited or regulated by any

Governmental Authority, including petroleum, petroleum products, asbestos, urea formaldehyde, regulated radioactive materials, polychlorinated biphenyls and toxic mold.

"Hedging Obligation" of any Person means (i) any Currency Hedging Obligation designed to protect the Borrower or any of its Subsidiaries from fluctuations in currency exchange rates and not to speculate on such fluctuations and (ii) any obligations of such Person pursuant to any Interest Rate Protection Agreement.

"Historical Financial Statements" means, as of the Closing Date, the audited financial statements of the Borrower and its Subsidiaries for the Fiscal Year ending December 31, 2023, consisting of a balance sheet as of the end of, and the related consolidated statements of income, stockholders' equity and cash flows for, such Fiscal Year, and (ii) [the unaudited financial statements of the Borrower and its Subsidiaries for the Fiscal Quarter ending March 31, 2024, consisting of a balance sheet as of the end of, and the related consolidated statements of income, stockholders' equity and cash flows for, the Fiscal Quarter ending on such date] and, in the case of clauses (i) and (ii), certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition of Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"Incur" means, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (by conversion, exchange or otherwise), assume (pursuant to a merger, consolidation, acquisition or other transaction), Guarantee or otherwise become liable in respect of such Indebtedness or other obligation or the recording, as required pursuant to GAAP or otherwise, of any such Indebtedness or other obligation on the balance sheet of such Person (and "Incurrence" and "Incurred" shall have meanings correlative to the foregoing); *provided*, *however*, that a change in GAAP that results in an obligation of such Person that exists at such time becoming Indebtedness shall not be deemed an Incurrence of such Indebtedness. Indebtedness otherwise Incurred by a Person before it becomes a Subsidiary of the Borrower will be deemed to have been Incurred at the time it becomes such a Subsidiary.

"Indebtedness" means, with respect to any Person, without duplication, whether recourse is to all or a portion of the assets of such Person and whether or not contingent:

(1)     all obligations of such Person for borrowed money;

(2)     all obligations of such Person evidenced by bonds, notes, debentures or other similar instruments;

(3)     every reimbursement obligation of such Person with respect to letters of credit, banker's acceptances or similar facilities issued for the account of such Person, other than obligations with respect to letters of credit securing obligations, other than obligations referred to in clauses (1), (2) and (9) of this definition, entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the 10th day following payment on the letter of credit;

(4)      every obligation of such Person for the deferred purchase price of property or services (excluding any trade payables and other accrued current liabilities incurred in the ordinary course of business which are not overdue by more than 30 days or which are being contested in good faith);

(5)      all Guaranteed Indebtedness of such Person;

(6)      the maximum fixed redemption or repurchase price of Disqualified Stock of such Person at the time of determination plus accrued but unpaid dividends;

(7)      all obligations under Interest Rate Protection Agreements of such Person;

(8)      the net amount owing under all Currency Hedging Obligations of such Person;

(9)      all Capital Lease Obligations of such Person;

(10)     all obligations referred to in clauses (1) through (9) above of other Persons, the payment of which is secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such obligations; provided that the amount of such Indebtedness will be the lesser of (A) the Fair Market Value of such property at such date of determination and (B) the amount of such Indebtedness.

Notwithstanding the foregoing, Indebtedness shall not include CSO Obligations.  The term "Indebtedness" shall not include any lease, concession or license of property (or guarantee thereof) which would be considered an operating lease under GAAP as in effect on the Closing Date, any prepayments of deposits received from clients or customers in the ordinary course of business, or obligations under any license, permit or other approval (or guarantees given in respect of such obligations) incurred in the ordinary course of business.

Notwithstanding anything in this Agreement to the contrary, the calculation of Indebtedness shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159, "The Fair Value Option for Financial Assets and Financial Liabilities," or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Borrower or any Subsidiary at "fair value," as defined therein.  For the avoidance of doubt, Indebtedness does not include any liability for United States federal, state, local, foreign or other taxes owed or owing by the Borrower or any of its Subsidiaries.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Facility Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 9.04(b).

"Intercreditor Agreement" means a Junior Intercreditor Agreement or a Senior Intercreditor Agreement.

"Interest Payment Date" means the last day of each Interest Period and the Maturity Date; provided, however, that if any Interest Payment Date would be a day other than a Business Day, such Interest Payment Date shall instead be the immediately preceding Business Day.

"Interest Period" means, as to each Loan, the period commencing on the date such Loan is disbursed and ending on the date three (3) months thereafter; provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the scheduled Maturity Date.

"Interest Rate Protection Agreement" means any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement, option or future contract or other similar agreement or arrangement designed to protect the Borrower or any of its Subsidiaries against fluctuations in interest rates or for the purpose of fixing, hedging or swapping interest rates.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of direct or indirect loans (including Guarantees of Indebtedness or other obligations), advances or capital contributions (excluding commissions, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP; provided that an acquisition of assets, Equity Interests or other securities by the Borrower or a Subsidiary of the Borrower for consideration consisting of common equity securities of the Borrower  shall not be deemed to be an Investment.  If the Borrower or any Subsidiary of the Borrower sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary of the Borrower  such that after giving effect to any such sale or disposition, such Person is no longer a direct or indirect Subsidiary of the Borrower , the Borrower will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Equity Interests of such Subsidiary not sold or disposed of.

The amount of any Investment outstanding at any time shall be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash by the Borrower or a Subsidiary of the Borrower in respect of such Investment.

"Junior Intercreditor Agreement" means an Intercreditor Agreement, substantially in the form of Exhibit F or otherwise reasonably acceptable to the Required Lenders, pursuant to which the Liens securing any applicable Indebtedness are subordinated to the Liens securing the Obligations.

"Law" means all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" means each financial institution listed on the signature pages hereto as a First Out Lender and/or Second Out Lender, as applicable, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"Lender Appointment Period" has the meaning specified in Section 8.06.

"Lien" means any mortgage, lien (statutory or other), pledge, security interest, encumbrance, claim, hypothecation, assignment for security, deposit arrangement or preference or other security agreement of any kind or nature whatsoever.

"Loan" means a First Out Loan and/or Second Out Loan, as the context may require, made by a Lender to the Borrower pursuant to Section 2.01.

"Loan Party" means each of the Borrower and Guarantors.

"Loan SPV" means CURO SPV, LLC, a Delaware limited liability company.

"Margin Stock" as defined in Regulation U of the Board as in effect from time to time.

"Material Adverse Effect" means a material adverse effect on (a) the ability of any Loan Party to perform any of its respective obligations under any of the Facility Documents, (b) the legality, validity or enforceability of any provision of this Agreement or any other Facility Document, (c) the business, financial condition or results of operations of the Loan Parties, taken as a whole, or (d) the ability of Collateral Agent (on behalf of itself and the Secured Parties) to exercise its remedies at the times and in the manner contemplated by the Collateral Document.

"Maturity Date" means the earlier of (a) the Scheduled Maturity Date and (b) the date of acceleration of the Loans pursuant to Section 6.01.

"Mortgages" means a collective reference to each mortgage, deed of trust, deed to secure debt and any other document or instrument under which any Lien on real property owned by the Borrower or any Guarantor is granted to secure any Obligations or under which rights or remedies with respect to any such Liens are governed.

"Multiemployer Plan" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means (a) the aggregate cash proceeds received by the Borrower or any of its Subsidiaries in respect of any Asset Sale (including any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (i) the direct costs relating to such Asset Sale (including legal, accounting and investment banking fees and sales commissions), (ii) any relocation expenses Incurred as a result thereof, (iii) taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), (iv) amounts required to be applied to the repayment of Indebtedness secured by a Lien on the asset or assets that were the subject of such Asset Sale which Lien is senior in priority to the Liens on such asset or assets securing the Obligations granted by the Collateral Documents, if any, and (v) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP; provided that the Borrower or any Subsidiary may, within 365 days after the receipt of any such proceeds from an Asset Sale by the Borrower or any of its Subsidiaries, apply any portion of such proceeds, at its option, as follows and such portion of such proceeds shall not constitute Net Proceeds:  (x) with respect to Asset Sales of assets of a Subsidiary that is not a Loan Party, to permanently reduce Indebtedness of a Subsidiary that is not a Loan Party (and to correspondingly reduce commitments with respect thereto), other than Indebtedness owed to the Borrower or another Subsidiary of the Borrower; (y) to the extent the Asset Sale constituted the sale of consumer loans, or other loans generated through the conduct of Similar Businesses, to the making of advances and extension of credit to customers in the ordinary course of business consistent with past practice that are either (A) recorded as accounts receivable or consumer loans on the consolidated balance sheet of the Borrower or (B) consumer loans the making of which are facilitated by the Borrower or a Subsidiary acting as a credit services organization or similar services provider in an amount no greater than the cash collateralize or repurchase such loans; and/or (z) the making of a capital expenditure or the acquisition of a controlling interest in another business or other assets, in each case, that are used or useful in a Similar Business or that replace the assets that are the subject of such Asset Sale (it being understood that if the Borrower or any Subsidiary contractually commits within such 365-day period to apply such proceeds within 180 days of such contractual commitment in accordance with any of the above clauses (x), (y) and (z), and such proceeds are subsequently applied as contemplated in such contractual commitment, then the requirement for application of net proceeds set forth in this proviso shall be considered satisfied) (it being further understood that, any net proceeds not so applied pursuant to this proviso shall constitute Net Proceeds as of the date of such 365-day period or additional 180-day period, as applicable); provided further that the proceeds realized in any single transaction or series of related transactions shall not constitute Net Proceeds unless the amount of such proceeds exceeds $3,000,000 and only the aggregate amount of proceeds (excluding, for the avoidance of doubt, net proceeds described in the preceding proviso) in excess of $3,000,000 shall constitute Net Proceeds; and

(b) the cash proceeds from the incurrence, issuance or sale by the Borrower or any Subsidiary of any Indebtedness (other than Indebtedness permitted by Section 5.18), net of all fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale.

"Non-Public Information" means information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"Note" means a note evidencing the Loans of a Lender in the form of Exhibit B hereto.

"Obligations" means (i) all obligations of every nature of each Loan Party from time to time owed to the Secured Parties under any Facility Document whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any Obligation, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise and (ii) all Additional Secured Obligations; provided that Obligations of a Loan Party shall exclude any Excluded Swap Obligations with respect to such Loan Party.

"Operating Expenses" means, with respect to any Person(s) for any period, the operating expenses of such Person(s) for such period, determined in accordance with GAAP on a consolidated basis, excluding, to the extent otherwise included in Operating Expenses, (a) one-time costs solely to the extent consisting of (i) transaction costs, restructuring expenses, expenses associated with sold or discontinued businesses and/or product lines and regulatory and legal charges in an aggregate amount during any period of four Fiscal Quarters not to exceed the One Time Expense Cap and (ii) goodwill impairments, (b) non-cash gains or losses arising from the disposition of assets (other than loans and receivables) outside of the ordinary course of business, including gains or losses realized on the disposition of the Flexiti line of business, and (c) depreciation and amortization (including amortization of goodwill and other intangibles).

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Administrative Agent.  The counsel may be an employee of or counsel to the Borrower.

"Organizational Documents" means, as applicable, for any Person, such Person's articles or certificate of incorporation, by-laws, memorandum and articles of association, partnership agreement, trust agreement, certificate of limited partnership, articles of organization, certificate of formation, shareholder agreement, voting trust agreement, operating agreement, subscription agreement, limited liability company agreement and/or analogous documents, as amended, modified or supplemented from time to time.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Facility Document, or sold or assigned an interest in any Loan or Facility Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Facility Document, except any such Taxes that result from an assignment (other than any assignment requested or required by the Borrower) pursuant to Section 9.05 and are imposed as a result of a connection between the Recipient and the taxing jurisdiction (other than a connection arising solely from any Facility Document or any transactions contemplated thereunder).

"Participant Register" has the meaning set forth in Section 9.05(g)(iv).

"Payment Notice" as defined in Section 2.15(i)(B).

"Payment Recipient" as defined in Section 2.15(i)(A).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 or Section 430 of the Code or Section 302 or Title IV of ERISA.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR."

"Permitted Acquisition" has the meaning set forth in clause 3 of the definition of Permitted Investments.

"Permitted Equity Issuance" means any issuance of Equity Interests (other than Disqualified Stock) by the Borrower permitted under this Agreement.

"Permitted Holders" means any one or more members of the Ad Hoc Group and their Affiliates, and any group (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) of which any member of the Ad Hoc Group or any of their affiliates is a member, so long as Persons otherwise qualifying as Permitted Holders control a majority of the direct or indirect interests in the Borrower held by such group in the aggregate.

"Permitted Indebtedness" means Indebtedness that:

1.   is incurred by a Loan Party and not guaranteed by any Person that is not a Loan Party;

2.   if secured, is secured by no assets other than the Collateral and the Liens securing such Indebtedness are subject to an Intercreditor Agreement;

3.   does not mature earlier than the Scheduled Maturity Date and does not have mandatory prepayment or redemption provisions (other than customary asset sale proceeds events, insurance, eminent domain and condemnation proceeds events, change of control offers, events of default, in each case not inconsistent with the terms hereof), that could result in the prepayment or redemption thereof prior to the Scheduled Maturity Date; and

4.   does not include any financial maintenance covenants.

"Permitted Investments" means:

(1)      (x) any Investment in the Borrower or any Subsidiary of the Borrower (other than a Receivables Entity and other than Loan SPV); *provided* that the Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in

27

value) of all Investments by the Loan Parties in Subsidiaries of the Borrower other than Loan Parties pursuant to this clause (x) of paragraph (1), together with all Investments pursuant to paragraph (3) below outstanding at such time, shall not exceed $25 million and (y) any Investment in any Canadian Subsidiary (other than a Receivables Entity) in the form of cash or Cash Equivalents made in the ordinary course of business; provided that the assets held by such Canadian Subsidiary in which an Investment is made pursuant to this clause (y) of paragraph (1) consist entirely of assets comprising the Canadian direct-lending line of business (other than de minimis assets) (any Subsidiary described in this clause (y), a "Canadian Direct Lending Subsidiary");

(2)     any Investment in cash or Cash Equivalents;

(3)     any Investment by the Borrower or any Subsidiary of the Borrower in a Person, if as a result of such Investment (A) such Person becomes a Subsidiary of the Borrower (other than a Receivables Entity and other than Loan SPV) or (B) such Person is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Borrower or a Subsidiary of the Borrower (other than a Receivables Entity and other than Loan SPV); *provided* that the Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value) of all Investments pursuant to this paragraph (3) in Persons that do not become Loan Parties, together with all Investments by Loan Parties in Subsidiaries of the Borrower other than Loan Parties pursuant to clause (x) of paragraph (1) above, outstanding at such time, shall not exceed $[25] million (any Investment pursuant to this clause (3), a "Permitted Acquisition");

(4)     any Investment existing on the Closing Date (and set forth on Schedule 1.01(A) attached hereto) or made pursuant to binding commitments in effect on the Closing Date (and set forth on Schedule 1.01(A) attached hereto) or an Investment consisting of any extension, modification or renewal of any Investment existing on the Closing Date (and set forth on Schedule 1.01(A) attached hereto); *provided* that the amount of any such Investment may be increased only (x) as required by the terms of such Investment as in existence on the Closing Date or (y) as otherwise permitted under this Agreement;

(5)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 5.19;

(6)     Hedging Obligations that are Incurred by the Borrower or any of its Subsidiaries for the purpose of fixing or hedging (A) interest rate risk with respect to any floating rate Indebtedness that is permitted by the terms of this Agreement to be outstanding or (B) currency exchange risk in connection with existing financial obligations and not for purposes of speculation;

(7)     Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits;

(8)     loans and advances to officers, directors and employees of the Borrower and its Subsidiaries in the ordinary course of business not to exceed $[2,000,000] in the aggregate at any one time outstanding;

(9)     any Investment consisting of a Guarantee permitted by <u>Section 5.18</u>;

(10)     any redemption or repurchase of the Backstop Notes by Loan SPV in accordance with the terms thereof;

(11)     Investments received in settlement of <u>bona fide</u> disputes or as distributions in bankruptcy, insolvency, foreclosure or similar proceedings, in each case in the ordinary course of business;

(12)     advances to customers or suppliers in the ordinary course of business;

(13)     Investments consisting of purchases and acquisitions of supplies, materials and equipment or purchases or contract rights or licenses of intellectual property, in each case in the ordinary course of business;

(14)     receivables owing to the Borrower or any of its Subsidiaries if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(15)     CSO Obligations of the Borrower and its Subsidiaries incurred in the ordinary course of business;

(16)     Investments consisting of obligations of officers and employees to the Borrower or its Subsidiaries in connection with such officer's and employees' acquisition of Equity Interests in the Borrower (other than Disqualified Stock) so long as no cash is actually advanced by the Borrower or any of its Subsidiaries in connection with the acquisition of such obligations);

(17)     Investments in a Receivables Entity, or any Investment by a Receivables Entity in any other Person, in each case, in connection with a Qualified Receivables Transaction, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Transaction or any related Indebtedness; *provided*, *however*, that any Investment in a Receivables Entity is in the form of a purchase money note, contribution or sale of receivables or an equity interest; and

(18)     other Investments in an aggregate amount outstanding not to exceed $40,000,000.

"<u>Permitted Liens</u>" means:

(1)     subject to the terms of an Intercreditor Agreement, Liens on the Collateral securing Indebtedness permitted to be Incurred pursuant to <u>Section 5.18(b)(i)</u>, provide not more than $25 million principal amount of such Indebtedness shall be subject to a Senior Intercreditor Agreement and the remainder, if any, shall be secured by Liens ranking junior in priority to the Liens securing the Obligations or any Guarantees thereof pursuant to a Junior Intercreditor Agreement;

(2)     Liens in favor of the Borrower or a Guarantor;

(3)     Liens on the Loans held by Loan SPV, the proceeds of such Loans, and the other assets of Loan SPV, in each case securing the Backstop Notes;

(4)     [reserved;]

(5)     Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds, workmen's compensation or unemployment obligations or other obligations of a like nature, or to secure letters of credit issued with respect to such obligations, Incurred in the ordinary course of business;

(6)     Liens consisting of deposits in connection with leases or other similar obligations, or securing letters of credit issued in lieu of such deposits, incurred in the ordinary course of business, and cash deposits in connection with acquisitions otherwise permitted under this Agreement;

(7)     Liens consisting of deposits or cash collateral securing obligations of any Loan Party or Subsidiary thereof in respect of overdrafts and liabilities that arise from any treasury, depository or cash management services, including in connection with any automated clearing house transfers of funds or any similar transactions;

(8)     Liens existing on the Closing Date (provided that such Liens, to the extent securing obligations in excess of $1 million individually or $2 million in the aggregate, are set forth on Schedule 1.01(B)) and replacement Liens that do not encumber additional assets or secure increased obligations, unless such encumbrance is otherwise permitted;

(9)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent for more than 30 days or that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, *provided* that any reserve or other appropriate provision as shall be required in conformity with GAAP shall have been made therefor;

(10)     Liens securing Permitted Refinancing Debt; *provided* that the obligor under such Indebtedness was permitted to Incur such Liens with respect to the Indebtedness so refinanced under this Indenture and:

(a)     the new Lien is limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to, such property or proceeds or distributions thereof);

(b)     the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (x) the outstanding principal amount, or, if greater, committed amount, of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged with such Permitted Refinancing Debt; and (y) an amount necessary to pay any fees and expenses, including premiums, related to such renewal, refunding, refinancing, replacement, defeasance or discharge; and

(c)      if the original Lien is on any portion of the Collateral and junior in priority to the Liens securing the Obligations and the Guarantees thereof, the new Lien shall be junior in priority to the Liens securing the Obligations and the Guarantees thereof;

(11)     statutory and common law Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen or other similar Liens arising in the ordinary course of business with respect to amounts that are not yet delinquent for more than 30 days or that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, *provided* that any reserve or other appropriate provision as shall be required in conformity with GAAP shall have been made therefor;

(12)     Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review, *provided* that any reserve or other appropriate provision as shall be required in conformity with GAAP shall have been made therefor;

(13)     Liens arising from filings of UCC financing statements or similar documents regarding leases or otherwise for precautionary purposes relating to arrangements not constituting Indebtedness;

(14)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(15)     Liens securing the Obligations or any Guarantees thereof;

(16)     [reserved];

(17)     Liens securing obligations in an aggregate principal amount at the time of incurrence of such Liens not to exceed $25,000,000;

(18)     encumbrances or exceptions expressly permitted pursuant to the Mortgages;

(19)     Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including Liens securing letters of credit issued in the ordinary course of business in connection therewith;

(20)     [reserved;]

(21)     Liens on the property or assets of the Canadian Recourse Facility Borrower securing the Canadian Recourse Facility; and

(22)     any Lien on (a) loans receivable and related assets of the types specified in the definition of "Qualified Receivables Transaction" transferred to a Receivables Entity or on assets

31

of a Receivables Entity or (b) Servicer Accounts, in each case under clauses (a) or (b), granted in connection with (and as security for) a Qualified Receivables Transaction.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest in connection with or in respect of any referenced Indebtedness.

"Permitted Refinancing Debt" means any Indebtedness of the Borrower or any of its Subsidiaries issued in exchange for, or the net cash proceeds of which are used to extend, refinance (including through the issuance of debt securities), renew, replace (whether or not upon termination and whether with the original lenders, institutional investors or otherwise), defease or refund other Indebtedness of the Borrower or any of its Subsidiaries, in whole or in part; *provided* that:

(1)     the principal amount (or accreted value, if applicable) of such Permitted Refinancing Debt does not exceed the principal amount and premium, if any, plus accrued interest (or accreted value, if applicable) of the Indebtedness so extended, refinanced, renewed, replaced, defeased or refunded (plus the amount of any fees and expenses Incurred in connection therewith);

(2)     such Permitted Refinancing Debt has a final scheduled maturity date later than the final scheduled maturity date of, and has a Weighted Average Life equal to or greater than the Weighted Average Life of, the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(3)     if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is (i) subordinated in right of payment to the Obligations or any Guarantee thereof, such Permitted Refinancing Debt is subordinated in right of payment to, the Obligations or any Guarantee thereof on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded, or (ii) unsecured or secured by Liens on any of the Collateral junior in priority to the Liens securing the Obligations or any Guarantee thereof, such Permitted Refinancing Debt is either unsecured or secured by Liens on any of the Collateral junior in priority to the Liens securing the Obligations or any Guarantee thereof on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded; and

(4)     such Indebtedness is incurred either by the Borrower or by the Subsidiary of the Borrower that is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded or would otherwise be permitted to Incur such Indebtedness.

"Person" means any individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, association, estate, organization, joint venture or other entity, or a government or any agency or political subdivision or agency thereof.

"Platform" has the meaning set forth in Section 5.04.

"Pledge Agreement" means the Pledge Agreement, dated as of the Closing Date, among the Borrower and the Guarantors in favor of the Collateral Agent, as amended or supplemented from time to time in accordance with its terms.

"Preferred Stock" as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"Prepayment Notice" has the meaning set forth in Section 2.13(a).

"Principal Office" means, for the Administrative Agent, its "Principal Office" or account which may include such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to the Borrower, the Administrative Agent and each Lender.

"Pro Rata Share" means, with respect to all payments, computations and other matters relating to the Commitment or Loans of any Lender or any participations purchased therein by any Lender, as the context requires, the percentage obtained by dividing (x) the Exposure of that Lender by (y) the aggregate Exposure of all Lenders.

"PTE" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Receivables Facility" means any Indebtedness incurred in connection with a Qualified Receivables Transaction.  Each of the Securitization Facilities, as in effect on the Closing Date, shall constitute a Qualified Receivables Facility.

"Qualified Receivables Transaction" means any transaction or series of transactions that may be entered into by the Borrower or any of the Subsidiaries pursuant to which the Borrower or any of the Subsidiaries may sell, convey or otherwise transfer to:

       (1)     a Receivables Entity (in the case of a transfer by the Borrower or any of the Subsidiaries); or

       (2)     any other Person (in the case of a transfer by a Receivables Entity),

or may grant a security interest in, any loans receivable (whether now existing or arising in the future) of the Borrower or any of the Subsidiaries, and any assets related thereto, including all collateral securing such loans receivable, all contracts and all Guarantees or other obligations in respect of such loans receivable, proceeds of such loans receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving loans receivable or

refinancings thereof; *provided*, *however*, that the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the chief financial officer of the Borrower ).

      For the avoidance of doubt and notwithstanding the foregoing, each of the transactions contemplated by each of the Securitization Facilities (each as in effect on the Closing Date (after giving effect to Section 3.01(j))) is a "Qualified Receivables Transaction."

"Receivables Entity" means (a) a Wholly-Owned Subsidiary of the Borrower or (b) another Person, engaging in a Qualified Receivables Transaction with the Borrower, in each case, that engages in no activities other than in connection with the financing of loans receivables and is designated by the Board of Directors of the Borrower (as provided below) as a Receivables Entity, and in either of clause (a) or (b):

      (1)    no portion of the Indebtedness or any other obligations (contingent or otherwise) of such entity:

           (A)    is Guaranteed by the Borrower or any Subsidiary of the Borrower (excluding Guarantees of obligations (other than the principal of, and interest on, Indebtedness) pursuant to Standard Securitization Undertakings),

           (B)    is recourse to or obligates the Borrower or any Subsidiary of the Borrower in any way (other than pursuant to Standard Securitization Undertakings), or

           (C)    subjects any property or asset of the Borrower or any Subsidiary of the Borrower, directly or indirectly, contingently or otherwise, to the satisfaction thereof (other than pursuant to Standard Securitization Undertakings);

      (2)    the entity is not an Affiliate of the Borrower or is an entity with which neither the Borrower nor any Subsidiary of the Borrower has any material contract, agreement, arrangement or understanding other than on terms that the Borrower reasonably believes to be not materially less favorable to the Borrower or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Borrower; and

      (3)    is an entity to which neither the Borrower nor any Subsidiary of the Borrower has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

      Any such designation by the Board of Directors of the Borrower shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certified copy of the resolution of such Board of Directors giving effect to such designation and an officer's certificate certifying that such designation complied with the foregoing conditions.

      Each of Heights Financing I, LLC, Heights Financing II, LLC, First Heritage Financing I, LLC, CURO Canada Receivables GP II, Inc., CURO Canada Receivables GP, Inc., CURO Canada Receivables Limited Partnership, and CURO Canada Receivables II Limited Partnership is deemed to have been designated as a Receivables Entity as of the Closing Date.

"Recipient" means (a) the Administrative Agent and (b) any Lender, as applicable.

"Register" has the meaning specified in Section 2.08(b).

"Regulation D" means Regulation D of the Board, as in effect from time to time.

"Regulation FD" means Regulation FD as promulgated by the SEC under the Securities Act and Exchange Act.

"Regulation T" means Regulation T issued by the Board.

"Regulation U" means Regulation U issued by the Board.

"Regulation X" means Regulation X issued by the Board.

"Related Fund" means, with respect to any Lender that is a fund that invests in bank or commercial loans and similar extensions of credit, any other fund that invests in bank or commercial loans and similar extensions of credit and is advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Lender.

"Relevant Governmental Body" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, trustees, officers, employees, shareholders, controlling Persons, counsel, representatives, attorneys-in-fact, agents and advisors of such Person and of such Person's Affiliates and each of their heirs, successors and assigns.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the sum of the aggregate Exposure of all Lenders; *provided* that "Required Lenders" shall always include at least two (2) unaffiliated Lenders if there are two or more unaffiliated Lenders.

"Resolution Authority" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payments" has the meaning specified in Section 5.16.

"Scheduled Maturity Date" means [●], 2028.

"SEC" means the United States Securities and Exchange Commission and any successor Governmental Authority performing a similar function.

"Second Out Commitment" means a commitment of a Lender to make, be deemed to make, or otherwise fund a Second Out Loan hereunder on the Closing Date, and "Second Out Commitments" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Second Out Commitment, if any, is set forth opposite such Lender's name on Schedule 2.01, subject to any adjustment or reduction pursuant to the terms and conditions hereof.

"Second Out Lender" means each financial institution listed Schedule 2.01 as a Second Out Lender for so long as they hold Second Out Loans and any other Person that becomes a party hereto as a Second Out Lender pursuant to an Assignment Agreement.

"Second Out Loan" means a loan made or deemed made by a Second Out Lender to the Borrower pursuant to Section 2.01(b).

"Secured Hedging Obligations" means all Hedging Obligations of any Loan Party pursuant to an agreement with any person that, at the time it enters into such agreement (or on the Closing Date), is an Agent, a Lender or an Affiliate of an Agent or a Lender; provided that obligations under such agreement are not designated by notice delivered by the Borrower to the Administrative Agent to be excluded from being Secured Hedging Obligations.

"Secured Parties" has the meaning set forth in the Security Agreement.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Securitization Facilities" means the following warehouse/securitization facilities entered into by the Borrower or any of its Subsidiaries:

(i)        the non-recourse facility established by that certain Credit Agreement, dated as of July 13, 2022, among First Heritage Financing I, LLC, as borrower ("First Heritage"), First Heritage Credit, LLC, as servicer, the other servicers and subservicers from time to time party thereto, the lenders from time to time party thereto, the agents for the lender groups from time to time party thereto, Atlas Securitized Products Holdings, L.P., as administrative agent and structuring and syndication agent, ComputerShare Trust Company, National Association, as paying agent, image file custodian, and collateral agent, Systems & Services Technologies, Inc., as backup servicer and Wilmington Trust, National Association, as borrower loan trustee ("First Heritage Loan Trustee"), and as amended, amended and restated, supplemented, replaced or otherwise modified from time to time and the related basic documents in effect from time to time, including without limitation, the Purchase Agreement dated as of July 13, 2022, among First Heritage, First Heritage Credit, LLC, the originators from time to time party thereto and the First Heritage Loan Trustee, as amended, amended and restated, supplemented or otherwise modified from time to time to the extent such amendment, amendment and restatement, supplement or other modification after the date hereof is permitted by the terms of the Facility Documents (the "First Heritage SPV Facility");

(ii)      the non-recourse facility established by that certain Credit Agreement, dated as of July 15, 2022, among Heights Financing I, LLC, as borrower ("Heights I"), SouthernCo, Inc., as servicer, the other servicers and subservicers from time to time party thereto, the lenders from time to time party thereto, the agents for the lender groups from time to time party thereto, Atlas Securitized Products Holdings, L.P., as administrative agent and structuring and syndication agent, ComputerShare Trust Company, National Association, as paying agent, image file custodian, and collateral agent, Systems & Services Technologies, Inc., as backup servicer and Wilmington Trust, National Association, as borrower loan trustee ("Heights I Loan Trustee"), and as amended, amended and restated, supplemented, replaced or otherwise modified from time to time and the related basic documents in effect from time to time, including without limitation, the Purchase Agreement dated as of July 15, 2022, among Heights I, SouthernCo, Inc., the originators from time to time party thereto and the Heights I Loan Trustee, as amended, amended and restated, supplemented or otherwise modified from time to time to the extent such amendment, amendment and restatement, supplement or other modification after the date hereof is permitted by the terms of the Facility Documents (the "Heights I SPV Facility");

(iii)      the non-recourse facility established by that certain Credit Agreement, dated as of November 3, 2023, among Heights Financing II, LLC, as borrower ("Heights II"), SouthernCo, Inc., as servicer, the other servicers and subservicers from time to time party thereto, the lenders from time to time party thereto, the agents for the lender groups from time to time party thereto, Midtown Madison Management LLC, as administrative agent, structuring and syndication agent, collateral agent and paying agent, Systems & Services Technologies, Inc., as backup servicer and image file custodian, and Wilmington Trust, National Association, as borrower loan trustee ("Heights II Loan Trustee"), and as amended, amended and restated, supplemented, replaced or otherwise modified from time to time and the related basic documents in effect from time to time, including without limitation, the Purchase Agreement dated as of November 3, 2023, among Heights II, SouthernCo, Inc., the originators and other entities from time to time party thereto and the Heights II Loan Trustee, as amended, amended and restated, supplemented or otherwise modified from time to time to the extent such amendment, amendment and restatement, supplement or other modification after the date hereof is permitted by the terms of the Facility Documents (the "Heights II SPV Facility");

(iv)      the non-recourse facility established by that certain Second Amended and Restated Asset-Backed Revolving Credit Agreement, dated as of November 12, 2021, among Curo Canada Receivables Limited Partnership, as borrower ("Canada I SPV"), by its general partner, Curo Canada Receivables GP Inc. ("Canada I GP"), the lenders party thereto and Waterfall Asset Management, LLC, as administrative agent, and as amended, amended and restated, supplemented, replaced or otherwise modified from time to time and the related loan documents in effect from time to time, including without limitation, the Second Amended and Restated Sale and Servicing Agreement dated as of November 12, 2021, among Canada I SPV, Canada I GP, Curo Canada Corp., as seller and servicer, LendDirect Corp., as seller and servicer and the other entities from time to time party thereto, as amended, amended and restated, supplemented or otherwise modified from time to time to the extent such amendment, amendment and restatement, supplement or other modification after the date hereof is permitted by the terms of the Facility Documents (the "Canada I SPV Facility"); and

(v)      the non-recourse facility established by that certain Asset-Backed Revolving Credit Agreement, dated as of May 12, 2023, among Curo Canada Receivables II Limited Partnership, as borrower ("Canada II SPV"), by its general partner, Curo Canada Receivables II GP Inc. ("Canada II GP"), the lenders party thereto and Midtown Madison Management LLC, as administrative agent, and as amended, amended and restated, supplemented, replaced or otherwise modified from time to time and the related loan documents in effect from time to time, including without limitation, the Sale and Servicing Agreement dated as of May 12, 2023, among Canada II SPV, Canada II GP, Curo Canada Corp., as seller and servicer, LendDirect Corp., as seller and servicer and the other entities from time to time party thereto, as amended, amended and restated, supplemented or otherwise modified from time to time to the extent such amendment, amendment and restatement, supplement or other modification after the date hereof is permitted by the terms of the Facility Documents (the "Canada II SPV Facility").

"Security Agreement" means the Security Agreement, dated as of the Closing Date, among the Borrower and the Guarantors in favor of the Collateral Agent, as amended or supplemented from time to time in accordance with its terms.

"Senior Intercreditor Agreement" means an Intercreditor Agreement customary in form and substance and reasonably satisfactory to the Required Lenders, pursuant to which the Liens securing any Indebtedness are made pari passu with the Liens securing the Obligations (other than with respect to control of remedies).

"Servicer Account" means any deposit account or securities account used as a collection account for loans receivable contributed or sold to the applicable Receivables Entity that is periodically swept to a zero balance or subject to a requirement to transfer collections therefrom on a periodic basis.

"Set-off Party" has the meaning specified in Section 9.12.

"Similar Business" means any business conducted or proposed to be conducted by the Borrower and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental, complementary or ancillary thereto, or a reasonable extension or expansion thereof.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"Solvent" means, with respect to the Borrower and any of its Subsidiaries on a consolidated basis, that as of the date of determination, both (i) (a) the sum of the Borrower and its Subsidiaries' debt (including contingent liabilities) does not exceed the present fair saleable value of the Borrower's and its Subsidiaries' present assets; (b) the Borrower and its Subsidiaries' capital is not unreasonably small in relation to its business as contemplated on the Closing Date or with respect to any transaction contemplated to be undertaken after the Closing Date; and (c) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become

due (whether at maturity or otherwise); and (ii) such Person is "solvent" within the meaning given that term and similar terms under the Bankruptcy Code and applicable Laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified Loan Party" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 7.10).

"Standard Securitization Undertakings" means representations, warranties, covenants and indemnities entered into by the Borrower or any Subsidiary of the Borrower that, taken as a whole, are customary for a non-recourse loans receivable financing transaction.

"Subsidiary" of any Person means:

(1)    any corporation of which more than 50% of the outstanding shares of Capital Stock having ordinary voting power for the election of directors is owned directly or indirectly by such Person; and

(2)    any partnership, limited liability company, association, joint venture, business trust or other entity in which such Person, directly or indirectly, has at least a majority ownership interest entitled to vote at the election of directors, managers or trustees thereof (or other person performing similar functions).

Except as otherwise indicated herein, references to Subsidiaries shall refer to Subsidiaries of the Borrower.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, repurchase transactions, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Swap Master Agreement"), including any such obligations or liabilities under any Swap Master Agreement.

"Swap Master Agreement" has the meaning set forth in the definition of Swap Agreement.

39

"Swap Obligations" means with respect to any Guarantor any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Tax" means any present or future tax, levy, impost, duty, assessment, deduction or withholding or similar charges in the nature of a tax imposed by any Governmental Authority (and interest, fines, penalties and additions related thereto).

"Term SOFR" means, for any calculation with respect to a Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Transactions" means the borrowing of Loans by the Borrower under this Agreement contemplated to be funded on the Closing Date, and the payment of fees and expenses, incurred in connection with the foregoing.

"UK Financial Institution" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Lender" has the meaning set forth in Section 2.19(c).

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Unrestricted Cash" means, with respect to any Person(s), cash or Cash Equivalents of such Person(s) that would not appear as "restricted" on a consolidated balance sheet of such Person(s).

"Voting Stock" of a Person means all classes of Capital Stock or other interests (including partnership interests) of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

"Weighted Average Life" means, as of any date, with respect to any Indebtedness, the quotient obtained by dividing (1) the sum of the products of the number of years from such date to the dates of each successive scheduled principal payment (including any sinking fund payment requirements) of such Indebtedness multiplied by the amount of such principal payment, by (2) the sum of all such principal payments.

"Wholly-Owned Subsidiary" of any Person means a Subsidiary of such Person all of the outstanding Capital Stock of which (other than directors' qualifying shares and nominal amounts required to be held by local nationals) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person (or any combination thereof).

"Write-Down and Conversion Powers" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02   Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

Section 1.03   Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required

to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis.  If at any time any change in GAAP would affect the computation of any provision (including any definition, financial ratio or requirement set forth in any Facility Document), and either the Borrower or Administrative Agent shall so request, Administrative Agent and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to Administrative Agent financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

Section 1.04   <u>Principles of Construction</u>.  All references to Articles, Sections, Schedules, Exhibits, and Appendices are to Articles, Sections, Schedules, Exhibits, and Appendices in or to this Agreement unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All references to agreements and other contractual instruments shall be deemed to include subsequent amendments, permitted assignments and other modifications thereto, but only to the extent such amendments, assignments and other modifications are not prohibited by the terms of any Facility Document.  Furthermore, any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time.

Section 1.05   <u>Rate</u>.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract

or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.06   Divisions.  Any restriction, condition or prohibition applicable to a merger, transfer, consolidation, amalgamation, assignment, sale or transfer, or similar term set forth in the Facility Documents shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company, as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable.  Any reference in any Facility Document to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person under the Facility Documents (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity.

Section 1.07   Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as specifically provided in Section 2.15 or as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

## ARTICLE II

## AMOUNTS AND TERMS OF THE LOANS

Section 2.01   Commitments and Loans.

(a)      First Out Commitments and Loans.

(i)      Subject to the terms and conditions hereof, each First Out Lender agrees, severally and not jointly, to make, and in accordance with the Chapter 11 Plan will be deemed to have made, First Out Loans to the Borrower on the Closing Date in an aggregate amount equal to such First Out Lender's Closing Date First Out Commitment.

(ii)      Subject to the terms and conditions hereof, each First Out Lender agrees, severally and not jointly, to make First Out Loans to the Borrower following the Closing Date and on or prior to the first anniversary of the Closing Date in up to two (2) drawings in an aggregate amount not to exceed such First Out Lender's remaining First Out Commitment following the Closing Date.  Each borrowing pursuant to this clause (ii) shall be in an aggregate principal amount of $[12,500,000] (or shall be in an amount equal to the entirety of the remaining First Out Commitments).

(iii)      Upon a First Out Lender's funding of a First Out Loan, such First Lender's First Out Commitment with respect to such First Out Loan shall be permanently reduced by the amount of such First Out Loan.  Any First Out Commitment outstanding as of the

first anniversary of the Closing Date shall automatically expire without further notice or action by any Person at 12:00 p.m. (New York City time) on the first anniversary of the Closing Date. Amounts repaid or prepaid in respect of the First Out Loans may not be reborrowed.

(b)      Second Out Commitments and Loans.  Subject to the terms and conditions hereof, each Second Out Lender agrees, severally and not jointly, to make, and in accordance with the Chapter 11 Plan will be deemed to have made, Second Out Loans to the Borrower on the Closing Date in an aggregate amount not to exceed such Second Out Lender's Second Out Commitment.  The full amount of the Second Out Commitments shall be drawn in a single drawing, and the Second Out Commitments shall expire in their entirety accordingly, on the Closing Date.  Second Out Loans, or portions thereof, that are repaid or prepaid may not be reborrowed.

Section 2.02    Borrowing Mechanics for Loans.

(a)      [Reserved.]

(b)      The Borrower shall deliver to the Administrative Agent a fully executed and delivered Borrowing Request not later than 12:00 noon (New York time) at least three (3) Business Days in advance of the date that the Borrower seeks to borrow Loans hereunder(other than any First Out Loans and Second Out Loans deemed to have made on the Closing Date in accordance with the Chapter 11 Plan) (or, in each case, such shorter period acceptable to the Administrative Agent).

(c)      [Reserved].

(d)      Notice of receipt of each Borrowing Request in respect of Loans, together with the amount of each Lender's Pro Rata Share thereof, if any, together with the applicable interest rate, shall be provided by the Administrative Agent to each Lender by electronic mail with reasonable promptness, but (provided the Administrative Agent shall have received such notice by 12:00 noon (New York time)) on the same day as the Administrative Agent's receipt of such notice from the Borrower.

(e)      Each Lender shall make the amount of its Loans available to the Administrative Agent not later than 12:00 noon (New York time) on the  applicable borrowing date by wire transfer of same day funds in Dollars at the Principal Office designated by the Administrative Agent.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein and receipt of all applicable funds from the Lenders, the Administrative Agent shall make the proceeds of such Loans available to the Borrower on the Closing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by the Administrative Agent from Lenders to be credited to the account of the Borrower at the Principal Office designated by the Administrative Agent or such other account as may be designated in writing to the Administrative Agent by the Borrower.

Section 2.03    Payment of Loans.  Notwithstanding any other provision hereof or of any other Facility Document, all Loans, all accrued interest thereon and all other Obligations (other than Additional Secured Obligations) shall be due and payable by the Borrower on the Maturity Date.

Section 2.04    [Reserved].

Section 2.05    [Reserved].

Section 2.06    Pro Rata Shares; Availability of Funds.

(a)    Pro Rata Shares.  All Loans (other than fees paid in kind in accordance with the terms of the Facility Documents, which shall be paid as set forth therein) shall be made by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder.

(b)    Availability of Funds.  Unless the Administrative Agent shall have been notified by any Lender prior to the applicable Closing Date that such Lender does not intend to make available to the Administrative Agent the amount of such Lender's Loan requested on the Closing Date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such Closing Date and the Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to the Borrower a corresponding amount on such Closing Date.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the Closing Date until the date such amount is paid to the Administrative Agent, at the customary rate set by the Administrative Agent for the correction of errors among banks.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall within five (5) Business Days pay such corresponding amount to the Administrative Agent together with interest thereon, for each day from the Closing Date until the date such amount is paid to the Administrative Agent.  Nothing in this Section 2.06(b) shall be deemed to relieve any Lender from its obligation to fulfill its Commitment hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder.

Section 2.07    Use of Proceeds.  The Loans deemed advanced on the Closing Date shall be issued in satisfaction of the applicable obligations under the Chapter 11 Plan.  The proceeds of the Loans incurred following the Closing Date may be applied by the Borrower for general corporate purposes.  No portion of the proceeds of any Loan shall be used in any manner that causes or might cause such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board or any other regulation thereof or to violate the Exchange Act.

Section 2.08    Evidence of Indebtedness; Register; Notes.

(a)    Lenders' Evidence of Indebtedness.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of the Borrower to such Lender, including the amounts of the Loans made by it, the amount of interest and fees paid to it

45

in kind and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; provided that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitment or the Borrower's Obligations in respect of any Loans; *provided*, *further*, that in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)     Register.  The Administrative Agent (or its agent or sub-agent appointed by it), as a non-fiduciary agent of Borrower, shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Commitment and Loans of each Lender from time to time (the "Register").  The Register shall be available for inspection by the Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior written notice.  The Administrative Agent shall record, or shall cause to be recorded, in the Register the Commitments and the Loans in accordance with the provisions of Section 9.05, any payment of interest or fees in kind and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on the Borrower and each Lender, absent manifest error; provided that failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitment or the Borrower's Obligations in respect of any Loan.  The Borrower hereby designates the Administrative Agent to serve as the Borrower's non-fiduciary agent solely for purposes of maintaining the Register as provided in this Section 2.08, and the Borrower hereby agrees that, to the extent the Administrative Agent serves in such capacity, the Administrative Agent and its officers, directors, employees, agents, sub-agents and affiliates shall constitute Indemnitees.

(c)     Notes.  If so requested by any Lender by written notice to the Borrower (with a copy to the Administrative Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 9.05) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after the Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loan.

Section 2.09     Interest on Loans.

(a)     Except as otherwise set forth herein, the First Out Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof at a rate per annum equal to Adjusted Term SOFR plus 10.00% per annum.

(b)     Except as otherwise set forth herein, the Second Out Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof at a rate per annum equal to 13.00% per annum.

(c)     Interest on each Loan shall be payable in kind or, at the Borrower's election, in whole or in part in cash (and shall be paid in full, in cash on the Maturity Date); *provided*, the Borrower shall elect to pay interest in kind to the extent required under any of the

Securitization Facilities.  Borrower shall deliver written notice of its election to pay interest in cash and/or in kind to the Administrative Agent at least six (6) Business Days prior to the applicable Interest Payment Date; *provided*, if the Borrower does not submit such notice, the Borrower shall be deemed to have elected to pay interest in kind to the maximum permissible extent.  Any interest that is paid in kind shall be capitalized and added to the outstanding principal amount of the applicable Loans (i.e., First Out Loans or Second Out Loans) on the applicable Interest Payment Date and constitute First Out Loans or Second Out Loans, as applicable, for all purposes under the Facility Documents, which Loans shall be payable as part of the outstanding principal amount of the Loans upon any prepayment of the Loans in accordance with the terms of the Facility Documents, whether voluntary or mandatory, and shall be payable in cash as part of the outstanding principal amount of the Loans upon the Maturity Date. All capitalized amounts shall constitute principal of the First Out Loans or Second Out Loans and shall accrue interest at the applicable rate from the date capitalized at the rate at which the Loans accrue interest, payable in accordance with this <u>Section 2.09</u>.

(d)      Except as otherwise set forth herein, (i) interest on First Out Loans shall be computed on the basis of a 360-day year and actual days elapsed, and (ii) interest on each Second Out Loan shall be computed on the basis of a 365-day year, for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan  shall be included, and the date of payment of such Loan  shall be excluded; *provided* that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)      Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of such Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity or upon acceleration of such Loan.

Section 2.10    [Reserved].

Section 2.11    <u>Default Interest; Late Fees</u>.  If (a) all or any portion of the principal amount of or interest on any Loan shall not be paid when due (whether at stated maturity, by acceleration or otherwise) or (b) an Event of Default shall occur and be continuing, the applicable portion of such Obligations or, as to clause (b), all outstanding Loans (whether or not overdue) shall bear interest, from the date of such nonpayment until such amount is paid in full or from the date of occurrence of such Event of Default until such Event of Default ceases to be continuing, at a rate per annum (the "<u>Default Rate</u>") that is equal to the rate that would otherwise be applicable to such loans pursuant to <u>Section 2.09</u> *plus* 2.00% per annum.  Payment or acceptance of the increased rates of interest provided for in this <u>Section 2.11</u> is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender. Interest accruing pursuant to this <u>Section 2.11</u> is payable on demand in cash in arrears.

Section 2.12   Fees.  The Borrower shall pay to the Agents, for the account of the Agents, the fees and other amounts set forth in the Agent Fee Letter in the amounts, and at the times, specified therein.

Section 2.13   Voluntary Prepayments.

(a)   Voluntary Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Loan, subject to the succeeding clause (b), in whole or in part, without premium or penalty in an aggregate principal amount equal to $500,000, any integral multiple thereof in excess of $500,000 or the aggregate principal amount outstanding. The Borrower shall provide written notice to the Administrative Agent of the voluntary prepayment of any Loans (the "Prepayment Notice") not later than 2:00 p.m. (New York City time) at least three (3) Business Days prior to such voluntary prepayment.  Each such Prepayment Notice shall be irrevocable and the principal amount of the Loans specified therein shall become due and payable on the prepayment date specified therein; *provided* that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, indentures or similar agreements or other transactions, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. All voluntary prepayments of Loans shall be accompanied by accrued and unpaid interest on the principal amount repaid.

(b)   Any such voluntary prepayment shall be applied (1) ratably to the First Out Loans of each First Out Lender until such First Out Loans are repaid in full, and (2) thereafter, ratably to the Second Out Loans of each Second Out Lender.

Section 2.14   Mandatory Prepayments.  (a) The Borrower shall apply (i) all Net Proceeds of Asset Sales permitted by Section 5.19(r) (which, for the avoidance of doubt, shall not include transfers of loan receivables in connection with the Securitization Facilities) and of all Events of Loss, in each case to the extent in excess of $10 million in the aggregate for all such transactions and occurrences since the Closing Date and (ii) all Net Proceeds of Incurrences of Indebtedness not permitted by Section 5.18, to prepay Loans within 5 Business Days after receipt thereof.  Any such prepayment shall be applied (1) ratably to the First Out Loans of each First Out Lender until such First Out Loans are repaid in full, and (2) thereafter, ratably to the Second Out Loans of each Second Out Lender.

(b)   All mandatory prepayments of Loans shall be accompanied by accrued and unpaid interest on the principal amount repaid, calculated as if Loans in a principal amount equal to the amount of such mandatory prepayment were being voluntarily prepaid on the date of such mandatory prepayment.

(c)   The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans not later than 2:00 p.m. (New York City time) five (5) Business Days prior to the date of such mandatory prepayment.  Each such Prepayment Notice shall specify the date of such mandatory prepayment and provide a reasonably detailed calculation of the amount of such prepayment, the interest payable in connection therewith.  The Administrative Agent will promptly notify each Lender of the contents of any such Prepayment Notice and of such Lender's ratable portion of such prepayment.  Any such mandatory

48

prepayment shall be applied ratably to the Loans of each Lender; *provided* that any Lender (a "Declining Lender" and any Lender which is not a Declining Lender, an "Accepting Lender") may elect, by delivering written notice to the Administrative Agent and the Borrower not later than 3:00 p.m. (New York City time) one (1) Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment, that any amount of any mandatory prepayment otherwise required to be made with respect to the Loans held by such Lender not be made (the aggregate amount of such prepayments declined by the Declining Lenders, the "Declined Prepayment Amount"); *provided further* if a Lender fails to deliver notice setting forth such rejection of a prepayment to the Administrative Agent within the time frame specified above or such notice fails to specify the principal amount of the Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Loans; *provided further* that Loan SPV shall be treated as a Declining Lender with respect to the portion of any such mandatory prepayment that it elects not be made and an Accepting Lender with respect to the portion of any such mandatory prepayment that it elects to be made.  In the event that the Declined Prepayment Amount is greater than $0, the Administrative Agent will promptly notify each Accepting Lender of the amount of such Declined Prepayment Amount and of any such Accepting Lender's ratable portion of such Declined Prepayment Amount (based on such Lender's pro rata share of the Loans other than the Loans of Declining Lenders)).  Any such Accepting Lender may elect, by delivering, not later than 3:00 p.m. (New York City time) one (1) Business Day after the date of such Accepting Lender's receipt of notice from the Administrative Agent regarding such additional prepayment, a written notice, that such Accepting Lender's ratable portion of such Declined Prepayment Amount not be applied to repay such Accepting Lender's Loans, in which case the portion of such Declined Prepayment Amount which would otherwise have been applied to such Loans of the Declining Lenders shall instead be retained by the Borrower.  Each Lender's ratable portion of such Declined Prepayment Amount (unless declined by the respective Lender as described in the preceding sentence) shall be applied to the respective Loans of such Lenders.

Section 2.15   General Provisions Regarding Payments.

(a)    All payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, set-off or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 12:00 noon (New York City time) on the date due at the Principal Office designated by the Administrative Agent for the account of Lenders.  For purposes of computing interest and fees, funds received by the Administrative Agent after that time on such due date shall be deemed to have been paid by the Borrower on the next succeeding Business Day.

(b)    All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c)    The Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest

due hereunder (with respect to mandatory prepayments, subject to <u>Section 2.14(c)</u>), together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by the Administrative Agent.

(d)     [Reserved].

(e)     Whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the Commitment fees hereunder.

(f)     The Borrower hereby authorizes the Administrative Agent to charge the Borrower's accounts with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(g)     The Administrative Agent may deem any payment by or on behalf of the Borrower hereunder that is not made in same day funds prior to 12:00 noon (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  The Administrative Agent shall give prompt written notice to the Borrower and each applicable Lender if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of <u>Section 6.01(a)</u>.  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate from the date such amount was due and payable until the date such amount is paid in full.

(h)     If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to <u>Section 6.01</u>, all payments or proceeds received by Agents hereunder in respect of any of the Obligations, shall be applied in accordance with the application arrangements described in the Security Agreement.

(i)     <u>Erroneous Payments</u>.

(A)     If the Administrative Agent notifies a Lender or other Secured Party, or any Person who has received funds on behalf of a Lender or other Secured Party (any such Lender, other Secured Party or other recipient and their respective successors and assigns, a "<u>Payment Recipient</u>"), that the Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, other Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "<u>Erroneous Payment</u>") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the

50

Administrative Agent and held in trust for the benefit of the Administrative Agent, and such Lender or other Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this Section 2.15(i) shall be conclusive, absent manifest error.

(B)     Without limiting the immediately preceding Section 2.15(i)(A), each Payment Recipient hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment (a "Payment Notice"), (y) that was not preceded or accompanied by a Payment Notice, or (z) that such Payment Recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case, then (1) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (2) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment, and (3) such Payment Recipient shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 2.15.

To avoid doubt, failure to deliver a notice to the Administrative Agent pursuant to this Section 2.15 shall not have any effect on a Payment Recipient's obligations pursuant to this Section 2.15 or on whether or not an Erroneous Payment has been made.

(C)     Each Lender and Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Facility Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party from any source, against any amount due to the Administrative Agent under Section 2.15(i)(A) above or under the indemnification provisions of this Agreement.

(D)     If an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor in accordance with Section 2.15(i)(A), from any Payment Recipient that has received such Erroneous Payment (or

51

portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such uncovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (A) such Lender shall be deemed to have assigned its Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") (on a cashless basis and such amount calculated) at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment Agreement with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent (but the failure of such Person to deliver any such Notes shall not affect the effectiveness of the foregoing assignment), (B) the Administrative Agent as the assignee Lender shall be deemed to have acquired the Erroneous Payment Deficiency Assignment, (C) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender, and (D) the Administrative Agent will reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(E)     Subject to Section 9.05, the Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf).  In addition, an Erroneous Payment Return Deficiency owing by the applicable Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by the Administrative Agent on or with respect to any such Loans acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that any such Loans are then owned by the Administrative Agent) and (y) may, in the sole discretion of the Administrative Agent, be reduced by any amount specified by the Administrative Agent in writing to the applicable Lender from time to time.

(F)     The Borrower and each other Loan Party hereby agree that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be contractually subrogated (irrespective of whether the

Administrative Agent may be equitably subrogated) to all the rights of such Lender or other Secured Party under the Facility Documents with respect to such amount, (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment, and (z) to the extent that an Erroneous Payment was in any way or at any time credited as a payment or satisfaction of any of the Obligations, the Obligations or part thereof that were so credited, and all rights of the applicable Lender, other Secured Party or Administrative Agent, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received; provided, however, the amount of such Erroneous Payment that is comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment shall be credited as a payment or satisfaction of the Obligations and the Obligations or part thereof that were so credited shall not be reinstated.

(G)     To the extent permitted by applicable requirements of law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(H)     Each party's obligations, agreements and waivers under this Section 2.15(i) shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender or other Secured Party, the termination of any Commitment or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Facility Document.

(I)     Notwithstanding anything to the contrary in this Section 2.15(i), the Loan Parties shall have no obligations, liabilities or responsibilities for any actions, consequences or remediation (including the repayment or recovery of any amounts) contemplated by this Section 2.15(i) (and, for the avoidance of doubt, it is understood and agreed that if a Loan Party has paid principal, interest or any other amounts owed pursuant to a Facility Document, nothing in this Section 2.15(i) (or any equivalent provision) shall require any such Loan Party to pay additional amounts that are duplicative of such previously paid amounts).

Section 2.16     Ratable Sharing.  Lenders hereby agree among themselves, that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Facility Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of any amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Facility Documents (collectively, the "Amounts Due" to such Lender) which is greater than the proportion received by any other Lender entitled to payment thereof in respect of such Amounts Due to such other Lender, then the Lender receiving such proportionately greater

payment shall (a) notify the Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Amounts Due to the other Lenders entitled to payment thereof so that all such recoveries of Amounts Due shall be shared by all Lenders in proportion to the Amounts Due to them; *provided* that if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of the Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest.  The Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by the Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.  The provisions of this Section 2.16 shall not be construed to apply to (a) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it in accordance with the express terms of this Agreement.

Section 2.17   [Reserved].

Section 2.18   Increased Costs; Capital Adequacy.

(a)      Compensation For Increased Costs and Taxes.  In the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any Change in Law (i) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender or (ii) imposes any other condition or Tax (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" and (C) Connection Income Taxes) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, the Borrower shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to the Borrower (with a copy to the Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.18(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)      Capital Adequacy Adjustment.  In the event that any Lender shall have determined that a Change in Law has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Commitment or other obligations hereunder with respect to the Loans, to a level below that which such Lender or such controlling corporation could have achieved but for such Change in Law (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five (5) Business Days after receipt by the Borrower from such Lender of the statement referred to in the next sentence, the Borrower shall pay to such Lender such additional amount or amounts as shall compensate such Lender or such controlling corporation on an after tax basis for such reduction.  Such Lender shall deliver to the Borrower (with a copy to the Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.18(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

Section 2.19   Taxes; Withholding, Etc.

(a)      Payments to Be Free and Clear.  All sums payable by or on account of any obligation of any Loan Party hereunder or under any other Facility Document shall (except to the extent required by applicable Law) be paid free and clear of, and without any deduction or withholding for or on account of, any Tax.

(b)      Withholding of Taxes.  If any applicable Loan Party or any other applicable withholding agent is required by applicable Law to make any deduction or withholding for or on account of any Tax from any sum paid or payable under any of the Facility Documents, then:  (i) the Borrower shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as the Borrower becomes aware of it; (ii) the Borrower shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law, such payment to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on the Administrative Agent or such Lender, as the case may be) on behalf of and in the name of the Administrative Agent or such Lender; (iii) if such deduction or withholding is made on account of any Indemnified Tax, the sum payable by such Loan Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after such deduction, withholding or payment has been made (including such deductions, withholdings, or payments applicable to additional sums payable under this Section 2.19), the Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to the amount it would have received had no such deduction, withholding or payment been required or made; and (iv) within thirty (30) days after any payment of any Tax by the Borrower pursuant to clause (ii), the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by the relevant Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence satisfactory to the Administrative Agent of such deduction, withholding or payment and of the remittance thereof to the relevant Governmental Authority.

(c)      Evidence of Exemption From U.S. Withholding Tax.

(i)       Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Facility Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution, and submission of such documentation (other than such documentation set forth in paragraph (A) of Section 2.19(c)(ii), Section 2.19(c)(iii), or Section 2.19(c)(iv)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)       Without limiting the generality of paragraph (i), each Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Agent for transmission to the Borrower, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and, upon request, at such other times as may be necessary in the determination of the Borrower or the Administrative Agent (each in the reasonable exercise of its discretion), (A) whichever of the following is applicable: (1) in the case of such Foreign Lender (or, if such Foreign Lender is disregarded as an entity separate from its owner for U.S. federal income tax purposes, such owner) claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Facility Document, two (2) executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Facility Document, Internal Revenue Service Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty; (2) two (2) executed copies of Internal Revenue Service Form W-8ECI with respect to such Foreign Lender (or, if such Foreign Lender is disregarded as an entity separate from its owner for U.S. federal income tax purposes, such owner); (3) in the case of such Foreign Lender (or, if such Foreign Lender is disregarded as an entity separate from its owner for U.S. federal income tax purposes, such owner) claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a Certificate re Non-Bank Status and (y) two (2) executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor form); or (4) to the extent such Foreign Lender (or, if such Foreign Lender is disregarded as an entity separate from its owner for U.S. federal income tax purposes, such owner) is not the beneficial owner, two (2) executed copies of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Form W-8ECI, W-BEN, W-8BEN-E, a Certificate re Non-Bank Status, Internal Revenue Service Form W-9, or other certification documents from each beneficial owner, as applicable; provided that if such Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the

portfolio interest exemption, such Foreign Lender may provide a Certificate re Non-Bank Status on behalf of each such direct and indirect partner; and (B) executed copies of any other form required under the Code and reasonably requested by the Borrower to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal withholding tax with respect to any payments to such Lender of interest payable under any of the Facility Documents.

(iii)     Without limiting the generality of paragraph (i), each Lender that is a U.S. Person (or, if such Lender is disregarded as an entity separate from its owner for U.S. federal income tax purposes, is owned by a U.S. Person) (such Lender or such owner, as applicable, a "U.S. Lender") shall deliver to the Administrative Agent and the Borrower on or prior to the Closing Date (or, if later, on or prior to the date on which such Lender becomes a party to this Agreement) two (2) executed copies of Internal Revenue Service Form W-9 (or any successor form), properly completed and duly executed by such Lender, certifying that such U.S. Lender is entitled to an exemption from United States federal backup withholding tax, or otherwise prove that it is entitled to such an exemption.

(iv)     FATCA.  If a payment made to a Recipient under any Facility Document would be subject to United States federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and Administrative Agent, at the time or times prescribed by Law and at such time or times reasonably requested by the Borrower or Administrative Agent, such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Administrative Agent as may be necessary for the Borrower or Administrative Agent to comply with its obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this paragraph (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(v)     Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any material respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(vi)     If the Administrative Agent is a U.S. Person (or if the Administrative Agent is disregarded as an entity separate from its owner for U.S. federal income tax purposes and such owner is a U.S. Person), it (or such owner, as applicable) shall deliver to the Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower) two (2) executed copies of Internal Revenue Service Form W-9 certifying that the Administrative Agent (or such owner, as applicable) is entitled to an exemption from U.S. federal backup withholding Tax.  If the Administrative Agent is not a U.S. Person (or if the Administrative Agent is disregarded as an entity separate from its owner for U.S. federal income tax purposes and such owner is not a U.S. Person), it (or such owner, as applicable) shall provide to the Borrower on or prior to the date on which the Administrative

Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower): (A) with respect to payments received for the Administrative Agent's own account, two (2) executed copies of Internal Revenue Service Form W-8ECI with respect the Administrative Agent (or such owner, as applicable), and (B) with respect to payments received on account of any Lender, two (2) executed copies of Internal Revenue Service Form W-8IMY certifying that the Administrative Agent (or such owner, as applicable) is either (x) a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a "U.S. person" with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent (or such owner, as applicable) as a "U.S. person" with respect to such payments as contemplated by Section 1.1441-1(b)(2)(iv) of the Treasury Regulations) or (y) a "qualified intermediary" assuming primary withholding responsibility under Chapters 3 and 4 of the Code and/or primary IRS Form 1099 reporting and backup withholding responsibility for payments it receives for the account of others.

(d)     Payment of Other Taxes.  Without limiting the provisions of or duplicating any amounts payable pursuant to Section 2.19(b), the Borrower shall timely pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable Law (or, at the option of the Administrative Agent, timely reimburse it for the payment of any Other Taxes).  The Borrower shall deliver to the Administrative Agent official receipts or other evidence of such payment reasonably satisfactory to the Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(e)     Indemnified Taxes.  Without limiting the provisions of or duplicating any amounts payable pursuant to Sections 2.19(b) or 2.19(d), the Borrower shall indemnify the Administrative Agent and any Lender for the full amount of Indemnified Taxes (including any such Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.19) paid or payable by the Administrative Agent or any Lender or any of their respective Affiliates or required to be withheld or deducted from a payment to the Administrative Agent or any Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability (with supporting documentation as necessary) delivered to the Borrower shall be conclusive absent manifest error.  Such payment shall be due within ten (10) days after demand therefor.

(f)     Repayment.  If the Borrower pays any additional amounts or makes an indemnity payment under this Section 2.19 to any Lender or the Administrative Agent, and such Lender or the Administrative Agent determines in its sole discretion exercised in good faith that it has actually received in connection therewith any refund of the underlying Indemnified Taxes, such Lender or the Administrative Agent shall pay to the Borrower an amount equal to such refund which was obtained by such Lender or Administrative Agent (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.19 with respect to the Indemnified Taxes giving rise to such refund) reduced by all reasonable out-of-pocket expenses (including Taxes) of such Lender or the Administrative Agent, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided*, *however,* that the Borrower, upon the request of such Lender or the

58

Administrative Agent, shall repay the amount paid over to the Borrower to any Lender or the Administrative Agent in the event any Lender or the Administrative Agent is required to repay such refund, plus any interest, penalties or other charges.  Notwithstanding anything to the contrary in this paragraph (f), in no event will any Lender or the Administrative Agent be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place any Lender or the Administrative Agent in a less favorable net after-Tax position than such Lender or the Administrative Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any Lender or the Administrative Agent to disclose any Confidential Information to the Borrower or any other Person (including its Tax returns).

(g)     Survival.  Each party's obligations under this Section 2.19 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Facility Document.

Section 2.20     Obligation to Mitigate.  Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would entitle such Lender to receive payments under Sections 2.18 or 2.19, it shall, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Loans through another office of such Lender or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the additional amounts which would otherwise be required to be paid to such Lender pursuant to Sections 2.18 or 2.19 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Commitments or Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Commitments or Loans or the interests of such Lender; *provided* that such Lender shall not be obligated to utilize such other office pursuant to this Section 2.20 unless the Borrower agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described above.  A certificate as to the amount of any such expenses payable by the Borrower pursuant to this Section 2.20 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive absent manifest error.

Section 2.21     Benchmark Replacement Setting.

(a)     Notwithstanding anything to the contrary herein or in any other Facility Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then the applicable Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Facility Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Facility Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)      No Swap Agreement shall constitute a "Facility Document" for purposes of this <u>Section 2.21</u>).

(c)      <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Facility Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Facility Document.

(d)      <u>Notices; Standards for Decisions and Determinations</u>.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent (at the direction of the Required Lenders) will notify the Borrower of (y) the removal or reinstatement of any tenor of a Benchmark pursuant to <u>Section 2.21(d)</u> and (z) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or any Lender (or group of Lenders) pursuant to this <u>Section 2.21</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Facility Document, except, in each case, as expressly required pursuant to this <u>Section 2.21</u>.

(e)      <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Facility Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent (at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor; provided however that, in each case, such modification is administratively feasible for the Administrative Agent.

Section 2.22   <u>Illegality</u>.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any

Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make, and any right of the Borrower to, continue Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted together with any additional amounts required pursuant to Section 2.24.  Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 2.23   Inability to Determine Rates.  Subject to Section 2.21, if, on or prior to the first day of any Interest Period for any Loan: (i) the Administrative Agent (acting at the Direction of the Required Lenders) determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or (ii) the Required Lenders determine that for any reason in connection with any request for a Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent, then, in each case, the Administrative Agent (upon the instruction of the Required Lenders) will promptly so notify the Borrower and each Lender.  Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make Loans, and any right of the Borrower to continue Loans, shall be suspended (to the extent of the affected Loans or affected Interest Periods) until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of Loans (to the extent of the affected Loans or affected Interest Periods).  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.24.

Section 2.24   Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, setting forth in reasonable detail the basis for calculating such compensation, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b)      any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits and all administrative processing or similar fees) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained, but excluding any such loss for which no reasonable means of calculation exist, as set forth in <u>Section 2.23</u>.

Section 2.25      <u>Matters Applicable to All Requests for Compensation</u>.

(a)      Any Agent or any Lender claiming compensation under this Article II shall deliver a certificate to the Borrower contemporaneously with the demand for payment, setting forth in reasonable detail a calculation of the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)      With respect to any Lender's claim for compensation under <u>Section 2.22</u>, or 2.23, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

# ARTICLE III

## CONDITIONS PRECEDENT

Section 3.01      <u>Conditions to Closing Date and Initial Draw</u>.  The effectiveness of this Agreement and the obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with the terms hereof):

(a)      The Administrative Agent shall have signed this Agreement, the Security Agreement, and the Pledge Agreement and shall have received from each other Person that is to be a party thereto on the Closing Date a counterpart signed by such Person of this Agreement, the Security Agreement and the Pledge Agreement.  The Administrative Agent shall have received copies of UCC-1 financing statements with respect to each Loan Party, to be filed on the Closing Date in the appropriate filing offices.

(b)      The Administrative Agent shall have received a favorable written opinion in form and substance satisfactory to the Administrative Agent (addressed to the Administrative Agent and the Lenders and dated the Closing Date) of (i) Akin Gump Strauss Hauer & Feld LLP, counsel for the Borrower and (ii) local counsel in each jurisdiction in which a Loan Party is organized and the laws of which are not covered by the opinion referred to in clause (i) above.

(c)　　The Administrative Agent shall have received, in respect of each Loan Party, a certificate of such Loan Party, dated the Closing Date and executed by a secretary, an assistant secretary or other Authorized Officer of such Loan Party, attaching and certifying (i) a copy of the articles or certificate of incorporation, formation or organization or other comparable organizational document of such Loan Party, which shall be certified by the appropriate Governmental Authority, (ii) a copy of the bylaws or operating, management, partnership or similar agreement of such Loan Party, as applicable, together with all amendments thereto as of the Closing Date, (iii) signature and incumbency certificates of the officers of, or other authorized persons acting on behalf of, such Loan Party executing each Facility Document, (iv) resolutions or written consent, as applicable, of the board of directors or similar governing body of such Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Facility Documents to which it is a party, and (v) a good standing certificate (or equivalent) from the applicable Governmental Authority of such Loan Party's jurisdiction of organization, dated the Closing Date or a recent date prior thereto, all in form and substance reasonably satisfactory to the Administrative Agent.

(d)　　The Administrative Agent shall have received a certificate, dated the Closing Date and signed by an Authorized Officer of the Borrower, certifying that (i) the representations and warranties of the Loan Parties set forth in the Facility Documents are true and correct in all material respects (or, in the case of any such representation or warranty under the Facility Documents already qualified as to materiality, in all respects) on and as of the Closing Date (except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall only be certified to be so true and correct in all material respects on and as of such prior date) and (ii) on the Closing Date, no Default or Event of Default shall have occurred and be continuing.

(e)　　The Agents, the Lenders and the members of the Ad Hoc Group (or, as applicable, their counsel and other advisors) shall have received (i) payment of all fees and other amounts due and payable by the Borrower or any of its Subsidiaries on or prior to the Closing Date pursuant to this Agreement or any commitment letter or fee letter entered into in connection herewith, and (ii) to the extent invoiced at least one Business Day before the Closing Date, payment or reimbursement of all reasonable out-of-pocket expenses, including the fees and expenses of counsel to the Agent and the Lenders, required to be paid or reimbursed by the Borrower or any of its Subsidiaries in accordance with this Agreement or any other agreement entered in connection with or further to the Transactions.

(f)　　The Administrative Agent shall have received, at least two (2) Business Days prior to the Closing Date, (i) all documentation and other information required by regulatory authorities with respect to the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, and (ii) to the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such Loan Party, in each case, that has been reasonably requested by any Lender in writing at least five (5) Business Days prior to the Closing Date.

(g)　　[SPV/securitization closing items]

(h)      The Borrower shall have delivered to the Administrative Agent a solvency certificate in form and substance satisfactory to the Lenders and demonstrating that the Borrower is, together with its Subsidiaries, Solvent.

(i)      The Borrower shall have delivered to the Administrative Agent the Historical Financial Statements.

(j)      In order to evidence a continuing valid, perfected first priority security interest in the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, each Loan Party shall have delivered to the Collateral Agent:

(i)      evidence satisfactory to the Collateral Agent of the compliance by each Loan Party of its obligations under the Security Agreement and the other Collateral Documents (including its obligations to execute and deliver UCC financing statements, intellectual property security agreements and originals of stock certificates in respect of Equity Interests (along with corresponding stock powers) and promissory notes in respect of pledged debt (along with allonges)); and

(ii)      evidence that each Loan Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument in a proper form for filing, if applicable, reasonably required by the Collateral Agent.

(k)      Each condition precedent set forth in the Chapter 11 Plan shall have been satisfied.

(l)      To the extent requested by the Ad Hoc Group, the Administrative Agent shall have received a customary, executed payoff letter and applicable intellectual property lien and uniform commercial code financing statement terminations with respect to the DIP Facility and Prepetition First Lien Facility in form reasonably satisfactory to it, and such facilities shall be terminated (and all Guarantees and Liens relating thereto released) substantially concurrently with the occurrence of the Closing Date.

The Administrative Agent shall notify the Loan Parties and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

Section 3.02   <u>Conditions to Making of Loans</u>.  The obligation of each Lender to make any Loan, on the Closing Date or thereafter, is subject to the fulfillment or waiver of each of the following conditions precedent:

(a)      Each of the representations and warranties of the Loan Parties set forth in the Facility Documents are true and correct in all material respects (or, in the case of any such representation or warranty under the Facility Documents already qualified as to materiality, in all respects) on and as of the Closing Date (except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall only be certified to be so true and correct in all material respects on and as of such prior date).

(b)      No event shall have occurred, or would result from the making of the Loans on the Closing Date or from the application of the proceeds therefrom, which constitutes a Default or an Event of Default.

(c)      The Administrative Agent shall have received a Borrowing Request in accordance with the requirements hereof.

The borrowing of the Loans on the Closing Date shall be deemed to constitute a representation and warranty by the Loan Parties on the date thereof that the conditions set forth in paragraphs (a) and (b) of this Section 3.02 have been satisfied.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.01    Loan Parties' Representations and Warranties.  The Loan Parties represent and warrant as follows:

(a)      Organization; Requisite Power and Authority; Qualification.  Each of the Borrower and its Subsidiaries (i) is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization as identified on Schedule 4.01(a), (ii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Facility Documents to which it is a party and to carry out the Transactions contemplated thereby and (iii) is qualified to do business and in good standing in every jurisdiction where any material portion of its assets are located and wherever necessary to carry out its material business and operations, except in the case of subclause (iii), where the failure to be so qualified or so to be in good standing could not reasonably be expected to have a Material Adverse Effect.

(b)      Equity Interests and Ownership.  The Equity Interests of each of the Borrower and its Subsidiaries have been duly authorized and validly issued and are fully paid and non-assessable.  Except as set forth on Schedule 4.01(b), as of the Closing Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Borrower or any of its Subsidiaries is a party requiring, and there is no membership interest or other Equity Interests of the Borrower or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by the Borrower or any of its Subsidiaries of any additional membership interests or other Equity Interests of the Borrower or any of its Subsidiaries or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of the Borrower or any of its Subsidiaries. Schedule 4.01(b) correctly sets forth the ownership interest of the Borrower and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date.

(c)      Due Authorization.  The execution, delivery and performance of the Facility Documents have been duly authorized by all necessary action on the part of each Loan Party that is a party thereto.

(d)      No Conflict.  The execution, delivery and performance by the Loan Parties of the Facility Documents to which they are parties and the consummation of the Transactions do

not and will not (i) violate (A) any provision of any Law or any governmental rule or regulation applicable to any such Loan Party, (B) any of the Organizational Documents of any Loan Party or (C) any order, judgment or decree of any court or other agency of government binding on such Loan Party; (ii) result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of such Loan Party; (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of such Loan Party (other than any Liens created under any of the Facility Documents in favor of the Collateral Agent on behalf of the Secured Parties); or (iv) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of any Loan Party, except for such approvals or consents which have been obtained on or before the Closing Date and disclosed in writing to the Lenders.

(e)     Governmental Consents.  The execution, delivery and performance by each Loan Party of the Facility Documents to which it is a party and the consummation of the transactions contemplated by the Facility Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Collateral Agent for filing and/or recordation, as of the Closing Date or such later date as is permitted under this Agreement or the other Facility Documents.

(f)     Binding Obligation.  Each Facility Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(g)     Historical Financial Statements.  The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the date thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.

(h)     No Material Adverse Change.  Since December 31, 2023, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(i)     Adverse Proceedings, Etc.  There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.  Neither the Borrower nor any of its Subsidiaries (i) is in violation of any applicable Laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (ii) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(j)      Payment of Taxes.  All income and other material Tax returns and reports of the Borrower and its Subsidiaries required to be filed by any of them have been timely filed. All Taxes due and payable and all assessments, fees, Taxes and other governmental charges upon the Borrower and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable, except for Taxes (i) that are being actively contested by the Borrower or such Subsidiary in good faith and by appropriate proceedings and (ii) where such failure to pay is not adverse in any material respect to the Lenders; *provided*, in each case, that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

(k)      Properties.  The Borrower and each of its Subsidiaries has (A) good, sufficient and legal title to (in the case of fee interests in real property), (B) valid leasehold interests in (in the case of leasehold interests in real or personal property), (C) valid licensed rights in (in the case of licensed interests in intellectual property) and (D) good title to (in the case of all other personal property), all of their respective properties and assets reflected in the Historical Financial Statements referred to in Section 4.01(g) and in the most recent financial statements delivered pursuant to Section 5.01, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business.  Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(l)      Environmental Matters.  In each case, except to the extent not reasonably likely to result in a Material Adverse Effect, (i) the Borrower and each of its Subsidiaries is in compliance with all applicable Environmental Laws, and any past noncompliance has been fully resolved without any pending, on-going or future obligation or cost; (ii) the Borrower and each of its Subsidiaries has obtained and maintained in full force and effect all Governmental Authorizations required pursuant to Environmental Laws for the operation of their respective business; (iii) to the Borrower and each Subsidiary's knowledge, there are and have been no conditions, occurrences, violations of Environmental Law, or presence or Releases of Hazardous Material which could reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries; (iv) there are no pending Environmental Claims against the Borrower or any of its Subsidiaries, and neither the Borrower nor any of its Subsidiaries has received any written notification of any alleged violation of, or liability pursuant to, Environmental Law or responsibility for the Release or threatened Release of, or exposure to, any Hazardous Materials; and (v) no Lien imposed pursuant to any Environmental Law has attached to any Collateral and, to the knowledge of any Loan Party, no conditions exist that would reasonably be expected to result in the imposition of such a Lien on any Collateral.

(m)      No Defaults.  Neither the Borrower nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

(n)      Governmental Regulation.  Neither the Borrower nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered

investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

(o)     Margin Stock.  Neither the Borrower nor any of its Subsidiaries owns any Margin Stock.

(p)     Employee Benefit Plans.  No ERISA Event has occurred or is reasonably expected to occur that would result in a Material Adverse Effect.

(q)     Solvency.  The Loan Parties, taken as a whole, are, and on any date on which this representation and warranty is made, shall be, Solvent.

(r)     Compliance with Statutes, Etc.  The Borrower and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its assets and property (including compliance with all applicable Environmental Laws), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(s)     Disclosure.  The representations and warranties of the Loan Parties contained in the Facility Documents and in the other documents, certificates or written statements furnished to the Lenders by or on behalf of the Borrower and its Subsidiaries for use in connection with the Transactions contemplated hereby, in each case, as modified or supplemented by other information so furnished, when taken as a whole, do not contain any untrue statement of a material fact or omit to state a material fact (known to the Borrower and its Subsidiaries, in the case of any document not furnished by them) necessary in order to make the statements contained therein not misleading in light of the circumstances under which the same were made; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered, it being understood that any such projected financial information may vary from actual results and such variations could be material.

(t)     PATRIOT Act.  To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act.  No part of the proceeds of the Loans shall be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(u)     Collateral.  All Obligations are secured by the Collateral under the Collateral Documents and entitled to a senior secured position with respect to such Collateral thereunder in accordance with the terms thereof.

## ARTICLE V

## COVENANTS

So long as any Commitment is in effect and any Obligation (other than Additional Secured Obligations and contingent indemnification and expense reimbursement obligations not then due) hereunder remains unpaid:

Section 5.01    Financial Statements and Other Reports.  In the case of the Borrower, the Borrower shall deliver to the Administrative Agent (which shall furnish to each Lender):[6]

(a)    Quarterly Financial Statements.  As soon as available, and in any event within 75 days after the end of each of the first three Fiscal Quarters of each Fiscal Year (commencing with the Fiscal Quarter ending [June 30], 2024), the condensed consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter and the related condensed consolidated statements of operations, income, changes in stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, which condensed consolidated balance sheets and related consolidated statements of operations, income, changes in stockholders' equity and cash flows shall be accompanied by a Financial Officer Certification; provided that the delivery by the Borrower of quarterly reports on Form 10-Q shall satisfy the requirements of this Section 5.01(a) to the extent such quarterly reports include the information specified herein (it being understood that any such financials statements that are publicly accessible through the website of the Borrower or the website of the SEC will be deemed to be provided in accordance with this Section 5.01(a));

(b)    Annual Financial Statements.  As soon as available, and in any event within 135 days after the end of each Fiscal Year (commencing with the Fiscal Year ending December 31, 2024), (i) the audited consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related audited consolidated statements of operations, income, changes in stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, which consolidated balance sheets and related consolidated statements of operations, income, changes in stockholders' equity and cash flows shall be accompanied by a Financial Officer Certification; and (ii) with respect to such consolidated financial statements a report thereon of independent certified public accountants of recognized national standing selected by the Borrower, and reasonably satisfactory to the Administrative Agent (which report and/or the accompanying financial statements shall be unqualified (except to the extent (and only to the extent) that a "going concern" qualification or statement relates to the report and opinion accompanying the financial statements for the Fiscal Year ending immediately prior to the Scheduled Maturity Date and which qualification or statement is solely a consequence of such impending Scheduled Maturity Date under this Agreement), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with

---

[6] To conform to the reporting under the LLC Agreement.

GAAP applied on a basis consistent with prior years (except, with respect to GAAP being applied on a consistent basis, as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards); provided that the delivery by the Borrower of annual reports on Form 10-K shall satisfy the requirements of this Section 5.01(b) to the extent such annual reports include the information specified herein (it being understood that any such financials statements that are publicly accessible through the website of the Borrower or the website of the SEC will be deemed to be provided in accordance with this Section 5.01(b));

(c)     Compliance Certificates.   Together with each delivery of financial statements of the Borrower and its Subsidiaries pursuant to Section 5.01(a) and (b), a duly executed and completed Compliance Certificate;

(d)     [Reserved]

(e)     Public Reports.  Promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent, other materials filed by the Borrower or any of its Subsidiaries with the SEC, or distributed to its stockholders generally, as applicable; *provided*, *however*, that such reports, proxy statements, filings and other materials required to be delivered pursuant to this clause (e) shall be deemed delivered for purposes of this Agreement when publicly accessible through the website of the Borrower or the website of the SEC;

(f)     Notice of Default.  Promptly upon any Authorized Officer of any Loan Party obtaining knowledge (A) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to any Loan Party with respect thereto; (B) that any Person has given any notice to any Loan Party or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 6.01(d); or (C) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of an Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Borrower (or such Subsidiary) has taken, is taking and proposes to take with respect thereto;

(g)     Notice of Litigation.  Promptly upon any responsible officer of any Loan Party obtaining actual knowledge of (A) any Adverse Proceeding not previously disclosed in writing by the Borrower to the Lenders or (B) any development in any Adverse Proceeding that, in the case of either clause (A) or (B), if adversely determined could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, or the exercise of rights or performance of obligations under any Facility Document written notice thereof together with such other information as may be reasonably available to the Borrower to enable the Lenders and their counsel to evaluate such matters;

70

(h)     ERISA.  (A) With reasonable promptness, upon the occurrence of any ERISA Event which, either alone or together with the occurrence of another ERISA Event or other ERISA Events, is reasonably expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action such the Borrower, its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto; and (B) upon request of the Administrative Agent, with reasonable promptness, copies of (1) in each case Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by the Borrower, or any of its respective ERISA Affiliates with the Department of Labor with respect to each Pension Plan; (2) all notices received by the Borrower or any of its respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and

(i)     Other Information.  Promptly, from time to time, (i) such other information regarding the operations, business affairs and financial condition of the Borrower or any of its Subsidiaries, or compliance with the terms of any Facility Document as in each case the Administrative Agent (for itself or on behalf of any Lender) or any member of the Ad Hoc Group may reasonably request, (ii) information and documentation reasonably requested by any Agent (for itself or on behalf of any Lender) for purposes of compliance with applicable "know your customer" requirements under the USA PATRIOT Act or other applicable anti-money laundering laws and (iii) to the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulator, a Beneficial Ownership Certification (or update thereof) for such Loan Party upon request of the Administrative Agent (for itself or on behalf of any Lender).

Section 5.02     [Reserved].

Section 5.03     Information Regarding Collateral.

(a)     [Reserved;]

(b)     The Borrower shall furnish to the Collateral Agent prompt written notice of any change (1) in any Loan Party's corporate name, (2) in any Loan Party's identity or corporate structure, (3) in any Loan Party's jurisdiction of organization or (4) in any Loan Party's Federal Taxpayer Identification Number or state organizational identification number. Each Loan Party agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents; and

(c)     Each Loan Party also agrees promptly to notify (or to have the Borrower notify on its behalf) the Collateral Agent if any material portion of the Collateral is damaged or destroyed.

Section 5.04     Certification of Public Information.  The Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material Non-Public Information with respect to the Borrower, its Subsidiaries or their securities) and, if documents or notices required to be delivered pursuant to this Section 5.04 or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the "Platform"), any document or notice

71

that the Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for such public-side Lenders. The Borrower agrees to clearly designate all Information provided to the Administrative Agent by or on behalf of the Borrower which is suitable to make available to public-side Lenders. If the Borrower has not indicated whether a document or notice delivered pursuant to this <u>Section 5.04</u> contains Non-Public Information, the Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material Non-Public Information with respect to the Borrower, its Subsidiaries and their securities.

Section 5.05   <u>Existence</u>.  Subject to Section 5.19, the Borrower will do or cause to be done all things necessary to preserve and keep in full force and effect (i) its corporate existence and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective Organizational Documents (as the same may be amended from time to time) of the Borrower or any such Subsidiary and (ii) the material rights (charter and statutory), licenses and franchises of the Borrower and each of its Subsidiaries; *provided*, *however*, that the Borrower will not be required to preserve any such material right, license or franchise, or the corporate, partnership or other existence of a Subsidiary of the Borrower, if the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Lenders.

Section 5.06   <u>Payment of Taxes and Claims</u>.  Each of the Loan Parties shall, and shall cause each of its Subsidiaries to, pay all Taxes imposed upon it (including in its capacity as a withholding agent) or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by Law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; *provided* that no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (1) adequate reserves or other appropriate provisions as shall be required in conformity with GAAP shall have been made therefor or (2) with respect to which the failure to pay would not reasonably be expected to be material to the Loan Parties.

Section 5.07   <u>Maintenance of Properties</u>.  Each of the Loan Parties shall, and shall cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material property used or useful in the business of the Borrower and its Subsidiaries and from time to time shall make or cause to be made all appropriate repairs, renewals and replacements thereof, in each case except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 5.08   <u>Insurance</u>.  Each of the Loan Parties shall, and shall cause each of its Subsidiaries to, maintain or cause to be maintained, with financially sound and reputable insurers of national standing, such public liability insurance, third party property damage insurance, business interruption insurance, casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Loan Parties and their

Subsidiaries and insurance against other risks, in each case as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as are customary for such Persons.  Each such policy of insurance shall (1) name the Secured Parties as additional insureds thereunder as their interests may appear and (2) in the case of each property insurance policy, contain a customary lender loss payable and/or additional insured clause or endorsement, reasonably satisfactory in form and substance to the Collateral Agent.

Section 5.09    Books and Records; Inspections.  Each of the Loan Parties shall, and shall cause each of its Subsidiaries to, maintain proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities.  Each Loan Party shall, and shall cause each of its Subsidiaries to, up to two (2) times in any Fiscal Year or at any time during the continuation of an Event of Default, any authorized representatives designated by the Administrative Agent to visit and inspect any of the properties of any Loan Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested (in each case subject to confidentiality restrictions and privileged materials).

Section 5.10    Compliance with Contractual Obligations and Laws.  Each of the Loan Parties shall, and shall cause each of its Subsidiaries to, comply with the requirements of all Contractual Obligations and all applicable Laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws), noncompliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.11    Environmental Compliance.  Each of the Loan Parties shall, and shall cause each of its Subsidiaries to, use and operate all of its facilities in compliance with all Environmental Laws, keep all necessary Governmental Authorizations required pursuant to any Environmental Laws, and handle all Hazardous Materials in compliance with all Environmental Laws, in each case except where the failure to comply with the terms of this clause could not reasonably be expected to have a Material Adverse Effect.

Section 5.12    Subsidiaries.  The Borrower shall promptly send to the Collateral Agent written notice setting forth with respect to any Person that becomes a Subsidiary of the Borrower after the Closing Date (i) the date on which such Person became a Subsidiary of the Borrower and (ii) all of the data required to be set forth in Schedules 4.01(a) and 4.01(b) with respect to all Subsidiaries of the Borrower; and such written notice shall be deemed to supplement Schedule 4.01(a) and 4.01(b) for all purposes hereof.

Section 5.13    Further Assurances.  Each of the Loan Parties shall, and shall cause each of its Subsidiaries to, at any time or from time to time upon the request of the Administrative Agent, at the expense of the Loan Parties, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Facility

Documents.  In furtherance and not in limitation of the foregoing, each Loan Party shall take such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by the assets of the Loan Parties to the extent and in the manner contemplated by the Facility Documents.  Upon the exercise by the Administrative Agent or the Collateral Agent of any power, right, privilege or remedy pursuant to this Agreement or the other Facility Documents which required any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will use commercially reasonable efforts to execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or the Collateral Agent may be reasonably required to obtain from the Borrower or any of its Subsidiaries for such consent, approval, recording, qualification or authorization.  If perfecting any Lien on any Collateral that consists of rights that are licensed or leased from a third party requires the consent of such third party pursuant to the terms of an applicable license or lease agreement, and such terms are enforceable under applicable law, the Borrower or the Guarantors, as the case may be, will use all commercially reasonable efforts to obtain such consent with respect to the perfecting of such Lien.

Section 5.14   Mortgages.  With respect to any fee interest in any real property that (a) is acquired by the Borrower or a Guarantor after the Closing Date that does not constitute an Excluded Asset set forth in clause (3) of the definition thereof or (b) whether owned by the Borrower or a Guarantor as of the Closing Date or subsequently acquired by the Borrower or a Guarantor, ceases to constitute an Excluded Asset set forth in clause (3) of the definition thereof (such real property referred to individually and collectively as the "Premises"), within 120 days of such acquisition or cessation (as applicable), the Borrower will or will cause the applicable Guarantor, as the case may be, to:

(1)   deliver to the Collateral Agent, as mortgagee, for the benefit of the Secured Parties, fully executed Mortgages, duly executed by the Borrower or the applicable Guarantor, as the case may be, together with evidence of the completion (or satisfactory arrangements for the completion), or all recordings and filings of such Mortgage as may be necessary to create a valid, perfected Lien, subject to Permitted Liens and any Intercreditor Agreement, against the Premises purported to be covered thereby;

(2)   deliver to the Collateral Agent, a mortgagee's title insurance policy in favor of the Collateral Agent in an amount equal to 100% of the Fair Market Value of the Premises purported to be covered by the related Mortgage, insuring that the interests created by the Mortgage constitute valid Liens thereon free and clear of all Liens, defects and encumbrances other than Permitted Liens and any other exceptions disclosed in such policy, and such policy shall also include, to the extent available and issued at ordinary rates, customary endorsements and shall be accompanied by evidence of the payment in full (or satisfactory arrangements for the payment) of all premiums thereon;

(3)   deliver to the Collateral Agent, the most recent survey of such Premises, together with either (i) an updated survey certification in favor of the Collateral Agent from the applicable surveyor stating that, based on a visual inspection of the

74

property and the knowledge of the surveyor, there has been no change in the facts depicted in the survey or (ii) an affidavit and/or indemnity from the Borrower or the applicable Guarantor, as the case may be, stating that to its knowledge there has been no change in the facts depicted in the survey, other than, in each case, changes that do not materially adversely affect the use by the Borrower or Guarantor, as applicable, of such Premises for the Borrower or such Guarantor's business as so conducted, or intended to be conducted, at such Premises and in each case, in form sufficient for the title insurer issuing the title policy to remove the standard survey exception from such policy and issue a survey endorsement to such policy; and

        (4)    deliver to the Collateral Agent an opinion of outside counsel reasonably acceptable to the Collateral Agent that such Mortgage has been duly authorized, executed and delivered by the Borrower or such Guarantor, constitutes a legal, valid, binding and enforceable obligation of the Borrower or such Guarantor and creates a valid perfected Lien in the Premises purported to be covered thereby.

        Section 5.15   <u>Post-Closing Obligations</u>.  Each of the Loan Parties shall, and shall cause each of its Subsidiaries to, complete all undertakings set forth on <u>Schedule 5.15</u> attached hereto in the time periods specified therein (as each may be extended by the Administrative Agent in its reasonable discretion).

        Section 5.16   <u>Restricted Payments</u>.  (a) The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly:

        (i)    declare or pay any dividend on, or make any other payment or distribution in respect of, its Equity Interests (including any dividend or distribution payable in connection with any merger or consolidation involving the Borrower) or similar payment to the direct or indirect holders thereof in their capacity as such (other than any dividends or distributions payable solely in its Equity Interests (other than Disqualified Stock) and dividends or distributions payable to the Borrower or any of its Subsidiaries (and, if such Subsidiary has stockholders other than the Borrower or other Subsidiaries, to its other stockholders on no more than a pro rata basis));

        (ii)    purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Borrower held by any Person or any Equity Interests of any Subsidiary of the Borrower held by any Affiliate of the Borrower (in each case other than held by the Borrower or a Subsidiary of the Borrower), including in connection with any merger or consolidation and including the exercise of any option to exchange any Equity Interests (other than into Equity Interests of the Borrower that are not Disqualified Stock);

        (iii)    make any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to the scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Indebtedness that is contractually subordinated in right of payment to any of the Obligations or any Guaranty thereof, any Indebtedness that is secured by Liens on any of the Collateral junior in priority to the Liens securing the Obligations or any Guaranty thereof or any unsecured Indebtedness (other than the payment of interest and other than the purchase, repurchase or other acquisition of such Indebtedness purchased in anticipation

of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within ninety days of the date of such purchase, repurchase or other acquisition); provided that, for the avoidance of doubt, this clause (iii) shall not prohibit the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Qualified Receivables Facility by the applicable Receivables Entity or of the Backstop Notes by Loan SPV in accordance with the terms thereof; or

(iv)     make any Restricted Investment.

(all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "Restricted Payments").

(b)     The foregoing provisions will not prohibit:

(i)     the payment of any dividend or other distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or other distribution or giving of the irrevocable redemption notice, so long as said date is after the Closing Date, if at said date of declaration or notice, such payment would have complied with the provisions of this Agreement;

(ii)     any Restricted Payment made in exchange for, or with the net cash proceeds from, the substantially concurrent sale of Equity Interests of [(or contributions to the capital of)] the Borrower (other than any Disqualified Stock and other than Equity Interests issued or sold to a Subsidiary of the Borrower) or a substantially concurrent cash capital contribution received by the Borrower from its shareholders;

(iii)     the defeasance, redemption, repurchase, retirement or other acquisition of Indebtedness of the Borrower or any Guarantor that is contractually subordinated in right of payment to any of the Obligations or to any Guaranty thereof, Indebtedness that is secured by Liens on any of the Collateral junior in priority to the Liens securing the Obligations or any Guaranty thereof or unsecured Indebtedness in exchange for, or with the net cash proceeds from, an Incurrence of Permitted Refinancing Debt with respect to such Indebtedness;

(iv)     the redemption, repurchase, retirement or other acquisition for value of any Equity Interests of the Borrower or any Subsidiary of the Borrower held by current or former employees, officers, directors or consultants of the Borrower (or any of its Subsidiaries), in each case solely upon such Person's death, disability, retirement or termination of employment or under the terms of any Employee Benefit Plan or other agreement under which such Equity Interests were issued; provided that the aggregate amount of such repurchases and other acquisitions (excluding amounts representing cancellation of Indebtedness) shall not exceed $2.5 million in any Fiscal Year;

(v)     payments of dividends on Disqualified Stock issued pursuant to Section 5.18;

(vi)     repurchases of Capital Stock deemed to occur upon exercise of stock options if such Capital Stock represents a portion of the exercise price of such options;

76

(vii)    cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of the Borrower; provided, however, that any such cash payment shall not be for the purpose of evading the limitations of this Section 5.16;

(viii)    so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, payments of intercompany subordinated Indebtedness, the Incurrence of which was permitted under clause (v) of Section 5.18(b);

(ix)    the repurchase, redemption or other acquisition or retirement for value of any Indebtedness of the Borrower or any Guarantor that is contractually subordinated in right of payment to any of the Obligations or to any Guaranty thereof, any Indebtedness that is secured by Liens on any of the Collateral junior in priority to the Liens securing the Obligations or any Guaranty thereof or any unsecured Indebtedness upon the occurrence of an "asset sale" or "change of control"; provided that no such repurchase, redemption or other acquisition or retirement for value of any such Indebtedness shall be permitted prior to repayment in full of the Loans and all other Obligations that are accrued and payable in connection therewith; or

(x)    other Restricted Payments in an aggregate amount outstanding not to exceed $25.0 million; or

(xi)    the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to the scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Indebtedness with respect to a Qualified Receivables Facility.

(c)    The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of the Restricted Payment of the assets proposed to be transferred by the Borrower or such Subsidiary, as the case may be, pursuant to the Restricted Payment.

(d)    [Reserved.]

(e)    Notwithstanding anything to the contrary set forth in this Section 5.16, no Loan Party shall make any Restricted Payment to, or Investment in, any Subsidiary (other than another Loan Party) consisting of any intellectual property or any other assets (other than cash and Cash Equivalents) material to the operations of the Borrower and its Subsidiaries in the ordinary course of business.

Section 5.17    Dividend and Other Payment Restrictions Affecting Subsidiaries. (a) The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Subsidiary of the Borrower to:

(i)    pay dividends or make any other distributions to the Borrower or any of its Subsidiaries with respect to its Capital Stock or any other interest or participation in, or measured by, its profits;

(ii)     pay any Indebtedness owed to the Borrower or any of its Subsidiaries;

(iii)     make any loans or advances to the Borrower or any of its Subsidiaries; or

(iv)     sell, lease or transfer any of its properties or assets to the Borrower or any of its Subsidiaries.

(b)     However, the foregoing restrictions will not apply to encumbrances or restrictions existing under or by reason of:

(i)     any agreements in effect or entered into on the Closing Date, including agreements governing Existing Indebtedness (including the Backstop Notes) as in effect on the Closing Date, and any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings thereof (in each case, regardless of whether such replacement or refinancing is consummated at the same time or later than the termination or repayment of the Indebtedness being refinanced or replaced), in whole or in part; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in the agreements governing such Indebtedness as in effect on the Closing Date;

(ii)     [Reserved];

(iii)     the Facility Documents;

(iv)     applicable law and any applicable rule, regulation or order;

(v)     customary non-assignment provisions in leases, licenses or other agreements entered into in the ordinary course of business;

(vi)     purchase money obligations and Capital Lease Obligations that impose restrictions of the nature described in clause (iv) of Section 5.17(a) on the property so acquired;

(vii)     any agreement for the sale or other disposition of all or substantially all of the Capital Stock or assets of a Subsidiary of the Borrower that restricts distributions by that Subsidiary pending its sale or other disposition thereof;

(viii)     any agreement or other instrument of a Person acquired by the Borrower or any Subsidiary of the Borrower in existence at the time of such acquisition (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(ix)     Liens that limit the right of the Borrower or any of its Subsidiaries to dispose of the asset or assets subject to such Lien;

(x)     customary provisions limiting the disposition or distribution of assets or property in partnership, joint venture, asset sale agreements, stock sale agreements and other similar agreements, which limitation is applicable only to the assets that are the subject of such agreements;

(xi)     Permitted Refinancing Debt, provided that the restrictions contained in the agreements governing such Permitted Refinancing Debt are not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced;

(xii)     any such encumbrance or restriction with respect to any Foreign Subsidiary of the Borrower pursuant to an agreement governing Indebtedness incurred by such Foreign Subsidiary, (a) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive to the Borrower and its Subsidiaries than the encumbrances and restrictions contained in the agreements described in clauses (i) and (ii) above (as determined in good faith by the Borrower), or (b) if such encumbrance or restriction is not materially more restrictive to the Borrower and its Subsidiaries than is customary in comparable financings (as determined in good faith by the Borrower) and either (x) the Borrower determines in good faith that such encumbrance or restriction will not materially affect the Borrower's ability to make the principal or interest payments on the Loans or (y) such encumbrance or restriction applies only if a default occurs in respect of a payment or financial covenant relating to such Indebtedness;

(xiii)     any encumbrance or restriction existing under or by reason of contractual requirements of a Receivables Entity in connection with a Qualified Receivables Transaction; provided that such restrictions apply only to such Receivables Entity or any Subsidiary acting as servicer or sub-servicer for such Qualified Receivables Transaction; provided that any such encumbrance or restriction applicable to a Subsidiary acting as servicer or sub-servicer for such Qualified Receivables Transaction shall apply only to Servicer Accounts;

(xiv)     restrictions on cash or other deposits or net worth imposed by landlords, suppliers and customers under contracts entered into in the ordinary course of business; and

(xv)     any encumbrance or restriction applicable only to Loan SPV existing under or by reason of the Organizational Documents of Loan SPV or the Backstop Notes, in each case as in existence on the Closing Date.

Section 5.18   Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.  (a) The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Debt) and the Borrower will not issue any Disqualified Stock and will not permit any of its Subsidiaries to issue any shares of Disqualified Stock or Preferred Stock.

(b)     The foregoing provisions will not prohibit the Incurrence of any of the following items of Indebtedness:

(i)      (1) Permitted Indebtedness in an aggregate amount, together with any Permitted Refinancing Debt in respect thereof, not to exceed $75 million at any time outstanding, and (2) Permitted Refinancing Debt in exchange for, or the net cash proceeds of which are used to extend, refinance, renew, replace, defease or refund (in each case, whether or not upon termination and whether with the original lenders, institutional investors or otherwise, including through the issuance of debt securities), in whole or in part, any Permitted Indebtedness;

(ii)      the Incurrence by the Borrower and the Guarantors of Indebtedness represented by the Loans and the related Guarantees;

(iii)      [reserved;]

(iv)      the Incurrence by the Borrower or any of its Subsidiaries of Permitted Refinancing Debt in exchange for, or the net cash proceeds of which are used to extend, refinance, renew, replace, defease or refund (in each case, whether or not upon termination and whether with the original lenders, institutional investors or otherwise, including through the issuance of debt securities), in whole or in part, Indebtedness that was Incurred pursuant to clauses (ii), (iv) or (viii) of this Section 5.18(b);

(v)      the Incurrence of intercompany Indebtedness of the Borrower, a Guarantor or any Subsidiary of the Borrower (other than a Receivables Entity and other than Loan SPV) for so long as such Indebtedness is not prohibited by Section 5.18; provided that (i) such Indebtedness shall be unsecured and if owing by the Borrower or any Guarantor, contractually subordinated in all respects to the Obligations and any Guaranty thereof, and (ii) if as of any date any Person other than the Borrower or a Subsidiary owns or holds any such Indebtedness or holds a Lien in respect of such Indebtedness (other than Permitted Liens of the type described in clause (1) or (15) or any permitted refinancing Lien in respect thereof), such date shall be deemed the incurrence of Indebtedness not permitted under this clause (v);

(vi)      Guarantees by the Borrower or any Subsidiary of the Borrower of Indebtedness of the Borrower or any Subsidiary of the Borrower (other than a Receivables Entity and other than Loan SPV) otherwise permitted hereunder so long as the Person giving such Guarantee could have Incurred the Indebtedness that is being Guaranteed; provided that if the Indebtedness being guaranteed (x) is subordinated to any of the Obligations or a Guaranty thereof, then the Guarantee must be subordinated to the same extent as the Indebtedness being guaranteed or (y) is owed by any Subsidiary of the Borrower that is not a Guarantor, such Guarantee shall be subordinated to the prior payment in full of the Obligations in the case of the Borrower or the Guarantees in the case of a Guarantor;

(vii)      the Incurrence by the Borrower or any of its Subsidiaries of Hedging Obligations that are Incurred for the purpose of fixing or hedging (A) interest rate risk with respect to any floating rate Indebtedness that is permitted by the terms of this Agreement to be outstanding or (B) currency exchange risk in connection with existing financial obligations in the ordinary course of business and not for purposes of speculation;

(viii)    the Incurrence on or prior to the Closing Date of Existing Indebtedness (other than Indebtedness described in clauses (i), (ii) or (v) of this Section 5.18(b)); provided that all Existing Indebtedness (other than Existing Indebtedness with a principal amount not in excess of $1 million individually or $2 million in the aggregate for all such Existing Indebtedness) shall be set forth on Schedule 5.18 attached hereto;

(ix)    the Incurrence of obligations in respect of letters of credit, bank guarantees, performance, bid and surety bonds and completion guarantees provided by the Borrower or any of its Subsidiaries in the ordinary course of business;

(x)    the Incurrence by the Borrower or any of its Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within four Business Days of its Incurrence;

(xi)    Indebtedness in an aggregate principal amount not to exceed $25,000,000;

(xii)    Indebtedness of the Borrower or any Subsidiary of the Borrower consisting of the financing of insurance premiums in the ordinary course of business;

(xiii)    Indebtedness consisting of promissory notes or similar Indebtedness issued by the Borrower or any Subsidiary of the Borrower to current, future or former officers, directors and employees thereof, or to their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Borrower or a Subsidiary of the Borrower to the extent described in clause (iv) of Section 5.16(b);

(xiv)    Indebtedness arising from agreements of the Borrower or any of its Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition; provided that the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds actually received by the Borrower or such Subsidiary in connection with such disposition;

(xv)    Indebtedness Incurred by a Canadian Direct Lending Subsidiary (the borrower in respect of such Indebtedness, the "Canadian Recourse Facility Borrower") (and any unsecured Guarantee thereof by the Borrower) with respect to one or more single-pay recourse facilities (and Permitted Refinancing Indebtedness in respect thereof) in an aggregate principal amount outstanding at any one time not in excess of $25.0 million (the "Canadian Recourse Facility");

(xvi)    Indebtedness Incurred by a Receivables Entity (and Guarantees thereof by the Borrower or any Subsidiary that constitute Standard Securitization Undertakings) in a Qualified Receivables Transaction (i) under the Securitization Facilities,  or (ii) having terms (including as to advance rates, minimum liquidity, restricted cash and pay-down provisions)

either substantially consistent with the terms of the Indebtedness described in subclause (i) or otherwise consistent with prevailing market terms as of the date of incurrence; and

(xvii)   Indebtedness of Loan SPV consisting of Backstop Notes in an aggregate principal amount not to exceed $[16,789,500] and the Guarantee thereof by the Borrower; provided that such Guarantee shall be unsecured and contractually subordinated in right of payment to the payment in full of the Obligations of the Borrower.

(c)      For purposes of determining compliance with this Section 5.18, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in clauses (i) through (xvii) of paragraph (b) above, the Borrower will, in its sole discretion, divide and classify such item of Indebtedness in any manner that complies with this Section 5.18 and will only be required to include the amount and type of such Indebtedness in one of such clauses, and may re-classify any such item of Indebtedness from time to time among such clauses, so long as such item meets the applicable criteria for such category. For the avoidance of doubt, Indebtedness may be classified as Incurred in part pursuant to one of the clauses (i) through (xvii) above, and in part under one or more other clauses. Indebtedness outstanding on the Closing Date under each of the Securitization Facilities shall be treated as Incurred pursuant to clause (xvi) of paragraph (b) above.

(d)      For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

(e)      The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

(f)      Accrual of interest and dividends, accretion of accreted value, issuance of securities paid-in-kind, the accretion or amortization of original issue discount, the payment of interest in the form of additional Indebtedness, the payment of dividends in the form of additional shares of Preferred Stock or Disqualified Stock, the reclassification of commitments or obligations not treated as Indebtedness due to a change in GAAP, changes to amounts outstanding in respect of Hedging Obligations solely as a result of fluctuations in foreign currency exchange rates or interest rates or by reason of fees, indemnities and compensation payable thereunder shall not be deemed to be an Incurrence of Indebtedness for purposes of this Section 5.18.

(g)      The Borrower will not incur, and will not permit any Guarantor to incur, any Indebtedness that is contractually subordinated in right of payment to any other Indebtedness of the Borrower or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Obligations and the Guaranties thereof on substantially identical terms; provided, however, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness solely by virtue of being unsecured or by virtue of being secured on a junior Lien priority basis.

Accrual of interest, accretion of accreted value, accretion or amortization of original issue discount, the payment of interest in the form of additional Indebtedness or the reclassification of commitments or obligations not treated as Indebtedness due to a change in GAAP, will not be deemed to be an incurrence of Indebtedness for purposes of this Section 5.18.

Section 5.19    Mergers, Consolidations, Sales of Assets and Acquisitions.  The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, merge into, amalgamate with or consolidate with any other person, or permit any other person to merge into, amalgamate with or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or Dispose of any Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of related transactions) all or substantially all of the assets of any other person or division or line of business of a person, except that this Section 5.19 shall not prohibit:

(a)      if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing or would result therefrom, (i) the merger, amalgamation or consolidation of any Subsidiary of the Borrower with or into the Borrower in a transaction in which the Borrower is the survivor, (ii) the merger, amalgamation or consolidation of any Subsidiary of the Borrower with or into any Loan Party (other than the Borrower) in a transaction in which the surviving or resulting entity is a Domestic Subsidiary and is or becomes a Loan Party and, in the case of each of clauses (i) and (ii), no person other than the Borrower or another Loan Party receives any consideration, (iii) the merger, amalgamation or consolidation of any Subsidiary of the Borrower (other than a Loan Party) with or into any other Subsidiary that is not a Loan Party, (iv) the liquidation or dissolution or change in form of entity of any Subsidiary if (x) the Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of the Borrower and is not materially disadvantageous to the Lenders, (y) no Loan Party is liquidated or dissolved into a Subsidiary that is not a Loan Party and (z) no Domestic Subsidiary is liquidated or dissolved into a Foreign Subsidiary, (v) any Subsidiary of the Borrower may merge, amalgamate or consolidate with any other person in order to effect an Investment permitted pursuant to Section 5.16 so long as the continuing or surviving person shall be a Subsidiary, which shall be a Domestic Subsidiary and a Loan Party if the merging, amalgamating or consolidating Subsidiary was a Loan Party and which together with each of its Subsidiaries shall have complied with any applicable requirements of Section 7.09, (vi) any Subsidiary may merge, amalgamate or consolidate with any other person in order to effect a Disposition otherwise permitted pursuant to this Section 5.19, or (vii) any Permitted Acquisition and any purchase, lease or other acquisition (in one transaction or a series of related transactions) of all or substantially all of the assets of any other person or division or line of business of a person which, if structured as a merger or purchase of Equity Interests, would constitute a Permitted Acquisition;

(b)     a Disposition of assets to the Borrower or any Subsidiary of the Borrower (other than a Receivables Entity and other than Loan SPV); *provided* that any Disposition by a Loan Party to a Subsidiary that is not a Loan Party in reliance on this clause (b) shall be for cash and for Fair Market Value;

(c)     an issuance of Equity Interests by a Subsidiary of the Borrower to the Borrower or to a Wholly-Owned Subsidiary of the Borrower that is a Subsidiary;

(d)     a Restricted Payment that is permitted by Section 5.16 or a Permitted Investment;

(e)     the Incurrence of Permitted Liens and the Disposition of assets subject to such Liens by or on behalf of the Person holding such Liens;

(f)     the Disposition of accounts in accordance with industry practice in connection with the compromise or collection thereof;

(g)     any Disposition of cash or Cash Equivalents;

(h)     the lease, assignment or sub-lease of any property in the ordinary course of business;

(i)     any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business;

(j)     sales of assets that have become worn out, obsolete or damaged or otherwise unsuitable for use in connection with the business of the Borrower or any of its Subsidiaries;

(k)     the license of patents, trademarks, copyrights, software applications and know-how to Subsidiaries of the Borrower and to third Persons in the ordinary course of business;

(l)     the Disposition of precious metals in the ordinary course of business;

(m)     Dispositions of motor vehicles securing consumer loans made by the Borrower and its Subsidiaries in the ordinary course of business;

(n)     sales of loans receivable and related assets of the type specified in the definition of "Qualified Receivables Transaction" to a Receivables Entity in connection with a Qualified Receivables Transaction;

(o)     transfers of loans receivable and related assets of the type specified in the definition of "Qualified Receivables Transaction" by a Receivables Entity in a Qualified Receivables Transaction;

(p)     any Disposition of the Equity Interests of Katapult Holdings, Inc.;

(q)      [reserved]; and

(r)      other Dispositions of assets to persons other than the Borrower and its Subsidiaries; provided, that (i) the Net Proceeds thereof, if any, are applied in accordance with Section 2.14 to the extent required thereby, (ii) such Disposition is for at least Fair Market Value, and (iii) at least 75% of the consideration for such Disposition received by the Borrower and its Subsidiaries consists of cash or Cash Equivalents; provided that for purposes of this clause (iii), each of the following shall be deemed to be cash: (a) any liabilities (as shown on the Borrower's or such Subsidiary's most recent balance sheet) of the Borrower or any Subsidiary of the Borrower (other than contingent liabilities and liabilities that are by their terms subordinated to any of the Obligations or any Guaranty thereof) that are assumed by the transferee of any such assets and with respect to which the Borrower or such Subsidiary is unconditionally released from further liability, and (b) any notes or other obligations or other securities received by the Borrower or such Subsidiary from the transferee that are converted by the Borrower or such Subsidiary into cash or Cash Equivalents within 45 days after receipt thereof (to the extent of the cash or Cash Equivalents received).

Notwithstanding anything to the contrary set forth in this Section 5.19, no Loan Party shall make any Disposition to any Subsidiary that is not a Loan Party consisting of any intellectual property or any other assets (other than cash and Cash Equivalents) material to the operations of the Borrower and its Subsidiaries in the ordinary course of business.

Section 5.20   Transactions with Affiliates.  (a) The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, exchange, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any contract, agreement, understanding, loan, advance or Guarantee with, or for the benefit of, any Affiliate (each of the foregoing, an "Affiliate Transaction") involving aggregate consideration in excess of $1 million, unless:

(i)      such Affiliate Transaction is on terms that are no less favorable to the Borrower or the relevant Subsidiary than those that would have been obtained in a comparable transaction at the time in an arm's-length transaction with a person who was not an Affiliate; and

(ii)      if such Affiliate Transaction involves an amount in excess of $2 million, the terms of the Affiliate Transaction are set forth in writing and a majority of the non-employee directors of the Borrower disinterested with respect to such Affiliate Transaction has determined in good faith that the criteria set forth in clause (i) of this Section 5.20(a) are satisfied and has approved the relevant Affiliate Transaction as evidenced by a resolution of the Board of Directors of the Borrower set forth in an officer's certificate.

(b)      The foregoing provisions will not apply to the following:

(i)      any employment agreement or compensation plan or arrangement and other benefits (including retirement, health, stock option and other benefit plans) entered into

by the Borrower or any of its Subsidiaries in the ordinary course of business of the Borrower or such Subsidiary;

(ii)       transactions exclusively between or among the Loan Parties; *provided* that such transactions are not otherwise prohibited by the Facility Documents;

(iii)      any agreement existing on the Closing Date and, unless expressly disclosed in an Annual Report on Form 10-K, Quarterly Report on Form 10-Q or Current Report on Form 8-K, in each case of the Borrower and made publicly available on the website of the SEC prior to the Closing Date, set forth on Schedule 5.20(b)(iii) attached hereto, as in effect on the Closing Date, or as modified, amended or amended and restated by any modification, amendment or amendment and restatement (x) that, taken as a whole, is not more disadvantageous to the Lenders in any material respect than such agreement as it was in effect on the Closing Date or (y) made in compliance with the applicable provisions of clauses (i) and (ii) of Section 5.20(a);

(iv)      reasonable compensation of, and indemnity arrangements in favor of, directors of the Borrower and its Subsidiaries;

(v)       the issuance or sale of any Equity Interests (other than Disqualified Stock) of the Borrower and any contribution to the common equity of the Borrower;

(vi)      transactions with Affiliates who are Lenders under and in accordance with the Facility Documents;

(vii)     transactions with customers, clients, lessors, landlords, suppliers, contractors, or purchasers or sellers of goods or services that are Affiliates, in each case, in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and its Subsidiaries, in the reasonable determination of the Board of Directors of the Borrower;

(viii)    sales or other transfers or dispositions of accounts receivable and other related assets customarily transferred in an asset securitization transaction involving accounts receivable to a Receivables Entity in a Qualified Receivables Transaction, and acquisitions of Permitted Investments in connection with, and any other customary transactions effected as a part of, a Qualified Receivables Transaction; and

(ix)      Restricted Payments that are permitted by Section 5.16 and Permitted Investments.

Section 5.21   Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

Section 5.22   [Reserved.]

Section 5.23   Business Activities.  The Borrower shall not, and shall not permit any of its Subsidiaries to, engage in any business other than Similar Businesses.

Section 5.24   Stay, Extension and Usury Laws.  Each of the Borrower and the Guarantors covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of the Facility Documents; and each of the Borrower and the Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to any Agent or Lender, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 5.25   Loan SPV.  The Borrower shall not permit Loan SPV (A) to Incur any Indebtedness other than Backstop Notes in aggregate initial principal amount not to exceed [$16,789,500], plus accrued interest and any interest that is paid in kind and capitalized in accordance with the terms of the Backstop Notes, (B) to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired by it, other than Liens to secure the obligations under the Backstop Notes, (C) to Dispose of any assets, business or property, other than the making of interest, premium and principal payments to the holders of the Backstop Notes in connection with the satisfaction of any of the Loan SPV's obligations under the Backstop Notes in accordance with their terms, (D) to make or hold any Investment other than the Loans and cash or Cash Equivalents, (E) to make any Restricted Payment, other than in the form of cash dividends to its parent to the extent consistent with its obligations in respect of the Backstop Notes, (F) to, directly or indirectly, merge into, amalgamate with or consolidate with any other Person, or permit any other Person to merge into, amalgamate with or consolidate with it, other than a merger or other consolidation with and into Borrower or any Subsidiary in connection with the satisfaction in full of the Backstop Notes, (G) to acquire any assets, business or property other than the Loans on the Closing Date and any cash or Cash Equivalents, (H) breach or violate any of its Organizational Documents or the Backstop Notes, or (I) engage in any business or activity other than (1) the making and ownership of, Loans in an aggregate, initial principal amount not to exceed [$16,789,500], (2) maintaining its corporate existence, (3) participating in tax, accounting and other administrative activities, (4) execution and delivery of the Backstop Notes and any other security and other documentation incidental there to which it is a party and the performance of its obligations thereunder, (5) receiving and holding cash and Cash Equivalents in deposit accounts and securities accounts, and (6) activities incidental to the businesses or activities described in clauses (1) through (5) of this Section 5.25(I).   Notwithstanding anything to the contrary set forth in this Agreement or otherwise, neither the Borrower nor any of its Subsidiaries shall (i) repay, prepay, purchase, repurchase, redeem, defease or otherwise acquire or retire for value any Backstop Notes (except (A) payments by Loan SPV and (B) subject to the such guarantee being contractually subordinated in right of payment to the payment in full of the Obligations of the Borrower, payments under the guarantee of the Backstop Notes by the Borrower) or (ii) make any Investment in, or Dispose of any assets or properties to, Loan SPV (other than (i) holding Equity Interests of Loan SPV issued to the Borrower or its applicable Subsidiary prior to the Closing Date and (ii) making payments on the Loans held by Loan SPV in accordance with the terms of this Agreement and the other Facility Documents).

Section 5.26    [Reserved].

## ARTICLE VI

## EVENTS OF DEFAULT

Section 6.01    Events of Default.  If any of the following events ("Events of Default") shall occur:

(a)    any Loan Party shall fail to pay (i) when due any of the outstanding principal of the Loans or (ii) within three (3) Business Days after the same become due and payable, accrued interest on the Loans or any fee or any other amount due hereunder; or

(b)    any representation or warranty made by or on behalf of any Loan Party herein or in any other Facility Document, certificate, financial statement or other document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(c)    (i) any Loan Party or any Subsidiary thereof shall fail to perform or observe any term, covenant or agreement contained in Sections 2.07, 5.01(a), (b), (c), (d), (f), (g) or (h), 5.03(c), 5.16, 5.17, 5.18, 5.19, 5.20, 5.21, 5.23, 5.24, 5.25, or 5.26 of this Agreement; (ii)[reserved]; or (iii) the Loan Parties or any of their Subsidiaries shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or any other Facility Document, and such failure continues for 30 days; *provided,* that to the extent any Facility Document expressly provides for a shorter grace period, that shorter grace period will be given effect; or

(d)    (i) any Loan Party or any Subsidiary thereof (other than any Receivables Entity) fails (1) to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder or any Qualified Receivables Facility) having an aggregate principal amount of more than $10,000,000, or (2) to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with or without the giving of notice or lapse of time, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (d)(i)(2) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness; (ii) there occurs any event of default under any Swap Agreement as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Agreement) or any Termination Event (as so defined) under such Swap Agreement as to which such Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap

Agreement termination value exceeds $1,000,000; provided that in the case of clauses (d)(i) and (ii), any such failure referred to in clause (d)(i) or any such event of default or Termination Event referred to in clause (d)(ii), as the case may be, is unremedied and is not validly waived by the holders of such Indebtedness, or the counterparties of such Swap Agreement, as the case may be, in accordance with the terms of the documents governing such Indebtedness or Swap Agreement, as the case may be, prior to any termination of the Commitments or acceleration of the Loans pursuant to this Section 6.01; or (iii) the occurrence of an "Event of Default" or other similar event or circumstance under the Securitization Facilities or any other Qualified Receivables Facility, in each case, after giving effect to any grace period therein, that either (A) results in the acceleration of all or any portion of such Indebtedness prior to its final stated maturity or (B) has not been remedied (by amendment, cure, waiver or otherwise) thereunder within thirty (30) days after the related lenders thereunder received notice of the occurrence of such "Event of Default" (or other similar event or circumstance); or

(e)     any judgment or order for the payment of money in excess of $5,000,000 shall be rendered against any Loan Party or any Subsidiary thereof and either (x) enforcement proceedings shall have been commenced by any creditor upon such judgment or order which shall not have been stayed or dismissed within thirty (30) days after the commencement of such proceedings or (y) there shall be any period of forty-five (45) consecutive days during which such judgment remains unpaid and a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(f)     (i) any proceeding shall be instituted by or against a Loan Party or any Subsidiary thereof seeking relief under any Law relating to bankruptcy, insolvency or reorganization or relief of debtors or seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding-up, dissolution, reorganization, arrangement, compromise, adjustment, protection, relief, or composition of it or its debts under any Law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, sequestrator, conservator, examiner, liquidator, rehabilitator or other similar official for it or for any substantial part of its property and assets and, in the case of any such proceeding instituted against such Person, such proceeding shall remain undismissed or unstayed for a period of thirty (30) days; (ii) any Loan Party or any Subsidiary thereof shall consent to the institution of, fail to contest in a timely and appropriate manner, or file an answer admitting the material allegations in any proceeding or the filing of any petition described above; or (iii) any Loan Party or any Subsidiary thereof shall take any corporate or other action (as applicable), to authorize any of the actions set forth above in this Section 6.01(f);

(g)     (i) any Loan Party shall deny its obligations under this Agreement or any other Facility Document (to which it is a party), (ii) any Law shall purport to render invalid, or preclude enforcement of, any material provision of this Agreement or any other Facility Document or impair performance of the obligations hereunder or under any other Facility Document of any Loan Party, or (ii) any material provision of any Facility Document, after delivery thereof in accordance with the terms hereof or of any other Facility Document, shall for any reason cease to be valid and binding upon, or enforceable against any Loan Party; or

(h)    (i) any security interest created by any Collateral Document ceases to be in full force and effect (except as permitted by the terms of this Agreement or the Collateral Documents); *provided* that, such cessation, individually or in the aggregate, results in Collateral having a Fair Market Value in excess of $10,000,000 not being subject to a valid, perfected security interest or (ii) except as permitted by this Agreement, any Guarantee of the Obligations shall be held in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect or any Guarantor, or any Person acting on behalf of any Guarantor, shall deny or disaffirm its obligations under its Guarantee of the Obligations;

(i)    there shall occur one or more ERISA Events which ERISA Event or ERISA Events individually or in the aggregate, results in or would reasonably be expected to result in liability in excess of $10,000,000; or

(j)    a Change of Control shall have occurred and be continuing;

then, (i) upon the occurrence of any Event of Default described in <u>Section 6.01(f)</u>, automatically, and (ii) upon the occurrence of any other Event of Default, at the request of (or with the consent of) Required Lenders or the Administrative Agent, (A) the Commitments, if any, of each Lender having such Commitments shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Loan Party:  (I) the unpaid principal amount of and accrued interest on the Loans and (II) all other Obligations; (C) the Administrative Agent may cause the Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents; and (D) the Administrative Agent and the Collateral Agent may exercise on behalf of themselves, the Lenders and the other Secured Parties all rights and remedies available to the Administrative Agent, the Collateral Agent and the Lenders under the Facility Documents or under applicable Law or in equity.  After the exercise of remedies provided for in Section 6.01 (or after the Obligations have automatically become immediately due and payable as set forth in the Section 6.01), any amounts received on account of the Obligations shall be applied (i) first, to any amounts owed to the Agent under the Facility Documents, (ii) ratably to the First Out Loans of, and other Obligations owing to, each First Out Lender (in their capacity as such) until such First Out Loans and other Obligations are repaid in full and, (iii) thereafter ratably to the Second Out Loans of, and other Obligations owing to, each Second Out Lender (in their capacity as such).

## ARTICLE VII

## GUARANTY

Section 7.01    <u>The Guaranty</u>.  Each Guarantor, jointly and severally, hereby Guarantees to the Secured Parties and their respective successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of all of the Obligations (such obligations being herein collectively called the "<u>Guaranteed Obligations</u>"); provided that the Guaranteed Obligations of a Guarantor shall exclude any Excluded Swap Obligations with respect to such Guarantor.  Each Guarantor hereby agrees that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, each Guarantor will promptly pay the same, without any demand or

notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 7.02   Obligations Unconditional.  The obligations of each Guarantor under Section 7.01 are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of the Borrower under this Agreement or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other Guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 7.02 that the obligations of each Guarantor hereunder shall be absolute and unconditional under any and all circumstances.  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor, which shall remain absolute and unconditional as described above:

(a)      at any time or from time to time, without notice to such Guarantor, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)      any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein shall be done or omitted;

(c)      the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be modified, supplemented or amended in any respect, or any right under this Agreement or any other agreement or instrument referred to herein shall be waived or any other Guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(d)      any lien or security interest granted in favor of Collateral Agent for the benefit of the Secured Parties as security for any of the Guaranteed Obligations shall fail to be perfected.

Each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Secured Parties exhaust any right, power or remedy or proceed against the Borrower under this Agreement or any other agreement or instrument referred to herein, or against any other Person under any other Guarantee of, or security for, any of the Guaranteed Obligations, and each Guarantor agrees that any consent by the Administrative Agent or the Lenders hereunder shall be effective only in the specific instance and for the specific purpose for which it is given.

Section 7.03   Reinstatement.  The obligations of each Guarantor under this Article shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or any Guarantor in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations,

whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify each Secured Party on demand for all reasonable costs and expenses (including without limitation reasonable and documented fees, charges and disbursements of counsel) incurred by each Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar Law.

Section 7.04   Subordination and Subrogation.  Unless and until the Guaranteed Obligations have been paid in full, all rights of each Guarantor against the Borrower with respect to the Guarantee in Section 7.01 shall be subordinated to such payment in full and each Guarantor agrees not to assert any right of subrogation and any right to enforce any remedy which any Secured Party now has or may hereafter have against the Borrower, any endorser or any other guarantor of all or any part of the Guaranteed Obligations until the Guaranteed Obligations are paid in full, and each Guarantor hereby subordinates any benefit of, and any right to participate in, any security or Collateral given to Collateral Agent on behalf of the Secured Parties to secure payment of the Guaranteed Obligations or any other liability of the Borrower to Lenders until the Guaranteed Obligations are paid in full.

Section 7.05   Remedies.  Each Guarantor agrees that, as between such Guarantor and the Secured Parties, the obligations of the Borrower under this Agreement may be declared to be forthwith due and payable as provided in Article VI (and shall be deemed to have become automatically due and payable in the circumstances provided in Article VI, without notice or other action on the part of any Secured Party and regardless of whether payment of such obligations has then been accelerated) for purposes of Section 7.01 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by such Guarantor for purposes of Section 7.01.

Section 7.06   Continuing Guarantee.  The Guarantee in this Article VII is a continuing Guarantee, and shall remain in full force and effect until (i) the termination of all Commitments and final payment in full of the Guaranteed Obligations and all other amounts payable under any other Facility Document (in each case other than the Additional Secured Obligations and any contingent indemnification obligations or expense reimbursement claims not then due) or (ii) with respect to any Person, if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder (other than upon the basis of such Person ceasing to be a Subsidiary as a result of a transaction with the primary intention to release such Subsidiary from its Guarantee in this Article VII).

Section 7.07   General Limitation on Guaranteed Obligations.  In any action or proceeding involving any state corporate Law, or any state or Federal bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision hereof to the contrary,

92

the amount of such liability shall, without any further action by such Guarantor or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 7.08   Contribution by Guarantors.  All Guarantors desire to allocate among themselves (collectively, the "Contributing Guarantors"), in a fair and equitable manner, their obligations arising under this Guarantee.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "Funding Guarantor") under this Guarantee such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "Fair Share" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors *multiplied by* (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guarantee in respect of the obligations Guaranteed.  "Fair Share Contribution Amount" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guarantee that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the Code or any comparable applicable provisions of state law; provided that solely for purposes of calculating the Fair Share Contribution Amount with respect to any Contributing Guarantor for purposes of this Section 7.08, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "Aggregate Payments" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guarantee (including in respect of this Section 7.08), *minus* (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.08.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.08 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.08.

Section 7.09   Additional Guarantors.  If (i) the Borrower or any of its Subsidiaries shall acquire or create, or there shall exist, another Domestic Subsidiary (other than a Receivables Entity or Loan SPV) after the Closing Date or (ii) any Foreign Subsidiary of the Borrower guarantees (or otherwise becomes liable for) Indebtedness of the Borrower or any Guarantor, then the Borrower will cause such Subsidiary to become a Guarantor hereunder and:

(a)       execute a Counterpart Agreement substantially in the form of Exhibit E, in accordance with the terms of this Agreement, pursuant to which such Subsidiary shall

unconditionally Guarantee, on a senior secured basis, all of the Obligations on the terms set forth in this Agreement;

(b)      execute and deliver to the Collateral Agent such amendments or supplements to the Collateral Documents necessary in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest in the Equity Interests of such Subsidiary, subject to Permitted Liens and any Intercreditor Agreement, which are owned by the Borrower or a Guarantor and are required to be pledged pursuant to the Collateral Documents;

(c)      take such actions as are necessary to grant to the Collateral Agent for the benefit of the Secured Parties a perfected security interest in the assets of such Subsidiary, other than Excluded Assets and subject to Permitted Liens and any Intercreditor Agreements, including the filing of UCC financing statements, in each case as may be required by the Collateral Documents;

(d)      take such further action and execute and deliver such other documents specified in the Collateral Documents or as otherwise may be reasonably requested by the Collateral Agent to give effect to the foregoing; and

(e)      deliver to the Collateral Agent an Opinion of Counsel that (i) such Counterpart Agreement and any other documents required to be delivered have been duly authorized, executed and delivered by such Subsidiary and constitute legal, valid, binding and enforceable obligations of such Subsidiary and (ii) the Collateral Documents to which such Subsidiary is a party create a valid perfected Lien on the Collateral covered thereby.

By execution of this Agreement as a Guarantor, the Borrower covenants and agrees to perform its obligations under this Section 7.09.

Section 7.10    Keepwell.  Each Loan Party that is a Qualified ECP Guarantor at the time the Guarantee or the grant of a Lien under the Facility Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Facility Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Article VII voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full. Each Loan Party intends this Section 7.10 to constitute, and this Section 7.10 shall be deemed to constitute, a Guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

## ARTICLE VIII

## AGENTS

Section 8.01    <u>Authorization and Authority</u>.  Each Lender hereby irrevocably appoints, designates and authorizes Alter Domus (US) LLC as Administrative Agent and as Collateral Agent, in each case, to take such actions on its behalf under the provisions of this Agreement and under each other Facility Document and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement or any other Facility Document, together with such actions and powers as are reasonably incidental thereto.  In furtherance of the foregoing, each Lender (in its capacity as a Lender and on behalf of itself and its Affiliates as potential counterparties to Cash Management Obligations or Secured Hedging Obligations) hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, neither the Administrative Agent nor the Collateral Agent shall have any duties or responsibilities, except those expressly set forth herein or in the other Facility Documents, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Facility Document or otherwise exist against the Administrative Agent or the Collateral Agent.  The provisions of this Article VIII are solely for the benefit of Agents and Lenders, and no Loan Party shall have rights as a third party beneficiary or otherwise of any of such provisions.

Section 8.02    <u>Agent Individually</u>.  Each Lender understands that each Agent, acting in its individual capacity, and its Affiliates are engaged in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (such services and businesses are collectively referred to in this <u>Section 8.02</u> as "<u>Activities</u>") and may engage in the Activities with or on behalf of the Borrower or its Affiliates.  Furthermore, Agents and their respective Affiliates may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Borrower and its Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Borrower or its Affiliates).

Section 8.03    <u>Duties of Agents; Exculpatory Provisions</u>.

(a)    An Agent's duties hereunder and under any other Facility Document are solely ministerial and administrative in nature and no Agent shall have any duties or obligations except those expressly set forth herein or therein.  Without limiting the generality of the foregoing, an Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written direction of the Required Lenders, provided that an Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent or any of its Affiliates to liability or that is contrary to this Agreement or applicable Law.

(b)     No Agent shall be liable (nor shall any Lender or Loan Party have any right of action whatsoever against any Agent) for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances) or (ii) in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any Default or Event of Default or the event or events that give or may give rise to any Default or Event of Default unless and until a Loan Party or any Lender shall have given written notice to such Agent describing such Default or Event of Default and such event or events.

(c)     No Agent nor any of its Affiliates shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty, representation or other information made or supplied in or in connection with this Agreement or any other Facility Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith or the adequacy, accuracy and/or completeness of the information contained therein, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Facility Document or any other agreement, instrument or document or the perfection or priority of any Lien or security interest created or purported to be created hereby or thereby or (v) the satisfaction of any condition set forth in Article III or elsewhere herein, other than (but subject to the foregoing clause (ii)) to confirm receipt of items expressly required to be delivered to an Agent.

Section 8.04   Reliance by Agent.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Each Agent shall be fully justified in failing or refusing to take any action under any Facility Documents unless it shall first receive the advice or concurrence of the Required Lenders and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Facility Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Secured Parties.  Notwithstanding the foregoing, no Agent shall be required to take, or to omit to take, any action that is, in the opinion of such Agent or its counsel, contrary to any Facility Document or applicable requirement of law.  For purposes of determining compliance with the conditions specified in Sections 3.01 and 3.02, each Lender that has signed this Agreement (or an addendum or joinder to this Agreement) shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be consented to or

approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date or the date on which a Loan has been requested to be made, as applicable, specifying its objection thereto.

The Agents are not obliged to expend or risk their own funds or otherwise incur any financial liability in the performance of their duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if they have grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to them.  The Agents shall not be responsible for any unsuitability, inadequacy, expiration or unfitness of any security interest created hereunder or pursuant to any other security documents pertaining to this matter nor shall it be obligated to make any investigation into, and shall be entitled to assume, the adequacy and fitness of any security interest created hereunder or pursuant to any other security document pertaining to this matter.  In no event shall the Agents be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if such loss or damage was foreseeable or it has been advised of the likelihood of such loss or damage and regardless of the form of action.  In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

Section 8.05   Delegation of Duties.  An Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Facility Documents by or through any one or more sub-agents appointed by such Agent, and such Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties; *provided* that in each case that no such delegation to a sub-agent or a Related Party shall release such Agent from any of its obligations hereunder. Each such sub-agent and the Related Parties of such Agent and each such sub-agent shall be entitled to the benefits of all provisions of this Article VIII and Section 9.04 (as though such sub-agents were the "Agent" hereunder and under the other Facility Documents) as if set forth in full herein with respect thereto.

Section 8.06   Resignation of Agent.  An Agent may at any time give notice of its resignation to the Lenders and the Borrower.  The Required Lenders may remove an Agent by giving notice thereof to the Lenders, the Agents and the Borrower.  Upon receipt of any such notice of resignation or delivery of such notice of removal, the Required Lenders shall have the right (in consultation with the Borrower) to appoint a successor Agent.  If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring or removed Agent gives notice of its resignation or the Required Lenders deliver notice of removal (such 30 day period, the "Lender Appointment Period"), then the retiring or removed Agent may on behalf of Lenders appoint a successor Agent meeting the qualifications set forth above.  In addition and without any obligation on the part of the retiring or removed Agent to appoint, on behalf of Lenders, a successor Agent, the retiring or removed Agent may at any time upon or after the end of the Lender Appointment Period notify the Borrower and Lenders that no qualifying Person has accepted appointment as

successor Agent and the effective date of such retiring or removed Agent's resignation which effective date shall be no earlier than three (3) Business Days after the date of such notice.  Upon the resignation effective date established in such notice and regardless of whether a successor Agent has been appointed and accepted such appointment, the retiring or removed Agent's resignation shall nonetheless become effective and (i) the retiring or removed Agent shall be discharged from its duties and obligations as Agent hereunder and under the other Facility Documents (except in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under the Facility Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties as Agent of the retiring or removed Agent, and the retiring or removed Agent shall be discharged from all of its duties and obligations as Agent hereunder and/or under the other Facility Documents.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Agent's resignation hereunder and under the other Facility Documents, the provisions of this Article VIII and Section 9.04 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

Section 8.07   Non-Reliance on Agent.

(a)   Each Lender (including its Related Parties) acknowledges that each Agent has not made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent to such Lender as to any matter, including whether any Agent has disclosed material information in its possession.  Each Lender (including its Related Parties) confirms to each Agent that it (i) possesses (individually or through its Related Parties) such knowledge and experience in financial and business matters that it is capable, without reliance on any Agent or any of its Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Agreement, (y) making its portion of the Loans and (z) taking or not taking actions hereunder, (ii) is financially able to bear such risks and (iii) has, independently and without reliance upon any Agent or any of its Related Parties and based upon such documents and information as it has deemed appropriate, determined that entering into this Agreement and making its portion of the Loans is suitable and appropriate for it.

(b)   Each Lender acknowledges that (i) it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Facility Documents, (ii) it has, independently and without reliance upon any Agent or any of its Related Parties, made its own appraisal and investigation of all risks associated with, and its own credit analysis and decision to enter into, this Agreement based on such documents and information as it has deemed appropriate and (iii) it will, independently and

without reliance upon any Agent or any of its Related Parties, continue to be solely responsible for making its own appraisal and investigation of all risks arising under or in connection with, and its own credit analysis and decision to take or not take action under, this Agreement and the other Facility Documents based on such documents and information as it shall from time to time deem appropriate, which may include, in each case:

(i)       the financial condition, status and capitalization of the Borrower;

(ii)      the legality, validity, effectiveness, adequacy or enforceability of this Agreement and the other Facility Documents and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with this Agreement;

(iii)     determining compliance or non-compliance with any condition hereunder to the making of a Loan and the form and substance of all evidence delivered in connection with establishing the satisfaction of each such condition; and

(iv)     the adequacy, accuracy and/or completeness of any other information delivered by any Agent or by any of their respective Related Parties under or in connection with this Agreement, the other Facility Documents, the Transactions contemplated hereby and thereby or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with this Agreement

Section 8.08    Collateral and Guarantee Matters.

(a)      Each Lender hereby further authorizes each Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guarantee hereunder, the Collateral Documents and the other Facility Documents. Without further written consent or authorization from Lenders, the Administrative Agent or Collateral Agent, as applicable, shall (and the Lenders hereby authorize and direct the Administrative Agent and Collateral Agent to), at the request and cost of the Borrower, execute any documents or instruments necessary to release (i) any Guarantor from its obligations under the Facility Documents in the circumstances for such release set forth in clauses (i) and (ii) of Section 7.06 and (ii) any Lien encumbering any item of Collateral that either (A) is the subject of a Disposition to a Person other than a Loan Party permitted under the Facility Documents, (B) is or becomes Excluded Assets or (C) is owned by a Person whose obligations under the Facility Documents are released pursuant to clause (i) of this Section 8.08(a); provided, that in each case the Administrative Agent or the Collateral Agent, as applicable, shall have received a certificate of an Authorized Officer of the Borrower containing such certifications as the Administrative Agent or the Collateral Agent, as applicable, shall reasonably request.  Any such release shall be deemed subject to Section 7.03 and any similar provision of any Collateral Document.  The Borrower agrees to pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or the Collateral Agent (and their respective representatives) in connection with taking such actions to release security interests in Collateral and obligations under the Facility Documents as contemplated by this Section 8.08(a).  Additional Secured Obligations shall be secured and guaranteed pursuant to the Collateral Documents only to the extent that, and for so long as, the other Obligations are so

secured and guaranteed. No person shall have any voting rights under any Facility Document solely as a result of the existence of Additional Secured Obligations owed to it. For the avoidance of doubt, no release of Collateral or Guarantors effected in the manner permitted by this Agreement shall require the consent of any holder of Additional Secured Obligations (in such capacity).

(b)     The Lenders and the other Secured Parties hereby irrevocably authorize and instruct the Administrative Agent and the Collateral Agent to, without any further consent of any Lender or any other Secured Party, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify any Intercreditor Agreement in order to permit the granting of Liens that are, and that have priority, expressly permitted by the terms of this Agreement. The foregoing provisions are intended as an inducement to any provider of any Indebtedness not prohibited by Section 5.18 hereof to extend credit to the Loan Parties and such persons are intended third-party beneficiaries of such provisions.

(c)     Anything contained in any Facility Document to the contrary notwithstanding, the Borrower, Administrative Agent, Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee hereunder, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of a Secured Party in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Secured Party may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by Collateral Agent at such sale.

Section 8.09     <u>Right to Indemnity</u>.  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent upon demand to the extent that such Agent shall not have been reimbursed by any Loan Party (and without limiting its obligation to do so), for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Facility Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Facility Documents; *provided* that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is

furnished; provided that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; *provided*, *further*, that this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

Section 8.10   Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under the Bankruptcy Code or other applicable Law or any other judicial proceeding relative to the Borrower, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise (a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the other Secured Parties (including fees, disbursements and other expenses of counsel) allowed in such judicial proceeding and (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.  Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and other Secured Party to make such payments to the Administrative Agent.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or other Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or other Secured Party to authorize the Administrative Agent to vote in respect of the claim of such Person or in any such proceeding.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01   Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Facility Document, and no consent to any departure by the Borrower or Guarantor therefrom, shall be effective unless in writing signed by the Required Lenders (*provided* that any Defaulting Lender shall be deemed not to be a "Lender" for purposes of calculating the Required Lenders (including the granting of any consents or waivers) with respect to any of the Facility Documents) and the Borrower and the applicable Loan Parties, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no amendment, waiver or consent shall, unless in writing and signed by each Lender that would be directly and adversely affected thereby, the Administrative Agent and/or the Collateral Agent, as the case may be, do any of the following: (a) reduce or forgive the principal of, or interest (or the rate of interest) on, or reduce the amount of interest payable in cash in respect of, any Loan or any other amounts payable hereunder, (b) postpone any date fixed for any payment of principal of, or interest on, any Loan or any other amounts payable hereunder or waive any demand for any such payment, (c) increase any Commitment of any Lender over the amount thereof then in effect or extend the outside date for such Commitment, (d) release all or substantially all of the value of the Guarantees hereunder or

release all or substantially all of the Collateral, (e) amend the definition of "Required Lenders," or this <u>Section 9.01</u> or otherwise change the percentage of the Commitments or the aggregate unpaid principal amount of the Loans or the number of Lenders that shall be required for Lenders or any of them to take any action hereunder, (f) amend the definition of "Pro Rata Share" or otherwise alter the pro rata sharing of payments required hereby, or (g) except as set forth in the following proviso, subordinate the Obligations or any Guarantees thereof to any other Indebtedness (including other Obligations) or subordinate the Secured Parties' Liens on the Collateral; *provided*, that only the consent of the Required Lenders shall be required to subordinate the Obligations or the Liens securing the Obligations (i) to Indebtedness for borrowed money the proceeds of which are not used to replace or refinance any of the Obligations or (ii) to "debtor-in-possession" or similar financing incurred in a bankruptcy or other insolvency proceeding.

In addition, (i) no amendment, waiver or consent shall, unless in writing and signed by the relevant Agent in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or any other Facility Document, and (ii) no amendment, waiver or consent shall, unless in writing and signed by Lenders holding a majority of the Exposure arising from the First Out Loans and First Out Commitments, or a majority of the Exposure arising from the Second Out Loans and Second Out Commitments, as applicable, disproportionately and adversely affect the First Out Lenders relative to the Second Out Lenders, or the Second Out Lenders relative to the First Out Lenders, as applicable.

In addition, notwithstanding anything else to the contrary contained in this <u>Section 9.01</u>, (a) if the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Facility Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and (b) the Administrative Agent and the Borrower shall be permitted to amend any provision of any Collateral Document to better implement the intentions of this Agreement and the other Facility Documents, and in each case, such amendments shall become effective without any further action or consent of any other party to any Facility Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

Section 9.02    <u>Notices, Etc.</u>

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by electronic mail, to the Borrower and each Agent at the addresses (or electronic mailing address) set forth below. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in such paragraph (b).

<u>If to the Borrower</u>:

CURO Group Holdings Corp.
101 N. Main Street, Suite 600
Greenville, SC 29601
Attention: Legal Department
Electronic Mailing Address: BeccaFox@curo.com; legaldept@curo.com

With a copy (which shall not constitute notice) to:


<u>If to the Administrative Agent or Collateral Agent</u>:

Alter Domus (US) LLC
225 W. Washington, 9th Fl
Chicago, IL  60606
Email:  Legal_agency@alterdomus.com; ADPC@alterdomus.com;
Emily.ergangpappas@alterdomus.com
Attention:  Nick Keelen

With a copy (which shall not constitute notice) to:

Notices and other communications to any Agent and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by such Agent and the Lenders; *provided* that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  Each Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.  Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that, except as otherwise expressly set forth herein, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause <u>(i)</u> of notification that such notice or communication is available and identifying the website address therefore.

(b)    <u>Change of Address, Etc</u>.  Any party hereto may change its address or electronic mailing address for notices and other communications hereunder by notice to the other parties hereto.

Section 9.03    No Waiver; Remedies.  No failure on the part of any Agent or Lender to exercise, and no delay in exercising, any right, remedy, power or privilege hereunder, or under any other Facility Document shall operate as a waiver thereof nor shall the single or partial exercise, of any such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Lender or Agent to any other or further action in any circumstances without notice or demand.

Section 9.04    Costs, Expenses and Indemnification.

(a)    Costs and Expenses.  The Borrower agrees to pay and reimburse all reasonable and documented out-of-pocket costs and expenses, if any (including, but not limited to, counsel fees and expenses, consultant fees and due diligence expenses), incurred by (i) each Agent and each of their respective Affiliates and (ii) the Ad Hoc Group (including the fees and expenses of Wachtell, Lipton, Rosen & Katz, counsel to the Ad Hoc Group, and Houlihan Lokey, financial advisor to the Ad Hoc Group) in connection with the preparation, negotiation, execution, delivery, administration, modification and supplementation of this Agreement, the Collateral Documents, the other Facility Documents and Collateral.  The Borrower further agrees to pay all reasonable and documented out-of-pocket costs and expenses, if any (including, but not limited to, counsel fees and expenses), incurred by each Agent and Lender and each of their respective Affiliates in connection the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement, the Collateral Documents, the other Facility Documents and the other documents to be delivered hereunder or in respect of the transactions contemplated hereby, including, but not limited to, counsel fees and expenses in connection with the enforcement of rights under this Section 9.04(a) and under any other Facility Document, but limited, in the case of the Lenders to a single primary counsel (and applicable local counsel) for all of them collectively.

(b)    Indemnification by the Borrower.  The Borrower shall indemnify each Agent and Lender (including the members of the Ad Hoc Group) and each of their respective Related Parties (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, obligations, penalties, actions, judgments, charges, liabilities and related expenses (including the reasonable and documented fees, charges and disbursements of counsel, which in the absence of any conflicts, may be limited to one counsel and one local counsel in any applicable jurisdiction and additional counsel as necessary due to actual conflicts of interest among such Indemnitees) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any Related Party of the Borrower arising out of, in connection with, or as a result of (i) this Agreement, any other Facility Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the Transactions contemplated hereby or thereby, (ii) the Loans or the use or proposed use of the proceeds therefrom, any claims, investigations, non-compliance, sanction or other actions with respect to such Loan, including any actions by the SEC or any Governmental Authority, (iii) any actual or prospective claim, litigation,

investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Related Party of the Borrower, and regardless of whether any Indemnitee is a party thereto, *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (A) are determined by a court of competent jurisdiction in a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, or (B) arise from disputes between or among Indemnitees that do not involve an act or omission by the Loan Parties or their Subsidiaries, other than any proceeding against the Administrative Agent, or Collateral.

(c)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefore is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, or as a result of, this Agreement, any other Facility Document or any agreement or instrument contemplated hereby, the Transactions contemplated hereby or thereby, the Loans or the use of the proceeds thereof.  No Indemnitee referred to in clause (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Facility Documents or the Transactions contemplated hereby or thereby.

(d)     Payments.  All amounts due under this Section 9.04 shall be due and payable within ten (10) days of demand by any Lender or Agent, as applicable, unless provided otherwise above.

Section 9.05     Successors and Assigns; Participations.

(a)     Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  Except as permitted by Section 5.19, no Loan Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Loan Party without the prior written consent of all Lenders (and any purported assignment or delegation without such consent shall be null and void).

(b)     Register.  The Borrower, the Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of a fully executed Assignment Agreement effecting the assignment or transfer thereof, together with the required forms and certificates regarding tax matters and any fees payable in connection with such assignment, in each case, as provided in Section 9.05(d).  Each assignment shall be recorded in the Register promptly following receipt by the Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to the Borrower and a copy of such Assignment Agreement shall be maintained, as applicable.  The date of such

105

recordation of a transfer shall be referred to herein as the "Assignment Effective Date". Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)     Right to Assign. Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (*provided*, that pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments):

(i)     to any Person meeting the criteria of clause (i) of the definition of the term "Eligible Assignee" upon the giving of notice to the Borrower and the Administrative Agent; and

(ii)     to any Person meeting the criteria of clause (ii) of the definition of the term "Eligible Assignee" upon such Person being consented to by each of the Borrower (*provided* that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) days after having received notice thereof) and the Administrative Agent (such consents not to be (x) unreasonably withheld or delayed or (y) in the case of the Borrower, required at any time an Event of Default has occurred and is continuing); *provided*, *further* that each such assignment pursuant to this Section 9.05(c)(ii) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by the Borrower and the Administrative Agent or as shall constitute the aggregate amount of the Commitments and Loans of the assigning Lender).

(d)     Mechanics. Assignments and assumptions of Loans and Commitments by Lenders shall be effected by manual execution and delivery to the Administrative Agent of an Assignment Agreement. Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date. In connection with all assignments there shall be delivered to the Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income Tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.19(c), together with payment to the Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable in the case of an Eligible Assignee which is already a Lender or is an Affiliate of a Lender or a Person under common management with a Lender). Furthermore, in connection with all assignments (except in the case of an Eligible Assignee which is already a Lender) there shall be delivered to the Administrative Agent a completed Administrative Questionnaire in the form of Exhibit H.

(e)     Representations and Warranties of Assignee. Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it shall make or invest in, as the case may be, its Commitments or

Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 9.05, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(f)     Effect of Assignment.  Subject to the terms and conditions of this Section 9.05, as of the "Assignment Effective Date" (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof, including under Section 9.09) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; *provided*, that anything contained in any of the Facility Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect any Commitment of such assignee and any Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to the Administrative Agent for cancellation, and thereupon the Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply the requirements of this Section 9.05 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.05(g).  Any assignment by a Lender pursuant to this Section 9.05 shall not in any way constitute or be deemed to constitute a novation, discharge, rescission, extinguishment or substitution of the Indebtedness hereunder, and any Indebtedness so assigned shall continue to be the same obligation and not a new obligation.

(g)     Participations.

(i)     Each Lender shall have the right at any time to sell one or more participations to any Eligible Assignee (in such capacity a "Participant") in all or any part of its Commitments, Loans or in any other Obligation.

(ii)     The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that both (A) requires the consent each Lender that would be directly and adversely affected thereby pursuant to Section 9.01 and (B) directly and adversely affects such Participant.

(iii)     The Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.18</u> and <u>2.19</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to this <u>Section 9.05</u>; *provided* that (x) a Participant shall not be entitled to receive any greater payment under <u>Sections 2.18</u> and <u>2.19</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless (A) and to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation or (B) the sale of the participation to such Participant is made with the Borrower's prior written consent and (y) a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of <u>Section 2.19</u> unless such Participant agrees to comply with <u>Section 2.19</u> as though it were a Lender; *provided*, *further*, that, except as specifically set forth in clauses (x) and (y) of this sentence, nothing herein shall require any notice to the Borrower or any other Person in connection with the sale of any participation.  To the extent permitted by law, each Participant shall also be entitled to the benefits of <u>Section 9.12</u> as though it were a Lender; *provided*, that such Participant agrees to be subject to <u>Section 2.16</u> as though it were a Lender.

(iv)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Facility Documents (the "<u>Participant Register</u>"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a Participant's interest in any Commitments, Loans, or its other Obligations under any Facility Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(h)     <u>Certain Other Assignments and Participations</u>.  In addition to any other assignment or participation permitted pursuant to this <u>Section 9.05</u> any Lender may assign and/or pledge (without the consent of the Borrower or the Administrative Agent) all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including to any Federal Reserve Bank or other central bank as collateral security pursuant to Regulation A of the Board and any operating circular issued by such Federal Reserve Bank or other central bank; *provided*, that no Lender, as between the Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge; *provided, further*, that in no event shall the applicable Federal Reserve Bank or other central bank, pledgee or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

Section 9.06    Governing Law; Submission to Jurisdiction.

(a)    Governing Law.  This Agreement and each other Facility Document shall be governed by, and construed in accordance with, the Law of the State of New York.

(b)    Submission to Jurisdiction.  Each Loan Party irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Southern District of New York, and all appropriate appellate courts or, if jurisdiction in such court is lacking, any New York court of competent jurisdiction sitting in the County of New York (and all appropriate appellate courts), in any action or proceeding arising out of or relating to this Agreement or any other Facility Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York court or, to the fullest extent permitted by applicable Law, in such Federal court. Each of the parties hereto agrees that a final nonappealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Nothing in this Agreement or in any other Facility Document shall affect any right that a Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Facility Document against the Borrower or the properties of either such party in the courts of any jurisdiction.

(c)    Waiver of Venue.  Each Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Facility Document in any court referred to in Section 9.06(b).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 9.02.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

(e)    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER FACILITY DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER FACILITY

DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND
CERTIFICATIONS IN THIS <u>SECTION 9.06(e)</u>.

Section 9.07    <u>Severability</u>.  In case any provision in this Agreement shall be held
to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this
Agreement, and the validity, legality and enforceability of the remaining provisions shall not in
any way be affected or impaired thereby.

Section 9.08    <u>Counterparts; Integration; Effectiveness</u>.

(a)    This Agreement may be executed in counterparts (and by different parties
hereto in different counterparts), each of which shall constitute an original, but all of which when
taken together shall constitute a single contract.  Except as provided in <u>Article III</u>, this
Agreement shall become effective when it shall have been executed by Lenders and when
Lenders shall have received counterparts hereof that, when taken together, bear the signatures of
each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this
Agreement by electronic mail shall be effective as delivery of a manually executed counterpart
of this Agreement.

(b)    <u>Electronic Execution of Assignments</u>.  The words "execution," "signed,"
"signature," and words of like import in any assignment shall be deemed to include electronic
signatures or the keeping of records in electronic form, each of which shall be of the same legal
effect, validity or enforceability as a manually executed signature or the use of a paper-based
recordkeeping system, as the case may be, to the extent and as provided for in any applicable
Law, including the Federal Electronic Signatures in Global and National Commerce Act, or any
other similar state Laws based on the Uniform Electronic Transactions Act.

Section 9.09    <u>Survival</u>.  <u>Sections 2.18</u>, <u>2.19</u>, <u>Article 8</u>, <u>9.04</u> and <u>9.12</u> shall
survive the repayment of the Loans and the termination of the Commitments evidenced hereby.
In addition, each representation and warranty made, or deemed to be made herein or pursuant
hereto shall survive the making of such representation and warranty, and Lenders shall not be
deemed to have waived, by reason of making the Loans, any Default or Event of Default that
may arise by reason of such representation or warranty proving to have been false or misleading,
notwithstanding that any Lender may have had notice or knowledge or reason to believe that
such representation or warranty was false or misleading at the time such extension of credit was
made.

Section 9.10    <u>Confidentiality</u>.  Each Agent and Lender agrees to maintain the
confidentiality of the Confidential Information, except that Confidential Information may be
disclosed (a) to each of their respective Affiliates and to their and their respective Affiliates'
respective partners, directors, officers, employees, agents, advisors and other representatives who
need to know such Confidential Information in relation to the transactions contemplated by this
Agreement, (b) to the extent requested by any regulatory authority purporting to have jurisdiction
over it (including any self-regulatory authority), (c) to the extent required by applicable Law or
regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in
connection with the exercise of any remedies hereunder or under any other Facility Document or
any action or proceeding relating to this Agreement or any other Facility Document or the

enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 9.10</u>, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Borrower or (h) to the extent such Confidential Information (x) becomes publicly available other than as a result of a breach of this <u>Section 9.10</u> or (y) becomes available to any Lender or Agent or any of its Affiliates on a non-confidential basis from a source other than the Borrower.

Section 9.11   <u>No Fiduciary Relationship</u>.  The Borrower acknowledges that each Agent, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "<u>Lenders</u>") have no fiduciary relationship with, or fiduciary duty to, the Borrower arising out of or in connection with this Agreement, and the relationship between Lenders and the Borrower is solely that of creditor and debtor.  This Agreement does not create a joint venture between the parties.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Facility Document), the Borrower acknowledges and agrees that:  (a) the extension of credit and other services regarding this Agreement provided by Lenders are arm's-length commercial transactions between the Borrower, on the one hand, and Lenders, on the other hand, and that the Lenders are not acting in an advisory or agency capacity to any Loan Party, (b) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (c) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the Loans and the use of such Loan.

Section 9.12   <u>Right of Set-off</u>.  Upon the occurrence of an Event of Default, Lenders and their respective Affiliates (each, a "<u>Set-off Party</u>") are hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Borrower or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency but other than escrow, payroll, payroll tax and other trust fund tax accounts) and any other Indebtedness at any time held or owing by a Set-off Party (including, but not limited to, by any of their branches and agencies wherever located) to or for the credit or the account of the Borrower or any other Loan Party against and on account of the obligations and liabilities of the Borrower or any other Loan Party to the Set-off Party under this Agreement and under any of the other Facility Documents, including, but not limited to, all claims of any nature or description arising out of or connected with this Agreement or any other Facility Document, irrespective of whether or not the relevant Set-off Party shall have made any demand hereunder and although said obligations, liabilities or claims, or any of them, shall be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness.  The rights of each Set-off Party under this <u>Section 9.12</u> are in addition to other rights and remedies (including other rights of set-off) that Lenders or their respective Affiliates may have.  Each Lender agrees to notify the Borrower and Administrative Agent promptly after any such set-off and application; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

Section 9.13    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to an Agent or a Lender, or a Lender or an Agent exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any debtor relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred.

Section 9.14    Obligations Several.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Facility Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.

Section 9.15    PATRIOT Act.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that shall allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the PATRIOT Act. Each Loan Party shall, promptly following any request by the Administrative Agent, the Collateral Agent or any lender, provide all documentation and other information that the Administrative Agent or such lender requests in order to comply with its ongoing obligations under the applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act and Beneficial Ownership Regulation.

Section 9.16    Headings Descriptive.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 9.17    Entire Agreement.  This Agreement and the other Facility Documents constitute the entire agreement between the parties hereto relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, between the parties hereto relating to the subject matter hereof.

Section 9.18    [Reserved].

Section 9.19    Borrower Acknowledgements.  The Borrower hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b) the Facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Facility Document) are an arm's-length commercial

112

transaction between the Borrower and the other Loan Parties, on the one hand, and the Administrative Agent, the Lenders and the other Agents on the other hand, and the Borrower and the other Loan Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Facility Documents (including any amendment, waiver or other modification hereof or thereof);

(i) in connection with the process leading to such transaction, each of the Administrative Agent and the other Agents, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for the Borrower, any other Loan Parties or any of their respective Affiliates, equity holders, creditors or employees, or any other Person;

(ii) neither the Administrative Agent or other Agent has any obligation to the Borrower, the other Loan Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Facility Documents;

(iii) the Administrative Agent, each other Agent and each Affiliate of the foregoing may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and neither the Administrative Agent nor any other Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and

(iv) neither the Administrative Agent nor any other Agent has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Facility Document) and the Borrower has consulted their own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. The Borrower hereby agrees that they will not claim that any Agent owes a fiduciary or similar duty to the Loan Parties in connection with the transactions contemplated hereby and waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent or any other Agent with respect to any breach or alleged breach of agency or fiduciary duty; and

(c) no joint venture is created hereby or by the other Facility Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower, on the one hand, and any Lender, on the other hand.

Section 9.20   <u>Lender Acknowledgements</u>.  Notwithstanding anything to the contrary in any Facility Document or in any other agreement, arrangement or understanding, each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(a) such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(b) the transaction exemption set forth in one or more PTEs, such as PTE 84¬14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96- 23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(c) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(d) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

In addition, unless either (a) sub-clause (i) in the immediately preceding clause (d)(1) is true with respect to a Lender or (b) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (d)(1), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Facility Document or any documents related hereto or thereto).

Section 9.21   <u>Acknowledgement and Consent to Bail-In of Affected Financing Institutions</u>.  Notwithstanding anything to the contrary in any Facility Document or in any other agreement, arrangement or understanding among any of the parties to any Facility Document, each party hereto any Facility Document, to the extent such liability is unsecured, may be subject

to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender hereto that is an Affected Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Facility Document; or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any applicable Resolution Authority.

[*Signature pages follow*]

**<u>Exhibit D</u>**

**Description of Transaction Steps**

# Pre-Emergence Structure



*Companies inside dashed box are members of First Heritage Financing I, LLC, Heights Financing I, LLC, or Heights Financing II, LLC financing structures, as applicable. The ownership of the entities is fluid and based on the portfolio mix across the originating entities at any given time.

# Post-Emergence Structure - Simplified



## Tax Matters

The Debtors are still analyzing the most tax efficient manner to implement the Post-Emergence Structure, but they anticipate that the most likely post-emergence corporate structure is reflected herein.

Specifically, the Debtors, in consultation with the Ad Hoc Group, are continuing to evaluate:

- Whether to make check-the-box elections with respect to New CURO Topco LLC, New CURO Holdings LLC, New CURO Intermediate LLC, and/or New CURO LLC (collectively, the "New LLC Holdcos").

- The restructuring transaction steps to effectuate the post-emergence structure.

The Debtors anticipate filing a more detailed Description of Transaction Steps that describes these additional restructuring transaction steps once they have completed their tax analysis in advance of the Effective Date.

While the Debtors currently anticipate that the Exit Facility will be issued by New CURO Holdings LLC, the Debtors, in consultation with the Ad Hoc Group, reserve the right to cause New CURO LLC to be the borrower under the Exit Facility Credit Agreement. Regardless of which entity is the borrower under the Exit Facility Credit Agreement, the New LLC Holdcos will be guarantors of the debt and the assets and liabilities of the loan parties (*i.e.*, the borrower and guarantors together) will remain the same. Similarly, while the Debtors currently anticipate that the CVRs will be issued by New CURO Topco LLC, the Debtors, in consultation with the Ad Hoc Group, reserve the right to cause New CURO Holdings LLC or New CURO LLC to issue the CVRs instead.

Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Joint Prepackaged Plan of Reorganization of Curo Group Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 50, as modified by Docket No. 119].

# Post-Emergence Structure



**Exhibit E**

**Rejected Executory Contract and Unexpired Leases List[3]**

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease will be assumed and assigned to the applicable Reorganized Debtor in accordance with the provisions and requirements of Bankruptcy Code sections 365 and 1123, other than those Executory Contracts and Unexpired Leases that: (1) are identified on **Schedule E(i)** and **E(ii)**, respectively; (2) have been previously rejected by a Final Order; (3) previously expired or terminated pursuant to their respective terms; or (4) are subject of a motion to reject Filed on or before the Effective Date.

Entry of the Combined Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Combined Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Combined Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Claims and Noticing Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.** All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to Bankruptcy Code section 365 shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

Inclusion of any Executory Contract and Unexpired Lease on this **Exhibit E** is not intended and shall not be construed as: (a) an admission that any such contract or lease is an executory contract or unexpired lease; (b) an admission of validity of any claim against a Debtor entity under

---

[3]   For the avoidance of doubt, the rejections of the Executory Contracts and Unexpired Leases listed in this **Exhibit E** shall include the rejection of any and all ancillary documents executed in connection with, or as part of, such Executory Contract or Unexpired Lease, including any ancillary document that any counterparty may assert as executory, whether or not such ancillary document is expressly listed herein.

the Bankruptcy Code or other applicable nonbankruptcy law on the basis of such contract or lease; (c) a waiver of the Debtors', or any other party in interest's, right to dispute any claim on any grounds; (d) a promise or requirement to pay any claim; or (e) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law.

**Schedule E(i)**

**List of Rejected Contracts**

| No. | Debtor(s) | Contract Description | Contract Counterparty | Counterparty Address | Rejection Date |
|---|---|---|---|---|---|
| 1 | CURO Canada Corp., CURO Group Holdings Corp., LendDirect Corp. | Commitment Letter dated May 26, 2021, as amended on July 29, 2023 | Leon's Furniture Limited | 45 Gordon MacKay Road Toronto, Ontario M9N 2V6 | No later than the Effective Date |

**Schedule E(ii)**

**List of Rejected Leases[4]**

| No. | Debtor | Lease Description | Lease Counterparty | Counterparty Address | Lease Site Address | Rejection Date |
|---|---|---|---|---|---|---|
| 1 | CURO Intermediate Holdings Corp. | Sublease | Café Harold's, LLC. d/b/a Harold's Chicken | 8825 South Cottage Grove Avenue, Chicago, IL 60619 | 1552 W 119th St. Chicago, IL 60643 | Petition Date |
| 2 | Curo Management, LLC | Sublease | Legacy Health Agency LLC | 440 North Wells Street, Suite 750 Chicago, Illinois 60654 | 200 W. Hubbard St., Suite 700 Chicago, IL 60654 | April 30, 2024 |
| 3 | Curo Management, LLC | Sublease | VidMob, Inc. | 440 North Wells Street, Suite 720 Chicago, Illinois 60654 | 200 W. Hubbard St., Suite 700 Chicago, IL 60654 | April 30, 2024 |

---

[4]   The Debtors purport that the subleases referenced in this **Schedule E(ii)** have been rejected by operation of law upon rejection of the underlying leases pursuant to the *Order (I) Authorizing and Approving (A) the Rejection of Certain Unexpired Leases of Non-Residential Real Property (B) Abandonment of Certain Personal Property and (C) Procedures to Reject Additional Unexpired Leases of Non-Residential Real Property and Abandon any Personal Property Thereon and (II) Granting Related Relief*, entered on April 18, 2024 [Docket No. 220].  However, the Debtors include such subleases in this **Schedule E(ii)** out of an abundance of caution.

## Exhibit F

## List of Retained Causes of Action

Article IV.F of the Plan provides as follows:

In accordance with Bankruptcy Code section 1123(b), and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Releases provided in Article VIII.C and the Exculpation contained in Article VIII.E of this Plan), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the List of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of such Causes of Action without notice to or approval from the Bankruptcy Court.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Combined Order, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. Except as otherwise set forth herein, the Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**

The Debtors expressly reserve all Causes of Action for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan, or the Combined Order, except in each case where such Causes of Action have been expressly waived, relinquished, released, compromised or settled in this Plan (including, for the avoidance of doubt, pursuant to the Debtor Releases provided in Article VIII.C and the Exculpation contained in Article VIII.E of this Plan) or any other Final Order (including, without limitation, the Combined Order and the DIP Orders). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

In accordance with Bankruptcy Code section 1123(b)(3), except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtors through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

Notwithstanding and without limiting the generality of Article IV.F of the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve the Causes of Action that are specifically enumerated herein:

## I.      Causes of Action Related to Insurance Policies and Surety Bonds

Unless otherwise released by the Plan or the Confirmation Order, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies and surety bond agreements to which any Debtor is a party or pursuant to which any Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. The Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule F(i)** attached hereto.

## II.     Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Possible Litigation

**Schedule F(ii)** attached hereto includes Entities that are party to or that the Debtors believe may become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. Unless otherwise released by the Plan or the Confirmation Order, the Debtors expressly reserve all Causes of Action, including all defenses, cross-claims, and counter-claims against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, including **Schedule F(ii)**, or any amendments thereto. Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule F(ii)** attached hereto.

## III.    Claims Related to Taxing Authorities

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all tax obligations to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, including, without limitation, against or related to all Entities that owe or that may in

the future owe money related to tax refunds to the Debtors or the Reorganized Debtors, regardless of whether such Entity is specifically defined herein.  The Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule F(iii)** attached hereto.

## IV.    Causes of Action related to Contracts and Leases

Unless otherwise released by the Plan or the Confirmation Order, the Debtors expressly reserve Causes of Action based in whole or in part upon any and all contracts and leases and similar instruments, to which any of the Debtors is a party or pursuant to which any of the Debtors has any rights whatsoever, including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors. The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, lessors, lessees, and licensees, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, reimbursement, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under Bankruptcy Code section 542 or 543; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

## V.    Causes of Action Related to Accounts Receivable

Unless otherwise released by the Plan or the Confirmation Order, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto.

## VI.    Causes of Action Related to Governmental Units

Unless otherwise released by the Plan or the Confirmation Order, the Debtors expressly reserve all Causes of Action against any local, state, federal, or foreign "governmental unit" (as defined in Bankruptcy Code section 101(27)).

## VII.    Causes of Action Related to Deposits / Prepayments, Adequate Assurance, and Other Collateral Postings

Unless otherwise released by the Plan or the Confirmation Order, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security

deposits (including any security deposit posted in connection with any real property lease), adequate assurance payment, or any other type of deposit, prepayment, or collateral (including cash collateral posted in connection with any bank account or surety bond), regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein.  The Debtors further reserve all rights regarding any adequate assurance deposits provided pursuant to the *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services; (II) Approving Adequate Assurance Procedures; (III) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; and (IV) Granting Related Relief* [Docket No. 88].

## VIII.    Causes of Action Related to Liens

Unless otherwise released by the Plan or the Confirmation Order, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein; *provided* that notwithstanding anything herein to the contrary, the Debtors hereby acknowledge and agree that no such Causes of Action exist with respect to the liens securing the DIP Facility.

## IX.    Causes of Action Related to Audits

Unless otherwise released by the Plan or the Confirmation Order, the Debtors expressly reserve all Causes of Action against or related to any auditor of the Debtors or any auditor's affiliate, subsidiary, or other Person or Entity acting on its behalf related to any audit involving any of the Debtors.

**Schedule F(i)**

**Insurance Policies**

| No. | Type of Coverage | Insurance Company | Policy Number | Current Policy Period |
|-----|------------------|-------------------|---------------|----------------------|
| 1 | Automobile | The Hartford Insurance | 22UENAY5VUZ | 6/27/2023 - 6/27/2024 |
| 2 | Crime | XL Specialty Insurance | ELU183760-23 | 12/7/2023 - 12/7/2024 |
| 3 | CURO Canada Corp. o/a Cash Money Mandatory BPL E&O (Canada) | AIG Insurance | 01-720-21-74 | 11/25/2023 - 11/25/2024 |
| 4 | Employment Practices Liability | Allied World Surplus Lines | 0314-1014 | 12/7/2023 - 12/7/2024 |
| 5 | Excess Cyber | Corvus Insurance | CXS-107909373-00 | 10/27/2023 - 10/27/2024 |
| 6 | Excess Cyber | Coalition | C-4LS3-094528-CYBER-2023 | 10/27/2023 - 10/27/2024 |
| 7 | Excess Cyber | Westfield Insurance | XCO-368873G-00 | 10/27/2023 - 10/27/2024 |
| 8 | Excess D&O | Endurance American Insurance | FIX30002181803 | 12/7/2023 - 12/7/2024 |
| 9 | Excess D&O | Argonaut Insurance | MLX7603076-6 | 12/7/2023 - 12/7/2024 |
| 10 | Excess D&O | RSUI Indemnity | NHS708259 | 12/7/2023 - 12/7/2024 |
| 11 | Excess D&O - Side A | XL Specialty Insurance | ELU194431-23 | 12/7/2023 - 12/7/2024 |
| 12 | Excess D&O - Side A | Allied World National Assurance | 0311-0754 | 12/7/2023 - 12/7/2024 |
| 13 | Excess Umbrella | CNA Insurance | 7039823808 | 6/27/2023 - 6/27/2024 |
| 14 | Fiduciary | Hudson Insurance | SFD31212302 | 12/7/2023 - 12/7/2024 |
| 15 | Foreign /International Master Policy - (DIC) | CNA Insurance | WP734995473 | 6/27/2023 - 6/27/2024 |
| 16 | General Liability | The Hartford Insurance | 22UUNAY5VVS | 6/27/2023 - 6/27/2024 |
| 17 | GL & Non-Owned Auto (Canada) | CNA Insurance | CGL292004323 | 6/27/2023 - 6/27/2024 |
| 18 | LendDirect Mandatory BPL E&O (Canada) | AIG Insurance | 01-720-21-69 | 11/25/2023 - 11/25/2024 |
| 19 | Primary Cyber | Beazley Group/Lloyd's | W3605E230101 | 10/27/2023 - 10/27/2024 |

| No. | Type of Coverage | Insurance Company | Policy Number | Current Policy Period |
|---|---|---|---|---|
| 20 | Primary D&O | XL Specialty Insurance | ELU194427-23 | 12/7/2023 - 12/7/2024 |
| 21 | Property & Inland Marine | The Hartford Insurance | 22UUNAY5VVS | 6/27/2023 - 6/27/2024 |
| 22 | Property (Canada) | CNA Insurance | CP292004273 | 6/27/2023 - 6/27/2024 |
| 23 | Umbrella Policy | The Hartford Insurance | 22XHUAY6FCF | 6/27/2023 - 6/27/2024 |
| 24 | Workers Compensation | The Hartford Insurance | 22WEAY5CS9 | 6/27/2023 - 6/27/2024 |

**Surety Bonds and Canadian LOCs**

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 1 | 1076251 | Ad Astra Recovery Services, Inc. | Minnesota Collection Agency Bond (Corporation/LLC) | The Hanover Insurance Company | State of Minnesota Commissioner of Commerce | 5/2/2023 | 5/2/2024 |
| 2 | 1008996 | Ad Astra Recovery Services, Inc. | Arizona Collection Agency Bond | The Hanover Insurance Company | Arizona Department of Financial Institutions | 6/22/2023 | 6/22/2024 |
| 3 | 1009000 | Ad Astra Recovery Services, Inc. | Oregon Collection Agency Registration NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | State of Oregon Department of Consumer and Business Services, Division of Finance and Corporate Securities | 6/22/2023 | 6/22/2024 |
| 4 | 1099366 | Ad Astra Recovery Services, Inc. | Rhode Island Debt Collector Registration NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Rhode Island Department of Business Regulation Division of Commercial Licensing | 7/1/2023 | 7/1/2024 |
| 5 | 1012326 | Ad Astra Recovery Services, Inc. | Washington Collection Agency Bond | The Hanover Insurance Company | Washington Collection Agency Board, Department of Licensing | 7/9/2023 | 7/9/2024 |
| 6 | 1008997 | Ad Astra Recovery Services, Inc. | Texas Third Party Debt Collector Bond | The Hanover Insurance Company | Texas Secretary of State, Registration Unit | 7/22/2023 | 7/22/2024 |
| 7 | 1014353 | Ad Astra Recovery Services, Inc. | Illinois Collection Agency Bond | The Hanover Insurance Company | Illinois Department of Financial and Professional Regulation Division of Professional Regulation | 7/22/2023 | 7/22/2024 |
| 8 | 1012329 | Ad Astra Recovery Services, Inc. | Utah Collection Agency Bond | The Hanover Insurance Company | State of Utah Department of Commerce Division of Securities | 9/11/2023 | 9/11/2024 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 9 | 1014308 | Ad Astra Recovery Services, Inc. | North Dakota Collection Agency License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | North Dakota Department of Financial Institutions Consumer Division | 10/2/2023 | 10/2/2024 |
| 10 | 1033766 | Ad Astra Recovery Services, Inc. | Wyoming Collection Agency NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Wyoming Collection Agency Board | 12/1/2023 | 12/1/2024 |
| 11 | 1014325 | Ad Astra Recovery Services, Inc. | Idaho Collection Agency License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Idaho Department of Finance | 12/4/2023 | 12/4/2024 |
| 12 | 150963 | Ad Astra Recovery Services, Inc. | Colorado Collection Agency Bond | The Hanover Insurance Company | Administrator, Colorado Fair Debt Collection Practices Act | 1/9/2024 | 1/9/2025 |
| 13 | 1033747 | Ad Astra Recovery Services, Inc. | New Mexico Collection Agency Bond | The Hanover Insurance Company | New Mexico Regulation and Licensing Department, Financial Institutions Division | 1/29/2024 | 1/29/2025 |
| 14 | 1076255 | Ad Astra Recovery Services, Inc. | Nevada Collection Agency License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | State of Nevada Financial Institutions Division, Department of Business and Industry | 2/13/2024 | 2/13/2025 |
| 15 | 1014342 | Ad Astra Recovery Services, Inc. | Tennessee Collection Service License Bond | The Hanover Insurance Company | Tennessee Collection Service License Bond | 4/18/2024 | 4/18/2025 |
| 16 | 1076254 | Ad Astra Recovery Services, Inc. | Maine Debt Collector Bond | The Hanover Insurance Company | Superintendent of the Bureau of Consumer Credit Protection of the State of Maine | 1/15/2024 | 1/15/2026 |
| 17 | 1076251 | Ad Astra Recovery Services, Inc. | Minnesota Collection Agency Bond (Corporation/LLC) | The Hanover Insurance Company | State of Minnesota Commissioner of Commerce | 5/2/2023 | 5/2/2024 |
| 18 | 1008996 | Ad Astra Recovery Services, Inc. | Arizona Collection Agency Bond | The Hanover Insurance Company | Arizona Department of Financial Institutions | 6/22/2023 | 6/22/2024 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 19 | 1009000 | Ad Astra Recovery Services, Inc. | Oregon Collection Agency Registration NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | State of Oregon Department of Consumer and Business Services, Division of Finance and Corporate Securities | 6/22/2023 | 6/22/2024 |
| 20 | 1099366 | Ad Astra Recovery Services, Inc. | Rhode Island Debt Collector Registration NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Rhode Island Department of Business Regulation Division of Commercial Licensing | 7/1/2023 | 7/1/2024 |
| 21 | 1012326 | Ad Astra Recovery Services, Inc. | Washington Collection Agency Bond | The Hanover Insurance Company | Washington Collection Agency Board, Department of Licensing | 7/9/2023 | 7/9/2024 |
| 22 | 1008997 | Ad Astra Recovery Services, Inc. | Texas Third Party Debt Collector Bond | The Hanover Insurance Company | Texas Secretary of State, Registration Unit | 7/22/2023 | 7/22/2024 |
| 23 | 1014353 | Ad Astra Recovery Services, Inc. | Illinois Collection Agency Bond | The Hanover Insurance Company | Illinois Department of Financial and Professional Regulation Division of Professional Regulation | 7/22/2023 | 7/22/2024 |
| 24 | 1012329 | Ad Astra Recovery Services, Inc. | Utah Collection Agency Bond | The Hanover Insurance Company | State of Utah Department of Commerce Division of Securities | 9/11/2023 | 9/11/2024 |
| 25 | 1014308 | Ad Astra Recovery Services, Inc. | North Dakota Collection Agency License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | North Dakota Department of Financial Institutions Consumer Division | 10/2/2023 | 10/2/2024 |
| 26 | 1033766 | Ad Astra Recovery Services, Inc. | Wyoming Collection Agency NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Wyoming Collection Agency Board | 12/1/2023 | 12/1/2024 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 27 | 1014325 | Ad Astra Recovery Services, Inc. | Idaho Collection Agency License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Idaho Department of Finance | 12/4/2023 | 12/4/2024 |
| 28 | 150963 | Ad Astra Recovery Services, Inc. | Colorado Collection Agency Bond | The Hanover Insurance Company | Administrator, Colorado Fair Debt Collection Practices Act | 1/9/2024 | 1/9/2025 |
| 29 | 1033747 | Ad Astra Recovery Services, Inc. | New Mexico Collection Agency Bond | The Hanover Insurance Company | New Mexico Regulation and Licensing Department, Financial Institutions Division | 1/29/2024 | 1/29/2025 |
| 30 | 1076255 | Ad Astra Recovery Services, Inc. | Nevada Collection Agency License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | State of Nevada Financial Institutions Division, Department of Business and Industry | 2/13/2024 | 2/13/2025 |
| 31 | 1014342 | Ad Astra Recovery Services, Inc. | Tennessee Collection Service License Bond | The Hanover Insurance Company | Tennessee Collection Service License Bond | 4/18/2024 | 4/18/2025 |
| 32 | 1076254 | Ad Astra Recovery Services, Inc. | Maine Debt Collector Bond | The Hanover Insurance Company | Superintendent of the Bureau of Consumer Credit Protection of the State of Maine | 1/15/2024 | 1/15/2026 |
| 33 | 1014325 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Idaho Department of Finance | 12/4/2024 | 12/4/2024 |
| 34 | 1014308 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | North Dakota Department of Financial Institutions | 10/2/2023 | 10/2/2024 |
| 35 | 150963 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Administrator of the Uniform Consumer Credit Code | 1/9/2024 | 1/9/2025 |
| 36 | 1008996 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Arizona Department of Financial Institutions | 6/22/2023 | 6/22/2024 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 37 | 1014342 | Ad Astra Recovery Services, Inc. | Collection Service License Bond | The Hanover Insurance Company | Tennessee Department of Financial Institutions | 4/18/2024 | 4/18/2025 |
| 38 | 1012329 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Utah Department of Commerce | 9/11/2023 | 9/11/2024 |
| 39 | 1012326 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Washington Department of Financial Institutions | 7/9/2023 | 7/9/2024 |
| 40 | 1076255 | Ad Astra Recovery Services, Inc. | Collection Agency License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Nevada Department of Financial Institutions Division | 2/13/2024 | 2/13/2025 |
| 41 | 1008997 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Texas Secretary of State, Registrations Unit | 7/22/2023 | 7/22/2024 |
| 42 | 1009000 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Oregon Division of Financial Regulations | 6/22/2023 | 6/22/2024 |
| 43 | 1076251 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Minnesota Department of Commerce | 5/2/2023 | 5/2/2024 |
| 44 | 1033766 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | Wyoming Division of Banking | 12/1/2023 | 12/1/2024 |
| 45 | 1033747 | Ad Astra Recovery Services, Inc. | Collection Agency Bond | The Hanover Insurance Company | New Mexico Financial Institutions Division | 1/29/2024 | 1/29/2025 |
| 46 | 1076254 | Ad Astra Recovery Services, Inc. | Debt Collector Bond | The Hanover Insurance Company | State of Maine, Director of Office of Consumer Credit Reg | 1/15/2024 | 1/15/2026 |
| 47 | 1014353 | Ad Astra Recovery Services, Inc. | Licensed Collection Agency Bond | The Hanover Insurance Company | Illinois Department of Financial & Professional Regulations | 7/22/2023 | 7/22/2024 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 48 | 1091281 | Ad Astra Recovery Services, Inc. | Debt Collector Bond | The Hanover Insurance Company | California Department of Financial Protection & Innovation | 12/31/2023 | 12/31/2024 |
| 49 | 1008977 | Attain Finance, LLC | Washington Money Services Business Bond | The Hanover Insurance Company | Washington Department of Financial Institutions | 5/9/2023 | 5/9/2024 |
| 50 | 1033741 | Attain Finance, LLC | Tennessee Money Transmitter NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Tennessee Department of Financial Institutions | 12/31/2023 | 12/31/2024 |
| 51 | 1014335 | Attain Finance, LLC | Oregon Money Transmitter License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Oregon Department of Consumer and Business Services, Division of Finance and Corporate Securities | 2/7/2024 | 2/7/2025 |
| 52 | 1008977 | Attain Finance, LLC | Washington Money Services Business Bond | The Hanover Insurance Company | Washington Department of Financial Institutions | 5/9/2023 | 5/9/2024 |
| 53 | 1033741 | Attain Finance, LLC | Tennessee Money Transmitter NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Tennessee Department of Financial Institutions | 12/31/2023 | 12/31/2024 |
| 54 | 1014335 | Attain Finance, LLC | Oregon Money Transmitter License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Oregon Department of Consumer and Business Services, Division of Finance and Corporate Securities | 2/7/2024 | 2/7/2025 |
| 55 | 1095263 | Covington Credit, Inc. | Oklahoma Supervised Lender License Bond | The Hanover Insurance Company | Oklahoma Department of Consumer Credit | 6/29/2023 | 6/29/2024 |
| 56 | 1095264 | Covington Credit, Inc. | Oklahoma Supervised Lender License Bond | The Hanover Insurance Company | Oklahoma Department of Consumer Credit | 6/29/2023 | 6/29/2024 |
| 57 | 1100137 | Covington Credit, Inc. | Oklahoma Supervised Lender License Bond | The Hanover Insurance Company | Oklahoma Department of Consumer Credit | 1/28/2024 | 1/28/2025 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|-----|---------------|-------|------|--------|---------------------|----------------|-----------------|
| 58 | 1095263 | Covington Credit, Inc. | Oklahoma Supervised Lender License Bond | The Hanover Insurance Company | Oklahoma Department of Consumer Credit | 6/29/2023 | 6/29/2024 |
| 59 | 1095264 | Covington Credit, Inc. | Oklahoma Supervised Lender License Bond | The Hanover Insurance Company | Oklahoma Department of Consumer Credit | 6/29/2023 | 6/29/2024 |
| 60 | 1100137 | Covington Credit, Inc. | Oklahoma Supervised Lender License Bond | The Hanover Insurance Company | Oklahoma Department of Consumer Credit | 1/28/2024 | 1/28/2025 |
| 61 | 1094993 | Covington Credit, Inc. dba Covington Credit dba www.heightsfinance.com | Oklahoma Supervised Lender License Bond | The Hanover Insurance Company | Oklahoma Department of Consumer Credit | 3/24/2024 | 3/24/2025 |
| 62 | 1094993 | Covington Credit, Inc. dba Covington Credit dba www.heightsfinance.com | Oklahoma Supervised Lender License Bond | The Hanover Insurance Company | Oklahoma Department of Consumer Credit | 3/24/2024 | 3/24/2025 |
| 63 | 1092735 | Curo Credit, LLC | California Debt Collection License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | California Department of Financial Protection & Innovation | 12/31/2023 | 12/31/2024 |
| 64 | 1092735 | Curo Credit, LLC | California Debt Collection License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | California Department of Financial Protection & Innovation | 12/31/2023 | 12/31/2024 |
| 65 | 1091153 | CURO Credit, LLC dba First Phase | Colorado Supervised Lender Bond | The Hanover Insurance Company | Administrator of the Uniform Consumer Credit Code | 8/10/2023 | 8/10/2024 |
| 66 | 1091465 | CURO Credit, LLC dba First Phase | New Hampshire Small Loan Lender NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Bank Commissioner State of New Hampshire | 10/26/2023 | 10/26/2024 |
| 67 | 1091466 | CURO Credit, LLC dba First Phase | North Dakota Money Broker License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | North Dakota Department of Financial Institutions | 10/26/2023 | 10/26/2024 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 68 | 1091467 | CURO Credit, LLC dba First Phase | South Dakota Money Lender License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | South Dakota Division of Banking | 10/26/2023 | 10/26/2024 |
| 69 | 1091153 | CURO Credit, LLC dba First Phase | Colorado Supervised Lender Bond | The Hanover Insurance Company | Administrator of the Uniform Consumer Credit Code | 8/10/2023 | 8/10/2024 |
| 70 | 1091465 | CURO Credit, LLC dba First Phase | New Hampshire Small Loan Lender NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Bank Commissioner State of New Hampshire | 10/26/2023 | 10/26/2024 |
| 71 | 1091466 | CURO Credit, LLC dba First Phase | North Dakota Money Broker License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | North Dakota Department of Financial Institutions | 10/26/2023 | 10/26/2024 |
| 72 | 1091467 | CURO Credit, LLC dba First Phase | South Dakota Money Lender License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | South Dakota Division of Banking | 10/26/2023 | 10/26/2024 |
| 73 | 107468681 | First Heritage of AL - Montgomery | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 74 | 107332148 | First Heritage of AL - Saraland | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 75 | 107333264 | First Heritage of AL - Decatur | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 76 | 107332163 | First Heritage of AL - Dothan | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 77 | 107333243 | First Heritage of AL - Florence | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 78 | 107333276 | First Heritage of AL - Meridan | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 79 | 400SC4328 | First Heritage of AL - Mobile | Designated Agent Bond | Travelers | Mississippi Department of Revenue | 10/1/2023 | 10/1/2024 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 80 | 106613045 | First Heritage of AL - Mobile | MS Small Loan Bond | Travelers | Mississippi Department of Banking & Consumer Finance | 10/1/2023 | 10/1/2024 |
| 81 | 107333257 | First Heritage of AL - Pelham | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 82 | 107517881 | First Heritage of AL - Pell City | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 83 | 107333261 | First Heritage of AL - Prattville | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 84 | 103861467 | First Heritage of AL - Ridgeland | TN Loan Bond | Travelers | Tennessee Department of Financial Institutions | 10/1/2023 | 10/1/2024 |
| 85 | 107333281 | First Heritage of AL - Starkville | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 86 | 107332167 | First Heritage of AL - Thomasville | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 87 | 107333259 | First Heritage of AL - Tillman Corner | Motor Vehicle Surety Bond | Travelers | Alabama Department of Revenue | 10/1/2023 | 10/1/2024 |
| 88 | 106152257 | First Heritage of Mississippi - Ridgeland | TN Loan Bond | Travelers | Tennessee Department of Financial Institutions | 10/1/2023 | 10/1/2024 |
| 89 | 103818433 | First Heritage of Mississippi - Ridgeland | MS Small Loan Bond | Travelers | Mississippi Department of Banking & Consumer Finance | 10/1/2023 | 10/1/2024 |
| 90 | 1105153 | Heights Finance Corporation | Wisconsin Loan Company Bond | The Hanover Insurance Company | Wisconsin Department of Financial Institutions | 7/7/2023 | 7/7/2024 |
| 91 | 1099351 | Heights Finance Corporation | Illinois Consumer Installment Loan Registration NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Illinois Department of Financial & Professional Regulation, Division of Financial Institutions | 12/31/2023 | 12/31/2024 |
| 92 | 1100133 | Heights Finance Corporation | Wisconsin Sales Finance Company Bond | The Hanover Insurance Company | Wisconsin Department of Financial Institutions | 2/1/2024 | 2/1/2025 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 93 | 1093008 | Heights Finance Corporation | Kentucky Consumer Loan License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Kentucky Department of Financial Institutions | 3/1/2024 | 3/1/2025 |
| 94 | 1100132 | Heights Finance Corporation | Wisconsin Sales Finance Company Bond | The Hanover Insurance Company | Wisconsin Department of Financial Institutions | 4/8/2024 | 4/8/2025 |
| 95 | 1105030 | Heights Finance Corporation | Alabama Consumer Credit License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Alabama State Banking Department | 5/26/2024 | 5/26/2025 |
| 96 | 1100134 | Heights Finance Corporation | Tennessee Industrial Loan and Thrift License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Tennessee Department of Financial Institutions | 12/28/2023 | 12/28/2024 |
| 97 | 1105153 | Heights Finance Corporation | Wisconsin Loan Company Bond | The Hanover Insurance Company | Wisconsin Department of Financial Institutions | 7/7/2023 | 7/7/2024 |
| 98 | 1099351 | Heights Finance Corporation | Illinois Consumer Installment Loan Registration NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Illinois Department of Financial & Professional Regulation, Division of Financial Institutions | 12/31/2023 | 12/31/2024 |
| 99 | 1100133 | Heights Finance Corporation | Wisconsin Sales Finance Company Bond | The Hanover Insurance Company | Wisconsin Department of Financial Institutions | 2/1/2024 | 2/1/2025 |
| 100 | 1093008 | Heights Finance Corporation | Kentucky Consumer Loan License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Kentucky Department of Financial Institutions | 3/1/2024 | 3/1/2025 |
| 101 | 1100132 | Heights Finance Corporation | Wisconsin Sales Finance Company Bond | The Hanover Insurance Company | Wisconsin Department of Financial Institutions | 4/8/2024 | 4/8/2025 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|---|
| 102 | 1105030 | Heights Finance Corporation | Alabama Consumer Credit License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Alabama State Banking Department | 5/26/2024 | 5/26/2025 |
| 103 | 1100134 | Heights Finance Corporation | Tennessee Industrial Loan and Thrift License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Tennessee Department of Financial Institutions | 12/28/2023 | 12/28/2024 |
| 104 | 1100136 | Southern Finance of Tennessee, Inc. | Tennessee Industrial Loan and Thrift License NMLS ESB (Electronic Surety Bond) | The Hanover Insurance Company | Tennessee Department of Financial Institutions | 12/28/2023 | 12/28/2024 |
| 105 | 10012789 | Cash Money Cheque Cashing, Inc. | Canadian Letter of Credit | RBC Royal Bank of Canada | Minister of Finance, Government of Alberta | 3/9/2022 | 12/27/2024 |
| 106 | 10012782 | Cash Money Cheque Cashing, Inc. | Canadian Letter of Credit | RBC Royal Bank of Canada | Minister of Finance, Province of Manitoba | 3/9/2022 | 12/16/2024 |
| 107 | 10012783 | Cash Money Cheque Cashing, Inc. | Canadian Letter of Credit | RBC Royal Bank of Canada | Minister of Finance, Province of Manitoba | 3/9/2022 | 12/16/2024 |
| 108 | 10012786 | Cash Money Cheque Cashing, Inc. | Canadian Letter of Credit | RBC Royal Bank of Canada | Minister of Finance, Provide of Manitoba | 3/9/2022 | 12/16/2024 |
| 109 | 10012787 | Cash Money Cheque Cashing, Inc. | Canadian Letter of Credit | RBC Royal Bank of Canada | Minister of Finance, Province of Manitoba | 3/9/2022 | 12/16/2024 |
| 110 | 2537567 | CURO Canada Corp. | Canadian Letter of Credit | RBC Royal Bank of Canada | Minister of Finance of Manitoba | 4/28/2022 | 4/27/2024 |
| 111 | 2540554 | CURO Canada Corp. | Canadian Letter of Credit | RBC Royal Bank of Canada | Minister of Finance, Province of Manitoba | 8/23/2022 | 8/22/2024 |

| No. | Surety/LOC No. | Party | Type | Issuer | Obligee/Beneficiary | Effective Date | Expiration Date |
|-----|----------------|-------|------|--------|---------------------|----------------|-----------------|
| 112 | 10012788 | LendDirect Corp. | Canadian Letter of Credit | RBC Royal Bank of Canada | Minister of Finance, Government of Alberta | 3/9/2022 | 12/27/2024 |

**Schedule F(ii)**

| Debtor(s) | Adverse or Potentially Adverse Party | Description |
|---|---|---|
| Heights Finance Corporation (TN) | Mieachelle Cannon | Alleged violations of FCRA. |
| CURO Canada Corp. | Annotennette Findlay | Alleging race, color, ethnic origin, sexual harassment. |
| CURO Management, LLC | Karen Hale | Alleging violation of RFDCPA and Consumer Legal Remedies Act. |
| Heights Finance Corporation (IL) | Michelle Emily Ruben | Alleging violation of the automatic stay. |
| SCIL Texas, LLC ("SCIL")[5] | Cristal Lee England | Allegations of knowingly hiring a third-party debt collector using prohibited practices. |
| SCIL | Tanna Hall | Alleging invalid service. |
| SCIL | Susana Martinez | Alleging improper service. |
| Heights Finance Corporation (IL) | Charles Jewell | Alleging CURO provided requested information and FCRA violations. |
| CURO Canada Corp. | Rhoda San Jose | Alleging discrimination, harassment and wrongful termination. |
| CURO Financial Technologies Corp. | Jared Bullock | Workers Compensation - Alleging broken ribs, lung and head injury. |

---

[5]   While SCIL is not an entity currently affiliated with the Debtors or the Company, the Debtors have retained liability on account of and an obligation to defend the three actions pending against SCIL included on this **Schedule F(ii)** in connection with the sale of SCIL, among other assets, to Sparrow Purchaser, LLC and CCF Intermediate Holdings, LLC in 2022.

| Debtor(s) | Adverse or Potentially Adverse Party | Description |
|---|---|---|
| CURO Management LLC | Apolonio Lopez Chavez | Alleging CURO never provided the requested information and FCRA violations. |
| Heights Finance Corporation (IL) | Heidi Juhasz | Alleging violations of FCRA. |
| CURO Canada Corp. | Yi Chin Chou | Small Claims - Alleging fraudulent transfer of funds. |
| Heights Finance Corporation (IL) | Lance Irwin | Alleging wrongful termination. |
| Heights Finance Holding Co. | Consumer Financial Protection Bureau (CFPB) | Alleging CFPA violations. |
| Heights Finance Corporation (IL) | Austin Alexander | Class Action alleging KCPA violations, KY Consumer Loan Statues, and Unjust Enrichment. |
| CURO Management, LLC; CURO Group Holdings Corp. | Destiny Nicole Griffin; Priscilla Lopez | Alleging discrimination, harassment and retaliation. |
| Heights Finance Corporation (IL) | Michelle Bellos | Violation of FCRA and failure to provide Plaintiff with the requested accounting/billing history. |
| CURO Canada Corp.; LendDirect Corp. | Jamillea Spence | Alleging race, color, ethnic origin, sexual harassment. |
| CURO Canada Corp. | Martha Williams; City of Toronto; Toronto Transit Commission; 1289139 Ontario, Inc. | Allegations of a slip and fall at the bus stop adjacent to the store location. |
| CURO Canada Corp. | Landu Bienvenu Kitonda aka "Roger" | Alleging payments should have paid off the principal of the loan by now. |
| CURO Group Holdings Corp | Tylia Johnson | Workers' Compensation – Alleging shoulder injury. |

| Debtor(s) | Adverse or Potentially Adverse Party | Description |
|---|---|---|
| CURO Canada Corp. | All Trans Financial Services Credit Union | Request for indemnification; underlying case alleging overcharge for fees and loss of funds on prepaid gift cards. |
| CURO Intermediate Holdings Corp. | Sparrow Purchaser, LLC CCF Intermediate Holdings, LLC | Delaware Chancery Court breach of contract action. |
| CURO Intermediate Holdings Corp. | Sparrow Purchaser, LLC CCF Intermediate Holdings, LLC | Demand for arbitration. |
| CURO Group Holdings Corp. | Engie Insight Services Inc., dba Engie Impact | Potential contract dispute. |
| CURO Group Holdings Corp | Leon's Furniture Limited; Trans Global Insurance Company; Trans Global Life Insurance Company | Potential contract dispute. |
| CURO Intermediate Holdings Corp. | National Retail Properties, Inc. | Potential lease rejection dispute. |
| Southern Finance of South Carolina, Inc. | ZRP Crosspointe Plaza, LLC | Potential lease rejection dispute. |
| Covington Credit of Georgia, Inc. | Americus Fee Owner, LLC | Potential lease rejection dispute. |
| CURO Management LLC | Wells Hubbard Limited Partnership | Potential lease rejection dispute. |
| CURO Intermediate Holdings Corp. | Café Harold's, LLC. d/b/a Harold's Chicken | Potential lease rejection dispute. |
| CURO Management LLC | Legacy Health Agency LLC | Potential lease rejection dispute. |
| CURO Management LLC | VidMob, Inc. | Potential lease rejection dispute. |

**Schedule F(iii)**

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 1. | 250 John W Morrow Jr Pkwy LLC | P.O. Box 81612, Chamblee, GA 30366 | Real Estate |
| 2. | 3386856 Canada Limited | 220 Yonge St,, Toronto, On M5B 2H1 | Real Estate |
| 3. | 45th Street Real Estate Ventures LLC | 123 N. Main Street, Unit #001, Crown Point, IN 46307 | Real Estate |
| 4. | Aiken County Treasurer | P.O. Box 919, Aiken, SC 29802-0919 | Personal Property Tax |
| 5. | Alabama Department of Revenue | P.O. Box 327431, Montgomery, AL 36132 | Business Privilege Tax |
| 6. | Alabama Department of Revenue | P.O. Box 327430, Montgomery, AL 36132 | Income Tax |
| 7. | Alabama Department of Revenue | 50 N. Ripley St., Montgomery, AL 36130 | Local Tax |
| 8. | Alabama Department of Revenue | 50 N. Ripley St., Montgomery, AL 36130 | Use Tax |
| 9. | Alabama Department of Revenue | P.O. Box 327435, Montgomery, AL 36132-7435 | Business License |
| 10. | Alabama State Banking Department | P.O. Box 4600, Montgomery, AL 36103-4600 | Business License |
| 11. | Alcorn Co. Tax Collector | P.O. Box 190, Corinth, MS 38835-0190 | Personal Property Tax |
| 12. | Allen Morgan, Tax Collector | Oktibbeha County Tax Collector, 101 E. Main, Ste 103, Starkville, MS 39759 | Personal Property Tax |
| 13. | American Financial Credit Services | 10333 N Meridian St, Suite 270, Indianapolis, IN 46290-1144 | Personal Property Tax |
| 14. | Americus Fee Owner | 3735-B Bean Road, Charlotte, Nc 28217 | Real Estate |
| 15. | Anamar Properties | P.O. Box 127, Hammond, LA 70404 | Real Estate |
| 16. | Anchor Equities, Ltd. | 3839 Bee Caves Rd., Suite 203, Austin, TX 78746 | Real Estate |
| 17. | Anderson County Trustee | Rodney Archer Trustee, 100 N Main St Rm 203, Clinton, TN  37716 | Personal Property Tax |
| 18. | Andrew Weathington | Judge Of Probate, 165 5th Ave P.O. Box 220, Ashville, AL  35953 | Business License |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 19. | Angelina County Tax Office | P.O. Box 1344, Lufkin, TX 75902-1344 | Personal Property Tax |
| 20. | Arizona Corporation Commission | 1300 W Washington, Phoenix, AZ 85007-2929 | Annual Report |
| 21. | Arizona Department of Revenue | 1600 West Monroe Street, Phoenix, AZ  85007 | Income Tax |
| 22. | Arkansas Secretary of State | State Capitol, 500 Woodlane Street, Suite 256, Little Rock, AR 72201 | Annual Report |
| 23. | Ascension Parish Tax Authority | P.O. Box 1718, Gonzales, LA 70707 | Business License |
| 24. | Ashland City Treasurer | Jacey Dean, 601 Main Street West, Ashland, WI 54806-0747 | Personal Property Tax |
| 25. | Attala County Tax Collector | Brenda Williams, 112 North Wells St, Kosciusko, MS 39090 | Personal Property Tax |
| 26. | Audrain County Collector | 101 N Jefferson Rm 103, Mexico, Mo 65265 | Personal Property Tax |
| 27. | Baldwin County Commissioner | P.O. Box 1549, Bay Minette, AL 36507-1549 | Personal Property Tax |
| 28. | Barbour Cty Commissioner | Marshall J Williams Iii, 303 E Broad St, Eufaula, AL  36027-1701 | Business License |
| 29. | Beaufort County Treasurer | P.O. Drawer 487, Atlanta, GA 30348-5176 | Personal Property Tax |
| 30. | Beauregard Parish Sheriff's Office | Attn: Sales/Occupational Tax Office, P.O. Box 639, Deridder, LA 70634 | Business License |
| 31. | Bedford County Trustee TN | Courthouse Annex Bldg 1St Flr, 100 Public Square West Ste 102, Shelbyville, TN  37160-3988 | Personal Property Tax |
| 32. | Betty McNeill Tax Collector | Marshall County Tax Collector, P.O. Box 40, Holly Springs, MS 38635 | Personal Property Tax |
| 33. | Blanchard Grove Prop | 9810 Bluebonnet Blvd, Baton Rouge, LA 70810 | Real Estate |
| 34. | Bloomingdale Fire District | 179 S Bloomingdale Rd, Bloomingdale, IL 60108 | Business License |
| 35. | Bobby J. Guidroz, Sheriff | P.O. Box 1029, Opelousas, LA 70571 | Business License |
| 36. | Boone County Collector of Rev | Brian McCollum, 801 E Walnut - Rm 118, Columbia, Mo 652014890 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 37. | Boone County Fiscal Court | 2950 Washington Street, Burlington, KY 41005 | Municipal Tax |
| 38. | Boyle County Sheriff | 321 W Main, Danville, KY 40422 | Personal Property Tax |
| 39. | Bradley County Trustee | Attn: Michael J Smith, 1701 Keith St NW, Cleveland, TN  37311-4381 | Personal Property Tax |
| 40. | Brian Hanna | Hanna Family Partnership, P.O. Box 54497, Lexington, KY 40555 | Real Estate |
| 41. | Brookhill Management Corp. | Huntsville West Lp, 501 Madison Ave. 18th Floor, New York, NY 10150-0117 | Real Estate |
| 42. | Butler County Alabama | Butler Cnty Judge Of Probate, 700 Court Square, Greeneville, AL 36037-0756 | Business License |
| 43. | Butler County Alabama | Butler Cnty Judge Of Probate, 700 Court Square, Greeneville, AL 36037-0756 | Personal Property Tax |
| 44. | Butler County Collector | 100 North Main, , Poplar Bluff, MO 63901 | Personal Property Tax |
| 45. | B-Y Strawberry Square Ltd | 4629 Marco Drive, San Antonio, TX 78265 | Real Estate |
| 46. | C. I. A. LLC | P.O. Box 14208, Baton Rouge, LA 70898 | Real Estate |
| 47. | Calhoun County Revenue Comm | Tim Hodges, 1702 Noble St Ste 104, Anniston, AL  36201 | Personal Property Tax |
| 48. | California Secretary of State | Business Programs Division, 1500 11th Street, Sacramento, Ca 95814 | Annual Report |
| 49. | Calloway County Sheriff | 701 Olive Street, Murray, KY 42071 | Personal Property Tax |
| 50. | Cameron County Tax Office | P.O. Box 952, Brownsville, TX 78522-0952 | Personal Property Tax |
| 51. | Canada Revenue Agency | Post Office Box 20000, Station A, Sudbury On  P3A 5C1 | Goods and Services Tax |
| 52. | Canada Revenue Agency | Post Office Box 20000, Station A, Sudbury On  P3A 5C1 | Income Tax |
| 53. | Cape Fear LLC | Dba: Mccreless Square, 78 AL ta Vista Way Suite 1, San Antonio, TX 78232 | Real Estate |

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 54. | Carter County Treasurer | Marsha Collins, 25 A Street NW Suite 105, Ardmore, OK 73401 | Personal Property Tax |
| 55. | Carter County Trustee | Chad Lewis, 801 Elk Ave, Elizabethton, TN  37643 | Personal Property Tax |
| 56. | Ccnr Properties LLC | P.O. Box 1136, Campbellsville, KY 42719 | Real Estate |
| 57. | Chambers Cnty Judge of Probate | 2 S Lafayette St Ste B, Lafayette, AL 36862-2073 | Business License |
| 58. | Charles Williams | Tax Assessor/Collector, 308 Court St, Wiggins, MS 39577 | Personal Property Tax |
| 59. | Charleston County | Revenue Collections, 4045 Bridge View Drive, North Charleston, SC 29405-7464 | Personal Property Tax |
| 60. | Chatham County | P.O. Box 9827, Savannah, GA  31412 | Personal Property Tax |
| 61. | Chester County Treasurer | P.O. Box 686, Charlotte, Nc 28263-3464 | Personal Property Tax |
| 62. | Christian County Sheriff | 701 W. 7th Street, Hopkinsville, KY 42240 | Personal Property Tax |
| 63. | Cindy Pennington | Revenue Commissioner, P.O. Box 1017, Talladega, AL  35161 | Business License |
| 64. | City Clerk-Treasurer's Office | P.O. Box 5005, Janesville, WI 53547-5005 | Personal Property Tax |
| 65. | City Hall Annex | 316 Breard St, Monroe, LA 71201 | Business License |
| 66. | City of Alabaster | Dept. # Cs 1, P.O. Box 830525, Birmingham, AL  35283 | Business License |
| 67. | City of Alexander City | Business License, P.O. Box 552, Alexander City, AL  35011 | Business License |
| 68. | City of Alexandria | Business Office, P.O. Box 71, Alexandria, LA 71309 | Personal Property Tax |
| 69. | City of Americus | 101 West Lamar St, Americus, GA 31709-3595 | Personal Property Tax |
| 70. | City of Amory | P.O. Drawer 457, Amory, MS 38821 | Business License |
| 71. | City of Andalusia | P.O. Box 429, , Andalusia, AL 36420 | Business License |
| 72. | City of Anniston | Attn: Finance Dept, P.O. Box 2168, Anniston, AL  36202 | Business License |

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 73. | City of Athens | 1806 Wilkinson St, Athens, AL 35612 | Business License |
| 74. | City of Atmore | 201 E Louisville Ave, , Atmore, AL 36504 | Business License |
| 75. | City of Baker | P.O. Box 707, Baker, LA 70704 | Business License |
| 76. | City of Berea | 212 Chestnut St, Berea, KY 40403 | Personal Property Tax |
| 77. | City of Bessemer | Assistant Tax Collector, P.O. Box 1190, Bessemer, AL  35021-1190 | Business License |
| 78. | City of Bessemer | Assistant Tax Collector, P.O. Box 1190, Bessemer, AL  35021-1190 | Personal Property Tax |
| 79. | City of Biloxi | License Administrator, P.O. Box 508, Biloxi, MS 39533-0508 | Business License |
| 80. | City of Birmingham | P.O. Box 830725 Birmingham, AL 35283-0725 | Rds City and County Tax |
| 81. | City of Boonville | 401 Main St, Boonville, MO 652330000 | Business License |
| 82. | City of Bossier City | P.O. Box 5399, Bossier City, LA 71171-5399 | Business License |
| 83. | City of Bowling Green | P.O. Box 1410, Bowling Green, Ky, 42102-1410 | Municipal Tax |
| 84. | City of Brewton | P.O. Box 368, Brewton, AL  36427-0368 | Business License |
| 85. | City of Brookhaven | P.O. Box 560, Brookhaven, MS 39602 | Business License |
| 86. | City of Camden | P.O. Box 7002, , Camden, SC 29020 | Business License |
| 87. | City of Canton | City Clerk Office, P.O. Box 1605, Canton, MS 39046 | Business License |
| 88. | City of Cape Girardeau | 401 Independence, P.O. Box 617, Cape Girardeau, MO  63701 | Business License |
| 89. | City of Center Point | P.O. Box 9847, Birmingham, AL 35215 | Business License |
| 90. | City of Charleston SC | Revenue Collections Office, P.O. Box 22009, Charleston, SC 29413-2009 | Business License |
| 91. | City of Chattanooga TN | Treasurer, 101 E 11Th St Ste 100, Chattanooga, TN  37401-0191 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 92. | City of Clarksville | Finance And Revenue Dept., P.O. Box 928, Clarkesville, TN  37041-0928 | Personal Property Tax |
| 93. | City of Clinton | 961 Highway 80 East, , Clinton, MS 39056 | Business License |
| 94. | City of Clinton Property Tax | Regina Redenour, 100 N. Bowling St., Clinton, TN  37716 | Personal Property Tax |
| 95. | City of Columbia | 201 Second St, , Columbia, MS 39429 | Business License |
| 96. | City of Columbia Mo | Dept Of Finance Bsnss Lic Div, P.O. Box 6015, Columbia, MO  65205 | Business License |
| 97. | City of Commerce GA | 27 Sycamore St, Commerce, GA 30529 | Business License |
| 98. | City of Cookeville | Customer Service Department, P.O. Box 998, Cookeville, TN  38503-0998 | Personal Property Tax |
| 99. | City of Corinth | P.O. Box 669, Corinth, MS 38835-0669 | Business License |
| 100. | City of Corinth | P.O. Box 669, Corinth, MS 38835-0669 | Personal Property Tax |
| 101. | City of Covington | Newton County, P.O. Box 1527, Covington, GA  30015-1527 | Business License |
| 102. | City of Cullman | P.O. Box 278, , Cullman, AL  35056-0278 | Business License |
| 103. | City of Dalton | P.O. Box 1205, Dalton, GA  30722 | Occupational Tax |
| 104. | City of Dayton TN | Thomas Solomon Tax Collector, P.O. Box 226, Dayton, TN  37321 | Personal Property Tax |
| 105. | City of Decatur | Revenue Dept, P.O. Box 488, Decatur, AL  35602 | Business License |
| 106. | City of Decatur IL | 1 Gary K Anderson Plaza, Dept R5 P.O. Box 830525, Decatur, IL 62523 | Business License |
| 107. | City of Demopolis | 211 North Walnut Ave, Demopolis, AL  36732 | Business License |
| 108. | City of Denham Springs | Business License Dept, P.O. Box 1629, Denham Springs, LA 70729 | Business License |
| 109. | City of Dexter | Crystal AL lstun Cty Collector, 301 E Stoddard St, Dexter, MO  63841 | Business License |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 110. | City of Dickson Tax Collector | 600 East Walnut St, Dickson, TN 37055 | Personal Property Tax |
| 111. | City of Dothan | Business License Division, P.O. Box 2128, Dothan, AL  36302-2128 | Business License |
| 112. | City of Douglasville Georgia | Occupational Tax/Business License, 6695 Church Street, Douglasville, GA  30133 | Business License |
| 113. | City of Dyersburg | 425 W. Court Street, Dyersburg, TN 38025-1358 | Personal Property Tax |
| 114. | City of Elizabethtown | Director Of Finance, P.O. Box 550, Elizabethtown, KY 42702-0550 | Business License |
| 115. | City of Enterprise | Revenue Department, P.O. Box 311000, Enterprise, AL  36331-1000 | Business License |
| 116. | City of Eufaula | P.O. Box 219, , Eufaula, AL  36072-0219 | Business License |
| 117. | City of Fayetteville | James H Lee, 110 Elk Ave South, Fayetteville, TN  37334 | Personal Property Tax |
| 118. | City of Festus | City Hall, 711 West Main, Festus, MO  63028 | Business License |
| 119. | City of Florence | 8100 Ewing Blvd, Florence, KY 41042 | Personal Property Tax |
| 120. | City of Florence, Kentucky | 8100 Ewing Boulevard, Florence, KY 41042 | Municipal Tax |
| 121. | City of Florence, SC | Business License Office, 324 West Evans St, Florence, SC 29501 | Business License |
| 122. | City of Florissant | Finance Department, 955 Rue St Francois, Florissant, MO  63031 | Business License |
| 123. | City of Foley | P.O. Drawer 1750, Foley, AL  36536 | Business License |
| 124. | City of Forest | P.O. Box 298, Forest, MS 39074 | Business License |
| 125. | City of Fulton | P.O. Box 130, Fulton, MO  65251 | Business License |
| 126. | City of Gainesville | P.O. Box 2496, , Gainesville, GA 30503 | Business License |
| 127. | City of Gallatin | 132 W Main St Room 111, Gallatin, TN  37066-3232 | Personal Property Tax |
| 128. | City of Garland | P.O. Box 462010, Garland, TX 75046-2010 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 129. | City of Greeneville TN | 200 North College St, Greeneville, TN  37745 | Personal Property Tax |
| 130. | City of Greenville | 206 S Main St, P.O. Box 2207, Greenville, SC 29602 | Business License |
| 131. | City of Greenville AL | 119 East Commerce St, Greenville, AL  36037-0158 | Business License |
| 132. | City of Gulfport | 1410 24th Avenue, Gulfport, MS 39501 | Business License |
| 133. | City of Guntersville | 341 Gunter Ave, , Guntersville, AL 35976 | Business License |
| 134. | City of Hammond | Tax Department, P.O. Box 2788, Hammond, LA 70404-2788 | Business License |
| 135. | City of Hattiesburg | P.O. Box 1897, Hattiesburg, MS 39403-1897 | Business License |
| 136. | City of Hattiesburg | Attn: Tax Department, P.O. Box 1898, Hattiesburg, MS 39403-1898 | Business License |
| 137. | City of Hazlehurst | P.O. Box 549, Hazlehurst, MS 39083 | Business License |
| 138. | City of Hazlehurst | P.O. Box 549, Hazlehurst, MS 39083 | Personal Property Tax |
| 139. | City of Hendersonville | Property Tax Collector, 101 Maple Dr N, Hendersonville, TN 370750000 | Personal Property Tax |
| 140. | City of Hohenwald | 118 West Linden Ave, Hohenwald, TN  38462 | Personal Property Tax |
| 141. | City of Hopkinsville | 715 South Virginia St, Hopkinsville, Ky, 42240 | Municipal Tax |
| 142. | City of Huntsville | P.O. Box 308, Huntsville, AL  35804-0308 | Business License |
| 143. | City of Jackson  TN | 101 E. Mains St Ste 101, Jackson, TN 38301 | Personal Property Tax |
| 144. | City of Jasper | Revenue Department, P.O. Box 1589, Jasper, AL  35502-1589 | Business License |
| 145. | City of Jefferson City | P.O. Box 530, Jefferson City, TN 37760 | Personal Property Tax |
| 146. | City of Kansas City, Missouri - Revenue Division | P.O. Box 843322, Kansas City MO 64184-3322 | Income Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 147. | City of Kingsport | 415 Broad St, Kingsport, TN  37660-4265 | Personal Property Tax |
| 148. | City of Knoxville | 400 Main Street St 450, Knoxville, TN 37901-5001 | Personal Property Tax |
| 149. | City of Kosciusko | 222 E Washington St, Kosciusko, MS 39090 | Business License |
| 150. | City of Lake Charles | P.O. Box 3706, Lake Charles, LA 70602 | Business License |
| 151. | City of Lawrenceburg | 233 W Gaines Nbu 4, Lawrenceburg, TN  38464 | Personal Property Tax |
| 152. | City of Lebanon | 200 Castle Heights Ave #117, Lebanon, TN  37087 | Personal Property Tax |
| 153. | City of Lexington | Cody C Wood, City Recorder, P.O. Box 1699, Lexington, TN  38351 | Personal Property Tax |
| 154. | City of Louisville | P.O. Box 510, Louisville, MS 39339 | Business License |
| 155. | City of Louisville | P.O. Box 510, Louisville, MS 39339 | Personal Property Tax |
| 156. | City of Madison Treasurer | P.O. Box 2999, Madison, WI 53701-2999 | Personal Property Tax |
| 157. | City of Madisonville KY | Director Of Finance, P.O. Box 1270, Madisonville, KY 42431 | Business License |
| 158. | City of Magee | 123 Main Ave N, MA gee, MS 39111 | Business License |
| 159. | City of Marinette | C/O City Clerk's Office, 1905 Hall Avenue, Marinette, WI 54143-1716 | Business License |
| 160. | City of Marinette | C/O City Clerk's Office, 1905 Hall Avenue, Marinette, WI 54143-1716 | Personal Property Tax |
| 161. | City of McAllen Tax Office | 311 North 15th, McAllen, TX 78505-0220 | Personal Property Tax |
| 162. | City of Mccomb | P.O. Box 667, Mccomb, MS 39649 | Business License |
| 163. | City of Memphis | Treasurer, P.O. Box 185, Memphis, TN  38101 | Personal Property Tax |
| 164. | City of Meridian | P.O. Box 1430, Meridian, MS 39302-1430 | Business License |
| 165. | City of Mexico | 300 North Coal Street, Mexico, MO 65265 | Business License |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 166. | City of Mobile | P.O. Drawer 1169, 205 Gvt St So.Twr 2Nd Flr, Mobile, AL  36633-1169 | Business License |
| 167. | City of Mobile | Revenue Department, Dept # 1530, P.O. Box 11407, Birmingham, AL 35246-1530 | Business License |
| 168. | City of Monroe | P.O. Box 147, Monroeville, AL 36461 | Business License |
| 169. | City of Montgomery | % Compass Bank, P.O. Box 830469, Birmingham, AL  35283-0469 | Business License |
| 170. | City of Montgomery License & Rev | Department Rbt #3, P.O. Box 830525, Birmingham, AL  35283 | Business License |
| 171. | City of Murfreesboro | P.O. Box 1139, Murfreesboro, TN 37133-1139 | Personal Property Tax |
| 172. | City of Muscle Shoals | 2010 Avalon Avenue, Muscle Shoals, AL  35662 | Business License |
| 173. | City of New Albany | P.O. Box 56, New Albany, MS 38652-0056 | Business License |
| 174. | City of New Iberia | 457 E Main St, Suite 304, New Iberia, LA 70560 | Business License |
| 175. | City of Northport | 3500 McFarland Blvd, Northport, AL 35476 | Business License |
| 176. | City of Olive Branch | 9200 Pigeon Roost Rd, Olive Branch, MS 38654 | Business License |
| 177. | City of Opelika | Revenue Department, P.O. Box 390, Opelika, AL  36803-0390 | Business License |
| 178. | City of Oxford | 107 Courthouse Sq, Oxford, MS 38655 | Business License |
| 179. | City of Paducah | P.O. Box 9001241, Louisville, KY 40290-1241 | Municipal Tax |
| 180. | City of Paducah | P.O. Box 9001241, Louisville, KY 40290-1241 | Business License |
| 181. | City of Pascagoula | P.O. Drawer 908, , Pascagoula, MS 39568-0908 | Business License |
| 182. | City of Pelham | P.O. Box 1238, Pelham, AL  35124 | Business License |
| 183. | City of Pell City | 1905 1st Ave North, Pell City, AL 35125 | Business License |

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 184. | City of Phenix City | Department Of Finance, 601 12th Street, Phenix City, AL  36867 | Business License |
| 185. | City of Philadelphia | 525 Main St, Philadelphia, MS 39350 | Business License |
| 186. | City of Picayune | 200 Hwy 11 South, Picayune, MS 39466 | Business License |
| 187. | City of Portland | 111 SW Columbia Street #600, Portland Or 97201-5840 | Business Tax |
| 188. | City of Portland | P.O. Box 9250, Portland, Or 97207 | Metro Sh Business Income Tax |
| 189. | City of Prattville | P.O. Box 680190, Prattville, AL 36068 | Business License |
| 190. | City of Rice Lake | Clerk-Treasurer's Office, 30 East Eau Claire Street, Rice Lake, WI 548680000 | Personal Property Tax |
| 191. | City of Richland | P.O. Box 180609, Richland, MS 39218 | Business License |
| 192. | City of Ridgeland | P.O. Box 217, Ridgeland, MS 39158 | Business License |
| 193. | City of Roanoke | P.O. Box 1270, , Roanoke, AL 36274 | Business License |
| 194. | City of Rolla | Finance Department, P.O. Box 979, Rolla, MO 65402 | Business License |
| 195. | City of Savannah | Revenue Department, 305 Fahm Street, Savannah, GA  31402-1228 | Business License |
| 196. | City of Savannah | Revenue Department, 305 Fahm Street, Savannah, GA  31402-1228 | Personal Property Tax |
| 197. | City of Scottsboro | Scottsboro City Hall, 316 S Broad St, Scottsboro, AL  35768 | Business License |
| 198. | City of Sedalia | 200 South Osage, Sedalia, MO 65301 | Business License |
| 199. | City of Senatobia | P.O. Box 1020, Senatobia, MS 38668-1020 | Business License |
| 200. | City of Sevierville TN | P.O. Box 5500, Sevierville, TN 37864 | Personal Property Tax |
| 201. | City of Sheboygan | 828 Center Ave, Suite 110, Sheboygan, WI 53081 | Personal Property Tax |
| 202. | City of Shreveport | Revenue Division, P.O. Box 30168, Shreveport, LA 71130-0168 | Business License |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 203. | City of Simpsonville | Business License, 118 Ne Main St, Simpsonville, SC 29681 | Business License |
| 204. | City of Slidell | Occupational License, P.O. Box 828, Slidell, LA 70459 | Business License |
| 205. | City of Somerset | City Clerk's Office, P.O. Box 989, Somerset, KY 42502 | Personal Property Tax |
| 206. | City of Somerset, Net Profits Tax Division | P.O. Box 989, Somerset, KY 42502 | Municipal Tax |
| 207. | City of Southaven | Office Of The City Clerk, 8710 Northwest Drive, Southaven, MS 38671 | Business License |
| 208. | City of Starkville | 110 West Main St, Starkville, MS 39759 | Business License |
| 209. | City of Sulphur | Occupational License, P.O. Box 1309, Sulphur, LA 70664 | Business License |
| 210. | City of Superior | Ashley Puetz Finance Director, 1316 N 14th St, Superior, WI 548800000 | Personal Property Tax |
| 211. | City of Sylacauga | 301 N Broadway Ave, Sylacauga, AL 35150 | Business License |
| 212. | City of Thomasville | P.O. Box 127, Thomasville, AL 36784-0127 | Business License |
| 213. | City of Thomson | P.O. Box 1017, Thomson, GA  30824 | Business License |
| 214. | City of Toccoa | 203 N Alexander Street, P.O. Box 579, Toccoa, GA  30577 | Personal Property Tax |
| 215. | City of Tupelo | P.O. Box 1485, Tupelo, MS 38802-1485 | Business License |
| 216. | City of Valley | 20 Fob James Dr, Valley, AL  36854 | Business License |
| 217. | City of Vicksburg | P.O. Box 150, Vicksburg, MS 39181-0150 | Business License |
| 218. | City of Waukegan | 100 N Martin Luther King Jr Avenue, Waukegan, IL 60085 | Business License |
| 219. | City of Waveland | 301 Coleman Ave, Waveland, MS 39576 | Business License |
| 220. | City of Waynesboro | 714 Wayne Street, Waynesboro, MS 39367 | Business License |
| 221. | City of West Bend Treasurer | 1115 S Main St, West Bend, WI 530950000 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 222. | City of West Columbia | P.O. Box 4044, West Columbia, SC 29171 | Business License |
| 223. | City of West Monroe | Acct: 29509-1036445, 2305 North 7th St, West Monroe, LA 71291 | Business License |
| 224. | City of West Plains | P.O. Box 710, West Plains, MO 65775 | Business License |
| 225. | City of Wiggins | 177 First St, Wiggins, MS 39577 | Business License |
| 226. | City of Winona | P.O. Box 29, Winona, MS 38967 | Business License |
| 227. | Clark County License Commissioner | Attn: Linda Goodman, P.O. Box 369, Grove Hill, AL  36451 | Business License |
| 228. | Clark County Sheriff | 17 Cleveland Ave, Winchester, KY 40391 | Personal Property Tax |
| 229. | Clark County Treasurer | 34 South Main, Room 103, Winchester, KY 40391 | Municipal Tax |
| 230. | Clarke County Tax Commissioner | Revenue Commissioner, 114 Court Street, Grove Hill, AL  36451 | Personal Property Tax |
| 231. | Clayton County Tax Commissioner | Permits & License, 121 S. McDonough St. Annex 2, Jonesboro, GA  30236-3694 | Personal Property Tax |
| 232. | Cleveland County Treasurer | Jim Reynolds, 201 S Jones Ste 100, Norman, OK 73069 | Personal Property Tax |
| 233. | Coffee Cnty Revenue Commissioner | P.O. Box 411, Enterprise, AL  36331-1690 | Personal Property Tax |
| 234. | Colbert County Judge of Probate | P.O. Box 47, Tuscumbia, AL  35674 | Personal Property Tax |
| 235. | Colbert County Revenue Commission | P.O. Box 741010, Tuscumbia, AL 35674 | Personal Property Tax |
| 236. | Colleton County SC | P.O. Box 8, Walterboro, SC 29488-0001 | Personal Property Tax |
| 237. | Colorado Department of Revenue | Denver Co 80261- 0005 | Income Tax |
| 238. | Columbus Consolidated Gov | Occupation Tax Section, 100th Tenth St, Columbus, GA  31902-1397 | Business License |
| 239. | Columbus Development Company LLC | 1302 West Pioneer Parkway, Peoria, IL 61612 | Real Estate |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 240. | Comanche County | Rhonda Brantley Treasurer, 315 SW 5th Street Room 300, Lawton, OK 73501-4371 | Personal Property Tax |
| 241. | Commerce Center LLC | 1124 Park West Blvd, Suite 101, Mount Pleasant, SC 29466 | Real Estate |
| 242. | Commonwealth of Kentucky Department of Revenue | Frankfort, KY 40620- 0021 | Income Tax |
| 243. | Commonwealth of Kentucky Department of Revenue | Frankfort, KY 40620- 0021 | Income and Franchise Tax |
| 244. | Commonwealth of Kentucky Department of Revenue | Frankfort, KY 40620- 0021 | Sales and Use Tax |
| 245. | Comptroller of Public Accounts | P.O. Box 149348, Austin TX 78714-9348 | Franchise Tax |
| 246. | Comptroller of Public Accounts | P.O. Box 149348, Austin TX 78714-9348 | Sales and Use Tax |
| 247. | Cook County Treasurer | P.O. Box 805438, Chicago, IL 60680-4155 | Business License |
| 248. | Cook County Treasurer | P.O. Box 805438, Chicago, IL 60680-4155 | Real Estate |
| 249. | Cordova Collection Baceline LLC | 511 Broadway, Denver, Co 80203 | Real Estate |
| 250. | County of Lexington | 212 S. Lake Dr., Suite 103, Lexington, SC 29072-3499 | Personal Property Tax |
| 251. | Cpc Mcalpin Square LLC | D/B/A Cpc Macalpin Square LLC, 151 Bodman Pl Ste 201, Red Bank, Nj 7701 | Real Estate |
| 252. | Crc Iv Reit LLC | D/B/A Cr West Ashley LLC, 1427 Clarkview Road Ste 500, Baltimore, MD 21264-9475 | Real Estate |
| 253. | Cullman County Judge of Probate | P.O. Box 970, Cullman, AL  35056-0970 | Business License |
| 254. | Dallas County Tax Office | P.O. Box 139066, Dallas, TX 75313-9066 | Personal Property Tax |
| 255. | Dallas County AL | Tax Collector, P.O. Box 987, Selma, AL  36702-0987 | Business License |

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 256. | Dallas County AL | Tax Collector, P.O. Box 987, Selma, AL  36702-0987 | Personal Property Tax |
| 257. | Darla Eden Tax Commissioner | Hall County Ga, P.O. Box 1579, Gainesville, GA  30503 | Personal Property Tax |
| 258. | Darlington County Treasurer | 1 Public Sq Room 203, Darlington, SC 29532-3213 | Personal Property Tax |
| 259. | Debbie J. Richards | Tax Assessor/Collector, 609 Azalea Drive, Waynesboro, MS 39367 | Personal Property Tax |
| 260. | Dekalb County Tax Commissioner | P.O. Box 100004, Atlanta, GA 30368-7545 | Personal Property Tax |
| 261. | Dekalb County-Probate | Judge Of Probate, 300 Grand Ave SW Ste 100, Fort Payne, AL  35967 | Business License |
| 262. | Delaware Division of Revenue | P.O. Box 2044, Wilmington, De 19899- 2044 | Income Tax |
| 263. | Delaware Secretary of State | 401 Federal Street, Dover, De 19901 | Annual Franchise Tax Report With Payment |
| 264. | Delaware Secretary of State | 401 Federal Street, Dover, De 19901 | Annual LLC Payment |
| 265. | Denton County | Michelle French-Tax Assessor/Collector, P.O. Box 90223, Denton, TX 86202-5223 | Personal Property Tax |
| 266. | Department of Financial & Professional Regulation | State Of Illinois-Cash Unit, 320 W Washington St Rm 344, Springfield, IL 62791 | Business License |
| 267. | Department of Fnance-Bowling Green Kentucky | 1017 College Street, P.O. Box 430, Bowling Green, KY 42102-0430 | Personal Property Tax |
| 268. | Department of Revenue | P.O. Box 23191 Jackson, MS 39225-3191 | Finance Company Tax |
| 269. | Department of Revenue | 445 E. Capitol Avenue, Pierre, Sd 57501 | Income Tax |
| 270. | Department of Revenue | P.O. Box 23191 Jackson, MS 39225-3191 | Income and Franchise Tax |
| 271. | Department of Taxation and Finance | P.O. Box 5563, Binghamton, NY 13902-5563 | Income Tax |
| 272. | Department of The Treasury Division of Taxation | P.O. Box 281, Trenton, Nj 08695-0281 | Income Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 273. | Dickson County Trustee | Attn: Glynda Pendergrass, P.O. Box 246, Charlotte, TN  370360000 | Personal Property Tax |
| 274. | Director of Finance | P.O. Box 550, Elizabethtown, KY 42702-0550 | Municipal Tax |
| 275. | Dorchester County | Delinquent Tax Collector's Office, 201 Johnston Street, St. George, SC 29477 | Business License |
| 276. | Dorchester County Treasurer | Dorchester County Real Estate Tax, P.O. Box 936782, Atlanta, GA 31193-6782 | Personal Property Tax |
| 277. | Dunklin County Courthouse | Kathy Rasberry Collector, P.O. Box 445, Kennett, MO  638570445 | Business License |
| 278. | Dyer County Trustee | 101 W Court St, P.O. Box 1360, Dyersburg, TN  38025-1360 | Personal Property Tax |
| 279. | East Baton Rouge Sheriff's Office | Sid J Gautreaux Iii, P.O. Box 919319, Dallas, TX 75391-9319 | Personal Property Tax |
| 280. | Ebi Holdings | P.O. Box 802, Southaven, MS 38671 | Real Estate |
| 281. | Eddie Fair Tax Collector | Hinds County Tax Collector, P.O. Box 1727, Jackson, MS 39215 | Personal Property Tax |
| 282. | Elite Properties Group Inc | P.O. Box 940166, Plano, TX 75094 | Real Estate |
| 283. | Ellis County Tax Office | Richard Rozier, 109 S Jackson St Rm-T125, Waxahachie, TX 75168-0188 | Personal Property Tax |
| 284. | Essington Shoppes LLC | P.O. Box 10740, Chicago, IL 60610 | Real Estate |
| 285. | Fayette County Public Schools | P.O. Box 55570, Lexington, KY 40555-5570 | Municipal Tax |
| 286. | Felix Diaz | Dba: Diaz F&M Holdings LLC, 316 Grayson Hwy Suite 5A, Lawrenceville, GA  30046 | Real Estate |
| 287. | Finance Director, City of Madisonville, KY | P.O. Box 1270, Madisonville, KY 42431 | Municipal Tax |
| 288. | Florence County Treasurer | Laurie Walsh Carpenter, P.O. Box 100501, Florence, SC 29502-0501 | Personal Property Tax |
| 289. | Florida Department of Revenue | P.O. Box 6440, Tallahassee Fl 32314-6440 | Income Tax |
| 290. | Fond Du Lac City Treasurer | P.O. Box 150, 160 S Macy St, Fond Du Lac, WI 54936-0150 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 291. | Forrest County Tax Collector | P.O. Box 1689, Hattiesburg, MS 39403 | Personal Property Tax |
| 292. | Four "L'S" Investments (1978) Inc. | 2nd Floor - 820 West Broadway, Vancouver, Bc V5Z 1J8 | Real Estate |
| 293. | Four S Commercial LLC | 8201 Preston Road, Suite 700, Justin, TX 76247 | Real Estate |
| 294. | Franchise Tax Board | P.O. Box 942857, Sacramento Ca 94257- 0500 | Business Annual Tax |
| 295. | Franchise Tax Board | P.O. Box 942857, Sacramento Ca 94257- 0500 | Income Tax |
| 296. | Galium 1333 Main LLC F/B/O | 3323 Ne 163rd St, Suite 608, Atlanta, GA  30374-6168 | Real Estate |
| 297. | Garland Independent School Dis | P.O. Box 461407, Garland, TX 75046-1407 | Personal Property Tax |
| 298. | Georgetown / Scott County | P.O. Box 800, Georgetown, KY 40324 | Municipal Tax |
| 299. | Georgia Department of Revenue | P.O. Box 740239, Atlanta, Georgia 30374 | Income Tax |
| 300. | Georgia Department of Revenue | 1800 Century Boulevard, Ne, Atlanta, Ga 30345 | Sales and Use Tax |
| 301. | Georgia Dept of Banking and Finance | 2990 Brandywine Road Suite 200, Atlanta, GA  30341-5565 Us | Loan Fee |
| 302. | Get Jr LLC | 119 Tuscany Way, Greer, SC 29650 | Real Estate |
| 303. | Gibb Shoals Property LLC | 1951 Gibb Shoals Road, Greenville, SC 29612-0273 | Real Estate |
| 304. | Greene County Trustee | 204 N Cutler St. Ste 216, Greeneville, TN  37745 | Personal Property Tax |
| 305. | Greentree Plaza Ltd | 5930 Lyndon B Johnson Fwy, Suite 400, Emerson, Nj 7630 | Real Estate |
| 306. | Greenville County Tax Collector | 301 University Ridge Ste 700, Greenville, SC 29601-3659 | Personal Property Tax |
| 307. | Gwinnett County | Tax Commissioner, P.O. Box 372, Lawrenceville, GA  30046 | Personal Property Tax |
| 308. | Hamblen County Trustee | 511 W 2nd North St, Morristown, TN 37814 | Personal Property Tax |
| 309. | Hamilton County Trustee | 625 Georgia Ave, Room 210, Chattanooga, TN  37402-1494 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 310. | Hampton County Treasurer | P.O. Box 87, Hampton, SC 29924-0087 | Personal Property Tax |
| 311. | Harris County Texas | Tax Assessor-Collector, P.O. Box 4622, Houston, TX 77210-4622 | Personal Property Tax |
| 312. | Harrison County Tax | 200 West Houston, Marshall, TX 75670 | Personal Property Tax |
| 313. | Harrison County Tax Collector | Sharon Nash Barnett, P.O. Box 1270, Gulfport, MS 39502 | Personal Property Tax |
| 314. | Henderson Co Trustee | John Cavness, Trustee, P.O. Box 9, Lexington, TN  38351 | Personal Property Tax |
| 315. | Holiday Crossing Baceline LLC | 511 Broadway, Denver, Co 80203 | Real Estate |
| 316. | Homewood Village LLC | P.O. Box 1864, Athens, GA  30603 | Real Estate |
| 317. | Hopkins County Fiscal Court | P.O. Box 690, Madisonville, KY 42431 | Municipal Tax |
| 318. | Horry County Treasurer | Angie Jones Treasurer, Dept 98 P.O. Box 100216, Conway, SC 29528-6107 | Personal Property Tax |
| 319. | Houston County | Patrick H Davenport Judge Of Probate, P.O. Box 6406, Dothan, AL 36302 | Business License |
| 320. | Houston County Tax Commission | Mark Kushinka, 200 Carl Vinson Pkwy, Warner Robins, GA  31095 | Personal Property Tax |
| 321. | Howell County Missouri | Janey Crow, Collector, 35 Court Square Ste 201, West Plains, MO 65775 | Business License |
| 322. | Illinois Department of Revenue | P.O. Box 19038, Springfield Il 62794- 9048 | Income Tax |
| 323. | Illinois Department of Revenue | P.O. Box 19038, Springfield Il 62794- 9048 | Sales and Use Tax |
| 324. | Illinois Secretary of State | Department Of Business Services, 501 S 2Nd St, Rm 350, Springfield, IL 62756-5510 | Annual Report |
| 325. | Indian Trail Legacy Center LLC | P.O. Box 604034, Charlotte, Nc 28260-4034 | Real Estate |
| 326. | Indiana Department of Revenue | P.O. Box 7228, Indianapolis In 46207-7228 | Income Tax |

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 327. | Indiana Department of Revenue | 100 N Senate Ave, Indianapolis, IN 46204 | Sales and Use Tax |
| 328. | Indiana Secretary of State | 200 W Washington St, Indianapolis, IN 46204 | Annual Report |
| 329. | Internal Revenue Service | Ogden, Ut  84201-0009 | Excise Tax |
| 330. | Internal Revenue Service | Ogden, Ut  84201-0011 | Income Tax |
| 331. | Iowa Attorney General | Attn: Notification & Fees Admin, 1305 E. Walnut Street, Des Moines, IA 50319 | Business License |
| 332. | Iowa Department of Revenue | P.O. Box 10468, Des Moines, IA 50306- 0468 | Income Tax |
| 333. | Irving Isd Tax Office | 2621 W Airport Fwy, P.O. Box 152021, Irving, TX 75015-2021 | Personal Property Tax |
| 334. | Jackson County Treasurer | P.O. Box 939, Altus, OK 73522 | Personal Property Tax |
| 335. | Jacobs Properties LLC | 2380 N Ocoee St, Mcdonald, TN 37353 | Real Estate |
| 336. | Jefferson County Clerk's Office | 527 W Jefferson Street, Room 100A, Louisville, KY 40202-2816 | Personal Property Tax |
| 337. | Jefferson County Dept. of Revenue | 716 Richard Arrington Jr. Blvd. N., Birmingham, AL  35203 | Business License |
| 338. | Jefferson County Tax Collector | 729 Maple St., Suite 36, Hillsboro, MO  63050 | Personal Property Tax |
| 339. | Jefferson County Trustee | Jennifer Boling Hall, P.O. Box 38, Dandridge, TN  37725 | Personal Property Tax |
| 340. | John M Moody | P.O. Box 2218, Florence, AL  35630 | Real Estate |
| 341. | Jones County Tax Collector | P.O. Box 511, Laurel, MS 39441 | Personal Property Tax |
| 342. | Judge of Probate | 176 W. 5th St., Prattville, AL  36067 | Business License |
| 343. | Judge of Probate Russell | P.O. Box 700, , Phenix City, AL 36868-0700 | Business License |
| 344. | Kansas Department of Revenue | P.O. Box 750260, Topeka Ks 66699-0260 | Income Tax |
| 345. | Kansas Department of Revenue | P.O. Box 3506, Topeka, Ks 66625-3506 | Use Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 346. | Kb Farrar LLC | 1600 Division St, Suite 140, Nashville, TN  37203 | Real Estate |
| 347. | Kershaw County Treasurer | P.O. Box 622, Camden, SC 29021-0622 | Personal Property Tax |
| 348. | Knox County Trustee | P.O. Box 70, Knoxville, TN  37901 | Personal Property Tax |
| 349. | Laclede County Government Cntr | Toni Morris Collector, 200 North Adams Ave, Lebanon, MO  65536 | Business License |
| 350. | Lafourche Parish Government | P.O. Drawer 5548, Thibodaux, LA 70302-5548 | Business License |
| 351. | Laredo Isd Tax Office | 904 Juarez Avenue, , Laredo, TX 78040 | Personal Property Tax |
| 352. | Lee Cnty Judge of Probate | Probate Judge, P.O. Box 2266, Opelika, AL  36803-2266 | Business License |
| 353. | Lee County Tax Collector | P.O. Box 271, Tupelo, MS 38802-0271 | Personal Property Tax |
| 354. | Lenoir City Finance Department | 530 Hwy 321 N. Suite 102, P.O. Box 445, Lenoir City, TN  37771 | Personal Property Tax |
| 355. | LFUCG – Division of Revenue | P.O. Box 14058, Lexington, KY 40512 | Municipal Tax |
| 356. | License Commissioner | P.O. Box 1059, Florence, AL  35631 | Business License |
| 357. | Lincoln County Trustee | Mary Jane Porter, 112 Main Ave S Rm 103, Fayetteville, TN  37334 | Personal Property Tax |
| 358. | Loudon County Trustee | Chip Miller Trustee, 101 Mulberry St Ste. 203, Loudon, TN  37774 | Personal Property Tax |
| 359. | Louisiana Department of Revenue | Post Office Box 91011, Baton Rouge La 70821-9011 | Income and Franchise Tax |
| 360. | Louisiana Motor Vehicle | Commission, 3017 Kingman St, Metarie, LA 70006 | Business License |
| 361. | Louisville Metro Revenue Commission | P.O. Box 35410, Louisville, KY 40232-5410 | Municipal Tax |
| 362. | Lowndes County Tax Assessor | Greg Andrews, P.O. Box 1077, Columbus, MS 39703 | Business License |
| 363. | Macon Bibb County Tax Comm | 188 Third Street, MA con, GA 31208-4503 | Personal Property Tax |
| 364. | Madison County | 100 E Main St - Rm 107, Jackson, TN  38301 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 365. | Madison County Tax Collector | 100 Northside Square, Huntsville, AL 35801-4820 | Personal Property Tax |
| 366. | Marinette County Treasurer | 1926 Hall Ave, Marinette, WI 541430000 | Personal Property Tax |
| 367. | Marion County Treasurer | P.O. Box 6145, Indianapolis, IN 46206-6145 | Personal Property Tax |
| 368. | Marion County Treasurer | P.O. Box 275, Columbia, SC 29202-3328 | Personal Property Tax |
| 369. | Marlboro County SC | Delorice B Barrington, P.O. Box 505, Bennettsville, SC 29512-0505 | Personal Property Tax |
| 370. | Marshall Cnty Judge of Probate | 425 Gunter Ave Ste 110, Guntersville, AL  35976-1199 | Business License |
| 371. | Marshall County Rev Commissioner | 424 Blount Ave Ste 124, , Guntersville, AL  35976 | Personal Property Tax |
| 372. | Massie-Clarke Development Co | 4131 Benttree Dr., Owensboro, KY 42304 | Real Estate |
| 373. | Mayes County Treasurer | Demecia Franklin, 1 Court Place Ste 100, Pryor, OK 74361-1010 | Personal Property Tax |
| 374. | Mazal Properties LLC | 1141 N Loop 1604 E, Suite 105-440, San Antonio, TX 78232 | Real Estate |
| 375. | Memphis and Shelby County Division of Planning & Development | 125 N Main St, Suite #477, Memphis, TN  38103 | Business License |
| 376. | Meriden Associates LLC | 277 Fairfield Rd. Ste 205, Fairfield, Nj 7004 | Real Estate |
| 377. | Michigan Department of Treasury | P.O. Box 30803, Lansing Mi 48909 | Income Tax |
| 378. | Millan Enterprises | 126 Main Street, Ste A, Clarksville, TN  37040 | Real Estate |
| 379. | Milwaukee County Treasurer | Public Portal, 901 N 9th St Room 102, Milwaukee, WI 53233 | Personal Property Tax |
| 380. | Mimco, Inc. | 6500 Montana Avenue, El Paso, TX 79925 | Real Estate |
| 381. | Minnesota Department of Revenue | 600 N. Robert St., St. Paul, Mn 55145- 1250 | Franchise Tax |
| 382. | Mississippi Court Collections | P.O. Box 1384, Brandon, MS 39043 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 383. | Missouri Department of Revenue | P.O. Box 700, Jefferson City, MO 65105- 0700 | Credit Institution Tax |
| 384. | Missouri Department of Revenue | P.O. Box 700, Jefferson City, MO 65105- 0700 | Income Tax |
| 385. | Missouri Department of Revenue | P.O. Box 700, Jefferson City, MO 65105- 0700 | Sales and Use Tax |
| 386. | Missouri Division of Finance | 301 West High St Room 630, P.O. Box 716, Jefferson City, MO  65101 | Business License |
| 387. | Mobile County | 3925-F Michael Blvd, P.O. Drawer 161009, Mobile, AL  36616 | Business License |
| 388. | Monroe Cnty Revenue Comm | P.O. Box 665, 65 North Alabama Ave, Monroeville, AL  36461 | Business License |
| 389. | Montgomery Cnty Judge of Pro | Business License Renewal, 101 S Lawrence St, Montgomery, AL 36101-0223 | Business License |
| 390. | Moreland Incorporated | P.O. Box 1250, Starkville, MS 39760 | Real Estate |
| 391. | Morgan County Comm of Lic | P.O. Box 668, Decatur, AL  35602-0668 | Business License |
| 392. | Mpa of Key West Ltd Ptr | 1433 12th Street, Key West, Fl 33040 | Real Estate |
| 393. | Ms Mbc LLC | P.O. Box 1524, West Point, MS 39773 | Real Estate |
| 394. | Muncie Planet Re LLC | Lee/Assoc 10201 N Illinois St Ste 390, Indianapolis, IN 46290 | Real Estate |
| 395. | Muskogee County Treasurer | Kelly M. Garrett, P.O. Box 1587, Muskogee, OK 74402-1587 | Personal Property Tax |
| 396. | Nevada Financial Institution Division | Attn: Application Processing, P.O. Box 3239, Carson City, Nv 89702 | Business License |
| 397. | New Mexico Dept of Financial Institutions | 2550 Cerrillos Road, 3rd Floor, P.O. Box 25101, Santa Fe, Nm 87504 | Business License |
| 398. | Newberry County Treasurer | Newberry County Treasurer, P.O. Box 206, Newberry, SC 29108 | Personal Property Tax |
| 399. | Newton Co Tax Commissioner | 1113 Usher Street, Suite 101, Covington, GA  30014 | Personal Property Tax |
| 400. | North Dakota Office of State Tax Commissioner | 600 E. Boulevard Ave. Dept 127, Bismarck, North Dakota 58505- 0599 | Income Tax |
| 401. | North Key Properties LLC | P.O. Box 180511, Delafield, WI 53018 | Real Estate |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 402. | Northwest Plaza | P.O. Box 866, Olive Branch, MS 38654 | Real Estate |
| 403. | Nueces County | P. O. Box 2810, Corpus Christi, TX 78403-2810 | Personal Property Tax |
| 404. | Occupational Tax Administrator | Owensboro, KY 42302-9008 | Income Tax |
| 405. | Occupational Tax Administrator | P.O. Box 10008, Owensboro, KY 42302-9008 | Municipal Tax |
| 406. | Office of The City Collector | 501 Vine St, Poplar Bluff, MO 63901 | Business License |
| 407. | Oklahoma County Treasurer | P.O. Box 268875, Oklahoma City, OK 73126-8875 | Personal Property Tax |
| 408. | Oklahoma Tax Commission | Oklahoma City, Ok  73194 | Income Tax |
| 409. | Oklahoma Tax Commission | Oklahoma City, Ok  73194 | Income and Franchise Tax |
| 410. | Oklahoma Tax Commission | Oklahoma City, Ok  73194 | Sales and Use Tax |
| 411. | Oliver Creek Holdings Lllp | P.O. Box 1429, Montgomery, AL 36102 | Real Estate |
| 412. | Onalaska City Treasurer | City Hall, 415 Main St, Onalaska, WI 546502953 | Personal Property Tax |
| 413. | Orangeburg County Auditor | P.O. Box 9000, Orangeburg, SC 29116-9000 | Personal Property Tax |
| 414. | Oregon Department of Revenue | P.O. Box 14777, Salem Or 97309-0960 | Excise Tax |
| 415. | Pacific West Real Estate Income Fund LLC | P.O. Box 36799, Charlotte, Nc 28236-6799 | Real Estate |
| 416. | Panola County Tax Assessor/Collector | 151 Public Square, Ste C, Batesville, MS 38606 | Personal Property Tax |
| 417. | Parish of Ascension | Robert P Webre, Sheriff/Tax Collector, P.O. Box 118, Gonzales, LA 70707-0118 | Personal Property Tax |
| 418. | Parish Sales Tax Fund | Terrebonne Parish Sales & Use Tax, P.O. Box 670, Houma, LA 70361-0670 | Business License |
| 419. | Pcdf Properties LLC | P.O. Box 208420, Dallas, TX 75320-8420 | Real Estate |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 420. | Pennsylvania Department of Revenue | P.O. Box 280427, Harrisburg Pa 17128-0427 | Income Tax |
| 421. | Pettis County Courthouse | Marsha L Boeschen Collector, 415 South Ohio Ste 216, Sedalia, MO 653010000 | Personal Property Tax |
| 422. | Pickens County Treasurer | Lockbox Oper/Td Bank, P.O. Box 1210, Columbia, SC 29202 | Personal Property Tax |
| 423. | Pike County Judge of Probate | Wesley H Allen, 120 W Church St, Troy, AL  36081 | Business License |
| 424. | Pike County Rev Commissioner | Curtis Blair, 120 West Church St, Troy, AL  36081 | Personal Property Tax |
| 425. | Pike County Tax Collector | Gwendolyn J Nunnery, P.O. Box 111, Magnolia, MS 39652 | Personal Property Tax |
| 426. | Pottawatomie County Treasurer | 309 N Broadway Ste 202, Shawnee, OK 74801 | Personal Property Tax |
| 427. | Preston Bend Real Estate LLC | 913 Thornridge, Sherman, TX 75090 | Real Estate |
| 428. | Randolph County Business License | P.O. Box 249, Wedowee, AL  36278 | Business License |
| 429. | Randolph County Collector | 372 Highway Jj Suite 1G, Huntsville, MO  65229 | Personal Property Tax |
| 430. | Rapides Parish and Applicable | Municipalities, 5606 Coliseum Blvd, Alexandria, LA 71303 | Business License |
| 431. | Rby #3 Property Management  LLC | 4629 Macro Drive, San Antonio, TX 78265-9506 | Real Estate |
| 432. | Rcc Cross Country Plaza LLC | C/O Hackney Real Estate, P.O. Box 17710, Richmond, VA 23226 | Real Estate |
| 433. | Red Mansions Realty Management LLC | 2324 Gruene Lake Drive, Suite C, New Braunfels, TX 78130 | Real Estate |
| 434. | Redus Family Limited | Partnership, 145 East Spring St., Ste. B-2, Cookeville, TN  38501 | Real Estate |
| 435. | Redus Family Ltd Partnership Llp | 145 E. Spring Street, B-2, Cookeville, TN  38501 | Real Estate |
| 436. | Regency Commercial Associates LLC | Dba: Regency Csp Iv LLC, 380 N Cross Pointe Blvd, Evansville, IN 47715-4027 | Real Estate |
| 437. | Regency Commercial Associates LLC | 330 Cross Pointe Blvd, Detroit, Mi 48278-0819 | Real Estate |

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 438. | Rflp, Ltd | 830 N.E. Loop 410, Suite 202, San Antonio, TX 78209 | Real Estate |
| 439. | Rhinelander City Clerk | 135 S Stevens St, Rhinelander, WI 545010000 | Personal Property Tax |
| 440. | Richland County Treasurer | P.O. Box 8028, Columbia, SC 29202-8028 | Business License |
| 441. | Richland County Treasurer | P.O. Box 8028, Columbia, SC 29202-8028 | Personal Property Tax |
| 442. | Richmond County Tax Comm | 530 Greene Street Room 117, Augusta, GA  30901 | Personal Property Tax |
| 443. | Rmr Coastal LLC | 2324 Gruene Lake Drive, Suite C, New Braunfels, TX 78130-3745 | Real Estate |
| 444. | Robertson County Trustee | Kendra Shelton, 515 South Brown Street, Springfield, TN  37172 | Personal Property Tax |
| 445. | Ronald M. Bykowski | D/B/A Century Properties, 3717 W Elm Street, Mchenry, IL 60050 | Real Estate |
| 446. | Rsdak LLC | 3423 Ashbourne Circle, Bloomington, IL 61702-1225 | Real Estate |
| 447. | Rutherford County Trustee | P.O. Box 1316, Murfreesboro, TN 37133 | Personal Property Tax |
| 448. | Saline County Tax Collector | Cindi A. Sims, P.O. Box 146, Marshall, MO 653400000 | Personal Property Tax |
| 449. | Sandlot Group LLC | 7130 W. Maple Suite 210, Wichita, Ks 67209 | Real Estate |
| 450. | SC Dept of Consumer Affairs | P.O. Box 5246, Columbia, SC 29210-8004 | Business License |
| 451. | SCDCA South Carolina Dept of Consumer Affairs | P.O. Box 5246, Columbia, SC 29250 | Business License |
| 452. | Scgiv-Garners  LLC | P.O. Box 724498, , Atlanta, GA 31139 | Real Estate |
| 453. | Scott County Clerk | 101 E Main Street, Georgetown, KY 40324 | Personal Property Tax |
| 454. | Scott County Tax Collector | 100 East 1st St, Forest, MS 39074 | Personal Property Tax |
| 455. | Sedgwick Co. Treasurer | Sedgwick Co Courthouse, P.O. Box 2961, Wichita, Ks 67201-2961 | Real Estate |

| No. | Vendor | Address | Tax Type |
|-----|--------|---------|----------|
| 456. | Sequoyah County Treasurer | 120 E Chickasaw, Sallisaw, OK 74955 | Personal Property Tax |
| 457. | Sevier County Trustee | 125 Court Ave Ste 212W, Sevierville, TN 37862 | Personal Property Tax |
| 458. | Shapland Realty LLC | 2101 Fox Drive, Suite 103, Champaign, IL 61820 | Real Estate |
| 459. | Shelby County Tax Commissioner | P.O. Box 1298, Columbiana, AL 35051 | Personal Property Tax |
| 460. | Shelby County Trustee | P.O. Box 2751, Attn: Regina Morrison Newman, Memphis, TN 38101 | Personal Property Tax |
| 461. | Sona Four Corners LP | 4141 Southwest Freeway, Suite 470, Houston, TX 77027 | Real Estate |
| 462. | South Carolina Department of Revenue | P.O. Box 125, Columbia, SC 29214-0032 | Income Tax |
| 463. | South Carolina Department of Revenue | P.O. Box 125, Columbia, SC 29214-0032 | Income and Franchise Tax |
| 464. | South Carolina Department of Revenue | P.O. Box 125, Columbia, SC 29214-0032 | Sales and Use Tax |
| 465. | Springview Shops LLC | P.O. Box 2527, Mount Pleasant, SC 29465 | Real Estate |
| 466. | St Charles County Collector | Michelle D. Mcbride, 201 N Second St - Ste 134, St Charles, Mo 63301-2889 | Personal Property Tax |
| 467. | St Clair County | Mike Bowling, 1815 Cogswell Ave Ste 212, Pell City, AL 35125 | Personal Property Tax |
| 468. | St John The Baptist Parish Tax | P.O. Box 2066, Laplace, LA 70069 | Business License |
| 469. | St Johns Investors LP | 200 Wingo Way, Suite 100, Charlotte, Nc 28275-1554 | Real Estate |
| 470. | State Banking Department  AL | Bureau Of Loans, P.O. Box 4600, Montgomery, AL  36104-4350 | Business License |
| 471. | State of Michigan | 2501 Woodlake Circle, Okemos, Mi 48865 | Annual Report |
| 472. | State of New Hampshire | 107 North Main Street, Concord, Nh 03301 | Annual Report |
| 473. | State of SC  Dept Consumer Affairs | P.O. Box 5246, Columbia, SC 29250-5246 | Business License |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 474. | State of Utah | Dept Of Financial Institutions, P.O. Box 146800, Salt Lake City, Ut 84114-6800 | Business License |
| 475. | State of Wisconsin Dept. of Fin. Institution | 4822 Madison Yards Way, North Tower, Madison, WI 53705 | Annual Report |
| 476. | Stephens Cnty Tax Commissioner | 70 North Alexander St Rm 103, Toccoa, GA  30577 | Personal Property Tax |
| 477. | Stunkel Commercial LLC | Stunkel Commercial LLC, 1440 W Republic Rd Ste 144, Springfield, MO 65807 | Real Estate |
| 478. | Sue Chen Corporation | 222 Municipal Dr. Ste 138, Richardson, TX 75080 | Real Estate |
| 479. | Sulphur Springs Isd | Tax Office, 631 Connally, Sulphur Springs, TX 75482 | Personal Property Tax |
| 480. | Sumter County Treasurer | 13 East Canal, Sumter, SC 29150-4925 | Personal Property Tax |
| 481. | Suso 1 Highland LP | 729 Thompson Lane, Suite 200, Nashville, TN  37064 | Real Estate |
| 482. | Tallapoosa Cnty Judge of Prob | Judge Of Probate, 125 N Broadnax St Rm 126, Dadeville, AL  36853-1371 | Business License |
| 483. | Tameri Dunnam, Tax Collector | Union County Tax Assessor, P.O. Box 862, New Albany, MS 38652 | Personal Property Tax |
| 484. | Tangi East LLC No 1 | 70325 Hwy 1077, Suite 300, Covington, LA 70433 | Real Estate |
| 485. | Tax Administrator | P.O. Box 658, Somerset, KY 42502 | Municipal Tax |
| 486. | Tax Administrators Office | 321 West Main St. Room 117, Danville, KY 40422-1848 | Municipal Tax |
| 487. | Tax and Revenue Administration | 9811 109 St Nw, Edmonton, Ab T5K 2L5, Canada | Income Tax |
| 488. | Tax Assessor-Collector | P.O. Box 961018, Fort Worth, TX 76161-0018 | Personal Property Tax |
| 489. | Tax Trust Accountavenu | P.O. Box 830900, Birmingham, AL 35283-0900 | Business License |
| 490. | Tennessee Department of Revenue | 500 Deaderick Street, Nashville, TN 37242 | Business Tax |
| 491. | Tennessee Department of Revenue | 500 Deaderick Street, Nashville, TN 37242 | Franchise Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 492. | Tennessee Department of Revenue | 500 Deaderick Street, Nashville, TN 37242 | Sales and Use Tax |
| 493. | Texas City Isd | P.O. Box 48, Houston, TX 77001 | Personal Property Tax |
| 494. | The Necessity Retail REIT | 38 Washington Square, Newport, RI 2840 | Real Estate |
| 495. | Tippecanoe County Treasurer | 20 N 3rd Street, Lafayette, IN 47901-1218 | Personal Property Tax |
| 496. | Tipton County Trustee Office | 1 Pleasant Ave Room 203, Covington, TN  38019 | Personal Property Tax |
| 497. | Tmb Properties  LLC | D/B/A Tmb Properties LLC, 1951 Gibb Shoals Rd, Greenville, SC 29612 | Real Estate |
| 498. | Town of Grand Chute | Town Treasurer, 1900 W Grand Chute Blvd, Grand Chute, WI 54913-9613 | Personal Property Tax |
| 499. | Town of Greeneville | 200 North College Street, Greeneville, TN  37745 | Personal Property Tax |
| 500. | Town of Lexington | P.O. Box 397, Lexington, SC 29071 | Business License |
| 501. | Town of Mountain City | Sheila Shaw City Recorder, 210 South Church Street, Mountain City, TN  37683 | Personal Property Tax |
| 502. | Town of Rib Mountain | Treasurer, 227800 Snowbird Ave, Wausau, WI 544015828 | Personal Property Tax |
| 503. | Treasurer - City of Berea, KY | 212 Chestnut Street, Berea, KY 40403 | Municipal Tax |
| 504. | Troup County Tax Commissioner | 100 Ridley Ave, Lagrange, GA 30240 | Personal Property Tax |
| 505. | Tsca-227 Limited Partnership | 301 S. Sherman St. #100, Richardson, TX 75081 | Real Estate |
| 506. | Tuscaloosa County | 714 Greensboro Ave, Room 124, Tuscaloosa, AL  35401-1891 | Personal Property Tax |
| 507. | Tuscaloosa County License Commissioner | 2501 7th St., Suite 100, Tuscaloosa, AL  35401 | Business License |
| 508. | Union City | City Hall, 408 S Depot St, Union City, TN  38281 | Personal Property Tax |
| 509. | Victoria County Tax Ac | Ashley Hernandez, 205 N Bridge St Ste 101, Victoria, TX 77902-2569 | Personal Property Tax |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 510. | Vigo County Treasurer | Tax Processing Center, P.O. Box 1466, Indianapolis, IN 46206-1466 | Personal Property Tax |
| 511. | Village At Sandhill LLC | 101 Flintlake Road, Columbia, SC 29223 | Real Estate |
| 512. | Village of Bloomingdale | 201 S Bloomingdale Rd, , Bloomingdale, IL 60108-1487 | Business License |
| 513. | Village of Matteson | 4900 Village Commons, Matteson, IL 60443 | Business License |
| 514. | Village of Melrose Park | 1000 N. 25th Avenue, Melrose Park, IL 60160 | Business License |
| 515. | Village of North Riverside | 2401 S Desplaines Ave, North Riverside, IL 60546 | Business License |
| 516. | Village of South Holland | 16220 Wausau Avenue, South Holland, IL 60472 | Business License |
| 517. | Village of West Baraboo | 500 Cedar St, Baraboo, WI 53913 | Personal Property Tax |
| 518. | Village Properties Inc | 115 West Madison St, Pulaski, TN 38478 | Real Estate |
| 519. | Virginia Department of Taxation | P.O. Box 1500, Richmond, VA 23218- 1500 | Income Tax |
| 520. | Warren County Tax Collector | Antonia Flaggs-Jones, P.O. Box 351, Vicksburg, MS 39181 | Personal Property Tax |
| 521. | Warren County Trustee | 201 Locust St Ste P1, McMinnville, TN  37111 | Personal Property Tax |
| 522. | Washington Cnty Trustee -Tn | P.O. Box 215, Jonesborough, TN 37659 | Personal Property Tax |
| 523. | Washington State Department of Revenue | 2101 4th Ave Suite 1400, Seattle, WA 98121 | Excise Tax |
| 524. | Waterstone Southeast Investors LLC | Dba: Waterstone Southeast Spartan Portfolio LLC, 250 First Ave, Ste 202, Needham, MA  02494 | Real Estate |
| 525. | Waterstone Southeast Portfolio LLC | P.O. Box 20062, Pittsburgh, Pa 15251-0062 | Real Estate |
| 526. | Wcj Wilson 95 Ltd | 800 Eighth Avenue Ste 340, Kroger Shopg Ctr-Wil Jennings Mngmt, Fort Worth, TX 76104 | Real Estate |
| 527. | Wells Hubbard LP | 445 N Wells St. Ste #200, Chicago, IL 60654 | Real Estate |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 528. | West Ashley Shoppes | C/O Contenental Realty Corporation, P.O. Box 69475-415, Baltimore, MD 21264-9475 | Real Estate |
| 529. | Wharton County | Cindy Hernandez Tax A/C, P.O. Box 189, Wharton, TX 77488 | Personal Property Tax |
| 530. | White Spunner Realty Inc | 3201 Dauphin St, Suite A, Mobile, AL 36606 | Real Estate |
| 531. | Whitley County Occupational Tax Office | P.O. Box 268, Williamsburg, KY 40769 | Municipal Tax |
| 532. | Whlr-Freeway Junction LLC | 2929 Virginia Beach Blvd., Suite 200, Virginia Beach, VA 23452 | Real Estate |
| 533. | Whlr-Lagrange LLC | 2529 Virginia Beach Blvd, Suite 200, Virginia Beach, VA 23452 | Real Estate |
| 534. | Williamsburg County Code Enforcement Office | 201 West Main St, Kingstree, SC 29556 | Business License |
| 535. | Williamsburg County Treasurer | P.O. Box 150, Kingstree, SC 29556-0150 | Personal Property Tax |
| 536. | Williamson County Trustee | Karen Paris Trustee, P.O. Box 1365, Franklin, TN 370651365 | Personal Property Tax |
| 537. | Willow Court  LLC | 17890 Blanco Road, Suite 305, San Antonio, TX 78232 | Real Estate |
| 538. | Winston County | 16540 West Main Street, Louisville, MS 39339 | Personal Property Tax |
| 539. | Wisconsin Department of Revenue | 2135 Rimrock Rd, Madison, WI 53708 | Income Tax |
| 540. | Wisconsin Department of Revenue | 2135 Rimrock Rd, Madison, WI 53708 | Use Tax |
| 541. | Wood Lawrenceburg Ctr LLC | 321 Henry St, Lexington, KY 40508 | Real Estate |
| 542. | Wp Developments LLC | 500 N Akard St, Ste 3240, Dallas, TX 75266-0394 | Real Estate |
| 543. | Wyoming Secretary of State | Herschler Building East, Suite 101, 122 W 25th Street, Cheyenne, WY 82002-0020 | Annual Report |
| 544. | Y&O 240 LLC | 4 Rabel Lane #668, Oklahoma City, OK 73102 | Real Estate |

| No. | Vendor | Address | Tax Type |
|---|---|---|---|
| 545. | York County Treasurer | P.O. Box 116, York, SC 29745 | Personal Property Tax |

**Exhibit G**

**CVR Agreement**

*[DRAFT]*

CONTINGENT VALUE RIGHT AGREEMENT

BETWEEN

[REORGANIZED CURO]

AND

EQUINITI TRUST COMPANY, LLC

[●], 2024

Table of Contents

Page

Section 1.   Definitions .................................................................................................................. 1
Section 2.   Issuance of CVRs; Appointment of CVR Agent .................................................... 7
Section 3.   No Certificate; Register; Delivery of Book-Entry CVRs ...................................... 8
Section 4.   [Global CVR Certificates .................................................................................... 8
Section 5.   Transferability; Change of Address ..................................................................... 9
Section 6.   Duration and Exercise of CVRs ............................................................................ 10
Section 7.   Cancellation of CVRs .......................................................................................... 13
Section 8.   Fundamental Changes .......................................................................................... 13
Section 9.   Required Notices to Holders ................................................................................ 13
Section 10.  Information Rights ............................................................................................... 14
Section 11.  Abandonment of CVRs ........................................................................................ 15
Section 12.  [RESERVED] ....................................................................................................... 15
Section 13.  CVR Agent ........................................................................................................... 15
Section 14.  Holder Not Deemed a Shareholder ...................................................................... 19
Section 15.  Notices ................................................................................................................. 19
Section 16.  Supplements and Amendments ............................................................................ 20
Section 17.  Waivers ................................................................................................................. 21
Section 18.  Successors ............................................................................................................ 21
Section 19.  Headings ............................................................................................................... 21
Section 20.  Counterparts ......................................................................................................... 21
Section 21.  Severability .......................................................................................................... 21
Section 22.  Benefits of this Agreement .................................................................................. 22
Section 23.  Applicable Law; Jurisdiction; Waiver of Service and Venue; Waiver of Jury Trial ............... 22
Section 24.  Entire Agreement ................................................................................................. 23
Section 25.  Force Majeure ...................................................................................................... 23
Section 26.  Further Assurances .............................................................................................. 23
Section 27.  Confidentiality ..................................................................................................... 23
Section 28.  Termination .......................................................................................................... 23

EXHIBITS
Exhibit A              Form of CVR Exercise Notice
[Exhibit B             Form of Global CVR Certificate]

## CONTINGENT VALUE RIGHT AGREEMENT

This Contingent Value Right Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "Agreement"), dated as of [●], 2024, between [Reorganized Curo], a Delaware limited liability company (the "Company")[1], and Equiniti Trust Company, LLC, a New York limited liability trust company (the "CVR Agent"). Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings set forth in Section 1.

### RECITALS

WHEREAS, on March 25, 2024, the Company and certain of its affiliates commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Texas, Houston Division (the "Bankruptcy Court"), and concurrently filed their *Joint Prepackaged Plan of Reorganization of CURO Group Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be modified, amended, or supplemented, the "Plan");

WHEREAS, on May [●], 2024, the Bankruptcy Court entered an order confirming the Plan;

WHEREAS, in accordance with the terms and conditions of the Plan, the Company shall issue and deliver contingent value rights ("CVRs") governed by this Agreement that, upon exercise, shall be settled solely for Cash Payments (as defined herein) to the holders of Existing CURO Interests (as defined herein);

WHEREAS, each CVR is a contractual right, providing the registered owner thereof the right to receive contingent cash payments if and to the extent payable pursuant to the terms and conditions of this Agreement; and

WHEREAS, the Company desires to appoint the CVR Agent as its agent with respect to the CVRs pursuant to the terms of this Agreement, and the CVR Agent desires to accept such appointment.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the Company and the CVR Agent hereto agree as follows:

Section 1.     Definitions.  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any references to any federal, state, local or foreign statute or law shall also refer to all rules and regulations promulgated thereunder, unless the context otherwise requires.  Unless the context otherwise requires:  (a) a term has the meaning assigned to it by this Agreement; (b) forms of the word "include" mean that the inclusion is not limited to the items listed; (c) "or" is disjunctive but not exclusive; (d) words in the singular include the plural, and in the plural include the singular; (e) provisions apply to successive events and transactions; and (f) "hereof", "hereunder", "herein" and "hereto" refer to the entire Agreement and not any

---

[1] **Note to Draft:**  Issuer to be confirmed pending finalization of post-emergence corporate structure and classification of the Company for U.S. federal income tax purposes, which, depending on the post-emergence corporate structure, may also require additional modifications to this Agreement.

section or subsection.

The following terms used in this Agreement shall have the meanings set forth below:

"$" means the currency of the United States.

"Accredited Investor" has the meaning set forth in Rule 501(a) under Regulation D of the Securities Act.

"Affiliate" of a specified Person means any other Person who directly or indirectly controls, is controlled by, or is under common control with such specified Person.  For purposes of the preceding sentence, "control" of a Person means possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of the management and policies of such Person through ownership of voting securities (or other ownership interests), contract, voting trust or otherwise.

"Aggregate Implied Exercise Price" means $[●][2] plus (b) the Aggregate Incremental Capitalization, in each case as of the applicable date of determination.

"Aggregate Incremental Capitalization" means, as of any date of determination, the aggregate amount of all net cash proceeds from equity raised by the Company or its successor or ultimate parent entity (including through issuance of any Equity Securities) (a) during the period after the Original Issue Date and before or as of the applicable date of determination and (b) for purposes of funding the Company's or its successor or ultimate parent entity's, or any of their respective Subsidiaries', business operations from and after the Original Issue Date[; *provided*, that the Aggregate Incremental Capitalization amount shall be reduced dollar-for-dollar by any dividend paid or distribution made in respect of the Common Units (or other equity interests issued by the Company or its direct or indirect parent or subsidiaries) during the same period, including any special dividends issued in connection with, or as a result of, a Fundamental Change].[3]

"Aggregate Market Value" means (a) the Market Price of a Common Unit *multiplied by* (b) the number of all Common Units issued and outstanding, in each case as of the applicable date of determination.

"Applicable Procedures" means, with respect to any transfer or exchange of, any exercise of or payment of, or any notice to any holder of any CVRs evidenced by a Global CVR Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"Appropriate Officer" means the Chief Executive Officer, the Chief Financial Officer, the Chief Accounting Officer, the Chief Legal and Administrative Officer and the Treasurer of the

---

[2] **Note to Draft**:  Number equal to (x) the sum of (i) the aggregate amount of the prepetition corporate-level debt of the Company (including principal, prepayment premium, interest, fees and any other amounts payable with respect to the Prepetition 1L Term Loan Claims, Prepetition 1.5L Notes and Prepetition 2L Notes, regardless of whether allowable under the Bankruptcy Code) as of immediately prior to the Effective Date, and (ii) the aggregate amount of the DIP Term Loans and other obligations under the DIP Credit Agreement (including principal, interest, fees and any other amounts payable with respect thereto) as of immediately prior to the Effective Date, *minus* (y) the sum of (i) the outstanding principal amount of Reorganized Curo's corporate-level debt immediately after the Effective Date, and (ii) all amounts paid in cash in respect of the items described in clause (x) on the Effective Date.

[3] **Note to Draft**:  Subject to further discussion.

Company, and such additional officers of the Company as may be designated as such by the Board of Directors from time to time.

"beneficial ownership" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular person, such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.  The terms "beneficially own" and "beneficially owned" have a corresponding meaning.

"Board of Directors" means the board of directors (or equivalent governing body) of the Company or its successor or ultimate parent entity, or any duly authorized committee of that board or equivalent governing body.

"Business Day" means any day other than Saturday, Sunday or any other day on which national banking associations in the State of New York generally are closed for commercial banking business.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Units" means the limited liability company interests of the Company designated as Common Units in the LLC Agreement, or the common equity interests in any successor or ultimate parent entity of the Company.

"Company Order" means a written request or order signed in the name of the Company by an Appropriate Officer and delivered to the CVR Agent.

["Depositary" means DTC and its successors as depositary hereunder.

"DTC" means The Depository Trust Company.][4]

"Equity Securities" means, with respect to an entity, any units or shares of any class of common equity capital of such entity.

"Exchange" means the principal U.S. national or regional securities exchange on which the Common Units are then listed or, if the Common Units are not then listed on a U.S. national or regional securities exchange, the principal other market on which the Common Units are then traded.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exercise Date" means any date of the exercise of the CVRs pursuant to Section 6.

"Existing CURO Interests" has the meaning given to it in the Plan.

---

[4] **Note to Draft**: Bracketed language relating to inclusion of definitions of DTC and Depositary are dependent upon receiving DTC approval following the confirmation of the Plan and prior to the Original Issue Date.

3

"Fundamental Change" means any (a) acquisition of ownership, directly or indirectly, beneficially or of record, by any Person of Equity Securities representing more than fifty percent (50%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Securities of the Company, other than any transaction, including any consolidation or merger, pursuant to which the holders of the Equity Securities of the Company as of immediately prior to such transaction own Equity Securities representing fifty percent (50%) or more of the aggregate ordinary voting power of the surviving company or parent thereof immediately after such transaction (a "Change of Control Transaction"), (b) sale, lease, transfer or other disposition of all or substantially all of the assets of the Company and its Subsidiaries (by value) to a Person other than the Company or any of its direct or indirect Subsidiaries, or (c) voluntary or involuntary liquidation, dissolution or winding up of the Company.  To qualify as a Fundamental Change, a transaction must be either (X) a *bona fide* arms'-length transaction with a Person that is not a Related Party or (Y) a *bona fide* arms'-length transaction with a Related Party; provided that, in the case of this clause (Y), the Company obtains the approval of such transaction from a majority of the disinterested directors on the Board of Directors who are not Affiliates of the applicable Related Party or who were not appointed to the Board of Directors by the applicable Related Party. Notwithstanding the foregoing, none of the following shall, in and of itself, constitute a Fundamental Change:  (1) any transaction for the purpose of changing the legal form of the Company or any of its Subsidiaries or parent companies, (2) any transaction undertaken in connection with and reasonably relating to the consummation of an IPO, (3) any transaction undertaken primarily in connection with and reasonably relating to intercompany or internal restructuring, (4) any recapitalization, reclassification or conversion of the equity interests of the Company or any of its Subsidiaries or parent companies in which equityholders of the Company receive securities with substantially similar economic and other rights, privileges and preferences (with respect to the surviving entity or ultimate parent entity thereof) as those possessed by the equity interests of the Company held by such equityholder (with respect to the Company), and in the same *pro rata* proportion as the relative number of equity interests held by such equityholders in the Company, in each case immediately prior to the consummation of such transaction, or (5) any other transactions similar to the foregoing, or for similar, complementary or related purposes, which in each case are not in the nature of a third-party merger or acquisition.

["Global CVR Certificate" means a certificate for CVRs in global form, deposited with or on behalf of and registered in the name of the Depositary or its nominee, that has the "Schedule of Decreases of CVRs" attached thereto, substantially in the form attached as Exhibit B.]

"Governmental Entity" means United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency or commission or any judicial or arbitral body.

"Holder" means a Person in whose name a CVR is registered in the CVR Register.

"IPO" means an underwritten public offering of Equity Securities of the Company (or a successor or ultimate parent entity) that results in such common Equity Securities of the Company or such successor or ultimate parent entity being listed on a Principal Exchange that results in no less than $50 million of proceeds.

4

"LLC Agreement" means the Limited Liability Company Agreement of the Company, effective as of the Effective Date (as defined in the Plan), as amended from time to time.

"Market Price" means (a) if the Common Units are listed on a Principal Exchange on the Trading Day immediately preceding the applicable date of determination, the volume-weighted average price of such Common Units as reported in composite transactions for United States exchanges and quotation systems for the twenty (20) consecutive Trading Days immediately preceding the applicable date of determination, as displayed under the heading "Bloomberg VWAP" on the applicable Bloomberg page (or if Bloomberg is no longer reporting such price information, such other service reporting similar information as shall be selected by the Company) for such Common Units in respect of the period from the scheduled open of trading twenty (20) Trading Days prior to the applicable date of determination until the scheduled close of trading of the primary trading session on the Trading Day immediately preceding the applicable date of determination (unless the Common Units have been listed on a Principal Exchange for less than twenty (20) Trading Days prior to the applicable date of determination, in which case the Market Price shall be the volume-weighted average price of a Common Unit for however many Trading Days the Common Units have been listed prior to the applicable date of determination); (b) if the Common Units are not listed on a Principal Exchange on the Trading Day immediately preceding the applicable date of determination, but are listed on any other Exchange, the volume-weighted average price of such Common Units on such Exchange for the twenty (20) consecutive Trading Days immediately preceding the applicable date of determination, as reported by such Exchange, or, if not so reported, a service reporting such information as shall be selected by the Company (unless the Common Units have been listed on such Exchange for less than twenty (20) Trading Days prior to the applicable date of determination, in which case the Market Price shall be the volume-weighted average price of a Common Unit for however many Trading Days the Common Units have been listed prior to the applicable date of determination); or (c) in the case of Common Units not covered by clauses (a) and (b) above, the Market Price of such Common Units shall be determined by (i) the Board of Directors, in its reasonable good faith judgment, or (ii) if the applicable Holder shall have a good faith objection to the Market Price so determined by the Board of Directors and notifies the Board of Directors of such objection within twenty (20) Business Days of receiving the Board of Directors' determination of the Market Price in the Market Price Notice (as defined herein), then by a nationally recognized valuation firm selected by the Board of Directors (the "Valuation Bank"), using one or more valuation methods that the Valuation Bank in its best professional judgment determines to be most appropriate; provided that in the event of a determination of Market Price at a time that the Company is party to a definitive agreement for a Change of Control Transaction or a private sale transaction as described in Section 6(b)(ii), the Market Price shall be equal to the total amount of consideration to be received in respect of a Common Unit in such Change of Control Transaction or private sale transaction described in Section 6(b)(ii), it being agreed, in the case of any non-cash consideration, that (x) to the extent such non-cash consideration consists of Equity Securities that are listed on a Principal Exchange or any other Exchange, the amount of such consideration shall be determined in accordance with clauses (a) and (b) above, which shall be applied to such securities *mutatis mutandis* as if they were Common Units, and (y) with respect to any other non-cash consideration, the amount of such consideration shall be the fair market value thereof, as determined by the Board of Directors in its reasonable good faith judgment.

"Original Issue Date" means the Effective Date (as defined in the Plan).

"outstanding" when used with respect to any CVRs, means, as of the time of determination, all CVRs theretofore originally issued under this Agreement except (a) CVRs that have been exercised pursuant to Section 6, (b) CVRs that have expired, terminated or become void or canceled pursuant to this Agreement and (c) CVRs that have otherwise been acquired by the Company.

"Permitted Transfer" means: (a) the Transfer (upon the death of the Holder) by will or intestacy; (b) a Transfer by instrument to an *inter vivos* or testamentary trust in which the CVRs are to be passed to beneficiaries upon the death of the grantor or the trustee, as applicable; (c) Transfers to any trust for the direct or indirect benefit of the Holder or the immediate family of the Holder, (d) Transfers to any beneficiaries of the Holder, including immediate family members or to any custodian or trustee of any trust, partnership, or limited liability company for the direct or indirect benefit of the Holder or the immediate family of the Holder, (e) Transfers to any family member of the Holder, or any entity all of the interests of which are held directly or indirectly for the benefit of any one or more family members of the Holder, in connection with the Holder's estate or tax planning, retirement or similar arrangements, (f) Transfers made pursuant to a court order of a court of competent jurisdiction in connection with divorce, bankruptcy or liquidation; or (g) a Transfer made by operation of law (including a consolidation or merger) or in connection with the dissolution, liquidation or termination of any corporation, limited liability company, partnership or other entity, in each such case made in compliance with applicable securities laws. A "Permitted Transferee" means any transferee in a Permitted Transfer.

"Person" means any natural person, corporation, partnership, firm, joint venture, limited liability company, unincorporated organization, trust, estate, Governmental Entity or other entity or organization.

"Plan Effective Date" means the Effective Date (as defined in the Plan).

"Principal Exchange" means each of the following Exchanges: The New York Stock Exchange, NYSE American, The NASDAQ Global Market and The NASDAQ Global Select Market (or any of their respective successors).

"Pro Rata Percentage" means, with respect to a Holder, the percentage equal to (a) the total number of CVRs held by such Holder as of the applicable date of determination, *divided by* (b) the number of Initial CVRs.

"Related Party" means (a) any director, officer or Affiliate of the Company or any of its Subsidiaries, and (b) each equityholder of the Company with a Governance Percentage Interest (as such term is defined in the LLC Agreement as of the date of this Agreement) in excess of 5% at the time of the relevant determination (calculated on an aggregate basis together with any other equityholders that are Affiliates of the relevant equityholder, and any of its or their related funds, investment vehicles and managed accounts), and each of their Affiliates and portfolio companies.

"Required CVR Holders" means Holders [(or beneficial holders in the case of CVRs evidenced by a Global CVR Certificate)] holding a majority of the then-outstanding CVRs and/or the interests therein.

"Securities Act" means the Securities Act of 1933, as amended.

6

"Subsidiary" means, with respect to any Person, any corporation, partnership, firm, joint venture, limited liability company, unincorporated organization, or other entity or organization, whether incorporated or unincorporated, (a) of which such first Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions, (b) of which such first Person is a general partner or managing member or (c) that is otherwise controlled by such first Person.

"Trading Day" means a day on which trading in the Common Units (or other applicable security) generally occurs on the principal exchange or market on which the Common Units (or other applicable security) are then listed or traded.

"Transfer" means any transfer, sale, assignment, pledge, hypothecation or other disposition, whether direct or indirect and whether voluntary or involuntary, or any agreement to transfer, sell, assign, pledge, hypothecate or otherwise dispose, including any such transfer, sale, assignment, pledge, hypothecation, disposition by operation of law or otherwise to an heir, successor or assign.  The term "Transferred" shall have a correlative meaning.

Section 2.    Issuance of CVRs; Appointment of CVR Agent.

(a)    The CVRs represent the contractual rights of Holders to receive Cash Payments if and to the extent payable pursuant to the terms of this Agreement.  On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan, on the Original Issue Date the Company shall issue and cause to be delivered to holders of Existing CURO Interests [the CVRs in global form registered in the name of Cede & Co., as nominee for DTC, by causing DTC (subject to Section 2(b)) to credit the account or accounts in which such holders held their respective Existing CURO Interests immediately prior the Plan Effective Time,][5] the aggregate number of CVRs to be issued hereunder, *pro rata* based on the number of Existing CURO Interests held by each such holder immediately prior to the Plan Effective Time.

(b)    [Prior to the Original Issue Date or as soon as reasonably practicable thereafter, the Company, to the extent possible, shall (i) cause the CVRs to be declared eligible for clearance and settlement through DTC and (ii) cause DTC to credit the CVRs to the account or accounts in which the holders of Existing CURO Interests held their respective Existing CURO Interests in accordance with Section 2(a).]

(c)    The Company hereby appoints the CVR Agent to act as agent for the Company with respect to the CVRs in accordance with the express terms and on the conditions set forth in this Agreement, and the CVR Agent hereby accepts such appointment.

(d)    The maximum aggregate number of CVRs that may be outstanding under this Agreement is limited to the number of CVRs that are issued hereunder in accordance with Section 2(a), which number is [●] and which CVRs were outstanding as of the Original Issue Date (the "Initial CVRs").  The number of outstanding CVRs at any given time may be less than the number of Initial CVRs, if reduced in accordance with Section 7.  From and after the Original

---

[5] **Note to Draft**:  Bracketed language relating to the CVRs being held through DTC is dependent upon receiving DTC approval following the confirmation of the Plan and prior to the Original Issue Date.

Issue Date, the Company shall not be permitted to issue any additional CVRs under this Agreement.

(e)     The CVRs shall entitle each Holder thereof, upon proper exercise, to receive from the Company an amount in cash equal to (i) such Holder's Pro Rata Percentage as of the Exercise Date, *multiplied by* (ii) (A) 7.5%, *multiplied by* (B) the difference calculated as (x) the Aggregate Market Value as of the Exercise Date *less* (y) the Aggregate Implied Exercise Price as of the Exercise Date (such cash amount, the "Cash Payment").  For the avoidance of doubt, if the foregoing calculation of the Cash Payment to be made results in zero or a negative number, then no Cash Payment shall be due.

Section 3.     No Certificate; Register; Delivery of Book-Entry CVRs.

(a)     The CVRs shall not be certificated[ other than in the form of a Global CVR Certificate registered in the name of the Depositary or its nominee].  [The CVRs shall be issued by book-entry registration ("Book-Entry CVRs"), registered in the names of the Holders of such CVRs. ] The CVR Agent shall keep a register (the "CVR Register") for the registration of CVRs in a book-entry position for each Holder.  The CVR Register shall set forth the name and address of each Holder and the number of CVRs held by such Holder.  The CVR Register will be updated as necessary by the CVR Agent to reflect the removal of Holders (including in accordance with Section 7), and upon receipt of such information with respect to any new Holder by the CVR Agent.  The parties hereto and their Affiliates or representatives may receive and inspect a copy of the CVR Register, from time to time, upon request made to the CVR Agent.

(b)     [Upon written order of the Company, the CVR Agent shall register in the CVR Register the Book-Entry CVRs.]

Section 4.     [Global CVR Certificates.

(a)     So long as a Global CVR Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("Agent Members") shall have no rights under this Agreement with respect to the CVRs evidenced by such Global CVR Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Company, the CVR Agent and any agent of the Company or the CVR Agent as the absolute owner of such CVRs, and as the sole Holder of such Global CVR Certificate, for all purposes.  Accordingly, any such Agent Member's beneficial interest in such CVRs will be shown only on records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the CVR Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the CVR Agent or any agent of the Company or the CVR Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(b)     Any holder of a beneficial interest in CVRs evidenced by a Global CVR Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such beneficial interest, agree that ownership of a beneficial interest in CVRs evidenced by a Global

8

CVR Certificate shall be reflected solely in book-entry form through a book-entry system maintained by the Depositary as the Holder of such Global CVR Certificate (or its agent).

(c)     Transfers of a Global CVR Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees.

(d)     The holder of a Global CVR Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder of a CVR is entitled to take under this Agreement or such Global CVR Certificate.

(e)     Each Global CVR Certificate will evidence such of the outstanding CVRs as will be specified therein and each shall provide that it evidences the aggregate number of outstanding CVRs from time to time endorsed thereon and that the aggregate number of outstanding CVRs evidenced thereby may from time to time be reduced, to reflect exercises, expirations or cancellations.  Any endorsement of a Global CVR Certificate to reflect the amount of any decrease in the aggregate number of outstanding CVRs evidenced thereby will be made by the CVR Agent in accordance with Section 7.

(f)     At such time as all CVRs evidenced by a particular Global CVR Certificate have been exercised, terminated, become void or expired in whole and not in part, such Global CVR Certificate shall, if not in custody of the CVR Agent, be surrendered to or retained by the CVR Agent for cancellation.

(g)     The Company initially appoints DTC to act as Depositary with respect to any Global CVR Certificates.]

Section 5.     Transferability; Change of Address.

(a)     The CVRs shall not be Transferred other than [(a) the Transfer of the Global CVR Certificate in accordance with Section 4(c) and (b)] in a Permitted Transfer to a Permitted Transferee in compliance with applicable securities laws and the procedural requirements of this Agreement, including Section 5(b).  Any final determination regarding whether a proposed transferee is a Permitted Transferee shall be made by the Company, in its discretion, pursuant to Section 5(b).  Any attempted Transfer of CVRs, in whole or in part, in violation of this Section 5(a) shall be void *ab initio* and of no effect.  The CVRs will not be listed on any quotation system or traded on any securities exchange. It is the intention of the parties that the CVRs not be, or deemed to be, securities as defined in the Securities Act and applicable U.S. securities laws and regulations.

(b)     Subject to the restrictions on transferability set forth in Section 5(a), every request made to Transfer a CVR to a Permitted Transferee must be made in writing to the Company and the CVR Agent and set forth in reasonable detail the circumstances related to the proposed Transfer, and such request must be accompanied by a written instrument or instruments of transfer and any other requested information or documentation in a form reasonably satisfactory to the Company and the CVR Agent, duly and validly executed by the registered Holder or Holders thereof or by the duly appointed legal representative thereof or by a duly authorized attorney. Upon receipt of such a written Transfer request, the Company shall, subject to its reasonable

determination that the Transfer instrument is in proper form and the Transfer otherwise complies with the other terms and conditions of this Agreement (including the provisions of <u>Section 5(a)</u>), instruct the CVR Agent in writing to register the Transfer of the CVRs in the CVR Register.  All duly Transferred CVRs registered in the CVR Register shall be the valid obligations of the Company, evidencing the same rights and entitling the transferee to the same benefits and rights under this Agreement as those held immediately prior to the Transfer by the transferor.  No Transfer of a CVR shall be valid until registered in the CVR Register, and any Transfer not duly registered in the CVR Register will be void *ab initio* (unless the Transfer was permissible hereunder and such failure to be duly registered is attributable to the fault of the CVR Agent to be established by clear and convincing evidence).  Any Transfer of the CVRs shall be without charge to the Holder; <u>provided</u> that the Company and the CVR Agent may require (i) evidence of payment of a sum sufficient to cover any stamp, documentary, registration, or other tax or governmental charge that is imposed in connection with such Transfer or the registration of such Transfer (or evidence that such taxes and charges are not applicable), or (ii) that the transferor establish to the reasonable satisfaction of the CVR Agent that such taxes have been paid.  The CVR Agent shall have no obligation to pay any such taxes or charges and the CVR Agent shall have no duty or obligation to take any action under any section of this Agreement that requires the payment by a Holder of such taxes or charges unless and until the CVR Agent is satisfied that all such taxes or charges have been paid.  Additionally, the fees and costs related to any legal opinion requested under this <u>Section 5(b)</u> shall be the responsibility of the Holder.

(c)     A Holder may make a written request to the CVR Agent to change such Holder's address of record in the CVR Register.  The written request must be duly and validly executed by the Holder.  Upon receipt of such written notice, the CVR Agent shall promptly record the change of address in the CVR Register.

Section 6.     <u>Duration and Exercise of CVRs</u>.

(a)     Subject to the terms of this Agreement, including Section 8 hereof, each Holder shall be entitled to exercise the CVRs held by such Holder on any Business Day from and after the Original Issue Date until 5:00 p.m., New York City time, on the tenth (10th) anniversary of the Original Issue Date or, if not a Business Day, then the next Business Day thereafter (the "<u>Expiration Date</u>").  At 5:01 p.m., New York City time, on the Expiration Date (or immediately prior to such earlier time as the CVRs may be canceled pursuant to <u>Section 8</u> in connection with a Fundamental Change), any CVRs in respect of which no CVR Exercise Notice has been received ("<u>Unexercised CVRs</u>") shall be deemed to be automatically exercised by the applicable Holders for the purposes of this Agreement (without the requirements of <u>Section 6(b)</u> and Section 6(c) below being completed), it being understood, for the avoidance of doubt, that the Cash Payment due upon such exercise shall be calculated pursuant to Section 2(e) and there is no certainty that a Cash Payment will be due.

(b)     Subject to the terms of this Agreement, the CVRs may only be exercised as follows:

(i)     at any time following the consummation of an IPO; and

10

(ii)     for twenty (20) Business Days following the receipt of notice pursuant to Section 9(c) of the consummation of any private sale by the Company of Common Units or other Equity Securities of the Company or its Subsidiaries or direct or indirect parent for aggregate cash consideration of not less than $50,000,000.

(c)     In order to validly exercise the CVRs, a Holder must provide a written notice of such Holder's election ("CVR Exercise Notice") to exercise the CVRs held by such Holder to the Company and the CVR Agent in accordance with the notice information set forth in Section 15 by no later than 5:00 p.m., New York City time, on the earlier of (i) the Expiration Date and (ii) if the CVRs are being exercised pursuant to Section 6(b)(ii), the last day of the 20 Business Day period referred to in Section 6(b)(ii), which CVR Exercise Notice shall be substantially in the form set forth in Exhibit A hereto, properly completed and duly executed by the Holder (such Holder who provides a valid CVR Exercise Notice, an "Exercising Holder").

(d)     Any exercise of CVRs pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms; provided that if upon such exercise, the Market Price is determined pursuant to clause (c) of the definition thereof, the Holder may withdraw its CVR Exercise Notice no later than twenty (20) Business Days after receiving the Market Price Notice.

(e)     The CVR Agent shall:

(i)     examine all CVR Exercise Notices and all other documents delivered to it by or on behalf of the Holders as contemplated hereunder to ascertain whether or not, on their face, such CVR Exercise Notices and any such other documents have been executed and completed in accordance with their terms and the terms and conditions hereof;

(ii)     where a CVR Exercise Notice or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the CVRs exists, (A) inform the appropriate parties (including the Person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled; and (B) inform the Company of and cooperate with and assist the Company in resolving any discrepancies between CVR Exercise Notices received and delivery of CVRs to the CVR Agent's account; and

(iii)     advise the Company no later than three (3) Business Days after receipt of a CVR Exercise Notice, of (A) the receipt of such CVR Exercise Notice and the number of CVRs exercised in accordance with the terms and conditions of this Agreement and (B) such other information as the Company shall reasonably require.

(f)     All questions as to the validity, form and sufficiency (including time of receipt) of a CVR Exercise Notice will be determined by the Company in good faith and its reasonable discretion.  The CVR Agent shall incur no liability for or in respect of such determination by the Company.  The Company reserves the right (acting in good faith and using its reasonable discretion) to reject any and all CVR Exercise Notices not in proper form in any material respect.  Moreover, the Company reserves the absolute right to waive any of the

conditions to the exercise of CVRs or defects in CVR Exercise Notices with regard to any particular exercise of CVRs.

(g)     As soon as practicable after the final determination of any Cash Payment due to an Exercising Holder as set forth herein, (i) the Company shall deposit an amount in cash equal to (A) the Cash Payment due to such Exercising Holder *plus* (B) the aggregate sum of any Cash Payments due to other Exercising Holders with respect to whom final determinations of Cash Payments due are made at substantially the same time, with the CVR Agent on behalf of all such Exercising Holders (such amount, together, the "Aggregate Cash Payments"), and (ii) the CVR Agent shall transfer to each Exercising Holder from the Aggregate Cash Payments an amount equal to the Cash Payment due to such Exercising Holder by check mailed to the address of such Exercising Holder as reflected in the CVR Register, or, if an Exercising Holder has provided the CVR Agent with wire transfer instructions meeting the CVR Agent's requirements prior to the date on which the Company deposits the Aggregate Cash Payments with the CVR Agent, by wire transfer of immediately available funds to such account(s) specified in such wire transfer instructions, in each case within five (5) Business Days of receipt by the CVR Agent of the Aggregate Cash Payments from the Company (the date on which the applicable Cash Payment is made to an Exercising Holder by the CVR Agent, the "CVR Payment Date")[; provided that any Cash Payments to be made to holders of beneficial interests in CVRs evidenced by a Global CVR Certificate shall be made to such beneficial holders in accordance with the Applicable Procedures].

(h)     The Company and the CVR Agent will be entitled to deduct and withhold, or cause to be deducted or withheld, from the Cash Payments or any other amount payable pursuant to this Agreement, such amount as the Company or the CVR Agent is required to deduct and withhold with respect to the making of any such payment under the Code, or any provision of state, local or non-U.S. tax law.  The Holders will deliver to the Company or the CVR Agent, as applicable, at the time or times reasonably requested by the Company or the CVR Agent, as applicable, such properly completed and executed documentation reasonably requested by the Company or the CVR Agent, as applicable, as will permit the Company or the CVR Agent to determine the appropriate amount of withholding.  To the extent that amounts so deducted or withheld are paid over to or deposited with the relevant Governmental Entity, deducted or withheld amounts will be treated for all purposes of this Agreement as having been paid to a Holder in respect of which such deduction and withholding was made.

(i)     If the Company requests in writing to the CVR Agent, any funds comprising the Aggregate Cash Payments deposited by the Company with the CVR Agent under Section 6(g) that remain undistributed to an Exercising Holder twelve (12) months after the applicable CVR Payment Date shall be delivered to the Company by the CVR Agent and the applicable Exercising Holder who has not theretofore received payment in respect of its applicable CVRs shall thereafter look only to the Company for payment of such amounts, subject to any applicable escheatment laws in effect from time to time.  Upon delivery of such funds to the Company, the escheatment obligations of the CVR Agent with respect to such funds shall terminate.  Notwithstanding any other provisions of this Agreement, any portion of the funds provided by or on behalf of the Company to the CVR Agent that remains unclaimed thirty-six (36) months after termination of this Agreement in accordance with Section 19 (or such earlier date immediately prior to such time as such amounts would otherwise escheat to, or become property of, any Governmental Entity) shall, to the extent permitted by law, become the property of the Company, free and clear of any

claims or interest of any Person previously entitled thereto, subject to any applicable escheatment laws in effect from time.

(j)      All funds received by the CVR Agent under this Agreement that are to be distributed or applied by the CVR Agent in the performance of services hereunder (the "Funds") shall be held by the CVR Agent as agent for the Company and deposited in one or more bank accounts to be maintained by the CVR Agent in its name as agent for the Company, and such funds shall be free of any claims by the Company other than reversionary rights and as set forth in Section 6(i), and separate from any potential bankruptcy estate of the Company.   Until paid pursuant to the terms of this Agreement, the CVR Agent will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.).  The CVR Agent shall have no liability for any diminution of the Funds that may result from any deposit made by the CVR Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party, except as a result of the CVR Agent's willful misconduct, fraud, bad faith or gross negligence (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything to the contrary herein, the Company shall be responsible for providing the CVR Agent with sufficient funds to satisfy its payment obligations to Holders.

Section 7.      Cancellation of CVRs.  If (a) an Exercising Holder exercises the CVRs held by it (and does not validly withdraw its CVR Exercise Notice pursuant to Section 6(d)) or (b) any CVRs are abandoned in accordance with Section 11, such exercised or abandoned CVRs, as applicable, shall thereupon be canceled, and the CVR Agent shall amend the CVR Register accordingly to reflect the cancellation of such CVRs.  [In the case of the cancellation of CVRs evidenced by a Global CVR Certificate, the CVR Agent shall cause the custodian of DTC to endorse the "Schedule of Decreases of CVRs" attached to such Global CVR Certificate to reflect the CVRs being canceled.]

Section 8.      Fundamental Changes.  In the event that the Company shall, at any time or from time to time after the Original Issue Date while the CVRs remain outstanding and unexpired in whole or in part, consummate a Fundamental Change, any Unexercised CVRs shall be deemed to be automatically exercised by the applicable Holders as set forth in Section 6(a) and each CVR shall be automatically canceled effective upon the date of consummation of such Fundamental Change (after which such CVR shall be void and may no longer be exercised) for no consideration other than as set forth in Section 6(a) (and for the avoidance of doubt no new CVRs shall be issued).

Section 9.      Required Notices to Holders.

(a)      If the Company enters into a definitive agreement in connection with, or the Board resolves to approve the Company's entry into or undertaking of, a Fundamental Change, the Company shall give written notice (a "Company Fundamental Change Notice") to the CVR Agent as soon as reasonably practicable but not less than ten (10) Business Days prior to the effective date of such Fundamental Change (or the applicable record date for such Fundamental Change if earlier), and the CVR Agent shall provide written notice (a "Holder Fundamental Change Notice") to the Holders of such Fundamental Change (and the record date for such

Fundamental Change, if applicable), within three (3) Business Days after receipt of such notice from the Company.  Each of the Company Fundamental Change Notice and the Holder Fundamental Change Notice shall specify the proposed effective date of the Fundamental Change and the record date (if applicable) and the material terms of such Fundamental Change.

(b)     The Company shall calculate the Market Price, the Aggregate Market Value, the Aggregate Implied Exercise Price and the corresponding Cash Payment (if any) due to each Exercising Holder as set forth in Section 2(e), within ten (10) Business Days of receiving the applicable CVR Exercise Notice(s), unless the Market Price is determined pursuant to clause (c) of the definition thereof or clause (y) of the last proviso thereof, in which case the Company shall calculate the Market Price, the Aggregate Market Value, the Aggregate Implied Exercise Price and the corresponding Cash Payment (if any) due to each Exercising Holder, within twenty (20) Business Days of receiving the applicable CVR Exercise Notice(s).  The Company shall deliver a written notice to the CVR Agent setting forth the Market Price, the Aggregate Market Value, the Aggregate Implied Exercise Price and the corresponding Cash Payment (if any) due to each Exercising Holder (the "Market Price Notice") no later than five (5) Business Days after it has calculated such amounts, and the CVR Agent shall, on behalf the Company, provide notice to each Exercising Holder of the Market Price, the Aggregate Market Value, the Aggregate Implied Exercise Price and the corresponding Cash Payment (if any) due to such Exercising Holder, each as calculated by the Company, within three (3) Business Days after the CVR Agent's receipt of the Market Price Notice from the Company.  For the avoidance of doubt, if the Market Price is determined pursuant to clause (c) of the definition thereof, then the final determination of the Market Price with respect to an Exercising Holder, and the corresponding Cash Payment (if any) due to such Exercising Holder, shall be subject to the procedures set forth in clause (c)(ii) of the definition of Market Price.

(c)     If the Company consummates a private sale of Common Units or other Equity Securities of the Company for aggregate cash consideration of not less than $50,000,000, the Company shall promptly give notice of such private sale to the CVR Agent, and the CVR Agent shall promptly provide written notice to the Holders of such private sale after receipt of such written notice from the Company.

(d)     The failure to give the notice required by Section 9(a) or Section 9(c) or any defect therein shall not affect the legality or validity of any action, sale, dissolution, liquidation or winding up of the Company; provided that the Holders maintain all legal rights and remedies under this Agreement with respect to any action required to be taken by the Company under this Agreement in connection with, or as a result of, a Fundamental Change.

Section 10.     Information Rights.  Each Holder, by virtue of being a Holder listed in the CVR Register, shall be entitled to the same information rights of the Members (as defined in the LLC Agreement) that are set forth in Section 11.4 of the LLC Agreement as of the date of this Agreement, subject to the same obligations of Members that are set forth in Section 11.17 of the LLC Agreement in respect of any information received pursuant to such information rights, as if each reference therein to one or more "Members" were deemed instead a reference to one or more "Holders."  For the avoidance of doubt, the rights and obligations of Holders under this Section 10 shall not be modified or changed as a result of any amendments or modifications of Sections 11.4 or 11.17 of the LLC Agreement effected from time to time after the date of this Agreement in

accordance with the terms of the LLC Agreement; <u>provided</u> that, to the extent that any such amendment or modification changes the section number where any information rights or confidentiality obligations of Members of the type set forth in Section 11.4 and Section 11.17, respectively, are set forth in the LLC Agreement, the cross-references to Sections 11.4 and 11.17 of the LLC Agreement in the first sentence of this <u>Section 10</u> shall be deemed to include (or will be replaced with, as applicable) cross-references to each such changed section number from and after such amendment or modification.

Section 11.   <u>Abandonment of CVRs</u>.  A Holder of CVRs may at any time, at such Holder's option, abandon all of such Holder's remaining rights in the CVRs by delivering to the CVR Agent a notice of abandonment relinquishing such CVRs to the Company without consideration therefor, in which case such CVRs shall be deemed canceled and no longer outstanding, and the CVR Agent shall amend the CVR Register in accordance with <u>Section 7</u> and notify the Company in writing of such abandonment.

Section 12.   [RESERVED]

Section 13.   <u>CVR Agent</u>.

(a)   *Rights and Duties of the CVR Agent.*

(i)   The Company hereby appoints the CVR Agent to act as agent of the Company as set forth in this Agreement.  The CVR Agent hereby accepts the appointment as agent of the Company and agrees to perform that agency upon the express terms and conditions (and no implied terms or conditions) set forth in this Agreement, by all of which the Company and the Holders, by their acceptance thereof, shall be bound. The CVR Agent shall act solely as agent of the Company hereunder and does not assume any obligation or relationship of agency or trust for or with any of the Holders or any beneficial owners of CVRs or any other Person.

(ii)   The CVR Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

(iii)   The CVR Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any Holder with respect to any action or default by the Company, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Company.

(iv)   The CVR Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the CVR Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Company resulting from any such act, default, neglect or misconduct, absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof.

(v)     The CVR Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Company with respect to any matter relating to its acting as CVR Agent hereunder.

(vi)     The CVR Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(vii)     The CVR Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The CVR Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the CVRs.

(viii)     The CVR Agent may rely on and be fully authorized and protected in acting or failing to act upon any law, act, regulation or any interpretation of the same even though such law, act, or regulation may thereafter have been altered, changed, amended or repealed.

(ix)     In the event the CVR Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the CVR Agent hereunder, the CVR Agent shall, as soon as practicable, provide notice of such ambiguity or uncertainty to the Company, and the CVR Agent may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to Company, the holder of any CVR or any other person or entity for refraining from taking such action, unless the CVR Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of CVR Agent.

(x)     Whenever in the performance of its duties under this Agreement, the CVR Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer of the Company and delivered to the CVR Agent.  The CVR Agent may rely upon such statement, and will be held harmless for such reliance, and shall not be held liable in connection with any delay in receiving such statement.

16

(xi)     The CVR Agent shall have no responsibility to the Company or any Holders of CVRs for interest or earnings on any moneys held by the CVR Agent pursuant to this Agreement.

(xii)     The CVR Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder, including any event or condition that may require action by the CVR Agent, unless the CVR Agent shall be specifically notified in writing of such event or condition by the Company, and all notices or other instruments required by this Agreement to be delivered to the CVR Agent must, in order to be effective, be received by the CVR Agent as specified <u>Section 15</u> hereof, and in the absence of such notice so delivered, the CVR Agent may conclusively assume no such event or condition exists.

(b)     *Limitation of Liability.*

(i)     The CVR Agent shall be liable hereunder only for its own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything contained herein to the contrary, the CVR Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to CVR Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from CVR Agent is being sought.  Neither party to this Agreement shall be liable to the other party for any consequential, indirect, special or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

(ii)     The CVR Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity of any CVR.  The CVR Agent shall not be responsible for any breach by the Company of any covenant or condition contained in this Agreement.

(c)     *Indemnification*.

(i)     The Company covenants and agrees to indemnify and to hold the CVR Agent harmless against any costs, expenses (including reasonable and documented fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as CVR Agent pursuant hereto; <u>provided</u> that such covenant and agreement does not extend to, and the CVR Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the CVR Agent as a result of, or arising out of, its gross negligence, bad faith or willful misconduct (which gross negligence, bad faith or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction).  The reasonable and

documented out-of-pocket costs and expenses incurred in enforcing this right of indemnification shall be paid by the Company.

(ii)    From time to time, the Company may provide the CVR Agent with instructions, by Company Order or otherwise, concerning the services performed by the CVR Agent hereunder.  In addition, at any time the CVR Agent may apply to any officer of the Company for instruction with respect to any matter arising in connection with the services to be performed by the CVR Agent under this Agreement.  The CVR Agent and its agents and subcontractors shall not be liable and shall be indemnified by Company for any action taken, suffered or omitted to be taken by CVR Agent in reliance upon any Company instructions.

(d)    *Right to Consult Counsel*.  The CVR Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company) with respect to any matter arising in connection with the services to be performed by the CVR Agent under this Agreement, and the CVR Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such legal counsel.

(e)    *Compensation and Reimbursement*.  The Company agrees to pay to the CVR Agent reasonable compensation for all services rendered by it hereunder, as set forth on a fee schedule mutually agreed upon on or prior to the date hereof and, from time to time, on demand of the CVR Agent, to reimburse the CVR Agent for all of its reasonable and documented out-of-pocket expenses and legal counsel fees and other disbursements incurred in the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder.

(f)    *CVR Agent May Act in Any Other Capacity*.  Nothing herein shall preclude the CVR Agent from acting in any other capacity for the Company or for any other legal entity.

(g)    *Resignation and Removal; Appointment of Successor*.

(i)    The CVR Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the CVR Agent's own gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction) after giving thirty (30) days' prior written notice to the Company.  The Company may remove the CVR Agent upon thirty (30) days' written notice, and the CVR Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid.  The CVR Agent shall, at the expense of the Company, cause notice to be given in accordance with Section 15(a) to the Company of said notice of resignation.  Upon such resignation or removal, the Company shall appoint in writing a new CVR Agent.  If the Company shall fail to make such appointment within a period of thirty (30) calendar days after it has been notified in writing of such resignation by the resigning CVR Agent or after such removal, then the Holder of any CVR may apply to any court of competent jurisdiction for the appointment of a new CVR Agent.  The new CVR Agent shall be vested with the same powers, rights, duties and

responsibilities as if it had been originally named herein as the CVR Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable expense of the Company and shall be legally and validly executed and delivered by the resigning or removed CVR Agent.  Not later than the effective date of any such appointment, (i) the Company shall file notice thereof with the resigning or removed CVR Agent, (ii) the resigning or removed CVR Agent shall deliver all of the relevant books and records to the successor CVR Agent and (iii) the resigning or removed CVR Agent shall deliver any funds held in connection with this Agreement to any such successor CVR Agent.  Failure to give any notice provided for in this Section 13(g)(i), however, or any defect therein, shall not affect the legality or validity of the resignation of the CVR Agent or the appointment of a new CVR Agent as the case may be.

(ii)     Any Person into which the CVR Agent or any new CVR Agent may be merged, or any Person resulting from any consolidation to which the CVR Agent or any new CVR Agent shall be a party, shall be a successor CVR Agent under this Agreement without any further act.  Any such successor CVR Agent shall promptly cause notice of its succession as CVR Agent to be given in accordance with Section 15(b) to each Holder at such Holder's last address as shown on the CVR Register.

Section 14.    Holder Not Deemed a Shareholder.  Nothing contained in this Agreement or in any of the CVRs shall be construed as conferring upon the Holders the right to vote, to receive distributions or dividends or to consent or to receive notice as equityholders in respect of the meetings of equityholders or for the election of directors of the Company or any other matter, or any rights whatsoever as equityholders of the Company.  The CVRs do not represent any equity or ownership interest in the Company or any of its Affiliates.

Section 15.    Notices.

(a)     Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Company or the CVR Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing (including telecopy or electronic communication) and telecopied, sent via electronic means, trackable or first-class mail or delivered by hand (including by courier service) as follows:

if to the Company, to:

[Reorganized Curo]
101 N. Main Street, Suite 600
Greenville, SC 29601
Attention: Chief Legal Officer
Email:  [●]

if to the CVR Agent, to:

Equiniti Trust Company, LLC

19

48 Wall Street, 22nd Floor
New York, NY 10005
Email:  ReorgWarrants@equiniti.com

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this Section 15(a).

All such communications shall be effective when sent.

(b)     Where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if (i) in writing and mailed, by trackable or first-class mail, to each Holder affected by such event, at the address of such Holder as it appears in the CVR Register or (ii) sent by electronic means.  Without limiting any of the rights or immunities of the CVR Agent under this Agreement, where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  [For the avoidance of doubt, any notice required to be given to holders of beneficial interests in CVRs evidenced by a Global CVR Certificate shall be required to be given only to DTC.  Where this Agreement provides for notice of any event to a holders of beneficial interests in CVRs evidenced by Global CVR Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.  All communications made to DTC shall be deemed effective five (5) business days after being sent.]

Section 16.     Supplements and Amendments.

(a)     This Agreement may be amended by the Company and the CVR Agent with the consent of the Required CVR Holders.

(b)     Notwithstanding the foregoing, the Company and the CVR Agent may, without the consent or concurrence of the Holders, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Company in this Agreement thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Company in this Agreement; provided, however, that in each case of this subsection (b) such amendment shall not adversely affect, alter or change the rights or interests of the Holders hereunder in any material respect or shorten the notice period for any notice required to be provided by the Company or the CVR Agent to the Holders hereunder or shorten the time period provided to Holders to respond to any such notice.

(c)     The consent of each Holder of any CVR affected thereby shall be required for any supplement or amendment to this Agreement that would (i) increase the Aggregate Implied Exercise Price or decrease the Aggregate Market Value or (ii) change the Expiration Date to an earlier date.  Any supplement or amendment that by its terms is disproportionally and materially adverse to any single Holder or group of Holders (the "Impacted Holders") as compared to all

20

other Holders shall require the consent of such individual Impacted Holder or Impacted Holders holding in excess of 50% of the total number of CVRs held by all Impacted Holders.

(d)      The CVR Agent shall join with the Company in the execution and delivery of any such amendment; provided that, as a condition precedent to the CVR Agent's execution of any amendment to this Agreement, the Company shall deliver to the CVR Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 16. Notwithstanding anything in this Agreement to the contrary, the CVR Agent shall not be required to execute any amendment to this Agreement that it has determined would adversely affect its own rights, duties, obligations or immunities under this Agreement and no amendment to this Agreement shall be effective unless duly executed by the CVR Agent. Upon execution and delivery of any amendment pursuant to this Section 16, such amendment shall be considered a part of this Agreement for all purposes and every Holder or holder of an interest in a CVR theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

(e)      Promptly after the execution by the Company and the CVR Agent of any such amendment, the Company shall give notice to the Holders, setting forth in general terms the substance of such amendment, in accordance with the provisions of Section 15(b). Any failure of the Company to mail such notice or any defect therein shall not, however, in any way impair or affect the validity of any such amendment.

Section 17.    Waivers. Subject to the requirements of Section 16(c), the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Required CVR Holders and the prior written consent of the CVR Agent.

Section 18.    Successors. The terms and provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company, the CVR Agent and the Holders and their respective successors and permitted assigns.

Section 19.    Headings. The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

Section 20.    Counterparts. This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument. A signature to this Agreement transmitted electronically shall have the same authority, effect and enforceability as an original signature.

Section 21.    Severability. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other provisions hereof; provided that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or other Governmental Entity not to be enforceable in accordance with its terms, the parties agree that the court or other Governmental Entity making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced; provided, further, that, if such excluded provision shall affect the rights, immunities, liabilities,

duties or obligations of the CVR Agent, the CVR Agent shall be entitled to resign immediately upon written notice to the Company.

Section 22.   Benefits of this Agreement.  This Agreement shall be binding upon and inure to the benefit of the Company, the CVR Agent and the Holders from time to time. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company, the CVR Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and all covenants, conditions, stipulations, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders.  Each Holder or holder of an interest in a CVR, by acceptance of a CVR or of such interest in a CVR, agrees to all of the terms and provisions of this Agreement applicable thereto.

Section 23.   Applicable Law; Jurisdiction; Waiver of Service and Venue; Waiver of Jury Trial.  THIS AGREEMENT, EACH CVR ISSUED HEREUNDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO, INCLUDING THE INTERPRETATION, CONSTRUCTION, VALIDITY AND ENFORCEABILITY THEREOF, SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.  THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A CVR (BY RECEIPT OF A CVR OR AN INTEREST IN A CVR) AND THE CVR AGENT CONSENT AND AGREE THAT ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTE ARISES IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY.  THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A CVR (BY RECEIPT OF A CVR OR AN INTEREST IN A CVR) AND THE CVR AGENT CONSENT AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS.  EACH OF THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A CVR (BY RECEIPT OF A CVR OR AN INTEREST IN A CVR) AND THE CVR AGENT WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (II) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM. THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A CVR (BY RECEIPT OF A CVR OR AN INTEREST IN A CVR) AND THE CVR AGENT HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE IN THE MANNER HEREIN PROVIDED.  EACH OF THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A CVR (BY RECEIPT OF A CVR OR AN INTEREST IN A CVR) AND THE CVR AGENT HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS

AGREEMENT OR SUCH HOLDER'S OWNERSHIP OF CVRS.  EACH OF THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A CVR (BY RECEIPT OF A CVR OR AN INTEREST IN A CVR) AND THE CVR AGENT CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER SUCH PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY OTHER SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND ACKNOWLEDGES THAT EACH OTHER SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 23.

Section 24.    Entire Agreement.  This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

Section 25.    Force Majeure.  Notwithstanding anything to the contrary contained herein, the CVR Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, epidemics, pandemics, government orders, shortage of supply, disruptions in public utilities, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems, labor difficulties, war, or civil unrest; provided that the CVR Agent shall (a) use its commercially reasonable efforts to end or mitigate the effects of any such occurrence on its performance and (b) resume the performance of its obligations as soon as reasonably practicable after the end of such occurrence.

Section 26.    Further Assurances.  The Company shall perform, acknowledge and deliver or cause to be performed, acknowledged and delivered all such further and other acts, documents, instruments and assurances as may be reasonably required by the CVR Agent for the carrying out or performing by the Company of the provisions of this Agreement.

Section 27.    Confidentiality.  The CVR Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, nonpublic Holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions).  However, each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law.

Section 28.    Termination.  This Agreement shall terminate at 5:02 p.m., New York City time, on the Expiration Date.  Notwithstanding the foregoing, this Agreement will terminate on such earlier date on which all CVRs have been exercised or deemed exercised in accordance with Sections 6 and 8 hereof.  Termination of this Agreement shall not relieve the Company or, if applicable, the CVR Agent, of any of its obligations arising prior to the date of such termination or in connection with the settlement of any CVR exercised prior to 5:00 p.m., New York City time, on the Expiration Date.  The provisions of Sections 13(a), 13(b), 13(c), 13(d), 13(e) and 13(f),

<u>Section 22</u>, <u>Section 23</u> and this <u>Section 28</u> shall survive such termination and the resignation or removal of the CVR Agent.

[The next page is the signature page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

[REORGANIZED CURO]

By: _____
    Name:
    Title:

EQUINITI TRUST COMPANY, LLC,
as CVR Agent

By: _____
    Name:
    Title:

<u>EXHIBIT A</u>

**FORM OF CVR EXERCISE NOTICE**
(To be executed by the holder hereof)

**[Date]**

**[Reorganized Curo]**
**101 N. Main Street, Suite 600**
**Greenville, SC 29601**

     Reference is hereby made to that certain CVR Agreement by and between [Reorganized Curo], a Delaware [limited liability company] (the "<u>Company</u>"), and Equiniti Trust Company, LLC, as agent with respect to the CVRs (the "<u>CVR Agent</u>"), dated [●], 2024 (the "<u>CVR Agreement</u>").  All capitalized terms used but not defined in this CVR Exercise Notice shall have the meanings ascribed thereto in the CVR Agreement.

     Pursuant to <u>Section 6(c)</u> of the CVR Agreement, the undersigned holder of one or more CVRs ("<u>Holder</u>") hereby notifies the Company that it irrevocably elects to exercise [●] CVRs in exchange for the applicable Cash Payment as provided in the CVR Agreement (subject to the Holder's right to withdraw this CVR Exercise Notice pursuant to <u>Section 6(d)</u> of the CVR Agreement (if applicable) no later than twenty (20)  Business Days after receiving the Market Price Notice and the other terms and conditions of the CVR Agreement).

     The CVR Agent shall endorse the "Schedule of Decreases in CVRs" attached hereto to reflect the CVRs being exercised.

*[Remainder of page intentionally left blank]*

Dated: _____


By: _____

Signature: _____

Address: _____

<u>EXHIBIT B</u>[6]

**FORM OF GLOBAL CVR CERTIFICATE**

THIS CERTIFICATE IS A GLOBAL CVR CERTIFICATE WITHIN THE MEANING OF THE CONTINGENT VALUE RIGHT AGREEMENT (THE "<u>CVR AGREEMENT</u>") HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY OR A SUCCESSOR DEPOSITARY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF.  THIS CERTIFICATE IS NOT EXCHANGEABLE FOR CONTINGENT VALUE RIGHTS ("<u>CVRS</u>") REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITARY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE CVR AGREEMENT, AND NO TRANSFER OF THIS CERTIFICATE (OTHER THAN A TRANSFER OF THIS CERTIFICATE AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE CVR AGREEMENT.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR CVRS IN DIRECT REGISTRATION FORM, THIS GLOBAL CVR CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS GLOBAL CVR CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("<u>DTC</u>"), TO [REORGANIZED CURO] (THE "<u>COMPANY</u>") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

---

[6] **Note to Draft**:  To include if CVRs are DTC eligible.

**[REORGANIZED CURO]**

No.__                                                    [__,__,___] Contingent Value Rights
                                                                        CUSIP No. [●]

THIS CERTIFIES THAT, for value received, [_____], or registered assigns (the "Holder"), is the registered holder of the number of Contingent Value Rights ("CVRs") set forth above. Each CVR entitles the Holder, subject to the provisions contained herein and in the CVR Agreement referred to on the reverse hereof, to cash payments from [Reorganized Curo], a Delaware limited liability company (the "Company"), in an amount determined pursuant to the provisions set forth on the reverse hereof and as more fully described in the CVR Agreement referred to on the reverse hereof.  Such payments shall be made by the Company in accordance with the terms of the CVR Agreement.

Payment of any amounts pursuant to this Global CVR Certificate shall be made only to the Holder (as defined in the CVR Agreement) of this Global CVR Certificate.  Such payment shall be made at the office or agency maintained by the Company for such purpose; provided, however, that the Company may pay such amounts by wire transfer or check payable in such money as specified under the terms of the CVR Agreement.  Equiniti Trust Company, LLC has been initially appointed as the CVR Agent.

Reference is hereby made to the further provisions of this Global CVR Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Global CVR Certificate has been countersigned by the CVR Agent by manual, facsimile or electronic signature of an authorized officer on behalf of the CVR Agent, this Global CVR Certificate shall not be valid for any purpose and no CVR evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Company has caused this certificate to be duly executed.

Dated:  [_____ __], 20[__]

                                                         [Reorganized Curo]

[SEAL]                                      By: _____
                                                                 [Title]
ATTEST:

Countersigned:

Equiniti Trust Company, LLC, as CVR Agent

By: _____
                 Authorized Agent

**Reverse of Global CVR Certificate**

**[REORGANIZED CURO]**

**GLOBAL CVR CERTIFICATE**

This Global CVR Certificate is issued under and in accordance with the Contingent Value Right Agreement, dated as of [●], 2024 (the "CVR Agreement"), between the Company and Equiniti Trust Company, LLC, as agent (the "Agent," which term includes any successor CVR Agent under the CVR Agreement), and is subject to the terms and provisions contained in the CVR Agreement, to all of which terms and provisions the Holder of this Global CVR Certificate consents by acceptance hereof.  The CVR Agreement and all amendments thereto is hereby incorporated herein by reference and made a part hereof.  Reference is hereby made to the CVR Agreement for a full statement of the respective rights, limitations of rights, duties, obligations and immunities thereunder of the Company, the CVR Agent and the Holders. All capitalized terms used in this Global CVR Certificate without definition shall have the respective meanings ascribed to them in the CVR Agreement.  Copies of the CVR Agreement can be obtained by contacting the CVR Agent.

Contingent payments pursuant to CVRs shall be made, to the extent payable, in cash to the Holders pursuant to their valid exercise of the CVRs in accordance with and pursuant to Section 6 of the CVR Agreement.

In the event of any conflict between this Global CVR Certificate and the CVR Agreement, the CVR Agreement shall govern and prevail.

The CVR Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Holders under the CVR Agreement by the Company and the CVR Agent with the consent of the Required CVR Holders.

No reference herein to the CVR Agreement and no provision of this Global CVR Certificate or of the CVR Agreement shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay any Cash Payments determined to be due and payable to Holders pursuant to the terms hereof and of the CVR Agreement at the times, place and amount, and in the manner, prescribed herein and in the CVR Agreement.

As provided in the CVR Agreement and subject to certain limitations therein set forth, the transfer of the CVRs represented by this Global CVR Certificate is registrable on the CVR Register, upon surrender of this Global CVR Certificate for registration of transfer at the office or agency of the Company maintained for such purpose duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company and the CVR Agent, duly executed by the Holder hereof or his or her attorney duly authorized in writing, and thereupon one or more new Global CVR Certificates or Book-Entry CVRs, for the same amount of CVRs, will be issued to the designated transferee or transferees.  The Company hereby initially designates the office of Equiniti Trust Company, LLC as the office for registration of transfer of this Global CVR Certificate.

No service charge will be made for any registration of transfer of CVRs, but the Company and the CVR Agent may require payment of a sum sufficient to cover any documentary, stamp or

similar issue or transfer taxes or other governmental charges imposed in connection with any registration of transfer.

This Global CVR Certificate, each CVR evidenced thereby and the CVR Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**SCHEDULE A**

**SCHEDULE OF DECREASES IN CVRS**

The following decreases in the number of CVRs evidenced by this Global CVR Certificate have been made:

| Date | Amount of decrease in number of CVRs evidenced by this Global CVR Certificate | Number of CVRs evidenced by this Global CVR Certificate following such decrease | Signature of authorized signatory |
|------|------|------|------|
| | | | |

## Exhibit H

**Warrant Agreement**

*[DRAFT]*

**WARRANT AGREEMENT**

**between**

**[REORGANIZED CURO]**

**and**

**EQUINITI TRUST COMPANY, LLC,**
**as Warrant Agent,**

**Dated as of [●], 2024**

**Warrants to Purchase Common Units**

# TABLE OF CONTENTS

**Page**

**1.**   Definitions..................................................................................................1

**2.**   Book-Entry Warrants ...............................................................................7
    2.1   Original Issuance of Warrants .......................................................7
    2.2   Form of Warrants ............................................................................8
    2.3   Execution and Delivery of Book-Entry Warrants .........................8
    2.4   [Global Warrant Certificates .........................................................9
    2.5   Transfer and Exchange of Book-Entry Warrants ........................10
    2.6   [Restrictions on Exchange or Transfer of a Book-Entry Warrant for a
            Beneficial Interest in a Global Warrant Certificate................10
    2.7   General Restrictions on Transfer .................................................11

**3.**   Exercise and Expiration of Warrants .....................................................11
    3.1   Right to Acquire Common Units Upon Exercise .........................11
    3.2   Exercise and Expiration of Warrants ...........................................11
    3.3   Application of Funds upon Exercise of Warrants ........................14
    3.4   Payment of Taxes ..........................................................................14
    3.5   Withholding and Reporting Requirements ...................................14
    3.6   Cashless Exercise .........................................................................15
    3.7   Cost Basis Information ..................................................................15
    3.8   All Warrants Are Equal ................................................................16

**4.**   Cash Exit Transaction, Dissolution, Liquidation or Winding Up .........16

**5.**   Adjustments ............................................................................................17
    5.1   Adjustments ...................................................................................17
    5.2   Fractional Interest .........................................................................25
    5.3   No Adjustments .............................................................................25
    5.4   Adjustment of Prices ....................................................................25

**6.**   Status of Common Units ........................................................................26

**7.**   Warrant Transfer Books .........................................................................26

**8.**   Warrant Holders .....................................................................................27
    8.1   No Rights as Unit Holder until Exercise......................................27
    8.2   Rights of Action ............................................................................27

**9.**   Concerning the Warrant Agent...............................................................28
    9.1   Rights and Duties of the Warrant Agent. .....................................28
    9.2   Limitation of Liability...................................................................30
    9.3   Indemnification..............................................................................31
    9.4   Right to Consult Counsel ..............................................................31
    9.5   Compensation and Reimbursement ..............................................31
    9.6   Warrant Agent May Hold Company Securities.............................32
    9.7   Resignation and Removal; Appointment of Successor .................32
    9.8   Appointment of Countersigning Agent .........................................33

| | | |
|---|---|---|
| **10.** | Notices ................................................................................................................ | 34 |
| | 10.1    Notices Generally .................................................................................. | 34 |
| | 10.2    Required Notices to Holders ................................................................. | 34 |
| **11.** | Information Rights ............................................................................................... | 35 |
| **12.** | Inspection ........................................................................................................... | 36 |
| **13.** | Supplements and Amendments ........................................................................... | 36 |
| **14.** | Waivers ............................................................................................................... | 37 |
| **15.** | Successors ........................................................................................................... | 37 |
| **16.** | Headings ............................................................................................................. | 37 |
| **17.** | Counterparts ....................................................................................................... | 37 |
| **18.** | Severability ........................................................................................................ | 37 |
| **19.** | Benefits of this Agreement ................................................................................. | 37 |
| **20.** | Applicable Law; Jurisdiction; Waiver of Service and Venue; Waiver of Jury Trial ......... | 38 |
| **21.** | Entire Agreement ................................................................................................ | 39 |
| **22.** | Force Majeure. .................................................................................................... | 39 |
| **23.** | Further Assurances. ............................................................................................ | 39 |
| **24.** | Confidentiality .................................................................................................... | 39 |

## <u>EXHIBITS</u>

Exhibit A          Form of Warrant Statement and Warrant Legend

[Exhibit B          Form of Global Warrant Certificate]

Exhibit [C]          Form of Joinder Agreement

## WARRANT AGREEMENT

This Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "***Agreement***"), dated as of [●], 2024, between [Reorganized Curo], a Delaware limited liability company (the "***Company***"), and Equiniti Trust Company, LLC, a New York limited liability trust company (the "***Warrant Agent***").  Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings set forth in <u>Section 1</u> hereof.

## WITNESSETH THAT:

**WHEREAS**, on March 25, 2024, the Company and certain of its affiliates commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Texas, Houston Division (the "***Bankruptcy Court***"), and concurrently filed their *Joint Prepackaged Plan of Reorganization of CURO Group Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be modified, amended, or supplemented, the "***Plan***");

WHEREAS, on [●], 2024, the Bankruptcy Court entered an order confirming the Plan;

WHEREAS, in accordance with the terms and conditions of the Plan, the Company proposes to issue and deliver the Warrants (as defined herein) to certain holders of Prepetition 2L Notes (as defined in the Plan);

**WHEREAS**, each Warrant shall entitle the registered owner thereof to purchase one Common Unit, subject to adjustment as provided herein;

**WHEREAS**, the Warrants and the Common Units issuable upon exercise of the Warrants are being issued in an offering in reliance on the exemption from the registration requirements of the Securities Act (as defined below) and of any applicable state securities or "blue sky" laws afforded by Section 1145 of the Bankruptcy Code; and

**WHEREAS**, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

**1.**     **Definitions**.

The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any references to any federal, state, local or foreign statute or law shall also refer to all rules and regulations promulgated thereunder, unless the context otherwise requires.  Unless the context otherwise requires:  (a) a term has the meaning assigned to it by this Agreement; (b) forms of the word "include" mean that the inclusion is not limited to the items listed; (c) "or" is disjunctive but not exclusive; (d) words in the singular include the plural, and in the plural

include the singular; (e) provisions apply to successive events and transactions; and (f) "hereof", "hereunder", "herein" and "hereto" refer to the entire Agreement and not any section or subsection.

The following terms used in this Agreement shall have the meanings set forth below:

"*$*" means the currency of the United States.

"*Accredited Investor*" has the meaning set forth in Rule 501(a) under Regulation D of the Securities Act.

"*Action*" has the meaning set forth in Section 10.2.

"*Additional Admission Documents*" has the meaning set forth in Section 2.3(c).

"*Admission Documents*" has the meaning set forth in Section 2.3(c).

"*Adjustment Event*" has the meaning set forth in Section 5.1(h).

"*Affiliate*" of a specified Person means any other Person who directly or indirectly controls, is controlled by, or is under common control with such specified Person.  For purposes of the preceding sentence, "*control*" of a Person means possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of the management and policies of such Person through ownership of voting securities (or other ownership interests), contract, voting trust or otherwise.

"*Agent Members*" has the meaning set forth in Section 2.4(b).

"*Agreement*" has the meaning set forth in the preamble hereto.

["*Applicable Procedures*" means, with respect to any transfer or exchange of, any exercise of, or any notice to any Holder of any Warrants evidenced by a Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.]

"*Appropriate Officer*" means the Chief Executive Officer, the Chief Financial Officer, the Chief Accounting Officer, the General Counsel and the Treasurer of the Company, and such additional officers of the Company as may be designated as such by the Board of Directors from time to time.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereto.

"*Bankruptcy Court*" has the meaning set forth in the recitals hereto.

"*beneficial ownership*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular person, such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether

such right is currently exercisable or is exercisable only after the passage of time.  The terms "***beneficially own***" and "***beneficially owned***" have a corresponding meaning.

"***Board of Directors***" means the board of directors (or equivalent governing body) of the Company or its successor, or any duly authorized committee of that board or equivalent governing body.

"***Book-Entry Warrants***" has the meaning set forth in <u>Section 2.2</u>.

"***Business Day***" means any day other than Saturday, Sunday or any other day on which national banking associations in the State of New York generally are closed for commercial banking business.

"***Cash Exit Transaction***" means any Fundamental Change in which the Common Units would be converted into, changed into or exchanged for consideration consisting solely of cash (including cash equivalents), rights to cash payments and/or other property that does not constitute securities.

"***Cashless Exercise***" has the meaning set forth in <u>Section 3.6</u>.

"***Cashless Exercise Market Price***" means the Market Price of the Common Units as of the Exercise Date with respect to any Cashless Exercise.

"***Cashless Exercise Warrants***" has the meaning set forth in <u>Section 3.6</u>.

"***Common Units***" means the limited liability company interests of the Company designated as Common Units in the LLC Agreement.

"***Company***" means the company identified in the preamble hereof, or any successor to the Company under this Agreement pursuant to the terms of this Agreement.

"***Company Order***" means a written request or order signed in the name of the Company by an Appropriate Officer and delivered to the Warrant Agent.

"***Corporate Agency Office***" has the meaning set forth in <u>Section 7</u>.

"***Countersigning Agent***" means any Person authorized by the Warrant Agent to act on behalf of the Warrant Agent to countersign Warrant Statements.

["***Depositary***" means DTC and its successors as depositary hereunder.

"***Determination Date***" has the meaning set forth in <u>Section 5.1(h)</u>.

"***DTC***" means The Depository Trust Company.]

"***Equity Securities***" means any Common Units and units of any class of common equity capital of the Company.

3

"*Exchange*" means, as to any series of securities, the principal U.S. national or regional securities exchange on which such securities are then listed or, if the securities are not then listed on a U.S. national or regional securities exchange, the principal other market on which such securities are then traded.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exercise Date*" has the meaning set forth in Section 3.2(f).

"*Exercise Form*" has the meaning set forth in Section 3.2(c).

"*Exercise Period*" means the period from and including the Original Issue Date to and including the Expiration Date.

"*Exercise Price*" means the exercise price per Common Unit, initially set at $[●], subject to adjustment as provided in Section 5.1.

"*Expiration Date*" means the earlier to occur of (a) the Scheduled Expiration Date and (b) a Winding Up.

"*Form Admission Documents*" has the meaning set forth in Section 2.3(c).

"*Fundamental Change*" means:  (a) any recapitalization, reclassification, redenomination or other change to the Common Units (other than (i) changes solely resulting from a subdivision or combination of the Common Units and (ii) Common Unit splits and Common Unit combinations that do not involve the issuance of any other series or class of securities); (b) any consolidation, merger, amalgamation, combination, division or binding or statutory Common Unit exchange involving the Company; and (c) any sale, lease, transfer or other disposition of all or substantially all of the assets of the Company and its Subsidiaries (by value) to a Person other than the Company or any of its direct or indirect Subsidiaries; and, in each case, as a result of which the Common Units are converted into, or are exchanged for, or represent solely the right to receive Transaction Consideration.

"*Funds*" has the meaning set forth in Section 3.3.

["*Global Warrant Certificate*" means a certificate for Warrants in global form, deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases of Warrants" attached thereto, substantially in the form attached as Exhibit B.

"*Global Warrant Legend*" means the legend set forth in Section 2.4(a).]

"*Governmental Entity*" means United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency or commission or any judicial or arbitral body.

"*Holder*" means any Person in whose name at the time any Warrant is registered upon the Warrant Register and, when used with respect to any Book-Entry Warrant, the Person in whose

name the Warrants evidenced by the applicable Warrant Statement is registered in the Warrant Register.

"***Joinder Agreement***" means a joinder agreement in form and substance attached hereto as <u>Exhibit C</u> or such other form as is approved by the Board of Directors.

"***LLC Agreement***" means the Limited Liability Company Agreement of the Company, effective as of the date hereof, as amended from time to time.

"***Management Plan***" means, collectively, the management incentive plan adopted by the Company in accordance with the Plan and any management incentive plan adopted by the Company after the date hereof.

"***Market Price***" means, as to any series of securities, (a) if such securities are listed on an Exchange, the VWAP for such securities in respect of the period from the scheduled open of trading twenty (20) Trading Days prior to the applicable date of determination until the scheduled close of trading of the primary trading session on the Trading Day immediately preceding such applicable date of determination (unless the securities have been listed on an Exchange for less than twenty (20) Trading Days prior to such applicable date of determination, in which case the Market Price shall be the VWAP for the securities for however many Trading Days the securities have been listed on such Exchange prior to such applicable date of determination); or (b) if the securities are not listed on an Exchange, the fair market value of the securities as determined by the Board of Directors, in its reasonable good faith judgment, as of the applicable date of determination.

"***Member***" has the meaning ascribed in the LLC Agreement.

"***Original Issue Date***" means the Effective Date (as defined in the Plan).

"***outstanding***" when used with respect to any Warrants, means, as of the time of determination, all Warrants theretofore originally issued under this Agreement except (a) Warrants that have been exercised pursuant to <u>Section 3.2(a)</u>, (b) Warrants that have expired, terminated or become void or canceled pursuant to this Agreement and (c) Warrants that have otherwise been acquired by the Company; <u>provided</u>, <u>however</u>, that in determining whether the Holders of the requisite amount of the outstanding Warrants have given any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Agreement, Warrants held directly or beneficially by the Company or any Subsidiary of the Company or any of their respective employees shall be disregarded and deemed not to be outstanding.

"***Person***" means any natural person, corporation, partnership, firm, joint venture, limited liability company, unincorporated organization, trust, estate, Governmental Entity or other entity or organization.

"***Plan***" has the meaning set forth in the recitals hereto.

"***Plan Effective Time***" has the meaning set forth in <u>Section 2.1(a)</u>.

"**Principal Exchange**" means each of the following Exchanges:  The New York Stock Exchange, NYSE American, The NASDAQ Global Market and The NASDAQ Global Select Market (or any of their respective successors).

"**Recipient**" has the meaning set forth in <u>Section 3.2(e)</u>.

 "**Required Warrant Holders**" means Holders of Warrants [(or beneficial holders in the case of Warrants evidenced by a Global Warrant Certificate)] holding a majority of the then-outstanding Warrants.

"**Scheduled Expiration Date**" means the seventh (7th) anniversary of the Original Issue Date or, if not a Business Day, then the next Business Day thereafter.

"**SEC**" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, firm, joint venture, limited liability company, unincorporated organization, or other entity or organization, whether incorporated or unincorporated, (a) of which such first Person directly or indirectly owns or controls a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions, (b) of which such first Person is a general partner or managing member or (c) that is otherwise controlled by such first Person.

"**Trading Day**" means a day on which trading in the Common Units (or other applicable security) generally occurs on the principal exchange or market on which the Common Units (or other applicable security) are then listed or traded; <u>provided</u> that, if the Common Units (or other applicable security) are not so listed or traded, "Trading Day" means a Business Day.

"**Transaction Consideration**" means, with respect to any transaction which is either a Fundamental Change or Winding Up, the cash, stock, shares or other securities or property, or any combination thereof, payable to each holder in respect of a Common Unit in exchange for, upon conversion of, or as a distribution on, Common Units (or otherwise into which such Common Units are changed into) in such transaction; <u>provided</u> that (a) no contingent or escrowed property shall be treated as part of Transaction Consideration unless and until such time as such property is actually paid to such holders of Common Units (and any contingent rights with respect thereto shall be treated as valueless unless and until such payment occurs); and (b) in the event holders of Common Units have the opportunity to elect the form of consideration to be received in such transaction, the type and amount of consideration paid or payable to each holder shall be deemed, for purposes of this Agreement, to be the weighted average per share (or unit) of the types and amounts of consideration received by all such holders in such transaction.  For all purposes under this Agreement, the value of any Transaction Consideration shall be determined reasonably and in good faith by the Board of Directors, using where applicable the Market Price of any applicable securities or other assets received with respect to a Common Unit.

"**_Unit of Transaction Consideration_**" means, with respect to a Fundamental Change, the amount and kind of Transaction Consideration (including, without limitation, cash) that a holder of one (1) Common Unit would be entitled to receive on account of such Fundamental Change (without giving effect to any arrangement not to issue or deliver a fractional portion of any security or other property).

"**_VWAP_**" means, as to any series of securities, (a) if the securities are listed on a Principal Exchange on the Trading Day immediately preceding the applicable date of determination, the volume-weighted average price of such securities in respect of the applicable time period, as reported in composite transactions for United States exchanges and quotation systems, as displayed under the heading "Bloomberg VWAP" on the applicable Bloomberg page (or if Bloomberg is no longer reporting such price information, such other service reporting similar information as shall be selected by the Company), and (b) if the securities are not listed on a Principal Exchange on the Trading Day immediately preceding the applicable date of determination, but are listed on any other Exchange, the volume-weighted average price of such securities on such Exchange in respect of the applicable time period, as reported by such Exchange, or, if not so reported, a service reporting such information as shall be selected by the Company, in each case of the foregoing clauses (a) and (b), determined without regard to pre-open or after-hours trading or any other trading outside of the trading hours of the regular trading session (including any extensions thereof) on the applicable Exchange.

"**_Warrant Agent_**" has the meaning set forth in the preamble hereof.

"**_Warrant Register_**" means the register established by the Warrant Agent set forth in Section 2.3(b).

"**_Warrant Statement_**" has the meaning set forth in Section 2.2.

"**_Warrants_**" means those certain warrants to purchase initially up to an aggregate of [●] Common Units at the Exercise Price, subject to adjustment pursuant to Section 5, issued hereunder.

"**_Warrant Units_**" means the Common Units issuable upon exercise of the Warrants.

"**_Winding Up_**" has the meaning set forth in Section 4.

2.      **Book-Entry Warrants**.

    2.1      Original Issuance of Warrants.

          (a)      On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan, on the Original Issue Date the Company shall issue and cause to be delivered to holders of Prepetition 2L Notes Claims (as defined in the Plan) [the Warrants in global form registered in the name of Cede & Co., as nominee for DTC, by causing DTC (subject to Section 2.1(b)) to credit the account or accounts in which such holders held their respective Prepetition 2L Notes Claims (as defined in the Plan) immediately prior to the effective

time of the Plan (the "***Plan Effective Time***")][1] the aggregate number of Warrants to be issued hereunder, *pro rata* based on the amount of Prepetition 2L Notes Claims held by each such holder immediately prior to the Plan Effective Time.

(b)      [Prior to the Original Issue Date or as soon as reasonably practicable thereafter, the Company shall use commercially reasonable efforts to (i) cause the Warrants to be declared eligible for clearance and settlement through DTC and (ii) cause DTC to credit the Warrants to the account or accounts in which the holders of Prepetition 2L Notes Claims held their respective Prepetition 2L Notes Claims in accordance with Section 2.1(a).]

2.2      Form of Warrants.  The Warrants shall not be certificated [other than in the form of a Global Warrant Certificate registered in the name of the Depositary or its nominee].  The Warrants shall be issued by book-entry registration on the books and records of the Warrant Agent (the "***Book-Entry Warrants***"), registered in the names of the Holders of such Warrants and evidenced by statements issued by the Warrant Agent to such Holders of Book-Entry Warrants reflecting such book-entry position (the "***Warrant Statements***"), in substantially the form set forth in Exhibit A hereto.  The Warrant Statements shall be dated the date on which they are countersigned by the Warrant Agent, shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon (which does not impact the Warrant Agent's rights, duties or immunities) as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage. Each Warrant Statement shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase one (1) Common Unit, subject to adjustment as provided in Section 5.

2.3      Execution and Delivery of Book-Entry Warrants.

(a)      Upon a Company Order, the Warrant Agent shall register in the Warrant Register the Book-Entry Warrants.

(b)      The Warrant Agent shall keep at its office or offices a warrant register (the "***Warrant Register***") in which, subject to such reasonable regulations as it may prescribe, it shall register the Book-Entry Warrants and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Sections 2.5[, 2.6] and 2.7 of this Agreement, all in form satisfactory to the Company and the Warrant Agent.  No service charge shall be made for any exchange or registration of transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the registered Holder in connection with any such exchange or registration of

---

[1] **Note to Draft**:  DTC-specific provisions TBD and bracketed throughout, pending eligibility discussion.

transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made.

(c)     The Warrant Agent is hereby authorized to countersign and deliver Warrant Statements as required by <u>Section 2.2</u> or by this <u>Section 2.3</u>, <u>Section 3.2(d)</u> or <u>Section 7</u>.

2.4     [<u>Global Warrant Certificates</u>.

(a)     Any Global Warrant Certificate shall bear the legend substantially in the form set forth in <u>Exhibit B</u> hereto (the "***Global Warrant Legend***").

(b)     So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("***Agent Members***") shall have no rights under this Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Warrants, and as the sole Holder of such Global Warrant Certificate, for all purposes.  Accordingly, any such Agent Member's beneficial interest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(c)     Any holder of a beneficial interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through a book-entry system maintained by the Depositary as the Holder of such Global Warrant Certificate (or its agent), and that ownership of a beneficial interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(d)     Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees.  Interests of beneficial owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures of the Depositary.

(e)     The holder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder of a Warrant is entitled to take under this Agreement or such Global Warrant Certificate.

(f)     Each Global Warrant Certificate will evidence such of the outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of outstanding Warrants from time to time endorsed thereon and that the aggregate number of outstanding Warrants evidenced thereby may from time to time be reduced, to reflect exercises, expirations or cancellations.  Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the aggregate number of outstanding Warrants evidenced thereby will be made by the Warrant Agent (i) in the case of an exercise, in accordance with the Applicable Procedures as required by Section 3.2(c), or (ii) in the case of an expiration, in accordance with Section 3.2(b).

(g)     Beneficial interests in any Global Warrant Certificate may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Global Warrant Certificate in accordance with the Applicable Procedures.

(h)     At such time as all Warrants evidenced by a particular Global Warrant Certificate have been exercised, terminated, become void or expired in whole and not in part, such Global Warrant Certificate shall, if not in custody of the Warrant Agent, be surrendered to or retained by the Warrant Agent for cancellation.

(i)     The Company initially appoints DTC to act as Depositary with respect to any Global Warrant Certificates.]

2.5     Transfer and Exchange of Book-Entry Warrants.  When a Holder of Book-Entry Warrants presents to the Warrant Agent a written request (i) to register the transfer of the Warrants; or (ii) to exchange such Warrants for an equal number of Warrants represented by Book-Entry Warrants of other authorized denominations, then the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, properly completed and duly executed by the registered Holder thereof or by his or her attorney, duly authorized in writing and accompanied by a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

2.6     [Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate.  A Book-Entry Warrant may not be exchanged for a beneficial interest in a Global Warrant Certificate unless the Warrants are eligible to be cleared or settled in DTC.  Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register, increase accordingly the number of Warrants on the Warrant Register registered in the name of the registered owner of the Global Warrant Certificate and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly.  If no Global Warrant Certificate is

then outstanding, the Company shall issue and the Warrant Agent shall countersign a new Global Warrant Certificate representing the appropriate number of Warrants.]

    2.7   <u>General Restrictions on Transfer</u>. The Warrants and the underlying Common Units are being offered and sold pursuant to an exemption from the registration requirements of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code, and to the extent that any Holder or beneficial owner of a Warrant is an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code, such Holder or beneficial owner, as applicable, may not be able to sell or transfer any Warrants in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder. By accepting a transfer of a Warrant, the Holder or beneficial owner, as applicable, acknowledges the restrictions set forth herein. Notwithstanding anything to the contrary contained in this Agreement, no Warrant or interest in any Warrant (however held) may be transferred if (a) such transfer would, or if the exercise of the transferred Warrant or interest in a Warrant and resulting issuance of Common Units to the transferee would, (i) violate the Securities Act or any state securities or "blue sky" laws applicable to the Company or to the Warrants to be transferred, (ii) impose liability or reporting obligations on the Company or any member of the Company under the Exchange Act or would otherwise require the Company or any member of the Company to make any filing with the SEC, (iii) individually or together with other concurrently proposed transfers, cause the Company to be regarded as an "investment company" under the Investment Company Act of 1940, as amended, or (b) following such proposed transfer, the Company would have either (i) in the aggregate, more than nineteen hundred (1.900) holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (ii) in the aggregate, more than four hundred and fifty (450) holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an Accredited Investor (determined, in each case, in the Company's sole discretion). In addition, no transfer of any Warrant or interest in any Warrant (however held) shall be permitted if such transfer is to a Competitor (as defined in the LLC Agreement), unless such transfer is approved in accordance with [Section 7.1(b)] of the LLC Agreement. Any transfer or purported transfer in violations of the applicable provisions of this Agreement shall be void *ab initio* and shall have no effect.

**3.**    **Exercise and Expiration of Warrants**.

    3.1   <u>Right to Acquire Common Units Upon Exercise</u>. Each duly issued Warrant shall, when countersigned by the Warrant Agent, entitle the Holder thereof, subject to the provisions thereof and of this Agreement, to acquire from the Company, for each Warrant evidenced thereby, one (1) Common Unit at the Exercise Price, subject to adjustment as provided in this Agreement. The Exercise Price, and the number of Common Units to be issued upon exercise of each Warrant, shall be adjusted from time to time as required by <u>Section 5.1</u>.

    3.2   <u>Exercise and Expiration of Warrants</u>.

        (a)   <u>Exercise of Warrants</u>. Subject to and upon compliance with all terms and conditions of this Agreement, a Holder may exercise all or any whole number of its Warrants, on

any Business Day from and after the Original Issue Date until 5:00 p.m., New York City time, on the Expiration Date, for the Common Units obtainable thereunder.

(b)   Expiration of Warrants.  The Warrants, to the extent not exercised prior thereto, shall automatically expire, terminate and become void as of 5:00 p.m., New York City time, on the Expiration Date.  No further action of any Person (including by, or on behalf of, any Holder, the Company, or the Warrant Agent) shall be required to effectuate the expiration of Warrants pursuant to this Section 3.2(b).

(c)   Method of Exercise.  In order for a Holder to exercise all or any of the Warrants held by such Holder, the Holder thereof must:  (i) [(x) in the case of a Global Warrant Certificate, deliver to the Warrant Agent an exercise form for the election to exercise such Warrants substantially in the form set forth in Exhibit B hereto (an "*Exercise Form*"), setting forth the number of Warrants being exercised and, if applicable, whether Cashless Exercise is being elected with respect thereto, and otherwise properly completed and duly executed by the Holder thereof and deliver such Warrants by book-entry transfer through the facilities of the Depositary to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants, or (y)] in the case of a Book-Entry Warrant, at the Corporate Agency Office, deliver to the Warrant Agent [an Exercise Form][an exercise form for the election to exercise such Warrants substantially in the form set forth in Exhibit B hereto (an "*Exercise Form*")], setting forth the number of Warrants being exercised and, if applicable, whether Cashless Exercise is being elected with respect thereto, and otherwise properly completed and duly executed by the Holder thereof as well as any such other information the Warrant Agent may reasonably require; and (ii) pay to the Warrant Agent an amount equal to (x) all taxes and charges required to be paid by the Holder, if any, pursuant to Section 3.4 prior to, or concurrently with, exercise of such Warrants, and (y) except in the case of a Cashless Exercise, the aggregate of the Exercise Price in respect of each Common Unit into which such Warrants are exercisable, in case of (x) and (y), by wire transfer in immediately available funds, to the account (No. [●]; ABA No. [●]; Reference: [●]) of the Company at the Warrant Agent or such other account of the Company at the Warrant Agent as the Warrant Agent shall have given notice to the Company and such Holder in accordance with Section 10.  In addition, any Holder that is not already a Member shall be required, as a condition precedent to the issuance of Warrant Units pursuant to their exercise of any Warrant, to execute a Joinder Agreement, and must deliver such documents and instruments (collectively with the Joinder Agreement, the "*Admission Documents*") as the Company reasonably determines to be necessary or appropriate in connection with the issuance of such Warrant Units to such Holder or to effect such Holder's admission as a Member of the Company.  The Company shall provide to the Warrant Agent, and the Warrant Agent shall make available to any Holder upon request, forms of the Admission Documents for use by such Holder in connection with its exercise of any Warrants (the "*Form Admission Documents*"); provided that this sentence shall not relieve any Holder of its obligation pursuant to the immediately prior sentence to execute and deliver Admission Documents other than or different from the Form Admission Documents ("*Additional Admission Documents*") reasonably requested by the Company as a condition precedent to the issuance of Warrant Units pursuant to such Holder's exercise of any Warrant; provided, further, that, if the Company reasonably requests any Holder to execute and deliver Additional Admission Documents, the issuance of the Warrant Units, and admission of the Holder as a Member in respect thereof, upon execution and delivery of such Additional

12

Admission Documents and all other documents and instruments required by this Agreement, shall be deemed retroactively effective to the time such Holder delivered the validly executed Exercise Form and Form Admission Documents to the Warrant Agent.

(d)    Partial Exercise.  If a Holder exercises fewer than all the Warrants then held by such Holder, [(i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall cause the custodian of DTC to endorse the "Schedule of Decreases of Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised, and (ii)] in the case of Book-Entry Warrants, the Warrant Agent shall adjust such Holder's Warrant Statement to reflect the Warrants being exercised.  The Warrant Agent shall deliver a new Warrant Statement to the Person or Persons in whose name such Warrants are so registered.

(e)    Issuance of Common Units.  Upon due exercise of Warrants evidenced by any Warrant Statement in conformity with the foregoing provisions of Section 3.2(c), the Warrant Agent shall, when actions specified in Section 3.2(c)(i) have been effected and any payment specified in Section 3.2(c)(ii) is received (as promptly confirmed in writing by the Company), deliver to the Company the Exercise Form received pursuant to Section 3.2(c)(i), deliver or deposit all funds, in accordance with Section 3.3, received as instructed in writing by the Company and advise the Company by electronic mail at the end of such day of the amount of funds so deposited to its account.  The Company shall thereupon, as promptly as practicable, (i) determine the number of Common Units issuable pursuant to exercise of such Warrants (and, if Cashless Exercise applies, in accordance with Section 3.6) and (ii) [(x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, deliver or cause to be delivered to the Recipient (as defined below) in accordance with the Applicable Procedures for Common Units in book-entry form to be so held through the facilities of DTC in an amount equal to, or, if the Common Units may not then be held in book-entry form through the facilities of DTC, Common Units in book entry form in an amount equal to, or duly executed certificates representing, or (y) in the case of exercise of Warrants evidenced by Warrant Statements,] execute or cause to be executed and deliver or cause to be delivered to the Recipient (as defined below) Common Units in book entry form in an amount equal to, or a certificate or certificates representing[, in case of clauses (x) and (y),] the aggregate number of Common Units issuable upon such exercise (based upon the aggregate number of Warrants so exercised), as so determined by the Company, together with an amount in cash in lieu of any fractional Common Unit(s), if the Company so elects pursuant to Section 5.2.  The Common Units in book-entry form or certificate or certificates representing Common Units so delivered shall be, to the extent possible, in such denomination or denominations as such Holder shall request in the applicable Exercise Form and shall be registered or otherwise placed in the name of, and delivered to, the Holder or, subject to Section 3.4, such other Person as shall be designated by the Holder in such Exercise Form (the Holder or such other Person being referred to herein as the "*Recipient*").

(f)    Time of Exercise.  Each exercise of a Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which each of the requirements for exercise of such Warrant specified in Section 3.2(c) has been duly satisfied (the "*Exercise Date*").  At such time, subject to Sections 2.7 and 5.1(j) and subject to compliance with all requirements of Section 3.2(c), Common Units in book-entry form or the certificates for the Common Units issuable upon such exercise as provided in Section 3.2(e) shall be deemed to

13

have been issued and, for all purposes of this Agreement, the Recipient shall, as between such Person and the Company, be deemed to be and entitled to all rights of the holder of record of such Common Units and shall be admitted as a Member of the Company in respect of such Common Units.

3.3 <u>Application of Funds upon Exercise of Warrants</u>. All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services hereunder (the "***Funds***") shall be held by the Warrant Agent as agent for the Company and deposited in one or more bank accounts to be maintained by the Warrant Agent in its name as agent for the Company. Until paid pursuant to the terms of this Agreement, the Warrant Agent will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.). The Warrant Agent shall have no liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party, except as a result of the Warrant Agent's willful misconduct, fraud, bad faith or gross negligence (each as determined by a final judgment of a court of competent jurisdiction). The Warrant Agent shall forward funds received for warrant exercises in a given month by the fifth (5th) Business Day of the following month by wire transfer to an account designated by the Company.

3.4 <u>Payment of Taxes</u>. The Company shall pay any and all taxes (other than income or withholding taxes) that may be payable in respect of the issue or delivery of Common Units on exercise of Warrants pursuant hereto. The Company or the Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Units in book-entry form or any certificates for Common Units or payment of cash or other property to any Recipient (other than, in the case of the Company, the Holder of the exercised Warrants), and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any Common Units in book-entry form or any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (b) it has been established to the Company's or the Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid.

3.5 <u>Withholding and Reporting Requirements</u>. The Company and the Warrant Agent shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Entity, and all distributions, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements. Notwithstanding any provision to the contrary, the Company and the Warrant Agent will be authorized to (i) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (ii) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, (iii) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes or (iv) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) and/or

requiring Holders to pay the withholding tax amount to the Company in cash as a condition of receiving the benefit of any antidilution adjustment pursuant to Section 5 or otherwise.  To the extent that any amounts are so deducted or withheld and paid over to the applicable Governmental Entity, such deducted or withheld amounts shall be treated for all purposes of this Warrant as having been paid to the Person in respect of which such deduction or withholding was made.

3.6    Cashless Exercise.  Notwithstanding any provisions herein to the contrary, if, on the Exercise Date of a Cashless Exercise, the Cashless Exercise Market Price of one (1) Common Unit is greater than the applicable Exercise Price on the Exercise Date, then, in lieu of paying to the Company the applicable Exercise Price by wire transfer in immediately available funds, the Holder may elect to receive Common Units equal to the value (as determined below) of the Warrants or any portion thereof being exercised (such portion, the "***Cashless Exercise Warrants***" with respect to such date) by:  [(i) in the case of Warrants evidenced by a Global Warrant Certificate, providing notice to the Warrant Agent pursuant to the Applicable Procedures and the Exercise Form; or (ii) in the case of Warrants evidenced by a Warrant Statement,] providing notice pursuant to the Exercise Form[, in the case of (i) or (ii),] that the Holder desires to effect a "cashless exercise" (a "***Cashless Exercise***") with respect to the Cashless Exercise Warrants, in which event the Company shall issue to the Holder a number of Common Units with respect to Cashless Exercise Warrants computed using the following formula (rounded down to the nearest whole Common Unit, and it being understood that any portion of the Warrants being exercised on such date that are not Cashless Exercise Warrants will not be affected by this calculation):

$$X = (Y (A–B)) \div A$$

Where X =  the number of Common Units to be issued to the Holder in respect of the Cashless Exercise Warrants

Y =  the number of Common Units purchasable under the Cashless Exercise Warrants being exercised by the Holder (on the Exercise Date)

A =  the applicable Cashless Exercise Market Price of one Common Unit (on the Exercise Date)

B =  the applicable Exercise Price (as adjusted through and including the Exercise Date).

The Company shall calculate and transmit to the Warrant Agent the number of Common Units to be issued on such Cashless Exercise, and the Warrant Agent shall have no obligation under this Agreement to calculate, confirm or verify such amount.

3.7    Cost Basis Information.

(a)      In the event of a cash exercise, the Company hereby instructs the Warrant Agent to record cost basis for newly issued Common Units at the time of such exercise in accordance with instructions by the Company.

(b)      In the event of a Cashless Exercise, the Company shall use reasonable efforts to provide cost basis for Common Units issued pursuant to a Cashless Exercise at the time the Company provides the cashless exercise to the Warrant Agent pursuant to Section 3.6 hereof.

3.8      <u>All Warrants Are Equal</u>.  All Warrants issued under this Agreement shall in all respects be equally and ratably entitled to the benefits of this Agreement, without preference, priority or distinction on account of the actual time of the issuance and authentication or any other terms thereof.  Each Warrant shall be, and shall remain, subject to the provisions of this Agreement until such time as such Warrant shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.  Each Holder and each holder of an interest in a Warrant shall be bound by all of the terms and provisions of this Agreement as fully and effectively as if such Holder had signed the same.

**4.      Cash Exit Transaction, Dissolution, Liquidation or Winding Up**.

If, on or prior to the Expiration Date, the Company (or any other Person controlling the Company) shall propose a voluntary or involuntary dissolution, liquidation or winding up (a "***Winding Up***") of the affairs of the Company or the Company shall enter into any agreement in respect of a Cash Exit Transaction, the Company shall give written notice thereof to the Warrant Agent and all Holders in the manner provided in Section 10.1(b) prior to the date on which such transaction is expected to become effective or, if earlier, the record date for such transaction. Such notice shall also specify the date as of which the holders of record of Common Units shall be entitled to exchange their Common Units for securities, money or other property deliverable upon such Cash Exit Transaction or Winding Up, as the case may be, on which date each Holder of Warrants shall receive the securities, money or other property which such Holder would have been entitled to receive had such Holder been the holder of record of the Common Units into which the Warrants were exercisable immediately prior to such Cash Exit Transaction or Winding Up, net of the then-applicable Exercise Price (but not less than zero) and the rights to exercise the Warrants shall terminate.  For the avoidance of doubt, upon consummation of a Cash Exit Transaction or Winding Up, all unexercised Warrants shall be automatically canceled for no consideration.

In the case of any such Cash Exit Transaction or Winding Up of the Company, the Company shall deposit with the Warrant Agent any funds or other property which the Holders are entitled to receive pursuant to the above paragraph, together with a Company Order as to the distribution thereof.  After receipt of such deposit from the Company and after receipt of surrendered Book-Entry Warrants, and any such other information as the Warrant Agent may reasonably require from the applicable Holders, the Warrant Agent shall make payment in appropriate amount to such Person or Persons as it may be directed in writing by the Holder surrendering such Book-Entry Warrant.  Any moneys, securities or other property which at any time shall be deposited by the Company or on its behalf with the Warrant Agent pursuant to this Section 4 shall be, and are hereby, assigned, transferred and set over to the Warrant Agent in accordance with Section 3.3 hereof; provided that moneys, securities or other property need not

be segregated from other funds, securities or other property held by the Warrant Agent except to the extent required by law.

**5.     Adjustments**.

    5.1     Adjustments.  In order to prevent dilution of the rights granted under the Warrants and to grant the Holders certain additional rights, the Exercise Price shall be subject to adjustment from time to time only as specifically provided in this Section 5.1 (the "***Adjustment Events***") and the number of Common Units issuable upon exercise of Warrants shall be subject to adjustment from time to time only as specifically provided in this Section 5.1.

All adjustments made to the Exercise Price pursuant to this Section 5.1 shall be calculated to the nearest one ten-thousandth of a cent ($0.000001), and all adjustments made to the Warrant Units issuable upon exercise of each Warrant pursuant to this Section 5.1 shall be calculated to the nearest one ten-thousandth of a Warrant Unit (0.0001).  Except as described in this Section 5.1, the Company will not adjust the Exercise Price and the number of Warrant Units for which the Warrants are exercisable.

        (a)     Adjustment to Exercise Price.  Upon any adjustment to the number of Warrant Units for which each Warrant is exercisable pursuant to Sections 5.1(b), 5.1(c), 5.1(d) and 5.1(e), the Exercise Price shall immediately be adjusted to equal the quotient obtained by dividing (i) the aggregate Exercise Price of the number of Warrant Units for which each Warrant was exercisable immediately prior to such adjustment by (ii) the maximum number of Warrant Units for which each Warrant is exercisable immediately after such adjustment; provided, however, that the Exercise Price with respect to the new number of Warrant Units for which each Warrant is exercisable resulting from any such adjustment shall not be less than $0.01 per Common Unit.  If the event causing any adjustment to the number of Warrant Units for which each Warrant is exercisable pursuant to Sections 5.1(b), 5.1(c), 5.1(d) or 5.1(e) is not consummated such that the adjustment is reversed pursuant to such section, the Exercise Price shall automatically be adjusted to the Exercise Price that would then be in effect if such adjustment had not occurred.

        (b)     Common Unit Distribution or Common Unit Split.  If the Company issues Common Units as a distribution on Common Units, or effects a subdivision or Common Unit split or Common Unit combination or reverse split, or shall increase or decrease the number of Common Units outstanding by reclassification of its Common Units, then in each case, the number of Warrant Units for which each Warrant is exercisable will be adjusted based on the following formula:

$$NS' = NS_0 \times \frac{OS'}{OS_0}$$

    where,

        NS'     =       the number of Warrant Units for which each Warrant is exercisable
                        in effect immediately after such event

| | | |
|---|---|---|
| $NS_0$ | = | the number of Warrant Units for which each Warrant is exercisable in effect immediately prior to such event |
| $OS'$ | = | the number of Common Units outstanding immediately after such event |
| $OS_0$ | = | the number of Common Units outstanding immediately prior to such event. |

Such adjustment shall become effective immediately after 9:00 a.m., New York City time, on the Business Day following the date fixed for the determination of Common Unit holders entitled to receive such distribution on the effective date of such subdivision or Common Unit split.  If any distribution of the type described in this Section 5.1(b) is declared but not so paid or made, the number of Common Units for which each Warrant is exercisable shall again be automatically adjusted to the number of  Common Units for which each Warrant is exercisable that would then be in effect if such distribution had not been declared.

(c)      Rights or Warrants.  If the Company issues to all or substantially all holders of its Common Units warrants or other rights entitling them to subscribe for or purchase Common Units, subject to the last paragraph of this Section 5.1(c), at a price per Common Unit less than the Market Price per Common Unit as of the Business Day immediately preceding the date of announcement of such issuance, the number of Warrant Units for which each Warrant is exercisable will be adjusted based on the following formula:

$$NS' = NS_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where,

| | | |
|---|---|---|
| $NS'$ | = | the number of Warrant Units for which each Warrant is exercisable in effect immediately after such event |
| $NS_0$ | = | the number of Warrant Units for which each Warrant is exercisable in effect immediately prior to such event |
| $OS_0$ | = | the number of Common Units outstanding immediately prior to such event |
| $X$ | = | the total number of Common Units issuable pursuant to such rights (or warrants) |
| $Y$ | = | the number of Common Units equal to the aggregate price payable to exercise such rights (or warrants) divided by the Market Price per Common Unit as of the record date. |

18

Such adjustment shall be successively made whenever any such rights or warrants are issued and shall become effective immediately after 9:00 a.m., New York City time, on the Business Day following the date fixed for the determination of unit holders entitled to receive such rights or warrants.  To the extent that Common Units are not delivered after the expiration of such rights or warrants, the number of Warrant Units for which the Warrants are exercisable shall automatically be readjusted to the number of Warrant Units for which the Warrants are exercisable that would then be in effect had the adjustments made upon the issuance of such rights or warrants been made on the basis of delivery of only the number of Common Units actually delivered.  If such rights or warrants are not so issued, the number of Warrant Units for which the Warrants are exercisable shall again be adjusted to be the number of Warrant Units for which each Warrant is exercisable that would then be in effect if such date fixed for the determination of unit holders entitled to receive such rights or warrants had not been fixed.  No adjustment shall be made pursuant to this Section 5.1(c) which shall have the effect of decreasing the number of Warrant Units issuable upon exercise of the Warrants.

In the event that the Company issues rights pursuant to a unit holder rights plan, no adjustment shall be required under this Section 5.1(c) until the time such rights become exercisable.

In determining whether any rights or warrants entitle the Holders to subscribe for or purchase Common Units at less than the Market Price, and in determining the aggregate price payable to exercise such rights or warrants, there shall be taken into account any consideration received by the Company for such rights or warrants and any amount payable on exercise thereof, the value of such consideration, if other than cash, to be determined reasonably and in good faith by the Board of Directors.

(d)    Other Distributions.  If the Company fixes a record date for the making of any distribution of Common Units, other securities, evidences of indebtedness or other assets or property of the Company to all or substantially all holders of the Common Units, excluding:

(i)    distributions and rights or warrants referred to in Sections 5.1(b) or 5.1(c);

(ii)    distributions paid exclusively in cash referred to in Section 5.1(e); and

(iii)    any Transaction Consideration in a Fundamental Change (for which Section 5.1(i)(A) applies),

then the number of Warrant Units for which each Warrant is exercisable will be adjusted based on the following formula:

$$NS' = NS_0 \times \frac{SP_0}{SP_0 - FMV}$$

where,

NS'    =    the number of Warrant Units for which each Warrant is exercisable in effect immediately after such distribution

| $NS_0$ | = | the number of Warrant Units for which each Warrant is exercisable in effect immediately prior to such distribution |
|---|---|---|
| $SP_0$ | = | the Market Price per Common Unit as of the last Trading Day immediately preceding the first date on which the Common Units trade regular way without the right to receive such distribution |
| FMV | = | the fair market value (as determined reasonably and in good faith by the Board of Directors) of the Common Units, other securities, evidences of indebtedness, assets or property distributed with respect to each issued and outstanding Common Unit on the record date for such distribution. |

Such adjustment shall become effective immediately prior to 9:00 a.m., New York City time, on the Business Day following the date fixed for the determination of unit holders entitled to receive such distribution.  Such adjustment shall be made successively whenever such a record date is fixed with respect to a subsequent event.  To the extent such distribution is not so paid or made, the number of Warrant Units will automatically be readjusted to the number that would then be in effect had the adjustment been made on the basis of only the distribution, if any, actually made or paid.

In the event the Company makes a distribution of rights pursuant to a unit holders' rights plan, no adjustment shall be required under this Section 5.1(d) until the time such rights become exercisable.

With respect to an adjustment pursuant to this Section 5.1(d) where there has been an equity interest of or relating to a Subsidiary or other business unit listed on a national securities exchange (a "*Spin-Off*"), the number of Warrant Units for which each Warrant is exercisable in effect immediately before 5:00 p.m., New York City time, on the record date fixed for determination of unit holders entitled to receive the distribution will be increased based on the following formula:

$$NS' = NS_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

| $NS'$ | = | the number of Warrant Units for which each Warrant is exercisable in effect immediately after such distribution |
|---|---|---|
| $NS_0$ | = | the number of Warrant Units for which each Warrant is exercisable in effect immediately prior to such distribution |
| $FMV_0$ | = | the product of (1) the VWAP of one unit of such capital stock, share capital or similar equity interest on the Exchange on which such capital stock, share capital or similar equity interest is listed |

over the first twenty (20) consecutive Trading Day period after the effective date of the Spin-Off and (2) the number of units of such capital stock, share capital or equity interests distributed per Common Unit

$MP_0$   =   the Market Price per Common Unit as of the twentieth (20th) Business Day after the effective date of the Spin-Off.

Such adjustment shall occur on the twentieth (20th) consecutive Trading Day from, and including, the effective date of the Spin-Off.  No adjustment shall be made pursuant to this <u>Section 5.1(d)</u> which shall have the effect of decreasing the number of Warrant Units issuable upon exercise of each Warrant.  To the extent such distribution is not so paid or made, the number of Warrant Units will automatically be readjusted to the number that would then be in effect had the adjustment been made on the basis of only the distribution, if any, actually made or paid.

(e)   <u>Cash Distribution</u>.  If the Company makes any cash distribution (excluding any cash distributions in connection with a Winding Up or a Cash Exit Transaction) during any quarterly fiscal period to all or substantially all holders of Common Units, the number of Warrant Units for which each Warrant is exercisable will be adjusted based on the following formula:

$$NS' = NS_0 \times \frac{SP_0}{SP_0 - C}$$

where,

$NS'$   =   the number of Warrant Units for which each Warrant is exercisable in effect immediately after the record date for such distribution

$NS_0$   =   the number of Warrant Units for which each Warrant is exercisable in effect immediately prior to the record date for such distribution

$SP_0$   =   the Market Price per Common Unit as of the last Trading Day immediately preceding the first date on which the Common Units trade regular way without the right to receive such distribution (or, if the Common Units are not then traded on an Exchange, the Market Price of the Common Units as of the first Business Day after the record date for such distribution)

$C$   =   the amount in cash per Common Unit the Company distributes to holders of Common Units.

Such adjustment shall become effective immediately after the close of business on the date for the determination of unit holders entitled to receive such cash distribution.  No adjustment shall be made pursuant to this <u>Section 5.1(e)</u> which shall have the effect of decreasing the number of

21

Warrant Units issuable upon exercise of the Warrants.  To the extent such distribution is not so paid or made, the number of Warrant Units will automatically be readjusted to the number that would then be in effect had the adjustment been made on the basis of only the distribution, if any, actually made or paid.

(f)     No Adjustment if Participating.  Notwithstanding the foregoing provisions of this Section 5.1, no adjustment shall be made hereunder, nor shall an adjustment be made to the ability of a Holder to exercise, for any distribution described herein if the Holder will otherwise participate in the distribution with respect to its Warrant Units without exercise of the Warrants (without giving effect to any separate exercise of preemptive rights).

(g)     When Adjustments Are to Be Made.  The adjustments required by this Section 5.1 shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price or the number of Common Units issuable upon exercise of the Warrants that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the Exercise Price or the Common Units issuable upon exercise of the Warrants immediately prior to the making of such adjustment by at least 1.0%.  Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by this Section 5.1 and not previously made, would result in such minimum adjustment.

(h)     Adjustment Event.  In any case in which this Section 5.1 provides that an adjustment shall become effective immediately after (i) a record date or record date for an event, (ii) the date fixed for the determination of unit holders entitled to receive a distribution pursuant to this Section 5.1 or (iii) a date fixed for the determination of unit holders entitled to receive rights or warrants pursuant to this Section 5.1 (each, a "***Determination Date***"), the Company may elect to defer until the occurrence of the applicable Adjustment Event (x) issuing to the Holder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional Common Units or other securities issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Common Units issuable upon such conversion before giving effect to such adjustment and (y) paying to such holder any amount in cash in lieu of any fraction pursuant to Section 5.2.  For purposes of this Section 5.1(h), the term "***Adjustment Event***" shall mean:

(A)     in any case referred to in clause (i) hereof, the occurrence of such event,

(B)     in any case referred to in clause (ii) hereof, the date any such distribution is made, and

(C)     in any case referred to in clause (iii) hereof, the date of expiration of such rights or warrants.

(i)     Adjustments for Fundamental Changes.

(A)     In case, after the date hereof, a Fundamental Change (other than a Cash Exit Transaction) shall occur while any Warrants remain outstanding and

unexpired, then proper provision shall be made (including the Company obtaining the agreement of any surviving entity in such transaction to assume the obligations of this Section) so that, upon the basis and terms and in the manner provided in this Agreement, the Holders, upon the exercise of the Warrants any time after the consummation of such transaction and prior to the Expiration Date, shall be entitled to receive (upon payment of the aggregate Exercise Price for each Warrant Unit otherwise issuable upon such exercise) a Unit of Transaction Consideration; provided, further, that the Board of Directors of the Company shall be entitled, in its sole discretion, to reduce the cash portion of a Unit of Transaction Consideration payable to such Holder in respect of each of its Warrants upon exercise thereof if and to the extent the Company reduces the Exercise Price payable by such Holder in respect of each such Warrant by an amount equal to such portion.

(B)     In connection with any Fundamental Change (other than a Cash Exit Transaction) prior to the Expiration Date, the Company shall make appropriate provision to ensure that the Holders shall have the right to receive, upon consummation of such transaction and thereafter upon exercise of any convertible securities so received, as applicable, such property as may be required pursuant to this Section 5.1, and to the extent such property includes convertible securities, the Company shall provide for adjustments substantially equivalent to the adjustments provided for in this Section 5.1.

(C)     Notwithstanding the foregoing provisions of this Section 5.1(i), in connection with any consolidation, merger, amalgamation, combination, division or binding or statutory Common Unit exchange involving the Company in which the Common Units are converted into, or are exchanged for, or represent solely the right to receive, shares or other equity securities of the resulting or surviving entity (or such entity's ultimate parent entity), the Company shall have the right to cause each Holder to exchange, and each Holder shall exchange, all of the Warrants then held by such Holder for warrants or other securities in such surviving entity or ultimate parent entity with substantially similar economic and other rights, privileges and preferences (with respect to the surviving entity or ultimate parent entity and the equity securities thereof) as those possessed by the Warrants held by such Holder (with respect to the Company and the Common Units) immediately prior to the consummation of such transaction, including adjustments substantially equivalent to the adjustments provided for in this Section 5.1.  Each such Holder shall take, or cause to be taken, all actions that are reasonably requested by the Company in furtherance of such exchange, including executing and delivering a warrant or similar agreement with respect to the warrants or other securities to be received by such Holder in such exchange.  All Warrants exchanged by Holders pursuant to this Section 5.1(i)(C) shall be canceled and, except as may be set forth in the definitive warrant or similar agreement entered into in connection with such exchange, this Agreement shall terminate as of the consummation of such exchange.

(j)     Deferrals.  In any case in which this Section 5.1 shall require that a decrease in the Exercise Price or an increase in the number of Warrant Units for which a Warrant

23

is exercisable be made effective prior to the occurrence of a specified event and any Warrant is exercised after the time at which the adjustment became effective but prior to the occurrence of such specified event, the Company may elect to defer (but not in any event later than the Expiration Date or the date of consummation of the applicable triggering event pursuant to this <u>Section 5.1</u>) until the occurrence of such specified event (i) the issuance to the applicable Holder of the number of Common Units issuable over and above the number of Common Units that would have been issuable upon such exercise immediately prior to such adjustment, and to require payment in respect of such number of Common Units the issuance of which is not deferred on the basis of the Exercise Price in effect immediately prior to such adjustment, and (ii) the corresponding reduction in the Exercise Price.

(k)      <u>Optional Tax Adjustment</u>.  The Company may at its option, at any time during the term of the Warrants, adjust the number of Common Units into which each Warrant is exercisable, or adjust the Exercise Price, in addition to those changes required by <u>Sections 5.1(b)</u>, <u>5.1(c)</u>, <u>5.1(d)</u> and <u>5.1(e)</u>, as deemed advisable by the Board of Directors of the Company, in order that any event treated for federal income tax purposes as a dividend of shares or share rights shall not be taxable to the recipients (or the amount that is taxable to the recipients shall be reduced).

(l)      <u>Warrants Deemed Exercisable</u>.  For purposes solely of this <u>Section 5</u>, the number of Common Units which the Holder of any Warrant would have been entitled to receive had such Warrant been exercised in full at any time or into which any Warrant was exercisable at any time shall be determined assuming such Warrant was exercisable in full at such time.

(m)      <u>Number of Units Outstanding</u>.  For purposes of this <u>Section 5.1</u>, the number of Common Units at any time in issue shall not include Common Units held in the treasury of the Company but shall include Common Units issuable in respect of scrip certificates issued in lieu of fractions of Common Units.  The Company will not make any distribution on Common Units held in the treasury of the Company.

(n)      <u>Successive Adjustments</u>.  Successive adjustments in the Exercise Price and the number of Common Units for which the Warrants are exercisable shall be made, without duplication, whenever any event specified in this <u>Section 5.1</u> shall occur.

(o)      <u>Notice of Adjustment</u>.  Upon the occurrence of each adjustment of the Exercise Price or the number of Common Units into which a Warrant is exercisable pursuant to this <u>Section 5.1</u>, the Company at its expense shall as promptly as practicable:

(i)      compute such adjustment in accordance with the terms hereof; and

(ii)      deliver to all Holders (in accordance with <u>Section 10.1(b)</u> and <u>Section 10.2</u>) and the Warrant Agent a certificate of the Chief Financial Officer of the Company setting forth the Exercise Price and the number of Common Units into which each Warrant is exercisable after such adjustment, setting forth a brief, detailed statement of the facts requiring such adjustment and the computation by which such adjustment was made (including a description of the basis on which the Market Price of the Common Units was determined by the Board of Directors).  As provided in

Section 9, the Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same from time to time at the Corporate Agency Office (as defined below) to any Holder desiring an inspection thereof during reasonable business hours.  The Company hereby agrees that it will provide the Holders and the Warrant Agent with reasonable notice of any Adjustment Event set forth in this Section 5.1.  The Company further agrees that it will provide to the Holders and the Warrant Agent with any new or amended exercise terms.  The Warrant Agent shall have no obligation under any Section of this Agreement to determine whether an Adjustment Event has occurred or to calculate any of the adjustments set forth herein.

5.2     Fractional Interest.  The Company shall not be required upon the exercise of any Warrant to issue any fractional Common Units, but may, in lieu of issuing any fractional Common Units make an adjustment therefore in cash on the basis of the Market Price per Common Unit as of the date of such exercise.  The number of Common Units (and any fractional Common Units) shall be calculated on the aggregate number of Warrants exercised by the applicable Holder.  If Book-Entry Warrants evidencing more than one Warrant shall be presented for exercise at the same time by the same Holder, the number of full Common Units which shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so to be exercised.  The Holders, by their acceptance of the Book-Entry Warrants, expressly waive their right to receive any fraction of a Common Unit or a unit certificate representing a fraction of a Common Unit if such amount of cash is paid in lieu thereof.

5.3     No Adjustments.  No adjustment to the Exercise Price or the number of Warrant Units for which the Warrants are exercisable need be made upon, as a result of or relating to (a) the issuance of any Common Units, Common Unit Equivalents, or other securities which may become issuable pursuant to the Management Plan; (b) the issuance of any other securities by the Company on or after the Original Issue Date, whether or not contemplated by the Plan, or upon the issuance of Common Units upon the exercise of any such securities, except as expressly contemplated in Section 5.1; (c) the issuance of Warrant Units pursuant to the exercise of Warrants; or (d) the issuance of any Equity Securities or other securities of the Company in connection with any acquisition transaction.

5.4     Adjustment of Prices.  Whenever any provision of this Agreement requires a calculation of a price over a span of multiple days (including, without limitation, a Market Price, a Cashless Exercise Market Price or a Quoted Price) the Company shall make appropriate adjustments to account for any adjustment to the Exercise Price that becomes effective, or any event requiring an adjustment to the Exercise Price where the record date, effective date or expiration date of the event occurs, at any time during the period when such price is to be calculated.  Further, and without limiting the foregoing, in the event of a Cashless Exercise following an adjustment to the Exercise Price where the Cashless Exercise Market Price spans any day prior to the effectiveness of such adjustment, the Company shall make appropriate adjustments to the Cashless Exercise Market Price to take into account such adjustment.

**6.      Status of Common Units**.

The Company covenants that, for the duration of the Exercise Period, the Company will at all times reserve and keep available, under the LLC Agreement and, if applicable, the Company's certificate of formation, the right and ability to issue and deliver upon the exercise of the Warrants, free of preemptive rights, such number of Common Units as from time to time shall be issuable upon the exercise in full of all outstanding Warrants for cash.  The Company further covenants that it shall, from time to time, take all steps necessary to increase the authorized number of Common Units if at any time the authorized number of Common Units remaining unissued would otherwise be insufficient to allow delivery of all Common Units then deliverable upon exercise in full of all outstanding Warrants.  The Company covenants that all Common Units issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and non-assessable (as such concepts apply to a limited liability company) and will be free of restrictions on transfer other than as set forth in the LLC Agreement and applicable to Common Units generally, and will be free from (i) any and all security interests created by or imposed upon the Company and (ii) all taxes, liens and charges in respect of the issue thereof (other than income or withholding taxes or taxes in respect of any transfer occurring contemporaneously or otherwise specified herein or in connection with a Cashless Exercise).  The Company shall take all such actions as may be necessary to ensure that all such Common Units may be so issued without violation of any requirements of any U.S. national securities exchange upon which Common Units may be listed (except for official notice of issuance which shall be promptly delivered by the Company upon each such issuance).  The Company covenants that all Common Units will, at all times that Warrants are exercisable, be duly approved for listing subject to official notice of issuance on each securities exchange, if any, on which the Common Units are then listed.  The Company covenants that the unit certificates issued to evidence any Common Units issued upon exercise of Warrants, if any, will comply with the applicable provisions of the Delaware Limited Liability Company Act.

The Company hereby authorizes and directs its current and future transfer agents for the Common Units at all times to reserve unit certificates for such number of authorized Common Units, to the extent as, and if, required.  The Company will supply such transfer agents with duly executed unit certificates for such purposes, to the extent as, and if, required.

**7.      Warrant Transfer Books**.

The Warrant Agent will maintain an office or offices (the "***Corporate Agency Office***") in the United States of America, where Warrants may be surrendered for registration of transfer or exchange and where Warrants may be surrendered for exercise of Warrants, which office is 48 Wall Street, 22nd Floor, New York, New York 10005 on the Original Issue Date.  The Warrant Agent will give prompt written notice to all Holders of any change in the location of such office.

The Warrants shall be issued in registered form only.  The Company shall cause to be kept at the Corporate Agency Office a Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Company shall provide for the registration of Warrants and of transfers or exchanges of Warrants as herein provided.

All Book-Entry Warrants issued upon any registration of transfer or exchange of Book-Entry Warrants shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Book-Entry Warrants surrendered for such registration of transfer or exchange.

No service charge shall be made for any registration of transfer or exchange of Warrants; provided, however, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange. The Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is reasonably satisfied that all such payments have been made.

The Warrant Agent shall, upon request and at the expense of the Company from time to time, deliver to the Company such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the Common Units as the Company may request. The Warrant Agent shall, upon reasonable advance notice, also make available to the Company for inspection by the Company's agents or employees, from time to time as the Company may request, such books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

The Warrant Agent shall keep copies of this Agreement and any notices given to Holders hereunder available for inspection, upon reasonable advance notice, by the Holders during normal business hours at the Corporate Agency Office. The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Agreement as the Warrant Agent may request.

**8.    Warrant Holders**.

8.1    <u>No Rights as Unit Holder until Exercise</u>.

(a)    Prior to the exercise of the Warrants and the date the Warrant Units are required to be delivered hereunder, and prior to compliance with all terms and conditions of this Agreement and the LLC Agreement for admission as a Member, no Holder of a Warrant shall have or exercise any rights by virtue hereof as a holder of Common Units of the Company or as a Member of the Company, including, without limitation, the right to vote, to receive distributions or dividends as a holder of Common Units or to receive notice of, or attend, meetings or any other proceedings of the holders of Common Units;

(b)    The consent of any Holder of a Warrant shall not be required with respect to any action or proceeding of the Company; and

(c)    No Holder of a Warrant shall have any right not expressly conferred hereunder or under, or by applicable law with respect to, the Warrant held by such Holder.

8.2    <u>Rights of Action</u>. All rights of action against the Company in respect of this Agreement, except rights of action vested in the Warrant Agent, are vested in the Holders of the Warrants, and any Holder of any Warrant, without the consent of the Warrant Agent or the Holder

of any other Warrant, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

**9.**      **Concerning the Warrant Agent**.

Sections 9.1, 9.2, 9.3, 9.4, 9.5, 9.6 and 9.8 shall survive the expiration of the Warrants and the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

>      9.1      Rights and Duties of the Warrant Agent.

>           (a)      The Company hereby appoints the Warrant Agent to act as agent of the Company as set forth in this Agreement.  The Warrant Agent hereby accepts the appointment as agent of the Company and agrees to perform that agency upon the express terms and conditions (and no implied terms or conditions) set forth in this Agreement, in the Warrant Statements, by all of which the Company and the Holders of Warrants, by their acceptance thereof, shall be bound; provided, however, that the terms and conditions contained in the Warrant Statements are subject to and governed by this Agreement.  The Warrant Agent shall act solely as agent of the Company hereunder and does not assume any obligation or relationship of agency or trust for or with any of the Holders or any beneficial owners of Warrants or any other Person.

>           (b)      The Warrant Agent shall not, by countersigning Warrant Statements or by any other act hereunder, be deemed to make any representations as to validity or authorization of (i) the Warrants or the Warrant Statements (except as to its countersignature thereon), (ii) any securities or other property delivered upon exercise of any Warrant, (iii) the accuracy of the computation of the number or kind or amount of units, stock, shares or other securities or other property deliverable upon exercise of any Warrant, (iv) the correctness of any of the representations of the Company made in such certificates that the Warrant Agent receives or (v) any of the statements of act or recitals contained in this Agreement or Warrant Statement.  The Warrant Agent shall not at any time have any duty to calculate or determine whether any facts exist that may require any adjustments pursuant to Section 5 hereof with respect to the kind and amount of units, stock, shares or other securities or any property issuable to Holders upon the exercise of Warrants required from time to time.  The Warrant Agent shall have no duty or responsibility to determine the accuracy or correctness of such calculation or with respect to the methods employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any Common Units or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 5 hereof, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any Common Units or Common Unit certificates or other securities or property upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to Section 5 hereof or to comply with any of the covenants of the Company contained in Section 5 hereof.  The Company shall perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable it to carry out or perform its duties under this Agreement.

(c)     The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the Warrant Statements (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

(d)     The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any Holder of Warrants with respect to any action or default by the Company, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Company.

(e)     The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Company with respect to any matter relating to its acting as Warrant Agent hereunder.

(f)     The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(g)     The Warrant Agent shall not be liable or responsible for any failure of the Company to comply with any of its obligations relating to any registration statement filed with the SEC or this Agreement, including without limitation obligations under applicable regulation or law.

(h)     The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrants authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issue and sale, or exercise, of the Warrants.

(i)     The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the Warrants.

(j)     The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon (i) any guaranty of signature by an "eligible guarantor institution" that is a member or participant in the Securities Transfer Agents Medallion Program or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, the foregoing; or (ii) any law, act, regulation or any interpretation of the same even though such law, act, or regulation may thereafter have been altered, changed, amended or repealed.

(k)     In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent shall, as soon as practicable, provide notice of such ambiguity or uncertainty to the Company, and the Warrant Agent may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to Company, the holder of any Warrant or any other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of the Warrant Agent.

(l)     Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer of the Company and delivered to the Warrant Agent.  The Warrant Agent may rely upon such statement, and will be held harmless for such reliance, and shall not be held liable in connection with any delay in receiving such statement.

(m)     The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder, including any event or condition that may require action by the Warrant Agent, unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Company, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in Section 10.1 hereof, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

9.2     Limitation of Liability.

(a)     The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to the Warrant Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from the Warrant Agent is being sought.  Neither party to this Agreement shall be liable to the other party for any consequential, indirect, punitive, special or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

(b)     Exclusions.  The Warrant Agent shall have no responsibility with respect to the validity or execution of any Warrant.  The Warrant Agent shall not be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any

Warrant.  The Warrant Agent shall not be responsible to make any adjustments required under the provisions of <u>Section 5</u> hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Units to be issued pursuant to this Agreement or any Warrant or as to whether any Common Units shall, when issued, be valid and fully paid and non-assessable (as such concepts apply to a limited liability company).

      9.3   <u>Indemnification</u>.

      (a)   The Company covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable and documented fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; <u>provided</u> that such covenant and agreement does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, its gross negligence, bad faith, fraud or willful misconduct (which gross negligence, bad faith, fraud or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction).  The reasonable and documented out-of-pocket costs and expenses incurred in enforcing this right of indemnification shall be paid by the Company.

      (b)   <u>Instructions</u>.  From time to time, the Company may provide the Warrant Agent with instructions, by Company Order or otherwise, concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any officer of the Company for instruction with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement.  The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by Company for any action taken, suffered or omitted to be taken by the Warrant Agent in reliance upon any Company instructions.

      9.4   <u>Right to Consult Counsel</u>.  The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company) with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement, and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) of the Warrant Agent in accordance with the opinion or advice of such legal counsel.

      9.5   <u>Compensation and Reimbursement</u>.  The Company agrees to pay to the Warrant Agent reasonable compensation for all services rendered by it hereunder, as set forth on a fee schedule mutually agreed upon on or prior to the date hereof and, from time to time, on demand of the Warrant Agent, to reimburse the Warrant Agent for all of its reasonable and documented out-of-pocket expenses and legal counsel fees and other disbursements incurred in the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder.

9.6     <u>Warrant Agent May Hold Company Securities</u>.  The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not the Warrant Agent under this Agreement.  Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.  Nothing herein shall preclude the Warrant Agent or any Countersigning Agent from acting in any other capacity for the Company or for any other legal entity.

9.7     <u>Resignation and Removal; Appointment of Successor</u>.

(a)     The Warrant Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the Warrant Agent's own gross negligence, bad faith, fraud or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction) after giving thirty (30) days' prior written notice to the Company.  The Company may remove the Warrant Agent upon thirty (30) days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid.  The Warrant Agent shall, at the expense of the Company, cause notice to be given in accordance with <u>Section 10.1(a)</u> to the Company of said notice of resignation.  Upon such resignation or removal, the Company shall appoint in writing a new Warrant Agent.  If the Company shall fail to make such appointment within a period of thirty (30) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent.  The new Warrant Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment, (i) the Company shall file notice thereof with the resigning or removed Warrant Agent, (ii) the resigning or removed Warrant Agent shall deliver all of the relevant books and records to the successor Warrant Agent and (iii) the resigning or removed Warrant Agent shall deliver any funds held in connection with this Agreement to any such successor Warrant Agent.  Failure to give any notice provided for in this <u>Section 9.7(a)</u>, however, or any defect therein, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new Warrant Agent as the case may be.

(b)     Any Person into which the Warrant Agent or any new Warrant Agent may be merged, or any Person resulting from any consolidation to which the Warrant Agent or any new Warrant Agent shall be a party, shall be a successor Warrant Agent under this Agreement without any further act.  Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be given in accordance with <u>Section 10.1(b)</u> to each Holder of a Warrant at such Holder's last address as shown on the Warrant Register.

9.8     Appointment of Countersigning Agent.

(a)     The Warrant Agent may, but is not required to, appoint a Countersigning Agent or Agents which shall be authorized to act on behalf of the Warrant Agent to countersign Warrant Statements issued upon original issue and upon exchange or registration of transfer, and Warrant Statements so countersigned shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Statement duly executed and delivered hereunder.  Wherever reference is made in this Agreement to the countersignature and delivery of Warrant Statements by the Warrant Agent or to Warrant Statements countersigned by the Warrant Agent, such reference shall be deemed to include countersignature and delivery on behalf of the Warrant Agent by a Countersigning Agent and Warrant Statements countersigned by a Countersigning Agent.

(b)     A Countersigning Agent may resign at any time by giving thirty (30) days' prior written notice thereof to the Warrant Agent and to the Company.  The Warrant Agent may at any time terminate the agency of a Countersigning Agent by giving thirty (30) days' prior written notice thereof to such Countersigning Agent and to the Company.

(c)     The Warrant Agent agrees to pay to each Countersigning Agent from time to time reasonable compensation for its services under this Section 9.8 and the Warrant Agent shall be entitled to be reimbursed for such payments, subject to the provisions of Section 9.5.

(d)     Any Countersigning Agent shall have the same rights and immunities as those of the Warrant Agent set forth in this Agreement.

(e)     Any Person into which the Warrant Agent or a Countersigning Agent may be merged or any Person resulting from any consolidation to which the Warrant Agent or such Countersigning Agent shall be a party, shall be a successor Warrant Agent or Countersigning Agent, as applicable, without any further act; provided that such Person would be eligible for appointment as a new Warrant Agent or Countersigning Agent, as applicable, under the provisions of Section 9.8(a), without the execution or filing of any paper or any further act on the part of the Warrant Agent or the Countersigning Agent.  Any such successor Warrant Agent or Countersigning Agent shall promptly cause notice of its succession as Warrant Agent or Countersigning Agent, as applicable, to be given in accordance with Section 10.1(b) to each Holder of a Warrant at such Holder's last address as shown on the Warrant Register.

**10.** **Notices**.

10.1    <u>Notices Generally</u>.

(a)    Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Company or the Warrant Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing (including telecopy or electronic communication) and telecopied, sent via electronic means, trackable or first-class mail or delivered by hand (including by courier service) as follows:

if to the Company, to:

> [Reorganized Curo]
> 101 N. Main Street, Suite 600
> Greenville, SC 29601
> Attention: Rebecca Fox, General Counsel
> Email: BeccaFox@curo.com

if to the Warrant Agent, to:

> Equiniti Trust Company, LLC
> 48 Wall Street, 22nd Floor
> New York, NY 10005
> Email:  ReorgWarrants@equiniti.com

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this <u>Section 10.1(a)</u>.

All such communications shall be effective when sent.

(b)    Where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if (i) in writing and mailed, by trackable or first-class mail, to each Holder affected by such event, at the address of such Holder as it appears in the Warrant Register or (ii) sent by electronic means.  Without limiting any of the rights or immunities of the Warrant Agent under this Agreement, where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  [For the avoidance of doubt, any notice required to be given to Holders with respect to any Warrants represented by a Global Warrant Certificate shall be required to be given only to DTC.]

[Where this Agreement provides for notice of any event to a Holder of a Global Warrant Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.]

10.2    <u>Required Notices to Holders</u>.  In the event the Company shall:

(a)      take any action that would result in an adjustment to the Exercise Price and/or the number of Common Units issuable upon exercise of a Warrant pursuant to <u>Section 5.1</u>;

(b)      effect any Fundamental Change or Winding Up; or

(c)      make a tender offer or exchange offer with respect to the Common Units (each of (a), (b) or (c), an "***Action***");

then, in each such case, the Company shall cause to be delivered to the Warrant Agent and shall give to each Holder of a Warrant, in accordance with <u>Section 10.1(b)</u> hereof, a written notice of such Action, including, in the case of an action pursuant to <u>Section 10.2(a)</u>, the information required under <u>Section 5.1(o)</u>. To the extent such notice does not constitute material nonpublic information in the reasonable determination of the Company, such notice shall be given promptly prior to taking such Action (and in any event at least seven (7) days prior to the date of the taking of such Action). To the extent applicable to the subject Action, such notice shall specify (i) the record date, if any, by which a Person must be a registered holder of Common Units to receive any distribution or otherwise participate in the Action as a holder of Common Units and (ii) if such Action is or, assuming its consummation, would be an Adjustment Event, to the extent such amount is reasonably calculable at the time such notice is given, the adjusted Exercise Price and number of Warrant Units issuable upon exercise of one Warrant after giving effect to such Adjustment Event.

If at any time the Company shall cancel any of the Actions for which notice has been given under this <u>Section 10.2</u> prior to the consummation thereof, the Company shall give each Holder prompt notice of such cancellation in accordance with <u>Section 10.1(b)</u>.

In addition, in the event that the Company enters into any definitive agreement or plan in respect of a Fundamental Change, the Company shall cause to be delivered to the Warrant Agent and shall give to each Holder of a Warrant, in accordance with <u>Section 10.1(b)</u>, a notice of the entering into such definitive agreement or plan, unless the Company has already given notice of the Action that is the subject of such definitive agreement or plan pursuant to the first paragraph of this <u>Section 10.2</u>.

## 11.      **Information Rights**.

Each Holder, by virtue of being a Holder listed in the Warrant Register, shall be entitled to the same information rights of the Members that are set forth in Section [11.4] of the LLC Agreement, subject to the same obligations of Members (as defined in the LLC Agreement) that are set forth in Section [11.17] of the LLC Agreement in respect of any information received pursuant to such information rights, as if each reference therein to one or more "Members" were deemed instead a reference to one or more "Holders." For avoidance of doubt, the rights and obligations of Holders under this <u>Section 11</u> are subject to any amendments or modifications of Sections [11.4] or [11.17] of the LLC Agreement effected from time to time in accordance with the terms of the LLC Agreement; <u>provided</u> that, to the extent that any such amendment or modification changes the section number where any information rights or confidentiality obligations of Members of the type set forth in Section [11.4] and Section [11.17], respectively,

are set forth in the LLC Agreement, the cross-references to Sections [11.4] and [11.17] of the LLC Agreement in the first sentence of this <u>Section 11</u> shall be deemed to include (or will be replaced with, as applicable) cross-references to each such changed section number from and after such amendment or modification.

**12.    Inspection**.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder of any Warrant.

**13.    Supplements and Amendments**.

(a)    This Agreement may be amended by the Company and the Warrant Agent with the consent of the Required Warrant Holders.

(b)    Notwithstanding the foregoing, the Company and the Warrant Agent may, without the consent or concurrence of the Holders of the Warrants, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Company in this Agreement thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Company in this Agreement; <u>provided</u>, <u>however</u>, that in the case of clause (ii) such amendment shall not adversely affect, alter or change the rights or interests of the Holders of the Warrants hereunder in any material respect.

(c)    The consent of each Holder of any Warrant affected thereby shall be required for any supplement or amendment to this Agreement or the Warrants that would: (i) increase the Exercise Price or decrease the number of Common Units receivable upon exercise of Warrants, in each case other than as provided in <u>Section 5.1</u>; (ii) change the Expiration Date to an earlier date; or (iii) modify the provisions contained in <u>Section 5.1</u> in a manner adverse to the Holders of Warrants generally with respect to their Warrants.

(d)    The Warrant Agent shall join with the Company in the execution and delivery of any such amendment; <u>provided</u> that, as a condition precedent to the Warrant Agent's execution of any amendment to this Agreement, the Company shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this <u>Section 13</u>.  Notwithstanding anything in this Agreement to the contrary, the Warrant Agent shall not be required to execute any amendment to this Agreement that it has determined would adversely affect its own rights, duties, obligations or immunities under this Agreement and no amendment to this Agreement shall be effective unless duly executed by the Warrant Agent.  Upon execution and delivery of any amendment pursuant to this <u>Section 13</u>, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Warrant or holder of an interest in a Warrant theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

(e)    Promptly after the execution by the Company and the Warrant Agent of any such amendment, the Company shall give notice to the Holders of Warrants, setting forth in

general terms the substance of such amendment, in accordance with the provisions of Section 10.1(b). Any failure of the Company to mail such notice or any defect therein shall not, however, in any way impair or affect the validity of any such amendment.

**14.   Waivers**.

The Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Required Warrant Holders and the prior written consent of the Warrant Agent.

**15.   Successors**.

The terms and provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company, the Warrant Agent and the Holders and their respective successors and permitted assigns.

**16.   Headings**.

The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**17.   Counterparts**.

This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument. A signature to this Agreement transmitted electronically shall have the same authority, effect and enforceability as an original signature.

**18.   Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other provisions hereof; provided that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or other Governmental Entity not to be enforceable in accordance with its terms, the parties agree that the court or other Governmental Entity making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced; provided, further that, if such excluded provision shall adversely affect the rights, immunities, liabilities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately upon written notice to the Company.

**19.   Benefits of this Agreement**.

This Agreement shall be binding upon and inure to the benefit of the Company, the Warrant Agent and the Holders from time to time. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company, the Warrant Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and

all covenants, conditions, stipulations, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders. Each Holder or holder of an interest in a Warrant, by acceptance of a Warrant or of such interest in a Warrant, agrees to all of the terms and provisions of this Agreement applicable thereto.

20.   **Applicable Law; Jurisdiction; Waiver of Service and Venue; Waiver of Jury Trial**.

THIS AGREEMENT, EACH WARRANT ISSUED HEREUNDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO, INCLUDING THE INTERPRETATION, CONSTRUCTION, VALIDITY AND ENFORCEABILITY THEREOF, SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.  THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A WARRANT (BY RECEIPT OF A WARRANT OR AN INTEREST IN A WARRANT) AND THE WARRANT AGENT CONSENT AND AGREE THAT ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTE ARISES IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY.  THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A WARRANT (BY RECEIPT OF A WARRANT OR AN INTEREST IN A WARRANT) AND THE WARRANT AGENT CONSENT AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS.  EACH OF THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A WARRANT (BY RECEIPT OF A WARRANT OR AN INTEREST IN A WARRANT) AND THE WARRANT AGENT WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (II) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.  THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A WARRANT (BY RECEIPT OF A WARRANT OR AN INTEREST IN A WARRANT) AND THE WARRANT AGENT HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE IN THE MANNER HEREIN PROVIDED.  EACH OF THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A WARRANT (BY RECEIPT OF A WARRANT OR AN INTEREST IN A WARRANT) AND THE WARRANT AGENT HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR SUCH HOLDER'S OWNERSHIP OF WARRANTS.  EACH OF THE COMPANY, EACH HOLDER AND EACH HOLDER OF AN INTEREST IN A WARRANT (BY RECEIPT OF A WARRANT OR AN INTEREST IN A WARRANT) AND THE WARRANT AGENT CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER SUCH PARTY HAS REPRESENTED,

EXPRESSLY OR OTHERWISE, THAT ANY OTHER SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND ACKNOWLEDGES THAT EACH OTHER SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 20</u>.

**21.**   **Entire Agreement**.

This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

**22.**   **Force Majeure**.

Notwithstanding anything to the contrary contained herein, the Warrant Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, epidemics, pandemics, government orders, shortage of supply, disruptions in public utilities, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems, labor difficulties, war, or civil unrest; <u>provided</u> that the Warrant Agent shall (a) use its commercially reasonable efforts to end or mitigate the effects of any such occurrence on its performance and (b) resume the performance of its obligations as soon as reasonably practicable after the end of such occurrence.

**23.**   **Further Assurances**.

The Company shall perform, acknowledge and deliver or cause to be performed, acknowledged and delivered all such further and other acts, documents, instruments and assurances as may be reasonably required by the Warrant Agent for the carrying out or performing by the Company of the provisions of this Agreement.

**24.**   **Confidentiality**.

The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including *inter alia*, personal, nonpublic Holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other Person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions). However, each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

[REORGANIZED CURO]

By: _____
     Name:
     Title:


EQUINITI TRUST COMPANY, LLC

By: _____
     Name:
     Title:

**EXHIBIT A**

## FORM OF WARRANT STATEMENT AND WARRANT LEGEND

*[Form of Warrant Statement to be included by the Warrant Agent; sample below]*

**WARRANT LEGEND**

THIS WARRANT HAS BEEN, AND THE SECURITIES REPRESENTED HEREBY WILL BE, ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "**BANKRUPTCY CODE**"). THIS WARRANT AND THE SECURITIES REPRESENTED BY THIS WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

IN ADDITION, THIS WARRANT AND THE SECURITIES REPRESENTED BY THIS WARRANT MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE PROVISIONS OF THE UNDERLYING WARRANT AGREEMENT AND THAT CERTAIN LIMITED LIABILITY COMPANY AGREEMENT OF [REORGANIZED CURO]), DATED ON OR ABOUT THE DATE OF THE WARRANT AGREEMENT (AS THE SAME MAY BE AMENDED, RESTATED OR MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS, THE "**LLC AGREEMENT**"), A COPY OF WHICH IS ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER OF THIS WARRANT OR THE SECURITIES REPRESENTED BY THIS WARRANT WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE WARRANT AGREEMENT AND, AS APPLICABLE, THE LLC AGREEMENT. THE SECURITIES REPRESENTED BY THIS WARRANT ARE ALSO SUBJECT TO CERTAIN OTHER RIGHTS AND OBLIGATIONS AS SET FORTH IN THE LLC AGREEMENT.

ONLY MEMBERS ARE ENTITLED TO EXERCISE THE RIGHTS OF MEMBERS UNDER THE LLC AGREEMENT, INCLUDING INFORMATION RIGHTS, VOTING RIGHTS AND REGISTRATION RIGHTS UNDER THE LLC AGREEMENT. NO PERSON MAY BECOME A MEMBER PURSUANT TO ANY TRANSFER OF UNITS OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE LLC AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE

COMPANY.  [A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY
CONTACTING: GENERAL COUNSEL, [REORGANIZED CURO], [ADDRESS].]

EXHIBIT B

[FACE OF GLOBAL WARRANT CERTIFICATE][2]

[REORGANIZED CURO]

GLOBAL WARRANT CERTIFICATE

EVIDENCING

WARRANTS TO PURCHASE COMMON UNITS

[FACE]

No. [____]                                                    CUSIP No. [●]

UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO [REORGANIZED CURO] (THE "**COMPANY**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THIS WARRANT HAS BEEN, AND THE SECURITIES REPRESENTED HEREBY WILL BE, ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "**BANKRUPTCY CODE**").  THIS WARRANT AND THE SECURITIES REPRESENTED BY THIS WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER.  IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT

---

[2] **Note to Draft**:  To include if Warrants are DTC eligible.

AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

IN ADDITION, THIS WARRANT AND THE SECURITIES REPRESENTED BY THIS WARRANT MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE PROVISIONS OF THE UNDERLYING WARRANT AGREEMENT AND THAT CERTAIN LIMITED LIABILITY COMPANY AGREEMENT OF [REORGANIZED CURO], DATED ON OR ABOUT THE DATE OF THE WARRANT AGREEMENT (AS THE SAME MAY BE AMENDED, RESTATED OR MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS, THE "**LLC AGREEMENT**"), A COPY OF WHICH IS ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE COMPANY.  NO TRANSFER OF THIS WARRANT OR THE SECURITIES REPRESENTED BY THIS WARRANT WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE WARRANT AGREEMENT AND, AS APPLICABLE, THE LLC AGREEMENT.  THE SECURITIES REPRESENTED BY THIS WARRANT ARE ALSO SUBJECT TO CERTAIN OTHER RIGHTS AND OBLIGATIONS AS SET FORTH IN THE LLC AGREEMENT.

ONLY MEMBERS ARE ENTITLED TO EXERCISE THE RIGHTS OF MEMBERS UNDER THE LLC AGREEMENT, INCLUDING INFORMATION RIGHTS, VOTING RIGHTS AND REGISTRATION RIGHTS UNDER THE LLC AGREEMENT.  NO PERSON MAY BECOME A MEMBER PURSUANT TO ANY TRANSFER OF UNITS OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE LLC AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE COMPANY.  [A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY CONTACTING: GENERAL COUNSEL, [REORGANIZED CURO], [ADDRESS].]

**[REORGANIZED CURO]**[3]

No.__                                                    [__,__,___] Warrants
                                                         CUSIP No. [●]

THIS CERTIFIES THAT, for value received, [_____], or registered assigns, is the registered owner of the number of Warrants to purchase Common Units of [Reorganized Curo], a Delaware limited liability company (the "***Company***", which term includes any successor thereto under the Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, the "***Warrant Agreement***"), dated as of [●], 2024, between the Company and Equiniti Trust Company, LLC (the "***Warrant Agent***", which term includes any successor thereto permitted under the Warrant Agreement) specified above or such lesser number as may from time to time be endorsed on the "Schedule of Decreases in Warrants" attached hereto, and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Holder's option, at any time when the Warrants evidenced hereby are exercisable, to purchase from the Company one Common Unit of the Company for each Warrant evidenced hereby, at the purchase price of $[●] per Common Unit (as adjusted from time to time, the "***Exercise Price***"), payable in full at the time of purchase, the number of Common Units into which and the Exercise Price at which each Warrant shall be exercisable, each being subject to adjustment as provided in <u>Section 5</u> of the Warrant Agreement.

The Company shall pay any and all taxes (other than income or withholding taxes) that may be payable in respect of the issue or delivery of Common Units on exercise of Warrants. The Company shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Units in book-entry form or any certificates for Common Units or payment of cash to any Person other than the Holder of the Warrant certificate evidencing the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any Common Units in book-entry form or any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or to the Company, (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid or (c) all other information as set forth in the Warrant Agreement has been received and all other terms and conditions of such issuance and delivery set forth in the Warrant Agreement have been complied with.

Each Warrant evidenced hereby may be exercised by the Holder hereof at the Exercise Price then in effect on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date in the Warrant Agreement.

Subject to the provisions hereof and of the Warrant Agreement, the Holder of this Global Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercised and, if applicable, whether Cashless Exercise is being elected with respect thereto, and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and delivering such Warrants by book-entry transfer through the facilities of the

---

[3] **Note to Draft**: To include if Warrants are DTC eligible.

Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with Applicable Procedures in respect of the exercise of such Warrants, together with payment in full of the Exercise Price as then in effect for each Common Unit receivable upon exercise of each Warrant being submitted for exercise unless Cashless Exercise is being elected with respect thereto.  Any such payment of the Exercise Price is to be by wire transfer in immediately available funds to such account of the Company at such banking institution as the Company shall have designated from time to time for such purpose.

Reference is hereby made to the further provisions of this Global Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Global Warrant Certificate has been countersigned by the Warrant Agent by manual, facsimile or electronic signature of an authorized officer on behalf of the Warrant Agent, this Global Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Company has caused this certificate to be duly executed.

Dated:  [_____ __], 20[__]

[Reorganized Curo]

[SEAL]                                         By: _____
                                                     [Title]

ATTEST:

Countersigned:

Equiniti Trust Company, LLC, as Warrant                     [                    ]
Agent
                                          OR

By: _____      By: _____
          Authorized Agent                        as Countersigning Agent

                                           By: _____
                                                   Authorized Officer

B-4

Reverse of Global Warrant Certificate[4]

[REORGANIZED CURO]

GLOBAL WARRANT CERTIFICATE

EVIDENCING

WARRANTS TO PURCHASE COMMON UNITS

The Warrants evidenced hereby are one of a duly authorized issue of Warrants of the Company designated as its Warrants to Purchase Common Units ("*Warrants*"), limited in aggregate number to [●] issued under and in accordance with the Warrant Agreement, dated as of [●], 2024 (the "*Warrant Agreement*"), between the Company and Equiniti Trust Company, LLC (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties, obligations and immunities thereunder of the Company, the Warrant Agent and the Holders of Warrants. A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder hereof.

The Exercise Price and the number of Common Units purchasable upon exercise of the Warrants are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

Except as provided in the Warrant Agreement, all outstanding Warrants shall expire and all rights of the Holders of such Warrants shall automatically terminate and cease to exist as of 5:00 p.m., New York time, on the Expiration Date. The "*Expiration Date*" shall mean the earlier to occur of (a) the seventh (7th) anniversary of the Original Issue Date or, if not a Business Day, then the next Business Day thereafter and (b) a Winding Up.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Holders of Warrants under the Warrant Agreement at any time by the Company and the Warrant Agent with the consent of the Required Warrant Holders.

Until the valid exercise of any Warrant, subject to the provisions of the Warrant Agreement and except as may be specifically provided for in the Warrant Agreement, (i) no Holder of a Warrant shall have or exercise any rights by virtue hereof as a holder of Common Units of the Company or as a Member of the Company, including, without limitation, the right to vote, to receive distributions or dividends or to receive notice of, or attend meetings of, unit holders or any other proceedings of the Company; (ii) the consent of any such Holder shall not be required with respect to any action or proceeding of the Company; and (iii) no such Holder shall have any right not expressly conferred by the Warrant held by such Holder.

---

[4] **Note to Draft**: To include if Warrants are DTC eligible.

This Global Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the laws of the State of New York.

All terms used in this Global Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement.

<u>Exercise Form</u>

Equiniti Trust Company, LLC
48 Wall Street, 22nd Floor
New York, NY 10005
E-mail: ReorgWarrants@equiniti.com

Re: [Reorganized Curo] Warrant Agreement, dated as of [●], 2024

In accordance with and subject to the terms and conditions hereof and of the Warrant Agreement, the undersigned Holder of this Warrant hereby irrevocably elects to exercise _____ Warrants and represents that for each of the Warrants evidenced hereby being exercised such Holder either has (please check one box only):

☐     tendered the Exercise Price in the aggregate amount of $_____ by wire transfer in immediately available funds to such account of the Company at such banking institution as the Company shall have designated from time to time for such purpose; or

☐     elected a "Cashless Exercise".

The undersigned, if not already a Member of the Company, is concurrently delivering a joinder to the LLC Agreement.

The undersigned requests that the Common Units issuable upon exercise be in fully registered form in such denominations and registered in such names and delivered, together with any other property receivable upon exercise, in such manner as is specified in the instructions set forth below.

[If the number of Warrants exercised is less than all of the Warrants evidenced hereby, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached hereto to reflect the Warrants being exercised.]

Dated: _____

(Insert Social Security or Other
Identifying Number of Holder)

Name: _____
                    (Please Print)

Address: _____

_____

_____
                    Signature

(Signature must conform in all respects to name
of Holder as specified in the Warrant Register and
must bear a signature guarantee by a bank, trust
company or member firm of a U.S. national
securities exchange.)

Signature Guaranteed:

Instructions as to denominations of Common Units issuable upon exercise and as to
delivery of such securities and any other property issuable upon exercise:

## SCHEDULE A

## SCHEDULE OF DECREASES IN WARRANTS

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant Certificate following such decrease | Signature of authorized signatory |
| --- | --- | --- | --- |

B-9

EXHIBIT [C]


# FORM OF JOINDER AGREEMENT


       Reference is hereby made to the Limited Liability Company Agreement, dated as of [●], 2024 (as amended, modified, supplemented or restated from time to time, the "LLC Agreement"), of [Reorganized Curo], a limited liability company formed under the laws of Delaware (the "Company").  Pursuant to and in accordance with Section 4.1(e) of the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement, and agrees that upon execution of this Joinder Agreement (this "Agreement") and upon the satisfaction of the conditions to the admission of such Person as a Member set forth in the LLC Agreement, such Person shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto, with effect from and after the date hereof.

       Capitalized terms used but not defined herein shall have the meanings ascribed to them in the LLC Agreement.

       IN WITNESS WHEREOF, the undersigned has executed this Agreement effective as of _____.


**[NEW MEMBER]**


By: _____
     Name:
     Title: