**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CURO Group Holdings Corp., *et al.*, | ) | Case No. 24-90165 (MI) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF ADDITIONAL SERVICES IN CONNECTION WITH THE
DEBTORS' RETENTION OF KPMG LLP TO PROVIDE TAX CONSULTING
SERVICES TO THE DEBTORS EFFECTIVE AS OF THE PETITION DATE**

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN FOURTEEN DAYS FROM THE DATE THIS MOTION WAS FILED.  IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN FOURTEEN DAYS FROM THE DATE THIS NOTICE WAS FILED. OTHERWISE, THE COURT MAY TREAT THE NOTICE AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**PLEASE TAKE NOTICE** that, on April. 17, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Application to Retain and Employ KPMG LLP to Provide Tax Consulting Services to the Debtors Effective as of the Petition Date* [Docket No. 213] (the "Application").[2]

**PLEASE TAKE FURTHER NOTICE** that, on May 14, 2024, the Court entered the *Order Granting Debtors' Application to Retain and Employ KPMG to Provide Tax Consulting Services to the Debtors Effective as of the Petition Date* [Docket No. 350] (the "Retention Order"). Paragraph 9 of the Retention Order provides that to the extent that the Debtors and KPMG wish to expand the scope of KPMG's services beyond those services set forth in the Engagement Letters

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Curo. The location of the Debtors' service address for purposes of these chapter 11 cases is 101 N. Main Street, Suite 600, Greenville, SC 29601.

[2]   Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Application.

or the Retention Order, the Debtors will file with the Court and serve on the U.S. Trustee and any official committee appointed in these chapter 11 cases a notice of such additional services including, if applicable, any such supplemental agreement(s) or engagement letters. The Retention Order also provides that absent any objection filed within fourteen (14) days after the filing and service of such notice, KPMG shall be deemed authorized and approved to provide and be compensated for such additional services pursuant to the Retention Order and the terms of such notice, supplemental agreement or engagement letter and that such additional services will be subject to the provisions of the Retention Order.

      **PLEASE TAKE FURTHER NOTICE** that, in accordance with the procedures set forth in the Retention Order, the Debtors hereby file this notice (the "Notice") and that certain engagement letter, dated as of April 30, 2024, pursuant to which KPMG is providing the Debtors with a valuation of certain financial and intangible assets and certain liabilities in connection with the Debtors' emergence from these Chapter 11 Cases (the "Additional Engagement Letter"). The Additional Engagement Letter is attached hereto as Exhibit A.

      **PLEASE TAKE FURTHER NOTICE** that, in accordance with the procedures set forth in the Retention Order, the deadline to object to this Notice is **June 6, 2024 at 4:00 p.m. CT** (the "Objection Deadline"). To the extent any such parties object to the Notice, the Debtors will schedule a hearing before the Court within ten (10) days of receipt of any such objection or as soon thereafter as is practicable.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will serve this Notice on the U.S. Trustee and any official committee appointed in these Chapter 11 Cases, pursuant to the terms of the Retention Order.  In light of the nature of the relief requested, the Debtors respectfully submit that no other or further notice need be provided pursuant to the Retention Order.

Dated: May 23, 2024
      Houston, Texas

/s/  Sarah Link Schultz

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Sarah Link Schultz (State Bar No. 24033047;
S.D. Tex. 30555)
Patrick Wu (State Bar No. 24117924;
S.D. Tex. 3872088)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email:  sschultz@akingump.com
       pwu@akingump.com

-and-

Michael S. Stamer (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Omid Rahnama (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email:  mstamer@akingump.com
       akordas@akingump.com
       orahnama@akingump.com

*Counsel to the Debtors*

## **Exhibit A**

**Additional Engagement Letter**



# CURO Group Holdings Corp.

**Economic and Valuation Services**
FASB ASC Topic 852 - Reorganizations



| | | | |
|---|---|---|---|
| KPMG LLP | | Telephone | +1 415 963 5100 |
| Suite 1400 | | Fax | +1 415 358 5746 |
| 55 Second Street | | kpmg.com | |
| San Francisco, CA 94105 | | | |

This Engagement Letter, including the Standard Terms and Conditions and any exhibits, attachments, addenda or appendices attached hereto (collectively, the "Agreement"), dated as of April 30, 2024 (the "Effective Date"), is between CURO Group Holdings Corp. ("Client" or "CURO") and KPMG LLP ("KPMG"), whereby Client is engaging KPMG to provide the professional services described herein (the "Services").

As Client reorganizes and emerges from Chapter 11 protection as stipulated in accordance with the United States Bankruptcy Code ("Chapter 11"), we understand that a valuation of certain financial and intangible assets ("Subject Assets") and certain liabilities ("Liabilities"), is required as part of Client's compliance with financial reporting requirements. Based upon our discussions and the preliminary data we have received to date, the following Subject Assets and Liabilities have been identified and will be the subject of our analysis:

• Loans Receivable

• Leasehold Interests

• Tradenames

• Proprietary Technology

• Customer Relationships, if identified

• Warrants

• Contingent Value Right ("CVR")

• Other Debt Instruments

Our analysis will assist Client with financial reporting requirements under Financial Accounting Standards Board ("FASB") ASC Topic 852, *Reorganizations*. In this regard, KPMG will estimate the fair value ("FV") of the Subject Assets and Liabilities as of the emergence date ("Valuation Date"), based on the definition of fair value specified by FASB ASC Topic 820, *Fair Value Measurement*. No other use is intended or implied.

The following sections of this engagement contract outline the professional arrangements, engagement team, background, objectives, scope, valuation approach, and deliverables.

**Professional Arrangements**

*Fees and Expenses*

The fee for services will be based on the actual time incurred to complete the work at 85 percent of our standard hourly rates for the individuals involved in providing the services, capped at the high end of the ranges below unless otherwise discussed with you.

KPMG LLP, a Delaware limited liability partnership and a member firm of
the KPMG global organization of independent member firms affiliated with
KPMG International Limited, a private English company limited by guarantee.



Page 2 of 4

As a result of our discussions with you, we estimate our fees to range as follows:

| Subject Assets and Liabilities | Low | High |
|---|---|---|
| Loans Receivable[1] | 35,000 | 45,000 |
| Leasehold Interests[2] | TBD | TBD |
| Tradenames | 10,000 | 15,000 |
| Proprietary Technology | 10,000 | 12,000 |
| Customer Relationships | 10,000 | 12,000 |
| Warrants | 10,000 | 12,000 |
| CVR | 15,000 | 20,000 |
| Per Debt - Assessment of Interest Rate[3,4] | 2,000 | 4,000 |
| Per Debt - Fair Value Analysis[3,5] | 5,000 | 6,000 |
| **Total** | **97,000** | **126,000** |

*1) Assumes valuation on a pool level.*
*2) Pending discussion with client on number of leases to be identified and valued.*
*3) Pricing is provided per debt instrument. To the extent there are efficiencies to be gained by valuing multiple debt instruments of similar type, we will discuss with you and revise our fee estimate accordingly before we begin the work.*
*4) We will perform an analysis of market interest rates to determine whether the book value of the debt instrument equates to fair value.*
*5) If the book value of the debt instrument is determined to not equate to fair value, either from information provided by you or our Assessment of Interest Rate, then we will perform a Fair Value Analysis. The Fair Value Analysis will leverage our work of the Assessment of Interest Rate.*

Our fee estimate includes eight (8) hours of audit related support and the delivery of two (2) iterations of our draft schedules, one (1) draft narrative report, and one (1) final narrative report with accompanying schedules.

KPMG understands that the Bankruptcy Court must approve its engagement and its fees in order to be compensated.  In that regard, KPMG intends to file applications with the Court for allowance of compensation and reimbursement of expenses in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any order of the Bankruptcy Court establishing procedures for monthly compensation and reimbursement of expenses for professionals. The Client acknowledges that professional time required to prepare detailed applications in accordance with the Bankruptcy Code, applicable rules and guidelines differ from KPMG's normal engagement and billing procedures and, as a result, will require significant effort by KPMG to comply therewith.  The Client agrees that, subject to Bankruptcy Court approval, KPMG shall be reimbursed for such professional time incurred.

*Other Fees and Expenses*

We will notify you if we encounter circumstances that warrant additional time or expense likely to change previously provided quotes or estimates. The following examples may result in additional professional



Page 3 of 4

fees which will be billed based on the actual time incurred to complete the work at 85 percent of our standard hourly rates for the individuals involved in providing the services:

- More than 2 iterations of the draft schedules, 1 draft narrative report, and 1 final narrative report with accompanying schedules

- More than 1 set of projections

- More than 8 hours of audit related support

- Incomplete or difficult to process client data

- Significant delays in receiving requested information (i.e., "start-and-stop" workflow)

In addition, we will bill you for out-of-pocket expenses (e.g., travel, lodging, meals, etc.) if needed, a one-time third-party valuation database fee of $1,950, and a technology fee of 3% for engagement fees incurred after the emergence date.

*Billing*

We will send invoices regularly. We will keep you updated on our progress billings for the project and discuss any areas or issues that might result in fees being outside our initial range.

**Information to be Provided by Client**

Client shall provide on a timely basis, and in the format requested, all information necessary for KPMG to provide the Services.

**Other Matters**

The Deliverables are not intended to be used, and cannot be used, in connection with any federal or state tax matter unless, in advance of such use, you request such use in writing and we agree to such use.

If necessary and appropriate, KPMG will meet with Client's independent auditor during the course of the engagement to discuss our services and any preliminary findings.



Page 4 of 4

**Additional Engagement Letter Information**

Appendices attached to this engagement contract include:

- Appendix I contains the Standard Terms and Conditions ("STACs") and the Limiting Assumptions Addendum to the STACs that are made part of this engagement contract.

- Appendix II includes a sample representation letter. Prior to issuing the Deliverables, we require a letter be provided stating that to the best of your knowledge, we have been provided with all relevant information available and that there is no reason to believe that the assumptions based on these representations are unreasonable. Near the completion of the engagement, we will furnish Client with a representation letter that is specific to this engagement and our final scope of services.

**Confirmation**

**IN WITNESS HEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.


**CURO Group Holdings Corp.**

Ismail Dawood
Chief Financial Officer

5/9/2024
_____
Date


**KPMG LLP**

Pragya Mishra
Managing Director

April 30, 2024
_____
Date

# Table of Contents

Background ................................................................................................................................ 1

Objectives and Scope ................................................................................................................ 2

Valuation Approach ................................................................................................................... 4

Deliverables ............................................................................................................................... 8

DocuSign Envelope ID: CDAB05CC-5C7D-48BA-95E1-93B8E5B85776

# Background

## Company Overview

CURO, together with its subsidiaries, provides consumer finance products in the United States and Canada. The company offers secured and unsecured installment loans, revolving line of credit, and single-pay loans; and credit protection insurance, check cashing, money transfer, foreign currency exchange, and other ancillary financial products and services, as well as reloadable prepaid debit cards and demand deposit accounts. The company also provides loans through online. It operates under the Covington Credit, Heights Finance, Quick Credit, Southern Finance, First Heritage Credit, Cash Money, and LendDirect. The company was formerly known as Speedy Group Holdings Corp. and changed its name to CURO Group Holdings Corp. in May 2016. CURO was founded in 1997 and is headquartered in Greenville, SC. On March 25, 2024, CURO, along with its affiliates, filed a voluntary petition for reorganization under Chapter 11 in the U.S. Bankruptcy Court for the Southern District of Texas.

# Objectives and Scope

## Recognition of Assets and Liabilities

An asset is identifiable apart from goodwill if either of the following applies:

- The asset is separable (i.e., it is capable of being separated or divided from the acquired entity and sold, transferred, licensed, rented, or exchanged, regardless if there is an intent to do so)
- The asset arises from contractual or other legal rights (regardless of whether those rights are separable)

## Standard of Value

Fair value (FV) is the standard of value for financial reporting and is defined under FASB ASC Topic 820, *Fair Value Measurement* as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." This is the definition we will utilize for ASC 852 purposes.

## Premise of Value

Inherent in the definition of value is the premise used to measure the fair value of an asset which assumes that a market participant would use the asset at its highest and best use. The highest and best use of a nonfinancial asset considers the use that is physically possible, legally permissible, and financially feasible. The current use of a nonfinancial asset is presumed to be its highest and best use unless market or other facts suggest that a different use by market participants would maximize the value of the asset. The highest and best use of a nonfinancial asset might provide maximum value to market participants through its use in combination with other assets or other assets and liabilities as a group or on a standalone basis.

## Scope

The work plan we have developed to complete the scope of this engagement includes the following general elements:

- Interviews with Client personnel familiar with the Subject Assets and Liabilities
- Analysis of financial condition and financial statements as of the Valuation Date
- Analysis of business plans, budgets, Board presentation materials, prospective operating information.
- Discussions with Client management ("Management") regarding the identification of the acquired intangible and tangible assets, and the Liabilities
- Estimates of the FV of the Subject Assets and Liabilities

- Documentation of our work product in a written report, described further below

We will also perform research concerning the industry, competitors, and general economic conditions and conduct additional analysis as deemed necessary.

We do not expect the appraisal to make use of any extraordinary or hypothetical assumptions.

Based on our preliminary discussions, valuations are expected to be required for the following:

- Loans Receivable

- Leasehold Interests

- Tradenames

- Proprietary Technology

- Customer Relationships, if identified

- Warrants

- CVR

- Other Debt Instruments

During the initial phase of our study, we will discuss with you the aforementioned assets and liabilities as well as any other intangible assets that come to our attention, so you can make an informed decision as to those you require us to appraise prior to expanding our scope.

Based on our experience in performing engagements of this nature, it is essential to have project managers from Client work closely with our team. A data request list will be sent to you as soon as possible. We recommend that a weekly status call be organized regarding the ongoing progress of our work.

## Client Responsibilities

During the course of our engagement, we will rely on Management to provide complete and accurate financial records, appropriate and sufficient access to the client's personnel and records, and well-documented and supported prospective financial information, where applicable.

# Valuation Approach

## Valuation Approaches

Our study will consider three ways of determining the subject interest's FV: the income, market, and cost approaches. We may utilize all or a combination of these approaches to derive our conclusions, depending on whether an approach is applicable or not. No formula yields a definitive determination of value as each company and asset valuation involves unique factors. The valuation process requires the objective analysis of data, the application of experienced judgment, and discussion with management to yield a reasonable conclusion. A brief description of each approach is discussed below:

**Income approach:** The income approach measures the value of an asset by the present value of its future economic benefits. These benefits can include earnings, cost savings, royalty savings, tax deductions and proceeds from the asset's disposition. When applied to assets of a business, value indications are developed by capitalizing current benefits or discounting prospective cash flows to their present value.

**Market approach:** The market approach measures the value of an asset through an analysis of recent sales or offerings of comparable assets. When applied to the valuation of an asset, consideration is given to the financial condition and operating performance of the company that owns the asset.

**Cost approach:** The cost approach measures the value of an asset or a business based on the cost to reconstruct or replace it with another of like utility.

In concluding on the respective FV of the subject interest, we will consider and reconcile the results from each approach as appropriate.

## Financial Asset and Liability Procedures

The following describes our planned procedures to valuing the financial assets and liabilities:

### *Loan Receivables*

We will consider the income approach in determining the fair value of the loan receivables. Considerations include loan contractual information, risk characteristics that influence expected cash flows and related assumptions, such as voluntary prepayment. Specifically, our approach includes:

- Obtain Client loan level information including contractual inputs such as principal balance, original term, remaining term, amortization type, maturity date, contractual index, coupon margin, etc.

- Perform loan segmentation per Client's instructions and in accordance with Client's policy

- Research market participant cash flow assumptions including expected losses and prepayment curves by pool

- Develop pool level discount rates including recent origination rates for similar products adjusted for liquidity risk and additional collection uncertainty

- Compute pool level discounted cash flows and fair values for the loan receivables

## *Warrants:*

- Review the terms and conditions of the warrants and discuss the relevant key terms with Management.

- Perform market research to indicate key assumptions and inputs as of the Valuation Date to be used in the Warrants' valuation, including but not limited to equity volatility and stock price.

- Employ an option pricing mode (e.g., Black Scholes formulas or lattice model) to estimate the fair value of the warrants

## *CVR:*

- Review the terms and conditions of the CVR and discussions with management to understand the nature of the CVR

- Use a Monte Carlo simulation model in a risk-neutral framework to simulate the relevant future financial metrics of the Company assuming Geometric Brownian Motion (GBM)

- For each simulation path, calculate CVR payments based on contractual terms and then discount such payments at a term-matched risk-free rate plus a credit spread

- Calculate the average present value of all simulated paths to estimate the fair value of the CVR as of the Valuation Date

## *Debts*

We will perform an analysis of market interest rates to determine whether the book value of the debt equates to fair value. If the book value of the debt is determined to not equate to fair value, we will then perform a fair value analysis using income approach to determine the FV of the Debts. The FV determined under this approach is a function of the following:

- The projected contractual cash flows of the debts

- A discount rate that reflects credit worthiness of the obligor and security status of the debts, as observed from comparable market securities

# Intangible Asset Procedures

KPMG will develop intangible asset values by reviewing Client's documentation, developing appropriate models, analyzing financial statements, performing research on royalty rates, and by interviewing Management. We will need to obtain detailed information related to each of the identified intangible assets and will perform valuation techniques specific to each asset type.

## *Leasehold Interests*

Valuation of the leasehold interests will include an analysis of current real property leases to determine any potential leasehold interests (i.e., above or below market rent positions). A positive leasehold position exists when the present value of the contract rent (inclusive of base rent, percent rent and option rent) is less than the present value of the market rent. A negative leasehold position exists when the present value of the contract rent (inclusive of base rent, percent rent and option rent) is greater than the present value of the market rent. Determination of lease contracts that we will analyze will be based on materiality, square footage, and lease start and termination dates. Our analysis of the leasehold interest will include, but not be limited to, the following general steps:

- Research the real property to assess quality, condition and utility of the assets

- If agreed, perform site inspection of all or a sample of the leased real estate

- Review of contract rents

- Estimate market rents for each facility based on comparables and other market data

- Compare the market rents to contractual rents

- Calculate the net present value of the difference between market rents and contractual rents over the remaining lease term using a market derived internal rate or return (discount rate)

## *Tradenames/Technology*

We will consider all three traditional approaches in determining the FV of these assets. However, we typically value these assets using the royalty savings approach. Under the royalty savings approach (RSA), value reflects the savings realized by owning the tradenames/technology. The standard associated with this valuation technique is that if the trademark/technology were licensed to an unrelated party, the unrelated party would pay a percentage of revenue for its use. The tradenames/technology owner is, however, spared this cost. This cost savings, or relief from royalty, represent the value of the tradenames/technology. The value under the RSA approach is a function of the following factors:

- The concluded royalty rate (as percentage of revenues) that one would pay for use of the tradenames/technology if it were licensed by a third party

- The projected revenues (sales - net of returns), generated by product sales under the tradenames/technology being valued

- The appropriate risk adjusted discount rate used to present value the stream of anticipated royalty payments

## Customer Relationships

We will consider all three valuation approaches in determining the FV of these assets. However, we typically value customer relationships using an income/excess earnings approach. Under this approach, value is reflected in the streams of cash flows that can be attributed to these relationships. The FV determined under this approach is a function of the following:

- Future revenues expected to be generated by these assets and the profitability of the assets
- Identification of the contribution of other tangible and intangible assets to the cash flows of these assets to apply an appropriate capital charge against the cash flows
- Determination of the appropriate risk adjusted discount rate to calculate the present value of the stream of anticipated cash flows

## Other Intangible Assets

We will work closely with your team to identify other potential intangible assets that may meet the asset recognition criteria of FASB ASC Topic 820 and FASB ASC Topic 350, *Intangibles – Goodwill and Other*.

We will discuss these intangible assets and others that may come to our attention with you.  We will discuss the potential impact that valuing these assets would have on the fair value estimated for the Subject Assets and Liabilities. We will value only the items that you direct us to value after having considered this potential impact.

# Deliverables

KPMG shall provide the following Deliverables:

- Financial schedules detailing KPMG's preliminary valuation conclusions.
- KPMG's opinion of value expressed in a written report with supporting schedules.
- The valuation report will include:
  - Discussion of the date, purpose, and scope of the valuation
  - The definition and standard of value
  - The valuation methodologies considered and employed
  - Assumptions utilized in the estimation of the FVs
  - Supporting documentation in the form of tables and schedules

DocuSign Envelope ID: CDAB05CC-5C7D-40BA-95E1-93B8E5B85773

# Appendices

DocuSign Envelope ID: CDAB05CC-5C7D-40BA-95E1-93B8E5B85772

# Appendix I

**KPMG LLP Standard Terms and Conditions for Advisory and Tax Services**

# Standard Terms and Conditions for Advisory and Tax Services

## 1. Definitions

(a) "Advice" means any advice, recommendations, work product, Deliverables or other information provided by KPMG in connection with the Services.

(b) "Agreement" means the Engagement Letter and these Standard Terms and Conditions for Advisory and Tax Services and any exhibits, attachments, addenda or appendices attached thereto.

(c) "AICPA" means the American Institute of Certified Public Accountants.

(d) "Client" or "you" (or derivatives thereof) means the engaging entity or entities, meaning the addressee(s) of the Engagement Letter.

(e) "Client Materials" means any and all materials, facilities, network, hardware, systems, software, data and other equipment and information, that in each case is owned by or licensed or leased to you including any third-party materials, to which we are provided access in connection with the Services.

(f) "Client Parties" means Client, its parent company and their affiliates, and their respective directors, officers, employees, and agents.

(g) "Condition" means any acts of God, wars, revolution, civil commotion, pandemic, epidemic, terrorism, acts of public enemy, embargo, acts of government in its sovereign capacity, labor difficulties, including without limitation, strikes, slowdowns, picketing or boycotts, or any other circumstances beyond the reasonable control of the non-performing party.

(h) "Confidential Information" means all documents, reports, data, records, forms and other materials that due to their character and nature, a reasonable person under like circumstances would treat as confidential received by one party (the "Receiving Party") relating to the provision or receipt of Services or otherwise in connection with the Agreement from, or on behalf of, the other party (the "Disclosing Party"); except to the extent such confidential information : (1) is already known to the Receiving Party at the time of disclosure by the Disclosing Party without an obligation of confidentiality; (2) is or becomes publicly known through no wrongful act of the Receiving Party; (3) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (4) is information provided by KPMG, as the Disclosing Party, to Client with respect to the tax treatment or tax structure of a transaction; or (5) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality.

(i) "Delayed Party" means the party delayed or unable to perform its obligations under this Agreement.

(j) "Deliverables" means the items created or configured for delivery to Client that are specified as deliverables in the Engagement Letter.

(k) "Engagement Letter" means the engagement letter to which these Standard Terms and Conditions for Advisory and Tax Services are attached.

(l) "Enabling Tools" means KPMG proprietary and third-party software tools that KPMG makes available to facilitate KPMG's Services to you, such as project management or communications tools.

(m) "Indemnified Party" means the party entitled to indemnification.

(n) "Indemnifying Party" means the party obligated to indemnify.

(o) "Intellectual Property Rights" means patents, copyrights, trademarks, trade secrets, and similar proprietary rights.

(p) "KPMG" or "we" (or derivatives thereof) means KPMG LLP, a Delaware registered limited liability partnership and the United States member firm of the international KPMG network of independent firms.

(q) "KPMG Parties" means KPMG, Member Firms and the legal entities comprising KPMG International and their respective partners, principals, employees, and agents.

(r) "KPMG Property" means KPMG's, or its licensors', inventions, technology, know-how, methodologies, works of authorship and other materials created prior to, independently of, or in the course of providing the Services, and all improvements, enhancements and modifications thereto and derivative works thereof, including all Intellectual Property Rights appurtenant thereto, except that KPMG Property shall not include Client Confidential Information.

(s) "KPMG Resources" means KPMG, Member Firms and third-party providers engaged by KPMG or a Member Firm, which may be located in or outside of the United States.

(t) "Liabilities" means liabilities, losses, expenses (including reasonable attorneys' fees and expenses), fines, penalties, taxes, and other direct damages.

(u) "Legal Demand" means a validly issued legal or regulatory demand or request, subpoena or other legal process.

(v) "Member Firms" means the members of the international KPMG network of independent firms and entities controlled by, or under common control with, one or more KPMG network member firms.

(w) "Residual Knowledge" means any generalized knowledge, experience, know-how, or any of the ideas, concepts, methodologies, tools, or techniques derived from or discovered during the provision of the Services performed under the Engagement Letter that does not contain Client's Confidential Information.

**KPMG**

(x)   "Services" means the services KPMG shall perform as set forth in the Engagement Letter.

### 2. Our services and personnel.

(a)   Our Services will be performed in accordance with AICPA and other applicable professional standards.

(b)   Any work performed in connection with the engagement described in the Agreement before its execution shall be governed by the Agreement.

### 3. Our fees.

(a)   We will bill you for fees and reasonable expenses as agreed to in the Engagement Letter. You agree to pay our invoices within thirty (30) days after receipt. If Client does not pay any properly submitted invoice amount within thirty (30) days after receipt of such invoice, then KPMG may suspend or terminate the Services. Notwithstanding the preceding sentence, any invoiced amounts not paid by their applicable due date shall accrue a late fee of the lesser of (i) 1.5% per month or (ii) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law.  Notwithstanding anything to the contrary set forth above, any invoice received by Client on or after August 15th of any calendar year shall be due no later than September 15th of that same calendar year.

(b)   Where we are reimbursed for expenses, we will bill you for the amount we paid and we will not add any markup to the expense. After such expenses are incurred, we may receive rebates or incentive payments based on our aggregate purchases, which may include expenses reimbursed by you in addition to other clients. Such rebates are not credited back to you but are used to reduce our overhead.

(c)   The fees, expenses and timelines set forth in the Engagement Letter may vary due to failure by a Client to meet its obligations under the Engagement Letter or a change in assumptions, such as failure of third parties to cooperate. Our fees do not include any sales, use, excise, value added, income or other taxes, tariffs, or duties applicable to your receipt of our Services, payment of which shall be your sole responsibility. KPMG shall be responsible for its net income or applicable employment taxes.

### 4. Use of our advice.

(a)   We may provide our Advice to you in draft form, but the final written Deliverable if provided supersedes any drafts provided earlier. Client agrees to review any draft Deliverables prepared by KPMG promptly and to advise KPMG on a timely basis of any comments Client may have. KPMG shall reasonably incorporate Client's comments into such Deliverable, however the content of the final Deliverable shall be determined by KPMG in the exercise of its professional judgment.

(b)   Deliverables bearing the "KPMG" name or logo may only be disclosed to a third party in its entirety and unmodified.

(c)   Advice is provided for your sole benefit and internal business use and not for the benefit of, or to be relied upon by any other party.

### 5. Termination.

Either party may terminate this Agreement at any time (i) by giving at least thirty (30) days' prior written notice to the other party, (ii) upon thirty (30) days written notice to the other party, in the event such other party breaches a term of this Agreement and such breach remains uncured at the end of such thirty (30) day period or (iii) upon written notice to the other party if laws, rules, regulations or professional standards applicable to a party preclude it from continuing to perform or receive the Services thereunder. Upon termination of this Agreement, Client shall pay all fees and expenses that have been incurred in connection with the performance of the Services through the effective date of such termination. Any provisions of the Agreement that by their nature are intended to survive termination or expiration will survive and continue to bind the parties.

### 6. Limitation on damages.

The total liability of the Client Parties and the KPMG Parties to one another for any Liabilities relating to the Services provided under the Engagement Letter shall be limited to the amount of fees paid to KPMG under the Engagement Letter. The Client Parties or KPMG Parties will not be liable to one another for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The preceding limitations do not apply to Liabilities arising from the parties' respective indemnification obligations or to the extent resulting from the gross negligence or willful misconduct of the parties. The provisions of this Paragraph 6 shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss asserted, whether in contract, statute, rule, regulation, or tort (including but not limited to negligence) or otherwise.

### 7. Ownership.

(a)   Subject to full payment to KPMG of fees owed for the applicable Services, KPMG (i) assigns to Client, all right, title and interest in and to the Deliverables except to the extent any KPMG Property is contained therein, and (ii) grants Client a royalty-free, non-exclusive, non-transferable, non-sublicensable perpetual license, to use such KPMG Property solely in connection with Client's internal use of the Deliverables.

(b)   Notwithstanding anything herein that may be construed to the contrary, Client agrees that nothing in this Agreement prevents KPMG from using Residual Knowledge.

### 8. Indemnification

(a)   KPMG shall indemnify, hold harmless and defend the Client Parties from and against any claims or Liabilities asserted by a third party against any of the Client Parties to the extent such Liabilities result from the infringement by the Deliverables (including any KPMG Property contained therein) of such third party's Intellectual Property Rights except to the extent arising

DocuSign Envelope ID: CDAB05CC-5C7D-48BA-95F1-93B8E5B8573C

Case 24-90061 Document 430 Filed in TXSB on 05/23/24 Page 23 of 29
Standard Terms and Conditions for Advisory and Tax Services

out of (i) use of the Deliverables other than in accordance with applicable documentation or instructions supplied by KPMG or other than for Client's internal business purposes; (ii) any modification of the Deliverables; (iii) the combination or operation of the Deliverables with materials, networks, systems or data not supplied or authorized in writing by KPMG in the Engagement Letter; or (iv) KPMG's compliance with any designs, specifications or instructions provided by, or on behalf of, any of the Client Parties. In case all or part of any Deliverable (including any KPMG Property contained therein) is held, or we believe is likely to be held, to constitute infringement, in addition to our obligations set forth in this Paragraph, we may at our option and expense either: (1) secure for you the right to continue to use such infringing item; or (2) replace such item with a substantially equivalent non- infringing item or modify such item so that it becomes non-infringing. If we believe we are unable to perform any of these options, we shall refund you the amount paid to us for such item as long as you return such item to us and cease all use of the same. This Paragraph states our entire liability and the sole and exclusive remedy with respect to any infringement or claim of infringement covered by this Paragraph 8(a).

(b) Client shall indemnify, hold harmless and defend the KPMG Parties from and against any Liabilities incurred or suffered by or asserted against any of the KPMG Parties in connection with a third-party claim arising from (i) Advice or (ii) the Client Materials or KPMG's use thereof. The foregoing obligations shall apply regardless of whether the third-party claim alleges a breach of contract, violation of statute, rule, regulation, or tort (including without limitation negligence) by any of the KPMG Parties.

(c) KPMG shall indemnify, hold harmless and defend the Client Parties from and against any Liabilities for physical injury to, or death of, any person, and damage to or destruction of any tangible property, to the extent resulting from the negligence or willful misconduct of any of the KPMG Parties. Client shall indemnify, hold harmless and defend the KPMG Parties from and against any Liabilities for physical injury to, or death of, any person, and damage to or destruction of any tangible property, to the extent such Liabilities result from the negligence or willful misconduct of any of the Client Parties.

(d) The Indemnified Party shall promptly notify the Indemnifying Party of any claim for which the Indemnified Party seeks indemnification. The Indemnifying Party shall conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense, and the Indemnified Party shall cooperate with the Indemnifying Party. The party not conducting the defense shall have the right to participate in such defense or settlement at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages for which the Indemnifying Party has accepted responsibility.

## 9. Client's responsibilities.

(a) You shall reasonably cooperate with us in the performance of the Services and provide us with, or procure for us, the personnel, facilities, systems, software, equipment, and information reasonably necessary for us to perform the Services, as well as fulfill any obligations set forth in the Engagement Letter. If you do not provide us with the foregoing, you acknowledge that our ability to provide the Services may be adversely affected. Client represents that it has all rights, licenses, consents, and permissions necessary for KPMG to receive and use the Client Materials to perform the Services and provide the Deliverables.

(b) We rely on the materials, information, and assumptions you provide to us to render our Advice. We will not independently investigate or verify the accuracy or completeness of the same. If such materials, information, or assumptions are inaccurate or incomplete, our Services or Advice could be materially affected.

(c) Client agrees that, while the Services may include advice and recommendations, all decisions in connection with the implementation of such advice and recommendations or to proceed with a proposed transaction are the sole responsibility of, and made by, Client. In particular, you shall be responsible for (i) assuming all management responsibilities and performing all management functions; (ii) overseeing the Services, by designating an individual, preferably within senior management, who possesses suitable skill, knowledge and/or experience; (iii) evaluating the adequacy and results of the Services; (iv) accepting responsibility for the results of the Services; and (v) establishing and maintaining internal controls over the processes with which the Services are concerned, including performing ongoing evaluations of your internal control as part of your monitoring activities.

## 10. Use of KPMG Resources and Enabling Tools.

(a) KPMG may engage KPMG Resources to assist in the performance of the Services, for example via subcontracting or contingent workforce personnel. KPMG remains responsible to Client for the performance of such Services, and adherence to obligations of confidentiality, by any KPMG Resources to the same extent KPMG is obligated under the terms of this Agreement. Client agrees it shall not bring any claim relating to the Agreement against any KPMG Resource, other than KPMG.

(b) KPMG may, with the assistance of KPMG Resources, use information obtained during engagements (i) to analyze trends, perform comparative analysis, and develop and improve benchmarks; (ii) to develop and improve technology and services; and (iii) to improve other services to Client and to provide insights to Client about its business. Such information will not be disclosed to third parties other than KPMG Resources assisting KPMG with these uses unless such information is in an aggregated or anonymized format that does not identify Client.

(c) KPMG may license certain Enabling Tools for use by Client to facilitate the Services. All other use is prohibited. Client may not redistribute, reproduce (except as necessary to run), modify, commercialize, allow third parties to access (unless authorized by KPMG in writing), or reverse engineer or decompile (except where such rights cannot be limited by applicable law) Enabling Tools. KPMG shall indemnify, hold harmless, and defend Client from and against third-party claims that authorized use of Enabling Tools infringes the Intellectual Property Rights of a third party, subject to any limits or requirements imposed by KPMG's licensors; and Client shall indemnify, hold harmless, and defend KPMG Parties from and against third-party claims

DocuSign Envelope ID: C0AB05CC-5C7D-48BA-95E1-93B8E5B8573C

Case 24-90168 Document 430 Filed in TXSB on 05/23/24 Page 24 of 29
Standard Terms and Conditions for Advisory and Tax Services

arising from Client's or its authorized users unauthorized use of Enabling Tools. Enabling Tools are not intended to be used as a system of record, repository, or hosting service, and Client access to the Deliverables and other documents will be removed from the Enabling Tools within a reasonable period of time (no less frequently than annually for audit clients and their affiliates) following the conclusion of the engagement to which they relate. Client shall download such Deliverables and documents for its records. Client acknowledges that use of Enabling Tools may be subject to additional terms specified in the Engagement Letter or other agreement. Enabling Tools are provided on an "as is" "as available" basis.

### 11. Confidentiality.

(a) The Receiving Party shall hold the Disclosing Party's Confidential Information in confidence and not disclose the Disclosing Party's Confidential Information to any other party without the Disclosing Party's prior written permission. Notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is (i) required or necessary to be disclosed pursuant to law, rule or regulation or, subject to appropriate conditions of confidentiality, to fulfill professional obligations and standards (including quality and peer review) or to submit and process insurance claims; (ii) to KPMG Resources performing the applicable Services, or (iii) in the case of the KPMG Parties, to the KPMG Resources providing internal, administrative, clerical, analytical and/or regulatory compliance operations and functions, and information technology support. The Receiving Party shall protect the Disclosing Party's Confidential Information as it protects its own confidential information but in no event shall use less than reasonable care.

(b) Upon request after completion of the Services, the Receiving Party will deliver to the Disclosing Party or destroy all of the Disclosing Party's Confidential Information and all copies thereof, except for copies retained in work paper files or records (i.e., engagement documentation), anything that may be stored in back up media or other electronic data storage systems, latent data and metadata.

(c) If the Receiving Party receives a Legal Demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall, unless prohibited by law or such Legal Demand, provide prompt written notice to the Disclosing Party of such Legal Demand in order to permit it to seek a protective order. The Receiving Party shall be entitled to comply with such Legal Demand to the extent required by law, subject to any protective order or the like that may have been entered in the matter.

(d) In a proceeding or investigation to which we are not a named party or respondent, if you request or we are required or authorized to produce documents or personnel as witnesses or for interviews, or otherwise to make information or materials relating to the Services available to you or a third party, you shall reimburse us for our time, at our standard hourly rates, and expenses, including reasonable attorneys' fees, incurred in responding to such request or requirement.

### 12. Third-party relationships.

KPMG is a large firm and part of a network of independent Member Firms that provide services to and have business relationships with many different entities, including entities who may have business interests that differ from Client's business interests. In accordance with applicable professional standards, prior to agreeing to provide Services requested by Client based upon the information provided by Client, KPMG will perform an internal search for any potential or actual conflicts of interest with the Services contemplated herein. Where such a potential conflict of interest is identified, KPMG would, subject to confidentiality, disclose the nature of such relationship to Client, including any planned safeguards, and seek Client's consent at such time.

### 13. Assignment, waiver, and severability.

(a) Subject to Paragraph 10, neither party may assign, transfer or delegate any of its rights, obligations, claims or proceeds from claims arising under or relating to this Agreement (including by operation of law, in which case the assigning party will, to the extent legally permissible, give as much advance written notice as is reasonably practicable thereof) without the prior written consent of the other party, such consent not to be unreasonably withheld, conditioned or delayed. Any assignment, transfer or delegation in violation hereof shall be null and void.

(b) Failure of a party to exercise or enforce any of its rights hereunder is not a waiver of such rights.

(c) In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of that provision is modified to the extent reasonably necessary to reflect the intent of the parties and this Agreement shall not be affected, and each such term and provision shall be valid and enforceable to the fullest extent permitted by law.

### 14. Governing law.

The Agreement and all disputes and claims between the parties (whether based in contract, tort, statute, rule, regulation or otherwise and whether pending in court or in an arbitral forum) shall be governed by and construed in accordance with the substantive and procedural laws of the State of New York, including without limitation its statutes of limitations, without regard to the conflict of laws provisions of New York or any other state or jurisdiction.

### 15. Alternative dispute resolution.

(a) Any dispute or claim between the parties shall be submitted first to non-binding mediation. Mediation shall take place at a location to be designated by the parties using the Mediation Procedures of the Rules for Non- Administered Arbitration of the International Institute for Conflict Prevention and Resolution (the "IICPR"), with the exception of paragraph 2 (Selecting the Mediator).

(b) If mediation is not successful within 90 days after the initial request for mediation, then such dispute shall be submitted to binding arbitration in accordance with the IICPR. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, validity, or enforceability of these dispute resolution procedures shall be

DocuSign Envelope ID: CDAB05CC-5C7D-48BA-95E1-93B8E5B8573C
Case 24-30168   Document 730   Filed in TXSB on 05/23/24   Page 25 of 29

**kPMG** | Standard Terms and Conditions for Advisory and Tax Services

governed by the Federal Arbitration Act and resolved by the arbitrators. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction.

(c) Arbitration shall take place in New York, New York and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq. Party-selected arbitrators shall be selected from the lists of neutrals maintained by either the IICPR or by JAMS, Inc., but the chair of the arbitration panel does not have to be selected from those specific lists. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort except as provided in IICPR Rule 13 (Interim Measures of Protection). Damages that are inconsistent with Paragraph 6 above shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

(d) Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm, enforce or vacate any final award entered in arbitration, in any court of competent jurisdiction, provided that such party will file such motion under seal unless prohibited under applicable court rules.

(e) Notwithstanding the agreement to such procedures, either party may seek equitable relief to enforce its rights in any court of competent jurisdiction.

## 16. Miscellaneous

(a) Independent Contractor. KPMG's relationship with Client is that of an independent contractor and neither party is an agent, distributor or representative of the other. Unless otherwise agreed to by the parties in writing, neither party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

(b) Use of Names and Logos. We may reference you as a customer in our marketing materials, including KPMG websites and social media, indicating the general services rendered (e.g., "Client is an Audit, Advisory and/or Tax client of KPMG LLP."). In addition, you give us the right to use your logo for internal KPMG presentations and intranet sites. Except as permitted herein, neither party shall acquire any right to use the name or logo of the other party or any part thereof unless required by law.

(c) Export Control. Each party acknowledges and agrees that it shall comply with all applicable United States export control laws and regulations in the performance of each party's respective activities under the Engagement Letter. Client shall not provide KPMG, or grant KPMG access to, (i) information (including technical data or technology), verbally, electronically, or in physical form, (ii) software or (iii) hardware, that is controlled for export by the United States government under the Arms Export Control Act of 1976, Export Control Reform Act of 2018, the International Traffic in Arms Regulations, Export Administration Regulations, Department of Energy Part 810 Regulations or Nuclear Regulatory Commission Part 110 Regulations, except information, software or hardware that is classified as EAR99 under the Export Administration Regulations.

(d) Non-Solicitation. During the term of the Agreement and for one year thereafter, neither party shall solicit or hire as an employee, consultant or otherwise any of the other party's personnel who have had direct involvement with the Services, without such other party's express written consent. This prohibition shall not apply to any offers of employment that result from a general solicitation for employment, including without limitation, through the Internet, newspapers, magazines and radio.

(e) Force Majeure. Except for the obligation of a party to make payments required hereunder, neither party shall be responsible for any delay or failure in performance of any part of this Agreement or the Services to the extent that such delay or failure is caused by reason of a Condition. The Delayed Party , shall be excused from such performance on a day-to-day basis during the continuance of such Condition (and the other party shall likewise be excused from performance of its obligations on a day-to-day basis during the same period); provided, however, that the Delayed Party shall use commercially reasonable efforts to avoid or remove such Condition, and both parties shall proceed promptly with the performance of their obligations under this Agreement whenever such Condition is removed or ceases. If the Condition continues for more than ninety (90) days, then the party affected may terminate this Agreement upon written notice to the Delayed Party.

(f) Personnel. KPMG is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the Services KPMG is providing, non-CPA holders may provide the Services under the Agreement.

(g) Disclaimer. Except as expressly stated in this Agreement, KPMG expressly disclaims and makes no warranties of any kind or nature with respect to the Services or Deliverables, express or implied, including warranties of merchantability, fitness for a particular purpose or use, or non-infringement.

(h) Order of Precedence. In the event of a conflict between the provisions of these Standard Terms and Conditions for Advisory and Tax Services and the specific provisions in the Engagement Letter, the terms of these Standard Terms and Conditions for Advisory and Tax Services shall control except to the extent the Engagement Letter expressly references the provisions of these Standard Terms and Conditions for Advisory and Tax Services which they modify.

## 17. Additional terms for engagements involving tax services.

This Section 17 shall apply only to KPMG's performance of tax Services.

(a) Notwithstanding anything to the contrary set forth herein, no provision in this Agreement is or is intended to be construed as a condition of confidentiality within the scope of the Internal Revenue Code of 1986 (the "IRC") section 6011 as implemented through Treasury Regulation 1.6011-4(b)(3)(i) (without regard to references to payment or receipt of a minimum fee) or under any similar or analogous provisions of the laws of a state or other jurisdiction. In particular, Client, its directors, officers, employees and agents may disclose to any and all persons, without limitation of any kind, tax information KPMG provides to Client, including all materials such as tax opinions, memoranda, or other written tax advice that describes or otherwise relates

to, either or both of the tax treatment and tax structure of any transaction on which KPMG's services are provided. Client will use commercially reasonable efforts to inform KPMG of any conditions of confidentiality imposed by third party advisors with respect to any transaction on which KPMG's services are requested. Such notification must occur prior to KPMG providing any advice with respect to the transaction.

(b)  Client expressly permits KPMG and any relevant KPMG Resource involved in provision of Services hereunder to make disclosures required pursuant to IRC sections 6011,6111 and 6112 and/or similar or analogous requirements of any state or other jurisdiction (domestic or foreign). Client will use commercially reasonable efforts to inform KPMG if Client is required to disclose any transaction covered by the Engagement Letter as a reportable transaction to the Internal Revenue Service ("IRS") or to any state or other jurisdiction (domestic or foreign) adopting similar or analogous provisions to IRC section 6011. KPMG will use commercially reasonable efforts to inform Client if KPMG provides Client's identifying information to the IRS under IRC section 6111 or 6112, or to any state tax authority or other jurisdiction (domestic or foreign) adopting similar or analogous provisions thereto.

(c)  Unless expressly provided for in the Engagement Letter, KPMG's Services do not include representing Client in the event of a challenge by the IRS or other tax or revenue authorities.

(d)  In rendering tax advice, KPMG may consider, for example, the applicable provisions of the IRC, and the Employee Retirement Income Security Act of 1974, each as amended, and the relevant state, local and foreign statutes, the regulations thereunder, income tax treaties, and judicial and administrative interpretations, thereof. These authorities are subject to change, retroactively or prospectively, and any such changes could affect the validity of KPMG's advice.

## 18. Additional terms for systems implementation Services.

This Section 18 shall apply only to KPMG's performance of Services related to the implementation of third-party systems or software.

(a)  Client shall accept or reject the Deliverable within ten (10) business days (or such other time period set forth in the Engagement Letter) after delivery (the "Acceptance Period") in accordance with this Section 18(a). If Client determines that the Deliverable does not materially conform to the specifications set forth in the Engagement Letter or agreed to in writing (the "Specifications"), then Client shall provide KPMG with a written notice of rejection specifying the material non-conformities between the Deliverable and the applicable Specifications ("Defects"). KPMG shall, at no additional cost to Client, correct the Defects after which Client shall be entitled to repeat the acceptance process set forth herein (each a "Work-out Period"). If after three Work-Out Periods the Deliverable does not conform in all material respects with the applicable Specifications, then at KPMG's option, KPMG may terminate the Engagement Letter and promptly provide Client with a refund of any amounts paid by Client for the defective Deliverable(s) and Client will promptly return such Deliverable(s) to KPMG. The Deliverables will be deemed accepted if the Client either fails to reject the Deliverables before the end of an Acceptance Period or uses the Deliverables in a production environment. To the extent any accepted Deliverable differs from the applicable Specifications, then such Specifications are hereby deemed modified to conform to the accepted Deliverable.

(b)  KPMG warrants to Client that for a period of ninety (90) days after the final Deliverable has been accepted pursuant to Section 18(a) ("Warranty Period") that Deliverable will conform to its Specifications in all material respects; provided that the foregoing warranty shall not apply to the extent the non-conformity arises out of (i) use of the Deliverable other than in accordance with applicable documentation or instructions, (ii) any modification of the Deliverable not expressly authorized in writing by KPMG, or (iii) the Client Materials. Any claim for breach of warranty arising out of or related to a Deliverable, including under this Agreement, must be made in writing to KPMG within the Warranty Period with respect to that Deliverable. Client's exclusive remedies, and KPMG's entire liability, for any breach of warranty arising out of or related to the Deliverables shall be, at KPMG's option, (A) the repair and replacement of the Deliverable or (B) the refund to Client of the amount paid to KPMG for the Deliverable (in which case Client shall promptly return the Deliverable to KPMG and shall have no further right to use the Deliverable).

## 19. Entire agreement; Amendment.

This Agreement constitutes the final, complete and exclusive agreement between the parties with respect to the subject matter of the foregoing and supersedes all other previous and contemporaneous oral and written agreements relating to that subject matter. Any amendments to the Agreement must be made in writing.

# KPMG LLP
## Valuation Services Limiting Assumptions Addendum to Standard Terms and Conditions for Advisory and Tax Services

This Valuation Services Limiting Assumptions Addendum to Standard Terms and Conditions for Advisory and Tax Services is an integral part of the accompanying Standard Terms and Conditions for Advisory and Tax Services.

20. **Nature of Opinion.** Neither our opinion nor our report are to be construed as a fairness opinion as to the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation, but, instead, are the expression of our determination of the fair [market] value of the Subject Assets between a hypothetical willing buyer and a hypothetical willing seller in an assumed transaction on an assumed valuation date. For various reasons, the price at which the Subject Assets might be sold in a specific transaction between specific parties on a specific date might be significantly different from the fair [market] value expressed in our report.

21. **Going Concern Assumption, No Undisclosed Contingencies.** Our analysis (i) assumes that as of the Valuation Date the Company and its assets will continue to operate as configured as a going concern; (ii) is based on the past and present financial condition of the Company and its assets as of the Valuation Date; and (iii) assumes that the Company had no undisclosed real or contingent assets or liabilities, no unusual obligations or substantial commitments, other than in the ordinary course of business, nor had any litigation pending or threatened that would have a material effect on our analysis.

22. **Reliance on Forecasted Data.** Any use of management's projections or forecasts in our analysis does not constitute an examination or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA"). We do not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines. Further, there will usually be differences between prospective and actual results because events and circumstances frequently do not occur as expected and those differences may be material.

23. **Verification of Legal Description or Title.** We have made no investigation of legal description or title and have assumed that owner(s) claims to property are valid. No consideration will be given to liens or encumbrances which may be against the property except as specifically stated as part of the financial statements you provide to us as part of this engagement. Full compliance with all applicable federal, state and local zoning, environmental, and similar laws and regulations is assumed, unless otherwise stated, and responsible ownership and competent management are assumed.

.

24. **Verification of Hazardous Conditions.** We will not investigate the extent of any hazardous substances that may exist as we are not qualified to test for such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation or other hazardous substances or environmental conditions may affect the value of the property, the value will be estimated predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value. No responsibility will be assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.

25. **Condition of Property.** We assume no liability whatsoever with respect to the condition of the subject property for hidden or unapparent conditions, if any, of the subject property, subsoil or structures, and further assume no liability or responsibility whatsoever with respect to the correction of any defects which may now exist or which may develop in the future. Equipment components considered, if any, were assumed to be adequate for the needs of the property's improvements, and in good working condition, unless otherwise reported.

26. **Zoning.** It is assumed that all public and private zoning and use restrictions and regulations had been complied with, unless non-conformity was stated, defined and considered in the report.

27. **The Americans with Disabilities Act ("ADA").** The ADA became effective January 26, 1992. We will not make a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more requirements of the ADA. If so, this fact could have a negative effect upon the value of the property. Since we have no direct evidence relating to this issue, we will not consider possible non-compliance with the requirements of the ADA in estimating the value of the property.

DocuSign Envelope ID: CDAB05CC-5C7D-40BA-95E1-93B8E5B8573C

# Appendix II

## Sample representation letter

**[Actual representation letter should be printed on Client letterhead]**

Month Day, Year  of rep letter

KPMG LLP

Attn: Pragya Mishra
Suite 1400
55 Second Street
San Francisco, CA 94105

Dear Pragya Mishra:

This letter will confirm our understanding regarding certain elements of KPMG LLP's engagement to assist CURO Group Holdings Corp. ("Client" or "CURO") in valuing certain financial and intangible assets and liabilities in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 852, *Reorganizations*. The valuation was performed as of Month Day, Year.

We have reviewed your report and the related data that was used in this report. In connection with your valuation study, we have supplied you with all significant and relevant information of which we are aware. The information supplied to you includes:

- Historical financial statement data of CURO, which are audited/un-audited

- Prospective financial data related to CURO, for which we have no reason to dispute the underlying assumptions

- All internal presentations that describe the history, nature of business, and outlook for CURO

- Other pertinent information

We understand you have relied on the aforementioned information and upon discussions with employees of CURO during your engagement and that you have not undertaken any procedures to verify the accuracy or completeness of this information. We understand that you express no opinion as to the fairness of the presentation of the aforementioned information and that any alterations or modifications to this information could materially affect your findings.

We have no reason to dispute the underlying financial information upon which you relied in your analysis. We understand that your findings are to be relied upon solely in connection with the circumstances set forth in your engagement contract.

We confirm that the valuation report is not supporting a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

Sincerely,

CURO Group Holdings Corp.